cash flow performance of the investment-grade ABSs, investment-grade CDOs and other investment-grade assets selected by the Investment Manager in its capacity as collateral manager of the Repackaging Vehicles (in such capacity, the "Repackaging Vehicle Collateral Manager"). The ability of a Repackaging Vehicle Collateral Manager to manage the assets of each Repackaging Vehicle will be restricted by the guidelines set forth in the operative documents relating to such Repackaging Vehicle. Repackaging Vehicle Junior Interests may be held directly or indirectly through an investment in a structured product that invests all or a substantial portion of its assets in Repackaging Vehicle Junior Interests. Such an investment will be considered to be a direct investment in the Repackaging Vehicle Junior Interests for the purpose of determining the portfolio limitations applicable to Repackaging Vehicle Junior Interests.

The equity securities issued by Repackaging Vehicles will generally not be secured or rated investment grade and will be subordinated to all other securities of the relevant Repackaging Vehicle and all other amounts due under the priority of payments set forth in the operative documents of such Repackaging Vehicle.

The Master Fund may also invest in other securities issued by a Repackaging Vehicle, including rated and secured securities, including investment-grade debt securities (the "Repackaging Vehicle Notes", together with the "Repackaging Vehicle Junior Interests", the "Repackaging Vehicle Securities"). In addition, all or a substantial portion of the Repackaging Vehicle Securities held by the Master Fund may be held indirectly through an investment in a secondary Repackaging Vehicle, Rampart Financial Ltd. ("Rampart"), a company incorporated under the laws of the Cayman Islands, for which BSAM and Stone Tower Debt Advisors LLC together act as investment managers. The shares of Rampart may be (but are not required to be) registered under the Securities Act and offered to, and traded by, the public. There can be no assurance that such shares will in fact be registered under the Securities Act, or if so registered, when such registration will be effective. Prospective investors should not invest in the Partnership in anticipation of any such registration of the shares.

The operative documents of Rampart and the offering documents of any other Repackaging Vehicle in which the Master Fund invests, and any operative documents referred to therein will, subject to any confidentiality requirements imposed on the Master Fund, be sent to Limited Partners and prospective investors without charge upon request to the General Partner at Bear Stearns Asset Management Inc., 383 Madison Avenue, New York, New York 10179, Attention: Alternative Fund Services; telephone: 212-272-1630; facsimile: 917-849-3018.

The Partnership will also seek to generate returns by engaging in structured finance capital structure arbitrage transactions. In these transactions the Partnership will purchase structured finance securities that the Investment Manager believes can be restructured in a more efficient manner. The Partnership will realize a gain if the restructured securities are then sold or valued at market prices above the aggregate level of the securities prior to the restructuring.

The Investment Manager carries out the Master Fund's investment process and risk control procedures by analyzing the potential interest and principal flows on the CDO or structured finance securities owned by the Master Fund. Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. The Investment Manager also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

The returns of the Master Fund are intended to be generated primarily from the cash flow performance of the securities selected by the Investment Manager. The performance of the Master Fund will be related to trends in the credit markets, but the Investment Manager believes the Master Fund will not be highly correlated to short-term equity market returns. Additionally, the Master Fund intends to construct a portfolio that minimizes correlation with short term movements in interest rates. To accomplish this goal the Master Fund will invest primarily in floating-rate assets or fixed-rate assets with an interest rate hedge. It is the intention of the Investment Manager to hedge the exposure of any assets to interest rate changes with interest rate swaps or by selling treasuries short. The Investment Manager will attempt to keep the effective interest rate duration of the Master Fund's investment portfolio close to zero.

The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities. Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or it is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets. In addition, it is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund.

The Partnership may also enter into other transactions where the Partnership is paid to take on risks the managers believe to be negatively correlated with the principal credit risk inherent in the Partnership's principal investments. These investments are not hedges in the strict sense but the managers believe the risk/reward characteristics of these investments serve to decrease the overall volatility of the Partnership.

*BSAM also operates Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Leverage High-Grade Fund"), an investment vehicle which has an investment strategy similar to that of the Master Fund, but that is subject to certain investment restrictions and considerations relating to additional leverage that it employs that are not applicable to the Master Fund. Accordingly, the investment portfolio and strategies of the Master Fund may differ substantially from those of the Enhanced Leverage High-Grade Fund.*

### Leverage and Credit Hedges

The Master Fund will borrow money to enable it to invest in securities whose market value exceeds 100% of the net asset value of the Master Fund. As the Master Fund purchases primarily highly rated investment-grade assets, the Master Fund will be capable of using leverage to invest in securities (excluding Repackaging Vehicle Junior Interests) with an aggregate value of as much as fifteen times the net asset value of the Master Fund. It is the intention of the Investment Manager, however, to limit Net Leverage to ten times the Net Asset Value. "Net Leverage" is defined as the total market value of the Master Fund's investments, excluding the Repackaging Vehicle Junior Interests, less the notional value of the Master Fund's credit default swap hedges, adjusted for the duration of these hedges, divided by the net asset value of the Master Fund, excluding the market value of Repackaging Vehicle Junior Interests. The Master Fund will primarily use repurchase agreements to finance its direct purchases of CDOs and other ABSs, although the Master Fund may use other forms of financing or leverage, including total return swaps and other derivative transactions. The Master Fund may also borrow money to facilitate redemptions or for other liquidity purposes.

It is anticipated that a substantial portion (as of the date of this Memorandum, approximately 30%) of the Master Fund's repurchase agreements will be entered into through a deposit agreement with one or more counterparties, pursuant to which the Master Fund will deposit an amount with the relevant counterparty and direct all or a portion of such funds to be invested in securities that are leveraged through the repo market. Dresdner Bank AG London Branch is the sole initial deposit agreement counterparty.

As mentioned above, the Master Fund will use credit-default swaps to hedge some of its credit exposure. A credit-default swap is a derivative contract where one party (the protection buyer) pays an annual premium to another party (the credit protection seller) in exchange for the right to receive a compensatory payment if a specified credit suffers a default or credit event. Credit default swaps will be used by the Master Fund to hedge credit exposure. A substantial portion of the Master Fund's credit default swap hedges may be general portfolio hedges that do not hedge a specific asset held by the Master Fund.

The Partnership will also use other instruments and strategies to hedge potential market volatility. These instruments and strategies include options, futures and short positions on various financial indices or individual securities where the managers believe there is an opportunity to limit volatility in a negative market scenario.

**Leverage of the Repackaging Vehicle Junior Interests**

In addition to the leverage employed by the Master Fund in its direct investments in highly rated investment-grade assets, as measured by Net Leverage, the Master Fund will effectively be using leverage by purchasing Repackaging Vehicle Junior Interests to gain exposure to the highly rated investment-grade assets of the Repackaging Vehicle.

Traditional leverage used in repurchase agreement financing is sensitive to the market price volatility of the assets being financed. If the market price of the assets being financed deteriorates, the Master Fund may be required to post additional margin or, if sufficient margin is not available, may be required to sell a financed position. This form of financing is typically called "mark-to-market recourse financing" because the repurchase counterparty uses the mark-to-market price of the financed assets to determine whether to call for additional margin. Under the arrangements for such financing, the repurchase counterparty has recourse to the assets of the Master Fund used to secure the financing. The leverage inherent in the Repackaging Vehicle Junior Interests, by contrast, may be characterized as "non-mark-to-market" and " non-recourse", as the Repackaging Vehicle does not have the right, upon the deterioration of the market price of its assets, to require additional capital from, and generally has no recourse to the assets of, the holders of Repackaging Vehicle Junior Interests. The initial Repackaging Vehicle Junior Interest capital contribution required by a Repackaging Vehicle is determined by, among other factors, the ratings quality and diversity of the assets held by the Repackaging Vehicle. If the total par amount of assets purchased by a Repackaging Vehicle were divided by the initial capital contribution of the Repackaging Vehicle Junior Interests, the result would be a leverage ratio of approximately 60-to-1. This mathematical ratio is substantially greater than both the gross leverage and Net Leverage ratios targeted by the Master Fund for the portion of its investment portfolio that does not include the Repackaging Vehicle Junior Assets. The Investment Manager anticipates, however, that the risk-adjusted return of Repackaging Vehicle Junior Interests will generally exceed the risk-adjusted return on assets financed under repurchase agreements or other forms of financing.

**Permitted Investments**

The Master Fund intends to concentrate its investments in the investment-grade classes of structured finance securities. For all investments (excluding Repackaging Vehicle Junior Interests) the Master Fund has targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA- by Standard & Poor's, from Aaa to Aa3 by Moody's or from AAA to AA- by Fitch. The 10% balance of the portfolio (excluding Repackaging Vehicle Junior Interests) may be rated below such ratings or be unrated. The above percentages are target concentrations only. The Master Fund will not be required to sell any security that is downgraded subsequent to its purchase by the Master Fund. It is anticipated that no more than 30% of the Master Fund's Net Asset Value will be invested in Repackaging Vehicle Junior Interests at the time any Repackaging Vehicle Junior Interest investment is made. The Repackaging Vehicle Junior Interests will generally not be rated.

The Master Fund's Memorandum and Articles of Association generally permit investments in any and all securities, including but not limited to stocks, bonds, warrants, notes, debentures (whether subordinated, convertible or otherwise), money market funds, commercial paper, certificates of deposit, obligations of the United States or any state thereof or of foreign governments (or any instrumentality thereof), bank debt, partnership interests, whether publicly offered or pursuant to private placements, as well as futures, swaps, forward and option contracts and other derivatives, whether or not traded or on an organized exchange.

*The descriptions contained herein of specific investment strategies and methods that may be engaged in by the Master Fund should not be understood as in any way limiting the Investment Manager's investment activities. The Master Fund may engage in investment strategies and methods not described herein that the Investment Manager considers appropriate; provided, however, that the Limited Partners will receive advance notice of any material change in the Master Fund's overall strategy or approach.*

*The Master Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objectives of the Master Fund will be achieved or that the Partnership will not incur substantial losses.*

## CERTAIN RISK FACTORS

*There is a high degree of risk associated with an investment in the Partnership and an investment in the Partnership should only be made after consultation with independent qualified sources of investment and tax advice. References to the Partnership or the Partnership's investments and portfolio in the following summary of risks refer to the combined risks relating to the investments and portfolio of the Partnership, the Master Fund and the Other Feeder Funds and references to the General Partner and its investment strategy and operations refer to Bear Stearns Asset Management Inc. as both General Partner of the Partnership and investment manager of the Master Fund, and its roles in connection with each respectively, unless the context suggests otherwise. Among the risks involved with an investment in the Partnership are the following:*

### Potential Loss of Investment

No guarantee or representation is made that the Partnership's investment program will be successful. In particular, the past results of the General Partner are not necessarily indicative of the future performance of the Partnership. As is true of any investment, there is a risk that an investment in the Partnership will be lost entirely or in part. The Partnership is not a complete investment program and should represent only a portion of an investor's portfolio management strategy.

### Leverage

The Partnership invests on a highly leveraged basis. The more leverage is employed, the more likely a substantial change will occur in the value of the Partnership. Accordingly, any event which adversely affects the value of an investment would be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to any investments in a market that moves adversely to such investments could result in a substantial loss which would be greater than if the investments were not leveraged. In addition, trading on margin will result in interest charges to the Partnership.

The Partnership will primarily be using repurchase agreements to finance its direct purchases of structured finance securities (other than Repackaging Vehicle Junior Interests), although the Partnership may use other forms of financing or leverage, including total return swaps, other derivative transactions and credit facilities. Repurchase agreements and total return swap financing entail significant financial risks, including the potential risk of loss of initial margin and additional amounts that may be required to be posted with the counterparty to the repurchase agreement or total return swap, as applicable, in connection with a particular transaction.

If the market value of securities purchased by the counterparty under a repurchase agreement (the "Purchased Securities") declines, the Partnership will be required to deliver additional margin. If additional margin is not properly posted, the counterparty to the repurchase agreement may declare that an event of default has occurred and sell all or a portion of the securities that are subject to the repurchase transaction. In addition, the Partnership will be responsible for any shortfall after such sale.

The Partnership will be required to repurchase the Purchased Securities on a specified repurchase date. If the Partnership fails to repurchase the Purchased Securities, the repurchase counterparty may declare an event of default under the repurchase agreement and sell the Purchased Securities. As a result, the Partnership may suffer the loss of some or all of its investment. Repurchase agreements generally do not provide for a right to early termination. Therefore, if a repurchase agreement counterparty agrees to an early termination of a repurchase transaction, the Partnership may be required to pay a transaction breakage fee and suffer a substantial loss. The repurchase agreements contemplated by the Partnership will be for terms of one month, three months or six months. The repurchase agreement counterparty is under no obligation to enter into new repurchase agreements with the Partnership. The inability of the Partnership to roll a repurchase agreement would require the Partnership to sell securities which may lead to a substantial loss.

Under a total return swap, the Partnership will be obligated to make certain periodic payments in exchange for the total return on a referenced asset, including coupons, interest and the gain or loss on such asset over the term of the swap. The Partnership may be required to maintain collateral with the total return swap counterparty. If the Partnership fails to fulfill its payment obligations or fails to post any required collateral under a total return swap, the total return swap counterparty may declare an event of default and, as a result, the Partnership may be required to pay swap breakage fees, suffer the loss of the amounts paid to the counterparty and forego the receipt from the counterparty of further total return swap payments. For additional risks relating to total return swaps, see "— *Other Investment Related Risks — OTC Derivatives*".

The Partnership has a targeted Net Leverage of 10 to 1 for the portion of the Master Fund's investments that are made in investments other than Repackaging Vehicle Junior Interest investments. "Net Leverage" is defined as the total market value of the Master Fund's investments, excluding Repackaging Vehicle Junior Interests, less the notional value of the Master Fund's credit default swap hedges, adjusted for the duration of these hedges, divided by the net asset value of the Master Fund, excluding the market value of Repackaging Vehicle Junior Interests. The gross leverage of the Partnership (leverage without subtracting the notional value of the credit default swaps) measured in the same manner as Net Leverage, above, will be higher than 10 to 1. To the extent that the credit default swap hedges in the portfolio do not perform as expected, and to the extent that the Partnership is exposed to additional credit default swap counterparty credit risks, the price volatility of the Partnership may be substantially more severe than indicated by a Net Leverage ratio of 10 to 1.

In addition to the direct financing by the Master Fund of its investments in CDOs and other assets, the investment in Repackaging Vehicle Junior Interests will expose the Master Fund to the highly leveraged investments in the collateral securing the other Repackaging Vehicle Securities and obligations. Due to the leverage inherent in the Repackaging Vehicle structure, changes in the value of the Repackaging Vehicle Junior Interests could be greater than the changes in the values of the underlying collateral, the assets constituting which are subject to, among other things, credit and liquidity risk. Investors must consider with particular care the risks of leverage in Repackaging Vehicle Junior Interests because, although the use of leverage creates an opportunity for substantial returns for the Master Fund on the Repackaging Vehicle Junior Interests, it increases substantially the likelihood that the Master Fund could lose its entire investment in Repackaging Vehicle Junior Interests if the pool of collateral held by the relevant Repackaging Vehicle is adversely affected by market developments.

**CDO Investment Related Risks**

The market value of CDOs will generally fluctuate with, among other things, the financial condition of the obligors on the underlying debt obligations or, with respect to Synthetic Securities, of the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. Prospective investors must understand that securities otherwise outside the Master Fund's investment parameters as described in this Memorandum (for example, bank loans, high-yield and mezzanine debt securities) may constitute all or a significant portion of the underlying securities held by a CDO, Synthetic Security or other investment of the Master Fund and that CDOs are therefore subject to risks particular to such securities.

CDOs are subject to credit, liquidity and interest rate risks. In particular, investment-grade CDOs will have greater liquidity risk than investment grade sovereign or corporate bonds. There is no established, liquid secondary market for many of the CDO securities the Master Fund may purchase. The lack of such an established, liquid secondary market may have an adverse effect on the market value of such CDO securities and the Master Fund's ability to sell them. Further, CDOs will be subject to certain transfer restrictions that may further restrict liquidity. Therefore, no assurance can be given that if the Master Fund were to dispose of a particular CDO held by the Master Fund, it could dispose of such investment at the previously prevailing market price.

The performance of CDOs will be adversely affected by macroeconomic factors, including (i) general economic conditions affecting capital markets and participants therein, (ii) the economic downturns and uncertainties affecting economies and capital markets worldwide, (iii) the effects of, and disruptions and uncertainties resulting from, the terrorist attacks of September 11, 2001 and the actual and potential military responses thereto and other consequences thereof and similar events, (iv) recent concern about financial performance, accounting and other

issues relating to various publicly traded companies and (v) recent and proposed changes in accounting and reporting standards and bankruptcy legislation.

As used herein, the following terms have the following meanings:

"Synthetic Security" is any derivative financial instrument with respect to a debt instrument, whether in the form of a swap transaction, structured bond investment or otherwise purchased or entered into, by the Master Fund with or from a synthetic security counterparty, which investment contains similar probability of default, recovery upon default (or a specific percentage thereof) and expected loss characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the synthetic security counterparty), but which will contain a maturity, interest rate and other non-credit characteristics that may be different from the Reference Obligation to which the credit risk of the Synthetic Security relates.

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Reference Obligor" means the obligor on a Reference Obligation.

*Synthetic Securities*. In addition to the credit risks associated with holding senior bank loans and high-yield debt securities, with respect to Synthetic Securities, the Master Fund will usually have a contractual relationship only with the counterparty of such Synthetic Security, and not with the Reference Obligor of the Reference Obligation. The Master Fund generally will have no right to directly enforce compliance by the Reference Obligor with the terms of the Reference Obligation nor will it have any rights of setoff against the Reference Obligor or rights with respect to the Reference Obligation. The Master Fund will not directly benefit from the collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of such Reference Obligation. In addition, in the event of the insolvency of the counterparty, the Master Fund will be treated as a general creditor of such counterparty, and will not have any claim with respect to the Reference Obligation. Consequently, the Master Fund will be subject to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, concentrations of Synthetic Securities in any one counterparty subject the Securities to an additional degree of risk with respect to defaults by such counterparty as well as by the Reference Obligor.

*Structured Finance Securities*. The Master Fund may invest in trust certificates or similar securities of the type generally considered to be "repackaged securities". Structured Finance Securities may present risks similar to those of the other types of CDOs in which the Master Fund may invest and, in fact, such risks may be of greater significance in the case of Structured Finance Securities. Moreover, investing in Structured Finance Securities may entail a variety of unique risks. Among other risks, Structured Finance Securities may be subject to prepayment risks, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may depend upon any associated interest rate hedging agreement providing for the exchange of interest accruing on the security being repackaged into interest stated to be payable on the trust certificate or similar securities). In addition, the performance of a Structured Finance Security will be affected by a variety of factors, including the level and timing of payments and recoveries on, the characteristics and the adequacy of, and the ability to realize upon, any related collateral.

*Insolvency of Issuers of CDOs*. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of a U.S. issuer of a CDO, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CDO and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they matured, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the issuer or to recover amounts previously paid by the issuer in satisfaction of such indebtedness. The measure of insolvency for this purpose varies. Generally, an issuer would be considered insolvent at a particular time if the sum of its debts was then greater than all of its property at a fair valuation or if the present fair saleable value of its assets was then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the issuer was insolvent after giving effect to the incurrence of the indebtedness constituting the CDO or that, regardless of the method of valuation, a court would not determine that the issuer was insolvent upon

giving effect to such incurrence. In addition, in the event of the insolvency of an issuer of a CDO, payments made on such CDO could be subject to avoidance as a preference if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CDO are voidable, whether as fraudulent conveyances or preferences, such payments can be recaptured.

The preceding description applies only to issuers of CDOs organized in the United States. Insolvency considerations will differ depending on the country in which each issuer is located or domiciled and may differ depending on whether the issuer is a non-sovereign or a sovereign entity.

*Lender Liability Considerations; Equitable Subordination.* In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders or bondholders on the basis of various evolving legal theories (commonly referred to as "lender liability"). Generally, lender liability is founded upon the premise that an institutional lender or bondholder has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the borrower or issuer or has assumed a degree of control over the borrower or issuer resulting in the creation of a fiduciary duty owed to the borrower or issuer or its other creditors or stockholders.

In addition, under common law principles that in some cases form the basis for lender liability claims, if a lender or bondholder (a) intentionally takes an action that results in the undercapitalization of an obligor to the detriment of other creditors of such obligor, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a lender or bondholder to dominate or control an obligor to the detriment of other creditors of such obligor, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors, which remedial action is called "equitable subordination". Because of the nature of CDOs, the Master Fund may be subject to claims from creditors of an obligor that debt obligations issued by such obligor that are held by the Master Fund should be equitably subordinated.

The preceding discussion is based upon principles of U.S. federal and state laws. Insofar as debt obligations issued by non-U.S. issuers are concerned, the laws of certain foreign jurisdictions may impose liability upon lenders or bondholders under factual circumstances similar to those described above, with consequences that may or may not be analogous to those described above under U.S. federal and state laws.

*Ineffectiveness of Credit Hedges.* The Master Fund may use credit default swaps to hedge a portion of the credit risk in the portfolio. The credit default swaps will generally not hedge a specific position but will hedge exposure to a group of credits that the Investment Manager believes to reflect the credit markets in general. It is possible these credit hedges will not be correlated with the portfolio as intended which will lead to a greater decline in the portfolio's value than that anticipated by the Investment Manager.

### Risks Related to an Investment in Repackaging Vehicle Junior Interests

The Repackaging Vehicle Junior Interests will represent equity interests in the relevant Repackaging Vehicle only and are not secured by any assets of such Repackaging Vehicle. Repackaging Vehicle Junior Interests will be subordinated to all other securities of the Repackaging Vehicle and all other amounts due under the priority of payments set forth in the operative documents of such Repackaging Vehicle. As such, the greatest risk of loss relating to defaults in the collateral portfolio of the Repackaging Vehicle is borne by the Repackaging Vehicle Junior Interests. The Master Fund, therefore, as holder of the Repackaging Vehicle Junior Interests, will rank behind all of the creditors, whether secured or unsecured and known or unknown, of the Repackaging Vehicle.

Each Repackaging Vehicle will be highly leveraged. The use of leverage generally magnifies the Repackaging Vehicle's risk of loss, particularly for the Repackaging Vehicle Junior Interests.

### Other Investment Related Risks

*Broad Discretion of General Partner; Potential Lack of Diversification.* There are no restrictions on the investment discretion of the General Partner except for those described under "The Investment Program" above. Accordingly, the General Partner is not restricted from investing a large portion of the assets of the Partnership in any one sector or investment.

*Evolving and New Investment Strategies.* The Investment Manager's strategies and trading techniques are continually evolving. The Investment Manager is not restricted from using the Partnership's capital to develop new strategies, even if the Investment Manager has limited experience in the type of strategy or in the markets or instruments involved. The strategies developed by the Investment Manager may not be successful and the resources devoted to the implementation of new strategies may diminish the effectiveness of the Investment Manager's implementation of the Investment Manager's established strategies.

*Lower-Rated and Unrated Securities.* While the primary focus of the Master Fund will be on highly-rated debt securities (AA- or higher), up to 10% of the investment portfolio (excluding Repackaging Vehicle Junior Interests) may be invested in lower-rated investment grade, below investment grade or unrated securities. As the Master Fund's portfolio is leveraged, such holdings may be equal to a substantial amount of the Master Fund's Net Asset Value. In fact, if the Master Fund employs Net Leverage of ten-times its Net Asset Value, the value of such securities may equal up to 100% of investors' capital. A substantial portion of the Limited Partners' investment may therefore be exposed to the credit risks and potentially greater volatility inherent in such securities.

*Directional Trading.* Certain of the positions taken by the Master Fund are designed to profit from forecasting absolute price movements in a particular instrument. Predicting future prices is inherently uncertain and the losses incurred, if the market moves against a position, will often not be hedged. The speculative aspect of attempting to predict absolute price movements is generally perceived to exceed that involved in attempting to predict relative price fluctuations.

*Hybrid and Other Strategies.* Many of the strategies executed by the Investment Manager combine elements of more than one general strategy type. Often, in the course of implementing a particular strategy an opportunistic trade representing a different trading approach will be made. For example, in seeking to exploit a relatively mispriced pair of assets, the Investment Manager may conclude that an asset is sufficiently over- or underpriced to merit taking an outright directional position.

The Investment Manager's approach combines a range of different trading techniques, implementing different strategies in different markets as well as combining different strategies, in the same or related markets.

The Investment Manager will continually develop new, and adapt and refine existing, strategies. There is no material limitation on the strategies that the Investment Manager may apply and no assurance as to which types of strategies may be applied at any one time.

*Equities.* Equity securities in which the Partnership invests may involve substantial risks and may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses.

*Short Sales.* The Partnership will enter into transactions, known as "short sales", in which it sells a security it does not own in anticipation of a decline in the market value of the security. Losses from short sales are potentially unlimited. In particular, a tender offer or similar transaction in respect of a company whose securities the Partnership has sold short could cause the value of such securities to rise dramatically, resulting in substantial losses to the Partnership. Brokers may also require the Partnership to "cover" a short position at an inopportune time.

*Fixed-Income Investments.* The value of the fixed-income securities in which the Partnership may invest will change as the general levels of interest rates fluctuate. When interest rates decline, the value of the Partnership's fixed-income securities can be expected to rise. Conversely, when interest rates rise, the value of such securities can be expected to decline.

*Securities Options.* The Partnership may engage in options trading, which is speculative and involves a high degree of risk. If the Partnership purchases a put or a call option, it may lose the entire premium paid. If the Partnership writes or sells a put option, it could lose the full "strike price" of the referenced security. If the Partnership writes or sells a call option, its loss is potentially unlimited.

*Illiquid Securities.* Securities purchased by the Master Fund may lack a liquid trading market, which may result in the inability of the Master Fund to sell any such security or other investment or to close out a transaction involving a non-U.S. currency or the sale of an option, thereby forcing the Master Fund to incur potentially unlimited losses. In particular, no secondary market generally exists for Repackaging Vehicle Junior Interests and no such secondary market is expected to develop, and it may be difficult for the Master Fund to determine the value of the Repackaging Vehicle Junior Interests at any particular time. The Master Fund may therefore find it difficult or uneconomic to liquidate its investment in the Repackaging Vehicle Junior Interests at any particular time. In certain cases, the Master Fund will not be permitted to transfer majority ownership of Repackaging Vehicle Junior Interests other than to a single transferee without the prior written consent of another party with a controlling interest in the relevant Repackaging Vehicle. Investments in Repackaging Vehicle Junior Interests will be substantially less liquid than the remaining assets in the Master Fund.

While the Investment Manager anticipates that the Master Fund's investment portfolio will be sufficiently diversified and liquid to permit timely withdrawals in most market conditions, each Limited Partner should be aware that the Repackaging Vehicle Junior Interests represent a portion of the Master Fund's assets that may not be liquidated in the event of substantial withdrawals. If all other assets have been liquidated, any remaining Limited Partners may not be able to withdraw their full Interests and will maintain an equity holding in one or more Repackaging Vehicles for an extended period of time through the Partnership's continued holding of such Repackaging Vehicle Junior Interests.

*OTC Derivatives.* The Partnership may enter into swap and other over-the-counter derivative transactions involving or relating to, among other things, interest rates, currencies, or securities, and including total return swaps. A swap transaction or contract for differences is an individually negotiated, non-standardized agreement between two parties to exchange cash flows (and sometimes principal amounts) measured by different rates or prices with payments generally calculated by reference to a principal ("notional") amount or quantity. Swap contracts, contracts for differences, and other over-the-counter derivatives are not traded on exchanges; rather banks and dealers act as principals in these markets. As a result, the Partnership will be subject to the risk of the inability or refusal to perform with respect to such contracts on the part of any counterparties with which the Partnership trades. Over-the-counter derivatives may also expose the Partnership to additional liquidity risks. The over-the-counter derivatives market is generally not regulated by any United States or non-U.S. governmental authority. Participants in these markets are not required to make continuous markets in the contracts they trade.

*Repurchase Agreement Counterparty Risk.* It is anticipated that a substantial portion (as of the date of this Memorandum, approximately 30%) of the Master Fund's repurchase agreements will be entered into through a deposit agreement with one or more counterparties (each a "Deposit Agreement Counterparty"), pursuant to which the Master Fund will deposit an amount with the relevant counterparty and direct all or a portion of such funds to be invested in securities that are leveraged through the repo market. Dresdner Bank AG London Branch ("Dresdner") is the sole initial Deposit Agreement Counterparty. The performance of the Master Fund with respect to securities financed through such a deposit agreement depends on the performance by the deposit agreement counterparty of its payment obligations. If the Deposit Agreement Counterparty were to fail in its obligation to pay under the relevant deposit agreement, the Limited Partners may suffer a loss of capital. If the Deposit Agreement Counterparty has financial difficulties it may be impossible for the Master Fund to recover its deposit and thus Limited Partners may suffer a substantial loss of their investment. In the event of a bankruptcy or insolvency of the Deposit Agreement Counterparty, or any replacement or additional counterparty, the Master Fund could experience (i) a loss of any realized or unrealized profits on the Master Fund's positions and/or (ii) a partial or total loss of the funds paid as upfront payments for the relevant deposit agreement. The Master Fund may seek to obtain a "security interest" or similar interest in the securities held by the Deposit Agreement Counterparty with respect to the relevant deposit agreement in an effort to achieve priority in respect of the payment obligations of the Deposit Agreement Counterparty in the event of its bankruptcy or insolvency. There can be no assurance, however, that any "security interest" will be achieved, maintained or, in the event of bankruptcy or insolvency, respected. The obligation of the Dresdner to repay any amounts (including the any deposit amounts) under the initial deposit agreement is not

secured. The Master Fund, therefore, is likely to have the status of a "general unsecured creditor" in the event that the Dresdner is placed in liquidation rather than in reorganization.

In the relatively recent past there have been a number of high-profile failures of financial institutions due to violations or failures of interest controls, management misfeasance or malfeasance, or exposure to failed clients and counterparties (including hedge funds). Accordingly, prospective investors should understand that the failure of the Deposit Agreement Counterparty could result in a substantial delay in the return to the Master Fund of capital invested in the relevant deposit agreement, or partial or total loss of such capital.

*Suspensions of Trading.* For all securities or commodities traded on public exchanges, each exchange typically has the right to suspend or limit trading in all securities or commodities that it lists. Such a suspension could render it impossible for the Partnership to liquidate its positions and thereby expose it to losses. In addition, there is no guarantee that non-exchange markets will remain liquid enough for the Partnership to close out positions.

*Futures.* Futures markets are highly volatile and a high degree of leverage is typical of a futures trading account. As a result, a relatively small price movement in a futures contract may result in substantial losses to the Partnership. Moreover, most commodity exchanges limit fluctuations in futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits". Such regulations could prevent the Partnership from promptly liquidating unfavorable positions and thus subject the Partnership to substantial losses.

*Hedging Transactions.* The Partnership may utilize a variety of financial instruments, such as derivatives, options, interest rate swaps, caps and floors, futures, and forward contracts, both for investment purposes and for hedging purposes. Hedging involves special risks including the possible default by the other party to the transaction, illiquidity, and, to the extent the General Partner's assessment of certain market movements is incorrect, the risk that the use of hedging could result in losses greater than if hedging had not been used. Nonetheless, with respect to certain investment positions, the Partnership may not be sufficiently hedged against market fluctuations, in which case an investment position could result in a loss greater than if the Partnership had been sufficiently hedged with respect to such position. Moreover, it should be noted that the Partnership's portfolio will always be exposed to certain risks that cannot be hedged, such as credit risk (relating both to particular securities and counterparties).

*International Investing.* Investing outside the United States may involve greater risks than investing in the United States. These risks include: (i) less publicly available information; (ii) varying levels of governmental regulation and supervision; and (iii) the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies are generally not subject to uniform accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to United States companies.

Foreign markets may also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct such transactions. Delays in settlement could result in periods when assets of the Master Fund are uninvested and no return is earned thereon. The inability of the Master Fund to make intended structured credit security purchases due to settlement problems or the risk of intermediary counterparty failures could cause the Master Fund to miss investment opportunities. The inability to dispose of a structured credit security due to settlement problems could result either in losses to the Master Fund due to subsequent declines in the value of such structured credit security or, if the Master Fund has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resources self-sufficiency and balance of payments position.

*Loans of Portfolio Securities.* The Partnership may lend its portfolio securities. By doing so, the Partnership attempts to increase income through the receipt of interest on the loan. In the event of the bankruptcy of the other party to a securities loan, the Partnership could experience delays in recovering the loaned securities. To the extent that the value of the securities the Partnership lent has increased, the Partnership could experience a loss if such securities are not recovered.

*Possible Lack of Diversification.* There are no absolute diversification or concentration constraints on the Partnership. If the Partnership's portfolio becomes relatively concentrated, the value of an investment in the Partnership may be subject to greater volatility and may be more susceptible to any single economic, political, or regulatory occurrence or the fortunes of a single company or industry than would be the case if the Partnership's investments were more diversified.

*Turnover.* The Partnership will not be restricted in effecting transactions by any limitation with regard to its portfolio turnover rate. In light of the Partnership's investment objectives and policies, the Partnership's portfolio turnover rate may be substantial, which would result in significant transaction costs.

<u>Restrictions on Voting Rights of the Partnership as Holder of Repackaging Vehicle Junior Interests</u>

As the Partnership will be deemed an affiliate of BSAM under the operative documents of the Repackaging Vehicles, the Partnership will not generally be entitled to vote the Repackaging Vehicle Securities held by it in any vote under the collateral management agreement of the Repackaging Vehicle or with respect to any vote or consent on any removal of the Repackaging Vehicle Collateral Manager either for or without cause or any other amendment or modification of the indenture governing the Repackaging Vehicle Securities which increases the rights or decreases the obligations of the Repackaging Vehicle Collateral Manager, for so long as BSAM or any of its affiliates is the Repackaging Vehicle Collateral Manager. However, the Partnership will be entitled to vote the Repackaging Vehicle Securities held by it with respect to all other matters.

<u>Certain Risks Related to the General Partner</u>

*Limited Operating History.* The Partnership commenced operations on October 1, 2003 and therefore has a limited operating history. In addition, the principals of the Investment Manager responsible for the Partnership's investments have managed a separate account with an investment objective and strategy substantially similar to that of the Partnership only since March 1, 2003. The Investment Manager therefore has only a limited record of performance in managing assets similar to the Partnership's assets, and such past performance is not necessarily indicative of future performance. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

*Dependence on the General Partner and Key Personnel.* The Partnership depends on the services of the General Partner and its personnel, particularly Ralph Cioffi, Matthew Tannin and Ray McGarrigal and on relationships among the General Partner and certain key personnel of the General Partner, on the one hand, and members of The Bear Stearns Group, including the Prime Broker, on the other. Loss of the services of any key personnel, including those named herein, could materially adversely impact the Partnership (and result in its liquidation).

*Use of "Manager Marks".* As described herein under "Determination of Net Asset Value", the General Partner is permitted to establish "fair value" of non-exchange listed investments. There can be no assurance that the fair value of such investments will be fully realizable upon their ultimate disposition. Because of the inherent uncertainty of the estimated values of unrealized gains and losses, the Net Asset Value as determined by the Administrator as of the last Business Day of each month (or on such other date as the Administrator may calculate Net Asset Value) may differ significantly from the actual Net Asset Value upon liquidation of such investments, and the differences could be material. The General Partner has a conflict of interest in making any such valuations because the valuations directly effect Net Asset Value and thus the amount of compensation received by the General Partner in respect of its services. Prospective investors should understand that any such General Partner marks are not subject to independent review, except as may be done in connection with the audit at year-end. *See "Conflicts of Interest— Asset Valuation".*

*Asset Valuation-Thinly Quoted Securities and Derivatives.* As described under "Allocation of Profit and Loss—Determination of Net Asset Value", the General Partner is permitted to modify valuations in its sole and absolute discretion to reflect fair value. In so doing, the General Partner may instead rely upon another "prudent method of valuation". For example, with respect to an over-the-counter security, the General Partner, if other quotes are not available, may rely upon a single broker-dealer quotation rather than the three-dealer quotes generally required in respect of assets traded on an over-the-counter market for which market quotations are readily available. It is not unusual for broker-dealers affiliated with an issuer of a structured financed security or derivative to provide "bid" and "ask" quotations for such security on a preliminary or "soft" basis. Such preliminary quotations may or may not reflect the "bid" or "ask" prices at which such broker-dealer would be willing to effect actual transactions. Broker-dealers unaffiliated with the issuer of such security or derivative, if providing quotes, may be even less likely to execute transactions (particularly sales transactions by the Partnership) at or near preliminary quotes.

The Partnership's portfolio may include substantial positions (in terms of number of issues and percentage of the Partnership's Net Asset Value) where there is only a single broker-dealer quoting prices, which may be preliminary or "soft", and where such broker-dealer is affiliated with the issuer of such security or derivative or with the Investment Manager. It is anticipated that a number of such securities and derivatives will be executed and maintained with a Bear Stearns Entity and that such positions will be valued in reliance on quotations provided by Bear Stearns Entities in accordance with the provisions set forth under "Allocation of Profit and Loss—Determination of Net Asset Value", which may be at fair value.

In the absence of actual sale transactions, it is difficult for the General Partner to test the reliability of preliminary quotes even when multiple broker-dealers are providing "bid" and "ask" prices. *Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio securities could dramatically affect the Partnership's Net Asset Value, particularly where the Partnership seeks to sell positions, if the General Partner's or its designee's judgments regarding appropriate valuations should prove incorrect.* See *"Conflicts of Interest—Asset Valuation"* and *"Allocation of Profit and Loss—Determination of Net Asset Value".*

*Competition.* In recent years there has been a marked increase in the number of, and flow of capital into, investment vehicles established in order to implement alternative asset investment strategies, including strategies similar to the strategy to be implemented by the Partnership. While the precise effect cannot be determined, such increase may result in greater competition for investment opportunities, or may result under certain circumstances in increased price volatility or decreased liquidity with respect to certain positions. Prospective investors should understand that the Partnership may compete with other investment vehicles, as well as investment and commercial banking firms, which have substantially greater resources, in terms of financial wherewithal and research staffs, than may be available to the Partnership.

*Other Clients of the General Partner.* The General Partner manages other accounts (as described herein), some of which it may have incentives to favor over the Partnership. The General Partner is not subject to any absolute restrictions on taking new accounts, which could increase the competition for its time and adversely impact the performance of the Partnership.

*Changes in Investment Program.* The General Partner's investment program is dynamic and changes over time. Thus, the General Partner may not use the same investment program in the future that it used in the past. The specific details of the General Partner's investment program are proprietary; consequently, Limited Partners will not be able to determine the full details of those methods, or whether those methods are being followed.

*Internal Restrictions on Partnership Investments.* The General Partner and its affiliates are investment advisers to registered investment companies and similar non-U.S. registered entities that may, from time to time, trade in the same markets and securities as the Partnership. Because the General Partner has, and its affiliates and their employees may have, a financial interest in the Partnership, it is possible that the Partnership could be restricted from buying or selling securities that are under consideration for purchase or sale or that are to be bought or sold by one of the registered investment companies or other entities, either until the securities are no longer under consideration for purchase or sale by one of the registered investment companies or other entities, or for a discrete time period, depending on the extant circumstances, after such registered investment company or other entity has completed its transaction, even where doing so would be a benefit to the Partnership. If the Partnership is determined to have been trading inconsistently with its internal restrictions, the Partnership may have to unwind its

transaction or, alternatively, disgorge its profit from the transaction. The Partnership will disgorge any such profits from each Capital Account, upon notification from compliance officers of the General Partner, based upon a method deemed prudent and practicable by the compliance officer, which may include *pro rata*, without regard to when a Limited Partner may have entered the Partnership.

**Certain Risks Related to Partnership's Structure**

*Conflicts of Interest.* The Partnership is subject to certain conflicts of interest. *See "Conflicts of Interest".*

*Charges to the Partnership.* The Partnership is obligated to pay certain fees and expenses, including an Advisory Fee, brokerage commissions and other costs and expenses associated with the acquisition and disposition of investments, and operating costs and expenses, irrespective of profitability. There can be no assurance that the Partnership will be able to earn sufficient income to offset these charges.

*Profit Share.* The General Partner could receive substantial allocations if the Partnership generates Net New Income. Prospective investors should note that (i) the fact that the Profit Share is payable only out of Net New Income may create an incentive for the General Partner to make investments that are riskier or more speculative than would be the case if the General Partner were compensated solely based on a flat percentage of capital and (ii) the General Partner may receive increased allocations because the Profit Share will be calculated on a basis that includes unrealized appreciation as well as realized gains. If a Profit Share is allocated to the General Partner in respect of a Limited Partner's Capital Account and a loss is subsequently charged to such Capital Account, the General Partner is entitled to retain all Profit Shares previously allocated to it in respect of that account. In addition, any withdrawal fee payable to the Partnership by a Limited Partner will increase the return, if any, on remaining Capital Accounts and thereby also increasing the Profit Share (if any) allocable to the General Partner.

*Limited Partners Will Not Participate in Management.* A Limited Partner has no right to participate in the management of the Partnership or in the conduct of its business. There exists broad discretion to expand, revise, or contract the Partnership's business without the consent of the Limited Partners. Any decision to engage in a new activity could result in the exposure of the Partnership's capital to additional risks which may be substantial. Under certain circumstances, however, the Limited Partners may elect to remove the General Partner. See "Removal of the General Partner".

*Limited Liquidity of the Interests.* There is no public market for the transfer of Interests and Interests may not be transferred without the approval of the General Partner. Withdrawals are permitted only at month-end on 40 days' prior written notice, subject to a withdrawal fee of 2% of the amount withdrawn, and, as of the last Business Day of the twelfth month-end following any capital contribution and every subsequent third month-end following the first year anniversary of any capital contribution, on 60 days' prior written notice without being subject to any withdrawal fee, and the General Partner may suspend the determination of Net Asset Value and withdrawals under certain circumstances, including the closure or suspension of trading on any relevant exchange or a breakdown in the means normally employed by the Partnership to value assets. Further, the Partnership may make distributions in kind rather than in cash.

*Possible Effect of Withdrawals.* Substantial withdrawal requests could require the Partnership to liquidate its positions more rapidly than otherwise desirable to raise the necessary cash to fund withdrawals and achieve a market position appropriately reflecting a smaller asset base. These factors could adversely affect the Partnership's Net Asset Value.

*Mandatory Withdrawal.* The General Partner may compel the withdrawal of any Limited Partner from the Partnership, in whole or in part, at any time without notice, if the General Partner reasonably believes that such Limited Partner subscribed for an Interest as a result of a misrepresentation or if such Limited Partner's continued participation in the Partnership would, in the reasonable judgment of the General Partner, put the Partnership or the other Limited Partners at a material tax, legal, regulatory, or pecuniary disadvantage or at any time upon 90 days' prior written notice if such Limited Partner's continued participation in the Partnership would, in the reasonable judgment of the General Partner, put the Partnership or the other Limited Partners at a material administrative disadvantage.

*Possible Indemnification Obligations.* The Partnership is generally obligated to indemnify the General Partner, the Administrator and possibly other parties under the various agreements entered into with such persons against any liability they or their respective affiliates may incur in connection with their relationship with the Partnership.

*Contingent Liabilities.* The General Partner has the power to establish such reserves for unknown or contingent liabilities as it may deem advisable. This could occur, for example, if some of the Partnership's positions were illiquid, if there are any assets that cannot be properly valued on the Withdrawal Date, or if there is any pending transaction or claim by or against the Partnership involving or that may affect the book value of the Interest of a withdrawing Limited Partner or the obligations of a withdrawing Limited Partner which cannot be then ascertained.

*Lack of Independent Experts Representing Investors.* The Advisory Fee and Profit Share have not been negotiated at arm's length. Further, while the General Partner has consulted with counsel, accountants, and other experts regarding the structure and terms of the Partnership, such counsel does not represent the Partnership or the Limited Partners. The Partnership and the General Partner urge each prospective investor to consult its own legal, tax, and financial advisers regarding the desirability of purchasing Interests and the suitability of an investment in the Partnership.

*Institutional Risk.* Institutions, such as brokerage firms, banks, and broker-dealers, generally have custody of the Partnership's portfolio assets and may hold such assets in "street name". Bankruptcy or fraud at one of these institutions could impair the operational capabilities or the capital position of the Partnership. The Partnership attempts to limit its investment transactions to well-capitalized and established banks and brokerage firms in an effort to mitigate such risks.

Notwithstanding the foregoing, markets in which the General Partner may effect transactions (e.g., credit default risk swaps) may include OTC or "interdealer" markets, and may also include unregulated private markets. The participants in such markets are typically not subject to the same level of credit evaluation and regulatory oversight as are members of the exchange-based markets. This exposes the Partnership to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Partnership to suffer a loss. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the General Partner has concentrated its transactions with a single or small group of counterparties. The General Partner is not restricted from dealing with any particular counterparty or from concentrating any or all transactions with one counterparty. The ability of the General Partner to transact business with any one or number of counterparties, the lack of any meaningful or independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Partnership.

**Other Risks**

*Risks Relating to Absence of, and Changes in, Statutory Regulation.* The Partnership is not registered under the Company Act or under the Commodity Exchange Act. Limited Partners, therefore, are not accorded the protective measures resulting from registration under such legislation. The Partnership may trade on certain foreign security exchanges as well as over-the-counter markets. Such exchanges and markets are not subject to regulation by any U.S. governmental agency and, accordingly, the protections afforded by such regulation will not be available to such investments.

*Regulatory Change.* The regulation of the U.S. and non-U.S. securities and derivatives markets and of investment funds such as the Partnership has undergone substantial change in recent years, and such change is expected to continue for the foreseeable future. The effect of regulatory change on the Partnership, while impossible to predict, could be substantial and adverse.

*General Economic and Financial Conditions.* The success of any investment activity is influenced by general economic and financial conditions that may affect the level and volatility of equity prices, interest rates, and the extent and timing of investor participation in the markets for both equity and interest-rate-sensitive securities. Unexpected volatility, illiquidity, governmental action, currency devaluation, or other events in global markets in

which the Partnership directly or indirectly holds positions could impair the Partnership's ability to carry out its business and could cause the Partnership to incur substantial losses.

***Tax Risk Factors.*** There are a number of tax risk factors associated with an investment in the Partnership. *See* "*Certain U.S. Federal Income Tax Considerations*".

INTERESTS ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY ARE SUITABLE ONLY FOR PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING.

## CONFLICTS OF INTEREST

The following inherent and potential conflicts of interest exist in respect of the Partnership.

### Compensation

The Partnership Agreement has not been negotiated at arm's length. The Advisory Fee payable to the General Partner and any brokerage commissions payable to Bear, Stearns Securities Corp. and, as applicable, Bear, Stearns International Limited and/or other members of the group of companies (each such member (but specifically not including the General Partner), a "Bear Stearns Entity") directly or indirectly owned by BSC (collectively, the "The Bear Stearns Group") are payable without regard to the overall success of or income earned by the Partnership.

### Appointment

The General Partner as general partner has an apparent conflict of interest between its fiduciary duty to the Partnership as general partner and its selection of itself as the Partnership's General Partner. Prospective investors must recognize that the Partnership has been formed specifically as an investment product to be managed by the General Partner, and that the General Partner will not appoint any other investment manager for the Partnership or the Master Fund even if doing so might be in the Partnership's best interests.

### Advisory Time

The General Partner and its affiliates and their key personnel will devote as much of their time to the business of the Partnership and the Master Fund as in their judgment is reasonably required. However, they are presently committed to and expect to be committed in the future to providing investment advisory services and securities research and brokerage services for other clients (including other pooled accounts) and engage in other business ventures in which the Partnership and the Limited Partners have no interest. As a result of these separate business activities, the General Partner may have conflicts of interest in allocating management time, services, and functions among the Partnership and other business ventures or clients.

In particular, Ralph Cioffi, Matthew Tannin and certain other members of the management team are responsible for managing the sizeable investment portfolio underlying certain other funds that focus primarily on leveraged investments in structured finance securities, including the Enhanced Leverage High-Grade Fund. In addition, as of the date of this Memorandum, Mr. Cioffi, Mr. Tannin and other members of the management team are involved in the establishment of, and will continue to manage, a derivatives product company, the primary strategy of which is to write credit default swap protection on a portfolio of debt instruments, and Rampart. BSAM, including certain members of the management team, also manages substantial investment portfolios for multiple CDOs.

### Other Clients; Allocation of Investment Opportunities

The General Partner is responsible for the investment decisions made on behalf of the Partnership and the Master Fund. There are no restrictions on the ability of the General Partner and its affiliates to manage accounts of other clients following the same or different investment objective, philosophy, and strategy as those used for the Partnership. In fact, the General Partner and its affiliates currently manage and expect to continue to manage other

portfolios that may invest pursuant to the same or different strategies as those employed by the Partnership. If a determination is made that the Partnership and another client of the General Partner and its affiliates should trade in the same securities on the same day, such securities will be allocated between the Partnership and other accounts in a manner that the General Partner and its affiliates determine in their discretion. Circumstances may occur in which an allocation could have adverse effects on the Partnership or the other client with respect to the price or size of securities positions obtainable or saleable. The results of the Partnership's activities may differ significantly from the results achieved by the Investment Manager or its affiliates for any other accounts or clients for which it or its affiliates may manage or provide investment advisory services.

More specifically, the General Partner and its related persons may buy and sell, for their own accounts, and hold proprietary positions in, the same securities they buy and sell for, or recommend to, the General Partner's clients. For example, the General Partner may purchase equity in CDOs for which it is providing investment management services.

As these situations may involve conflicts between the interest of the General Partner or its related persons, on the one hand, and the interests of the General Partner's clients, on the other, the General Partner has established internal policies to ensure that the General Partner and its personnel do not prefer their own interests to those of the General Partner's clients and that clients are treated fairly.

In addition, Ralph Cioffi, the senior portfolio manager of the General Partner, may from time to time on behalf of BSAM engage a broker-dealer affiliate of the General Partner to take advantage of structural arbitrage opportunities in connection with the "unwinding" of certain structured finance transactions. Such opportunities arise when the General Partner recognizes that the market value of the collateral that supports the debt securities of a structured finance transaction exceeds the cost to purchase such debt securities. By purchasing such securities and selling the collateral, the General Partner may "unwind" the structured finance transaction and realize profit from such excess of the collateral's value. BSAM will be compensated for such arbitrage transactions on an ad hoc basis. A conflict of interest would arise where BSAM receives a fee for engaging in an unwind transaction that relates to structured finance securities held by the Master Fund. However, if BSAM would receive a fee in connection with such transaction, the Partnership's portfolio managers will refer the compensation arrangement to BSAM's ethics committee for its determination of how to balance the interests of the Partnership with those of BSAM in accordance with BSAM's policies regarding conflicts.

**Proprietary Trading**

The General Partner and its principals, affiliates, and employees may trade in the securities and derivatives markets for their own accounts and the accounts of their clients, and in doing so may take positions opposite to, or ahead of, those held by the Partnership or may be competing with the Partnership for positions in the marketplace. Such trading may result in competition for investment opportunities or create other conflicts of interest on behalf of one or more such persons in respect of their obligations to the Partnership. Records of this trading will not be available for inspection by Limited Partners.

Bear Stearns and its affiliates are engaged in a broad spectrum of activities, including financial advisory activities and has extensive activities that are independent from and may from time to time conflict with those of the Partnership. Bear Stearns and its affiliates are actively engaged in transactions in the same securities and instruments in which the assets of the Partnership may be invested. Subject to applicable law, Bear Stearns and/or its affiliates may purchase or sell securities of, or otherwise invest, finance or advise issuers in which the Partnership has an interest. Bear Stearns and/or its affiliates may have proprietary interests in, and may advise, sponsor, manage or invest in other investment vehicles that have investment objectives similar or dissimilar to those of the Partnership (including prospective investors in the Partnership) and which engage in the same types of securities and instruments as the Partnership. The proprietary activities or portfolio strategies of Bear Stearns and its affiliates or the activities or strategies used for accounts managed by Bear Stearns or its affiliates for other customer accounts could conflict with the transactions and strategies employed by the Partnership and affect the prices and availability of the securities and instruments in which the Partnership invests. Issuers of securities held by the Partnership may have publicly or privately traded securities in which Bear Stearns or its affiliates are investors or make a market. The trading activities of Bear Stearns and its affiliates generally are carried out without reference to positions held directly or indirectly by the Partnership and may have an effect on the value of the positions so held or may result in

Bear Stearns or its affiliates having an interest in the issuer adverse to that of the Partnership. The results of the Partnership's activities may differ significantly from the results achieved by Bear Stearns or its affiliates for any proprietary account or from results achieved by Bear Stearns or its affiliates for any other accounts or clients for which it may manage or provide investment advisory services.

**Brokerage Placement Practices**

The Investment Manager intends to utilize Bear, Stearns Securities Corp. ("BSSC" or the "Prime Broker"), an affiliated broker, as the Master Fund's prime broker and custodian. The Master Fund's brokerage placement practices involve certain conflicts of interest. See "Brokerage Practices".

The relationships among The Bear Stearns Group and the Investment Manager create a conflict of interest in that there exists an incentive for the Investment Manager to execute transactions with or through The Bear Stearns Group and for the Investment Manager and The Bear Stearns Group to cause the Master Fund to engage in a higher volume of trading than would exist in the absence of such relationship. However, the Investment Manager intends to make all investment decisions for the Master Fund without consideration of the brokerage commissions that may be payable to The Bear Stearns Group.

From time to time, the Partnership may utilize brokers that provide capital introduction services to the Partnership and other funds managed by the General Partner and its affiliates. Such services may result in more investors, and concomitantly more assets, in the Partnership, which may benefit both the Partnership and its Limited Partners, on the one hand, and the General Partner and its affiliates, on the other hand. Benefits to the General Partner and its affiliates are increased Management Fees and potentially higher Profit Share as a result of such potentially larger Partnership asset size. The possibility of such benefits to the General Partner and its affiliates results in a conflict of interest in its selection of such brokers and may create an incentive for the General Partner to continue to retain any such brokers. There is no guaranty that any benefits to either the Partnership and its Limited Partners or to the General Partner and its affiliates may be realized or that capital introduction services provided by any such brokers will actually increase the Partnership's assets. The Partnership, and not the General Partner, pays brokerage fees and other fees and expenses to its brokers. However, none of such fees or expenses are specifically allocable to any capital introduction services that a broker may provide.

The Master Fund is not required to allocate either a stated dollar or stated percentage of its brokerage business to any broker for any minimum time period, and will review such relationships from time to time.

The Investment Manager may, in its discretion, appoint additional or alternative prime broker(s) and custodian(s).

**Brokerage Commissions/Soft Dollars**

Generally, the Investment Manager will direct brokerage to firms which furnish or pay for quotation and/or research, research-related services, and other products and services within the "safe harbor" provided by Section 28(e) of the Exchange Act. From time to time, however, the Investment Manager may receive research and research-related services and products through arrangements in fixed price underwritings without regard to the "safe harbor" provided by Section 28(e) of the Exchange Act, provided that the Investment Manager believes such arrangements to be in the best interests of the Partnership. Such services and products are of the same type as may be acquired with soft dollars in agency trades, but are not within the safe harbor because fixed price underwritings are done on a principal basis.

The Investment Manager is expected to derive substantial direct or indirect benefit from these services, particularly to the extent the Investment Manager uses soft dollars to pay for expenses which it would otherwise be required to pay. The investment information and soft dollar benefits received from brokers may be used by the Investment Manager in servicing other accounts, and not all such information and soft dollar benefits may be used by the Investment Manager in connection with the Master Fund. The Investment Manager is not required to allocate soft dollar benefits *pro rata* or on any other equitable basis among its accounts.

In negotiating commission rates the Investment Manager will take into account the financial stability and reputation of the broker, the quality of the investment research, investment strategies, special execution capabilities, clearance, settlement, custody, recordkeeping and other services provided by such broker.

**Principal Trades and Interested Party Transactions; Cross Transactions**

Section 206(3) of the Investment Advisers Act of 1940, as amended (the "Advisers Act") provides that it is unlawful for any investment adviser, directly or indirectly "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction". Transactions subject to the foregoing requirements are sometimes referred to as "principal trades".

To the extent permitted by applicable law, the Investment Manager may enter into transactions and invest in futures, securities, currencies or other instruments (including repurchase agreements and other forms of financing) on behalf of the Master Fund in which a Bear Stearns Entity, acting as principal or as agent for its customers, serves as the counterparty. The Investment Manager may also enter into cross transactions where a Bear Stearns Entity acts as agent on behalf of the Master Fund and the other party to the transaction. Cross transactions enable the Investment Manager to purchase or sell a block of securities for the Master Fund at a set price and possibly avoid an unfavorable price movement that may be created through entrance into the market with such purchase or sell order. The relevant Bear Stearns Entity may have a potentially conflicting division of responsibilities to both parties to such cross transaction.

The purchase or sale of an investment in a transaction requiring notice and consent under the "principal trade" provisions of Section 206(3) of the Advisers Act (each, a "Principal Transaction") may be presented for the review and (i) prior approval of the independent Master Fund Directors or such other advisory party as established by the General Partner in accordance with the Partnership Agreement or (ii) the Consent of the Partnership (as defined in the Partnership Agreement), excluding from the determination of such consent any Interests held by the Investment Manager and any of its affiliates. In that connection, the Subscription Agreement of each Limited Partner provides that each Limited Partners consents and agrees that if any transaction, including any transaction effected between the Master Fund and the Investment Manager or its affiliates, is subject to the disclosure and consent requirements of Section 206(3) of the Advisers Act, such requirements will be satisfied with respect to the Master Fund and all Limited Partners if disclosure is given to, and consent obtained from, the independent Master Fund Directors or such other advisory party.

On occasion, an account advised by BSAM may sell a particular security at the same time another account advised by BSAM buys the same security. In such situations, BSAM may effect cross transactions directly between such accounts, provided that such transactions have been authorized by the accounts in question, are consistent with the investment objectives and policies of such accounts (and, if applicable, with the procedures for such transactions established by the Partnership), are, in the view of the respective portfolio managers, favorable to both sides of such transactions and are otherwise executed in accordance with applicable rules and regulations. In addition, such transactions may only be undertaken if no commissions are paid to BSAM or any affiliate thereof. Notwithstanding the foregoing, however, cross transactions between managed accounts may result in the incurrence by such accounts of custodial fees, taxes or other related expenses.

Because the Investment Manager will serve as collateral manager of the Repackaging Vehicles, the purchase of the Repackaging Vehicle Junior Interests may be deemed to be a principal trade. The Investment Manager will, therefore, make appropriate disclosure to, and obtain consent from, the members of the board of directors of the Master Fund who are not affiliated with the Investment Manager prior to the investment by the Master Fund in Repackaging Vehicle Junior Interests.

To the extent permitted by applicable law, the Partnership may purchase investments that are issued, or are the subject of an underwriting or other distribution by Bear Stearns or its affiliates. The Partnership may invest in the securities of issuers affiliated with Bear Stearns or in which Bear Stearns has an equity or participation interest. The purchase, holding and sale of such investments by the Partnership may enhance the profitability of investments

made by Bear Stearns or its affiliates. The General Partner has fiduciary responsibilities with respect to the Partnership and will make such investment decisions in a manner which is consistent with those responsibilities.

**Investment Manager's Role as Repackaging Vehicle Collateral Manager**

In managing the assets of a Repackaging Vehicle as its collateral manager, the Investment Manager will have certain responsibilities which may potentially favor the interests of the holders of Repackaging Vehicle Securities that are senior to the Repackaging Vehicle Junior Interests or otherwise conflict with the investment objectives of the Partnership. However, while it is anticipated that the investment guidelines of a Repackaging Vehicle may restrict the Collateral Manager's discretion in selecting and managing a Repackaging Vehicle's investment portfolio and limit its reinvestment period to five years, the Investment Manager anticipates that the interests of the holders of the Repackaging Vehicle Securities will generally be aligned with the interests of the Limited Partners. In addition, the Investment Manager will pay over or otherwise transfer to the Master Fund any fees to which it would otherwise be entitled as Repackaging Vehicle Collateral Manager, but will be reimbursed for any of its out-of-pocket expenses incurred in the establishment of a Repackaging Vehicle and in its ongoing operations and may be indemnified for certain losses in connection with its role as Collateral Manager.

**Asset Valuation**

The fees payable to the General Partner are based directly on the Net Asset Value of the Partnership as of various dates. There may be no public market price for a portion of the Partnership's assets. The General Partner will generally value the Partnership's assets. Any financial instruments for which market quotations are not readily available will be valued at fair value as reasonably determined in good faith by the General Partner. The General Partner will have a conflict of interest in making such valuations because the valuations directly affect the Net Asset Value of the Partnership and thus the amount of the Advisory Fee and the Profit Share that the General Partner receives in respect of its services. Such valuations, however, will be performed by the General Partner in accordance with the methodology described in this Memorandum.

**Material Non-Public Information**

By reason of the advisory, investment banking, market-making and/or other activities of the General Partner and its affiliates, the General Partner and its affiliates may acquire confidential or material non-public information or be restricted by internal policies from initiating transactions in certain securities. The General Partner will not be free to divulge, or to act upon, any such confidential or material non-public information and, due to these restrictions, it may not be able to initiate or recommend certain types of transactions in certain securities or instruments for the Partnership's account that it otherwise might have initiated. The Partnership may be frozen in an investment position that it otherwise might have liquidated or closed out.

**Borrowing Arrangements**

Certain conflicts of interest may arise should the Partnership or the Master Fund enter into borrowing arrangements with any member of The Bear Stearns Group. In such situations, the General Partner has a conflict between its obligation to act in the best interests of the Limited Partners and any interest it may have in generating fees and other revenues for itself or its affiliates. Such arrangements may create other conflicts of interest since such financing and other transactions could, in certain circumstances, negatively impact the Partnership if the terms were made less favorable or if they were reduced or terminated and such member of The Bear Stearns Group may keep any profits, commissions and fees accruing in connection with such financing, In addition, in the event of adverse investment performance, the interest of such member in exercising available remedies may conflict with the interests of the Partnership. For instance, in its capacity as lender or counterparty, such member may take actions, such as foreclosing on collateral, that may have a material adverse affect on the Partnership. The Partnership will not be entitled to, and may not receive, any special consideration or forbearance by such member in the exercise of such member's rights, as a result of the Partnership's relationship with The Bear Stearns Group. If the General Partner engages in repurchase agreements with a Bear Stearns Entity, the terms of any particular transaction, including any pricing rate, repurchase price or margin percentages negotiated with the relevant Bear Stearns Entity may not individually or in the aggregate be the most favorable available.

**Cash Balance Investments**

The General Partner may invest a portion, and reserves the right in the future to invest all or substantially all, of the Partnership's short-term cash investments in money market funds advised and/or distributed by Bear Stearns or its affiliates. In such instances, each Limited Partner will bear, indirectly, its proportionate share of any investment advisory, distribution and other fees and expenses paid by the Partnership and Bear Stearns or its affiliates will earn additional compensation in connection with such investments. Such advisory, distribution and other fees and expenses will be in addition to any management fees, profit share and other expenses payable in respect of such Limited Partner's investment in the Partnership.

## THE GENERAL PARTNER AND INVESTMENT MANAGER

**General Partner of the Partnership**

Bear Stearns Asset Management Inc., a corporation formed under the laws of the State of New York, is the General Partner of the Partnership. The General Partner is generally responsible for the operation of the Partnership, including investment management responsibilities, but has delegated certain administrative duties to the Administrator.

The General Partner is registered with the SEC as an investment adviser under the Advisers Act. A copy of the General Partner's Form ADV, Part II is being delivered to investors in connection with the delivery of this Memorandum.

The General Partner is a wholly owned subsidiary of BSC. Affiliates of the General Partner, including Bear, Stearns & Co. Inc. ("Bear Stearns"), are engaged, among other things, in the business of providing investment advice to pension and profit sharing plans, endowment funds, insurance companies and bank trust departments and in providing administrative services to investment companies. As of February 28, 2006, the General Partner and its affiliates had over $45.4 billion in third-party funds under discretionary management.

In addition to serving as the General Partner of the Partnership, BSAM will also serve as the investment manager of each of the Master Fund and the Other Feeder Funds. The following individuals are primarily responsible for the management of the Master Fund's investment portfolio:

**Ralph Cioffi, Senior Portfolio Manager** – Mr. Cioffi is a Senior Managing Director of BSAM, has been with Bear Stearns since 1985 and is a member of BSAM's Board of Directors. From 1985 through 1991, Mr. Cioffi worked in institutional fixed income sales for Bear Stearns, where he specialized in structured finance products. He served as the New York head of fixed income sales for Bear Stearns from 1989 through 1991. From 1991 through 1994, Mr. Cioffi served as global product and sales manager for high grade credit products. He was involved in the creation of the Structured Credit effort at Bear Stearns and was a principal force behind Bear Stearns' position as a leading underwriter and secondary trader of structured finance securities, specifically collateralized debt obligations and esoteric asset backed securities. Mr. Cioffi has headed the investment team that manages the Bear Stearns High Grade Structured Credit Strategies Funds since March of 2003. He holds a B.S. degree in Business Administration with distinction from Saint Michaels College, Vermont, and is a member of the international business management and administration honor society, Sigma Beta Delta.

**Ray McGarrigal, Portfolio Manager** – Mr. McGarrigal is a Managing Director and has been in the Bear Stearns Financial Analytics and Structured Transactions group for 10 years where he structured high yield CDO's and CLO's as well as mortgage related and credit derivative deals. He has worked closely with all three rating agencies and brings structuring and surveillance expertise to the management team. Mr. McGarrigal has an M.B.A. in finance from New York University and a B.S. from the State University of New York at Oneonta.

**Matthew Tannin, Chief Operating Officer** – Mr. Tannin is a Senior Managing Director of BSAM, has been with Bear Stearns since 1994 and is the Chief Operating Officer of the Bear Stearns High Grade Structured Credit Strategies Fund. Previously, he spent seven years on Bear Stearns' Collateralized Debt Obligation Structuring Desk, focusing on emerging markets, high grade and market value transactions. From June of 2001 through February of