2003, he followed the CDO market as an analyst in Bear Stearns' Asset-Backed Research Group. Mr. Tannin received a J.D. from the University of San Francisco in 1993 and was a law clerk on the California Court of Appeal. Mr. Tannin received a BA in 1983 from Bucknell University where he was a Preston Warren scholar in philosophy.

**Removal of the General Partner**

Limited Partners not affiliated with the General Partner may remove the General Partner upon the affirmative vote of a Majority in Interest of the Limited Partners in accordance with the procedures set forth in the Partnership Agreement.

The Memorandum and the Articles of Association of the Master Fund contain provisions relating to the removal of the Master Fund Directors substantially similar to the foregoing provisions.

**Affiliated Investors**

As of the date of this Memorandum, an affiliate of the General Partner has an investment in the Partnership. The General Partner, its principals and/or its affiliates may from time to time, directly or through other investment vehicles (including one or more investment vehicles formed for the benefit of Bear Stearns and its affiliates), make additional investments in the Partnership and/or invest in the Other Feeder Funds. The General Partner, its principals and/or its affiliates are not required to maintain any investment in the Partnership or the Other Feeder Funds, and may withdraw its investment in the Partnership at any time without notice to Limited Partners.

**Liability and Indemnification of the General Partner under the Partnership Agreement**

Under the Partnership Agreement, to the extent that, at law or in equity, any of the General Partner, any affiliate of the General Partner, and any member, partner, shareholder, manager, director, officer, employee, or agent of the General Partner or any such affiliate (each such party, a "General Partner Party") has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or any Limited Partner, such General Partner Party shall not be liable for monetary or other damages to the Partnership or such Partner for such General Partner Party's good faith reliance on the provisions of the Partnership Agreement or for Losses (as defined in the Partnership Agreement) sustained or liabilities incurred by the Partnership or such Limited Partner as a result of: (i) errors in judgment on the part of such General Partner Party, or any act or omission of such General Partner Party, if such General Partner Party acted without fraud, bad faith, gross negligence or willful misconduct; (ii) errors in judgment on the part of any person, or any act or omission of any person, selected by such General Partner Party to perform services for the Partnership, *provided* that, in selecting such person, such General Partner Party acted without fraud, bad faith, gross negligence or willful misconduct; (iii) circumstances beyond such General Partner Party's control, including the bankruptcy, insolvency or suspension of normal business activities of any bank, brokerage firm or custodian holding the Partnership's assets; or (iv) failure to obtain the lowest negotiated brokerage commission rates, or to combine or arrange orders so as to obtain the lowest brokerage commission rates, with respect to any transaction on behalf of the Partnership, or failure to recapture, directly or indirectly, any brokerage commissions for the benefit of the Partnership.

In addition, the Partnership Agreement provides that the Partnership shall, to the fullest extent permitted by law, indemnify each General Partner Party from and against any and all Losses, except to the extent that it is finally adjudicated that an act or omission of such General Partner Party was material to the matter giving rise to such Losses and was committed by such General Partner Party with fraud, bad faith, willful misconduct or gross negligence.

The foregoing exculpatory and indemnification provisions may limit the remedies that might otherwise be available to the Partnership or the Limited Partners and/or result in a reduction of Net Asset Value due to indemnification payments. However, these provisions are not intended to permit exculpation or indemnification to the extent it would be inconsistent with the requirements of applicable federal or state securities laws or any other applicable laws. In addition, the indemnification provisions shall in no event cause the Limited Partners to incur any personal liability beyond their total Capital Accounts, nor shall it result in any liability of the Limited Partners to any third party.

The scope of permitted exculpation of general partners of Delaware limited partnerships continues to develop and change, and Limited Partners with questions concerning the duties of the General Partner Parties should consult their counsel. If a Limited Partner believes a General Partner Party has violated its fiduciary duty to the Partnership, he may seek legal relief for himself or on behalf of the Partnership under applicable laws to recover damages from or require an accounting by the General Partner Party. The disclosures relating to the business terms of the Partnership contained herein (and Limited Partners' consent thereto) would be used as a defense by a General Partner Party were a Limited Partner to assert that such General Partner Party had violated its fiduciary duty in agreeing to such terms.

**Investment Manager; the Investment Management Agreement**

For a description of BSAM and of the individuals primarily responsible for the management of the Master Fund's investment portfolio, see above under "—General Partner of the Partnership".

The Investment Manager entered into a discretionary investment management agreement with the Master Fund (the "Investment Management Agreement"). The Investment Management Agreement may be terminated by the Master Fund or the Investment Manager at any time upon 60 days' prior written notice to the other party. The Master Fund may terminate the Investment Management Agreement without any notice at any time for cause, which is defined as fraud, bad faith, gross negligence, willful misconduct or criminal wrongdoing of the Investment Manager with respect to its performance or non-performance of its duties or obligations under the Investment Management Agreement. It is not intended that the Master Fund will appoint an investment manager that is not affiliated with The Bear Stearns Group. The Investment Management Agreement provides that the Investment Manager may assign or delegate to one or more affiliates of the Investment Manager some or all of the Investment Manager's rights and duties under the Investment Management Agreement.

The Investment Management Agreement contains broad indemnification provisions that require the Master Fund to indemnify the Investment Manager and its affiliates, directors, managers, shareholders, officers, controlling persons, employees, sub-advisers (and their respective affiliates, directors, managers, shareholders, partners, members, officers, controlling persons, employees, and agents) and agents (including any individual who serves at the Investment Manager's request as director, officer, partner, trustee, or the like of another entity, including the Master Fund) and/or the legal representatives and controlling persons of any of the foregoing (each of the foregoing being an "Indemnified Party"), to the fullest extent permitted by applicable law against any liabilities, claims, and expenses, including amounts paid in satisfaction of judgments, in compromise, or as fines and penalties, and counsel fees and expenses reasonably incurred by such Indemnified Party in connection with the defense or disposition of any action, suit, or other proceeding, whether civil or criminal, before any court or administrative or investigative body, in which such Indemnified Party may be or may have been involved as a party or otherwise or with which such Indemnified Party may be or may have been threatened, while acting in any capacity described above or thereafter by reason of such Indemnified Party having acted in any such capacity, except with respect to any matter as to which such persons shall have been adjudicated by the highest court or tribunal that has jurisdiction over such matters to have acted in bad faith in determining that such person's action was in the best interest of the Master Fund and furthermore, in the case of any criminal proceeding, so long as such person had no reasonable cause to believe that the conduct was unlawful; *provided, however*, that (i) no indemnification shall be provided to any person for losses or expenses incurred as a result of such person's fraud, bad faith, gross negligence, or willful misconduct and (ii) with respect to any action, suit, or other proceeding voluntarily prosecuted by any Indemnified Party as plaintiff, indemnification shall be mandatory only if the prosecution of such action, suit, or other proceeding by such Indemnified Party was authorized by the Master Fund's Board of Directors. Further, the Investment Manager shall have no liability to the Master Fund for losses or expenses incurred so long as such losses or expenses did not arise by reason of the Investment Manager's fraud, bad faith, gross negligence or willful misconduct. The indemnification and exculpation provisions in the Investment Management Agreement shall not be construed as a waiver of any rights of the Master Fund or any investor under U.S. securities laws.

The Master Fund, in the discretion of the Master Fund's Board of Directors, shall make advance payments in connection with the expenses of defending any action with respect to which indemnification might be sought hereunder if the Master Fund receives a written affirmation of the Indemnified Party's good faith belief that the standard of conduct necessary for indemnification has been met and a written undertaking to reimburse the Master Fund unless it is subsequently determined that such Indemnified Party is entitled to such indemnification and if the Master Fund determines that the facts then known to it would not preclude indemnification. In addition, at least one

of the following conditions must be met: (i) the Indemnified Party shall provide reasonable collateral for such Indemnified Party's undertaking; (ii) the Master Fund shall be insured against losses arising by reason of any lawful advances; or (iii) an independent legal counsel, in written opinion, at the expense of the Indemnified Party, shall determine, based on a review of readily available facts (as opposed to a full trial-type inquiry), that there is reason to believe that the Indemnified Party ultimately will be found entitled to indemnification.

## THE MASTER FUND

### Capitalization

The Master Fund's authorized share capital is U.S. $2,000, divided into 2,000,000 participating shares, U.S. $0.001 par value each (the "Shares"). The Shares are issued fully paid and nonassessable. No capital of the Master Fund is under option or agreed, conditionally or unconditionally, to be put under option to any person. The Board of Directors may issue the Shares in separate tranches or series.

Each Share is entitled to one vote and is participating and redeemable. The Shares are entitled to receive any dividends which may be declared by the Board of Directors or any committee of the Board of Directors of the Master Fund.

No certificates will be issued for the Shares. Investors' shareholdings will be recorded in the Master Fund's books and records.

### Master Fund Directors; Delegation

The Directors of the Master Fund have ultimate authority over the Master Fund's operations, although the Directors have delegated authority to make investment decisions to the Investment Manager and have delegated responsibility for administration of the Master Fund to the Administrator. The Master Fund's Board of Directors is comprised of five directors, of whom three are affiliated, and two unaffiliated, with the Investment Manager. The unaffiliated Master Fund Directors may (and the initial unaffiliated Master Fund Directors do) serve as directors for other funds advised by the Investment Manager or its affiliates.

The following individuals serve as the directors of the Master Fund (the "Master Fund Directors") and also serve as the directors of the Offshore Feeder Fund:

**Barry J. Cohen** – Mr. Cohen is a Senior Managing Director and Director of Alternative Investments (Hedge Funds) for BSAM and is a member of the board of directors of Bear, Stearns & Co. Inc. Mr. Cohen joined Bear Stearns in 1987 as head of its Risk Arbitrage Department, which is one of the largest risk arbitrage operations in the world, and later headed the Bear Stearns Global Equity Arbitrage Funds. Prior to joining Bear Stearns in 1987, Mr. Cohen was a risk arbitrageur at First Boston Corporation, a partner in Bedford Partners, a risk arbitrage hedge fund and a mergers and acquisitions lawyer at Davis Polk & Wardwell. Mr. Cohen holds a B.A. in Applied Mathematics from Harvard College and received J.D. and M.B.A. degrees from Harvard Law and Harvard Business Schools, respectively.

**David G. Sandelovsky** – Mr. Sandelovsky is a Senior Managing Director of Alternative Investments (Hedge Funds) for BSAM. Mr. Sandelovsky joined BSAM in 2004 as the COO of its hedge fund business. Prior to joining BSAM, Mr. Sandelovsky served as a Managing Director at Deutsche Asset Management where he was Head of Trading and Risk for Single Manager Strategies in the Absolute Return Strategies division. Previously, Mr. Sandelovsky was a managing director and partner at Bankers Trust Company where he ran Foreign Exchange Trading and Sales in New York and served as a member of the Global Trading and Sales Management Committee. Mr. Sandelovsky holds a B.S. from The Wharton School, University of Pennsylvania.

**Gerald Cummins** – Mr. Cummins is a Managing Director of BSAM responsible for hedge fund middle office support and firm-wide operations risk. Mr. Cummins joined Bear Stearns in 1980 as part of its management training program and joined BSAM in 1984 to provide operations support for a newly developed options overwrite products.

He is currently a member of the BSAM Pricing, Risk and Best Execution Committees. Mr. Cummins received his B.A. in Mathematics from Fordham University.

**Scott P. Lennon** – Mr. Lennon is a Senior Vice President of Walkers SPV Limited ("Walkers SPV"), a Cayman Islands licensed trust company and mutual fund administrator. He heads the Fund Services Group at Walkers SPV. Prior to joining Walkers SPV in November 2003, Mr. Lennon worked at State Street Cayman Trust Company Ltd, which acquired the Global Securities Services business of Deutsche Bank (Cayman Islands) in February 2003. At Deutsche Bank, Mr. Lennon was the Head of Investment Funds from April 2001 to February 2003. Mr. Lennon holds a Bachelor of Commerce from Carleton University in Ottawa, Canada, and a Graduate Diploma in Public Accounting from McGill University, Montreal, Canada. Mr. Lennon is a member of the Institute of Chartered Accounts of Ontario and the American Institute of Certified Public Accountants, and he is a Chartered Financial Analyst charterholder. In addition, Mr. Lennon is a member of the CFA Institute and a member of the board of directors of the Cayman Islands Society of Financial Analysts.

**Michelle M. Wilson-Clarke** – Ms. Wilson-Clarke is a Vice President of Fund Services at Walkers SPV. Prior to joining Walkers SPV, Ms. Wilson-Clarke was a Vice President and Relationship Analyst at Wellington Management Company, LLP in Boston Massachusetts. In addition, Ms. Wilson-Clarke has a broad range of experience in capital markets, fund compliance and fund risk analysis. Ms. Wilson-Clarke received a B.S. in Mathematics and Computer Science from Howard University in Washington D.C., an M.B.A. in Finance from the Sloan School of Management at the Massachusetts Institute of Technology, and a M.S. in Mathematics.

## Certain Provisions of the Master Fund's Articles of Association Relating to Directors

A Director is not required to hold any Shares of the Master Fund by way of qualification. The remuneration of Directors shall be determined by the Master Fund's Board of Directors and any Director who serves on any committee or devotes special attention to the business of the Master Fund or performs services which, in the opinion of the Directors, are outside the scope of the ordinary duties of a Director may be paid such extra remuneration as the Directors may determine; *provided, however*, any Directors who also are directors, officers or employees of the Investment Manager shall not receive any remuneration from the Master Fund other than as part of the fees described under "Fees and Expenses" herein and in the following sentence. Directors may be reimbursed by the Master Fund for reasonable travel, hotel and other out-of-pocket expenses properly incurred by them in attending and returning from meetings of Directors or general meetings of the Master Fund or otherwise in connection with the business of the Master Fund.

A Director may hold any other office under the Master Fund (other than the office of the auditor) in conjunction with his office of Director, or may act in a professional capacity to the Master Fund on such terms as the Board of Directors may determine. No Director shall be disqualified, by his office, from contracting with the Master Fund, nor shall any such contract or any contract or arrangement entered into by the Master Fund in which any Director shall be in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Master Fund for any profit realized by any such contract or arrangement by reason of such Director holding that office if he shall declare the nature of his interest. If a Director has a material interest in the business to be conducted at any meeting, that Director will disclose such conflict to the other Directors. Persons who are directors, officers or employees of the Investment Manager may not contract with the Master Fund except as described herein.

A Director, notwithstanding his interest, may be counted in the quorum present at any meeting at which he or any other Director is appointed to hold any office or place of profit under the Master Fund and at which the terms of any such appointment are arranged, and he may vote on any such appointment or arrangement.

The maximum and minimum number of Master Fund Directors to be appointed may be fixed from time to time by an Ordinary Resolution; *provided, however* that during the pendency of a Removal Petition, the maximum and minimum number of Master Fund Directors may not be altered. Unless otherwise fixed, the minimum number of Master Fund Directors is one and the maximum number of Master Fund Directors is unlimited.

No Director of the Master Fund has any interest, direct or indirect, in any assets which have been or are proposed to be acquired or disposed of by, or leased to or by, the Master Fund since the date of incorporation of the Master Fund.

**Indemnification of Directors**

The Articles of Association of the Master Fund contain provisions indemnifying and exempting the members of the Board of Directors of the Master Fund, and its officers and agents, from liability in the discharge of their duties.

The Articles of Association of the Master Fund provide that no Director shall be liable (i) for the acts, receipts, neglects, defaults or omissions of any other director or officer or agent of the Master Fund, or (ii) for any loss on account of defect of title to any property of the Master Fund, or (iii) on account of the insufficiency of any security in or upon which any money of the Master Fund shall be invested, or (iv) for any loss incurred through any bank, broker or similar person, or (v) for any loss occasioned by any negligence, default, error of judgment or oversight on his part, or (vi) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Director's office or in relation thereto, in each case, unless the same shall happen through such Director's own bad faith, gross negligence or willful misconduct.

Every Director and officer of the Master Fund (but not including the auditors), and the personal representatives of the same shall, in the absence of such indemnified person's bad faith, gross negligence or willful misconduct, be indemnified and secured harmless out of the assets and funds of the Master Fund to the fullest extent permitted by applicable law, against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Director or officer in or about the conduct of the Master Fund's business or affairs or in the execution or discharge of such Director's or officer's duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Director or officer in defending (whether successfully or otherwise) any civil proceedings concerning the Master Fund or its affairs in any court whether in the Cayman Islands or elsewhere.

Notwithstanding the foregoing, the Master Fund will not indemnify any of its officers or Directors for any act or omission constituting gross negligence or willful misconduct.

**Other Provisions Relating to the Directors**

A Director may vote on a proposal, arrangement or contract in which he is materially interested as provided for in the Memorandum and Articles of Association. A Director may be a director or other officer or employee of any company that provides services to the Master Fund or in which the Master Fund may be interested and, unless otherwise agreed, no such Director will be accountable to the Master Fund for any remuneration or other benefits received thereby.

**Transactions between the Master Fund and the Investment Manager or its Affiliates**

Members of the Board of Directors who are not affiliated with the Investment Manager or their delegates or other authorized representatives of the Master Fund will have the responsibility for approving any transactions between the Master Fund and the Investment Manager or its affiliates involving significant conflicts of interest (including principal trades).

More particularly, Directors unaffiliated with the Investment Manager or any delegate designated by such Directors will be responsible for approving any principal transactions for which Master Fund consent is required pursuant to Rule 206(3) of the Advisers Act. The Investment Manager and its affiliates are not required to obtain approval for any transaction unless such approval is required by law.

## THE ADMINISTRATOR

PFPC Inc. (Delaware), a Massachusetts corporation, serves as the administrator, registrar and transfer agent of the Partnership, the Master Fund and the Other Feeder Funds (the "Administrator") pursuant to an administrative services agreement (the "Administration Agreement") between the Partnership and the Administrator.

Pursuant to the Administration Agreement, the Administrator serves as administrator, registrar and transfer agent and provides all day-to-day administrative services to the Partnership, including accounting and clerical functions, processing the issuance, transfer, and withdrawal of the Interests, maintaining all appropriate Limited Partner registers and ledgers, distributing annual reports and account statements to Limited Partners, responding to inquiries received from Limited Partners, prospective investors, and others, preparing and maintaining all financial and accounting books and records, maintaining the Partnership's principal administrative records, disbursing payment of expenses of the Partnership, responding to inquiries from the general public, and notifying the General Partner of withdrawal requests. The Administration Agreement may be terminated after the initial two year term, among other circumstances, at any time without penalty by either of the parties upon not less than 60 days' written notice to the other party.

Pursuant to the Administration Agreement, the Administrator is liable only for any damages arising out of its failure to perform its duties under the Administration Agreement to the extent such damages arise out of the Administrator's willful misfeasance, bad faith, negligence or reckless disregard of such duties or a material breach by the Administrator of the Administration Agreement. The Partnership agrees to indemnify and hold harmless the Administrator and its affiliates from all taxes, charges, expenses, assessments, claims and other liabilities, including, without limitation, reasonable attorneys' fees and disbursements (any such liability, a "Loss"), arising directly or indirectly from any action, or omission to act, in accordance with the Administration Agreement; *provided* that neither the Administrator, nor any of its affiliates, shall be indemnified against any Loss (or any expenses incident to such Loss) caused by the Administrator's or its affiliates' own willful misfeasance, bad faith, negligence or reckless disregard in the performance of the Administrator's activities under the Administration Agreement or a material breach by the Administrator of the Administration Agreement.

## FEES AND EXPENSES

The following is a summary of the Partnership's fees and expenses:

Organizational and Initial Offering Costs

The Master Fund paid the expenses of organizing the Partnership, the Offshore Feeder Fund and the Master Fund and the initial offering of Interests and shares of the Offshore Feeder Fund. Such expenses are being amortized on a straight-line basis over a period of not less than 60 months, beginning as of September 2003 unless the Master Fund Directors decide that some other amortization method shall be applied. The Partnership will bear, as an investor in the Master Fund, its pro rata share of all such organizational expenses. The Master Fund Directors believe that such amortization is more equitable than requiring the initial investors of the Partnership and the Offshore Feeder Fund to bear all such organizational expenses as would otherwise be required under GAAP. If such divergence from GAAP would be cause for qualification in any opinion given to the Partnership by its auditors, the Master Fund Directors will not permit such amortization, but may agree to other arrangements to similar equitable effect. If such arrangements are not feasible, the initial investors in the Partnership will likely bear a greater portion, if not all, of such organizational expenses.

Advisory Fee

The Partnership will pay to the General Partner an advisory fee (the "Advisory Fee") equal to 1/12 of 2.0% of the balance of each Limited Partner's Capital Account calculated as of the end of each calendar month (pro rated for periods of less than one month) prior to any accrual for or payment of any Advisory Fee, allocation of Profit Share or withdrawal effected on such date (approximately a 2.0% annual rate). The Advisory Fee is payable in arrears as of the last Business Day of each calendar quarter or upon the withdrawal of a Limited Partner from the Partnership. The Advisory Fee will be charged at the Master Fund level so long as and to the extent the Partnership's assets are

invested in the Master Fund. The Advisory Fee may, however, be charged at the Partnership level in the sole discretion of the General Partner. The General Partner will be entitled to the Advisory Fee regardless of the performance of the Partnership. The General Partner may, in its sole discretion, waive all or a portion of the Advisory Fee due to the General Partner from any Limited Partner.

In respect of Interests issued prior to September 1, 2004, the Partnership pays, and will continue to pay, the General Partner an Advisory Fee equal to 1/12 of 1% of the balance of each Limited Partner's Capital Account as of the end of each calendar month prior to any accrual for or payment of any Advisory Fee, allocation of Profit Share or withdrawal effected on such date (approximately a 1.0% annual rate).

Operational Costs

The Partnership will bear its operational expenses, including (without limitation) research expenses; legal fees; expenses of the continuous offering of Interests, including the cost of producing and distributing offering memoranda and other marketing materials; printing and mailing costs; filing fees and expenses; accounting, audit, and tax preparation expenses; computer software, licensing, programming and operating expenses; data processing costs; consultant fees; tax, litigation, and extraordinary expenses, if any; interest expenses (including interest due to repurchase agreements and borrowing by the Partnership); insurance expenses, custody fees, bank charges, brokerage commissions (including options trades); spreads and mark-ups on securities, swaps and forwards; short dividends, currency hedging costs, if any, and other investment and operating expenses. The Partnership will also bear, as an investor in the Master Fund, its *pro rata* share of the Master Fund's operational expenses, including, without limitation, interest expenses (including interest due to repurchase agreements and borrowing by the Master Fund); insurance expenses, custody fees, bank charges, brokerage commissions (including options trades); spreads and mark-ups on securities, swaps and forwards, short dividends, currency hedging costs, and other investment and operating expenses, the fees and out-of-pocket expenses of the Administrator and the Master Fund's board of directors. The Investment Manager and the Administrator will each bear the costs of providing their respective services to the Partnership and the Master Fund, including their general overhead, salary, and office expenses.

Administration Fees

The Partnership will pay its *pro rata* share of an annual fee payable to the Administrator on a monthly basis at the Master Fund level. The Administrator will perform accounting, investor servicing and tax services to the Master Fund, the Partnership and the Other Feeder Funds. The Administrator's fees for accounting will generally equal 0.10% of the Master Fund's Net Asset Value, subject to certain adjustments made on the basis of the leverage in the Master Fund and subject to such minimum fees as may be agreed between the Master Fund and the Administrator. The Administrator's fees for investor servicing and tax services will be based on the total number of investors in the Partnership and Other Feeder Fund, subject to such minimum fees as may be agreed between the Master Fund and the Administrator. The Administration fees will be calculated and accrued monthly based on the Master Fund's month-end Net Asset Value and is payable monthly in arrears on the last Business Day of each month.

Selling Commissions

Bear Stearns and certain other members of The Bear Stearns Group, to the extent they act as Placement Agents to the Partnership, will be compensated by the General Partner with payments based upon a percentage of the General Partner's Advisory Fee and/or Profit Share. Certain non-affiliated Placement Agents may be paid up to 3% of an investor's subscription price for Interests. Such commission may be waived or reduced by any such Placement Agent in respect of particular investors.

Waiver; Rebates

The General Partner in its discretion may waive or rebate part or all of the Advisory Fee or Profit Share in the case of certain Limited Partners. Such waiver or rebate will have no adverse effect on any other Limited Partner. No such waiver or rebate shall entitle any other Limited Partner to a waiver or rebate. Investments in the Partnership by the Investment Manager, certain Bear Stearns Entities, and their respective employees and other related persons may not be subject to all or a portion of the Advisory Fees or any Profit Share.

## BROKERAGE PRACTICES

The Master Fund has appointed Bear, Stearns Securities Corp. ("BSSC") as the Master Fund's prime broker and custodian (in such capacities, respectively, the "Prime Broker" and "Custodian") pursuant to a Prime Broker and Custodian agreement (the "Prime Brokerage Agreement"). BSSC is a wholly-owned subsidiary of Bear Stearns, an indirect wholly-owned subsidiary of BSC and an affiliate of the General Partner.

BSSC and, as applicable, other members of The Bear Stearns Group will provide certain clearing (including prime brokerage), margin financing and stock lending services with respect to the Master Fund's securities and cash carried on the books of BSSC. BSSC or an affiliate entity, as applicable, may earn interest on debit balances in the Partnership's accounts resulting from margin loans to the Partnership. Such services and facilities will be provided pursuant to a series of mutually acceptable agreements (the "Customer Documents") and may include an Institutional Account Agreement with The Bear Stearns Group containing provisions in compliance with the laws, rules and regulations of the United States Securities and Exchange Commission and other exchanges and dealer associations by which The Bear Stearns Group is regulated (collectively, the "U.S. Rules"). For the avoidance of doubt, the Institutional Account Agreement shall apply to the Master Fund's securities and cash carried on the books of BSSC but shall not apply to any assets where beneficial title is transferred to a Bear Stearns Entity (including, but not limited to, transactions under a Master Repurchase Agreement) or to assets transferred to a Bear Stearns Entity to serve as collateral in connection with principal transactions (including, but not limited to, activities covered by master agreements such as ISDA agreements, etc.). The Partnership is not committed to continue its prime brokerage relationship with BSSC for any minimum period and may in the future use more than one prime broker. BSSC or an affiliated entity or unit thereof (including Bear Stearns) may also execute orders to the extent permitted by applicable regulations and receive commissions, fees and other compensation in connection therewith.

BSSC, as Prime Broker and/or Custodian, may appoint sub-custodians, including other Bear Stearns Entities, of the Master Fund's cash and securities. BSSC will exercise reasonable skill, care and diligence in the selection of any such sub-custodian(s), will be responsible to the Master Fund for the duration of the sub-custody agreement(s) for satisfying itself as to the ongoing suitability of such sub-custodian to provide custodian services to the Master Fund, will maintain what it considers to be an appropriate level of supervision over such sub-custodian and will make appropriate inquiries periodically to confirm that the obligations of such sub-custodian(s) continue to be competently discharged.

The Master Fund may also enter into principal transactions with one or more Bear Stearns Entities. As security for the payment and performance of all liabilities and obligations of the Master Fund to BSSC and to each other Bear Stearns Entity with which the Master Fund engages in transactions, all assets of the Master Fund held by or through BSSC and any other Bear Stearns Entity will be charged with and subject to a lien in their favor and will therefore constitute collateral security for the Master Fund's liabilities and obligations to BSSC and to each other Bear Stearns Entity.

The Master Fund will have rights against BSSC for the return of all Master Fund assets held by it as Prime Broker and/or Custodian of the Master Fund, net of any obligations of the Master Fund to BSSC or any other Bear Stearns Entity, except for assets held by a Bear Stearns Entity as margin. In accordance with the U.S. Rules, all fully-paid and "excess margin" securities and net cash balances not required for the settlement of transactions (collectively, "Segregated Assets") may not be used by BSSC or by any other Bear Stearns Entity for its own purposes, but such Segregated Assets remain subject to the charge and lien to secure the Master Fund's liabilities and obligations to BSSC and to any other Bear Stearns Entities. (In accordance with U.S. Rules, the term "excess margin" means margin securities in excess of 140% of the amount of the margin indebtedness.)

Master Fund assets that are held by BSSC as Prime Broker and/or Custodian will be carried in the name of the Master Fund and beneficial ownership in the name of the Master Fund will be recorded on the books of BSSC. In accordance with applicable U.S. Rules, the Master Fund's assets that are not Segregated Assets may be borrowed, lent or otherwise used by BSSC and other Bear Stearns Entities as may hold such assets for their own purposes. Master Fund assets held by a Bear Stearns Entity as collateral for principal transactions between the Master Fund and such Bear Stearns Entity are not treated as Segregated Assets.

To the extent of applicable U.S. Rules, securities and cash held in customers' accounts will not be available to the non-customer creditors of BSSC or of any other Bear Stearns Entity, but all securities and cash held in customers' accounts at BSSC would be distributed *pro rata* among customers if there were to be an insolvency of BSSC, there were not sufficient customer assets to pay all customers in full and if BSSC's insurance were insufficient to cover any shortfall in customer assets.

Certain of the Master Fund's assets may be held at Bear, Stearns International Limited ("BSIL"). Any of the Master Fund's investments or cash recorded on the books of BSIL as belonging to the Master Fund will be held in accordance with applicable rules and regulations of the Financial Services Authority. If permitted thereunder, all such investments of the Master Fund may be borrowed, lent or otherwise used by BSIL for its own purposes and the Master Fund will have the right against BSIL for the return of equivalent assets. The Master Fund would rank as an unsecured creditor in relation thereto and, in the event of the insolvency of BSIL, the Master Fund may not be able to recover equivalent assets in full.

Neither BSSC nor any other Bear Stearns Entity will be liable for any loss to the Master Fund resulting from any act or omission in relation to the services provided under the terms of the Customer Documents unless such loss results directly from the negligence, bad faith, willful misfeasance of BSSC or other Bear Stearns Entity, but in no event is BSSC or any other Bear Stearns Entity liable for consequential or other types of special damages. Neither BSSC nor any other Bear Stearns entity will be liable for losses to the Master Fund caused by the insolvency, acts or omissions of any sub-custodian or other third party by whom or in whose control any of the Master Fund's investments or cash may be held (subject to the obligations regarding the selection and ongoing suitability of such sub-custodian or third party as set out above). BSSC accepts the same level of responsibility for nominee companies controlled by it as for its own acts. The Master Fund has agreed to indemnify BSSC and the other Bear Stearns Entities against any loss suffered by, and any claims made against, them to the extent set forth in the Customer Documents.

Neither BSSC nor any other Bear Stearns Entity will have any involvement in the management of the Master Fund or any decision-making discretion relating to the Master Fund's investments. Neither BSSC nor any other Bear Stearns Entity has any responsibility for monitoring whether investments by any investment manager or advisor are in compliance with any internal policies, investment goals or limitations of the Master Fund, and neither BSSC nor any other Bear Stearns Entity will be responsible for any losses suffered by the Master Fund.

BSSC is registered with and regulated by the Securities and Exchange Commission in the United States. BSIL is regulated by the Financial Services Authority in the United Kingdom. BSC has a credit rating of A-1 by Standard & Poor's and P1 by Moody's for its short-term debt, a credit rating of A by Standard & Poor's for its long term debt and a credit rating of A2 by Moody's for its long term debt. BSSC is separately rated A-1 for short term debt and single A+ for long term debt by Standard & Poor's.

The Bear Stearns Entities and the Master Fund each reserve the right to change the arrangements described above by agreement between them, and the Bear Stearns Entities have certain rights to modify such arrangements on notice to the Master Fund. The Master Fund may, in its discretion, terminate the arrangements described above in accordance with the Customer Documents. BSSC and each other Bear Stearns Entity reserve the right not to clear transactions and not to provide any of the services (including prime brokerage) described above if the provision of such services or the clearing of transactions presents a risk unacceptable to them and reserve the right to terminate the arrangements in accordance with the provisions of the Customer Documents.

BSSC and the other Bear Stearns Entities are service providers and are not responsible for the preparation of this document or the activities of the Master Fund and therefore accept no responsibility for the accuracy of any information contained in this document.

The Investment Manager may, in its discretion, appoint additional or alternative prime broker(s) and custodian(s).

## WITHDRAWALS, DISTRIBUTIONS AND ASSIGNMENTS

### Withdrawals

Prior to the completion of the winding up of the Partnership, no Limited Partner shall have the right to withdraw, or receive any return of, any portion of any of such Limited Partner's capital contribution(s) to, or Capital Account in, the Partnership except as discussed in this section.

Subject to the conditions and limitations described herein, (i) a Limited Partner may, upon not less than 40 days' prior written notice to the General Partner, withdraw all or a portion of such Limited Partner's Capital Account as of the last Business Day of any calendar month subject to a withdrawal fee of 2% of the amount withdrawn, unless such withdrawal fee is reduced or waived by the General Partner in its sole discretion, and (ii) a Limited Partner may, upon not less than 60 days' prior written notice to the General Partner, withdraw all or a portion of such Limited Partner's Capital Account attributable to a capital contribution as of the last Business Day of the twelfth month-end following such capital contribution and every subsequent third month-end following the first year anniversary of such capital contribution without being subject to any withdrawal fee (each such date, a "Withdrawal Date").

For example, with respect to a capital contribution made as of August 1, 2006, the Limited Partner may first withdraw all or part of its Capital Account attributable to such capital contribution without being subject to a withdrawal fee as of July 31, 2007 (i.e., the twelfth month-end following such capital contribution) and thereafter, as of the last Business Day of each October, January, April and July, so long as sufficient funds remain in its Capital Account that are attributable to such capital contribution.

Notwithstanding the foregoing, in respect of capital contributions made prior to September 1, 2004, a Limited Partner may: (i) upon not less than 40 days' prior written notice to the General Partner, withdraw all or a portion of such Limited Partner's Capital Account attributable to such capital contribution as of the last Business Day of any calendar month subject to a withdrawal fee of 1% of the amount withdrawn, unless such withdrawal fee is reduced or waived by the General Partner in its sole discretion, and (ii) upon not less than 60 days' prior written notice to the General Partner, withdraw all or a portion of its Capital Account attributable to such capital contribution as of the last Business Day of any calendar quarter without being subject to any withdrawal fee.

Partial withdrawals may not reduce a Limited Partner's Capital Account to less than the minimum investment of $1,000,000, unless such minimum is reduced or waived by the General Partner in its sole discretion.

If a Limited Partner makes capital contributions at different times, each capital contribution will be treated separately for the purpose of determining any applicable withdrawal fee, and withdrawals will be deemed to be made from the earliest capital contribution (as adjusted for changes in the Net Asset Value). The withdrawal fees described above are payable to the Partnership and are intended generally to cover anticipated expenses relating to the liquidation of Master Fund assets required to fund the relevant withdrawals, including "breakage costs". The General Partner may reduce or waive such withdrawal fees for any Limited Partner to the extent that it determines in its sole discretion that the Partnership will not incur such expenses or that the Partnership will not otherwise be materially disadvantaged by such reduction or waiver. The General Partner, however, will in no event be obligated to reduce or waive such withdrawal fees, including when there are no such expenses.

The General Partner may permit withdrawals on such shorter notice or on any date other than a Withdrawal Date (such withdrawals to be made on the basis of estimated Net Asset Values) in its sole and absolute discretion.

If, for any calendar quarter, the aggregate amount of withdrawal requests from the Partnership, together with redemption requests from the Other Feeder Funds, exceeds in value 25% of the net asset value of the Master Fund, determined as of the beginning of such calendar quarter and as adjusted for subscriptions during such calendar quarter, the General Partner (in such capacity and as investment manager or sponsor of the Other Feeder Funds) may elect to limit such withdrawals and redemptions to an aggregate value of not more than 25% of the net asset value of the Master Fund, allocating such withdrawals and redemptions pro rata according to the value of each withdrawing Limited Partner's Capital Account prior to its withdrawal request and the value of the shares/units of each

redeeming investor of the Other Feeder Funds prior to its redemption request. Any unhonored portion of a withdrawal request will remain invested in the Partnership, and will be deferred to the next Withdrawal Date subject to the same limitation.

Withdrawal requests must be submitted in writing, delivered by messenger, mail, or facsimile. Withdrawal requests may not be submitted by electronic mail.

All distributions may be made in cash or other property, or any combination thereof, as may be determined by the General Partner (or by the liquidator, in the case of a distribution made in connection with the winding up of the Partnership). Subject to its assessment of the activity and condition of the relevant market and general financial and economic conditions, the General Partner (or the liquidator) shall use its reasonable efforts to cause the Partnership to make distributions in the form of cash.

Withdrawal proceeds (based on unaudited data) will generally be paid within 30 days of the relevant Withdrawal Date. However, upon a complete withdrawal of a Limited Partner, the General Partner will, after applying all charges and credits properly allocable to such Limited Partner's Capital Account, cause the Partnership to distribute to such Limited Partner 90% of the withdrawal proceeds within 30 days of the relevant Withdrawal Date, and the balance (based on unaudited data), without interest, will be paid within 60 days of such Withdrawal Date. Any amount subject to the foregoing "hold-back" will not remain subject to the profit/loss of the Partnership following the Withdrawal Date. The General Partner may waive the foregoing hold-back provisions in its sole and absolute discretion and permit the withdrawal of any Limited Partner to be made generally within 30 days of the effective date of withdrawal. Upon certain circumstances, the General Partner may limit or suspend withdrawals and/or delay payment of withdrawal proceeds to withdrawing Limited Partners.

Capital Withdrawals will be made on the basis of estimated Net Asset Values. The Partnership Agreement provides that if the General Partner determines that the amount paid to a withdrawn Limited Partner was less or more than such Limited Partner was, in fact, entitled to receive, the General Partner will make appropriate adjusting payments to, or formally request appropriate adjusting payments from, such withdrawn Limited Partner.

Generally, no interest will be paid by the Partnership on withdrawn amounts pending distribution to Limited Partners. However, a Limited Partner may be credited with interest in respect of payments deferred to the extent that doing so would, in the General Partner's sole and absolute discretion, be equitable.

In its discretion, the General Partner may hold back a portion of the withdrawal proceeds payable to a Limited Partner in respect of withdrawn Interests (whether such redemption is voluntary or compulsory) to satisfy estimated or accrued expenses, contingencies or liabilities. The amount held back is in the General Partner's discretion.

### Compulsory Withdrawals

The General Partner may compel a Limited Partner to withdraw entirely from the Partnership, or to withdraw any portion of such Limited Partner's Capital Account, at any time without notice, if the General Partner reasonably believes that such Limited Partner subscribed for an Interest as a result of a misrepresentation or if such Limited Partner's continued participation in the Partnership would, in the reasonable judgment of the General Partner, put the Partnership or the other Limited Partners at a material tax, legal, regulatory, or pecuniary disadvantage including, by way of example and not limitation: (i) causing the Partnership to be required to be registered or regulated under the Company Act; (ii) causing the Partnership to be an association or "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes; (iii) causing the assets of the Partnership to be deemed to be "plan assets" for purposes of ERISA or Section 4975 of the Code; (iv) causing the Partnership to be registered under the Exchange Act, or the offering of its Interests registered under the Securities Act; (v) causing the General Partner to be required to be registered with the CFTC as a "commodity pool operator" and become a member of the NFA (if the General Partner is not then so registered and/or such a member); (vi) causing a violation under any law or any contractual provision to which the Partnership or its property or the General Partner is subject; or (vii) causing the Partnership to be in violation of (in the reasonable judgment of the General Partner), to potentially violate or otherwise cause concerns under, the anti-money laundering program and related responsibilities of the Partnership or the General Partner. In addition to the foregoing, the General Partner may compel a Limited Partner to withdraw entirely from the Partnership, or to withdraw any portion of such Limited Partner's Capital Account, at

any time upon 90 days' prior written notice if such Limited Partner's continued participation in the Partnership would, in the reasonable judgment of the General Partner, put the Partnership or the other Limited Partners at a material administrative disadvantage; provided that the General Partner may not so terminate the participation of a Limited Partner during the pendency of a Removal Petition as defined in the Partnership Agreement. No such mandatory withdrawal shall give rise to any claim or cause of action by any Limited Partner.

### Suspension of Withdrawals and Payment of Proceeds

The General Partner may suspend the determination of Net Asset Value and/or suspend withdrawals for the whole or any part of any period during which by reason of the closure of or the suspension of trading on any money or foreign exchange market, commodities exchange or stock exchange, or of a break-down in any of the means normally employed by the General Partner or its designee in ascertaining the value of the assets of the Partnership, or for any other reason the value of the assets owned or contracted for by the Partnership cannot in the opinion of the General Partner be reasonably ascertained, or circumstances exist as a result of which, in its opinion, it is not reasonably practicable for the Partnership to realize the assets owned or contracted for by it that together constitute a material proportion of the overall assets of the Partnership. The General Partner may also temporarily suspend withdrawals in order to effect orderly liquidation of the Partnership's assets necessary to effect withdrawals and shall suspend withdrawals if the General Partner has given notification to the Limited Partners of the dissolution of the Partnership. The Partnership may withhold payment to any person until after any suspension has been lifted. The determination of the General Partner shall be conclusive. Notice of any limitation or suspension will be given to any Limited Partner who has requested a withdrawal and to whom full payment of the withdrawal proceeds has not yet been remitted. If a withdrawal request is not withdrawn by a Limited Partner following notification of a suspension, the withdrawal will be completed as of the next month-end following the end of the suspension. The Master Fund has comparable ability to suspend redemptions of the Partnership's shares in the Master Fund.

### Distributions

The General Partner may, at any time or from time to time, but shall be under no obligation to, cause the Partnership to make a distribution to the Partners *pro rata* in accordance with their Capital Accounts as of the beginning of the Accounting Period in which such distribution is made. The General Partner does not intend to cause the Partnership to make any such distributions.

### Assignments

No Limited Partner may transfer (whether by sale, assignment, gift, exchange, pledge, mortgage, or hypothecation, or any other conveyance, disposition, or encumbrance, or any swap or other derivative transaction based on the value or change in value of an Interest, whether voluntary or involuntary) an Interest (or any interest therein) unless such transfer arises by operation of law or has been expressly approved by the General Partner. The General Partner may withhold such approval in its sole and absolute discretion or may grant such approval on such terms and subject to such conditions as the General Partner may determine.

Prior to the admission to the Partnership, as a Limited Partner, of a person to whom an Interest (or interest therein) has been transferred, such person (an "Assignee") shall be entitled to share in such profits and losses, to receive such distributions, and to receive such allocations of items of the Partnership's income, gain, deduction, loss and credit, as the transferor would have been entitled to share and receive in respect of the Interest (or interest therein) so transferred, but shall not be entitled to become a Limited Partner or to exercise any of the other rights, powers, or authority of a Limited Partner. No Assignee shall be admitted to the Partnership as a Limited Partner unless such admission is approved by the General Partner. The General Partner may withhold such approval in its sole and absolute discretion or may grant such approval on such terms and subject to such conditions as the General Partner may determine.

If a Limited Partner desires to transfer an Interest (or an interest therein), such Limited Partner shall be responsible for compliance with all conditions of transfer imposed by the Partnership Agreement and under applicable law and any expenses incurred by the Partnership for legal and/or accounting services in connection with reviewing the transfer or obtaining legal opinions in connection therewith. Upon the request of the General Partner, a Limited Partner desiring to transfer an Interest (or an interest therein) shall either cause the Partnership to be provided with,

or authorize the Partnership to obtain, an opinion of counsel satisfactory to the General Partner that the proposed transfer complies with the Securities Act and any applicable state securities laws.

## ALLOCATION OF PROFIT AND LOSS

This section of the Memorandum describes lengthy and detailed accounting provisions of the Partnership Agreement, a copy of which accompanies this Memorandum and is incorporated herein by this reference. The following description is a summary only, is not intended to be complete, and is qualified in its entirety by such reference.

### Partnership Accounting

The General Partner shall cause the Partnership to establish and maintain for each Partner (including the General Partner) a capital account ("Capital Account").

The balance in a Partner's Capital Account as of the beginning of each Accounting Period is referred to as the "Opening Balance" of such Capital Account for such Accounting Period, and the balance in a Partner's Capital Account as of the end of each Accounting Period is referred to as the "Closing Balance" of such Capital Account for such Accounting Period.

The Opening Balance of a Partner's Capital Account as of the beginning of the first Accounting Period in which a capital contribution is credited to such Capital Account shall equal the amount of such contribution. The Opening Balance of a Partner's Capital Account as of the beginning of each subsequent Accounting Period shall equal the Closing Balance of such Capital Account as of the end of the immediately preceding Accounting Period, increased by any additional capital contribution credited to such Capital Account as of the beginning of such Accounting Period and reduced by any Capital Withdrawals distributed from such Capital Account as of the beginning of such Accounting Period.

The Closing Balance of a Partner's Capital Account as of the end of an Accounting Period shall be equal to the Opening Balance of such Capital Account as of the beginning of such Accounting Period, adjusted in the following manner:

- first, any increase or decrease in Net Asset Value (determined prior to accrual of any Advisory Fees payable to the General Partner) for such Accounting Period shall be credited or debited (as the case may be) to such Opening Balance, *pro rata* in accordance with the Partnership Percentage associated with such Capital Account as of the beginning of such Accounting Period;

- second, to the extent that the General Partner is entitled to receive any Advisory Fee in respect of such Capital Account as of the end of such Accounting Period, the amount thereof shall be debited against such Opening Balance and paid to the General Partner, not as an allocation to the General Partner's Capital Account (unless the General Partner so determines), but as a payment made to a third-party service provider;

- third, to the extent that a Profit Share in respect of such Capital Account is required to be credited to the General Partner's Capital Account as of the end of such Accounting Period, the amount thereof shall be debited against such Opening Balance and credited to a new profit memo account (the "New Profit Memo Account"), established solely for bookkeeping purposes in connection with the allocation of Profit Share.

An "Accounting Period" shall (a) begin on the day after the close of the preceding Accounting Period and (b) end on the earlier of the close of the fiscal year of the Partnership, the effective date of any resignation or expulsion of a Partner, the effective date of any transfer of an Interest, the day preceding the effective date of any capital contribution or Capital Withdrawal, or such other day as may be determined by the General Partner. Initially, the General Partner intends to designate each calendar month-end as the close of an Accounting Period. "Partnership Percentage" associated with a Partner's Capital Account as of the beginning of an Accounting Period, means the

percentage determined by dividing the Opening Balance of such Capital Account at such time by the Opening Balances of all Capital Accounts and the New Profit Memo Account at such time. The sum of the Partnership Percentages associated with all Capital Accounts shall at all times equal 100%.

**Determination of Net Asset Value**

Net asset value ("Net Asset Value") shall be determined as of the end of each Accounting Period and means the value of the Partnership's assets less the amount of its liabilities, in each case determined in accordance with GAAP (except in respect of organizational costs) and the valuation principles set forth in the Partnership Agreement. For this purpose, liabilities include accrued liabilities irrespective of whether such liabilities may in fact never be paid. In addition, for purposes of determining the amount of the Partnership's liabilities, the General Partner may estimate expenses that are incurred on a regular or recurring basis over yearly or other periods and treat the amount of any such estimate as accruing in equal proportions over any such period and establish such reserves for the Partnership for contingent, unknown or unfixed debts, liabilities or obligations of the Partnership as the General Partner may reasonably deem advisable.

The General Partner may determine to treat any liability or expenditure of the Partnership that becomes fixed or is incurred in an Accounting Period subsequent to the Accounting Period to which such liability or expenditure relates (the "prior Accounting Period") as either (i) arising in the Accounting Period in which such liability becomes fixed or such expenditure is incurred or (ii) arising in such prior Accounting Period, in which case such liability or expenditure shall be charged to persons who were Partners during such prior Accounting Period (whether or not such persons are Partners during the Accounting Period in which such liability is fixed or such expenditure is incurred) in accordance with the Partnership Percentages associated with their Capital Accounts as of the beginning of such prior Accounting Period, and the Partnership shall be entitled to collect from such persons the amounts so charged to them (with interest thereon accruing from the time such persons received the related distributions, at a floating rate determined by the General Partner in its reasonable discretion).

The Partnership's assets shall be valued in accordance with the following principles unless GAAP requires otherwise:

- Assets listed or traded on a stock exchange or over-the-counter market (other than derivatives, as referred to below) for which market quotations are readily available will be valued at the official close of business price on the principal exchange or market for such investment, *provided* that the value of any investment listed on a stock exchange or over-the-counter market but acquired or traded at a premium or at a discount outside or off the relevant stock exchange or on an over-the-counter market, and securities which are not listed on a recognized securities exchange, may be valued at the mean of their "bid" and "ask" prices as quoted by each of three (or, if three are not reasonably available, two) recognized broker-dealers for such assets as at the date of valuation of the investment. If for specific assets the official close of business prices do not, in the opinion of the General Partner or its designee, reflect their fair value or are not available, the value shall be calculated with care and in good faith by the General Partner or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date.

- If the assets are listed or traded on several stock exchanges or over-the-counter markets, the official close of business price on the stock exchange or over-the-counter market which, in the opinion of the General Partner or its designee, constitutes the main market for such assets will be used.

- Cash and other liquid assets will be valued at their face value with interest accrued, where applicable.

- Exchange traded derivative instruments will be valued at the settlement price for such instruments on such market; if such price is not available such value shall be the probable realization value estimated with care and in good faith by the General Partner or its designee. Over-the-counter derivative instruments will be valued on each valuation date at the settlement price independently confirmed by the General Partner or its designee with the counterparty or by commercial pricing models which may be obtained from an affiliate of the General Partner. Open forward foreign exchange contracts shall be valued with reference to the prevailing forward foreign exchange rates, which the General Partner or its designee deems appropriate in the circumstances.

    Closed-out forward foreign exchange contracts that have not yet reached the maturity date will have locked-in a fixed currency gain or loss. This fixed currency amount shall be revalued at the same spot exchange rates used for other assets.

- Short-term money market instruments and bank deposits shall be valued at cost plus accrued interest to the date of valuation.

- If at the end of any Accounting Period, the exchange or market herein designated for the valuation of any given asset is not open for business, the valuation of such asset shall be determined as of the last preceding date on which such exchange or market was open for business. If a security or commodity interest could not be liquidated on the valuation date, due to the operation of daily limits or other rules of the exchange or market designated for the valuation thereof, the settlement price on the first subsequent day on which the security or commodity interest could be liquidated shall be the basis for determining the value thereof for that day, or such other value as the General Partner or its designee may deem fair and reasonable.

- There is no active market for Repackaging Vehicle Junior Interests. The Investment Manager will use a fair-value methodology for determining the value of Repackaging Vehicle Junior Interests. This methodology will consist of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle. The discount rate used in this analysis will be determined primarily by assessing the credit quality of the collateral pool of the Repackaging Vehicle.

- The foregoing valuations may be modified by the General Partner or its designee, in its sole and absolute discretion, if and to the extent that it shall determine that such modifications are advisable in order to reflect restrictions upon marketability or other factors affecting the value of assets or to obtain asset valuations within the time frames set by the General Partner. Without limiting the generality of the foregoing, the valuation of an asset by the General Partner or its designee may reflect the amounts invested by the Partnership in such asset, notwithstanding that such amounts may not represent the market value of such asset. The General Partner or its designee may also follow some other prudent method of valuation other than that referred to above if it considers that in the circumstances such other method of valuation should be adopted to reflect fairly the values of relevant investments or liabilities or to otherwise protect the interests of the Limited Partners. The General Partner is entitled to exercise its reasonable judgment in determining the values to be attributed to assets and liabilities and provided it is acting bona fide in the interest of the Partnership as a whole, such valuation is not open to challenge by current or previous investors. All good faith determinations of value by the General Partner or its designee shall be final and conclusive as to all Partners.

Organizational expenses are being amortized on a straight-line basis over a period of not less than 60 months, notwithstanding GAAP. Any opinion given to the Partnership by its auditors may be qualified with respect to the divergence of this amortization schedule from GAAP.

Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio securities could dramatically affect the Partnership's Net Asset Value and the Profit Share if the General Partner's or its designee's judgments regarding appropriate valuations should prove incorrect.

All matters concerning valuation, as well as accounting procedures, not expressly provided for in the Partnership Agreement may be determined by the General Partner, whose determination is final and conclusive as to all Limited Partners.

*As a significant portion of the Partnership's portfolio is likely to be executed through and maintained with a Bear Stearns Entity, prospective investors should understand that Bear Stearns Entities may value a substantial portion of such portfolio, which valuation will be made in accordance with the foregoing provisions. See "Conflicts of Interest".*