# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

NAVIGATOR CAPITAL PARTNERS, L.P., on
behalf of itself and all others similarly situated,

                   Plaintiff,

     -against-

BEAR STEARNS ASSET MANAGEMENT INC.,
BEAR STEARNS SECURITIES CORPORATION,
BEAR STEARNS COMPANIES INC.,
BEAR, STEARNS & CO. INC., RALPH
CIOFFI, RAYMOND MCGARRIGAL and
MATTHEW TANNIN,

                 Defendants,

     -and-

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES, L.P.,

            Nominal Defendant.
-------------------------------------------------------------------X

Index No.: 07-602663

**CLASS ACTION AND
VERIFIED DERIVATIVE
COMPLAINT**

Plaintiff designates New York
County as the place of trial.

Jury trial demanded.



NEW YORK
COUNTY CLERK'S OFFICE

AUG = 6 20

NOT COMPARED
WITH COPY FILE

        Plaintiff, individually and on behalf of all others similarly situated, alleges upon

information and belief (except for those allegations which pertain to Plaintiff, which allegations are

based upon personal knowledge), as follows:

### INTRODUCTION

        1.    This is a class action on behalf of purchasers of limited partnership

interests ("Interests") in Bear Stearns High-Grade Structured Credit Strategies, L.P. (the

"Partnership" or the "Fund") as well as a derivative action on behalf of the Fund, based upon

Defendants' breaches of fiduciary duty.

        2.    Despite their duties and responsibilities as managers and General Partner

of the Partnership, Defendants Bear Stearns Asset Management Inc. ("BSAM"), Ralph Cioffi,

Raymond McGarrigal and Matthew Tannin (collectively, the "Management Defendants")
completely abdicated their responsibilities to the Partnership and its investors by neglecting to
manage the Fund in a manner that would minimize risk and control losses in connection with
sub-prime mortgage-backed securities, and committed serious disclosure violations by failing to
inform investors that they had not fulfilled those responsibilities.

       3.     In that regard, the Management Defendants systematically and
continuously failed to disclose to investors that they: (a) were not sufficiently monitoring and
adequately assessing the credit risk inherent in the Partnership's investments; (b) were not
determining the frequency and severity of defaults of the underlying assets of each of the
structured finance securities invested in by the Partnership; (c) were not developing and
implementing credit enhancement mechanisms which would cause cash flow to be diverted away
from the Partnership's riskier investments under certain market conditions; and (d) were not
otherwise adequately engaging in hedging techniques to minimize risk. Based upon these non-
disclosures, the Management Defendants have breached their fiduciary duties to Plaintiff and
other investors in the Partnership. In addition, based upon the underlying wrongdoing, the
Management Defendants have breached their fiduciary duties to the Partnership.

       4.     The objective of the Fund was to seek high current income and capital
appreciation, primarily through leveraged investments in investment-grade structured finance
securities with an emphasis on triple-A and double-A rated structured finance securities.

       5.     Defendants marketed the Fund as a relatively safe investment, telling
potential investors that the Fund's modest returns of approximately 1% per month were
consistent with the Partnership's adequately hedged, relatively low-risk profile.

6.    Although the offering documents represented that the Partnership managers would regularly monitor and adequately hedge risk, the managers shirked these responsibilities and failed to disclose to investors their failure to adequately run the Partnership. Moreover, the fact that the Partnership was highly leveraged and invested primarily in high-risk financial instruments made it absolutely critical that the Management Defendants adequately manage the Partnership and minimize risk. They failed to do so.

7.    Indeed, the Management Defendants' failure to sufficiently hedge risk is apparent, at least in part, from the Fund's near total loss of value in a single month, June 2007.

8.    Defendants failed to disclose to investors the significant challenges facing the Partnership, and the meager steps they were taking to face those challenges, while at the same time reaping substantial fees. In this regard, BSAM made over $13.3 million for the year ended December 31, 2006, in advisory fees and profit share with respect to the Fund.

9.    Had Plaintiff and other investors known the truth, they would have taken steps to avoid the massive losses they suffered, such as by withdrawing their funds from the Partnership, removing BSAM as General Partner (pursuant to Section 3.2 of the Partnership Agreement), instituting their own hedges, and/or bringing suit before the value of the Partnership, and their investments in it, plummeted.

10.    The Management Defendants' abdication of their responsibilities was ultimately disclosed on July 18, 2007, when Defendants announced that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the Funds over time."

11.    As discussed further herein, in July and August 2007 Defendants also announced the restructuring of BSAM's woefully inadequate risk management function and the

3

institution of additional oversight, as well as the ouster of top Bear Stearns executive Warren
Spector.

12.    In an August 6, 2007 article, entitled *A Top Official at Bear Stearns*
*Ousted*, the New York Times concluded that the events leading to the collapse of the Partnership
was "a crisis that Bear, with its long expertise in bonds, structured products and in particular
mortgage-backed securities, ***should have seen coming***." (Emphasis added.) Bear Stearns' status
as the second largest underwriter of mortgage bonds in the United States made it even more
likely that it knew or should have known of the impending collapse of the Fund.

13.    For these reasons and those set forth below, the Management Defendants
plainly violated their fiduciary duties to Partnership investors as well as to the Partnership, itself.

## THE PARTIES

14.    Plaintiff Navigator Capital Partners, L.P. ("Plaintiff"), is a Delaware
Limited Partnership, and was at all relevant times the owner of Interests in the Partnership.
Plaintiff's principal office is located at 101 West End Avenue, New York, New York.

15.    Defendant Bear Stearns Asset Management Inc. ("BSAM") is a
corporation organized under the laws of the State of New York with its principal office located at
383 Madison Avenue, New York, New York. BSAM is the General Partner of the Partnership,
Investment Manager of the Fund and the Master Fund (defined below) through which the
Partnership invested, and is a wholly owned subsidiary of BSC.

16.    Defendant Bear, Stearns Securities Corporation ("BSSC") is a corporation
organized under the laws of the State of Delaware, with its principal office located at One
Metrotech Center North, Brooklyn, New York. BSSC acted as Prime Broker and Custodian to
the Master Fund, and is a wholly owned subsidiary of BSC.

4

17.     Defendant Bear Stearns Companies Inc. ("BSC") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and is the parent of BSAM, BSSC and BS&Co. BSC is publicly traded on the New York Stock Exchange under the symbol "BSC," and is the second largest underwriter of mortgage bonds in the United States.

18.     Defendant Bear, Stearns & Co. Inc. ("BS&Co.") is a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York. BS&Co. is a broker-dealer subsidiary of BSC and BSSC.

19.     Defendant Ralph Cioffi is a Senior Managing Director of BSAM. Mr. Cioffi founded the Fund, and was at all relevant times the Senior Portfolio Manager of the Fund and the Master Fund.

20.     Defendant Raymond McGarrigal is a Managing Director of BSAM. Mr. McGarrigal was at all relevant times a Portfolio Manager of the Fund and the Master Fund.

21.     Defendant Matthew Tannin is a Senior Managing Director of BSAM. Mr. Tannin was at all relevant times the Chief Operating Officer of the Fund.

22.     Defendants BSAM, Cioffi, McGarrigal and Tannin are collectively referred to as the "Management Defendants."

23.     By virtue of its position as General Partner, and their positions as managers, directly or indirectly, of the Partnership, the Management Defendants are in a fiduciary relationship with Plaintiff and other investors in the Partnership, and owed Plaintiff and other members of the Class (defined herein) the highest obligations of due care, good faith,

5

candor, loyalty and fair dealing. As further discussed herein, the Management Defendants

violated those duties in numerous respects, to the detriment of Plaintiff and the Class.

## JURISDICTION AND VENUE

24.     Jurisdiction is proper pursuant to CPLR § 301 because Defendants are

New York domiciliaries subject to the jurisdiction of New York Courts, and/or pursuant to

CPLR § 302 because Defendants transact business in, or have committed tortious acts within, the

State of New York.

25.     Pursuant to CPLR § 503, venue is proper in New York County since

Plaintiff resides in New York County. Further, one or more Defendants, including BSC and

BSAM, reside in New York County.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to CPLR § 901 on behalf of itself and

a class (the "Class") consisting of all investors who held Interests at any time during the period

August 1, 2006 through July 18, 2007 (the "Class Period"). Excluded from the Class are the

Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated

with any of the Defendants.

27.     This action is properly maintained as a class action for the following

reasons:

> a.     the Class is so numerous that joinder of all
>        members is impracticable;
>
> b.     there are questions of law and fact common
>        to all members of the Class which
>        predominate over any questions affecting
>        only individual Class members. The
>        common issues include, but are not limited
>        to, whether the Management Defendants
>        have breached their fiduciary duties owed to
>        Plaintiff and the other members of the Class,

6

including their duties of due care, entire
fairness, loyalty, and candor under Delaware
law, and whether Defendants BSC, BSSC
and BS&Co. aided and abetted those
breaches of fiduciary duties;

c.    Plaintiff's claims are typical of the claims of
other members of the Class;

d.    a class action is superior to other methods for
the fair and efficient adjudication of the
claims herein asserted;

e.    Plaintiff is an adequate representative of the
Class and will fairly and adequately protect
the interests of the Class;

f.    Plaintiff is committed to the prosecution of
this action and has retained competent
counsel experienced in litigation of this
nature; and

g.    Plaintiff does not anticipate any difficulty in
the management of this litigation as a class
action.

## FACTUAL BACKGROUND

28.    The Partnership was organized under the laws of the State of Delaware on

August 26, 2003. It commenced operations on October 1, 2003, and offered to sell Interests by

way of an offering document, entitled "Confidential Private Placement Memorandum," dated

August 31, 2004.

29.    Additional Interests were offered by way of a Confidential Private

Placement Memorandum issued in August 2006 ("August 2006 PPM").

30.    These private offerings of Interests were made pursuant to Section 4(2) of

the Securities Act of 1933 and Regulation D thereunder.

**Fees Charged by Defendants Purportedly to Manage the Fund**

31. BSAM charged the Partnership an advisory fee for services purportedly rendered, regardless of the performance of the Partnership, equal to 1/12 of 2.0% of the balance of each Limited Partner's Capital Account calculated as of the end of each calendar month (pro rated for periods of less than one month) prior to any accrual for or payment of any Advisory Fee, allocation of Profit Share or withdrawal effected on such date (approximately at a 2.0% annual rate). With respect to Interests issued prior to September 1, 2004, BSAM charged the Partnership 1/12 of 1.0% of the balance of each Limited Partner's Capital Account, calculated in the same fashion.

32. The August 2006 PPM also provided that BSAM would be allocated a profit share ("Profit Share") at the end of each relevant Accounting Period in an amount equal to 20% of Net New Income in respect of each Limited Partner's Capital Account, subject to a high water mark.

33. For the year ended December 31, 2006, the Advisory Fee totaled $5,001,025 and BSAM was allocated a Profit Share (or Performance Allocation) of $8,396,778.

**Partnership Investments Through the Master Fund**

34. The Partnership invested substantially all assets through the Bear Stearns High-Grade Structured Credit Strategies Master Fund Ltd. (the "Master Fund"), in what is termed a "master-feeder" arrangement.

35. The Master Fund was formed under Cayman law, and commenced operations on September 12, 2003, as part of a "master-feeder" structure. Feeder funds, including the Partnership, invested substantially all of their assets through the "master-feeder" structure, conducting most or all of their investment and trading activities indirectly through investments in the Master Fund.

8

36.     As of the date of the August 2006 PPM, other feeder funds investing

substantially all of their assets in the Master Fund included Bear Stearns High-Grade Structured

Credit Strategies (Overseas) Ltd. (the "Offshore Feeder Fund"), an exempted company

incorporated under the laws of the Cayman Islands to facilitate investment by non-U.S. investors

and tax-exempt U.S. investors, and Bear Stearns High-Grade Structured Credit Strategies

(Overseas) Yen Unit Trust, a Cayman Islands unit trust.

37.     As of December 31, 2006, the Partnership's beneficial ownership of the

Master Fund's net assets was 28.58%.

38.     On July 31, 2007, the Master Fund filed a Chapter 15 petition in the

United States Bankruptcy Court for the Southern District of New York, for recognition of

winding up proceedings pending before the Grand Court of the Cayman Islands under sections

1515 and 1517 of title 11 of the Bankruptcy Code.

### The Stated Primary Objective of the Partnership

39.     As set forth in Defendants' August 2005 response to the Alternative

Investment Management Association's Illustrative Questionnaire ("August 2005 AIMA

Response" or "Response"), the stated primary objective of the Partnership was "to seek high

current income and capital appreciation relative to LIBOR primarily through leveraged

investments in investment-grade structured finance securities with an emphasis on triple-A and

double-A rated structured finance securities."

40.     Pursuant to the terms of the PPM, BSAM invested Partnership funds into

mortgage-backed securities known as collateralized debt obligations ("CDOs"). CDOs are

created by bankers and money managers, who bundle bonds or loans to form a given CDO, and

then typically "split" or "slice" the CDO into several parts. The CDO parts are then sold

individually to investors as separate securities. The credit risk of the CDO is divided among

9

different tranches: senior tranches (often rated AAA), mezzanine tranches (often rated AA to

BB), and equity tranches (typically unrated), which are the most junior. Losses are applied in

reverse order of seniority. Accordingly, junior tranches offer higher coupons to compensate for

the added risk. The senior tranche is protected by the subordinated security structure and would

thus be the highest rated class, delivering the lowest return. The equity tranche (also known as

the first-loss tranche) is most vulnerable because it is the first class to absorb losses, and thus,

must offer higher coupons to compensate for the higher risk.

41.     In this case, BSAM invested the Partnership's money in CDOs that were

backed by sub-prime mortgages, which are riskier than traditional, credit-worthy mortgages

because the borrowers have poor credit or heavy debt loads. The market value of these

investments depended upon the flow of principal and interest paid by sub-prime borrowers

whose mortgages served as the underlying collateral for the mortgage securities.

### Defendants' Involvement in the Formation
### Of the Partnership's Investments

42.     In many cases, the Defendants, themselves, were directly involved in the

formation of the CDOs that were purchased by the Partnership. Thus, Defendants were keenly

aware of the operations of the underlying financial instruments in which the Partnership invested.

43.     Despite this awareness, the Management Defendants continued to cause

the Partnership to invest in high-risk instruments, even as the sub-prime market was collapsing

through increasing defaults and delinquencies, as described below.

### The Decline of the Sub-Prime Mortgage Market

44.     During the country's recent housing boom, which occurred from late-2001

until mid-2006, CDOs backed by sub-prime loans became very common investments and

generated high rates of return. During this period, there was a rapid growth in both loans to sub-

10

prime borrowers and in non-traditional types of mortgages. Indeed, by 2006, sub-prime

mortgages made up about 20% of all new mortgages, up from 2.5% in 1998. BSAM was the

third largest manager of CDOs that include sub-prime mortgages as of December 31, 2006.

45.    Even with the surge of risky loans, during the housing boom, the level of

defaults remained low because borrowers who fell behind could easily sell or refinance into

loans with better terms, thus avoiding default. Consequently, the value of the CDOs backed by

sub-prime loans remained stable, sustained by the steady stream of interest and principal

payments.

46.    However, beginning at least as early as August 1, 2006, as home prices

leveled off and declined in parts of the country, more borrowers have fallen behind on their

mortgage payments. Among sub-prime loans, delinquencies of more than 90 days, foreclosures

and seized properties have risen to their highest level in at least six years. These events have led

to a decrease in the value of CDOs backed by such loans.

47.    Despite the deteriorating market conditions, the Management Defendants

continued to invest the Partnership's money in risky sub-prime mortgage-backed securities,

while at the same time failing to implement hedging and other strategies to minimize risk

effectively.

48.    Notably, BSC took steps in January 2007 to reduce its own exposure to the

worsening sub-prime mortgage-backed securities market.

### Defendants' Admitted Responsibilities In
### Managing the Partnership and Minimizing Risk

49.    In their August 2005 AIMA Response, Defendants stated to investors that

the Partnership "generally takes positions in the high end of the capital structure which is hedged

through the use of credit default swaps" and that "[t]hese investments coupled with broad

11

diversification across positions and sectors should mitigate a majority of credit oriented risks

associated with fixed income."

   50. Moreover, Defendants informed investors in their Response that "[s]ince

the Fund utilizes repo financing, the portfolio managers have ***further mitigated their risk*** by

maintaining a significant portion of un-margined securities in case of a 'run on the bank.'"

(Emphasis added.)

   51. Defendants further stated in the Response that "[t]he Fund generally

invests, on a leveraged basis, in investment-grade structured finance securities rated AA or

higher. In addition, various derivatives, primarily credit-default swaps, but also options, swaps,

swaptions, futures and forward contracts, equity securities and currencies, may be used for

hedging purposes." Thus, Defendants assured investors that risk would be minimized through

the use of these strategies.

   52. Defendants described the operational risk management policy in their

August 2005 AIMA Response by stating that:

> There are three layers of risk management, the broker
> dealer, BSAM and the portfolio managers. ***The
> Fund's daily mark to market, which is done in
> house by Bear Stearns' repo desk and the team,
> keeps them in touch with any price movements that
> could foretell problems in any one of the Fund's
> investments.*** The team receives monthly marks on
> each of the Fund's investments from up to 15 broker
> dealers. ***The team monitors their positions through
> two main analytical systems . . . [which] allow them
> to monitor each deal, run stress tests, monitor
> monthly trustee reports on each deal and use
> technology to effectively monitor each position. In
> addition to the portfolio management team, Bear
> Stearns' and BSAM's risk management
> departments monitor the Fund's positions as well.***
> They monitor things such as minimum rating
> requirements, overall and net leverage and any

portfolio concentrations. On a monthly basis, the
portfolio managers meet with BSAM's CIO and
hedge fund risk management team to discuss the
portfolio and its performance. The team also meets
with Bear Stearns' global credit department to discuss
their positions, risk management and hedging
techniques. *As part of managing the Fund's risk,
the team actively engages in various hedging
techniques in the credit derivatives market, monitor
and maintain adequate liquidity and look to
minimize leverage while attempting to achieve the
Fund's cash on cash targets*.

(Emphasis added.)

53.    In the August 2006 PPM, BSAM further stated that:

The primary focus of the Investment Manager will be
*to assess the credit risk inherent in every potential
investment and to monitor the credit risk of the
investments* held by the Master Fund. The objective
of the analysis is to determine how the frequency and
severity of defaults of the underlying assets of each of
the structured finance securities will impact the
interest and principal payments on those securities.
*Because each of the investments held by the Master
Fund is essentially a construct of a large and
diversified collection of individual assets, it is
possible to monitor the performance of the
underlying assets in a quantitative way*. Unlike
investments in corporate fixed-income securities
where the credit performance of the issue is binary
(the bond is either current in its obligations to make
interest and principal payments or is in default) the
credit performance of a structured finance security is
directly related to the *observable* cash flow
characteristics of the underlying assets. *In addition,
it is anticipated that substantially all of the
structured finance securities purchased by the
Master Fund will have credit enhancement
mechanisms which, when the underlying pool of
assets experiences credit degradation beyond
objectively defined levels, cause cash flow to be
diverted away from the more junior structured
finance securities and towards the securities held by
the Master Fund*.

13

(Emphasis added.)

54.    Notwithstanding their obligation to adequately assess, monitor and hedge the credit risks of investments held by the Fund, and their admitted ability to do so, the Management Defendants failed to do so, in breach of their fiduciary duties under Delaware law.

55.    Additionally, the Management Defendants systematically and continuously failed to disclose to investors that they: (a) were not sufficiently monitoring and adequately assessing the credit risk inherent in the Partnership's investments; (b) were not determining the frequency and severity of defaults of the underlying assets of each of the structured finance securities invested in by the Partnership; (c) were not developing and implementing credit enhancement mechanisms which would cause cash flow to be diverted away from the Partnership's riskier investments under certain market conditions; and (d) were not otherwise adequately engaging in hedging techniques to minimize risk. Based upon these non-disclosures, the Management Defendants have breached their fiduciary duties to Plaintiff and other investors in the Partnership. The remaining Defendants aided and abetted such breaches by knowingly participating in the Management Defendants' wrongdoing.

### Plaintiff's Investments in the Partnership

56.    Plaintiff invested more than $700,000 in the Partnership from August 25, 2004 through April 13, 2005, and was admitted as a Limited Partner of the Partnership as of September 2004.

### The Collapse of the Partnership

57.    Defendants began to partially disclose the Partnership's ailing financial condition beginning in March 2007.

14

58.    In a report to investors for the month ended February 28, 2007, BSAM

stated that the Fund had returned an estimated -- 0.08%, commenting that:

> February was a volatile month in the structured credit
> markets, particularly in any credit associated with
> sub-prime mortgages.  Over the course of February,
> there were a number of failures in sub-prime
> originators as well as historically high levels of early
> delinquencies in sub-prime securitizations originated
> in 2006.  The public media carried many stories about
> potential disasters in the sub-prime market.  The
> result of this was a rapid and severe widening in the
> sub-prime credit derivatives index which in turn led
> to a broad based widening of mortgage-backed assets
> up and down the capital structure.  While *the Fund
> was well positioned for this spread widening* with its
> ABX hedges put in place over the second half of
> 2006, *the Fund was also a net purchaser of CDO
> assets in the latter part of 2006 and January 2007.
> These asset purchases were concentrated in CDOs
> with exposure to sub-prime collateral*.  Hedges
> accounted for a positive 13.5% gain with asset mark
> to market losses of 14.4% and carry of approximately
> 0.8%.

(Emphasis added.)

59.    For the month of March 2007, BSAM reported that the Fund had returned

an estimated -- 3.71%, commenting that "March was a difficult month for the Fund, as we

experienced our first negative return since we started the Fund in October of 2003.  Performance

suffered in March for two reasons:  first, continued weakness in CDOs with exposure to sub-

prime collateral caused additional mark downs in our long asset exposure; second, our short

positions rose in price as many investors who were short the sub-prime credit default index

covered their positions . . . ."

60.    For the month of April 2007, BSAM reported (on June 8, 2007) that the

Partnership returned, on an unaudited basis, --5.09%, and that this brought the year to date return

15

as of April 30, 2007, to -- 6.24%. In the June 8, 2007 report, BSAM also informed investors that

it had decided not to accept additional subscriptions in the Partnership at this time in light of

current market conditions.

61. For the period from January 1, 2007 through April 1, 2007, Limited

Partners contributed $14,250,000 to the Partnership and withdrew $9,200,289. The Fund had

$925 million of investor capital and gross long positions of $9.682 billion through March 31,

2007.

62. In April 2007, Plaintiff requested the Partnership to withdraw 100% of its

investment in the Partnership as of June 30, 2007.

63. In a July 18, 2007 letter updating Plaintiff and other investors, BSC

informed them that there was "very little value left for the investors in the High-Grade Fund as

of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the

Funds over time." The letter stated, in relevant part:

> Dear Client of Bear, Stearns & Co. Inc.:
>
> Let me take this opportunity to provide you with an
> update on the status of the High-Grade Structured
> Credit Strategies and High-Grade Structured Credit
> Strategies Enhanced Leveraged Funds managed by
> Bear Stearns Asset Management.
>
> A team at BSAM has been working diligently to
> calculate the 2007 month-end performance for both
> May and June for the funds. This process has been
> much more time-consuming than in prior months
> due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced
> with investor redemption requests and margin calls
> that they were unable to meet. The Funds sold
> assets in an attempt to raise liquidity, but were
> unable to generate sufficient cash to meet the
> outstanding margin obligations.

16

> As a result, counterparties moved to seize collateral
> or otherwise terminate financing arrangements they
> had with the Funds.  During June, the Funds
> experienced significant declines in the value of their
> assets resulting in losses of net asset value.

*  *  *

> Fund managers and account executives have been
> informing the Funds' investors of the significant
> deterioration in performance for May and June.

> The preliminary estimates show there is effectively
> no value left for the investors in the Enhanced
> Leverage Fund and *very little value left for the*
> *investors in the High-Grade Fund* as of June 30,
> 2007.  In light of these returns, we will seek an
> orderly wind-down of the Funds over time.

*  *  *

(Emphasis added.)

64.    The letter also conceded that investor confidence in BSAM had been

seriously impaired, and that it had restructured its deeply flawed risk management function and

instituted additional oversight, stating that:

> In the past weeks Bear Stearns has taken action to
> restore investor confidence in BSAM.  On June
> 29th, we announced that Jeff Lane was appointed
> chairman and chief executive officer of BSAM.
> Tom Marano, head of Bear Stearns' mortgage
> department, has been assigned to BSAM to aid in
> achieving orderly sales of the Funds' assets.

> *The risk management function at BSAM has been*
> *restructured so that it will now report up to Mike*
> *Alix, Bear Stearns' chief risk officer, creating an*
> *additional layer of oversight*.  Mike Winchell,
> former head of risk management for Bear Stearns
> and most recently with Bear Wagner, has been
> engaged to consult with BSAM with regard to its
> hedge fund risk management function.

(Emphasis added.)

17

65.    On August 5, 2007, BSC announced the resignation of co-President and co-Chief Operating Officer Warren Spector, stating that "In light of recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure."

66.    In an August 6, 2007 article concerning Mr. Spector's departure, entitled *A Top Official at Bear Stearns Ousted*, the New York Times observed that "The abrupt tightening of the credit markets recently has hit Bear Stearns particularly hard. In many ways ***it was a crisis that Bear, with its long expertise in bonds, structured products and in particular mortgage-backed securities, should have seen coming*.**" (Emphasis added.)

67.    As the foregoing disclosures demonstrate, the Management Defendants breached their fiduciary duties to Plaintiff and the Class by failing to disclose that they had not monitored and hedged the Partnership's positions as they had committed themselves to do, and that they had otherwise failed to implement risk management procedures and other strategies to protect investors' Interests. As a result of these breaches, Plaintiff and the Class suffered enormous financial losses.

## FIRST CAUSE OF ACTION

### (Class Claim for Breach of Fiduciary Duty Against the Management Defendants Under Delaware Law)

68.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 67 above as if fully set forth herein.

69.    As acknowledged in the August 2006 PPM, "The General Partner [i.e., BSAM] has fiduciary responsibilities with respect to the Partnership and will make investment decisions in a manner consistent with those responsibilities."

70.     Under Delaware law, the Management Defendants owed to Plaintiff and other members of the Class the highest obligations of due care, good faith, candor, loyalty and fair dealing.

71.     The Management Defendants systematically and continuously over a period of at least a year failed to disclose to investors that they:  (a) were not sufficiently monitoring and adequately assessing the credit risk inherent in the Partnership's investments; (b) were not determining the frequency and severity of defaults of the underlying assets of each of the structured finance securities invested in by the Partnership; (c) were not developing and implementing credit enhancement mechanisms which would cause cash flow to be diverted away from the Partnership's riskier investments under certain market conditions; and (d) were not otherwise adequately engaging in hedging techniques to minimize risk.

72.     Based upon these non-disclosures, the Management Defendants have breached their fiduciary duties to Plaintiff and other investors in the Partnership.

73.     Had the Management Defendants disclosed these facts to Plaintiff and other investors, they would have taken steps to avoid the massive losses they suffered, such as by withdrawing their funds from the Partnership, removing BSAM as General Partner (pursuant to Section 3.2 of the Partnership Agreement), instituting their own hedges, and/or bringing suit before the value of their investments in the Partnership plummeted.

74.     Plaintiff and other Class members have suffered damages proximately caused by the Management Defendants' breaches of fiduciary duties and are liable for damages in an amount to be proven at trial.  In particular, Plaintiff and other Class Members lost nearly the entire value of their investments in the Fund, losing many millions of dollars.

19

## SECOND CAUSE OF ACTION

### (Class Claim for Aiding and Abetting Breach of Fiduciary Duty Against BSC, BSSC and BS&Co. Under Delaware Law)

75.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 74 above as if fully set forth herein.

76.     As alleged above, the Management Defendants owed fiduciary duties to Plaintiff and other Class members.

77.     As alleged above, the Management Defendants breached the fiduciary duties they owed to Plaintiff and other Class members.

78.     BSC, BSSC and BS&Co. knowingly participated in the Management Defendants' breaches of fiduciary duties.

79.     BSC, BSSC and BS&Co. had actual knowledge of the breaches of fiduciary duties by the Management Defendants, and substantially assisted the Management Defendants in those breaches.

80.     In particular, the Fund's daily mark to market was done in-house by BSC's repo desk and the portfolio management team, which admittedly kept them in touch with any price movements that could foretell problems in any one of the Fund's investments.

81.     Further, BSC's risk management department monitored the Fund's positions and things such as minimum rating requirements, overall and net leverage and any portfolio concentrations, and BSC's global credit department would meet with the portfolio management team to discuss their positions, risk management and hedging techniques.

82.     BSSC knowingly participated in the Management Defendants' breach of fiduciary duty in its role as custodian and prime broker to the Fund and Master Fund.

20

83.    Plaintiff and other Class members have suffered damages proximately

caused by BSC's, BSSC's and BS&Co.'s knowing participation in the foregoing breaches of

fiduciary duties by the Management Defendants.

84.    Accordingly, BSC, BSSC and BS&Co. are liable to Plaintiff and other

Class members for aiding and abetting the Management Defendants' breaches of their fiduciary

duties to Plaintiff and other Class members, and are liable for damages in an amount to be proven

at trial.

## THIRD CAUSE OF ACTION

### (Derivative Claim For Breach of Fiduciary Duty Against the Management Defendants Under Delaware Law)

85.    Plaintiff incorporates by reference the allegations of paragraphs 1 through

84 above as if fully set forth herein.

86.    This claim is asserted derivatively against the Management Defendants on

behalf of the Partnership.

87.    As acknowledged in the August 2006 PPM, "The General Partner [i.e.,

BSAM] has fiduciary responsibilities with respect to the Partnership and will make investment

decisions in a manner consistent with those responsibilities."

88.    Under the Partnership Agreement, the General Partner is not relieved of

liability resulting from, *inter alia*, errors in judgment or any act or omission where the General

Partner was grossly negligent, engaged in willful misconduct, or acted fraudulently or in bad

faith.

89.    Under Delaware law, the Management Defendants owed to the Partnership

the highest obligations of due care, good faith, candor, loyalty and fair dealing.

21

90.     By reason of the foregoing, the Management Defendants breached their

fiduciary duties to the Partnership, including by their grossly negligent and/or bad faith failure to

adequately assess, monitor and hedge the credit risks of investments held by the Fund and the

Master Fund, and otherwise failing to manage the Fund with the requisite amount of due care.

91.     The Partnership has suffered damages proximately caused by the

Management Defendants' breaches of fiduciary duties, and the Management Defendants are

liable for damages in an amount to be proven at trial. In particular, the Partnership lost nearly its

entire value, losing many millions of dollars.

92.     Plaintiff did not make any demand on BSAM to institute this action

because such demand would have been a futile and useless act, given that BSAM remains the

General Partner of the Partnership and is one of the primary wrongdoers.

## FOURTH CAUSE OF ACTION

### (Derivative Claim For Aiding and Abetting Breach of Fiduciary Duty Against BSC, BSSC and BS&Co. Under Delaware Law)

93.     Plaintiff incorporates by reference the allegations of paragraphs 1 through

92 above as if fully set forth herein.

94.     As alleged above, the Management Defendants owed fiduciary duties to

the Partnership.

95.     As alleged above, the Management Defendants breached the fiduciary

duties they owed to the Partnership.

96.     BSC, BSSC and BS&Co. knowingly participated in the Management

Defendants' breaches of fiduciary duties.

22

97. BSC, BSC and BS&Co. had actual knowledge of the breaches of fiduciary duties by the Management Defendants, and substantially assisted the Management Defendants in those breaches.

98. In particular, the Fund's daily mark to market was done in-house by BSC's repo desk and the portfolio management team, which admittedly kept them in touch with any price movements that could foretell problems in any one of the Fund's investments.

99. Further, BSC's risk management departments monitored the Fund's positions and things such as minimum rating requirements, overall and net leverage and any portfolio concentrations, and BSC's global credit department would meet with the portfolio management team to discuss their positions, risk management and hedging techniques.

100. The Partnership has suffered damages proximately caused by these Defendants' knowing participation in the foregoing breaches of fiduciary duties by the Management Defendants.

101. Accordingly, BSC, BSSC and BS&Co. are liable to the Partnership for aiding and abetting the Management Defendants' breaches of their fiduciary duties to the Partnership, and are liable for damages in an amount to be proven at trial.

102. Plaintiff did not make any demand on BSAM to institute this action because such demand would have been a futile and useless act, given that BSAM remains the General Partner of the Partnership and is one of the primary wrongdoers.

WHEREFORE, Plaintiff demands judgment as follows:

a.   declaring this action to be a proper derivative and class action;

b.   declaring Plaintiff to be the representative of the Class;

23

c.    declaring that the Management Defendants and each of them have violated their fiduciary duties to the Partnership and to Plaintiff and the Class;

d.    declaring that Defendants BSC, BSSC and BS&Co. aided and abetted the Management Defendants' breaches of fiduciary duties;

e.    ordering Defendants, jointly and severally, to account to Plaintiff and the other members of the Class for all damages suffered or to be suffered by them or by the Partnership as a result of the Defendants' actions complained of herein;

f.    awarding Plaintiff, the Class and the Partnership damages in an amount to be proven at trial, including pre- and post-judgment interest;

g.    awarding Plaintiff the costs and disbursements of the action, as well as reasonable attorneys' fees and experts' fees; and

h.    granting such other and further relief as this Court may deem just and proper.

Dated:    August 6, 2007

By:    _____
Vincent R. Cappucci
Andrew J. Entwistle
Stephen D. Oestreich
Robert N. Cappucci
Michael H. Rosner
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

Douglas R. Hirsch
**SADIS & GOLDBERG LLP**
551 Fifth Avenue
21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Facsimile:  (212) 947-3796

*Attorneys for Plaintiff and the Class*

24

VERIFICATION

NAVIGATOR CAPITAL PARTNERS, L.P., BY STEVEN RESNICK, named plaintiff in the foregoing derivative and class action, hereby declares as follows:

I have read the complaint, and, based on the investigation conducted through counsel, know the contents thereof, I am informed and believe that the matters stated therein are true, and on that ground allege that the matters stated therein are true.

Executed this  _6_  day of August 2007, at New York, New York

_____
STEVEN RESNICK