UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NAVIGATOR CAPITAL PARTNERS, L.P., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>BEAR STEARNS ASSET MANAGEMENT INC., BEAR, STEARNS SECURITIES CORP., THE BEAR STEARNS COMPANIES INC., BEAR, STEARNS & CO. INC., RALPH CIOFFI, RAYMOND MCGARRIGAL, MATTHEW TANNIN, BARRY COHEN, GERALD CUMMINS, DAVID SANDELOVSKY, GREGORY QUENTAL, SCOTT LENNON, MICHELLE WILSON-CLARKE, AND WALKERS FUND SERVICES LIMITED,<br><br>Defendants,<br><br>- and -<br><br>BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES, L.P.,<br><br>Nominal Defendant. | No. 07 Civ. 07783 (AKH)<br><br>ECF Case<br><br>**FIRST AMENDED CLASS ACTION AND VERIFIED DERIVATIVE COMPLAINT**<br><br>Jury Trial Demanded |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................ 2

        A.      Structure and Putative Purpose of the Master Fund and the Partnership ............... 4

        B.      Defendants Conceal and Misrepresent the Liquidity Problems and Poor
                Performance of the Partnership Resulting From Their Grossly Negligent
                and/or Bad Faith Mismanagement ............................................................ 8

        C.      The Master Fund and Partnership Collapse ................................................ 12

II.     JURISDICTION AND VENUE ........................................................................ 15

III.    THE PARTIES ............................................................................................. 15

        A.      Plaintiff Navigator Capital Partners, L.P. ................................................ 15

                1.      Bear Stearns Asset Management ................................................ 16

                2.      Ralph Cioffi ........................................................................ 16

                3.      Matthew Tannin ................................................................... 17

                4.      Raymond McGarrigal ............................................................ 17

        B.      Bear Stearns Corporate Defendants ........................................................ 18

                1.      The Bear Stearns Companies Inc. .............................................. 18

                2.      Bear, Stearns Securities Corporation ......................................... 19

                3.      Bear, Stearns & Co. Inc. ......................................................... 19

        C.      Independent Master Fund Director Defendants ........................................... 20

                1.      Scott Lennon ....................................................................... 20

                2.      Michelle Wilson-Clarke ......................................................... 21

        D.      Affiliated Master Fund Director Defendants .............................................. 21

                1.      Barry Cohen ........................................................................ 21

                2.      Gerald Cummins .................................................................. 22

                3.      David Sandelovsky ............................................................... 22

                4.      Gregory Quental .................................................................. 22

        E.      Walkers Fund Services Limited ............................................................. 24

        F.      Nominal Defendant, Bear Stearns High-Grade Structured Credit
                Strategies, L.P. ............................................................................... 25

IV.     FACTUAL BACKGROUND .......................................................................... 25

        A.      Creation of the High-Grade Master Fund and the Partnership .......................... 25

                1.      The Sale of Partnership Interests .............................................. 28

                2.      Limited Partner Capital Accounts ............................................. 30

3.   Plaintiff's Purchase of Limited Partnership Interests ............................... 31

B.   The Investment Strategy Promised to Limited Partners ....................................... 31

1.   The Investment Strategy Focuses on Structured Finance Securities ........ 31

2.   The Promised Use of Leverage ................................................................. 36

3.   Proclaimed Hedging and Risk Management Strategy .............................. 38

C.   The High-Grade Master Fund's Transactions with Bear Stearns Entities ............ 40

D.   The Management Defendants' Fiduciary Duties and Contractual Obligations to Limited Partners ....................................................................... 43

1.   The Management Defendants' Duty to Monitor Diligently the High-Grade Master Fund's Credit Risk ..................................................... 43

2.   The Management Defendants' Duty to Value Portfolio Assets Fairly ........................................................................................................ 45

3.   The Management Defendants' Duty to Accurately Disclose the High-Grade Master Fund's Performance ................................................... 47

4.   The Management Defendants' Duty to Fairly Assess Fees and Profit Shares to Paid to Them by the Partnership ..................................... 49

5.   The Management Defendants' Duty to Obtain Approvals for the Related-Party Transactions Involving the High-Grade Master Fund ....... 50

E.   Rights of Limited Partners ................................................................................. 51

1.   Each Limited Partner Had the Right to Redeem its Interests on Notice ...................................................................................................... 52

2.   Each Limited Partner Had the Right to Seek to Remove BSAM as General Partner ....................................................................................... 53

3.   Each Limited Partner Had the Right to Rely on the Affiliated and Independent Directors to Oversee the High-Grade Master Fund ............. 54

4.   Each Limited Partner Had the Right to Accurate and Complete Disclosures Regarding the Operation and Performance of the High-Grade Master Fund and the Partnership ................................................... 54

V.   THE RISE AND FALL OF THE HIGH-GRADE MASTER FUND .............................. 56

A.   The High-Grade Master Fund's Early Putative Returns ....................................... 56

B.   Bear Stearns' Self-Dealing ................................................................................. 58

1.   The Management Defendants Failed to Obtain Required and Promised Approvals for a Multitude of Related-Party Transactions ........ 60

2.   The Independent Directors Were Not Truly Independent ........................ 65

C.   The Enhanced Fund is Formed to Conceal and Defray Liquidity Problems Within the High-Grade Master Fund and Partnership ........................................... 65

|   | D. | Everquest is Formed as an Additional Mechanism to Conceal High-Grade Master Fund and Partnership Liquidity Problems | 67 |
|   | E. | The High-Grade Master Fund Begins to Unravel and the Management Defendants Lie to Limited Partners | 68 |
|   |   | 1. The First Indications of Trouble with the High-Grade Master Fund | 69 |
|   |   | 2. The Management Defendants Fight Massive Redemptions | 73 |
|   |   | 3. The Partnership 2006 Audit Report Reveals the Extent of Self-Dealing | 75 |
|   |   | 4. The Truth Becomes Known | 76 |
|   |   | 5. Defendants Are Forced to Admit That the High-Grade Master Fund is Worthless | 79 |
| VI. | | MISMANAGEMENT OF THE PARTNERSHIP AND BREACHES OF FIDUCIATY AND CONTRACTUAL DUTIES OWED DIRECTLY TO LIMITED PARTNERS | 82 |
|   | A. | The Management Defendants Deliberately Abandoned the Stated Partnership Investment Strategy | 83 |
|   | B. | The Management Defendants Made Grossly Negligent Bets on Subprime Mortgages | 85 |
|   | C. | The Management Defendants Benefited Themselves by Consistently Overvaluing Partnership's Assets | 89 |
|   | D. | The Management Defendants' Gross Negligence Created a Constant Liquidity Crisis | 91 |
|   | E. | The Management Defendants Failed to Adequately Hedge the Partnership's Investments | 93 |
| VII. | | WALKERS KNOWINGLY PARTICIPATED IN THE MANAGEMENT DEFENDANTS' BREACHES OF THEIR DUTIES TO THE PARTNERSHIP AND LIMITED PARTNERS | 94 |
| VIII. | | RULE 23.1 DERIVATIVE STANDING ALLEGATIONS | 98 |
| IX. | | DEMAND FUTILITY ALLEGATIONS | 98 |
|   | A. | BSAM Is Neither Disinterested Nor Independent | 99 |
|   |   | 1. BSAM Faces Substantial Likelihood Of Liability For Its Breaches Of Fiduciary Duties | 99 |
|   |   | 2. BSAM Received Substantial Financial Benefit From Its Breaches Of Fiduciary Duties | 102 |
|   |   | 3. BSAM Engaged In Self-Dealing Transactions | 104 |
|   |   | 4. BSAM Is Not Independent | 105 |

      B.     The Partnership's Joint Liquidators Are Neither Disinterested Nor Independent ............................................................................................ 106

X.      CLASS ACTION ALLEGATIONS ................................................................ 109

XI.     CAUSES OF ACTION ................................................................................. 111

COUNT I ................................................................................................................ 111

      Class Claim for Breach of Fiduciary Duty Against the Management Defendants

COUNT II ............................................................................................................... 113

      Class Claim for Breach of Contract Against the Management Defendants

COUNT III .............................................................................................................. 115

      Class Claim for Common-Law Fraud Against the Management Defendants

COUNT IV .............................................................................................................. 117

      Class Claim for Aiding and Abetting Breach of Fiduciary Duty Against the Director Defendants, The Bear Stearns Corporate Defendants, and Walkers

COUNT V ................................................................................................................ 120

      Class Claim for Aiding and Abetting Common-Law Fraud Against the Director Defendants, the Bear Stearns Corporate Defendants, and Walkers

COUNT VI .............................................................................................................. 122

      Derivative Claim For Breach of Fiduciary Duty Against the Management Defendants

COUNT VII ............................................................................................................ 124

      Derivative Claim for Breach of Fiduciary Duty Against the Director Defendants

COUNT VIII ........................................................................................................... 126

      Derivative Claim for Gross Negligence Against the Management Defendants

COUNT IX .............................................................................................................. 127

      Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty Against the Director Defendants, the Bear Stearns Corporate Defendants, and Walkers

XII.    JURY DEMAND .......................................................................................... 131

Plaintiff, Navigator Capital Partners, L.P., ("Plaintiff" or "Navigator"), individually and on behalf of all others similarly situated, and derivatively on behalf of nominal defendant Bear Stearns High-Grade Structured Credit Strategies, L.P. (the "Partnership"), alleges the following upon information and belief (except for those allegations pertaining to Plaintiff, which are based upon personal knowledge).

Plaintiff's information and belief is based upon, among other things, a continuing investigation, directed by Plaintiff and conducted by and through Plaintiff's undersigned counsel, into the facts and circumstances alleged herein including, without limitation, review and analysis of:

(i)     documents that the Defendants named herein authorized, drafted, created, and/or provided to Plaintiff and to other holders of limited partnership interests ("Limited Partners") in the Partnership, including, but not limited to, the form of Subscription Agreement For Limited Partners hip Interests (the "Subscription Agreement"), the August 31, 2006 Amended and Restated Limited Partnership Agreement (the "Partnership Agreement" or "LPA"), the Private Placement Memorandum (the "PPM") for Limited Partnership Interests dated August 2006 (collectively, the Subscription Agreement, Partnership Agreement, and the PPM are referred to herein as the "Partnership Documents"), the monthly Preliminary Performance Profiles applicable to the Partnership (the "Monthly Profiles"), and the audited financial statements for the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "Master Fund");

(ii)    press releases, public statements, telephone conferences, news articles, analyst commentary, and other publications concerning the Master Fund, the Partnership and/or the Defendants;

(iii)   internal e-mails and other documents attached to the Administrative Complaint that the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed against Defendant Bear Stearns Asset Management Inc. ("BSAM") on November 14, 2007 (the "Administrative Complaint");

(iv)    the civil fraud complaint that the United States Securities and Exchange Commission (the "SEC") filed against Defendants Ralph Cioffi and Matthew Tannin in the United States District Court for the Eastern District of New York on June 19, 2008 (the "SEC Complaint") after conducting a year-long investigation, which included reviewing documents produced pursuant to requests issued beginning on June 18, 2007;

(v)     the criminal indictment (the "Indictment") returned by a Grand Jury empanelled in the United States District Court for the Eastern District of New York after a year-long investigation (involving a review of hundreds of thousands of pages of documents and scores of witness interviews) conducted by the United States Attorney's Office for the Eastern District of New York (the "Government") charging Defendants Ralph Cioffi and Matthew Tannin with securities and wire fraud as well as criminal conspiracy to commit the same concerning the Partnership; and

(vi)    consultation with experts in, among other things, structured finance.

Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control.  Plaintiffs believe that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery, including, but not limited to, a review of all documents and materials that Defendants have provided to the SEC and/or the Government.

## I.     SUMMARY OF THE ACTION

1.      This is a class action on behalf of all holders of limited partnership interests ("Interests" or "Partnership Interests") in the Partnership between August 31, 2004 and July 18, 2007 (the "Class Period"), as well as a derivative action on behalf of the Partnership, based upon Defendants' (defined below) breaches of fiduciary duty, breaches of contract, fraud, gross negligence, and aiding and abetting breaches of fiduciary duty.  As a direct result of the Defendants' conduct alleged herein, the Partnership lost the entirety of its value -- approximately $1 billion -- and Limited Partners were foreclosed from exercising rights under the Partnership Documents that would have enabled them to avoid the massive losses that they suffered by trusting the Defendants to act honestly, competently, in good faith, in compliance with the Partnership Documents and the law, and in the best interests of the Partnership and its Limited Partners.

2.       In violating their fiduciary and contractual duties and obligations, Defendants BSAM, Ralph Cioffi ("Cioffi"), Matthew Tannin ("Tannin"), and Raymond McGarrigal ("McGarrigal") (collectively, the "Management Defendants") used the Partnership and the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., through which the Partnership invested, as a ready purchaser of overpriced and risky subprime mortgage-backed structured finance securities primarily issued by the Management Defendants themselves.  For a while, the Management Defendants' investment "strategy," coupled with their intentional pattern of self-interested misrepresentations and concealment, earned them the high fees that they desired.  Despite taking numerous desperate measures, however, the Management Defendants could not outrun the damage that their gross negligence, bad faith, self-dealing, and lies directly caused.  On July 18, 2007, the Management Defendants were forced to admit that they had decimated the Partnership down to its last penny and that Plaintiff and other Limited Partners who had relied upon the Management Defendants to act in the Limited Partners' best interests would be left with nothing.

3.       Plaintiff demonstrated its willingness and ability to pursue claims on behalf of the Partnership and the Class arising from Defendants' wrongdoing by promptly filing its Class Action and Verified Derivative Complaint in New York State Court on August 6, 2007 (the "Action").  Defendants timely removed the Action to this Court.  Following the Second Circuit's reversal of this Court's remand of the Action to State Court, Plaintiff files this First Amended Complaint on behalf of the Partnership and the Class based upon additional facts that have emerged since the time that Plaintiff first filed the Action.

A.   **Structure and Putative Purpose of the Master Fund and the Partnership**

4.      As set forth in detail herein, the Partnership invested substantially all of its assets through the Master Fund in what is termed a "master-feeder" arrangement.  BSAM was the General Partner and Investment Manager of the Partnership and the Master Fund, and carried out its responsibilities through Defendants Cioffi, Tannin and McGarrigal.  Defendant Bear, Stearns Securities Corporation ("BSSC") served as prime broker and custodian of the Master Fund.  Defendant Bear, Stearns & Co. Inc. ("BS&Co.") served as, among other things, placement agent to the Partnership and the Master Fund, and Defendant The Bear Stearns Companies Inc. ("BSC") provided a variety of services to the Partnership and the Master Fund, including, but not limited to valuing their holdings.  (BSSC, BS&Co. and BSC are referred to collectively as the "Bear Stearns Corporate Defendants" and, together with the Management Defendants, the Bear Stearns Corporate Defendants are sometimes referred to herein as "Bear Stearns".)

5.      The stated objective of the Partnership was to seek high current income and capital appreciation, primarily through leveraged investments in investment-grade structured finance securities, chiefly collateralized debt obligations ("CDOs"), with an emphasis on triple-A and double-A rated classes.  In fact, the Partnership Documents provided that the Master Fund's investment portfolio would consist of approximately 90% low-risk investment-grade senior CDO classes rated AAA to AA- (excluding investments in the Repackaging Vehicle Junior Interests discussed below).  Among other things, the Partnership Documents promised Limited Partners that Partnership funds would be invested, monitored, and hedged consistent with the Management Defendants' structured finance expertise and the fiduciary duties they owed under the Partnership Documents and Delaware law.

4

6.      The Partnership Documents acknowledged that the involvement of the
Management Defendants as both General Partner and Investment Manager, as well as the roles
of the Bear Stearns Corporate Defendants in connection with the Partnership and the Master
Fund, presented numerous actual and potential conflicts of interest.  Representations in the
Partnership Documents, however, assured Limited Partners that mechanisms existed and would
be followed so that the Management Defendants would properly act in the best interests of the
Limited Partners and the Partnership.

7.      For example, a key component of the stated investment strategy was for the
Master Fund to purchase unrated and illiquid equity securities known as "Repackaging Vehicle
Junior Interests" from structured finance vehicles ("Repackaging Vehicles"), such as Parapet,
Rampart, and Klio, established and/or managed by the Management Defendants or other Bear
Stearns affiliates.  The Repackaging Vehicles typically issued securities like Repackaging
Vehicle Junior Interests (commonly referred to in the structured finance securities industry as
"toxic waste") and used the proceeds to purchase assets.  Included among the assets that the
Repackaging Vehicles purchased were subprime mortgage-backed securities.  The Management
Defendants and the Bear Stearns Corporate Defendants received substantial fees for arranging
and managing their Repackaging Vehicles, and these Defendants depended upon the Master
Fund and the Partnership to serve as a market for their riskiest securities.

8.      Because there was no secondary market for the Repackaging Vehicle Junior
Interests, the Partnership Documents assured Limited Partners that such securities would be
purchased at fair prices and carried at fair value as reasonably determined in good faith by the
Management Defendants, *i.e.* "manager marks."  Moreover, because Partnership/Master Fund
purchases of Repackaging Vehicle Junior Interests were related-party transactions/principal

trades, the approval of independent Master Fund Directors, Defendants Scott Lennon and

Michelle Wilson-Clarke (together, the "Independent Directors") were required to comply with

the Investment Advisers Act of 1940 (the "Investment Advisers Act") and the terms of the

Partnership Documents.  As set forth herein, the Management Defendants and the Independent

Directors wholly failed to comply with the requirements for obtaining approval for these and

other related-party transactions/principal trades, violating the Investment Advisers Act and the

promises made in the Partnership Documents.

9.      The Management Defendants skirted the related-party transaction/principal trade

approval requirements of the Partnership Documents and breached other duties to the Partnership

and Limited Partners so that the Management Defendants could impermissibly saddle the Master

Fund and the Partnership with risky securities backed by subprime mortgages to serve their own

financial interests.  First, the Management Defendants were able to earn fees by selling Bear

Stearns' most troubled securities into the Master Fund and the Partnership at inflated prices.

Second, pursuant to the Partnership Documents, the Management Defendants earned Advisory

Fees and a Profit Share based largely upon the Net Asset Value ("NAV") of the Partnership.  For

this reason, the Management Defendants persistently assigned inflated values to the Repackaging

Vehicle Junior Interests and other securities held by the Master Fund and the Partnership.

10.      The diagram below depicts how the Management Defendants and the Bear

Stearns Corporate Defendants used the Master Fund and the Partnership as a "money machine"

to serve their own interests to the detriment of Plaintiff, the other Limited Partners, and the

Partnership:



Plaintiff and Other
Limited Partnership Investors
Limited Partnership Interests
Advisory Fees & Profit Share ($13.3m in 2006)
$
Management Defendants
BSAM
Ralph Cioffi
Raymond McGarrigal
Matthew Tannin
General Partner & Investment Manager
Bear Stearns High-Grade
Structured Credit Strategies, L.P.
(the "Partnership")
BS&Co.
(Broker-dealer subsidiary of BSC & BSSC;
served as a placement agent for the Partnership)
Investment Manager
Shares in Master Fund
Bear Defendants were directly involved in forming many of the subprime CDO securities bought by the Partnership
BSSC
(Prime Broker & Custodian of the Partnership and Master Fund)
Bear Stearns High-Grade
Structured Credit Strategies, L.P.
Master Fund
Meet to discuss positions, risk management & hedging techniques
BSC
(Parent of BSAM, BSSC
and BS&Co.)
Daily valuation and monitoring
Subprime CDO securities and other risky
subprime mortgage-backed securities

**B.**     **Defendants Conceal and Misrepresent the Liquidity Problems and Poor Performance of the Partnership Resulting From Their Grossly Negligent and/or Bad Faith Mismanagement**

11.      While inflating the Partnership's NAV by assigning phony prices and values to illiquid assets, the Management Defendants represented that the Partnership was experiencing months of consecutive positive returns as of August 2006.  The truth, however, was far different. Based upon the self-dealing and basically useless investments that the Management Defendants had plunged into the Master Fund (and carried at grossly inflated values), the Partnership was experiencing severe liquidity problems.  Although concealed from Plaintiff and from the other Limited Partners, the Partnership's problems were so acute that the Management Defendants cobbled together an alternative fund, the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, (the "Enhanced Master Fund"), which was launched together with a domestic and an overseas feeder fund on or about August 1, 2006 (collectively, the "Enhanced Fund").  In connection with forming the Enhanced Funds, the Management Defendants duped Barclays Bank Plc. ("Barclays") to act as leverage counterparty and, unbeknownst to Barclays, as an indirect source of much-needed liquidity for the Partnership.

12.      Toward the end of the summer of 2006, and as a result of the massive volume of related-party transactions/principal trades in which the Management Defendants engaged without obtaining approval from the Independent Directors, BSC suspended the Management Defendants' ability to transact with Bear Stearns entities in connection with the Master Fund and Partnership.  This measure restricted access to a critical liquidity source and placed the Master Fund and the Partnership in further jeopardy.  Rather than disclose these constraints and associated risks to Limited Partners, however, the Management Defendants intensified their efforts to move all Limited Partners into the new Enhanced Fund structure and close down the High-Grade Master Fund and the Partnership.

13.     A September 17, 2006 e-mail exchange between Cioffi and Tannin under the

subject of "Liquidity Game Plan" addressed the very issue of "rolling" Partnership investors into

the Enhanced Fund.  This exchange, as alleged herein, demonstrates not only that the

Management Defendants knew that they had assigned unsupportable and inaccurate prices and

carrying values ("marks") to Partnership assets, but also lays bare the Management Defendants'

intention to play "beat the clock" by closing the Partnership down before having to reveal its true

performance and asset composition to Limited Partners, who would have exercised their

redemption rights.  In Cioffi's own words:

> ***What I was thinking was to build up 6 mos. of returns then send
> a letter to all the remaining investors and tell them we are closing
> the [Partnership] and ask everyone to convert to the [Enhanced
> Partnership].***  We'd have to handle it like we did a thru exchange
> of assets I would not want to have to sell everything.  This is the
> riskiest way to go because you know some LPs will not convert but
> I feel comfortable that we can get almost all of them to.

(emphasis added.)

Fueled by misrepresentations concerning the putative performance of the Partnership, the

Management Defendants convinced a number of Limited Partners to convert their Partnership

holdings into investments in the Enhanced Fund.  Moreover, approximately 36.74% of the assets

of the High-Grade Master Fund were transferred to comprise the assets of the newly created

Enhanced Master Fund, which would eventually suffer the same fate as the Partnership and the

High-Grade Master Fund.

14.     The Master Fund and the Partnership's liquidity and performance problems were

so severe, however, that even the Management Defendants' plan to "roll" everything into the

new Enhanced Fund structure secured by Barclays was not enough to assuage their fears of

getting caught.  Soon after the Enhanced Fund launched, the Management Defendants conceived

of another vehicle that they intended to use to disguise problems within both Funds, Everquest Financial Ltd. ("Everquest").

15.    The High-Grade Master Fund and the Enhanced Fund sold approximately $555 million of their worst CDO assets (most of which were previously owned through Parapet, a BSAM Repackaging Vehicle) to Everquest in exchange for $150 million in cash and 16 million shares of Everquest, purportedly valued at $25 per share.  Pursuant to a registration statement filed with the SEC on May 9, 2007, the Management Defendants' planned to raise desperately needed liquidity through an initial public offering of Everquest shares.  In June 2007, however, the Everquest IPO scheme was scrapped because investors eventually saw the offering for what it was:  an unabashed attempt by Bear Stearns to earn further fees by offloading its worst assets on the public.

16.    In addition to their efforts to conceal the Master Fund and Partnership's performance problems through the Enhanced Fund and Everquest, the Management Defendants consistently misrepresented, among other things:  (i) the performance and NAV of the Partnership; (ii) the effectiveness of putative hedges; (iii) the extent of leverage; and (iv) the Partnership's exposure to subprime mortgages.  Moreover, when Limited Partners became increasingly concerned with the impact of the downturn in the subprime mortgage market on their investments, the Management Defendants allayed Limited Partners' fears by lying about the number of redemption requests, as well as the level of new investments in the Partnership.  As alleged herein, the Management Defendants, with the knowing participation of the Bear Stearns Corporate Defendants, the Director Defendants, and Walkers, made several such misrepresentations in communications with Limited Partners, including, but not limited to, the Monthly Profiles, the Master Fund financial statements, and during telephone conferences.

17.     For example, the Monthly Profiles distributed to Limited Partners misrepresented the Partnership's subprime exposure as being only approximately 6% of assets.  While the foregoing figure addressed the Partnership's direct exposure to subprime, the Management Defendants had buried the Partnership's crippling indirect exposure to subprime mortgages in the column reserved for asset backed securities ("ABS"), which was 81% and 86% of collateral in February 2007 and March 2007, respectively.  During this time, the Management Defendants continued to claim falsely that approximately 90% of the Partnership's portfolio was rated from AAA to AA.

18.     As alleged in detail herein, during telephone conferences with investors in January, March, and April of 2007, the Management Defendants also made numerous false statements concerning the Partnership's subprime holdings and exposure as well as the effectiveness of the Management Defendants' hedging strategy.  These statements squarely contradicted the Management Defendants' privately expressed concerns and observations, and were directly intended to suppress and misrepresent information that would have caused Limited Partners to exercise their contractual rights to redeem.  Tellingly, in the midst of these misrepresentations, Defendant Cioffi secretly withdrew $2 million of his own investment from the Enhanced Fund while both he and Defendant Tannin told Limited Partners that they were *increasing* their investments in the High-Grade and Enhanced structures and were encouraging others that it was the right time for them to do the same.

19.     An April 19, 2007 BSAM internal risk-exposure report (the "BSAM Report") revealed that as of March 2007, the Master Fund's overall collateral including all asset classes was approximately "60% subprime."  Based upon his recognition that the subprime market was likely "toast," Defendant Tannin fired off panicked e-mails to Cioffi and McGarrigal on April

22, 2007, suggesting that the Master Fund and the Partnership should be closed immediately.

The Management Defendants held a conference call with Limited Partners and other investors

just three days later on April 25, 2007.  During this call, the Management Defendants made

numerous misrepresentations and omitted numerous facts, as alleged herein, including

pretending that:

> [W]e feel that we're in a position to do exactly what we've done all along and that the opportunities now, I mean, we were again quite cautious in 2006 and even 2005 because, on a risk-adjusted basis, it was not time to really take on significant amounts of risk. *Now is the time to do it.*  So the fact that we've been so cautious in the prior periods means that we have the capacity and the flexibility to take advantage of spreads that are simply irrational. So, from a portfolio construction and from a market view, *we're quite comfortable with where we sit*.

During this conference call, the Management Defendants also lied about the volume of

outstanding redemption requests, the level of new subscriptions, and numerous other facts

material to the operation and prospects of the Master Fund and the Partnership.

## C.    The Master Fund and Partnership Collapse

20.     Through the remainder of the spring of 2007, the Management Defendants

continued to make false statements in an effort to conceal their wholesale mismanagement of the

Partnership and to prevent Limited Partners from redeeming their Interests.  Defendants,

however, could not escape the inevitable impact of their grossly negligent and/or bad faith

failures to act in the best interests of the Limited Partners and the Partnership.  With the

prospects of the Everquest IPO in grave doubt, BSC, through its top executives, including

Warren Spector (since fired), stepped in and attempted to sell the Master Fund and Enhanced

Fund portfolios to outside investors, including Cerberus Capital Management.  When these last-

ditch efforts failed, BSC announced on June 22, 2007 that it would provide up to $3.2 billion in

financing to the Master Fund.  Ultimately, BSC provided only a small portion of this amount.  It

was too late, and the game was over when repo counterparties terminated financing agreements and moved in to sell assets and seize collateral.

21.     In a disclosure to Limited Partners on July 18, 2007, the Management Defendants finally admitted that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the Funds over time."  At the time of its collapse at the hands of the Management Defendants, whose multiple transgressions were aided and abetted by the Bear Stearns Corporate Defendants, the Director Defendants, and Walkers as alleged herein, the Partnership had approximately $1 billion in capital that vanished into thin air.

22.     Regulatory authorities quickly began investigations into the misconduct that resulted in the decimation of the Master Fund, the Partnership, and the Enhanced Funds.  On November 14, 2007, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed its Administrative Complaint against BSAM. The Administrative Complaint focuses upon the Management Defendants' and the Independent Directors' wholesale disregard for the approval process in connection with related-party transactions/principal trades, which was a key component of the Management Defendants' rampant self-dealing at inflated prices.

23.     Following a year-long investigation by the Government, which included substantial document review and witness interviews, Defendants Cioffi and Tannin were indicted on three counts of securities fraud, five counts of wire fraud, and one count of conspiracy to commit securities and wire fraud as a result of their activities in connection with the Partnership, Master Fund, and the Enhanced Funds.  During a hearing conducted before the Honorable

Frederic Block on July 18, 2008, the Government represented that there would likely be superseding indictments issued in the near future adding further charges.

24.     Moreover, at the time of the collapse, the SEC had already begun investigating the Management Defendants' misconduct.  After conducting its own year-long investigation, which included a substantial document review, the SEC filed its civil fraud Complaint on June 19, 2008 against Defendants Cioffi and Tannin for violating Sections 17(a) of the Securities Act of 1933 and 10(b) of the Securities Exchange Act of 1934 for their conduct in connection with the Partnership, the Master Fund, and the Enhanced Fund.  The SEC also alleges that Cioffi and Tannin spoliated what is likely some of the most damning evidence of their knowing misconduct.

25.     In sum, and as further alleged herein, the Management Defendants breached their fiduciary and contractual duties and committed fraud with the knowing participation of the Bear Stearns Corporate Defendants, the Director Defendants (defined below), and Walkers, by engaging in a variety of misconduct that directly caused Plaintiff, the Class, and the Partnership to suffer damages, including, but not limited to:

    (a)    Causing the Partnership and the Master Fund to make investments inconsistent with the terms of the Partnership Documents;

    (b)    Failing to sufficiently monitor and adequately assess the credit risk inherent in the Partnership's investments, as provided in the Partnership Documents;

    (c)    Causing the Partnership to enter into harmful and self-interested principal trades with other Bear Stearns entities without obtaining the promised and legally required approvals from the Independent Directors;

    (d)    Assigning inflated values to Partnership assets to increase their own fees and to falsely portray positive performance;

    (e)    Providing financial statements and updates to Limited Partners that did not accurately reflect the Partnership's investments or financial condition;

    (f)    Failing to adequately hedge the Partnership's investments, as provided for in the Partnership Documents;

    (g)    Failing to manage or monitor and, in fact, benefiting from acknowledged conflicts of interest;

    (h)    Misrepresenting and failing to disclose facts to Limited Partners material to the performance of the Partnership and the Limited Partners' rights to redeem their Partnership interests and/or petition for removal of the Partnership's General Partner;

    (i)    Concealing and/or misrepresenting facts related to the liquidity of the Partnership; and

    (j)    Violating the law and the promises made to Limited Partners in the Partnership Documents in connection with, among other things, related-party transactions.

## II.    JURISDICTION AND VENUE

26.    This Court has jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2)(A).

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial part of Defendants' conduct giving rise to the causes of action occurred in this District.

## III.    THE PARTIES

### A.    Plaintiff Navigator Capital Partners, L.P.

28.    Plaintiff Navigator Capital Partners, L.P. ("Plaintiff" or "Navigator") is a Delaware Limited Partnership formed on April 16, 2003, with its principal office located at 101 West End Avenue, New York, New York.  During the period from August 2004 to March 2005, Plaintiff directly invested approximately $1,450,000 of its own funds into the Partnership and itself signed the Subscription Agreement on August 25, 2004, which was countersigned by Defendant Cioffi on behalf of Defendant BSAM.  While Plaintiff in late-2005 assigned approximately $700,000 of its Interests to a third-party, it is now and was throughout the Class Period a continual holder of Partnership Interests.  Plaintiff seeks recovery for breaches of

fiduciary duties, breaches of contractual obligations, fraud and gross negligence on behalf of itself and Limited Partners as holders and on behalf of the Partnership.

### 1.    Bear Stearns Asset Management

29.    Defendant Bear Stearns Asset Management Inc. ("BSAM") was at all relevant times a corporation organized under the laws of the State of New York with its principal office located at 383 Madison Avenue, New York, New York.  BSAM was a wholly-owned subsidiary of Defendant The Bear Stearns Companies Inc. that purportedly provided expert asset management and advisory services to high net-worth investors and managed hedge funds created by it or by affiliated Bear Stearns entities.  BSAM created the Partnership, was at all times its General Partner and Investment Manager, and was the General Partner and Investment Manager of the Master Fund, a "hedge fund" through which the Partnership made all of its investments.  Additionally, as discussed below, BSAM created and/or served as investment manager for many of the structured finance vehicles and securities in which it caused the Partnership and the Master Fund to invest.  BSAM was registered with the SEC as an investment adviser under the Investment Advisers Act.

### 2.    Ralph Cioffi

30.    Defendant Ralph Cioffi is a resident of the State of New Jersey.  Mr. Cioffi was a Senior Managing Director of BSAM and a member of BSAM's Board of Directors who conceived of and founded the Partnership and the Master Fund and was at all relevant times the Senior Portfolio Manager and investment team leader of both.  Additionally, through BSAM and along with Defendants Tannin and McGarrigal, Mr. Cioffi developed and served as portfolio and collateral manager for a number of Bear Stearns affiliated structured finance vehicles in which BSAM caused the Partnership and the Master Fund to invest.  According to the Partnership Documents, Mr. Cioffi led the structured finance effort at BSAM and was the principal force

behind Bear Stearns becoming a leading underwriter and trader of structured finance securities, including CDOs, which were central to the collapse of the Partnership and the Master Fund.

### 3.   Matthew Tannin

31.    Defendant Matthew Tannin is a resident of the State of New York.  Mr. Tannin was a Senior Managing Director of BSAM and was at all relevant times the Chief Operating Officer of the Partnership and a manager of the Master Fund.  Additionally, through BSAM and along with Defendants Cioffi and McGarrigal, Mr. Tannin developed and served as portfolio and collateral manager for a number of affiliated structured finance vehicles in which BSAM caused the Partnership and the Master Fund to invest.  According to certain Partnership Documents, Mr. Tannin had years of experience at Bear Stearns structuring CDOs, which were central to the collapse of the Partnership and the Master Fund.

### 4.   Raymond McGarrigal

32.    Defendant Raymond McGarrigal is a resident of the State of New York.  Mr. McGarrigal was a Managing Director of BSAM and served as a portfolio manager of the Partnership and the Master Fund.  Additionally, through BSAM and along with Defendants Cioffi and Tannin, Mr. McGarrigal developed and served as portfolio and collateral manager for a number of Bear Stearns affiliated structured finance vehicles in which BSAM caused the Partnership and the Master Fund to invest.  According to certain Partnership Documents, Mr. McGarrigal had years of experience at Bear Stearns structuring CDOs, which were central to the collapse of the Partnership and the Master Fund.

33.    Defendants BSAM, Cioffi, McGarrigal and Tannin are collectively referred to herein as the "Management Defendants."

34.    BSAM, by virtue of its position as General Partner and Investment Manager of the Partnership, and the other Management Defendants, by virtue of their positions as managers

17

of the Partnership and BSAM's selected delegatees of certain duties to operate the Partnership, were under Delaware law and the terms of the Partnership Documents in a fiduciary and contractual relationship with Plaintiff and with other Limited Partners, and owed Plaintiff and the Class the highest obligations of due care, good faith, candor, disclosure, loyalty and fair dealing. The Management Defendants owed similar, but not identical, duties directly to the Partnership.

**B.     Bear Stearns Corporate Defendants**

**1.     The Bear Stearns Companies Inc.**

35.     Defendant The Bear Stearns Companies Inc. ("BSC") was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York.  BSC was the parent of BSAM, Bear, Stearns Securities Corporation and Bear, Stearns & Co. Inc. and, until May 30, 2008, BSC and its subsidiaries comprised one of largest global investment banks.  Among other things, BSC (with its subsidiary companies) held itself out to be an industry leader in the origination, underwriting, structuring and trading of structured finance and mortgage securities, including CDOs.  During the Class Period, BSC was the second largest underwriter of mortgage bonds in the United States.  Additionally, BSC represented that it, along with its subsidiary companies, possessed and would apply specialized expertise in structuring CDOs, which were central to the collapse of the Partnership and the Master Fund.

36.     In March 2008, largely due to the wrongdoing alleged herein, BSC experienced a liquidity crisis that brought it to the brink of bankruptcy.  In a bail-out transaction largely engineered by the Federal Reserve, JPMorgan Chase & Co. ("JPMorgan") agreed to acquire the foundering BSC.  Pursuant to a merger agreement, on May 30, 2008, a merger subsidiary of JPMorgan joined with BSC, with BSC surviving as a wholly-owned subsidiary of JPMorgan.

Due to the merger, BSC and its subsidiaries are now subsidiaries of JPMorgan, a global investment bank with its principal office at 270 Park Avenue, New York, New York.

### 2. Bear, Stearns Securities Corporation

37. Defendant Bear, Stearns Securities Corporation ("BSSC") was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at One Metrotech Center North, Brooklyn, New York, and was a subsidiary of BSC. BSSC facilitated the investments and operation of the Partnership and the Master Fund by acting as Prime Broker and Custodian for the Master Fund's trades and transactions, many of which violated the law and the terms of the Partnership Documents to the detriment of Limited Partners and the Partnership.

### 3. Bear, Stearns & Co. Inc.

38. Defendant Bear, Stearns & Co. Inc. ("BS&Co.") was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and was a broker-dealer subsidiary of BSC and BSSC. BS&Co. is registered with the SEC as a broker-dealer and as an investment adviser under the Investment Advisers Act. BS&Co. facilitated the investments and operation of the Partnership and the Master Fund by providing placement services to the Master Fund. In addition, during the life of the Master Fund, BS&Co. was party to or facilitated thousands of related-party trades and transactions between it, other Bear Stearns entities, and the Master Fund, many of which violated the law and the terms of the Partnership Documents to the detriment of the Limited Partners and the Partnership.

39. BSC, BSSC and BS&Co. (collectively, the "Bear Stearns Corporate Defendants") aided and abetted the Management Defendants' and Director Defendants' (defined below) various breaches of fiduciary duties and gross negligence. The Bear Stearns Corporate

Defendants had knowledge of the various breaches of fiduciary duties and gross negligence by the Management Defendants and Director Defendants, and substantially assisted in the conduct by, among other things, failing to monitor the activities of the Management Defendants with respect to their management and investments of the Partnership and the Master Fund, failing to ensure that the Director Defendants were adequately dispatching their duties to oversee all aspects of the operation of the Master Fund, and providing brokerage and placement services to the Master Fund without which the breaches of fiduciary duty and gross negligence could not have occurred.

40.     In many cases, the Bear Stearns Corporate Defendants entered into repurchase agreements and other related-party trades and transactions with the Master Fund that furthered the wrongdoing with the knowledge that the Management Defendants were not causing or working with the Independent Directors to have such transactions independently reviewed.

41.     The Bear Stearns Corporate Defendants profited in a number of ways from their misconduct and the misconduct of the other Defendants, including, but not limited to, earning massive fees and commissions from trades and transactions entered into between and among the Master Fund and Bear Stearns, including, but not limited to, the sale of Bear Stearns created and issued securities to the Master Fund at prices inflated by the Management Defendants.

**C.     Independent Master Fund Director Defendants**

**1.     Scott Lennon**

42.     Defendant Scott Lennon is a resident of the Cayman Islands.  Mr. Lennon was at all relevant times a Senior Vice President of Walkers Fund Services Limited ("Walkers"), a Cayman Islands trust company and investment fund administrator.  Beginning in or about August 2006, Mr. Lennon was one of two purportedly independent directors of the Master Fund responsible for objectively evaluating related-party trades and transactions on behalf of the

Partnership and the Master Fund -- a responsibility that he either ignored or was unable to perform based upon the Management Defendants' knowing failure to provide required documentation.

### 2.   Michelle Wilson-Clarke

43.     Defendant Michelle Wilson-Clarke is a citizen of the United States and a resident of the Cayman Islands.  Ms. Wilson-Clarke was at all relevant times a Vice President of Walkers.  Beginning in or about August 2006, Ms. Wilson-Clarke was one of two purportedly independent directors of the Master Fund responsible for objectively evaluating related-party trades and transactions on behalf of the Partnership, Limited Partners, and the Master Fund -- a responsibility that she either ignored or was unable to perform based upon the Management Defendants' knowing failure to provide required documentation.

44.     Defendants Lennon and Wilson-Clarke are referred to herein as the "Independent Directors."  The Independent Directors were named as directors in the PPM, which they knew or should have known would be distributed to investors in the U.S., were named directors for the Master Fund which they knew or should have known was partially owned by U.S. investors, and they were intended at all times relevant hereto to be in contact by phone, regular and electronic mail and/or were intended to or did meet with the BSAM employees located in New York regarding related-party transactions between the Master Fund and Bear Stearns entities located in New York.

### D.   Affiliated Master Fund Director Defendants

### 1.   Barry Cohen

45.     Defendant Barry Cohen is a resident of the State of New York.  Mr. Cohen is or was a Senior Managing Director and Director of Alternative Investments (hedge funds) at

BSAM and a member of the Board of Directors of BS&Co.  Mr. Cohen was at all relevant times one of three affiliated directors of the Master Fund.

### 2.    Gerald Cummins

46.    Defendant Gerard Cummins is a resident of the State of New York.  Mr. Cummins is or was a Managing Director of BSAM responsible for hedge fund middle-office support and firm-wide operations risk.  Mr. Cummins was at all relevant times one of three affiliated directors of the Master Fund.

### 3.    David Sandelovsky

47.    Defendant David Sandelovsky is a resident of the State of New Jersey.  Mr. Sandelovsky is or was a Senior Managing Director of Alternative Investments (hedge funds) at BSAM and the Chief Operating Officer of BSAM's hedge fund business.  From at least the beginning of the Class Period until on or about March 28, 2007, Mr. Sandelovsky was one of three affiliated directors of the Master Fund.

### 4.    Gregory Quental

48.    Defendant Gregory Quental is a resident of the State of Connecticut.  Mr. Quental is or was a Senior Managing Director of BSAM and co-head of BSAM's HedgeSelect and Due Diligence Groups.  Additionally, in 2005, Mr. Quental became Chairman of the Board of Directors of Bear Measurisk LLC, a subsidiary of BSAM that purportedly was an industry-leading provider of independent risk-transparency and risk-measurement solutions to investors.  On or about March 28, 2007, Mr. Quental became one of three affiliated directors of the Master Fund.

49.    Defendants Cohen, Cummins, Sandelovsky and Quental are referred to herein as the "Affiliated Directors."

22

50.     Pursuant to the Partnership Documents, the Affiliated Directors and Independent Directors (collectively, the "Director Defendants") had ultimate authority over the Master Fund's operations.  Even though they were entitled to and did delegate authority to manage the day-to-day operations and investment decisions of the Master Fund, the Director Defendants were duty bound to oversee all of its operations and to supervise its designees to ensure that the Master Fund and its managers complied with the Partnership Documents, applicable laws, and duties owed to its investors such as Limited Partners.  The Affiliated Directors and the Independent Directors breached their respective duties.

51.     In addition to their general responsibility to oversee operations of the Master Fund with the Affiliated Directors, the Independent Directors were responsible for approving all "principal trades" as defined by Section 206(3) of the Investment Advisers Act between the Master Fund and any Bear Stearns entity.  This legal responsibility was affirmed in the Partnership Documents.

52.     As a result of their positions as directors of the Master Fund, the Director Defendants were in a fiduciary relationship with Plaintiff and other Limited Partners in the Partnership, and owed Plaintiff, the Class of Limited Partners, and the Partnership itself the highest obligations of due care, good faith, candor, disclosure, loyalty and fair dealing.

53.     The Director Defendants violated their duties in numerous respects, to the detriment of Plaintiff, the Class and the Partnership, by, among other things, failing to oversee the operations of the Master Fund and failing to review and/or approve principal trades and transactions entered into between the Master Fund and other Bear Stearns entities as required by the Investment Advisers Act and affirmed by the Partnership Documents.

54.     In addition, the Director Defendants aided and abetted the Management

Defendants' breaches of fiduciary duties by failing to adequately oversee the Master Fund.

Moreover, by giving the Management Defendants unfettered discretion to value the Master Fund

assets and investments and to cause the Master Fund to enter into principal trades and

transactions without the required review, the Independent Directors facilitated the breaches of

fiduciary duty that directly caused injuries to Plaintiff, the Class, and the Partnership.

### E.     Walkers Fund Services Limited

55.     Walkers Fund Services Limited ("Walkers") is a Cayman Islands company with

its principal office located at Walker House, 87 Mary Street, George Town, Grand Cayman,

Cayman Islands.  Walkers is a licensed trust company and investment fund administrator, which

provides a full range of services to offshore investment funds, including but not limited to,

providing directors, administrative, and trustee services.  Walkers provided services to the

Master Fund, including but not limited to providing the Independent Directors and performing

administrative tasks such as collecting and disseminating valuation information to Limited

Partners.  Walkers was, for all intents and purposes, an extension of BSAM and the Bear Stearns

Corporate Defendants as it provided supposedly independent directorial and oversight services

and/or other services during the period alleged herein to at least 9 BSAM hedge funds other than

the Master Fund and its affiliated law firm served as legal counsel to at least 16 Bear Stearns

hedge funds that BSAM advised, including the Master Fund.  Moreover, Walkers knew it was

providing directors (Defendants Lennon and Wilson-Clarke) to the Master Fund who would be

named in the PPM issued to investors in the U.S. to serve as directors for the Master Fund which

they knew or should have known was partially owned by U.S. investors, and that their employees

were intended at all times relevant hereto to be in contact by phone, regular and electronic mail

and/or were intended to or did meet with the BSAM employees located in New York regarding

related-party transactions between the Master Fund and Bear Stearns entities located in New York.

56.    Walkers was compensated for services rendered to the Partnership directly by Limited Partners and for services rendered to the Master Fund indirectly *pro rata* by Limited Partners.  As described more fully below, Walkers breached duties owed to the Partnership and to Limited Partners.

57.    In addition, Walkers aided and abetted the Management Defendants' breaches of fiduciary duties by knowingly and substantially assisting in those breaches.

**F.    Nominal Defendant, Bear Stearns High-Grade Structured Credit Strategies, L.P.**

58.    Nominal Defendant Bear Stearns High-Grade Structured Credit Strategies, L.P., is a limited partnership organized under the laws of the State of Delaware on August 26, 2003, and subject to the provisions of the Delaware Revised Uniform Limited Partnership Act, 6 Del C. § 17-101 *et seq*. (the "Delaware Limited Partnership Act").

**IV.    FACTUAL BACKGROUND**

**A.    Creation of the High-Grade Master Fund and the Partnership**

59.    Defendant Cioffi joined Bear Stearns in 1985 as a fixed-income salesman. Beginning in 1991, Cioffi became sales manager for high-grade credit products, where he was involved in the creation of Bear Stearns' structured credit effort and was a principal force behind Bear Stearns' move to become a leading underwriter and secondary trader of structured finance securities, including CDOs.

60.    Starting in 1998, the global CDO market grew an estimated 150% per year, reaching approximately $750 billion in 2005.  Further, because of diminishing IPO and Mergers and Acquisitions activity, CDOs became one of the most profitable products for investment

banks.  This fact was not lost on the Management Defendants or the Bear Stearns Corporate Defendants as BSC, with its subsidiaries, was by 2002 routinely among the leading issuers in the global CDO market.

61.     During the same decade that Defendant Cioffi was leading Bear Stearns' move into the exploding structured finance and CDO market, the hedge fund industry was experiencing similarly robust growth.  According to a September 2003 Staff Report to the SEC, in the decade between 1992 and 2002 the number of hedge funds operating in the U.S. increased from 400 to approximately 6,000.  Moreover, assets under hedge fund management increased from approximately $50 billion to $600 billion during the same period.

62.     Hedge fund growth was driven largely by increased participation of large institutional investors such as pension plans, foundations and endowments seeking to reinforce their portfolios by investing in funds that diversified their investment strategies to seek returns in varying market conditions.  Defendant Cioffi had relationships with many such large institutional investors from his time in fixed-income sales at Bear Stearns.

63.     Defendant Cioffi eventually considered leaving Bear Stearns to form and manage his own hedge fund.  Naturally, the confluence of growth in the structured finance and hedge fund industries presented an enticing opportunity for someone with Defendant Cioffi's experience.

64.     Bear Stearns ultimately convinced Defendant Cioffi to stay at Bear Stearns and to run his hedge fund through BSAM.  By agreeing to run it through BSAM, Defendant Cioffi knew the fund would be atypical of normal hedge funds that are stand-alone entities often run by lesser-known money managers.  Defendant Cioffi knew his fund would carry the imprimatur of one of the largest and most venerated investment banks in the U.S.  Moreover, Bear Stearns'

reputation as the savviest manager of credit-risk on Wall Street would be crucial to enticing investors into the newly created fund and in convincing them to hold their positions once invested.

65.     Due to the tax advantages available to investment companies offshore, Defendants BSAM, Cioffi and Tannin chose to form their new hedge fund, the Master Fund, in the Cayman Islands.

66.      Along with Defendant Cioffi, the early management team for the Master Fund consisted of Defendant Tannin, the *de facto* co-creator of the fund, and Joanmarie Pusateri, a BSAM Vice President who was in charge of the in-house administrative operations of the Master Fund.  The Affiliated Directors were Messrs. Cohen, Cummins, and Sandelovsky, who were all Managing Directors in BSAM's hedge fund area.  Defendant McGarrigal later joined the team as a Portfolio Manager with Defendant Cioffi.

67.     As is typical of many offshore hedge funds, the Master Fund did not receive capital directly from investors.  Instead, in what is commonly termed a "master-feeder" arrangement, investment in the Master Fund came through three "feeder-funds" created by Bear Stearns contemporaneously with the Master Fund, of which the Partnership was one.

68.     The Partnership was organized under the laws of the State of Delaware on August 26, 2003, subject to the provisions of the Delaware Limited Partnership Act.  Pursuant to the Partnership Agreement, the Partnership is and was at all times "governed by and construed and administered in accordance with the internal substantive laws of the State of Delaware," which included, among other things, the axiom that a general partner of a limited partnership owes fiduciary duties to the limited partners and to the partnership itself.

69.     As a feeder-fund, the Partnership conducted all of its investment and trading activities through capital contributions to the Master Fund in exchange for an ownership interest. Thus, the value of the Partnership reflected its *pro rata* co-ownership of the Master Fund (the other feeder-funds were also co-owners) and each Limited Partner's Interests reflected its individual *pro rata* ownership of the Partnership's portion.  As a result, the overall value of the Partnership and each Limited Partner's ownership Interests were tied entirely to the performance and overall value of the Master Fund.

70.     At the beginning of the Class Period in August 2004, in addition to the Partnership, two other feeder-funds invested through the Master Fund:  the Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (the "Offshore Feeder Fund"), an exempted company incorporated under the laws of the Cayman Islands to facilitate investment by non-U.S. investors and tax-exempt U.S. investors, and Bear Stearns High-Grade Structured Credit Strategies (Overseas) Yen Unit Trust (the "Yen Feeder Fund"), a Cayman Islands unit trust, which facilitated Japanese investment in the Master Fund.  As of December 31, 2006, the Partnership owned approximately 28% of the Master Fund.  Plaintiff was not at any time a limited partner or holder of interests in the Offshore or Yen Feeder Fund.

### 1.     The Sale of Partnership Interests

71.     The Partnership commenced operations on October 1, 2003, and offered Partnership Interests for sale by way of a Confidential Private Placement Memorandum dated August 31, 2004.

72.     Prospective investors joined by executing a Subscription Agreement and, if approved as an investor, becoming a Limited Partner by making an initial capital contribution ("Capital Contribution").  The Partnership Interests were offered as exempt securities pursuant to Section 4(2) of the Securities Act of 1933 and Regulation D therein.  Thus, to be approved as a

Limited Partner, investors were required to be an "Accredited Investor" under Regulation D and a "Qualified Purchaser" under the Investment Company Act of 1940.

73.     The initial minimum Capital Contribution for newly approved Limited Partners was $1,000,000, subject to adjustment by the General Partner.  Limited Partners were thereafter permitted to make subscriptions of at least $250,000.

74.     Due to its apparent early success, the Partnership began as a highly sought after investment, and most, if not all, Limited Partners in the beginning contributed at least the minimum initial subscription amount of $1,000,000 and subsequent subscription minimum of $250,000.  Soon after, however, the Management Defendants exercised their discretion to accept lesser initial capital contributions that were in some cases as much as 75% lower than the initially required minimum.  Similarly, the Management Defendants accepted subsequent additional subscriptions in amounts much less than the stated minimum of $250,000.

75.     The Management Defendants, however, never disclosed to Limited Partners that the primary reason for accepting subscriptions below the stated minimums was to combat nearly constant liquidity concerns throughout the life of the Partnership.  Moreover, on information and belief, the Management Defendants eventually also caused the Partnership to accept Limited Partners that did not meet the statutory requirements to purchase exempt securities.  The Management Defendants again failed to disclose to Limited Partners that they were lowering subscription and approval requirements to combat liquidity problems.  In fact, in what became a *de facto ponzi* scheme, the Management Defendants concealed the Partnership's liquidity problems throughout the Class Period by discouraging redemptions and attracting new Capital Contributions to temporarily keep the Partnership afloat.

76.     The Subscription Agreement, Limited Partnership Agreement and a Confidential Private Placement Memorandum issued in August 2006 (the "August 2006 PPM" or "PPM") that replaced the August 2004 PPM (collectively, the "Partnership Documents") set forth the putative purposes and investment strategies of the Partnership, as well as the respective rights, duties, and obligations of BSAM, the other Management Defendants and Limited Partners.

77.     By executing the Subscription Agreements incorporating the other Partnership Documents, each Limited Partner was owed both fiduciary and contractual obligations by the Management Defendants.  The Partnership Agreement contained a limited exculpation clause under which the Limited Partners and Partnership would hold the Management Defendants harmless for losses to the Partnership, ***provided however***, the losses were not, as here, the result of  "fraud, bad faith, gross negligence or willful misconduct."  (Partnership Agreement at p. 30.)

### 2.     Limited Partner Capital Accounts

78.     According to the Partnership Documents, Limited Partner investments and capital attributed to each Limited Partner was segregated into a "Capital Account" created and maintained on behalf of each Limited Partner by the Management Defendants.  Each Limited Partner's ownership (Interests) were reflected in its Capital Account as an amount corresponding to Limited Partner's *pro rata* share of the total value of the Partnership, which was in turn a reflection of a percentage of the value of the Master Fund.

79.     The amount in each Limited Partner's Capital Account was adjusted as the value of the Partnership's interest in the Master Fund increased or decreased, the Limited Partners made additional Capital Contributions, or, as discussed below, the Limited Partners redeemed all or part of their Interests.  In addition, operational expenses, including payments to service providers of the Partnership and the Master Fund, such as Walkers, were deducted *pro rata* from the Limited Partners' Capital Accounts, as were fees and profit shares.

30

### 3.     Plaintiff's Purchase of Limited Partnership Interests

80.     Plaintiff executed its initial Subscription Agreement for the Partnership on August 25, 2004, and made its $1,000,000 Capital Contribution on August 31, 2004.  Plaintiff was admitted as a Limited Partner as of September 2004.

81.     Plaintiff made additional investments in the amount of $100,000 on or about November 1, 2004, $100,000 on or about December 1, 2004, and $250,000 on or about March 30, 2005, although near year-end 2005 it assigned approximately $700,000 of its Interests to a third-party while still remaining a Limited Partner.

82.     On or about April 24, 2007, Plaintiff submitted an Irrevocable Request for Withdrawal of 100% of its Interests.  Along with countless other Limited Partners during the late spring of 2007, Plaintiff's redemption request was never honored by the Management Defendants.  Plaintiff and all other Limited Partners were then completely foreclosed from redeeming their Interests in June 2007, when the Management Defendants instituted a moratorium on redemptions that lasted until the Partnership and the Master Fund collapsed.

### B.     The Investment Strategy Promised to Limited Partners

### 1.     The Investment Strategy Focuses on Structured Finance Securities

83.     The Management Defendants marketed the Master Fund based on Bear Stearns' well-known structured finance expertise and the Management Defendants' purported expertise in the area of structured finance securities, particularly CDO securities.

84.     True to their structured finance backgrounds, Defendants Cioffi and Tannin conceived of the Partnership and the Master Fund to seek "high current income and capital

appreciation with respect to LIBOR[1] . . . primarily through leveraged investments in investment-grade structured finance securities."  The structured finance securities on which they focused were CDO securities.

85.     CDO securities are issued by special purpose vehicles ("SPVs") created by banks and other financial institutions for the purpose of financing the purchase of diversified pools of assets such as mortgages and other debt obligations.  The banks and financial institutions generate fees by causing the SPVs to acquire pools of assets and dividing the pools into several classes of CDO securities, which are sold individually to investors.  As explained by the PPM:

> Structured finance securities are the securities of special purpose vehicles ( ) that purchase diversified pools of assets.  The assets held by the SPV are financed through the issuance of several classes, or tranches, of securities each of which has a specific right to the interests and principal payments from the underlying diversified pool of assets held by the SPV.

(PPM at p. 11.)

86.     As stated by the PPM, each class of a CDO's securities typically has a credit rating based on its "seniority," the relative right to payments from the underlying assets.  Any losses from payment defaults on the underlying assets are applied in reverse order of seniority.  Senior classes are the mostly highly rated (often rated AAA) by rating agencies such as Moody's Investors Service, Standard & Poor's, and Fitch Ratings Ltd., and are protected by the subordinated security structure, but deliver the lowest returns.  Equity classes, also referred to as "junior interests," are often unrated and are the first class to absorb losses, but offer higher returns to compensate for the higher risk.

---

[1]  LIBOR, the London Interbank Offered Rate, is the rate under which banks make loans to other banks and is often used as a benchmark in the financial community.

87.     CDO securities are issued in different credit risk classes in this manner to cater to the various risk-return profiles of investors.  Senior CDO classes are attractive to investors because they can offer greater yields than more traditional fixed-income securities (like bonds) with similar credit ratings.  Often, senior classes pay a spread above LIBOR despite their AAA ratings.  Equity classes are attractive to investors because, while risky, they can offer large returns.

88.     According to the Partnership Documents, the Master Fund's putative investment strategy centered on leveraging the Management Defendants' purported structured finance and credit risk expertise to identify CDO securities assets offering high returns relative to their credit rating or risk profiles.  According to the August 2006 PPM, "[t]he Investment Manager [would] use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that [were] priced attractively."

89.     The Master Fund's purported investment strategy was to achieve returns above LIBOR by making diversified purchases of CDO securities largely on the senior end of the ratings spectrum, but also on the unrated end that would offer higher corresponding returns.

90.     Acording to the "Permitted Investments" section of the PPM, the Master Fund would target a portfolio composition of approximately 90% (excluding investments in equity classes as discussed below) low-risk investment-grade senior CDO classes rated AAA to AA-. (PPM at p. 14.)  The investment theory was that, if properly selected by the Investment Manager, these CDO securities could offer returns above LIBOR without subjecting the Master Fund to the increased credit risk that typically would accompany higher yields.  The 90% AAA/AA- rating threshold was an important figure for Limited Partners because it was an objective benchmark by

which they could monitor the Master Fund's investment composition in an otherwise, as is typical of a hedge fund, opaque investment.

91.     In addition to direct investments in highly-rated investment-grade CDO securities, the Master Fund also intended to invest in non-investment grade unrated or underrated equity securities issued by both typical SPVs and a modified type of SPV that packaged together various types of existing CDO securities and reissued new CDO securities based on the newly "repackaged" assets.  These latter special SPVs were termed by the PPM as "Repackaging Vehicles", (also known as "CDOs-Squared") and the unrated or underrated equity securities they issue were termed "Repackaging Vehicle Junior Interests".

92.     Each time a SPV or Repackaging Vehicle creates and issues a CDO, approximately 5% to 15% of its capital structure is issued as equity class securities.  This equity class is sometimes referred to as the "first-loss" or "toxic waste" class because it is always unsecured and has the lowest payment priority and thus the highest risk of default.  In addition, the equity classes are often populated by the riskiest debt, which during 2006-2007 often included subprime mortgages.

93.     As further discussed below, the Management Defendants' plan for the Master Fund included selling it securities issued by Repackaging Vehicles that Bear Stearns affiliates, including the Management Defendants, created from existing CDOs.

94.     For example, in April 2004, the Management Defendants created and acted as the collateral manager for Klio Funding Ltd. ("KLIO"), which was a Repackaging Vehicle constructed by combining existing CDOs into a pool and then causing the Repackaging Vehicle to issue "new" CDO securities in various classes, including non-rated equity securities.  The

Management defendants caused the Master Fund to purchase equity securities from KLIO, as well as a number of additional "KLIO" entities they created over the life of the Master Fund.

95.     Similarly, on September 29, 2006, the Management Defendants created Parapet 2006, Ltd. ("Parapet") and acted as its collateral manager.  Parapet was a prototypical BSAM Repackaging Vehicle in that it was created by purchasing various equity securities that had been issued by already existing CDOs and restructuring them into new CDO equity securities to be issued to investors (including the Master Fund) thereby creating a classic "CDO-Squared."  As discussed below, the Master Fund purchased Parapet securities.

96.     Pursuant to the PPM, the Management Defendants intended to cause up to 40% of the Master Fund's NAV to be invested in Repackaging Vehicle Junior Interests.  (PPM at p. 11.) Theoretically, the risky nature of the Repackaging Vehicle Junior Interests would be mitigated by the investment-grade senior CDO classes in the Master Fund's investment portfolio.

97.     As discussed below, however, by the beginning of the Class Period, the Management Defendants had abandoned their obligations to carefully evaluate available investment-grade senior securities in terms of their potential risk versus returns, and instead began increasingly causing the Master Fund to invest primarily in high-risk unrated Repackaging Vehicle Junior Interests completely without regard to their credit risk profile.  The Management Defendants failed to disclose to Plaintiff and to the other Limited Partners that they had abandoned the PPM's original strategy, and caused materials to be released to Limited Partners that did not accurately reflect the true credit ratings breakdown of assets in the Master Fund's portfolio.

98.     Moreover, the Management Defendants failed to disclose that they were secretly causing the Master Fund to invest in CDO securities backed by subprime debt, and, in many

cases, were buying the most risky investments from Bear Stearns' SPVs and Repackaging Vehicles which could not otherwise be sold to the public at large.  In other words, the Management Defendants caused the Master Fund and the Partnership to become the marketplace for Bear Stearns' illiquid and otherwise immovable securities.

### 2.   The Promised Use of Leverage

99.     A central component of the Master Fund's investment strategy was to borrow money (use leverage) against assets purchased by the Master Fund to purchase even higher quantities of CDO securities selected by the Management Defendants.  By using leverage, the Management Defendants could enable the Master Fund to invest many times the amount of capital actually contributed by Limited Partners in the Partnership, Overseas Feeder Fund or Yen Feeder Fund.

100.    Specifically, the Management Defendants intended to use leverage to purchase investment-grade securities with an aggregate value of up to 10 times the NAV of the Master Fund.  (PPM at p. 16.)  By use of 10 times leverage, the Investment Manager could, in theory, increase returns provided by the highly-rated CDO securities it selected, provided that they generated returns greater than the cost of borrowing.  However, the PPM contained no limit on the leverage the Master Fund could employ with respect to Junior Interests, except of course the Management Defendants' fiduciary duties of care.

101.    The Master Fund primarily gained leverage through repurchase agreements ("Repo Agreement(s)").  Repo Agreements were loans under which the Master Fund transferred certain assets to a counterparty subject to an agreement by the counterparty to transfer the assets back to the Master Fund on demand or at a date certain for an adjusted amount.  In other words, the assets acted as the collateral for a loan and the adjustment to the amount repaid reflected interest on the transaction.  The Repo Agreements employed by the Master Fund were typically

one, three or six-month agreements, during which time the Master Fund could use proceeds to make additional investments in structured finance securities or to meet short-term operational liquidity needs.

102.    At least one or more of the Bear Stearns Corporate Defendants was frequently the leverage counterparty for the Master Fund's Repo Agreements.  However, as discussed below, due to the failure of the Management Defendants to obtain required approvals for related-party trades and transactions, by September 2006, the Master Fund was prohibited from entering into Repo Agreements with Bear Stearns entities, further contributing to constant liquidity problems. Of course, the Management Defendants never told Limited Partners that Bear Stearns could no longer be a source of liquidity and it made the Enhanced Fund even more vital to continuing to hide the Master Fund's liquidity problems.

103.    Using Repo Agreements to leverage investment exposure, however, created considerable risk for the Master Fund.  *First*, if the collateral for the loan decreased in value during the term of agreement, the counterparty could require the Master Fund to post additional capital to cover the spread between the loan and the value of the collateral.  *Second*, while Repo Agreements were typically renewed ("rolled over"), a counterparty was under no obligation to do so when the term expired.  Thus, while Repo Agreements were a good source of leverage and short-term liquidity for the Master Fund, they could also cause liquidity problems if the Master Fund needed cash to post additional collateral or to satisfy an expiring Repo Agreement.  The Master Fund was particularly subject to liquidity concerns because many of its holdings were in the form of illiquid Repackaging Vehicle Junior Interests, which could not be sold to raise cash.

104.    The use of massive leverage through Repo Agreements presented an even more fundamental risk.  Investments that go up by their nature can also go down.  Thus, while greater

exposure to structured finance securities through leverage meant compounded returns, it also meant that any adverse changes to the value of investments, however slight, would be magnified.

105.    Ultimately, as discussed below, the Management Defendants' overuse of leverage contributed to the collapse of the Master Fund.  The Management Defendants were aware that massively leveraged investments were uniquely vulnerable to adverse events, yet the Management Defendants failed to invest with due care and continued to secretly cause the Master Fund to enter into reckless investments and to purchase illiquid and risky Repackaging Vehicle Junior Interests for which there was no public market and that could not be resold if liquidity needs arose.

### 3.    Proclaimed Hedging and Risk Management Strategy

106.    Due to the risk in the Master Fund's leveraging strategy, an additional and central component of the Management Defendants' purported investment strategy was to hedge the Master Fund's risky investments in structured finance securities.

107.    The August 2006 PPM stated that the Master Fund's investments always would be protected by credit enhancement mechanisms which would benefit the Master Fund during adverse credit events:

> [I]t is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund.

(PPM at p. 13.)

108.    In other words, when defaults or the risk of defaults caused the credit profiles of the assets underlying the Master Fund's structured finance securities to degrade, cash would be diverted to satisfy repayment obligations to the assets held by the Master Fund.

109.    The PPM represented that the Management Defendants would cause the Master

Fund's investments to be specifically hedged against losses by credit-default swaps, a type of

insurance against adverse credit events:

> [T]he Master Fund will use credit-default swaps to hedge some of
> its credit exposure.  A credit-default swap is a derivative contract
> where one party ( ) pays an annual premium to another party ( ) in
> exchange for the right to receive a compensatory payment if a
> specified credit suffers a default or credit event.  Credit default
> swaps will be used by the Master Fund to hedge credit exposure.

(PPM at p. 13.)

110.    The Management Defendants' responsibility to protect the Master Fund through

hedges was reiterated in BSAM's August 30, 2005 Alternative Investment Management

Association Ltd. Questionnaire for Due Diligence Review (the "AIMA Questionnaire"), which

was provided to Limited Partners, wherein BSAM represented:

> On a monthly basis, the portfolio managers meet with BSAM's CIO and
> hedge fund risk management team to discuss the portfolio and its
> performance.  The team also meets with Bear Stearns' global credit
> department to discuss their positions, risk management and hedging
> techniques.  ***As part of managing the Fund's risk, the team actively***
> ***engages in various hedging techniques in the credit derivatives market,***
> ***monitor and maintain adequate liquidity and look to minimize leverage***
> ***while attempting to achieve the Fund's cash on cash targets***.

111.    The hedging transactions into which the Management Defendants caused the

Master Fund to enter were intended to and did give Plaintiff and other Limited Partners comfort

that the massively leveraged CDO investments would be protected from adverse market events.

For example, during January and February 2007, at the time when the financial media began

writing about the weakening CDO market, the Management Defendants reassured Limited

Partners by claiming that the Master Fund's hedges would thrive in the softening market.

112.    However, by January 2007, and certainly no later than March 2007, the

Management Defendants were aware that the Master Fund's investments were insufficiently

hedged.  Nevertheless, the Management Defendants continued to mislead Limited Partners regarding the hedges in investor calls and in PPM mandated materials that they distributed to Limited Partners.

> C.   **The High-Grade Master Fund's Transactions with Bear Stearns Entities**

113.   The PPM provided that the Master Fund could transact with Bear Stearns entities, including using BSSC as its prime broker and custodian, and transacting with Bear Stearns entities as Repo Agreement counterparties.

114.   More significantly, the PPM provided that the Master Fund would invest in structured finance securities issued by SPVs and Repackaging Vehicles created by BSAM and other Bear Stearns entities and for which the Management Defendants or other Bear Stearns personnel were collateral managers.  (PPM at pp. 11-12.)

115.   The Management Defendants created Parapet from already existing CDO securities that they repackaged as a new entity.  In the case of Parapet, the "new" CDO securities it issued were in two classes:  (i) a $137 million floating rate note "rated" AA or the equivalent that was purchased by the Master Fund and Enhanced Master Fund; and (ii) $369 million of unrated equity classes that were dumped into Everquest.  This transaction was a prototypical BSAM Repackaging Vehicle transaction in that it gathered existing CDO securities with various ratings and stripped off the higher rated securities into one class and the toxic waste into another.

116.   Permitting the Management Defendants to create and serve as collateral managers for Repackaging Vehicles in which the Master Fund invested gave the Master Fund access to the Management Defendants' supposed expertise in identifying attractive assets.  Through this arrangement, the Management Defendants would not be limited to picking through the securities of hundreds of already constructed CDOs being offered to the market; rather they could purchase

securities from CDOs that they created and populated with quality underlying assets based upon their ability to weigh the credit-worthiness.

117.     Indeed, the August 2006 PPM touted that the risk associated with the Master Fund's investments in CDOs and Repackaging Vehicle Junior Interests could be reduced by the Management Defendants' successful selection of assets to underlie the Repackaging Vehicles:

> The returns of the Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABS, investment-grade CDOs and other investment-grade assets selected by the Investment Manager in its capacity as collateral manager of the Repackaging Vehicles.

(PPM at pp. 11-12.)

118.     This arrangement was beneficial to the Management Defendants in a number of ways.  *First*, Bear Stearns entities received commissions and management fees associated with arranging the structured finance vehicles and issuing the underlying securities.  *Second*, the Master Fund's role as a purchaser created a market for securities issued by Repackaging Vehicles, thereby enhancing the profitability of Bear Stearns' own investments in CDOs and allowing Bear Stearns to continue generating large fees for new CDO issues.

119.     In addition to the explicit assurances provided in the Partnership Documents, any potential conflicts of interest between Bear Stearns and the Master Fund caused by allowing Bear Sterns entities and employees to manage the Master Fund and to sell securities to it were supposed to be mitigated by the Management Defendants' fiduciary duties to act in the best interests of Limited Partners as well as the Independent Directors' approval of related-party trades and transactions.

120.     The principal-transactions began soon after the Partnership was formed.  As discussed above, the Management Defendants caused the Master Fund to invest in BSAM's Repackaging Vehicle called KLIO, which the Management Defendants had created in April

41

2004 from a collection of other CDOs.  According to the August 2004 PPM, the Master Fund purchased 64% of KLIO's floating rate notes and 100% of its preferred shares (its equity securities).  After the August 2004 PPM, the Management Defendants never caused similar details of related-party transactions to be disclosed, including not in the later PPM when such transactions had escalated.

121.    Similar to KLIO, the Management Defendants created Parapet from already existing CDO securities that they repackaged as a new entity.  In the case of Parapet, the "new" CDO securities it issued were in two classes:  (i) a $137 million floating rate note "rated" AA or the equivalent that was purchased by the Master Fund and Enhanced Master Fund; and (ii) $369 million of unrated equity classes that were dumped into Everquest.

122.    This transaction was a prototypical BSAM Repackaging Vehicle transaction in that it gathered existing CDO securities with various ratings and stripped off the higher rated securities into one class and the toxic waste into another.  As with most of these transactions, the Master Fund got the short end.  Its interests in KLIO and Parapet were troublesome investments that were ultimately unsuccessfully dumped on Everquest.

123.    Unfortunately, as discussed below, unbeknownst to investors, the Master Fund ultimately became a dumping ground for illiquid equity classes of CDOs that Bear Stearns entities could not sell to investors on the open market.  During the Class Period, the Management Defendants caused the Master Fund to purchase hundreds of millions of dollars worth of Bear Stearns structured finance securities in transactions that, in most cases, the Independent Directors either failed to meaningfully review or failed to review at all as required by law and by the Partnership Documents.  By December 31, 2006, a staggering 81% of the Master Fund's assets were securities created by Bear Stearns entities.

D.     **The Management Defendants' Fiduciary Duties and Contractual Obligations to Limited Partners**

124.    In addition to carefully outlining the Master Fund's investment strategy, the Partnership Documents provided a number of additional fiduciary and contractual obligations that the Management Defendants owed to each Limited Partner in connection with the operation of the Partnership and the Master Fund.

1.     **The Management Defendants' Duty to Monitor Diligently the High-Grade Master Fund's Credit Risk**

125.    The PPM specifically provided that the Management Defendants would carefully and constantly monitor the Master Fund's credit risk with respect all actual or contemplated investments:

> The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities.

(PPM at p. 13.)

126.    Even though the CDO securities held by the Master Fund were complexly constructed investments, and the Master Fund often held more than 2,000 separate positions, the PPM assured investors that the Management Defendants would monitor the performance and credit risk of each of the Master Funds' investments using objective criteria:

> Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets.

(PPM at p. 13.)

127.    Moreover, the PPM described the process by which the Management Defendants would use unique proprietary models and valuation tools created by Bear Stearns to monitor the Master Fund's risk:

> Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party vendor analytical systems. [BSAM] also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.

(PPM at p. 12.)

128.    Once again, BSAM's AIMA Questionnaire reiterated its responsibility to use the Bear Stearns unique corporate expertise to carefully monitor risk:

> There are three layers of risk management, the broker dealer, BSAM and the portfolio managers. ***The Fund's daily mark to market, which is done in house by Bear Stearns' repo desk and the team, keeps them in touch with any price movements that could foretell problems in any one of the Fund's investments***. The team receives monthly marks on each of the Fund's investments from up to 15 broker dealers. ***The team monitors their positions through two main analytical systems . . . [which] allow them to monitor each deal, run stress tests, monitor monthly trustee reports on each deal and use technology to effectively monitor each position. In addition to the portfolio management team, Bear Stearns' and BSAM's risk management departments monitor the Fund's positions as well***.

(emphasis added.)

129.    In short, the Management Defendants' explicitly promised, and were obligated under the PPM, to monitor the credit-risk of the Master Fund's Investments on a constant basis. Indeed, credit monitoring was among the explicit fiduciary and contractual obligations that the Management Defendants owed Plaintiff and other Limited Partners.

44

## 2.      The Management Defendants' Duty to Value Portfolio Assets Fairly

130.    Generally, the most accepted valuation method for financial assets is "mark-to-market" accounting, which is essentially determining the current price an asset would obtain on the open market.   For example, if a given asset is listed or traded on a stock exchange, it can be valued at or near the official price on the principal exchange for such asset or by examining the various prices at which similar assets are selling in various markets.

131.    However, in the case of the Master Fund, mark-to-market accounting was discarded for the majority of its holdings because a ready market was not available for the securities that the Management Defendants purchased, and prices were either unavailable or, in some cases, the Management Defendants sought to revalue the assets on their own.  Pursuant to the PPM, the Management Defendants were permitted to use "manager-marks" to value assets assuming that they honored their fiduciary duties to Plaintiff, other Limited Partners, and the Partnership in so doing.  In this regard, the PPM provided:

> If for specific assets the official close of business price does not, in the opinion of the General Partner or its designee, reflect their fair value or are not available, the *value is to be calculated with care and good faith by the General Partner or its designee* with a view to establishing the probable realization value for such assets as at the close of business on the valuation date.

(PPM at p. 45.)

132.    The PPM provided the Management Defendants even more flexibility to value Repackaging Vehicles Junior Interests, which were typically illiquid investments for which there was no secondary market and no formal exchange.  Under the PPM, the Management Defendants promised to value such assets using the "fair-value methodology."  The methodology consisted of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle, with a discount

"determined primarily by assessing the credit quality of the collateral pool of the repackaging

vehicle." (PPM at p. 46.) In other words, valuation of the Repackaging Vehicle Junior Interests

was done using the present value of cash flows adjusted by the likelihood of default over the life

of the investment. Bear Stearns' claimed expertise in assessing credit risk in the market was not

only relevant to investment decisions and post-investment monitoring, but also to the appropriate

valuation of assets already held by the Partnership.

133.     In practice, however, the Management Defendants' flexibility in valuing assets

was almost limitless, except for other than the boundaries of good faith and reasonableness,

which were ignored. As provided by the PPM:

> [T]he valuation of an asset … may reflect the amounts invested by
> the Partnership in such asset, notwithstanding that such amounts
> may not represent the market value of such asset. The General
> Partner or its designee may also follow some other prudent method
> of valuation other than that referred to above …. The General
> Partner is entitled to exercise its reasonable judgment in
> determining the values to be attributed to assets … and provided it
> is acting bona fide in the interest of the Partnership as a whole,
> such valuation is not open to challenge by current or previous
> investors.

(PPM at p. 46.)

134.     In sum, the Management Defendants had nearly unlimited discretion to assign

manager-marks to investments, assets and collateral in which they caused the Master Fund to

have an interest. In turn, these assets were often sold to the Master Fund by BSAM and other

Bear Entities. The only limit on the manager-marks was the Management Defendants' fiduciary

duties to act in the best interests of the Partnership and Limited Partners -- under Delaware law

and the Partnership Documents -- oversight by the Director Defendants, and review and approval

by BSAM's pricing committee.

### 3.   The Management Defendants' Duty to Accurately Disclose the High-Grade Master Fund's Performance

135.   While the Management Defendants had the right to keep confidential from Limited Partners any information which they reasonably believed to be sensitive or in the nature of trade secrets, the Management Defendants were required to make information concerning the performance of the Partnership and the Master Fund available to Limited Partners on a periodic basis.

136.   Pursuant to the Partnership Documents, the Management Defendants were required to deliver a report to Limited Partners at the conclusion of each fiscal year concerning the Partnership's operations during that year.  The year-end report was required to contain an audited balance sheet of the Partnership as of the end of such fiscal year, as well as audited statements of Partnership income and any changes in the financial position of the Partnership during the course of the year.  The annual audited financial statements also included schedules of investment for the Master Fund.  The Management Defendants were also required to have quarterly reports delivered to each Limited Partner setting forth:  (i) an unaudited statement of the rate of return of the Partnership for such fiscal quarter; and (ii) any other financial reports and information as BSAM may deem appropriate.  In addition, within 30 days of the end of any calendar month, the Management Defendants were required to deliver an account statement to each Limited Partner containing information relating to the NAV of the Partnership and each Limited Partner's Capital Account balance.

137.   As a non-public Delaware limited partnership and exempt Cayman Islands company, respectively, the Partnership and Master Fund were not required to make filings or report to the SEC.  Thus, annual audits of the Partnership and Master Fund were typically the

only time each year when eyes outside the insular world of Bear Stearns examined the finances of the Partnership and Master Fund.

138.    Given the Management Defendants' nearly absolute control of the Partnership and Master Fund, the yearly audits were designed to give comfort to Limited Partners that the financial condition of the Partnership and Master Fund were independently reviewed by a disinterested party who would perhaps more critically view the returns.  The audits were particularly important given that a central feature of the Master Fund's investment strategy was investing in illiquid and difficult to value securities issued by Bear Stearns affiliates.

139.    Moreover, during the life of the Master Fund, the Management Defendants held numerous investor conference calls wherein they discussed the performance of the Master Fund and, in some cases during the Class Period, the level of subscriptions and redemptions and the hedging transactions in which they had caused the Master Fund to enter.

140.    The Management Defendants also caused the Monthly Profiles to be issued to Limited Partners, which contained basic information on the state of the Master Fund including, but not limited to, the monthly rates of return of the Master Fund and Partnership, the "Ratings Distributions" of the portfolio, and the "Collateral Summary" of the collateral underlying the portfolio.  Defendants Cioffi, Tannin and McGarrigal were involved in drafting the Monthly Profiles and at all times throughout the Class Period were aware of their contents.

141.    At bottom, the Management Defendants had specific fiduciary duties to disclose to Limited Partners information material to the Master Fund and its operations.  At the very least, the Management Defendants had fiduciary and contractual duties to ensure the accuracy of information provided to Limited Partners in year-end financials, during investor conference calls, and in Monthly Profiles.  As set forth herein, the Management Defendants wholly failed to

properly discharge these duties and issued materials that misled Limited Partners as to virtually every aspect of the Master Fund's condition.

### 4. The Management Defendants' Duty to Fairly Assess Fees and Profit Shares to Paid to Them by the Partnership

142. The Management Defendants charged the Partnership an Advisory Fee regardless of the performance of the Partnership. The Advisory Fee was equal to 2.0% per year of the balance of each Limited Partner's Capital Account and was paid in 1/12 increments as of the end of each calendar month (*pro rata* for periods of less than one month). (PPM at pp. 37-38.) Because the Limited Partner's Capital Accounts reflected the value of their *pro rata* ownership of the Master Fund, the Advisory Fee was directly proportional to the NAV calculated by the Management Defendants.

143. The PPM also provided that BSAM was allocated a Profit Share at the end of each relevant Accounting Period in an amount equal to 20% of net new income reflected in each Limited Partner's Capital Account, subject to a high water mark. (PPM at p. 47.) Again, the Profit Share was based on the NAV calculated by the Management Defendants.

144. Pursuant to the Partnership Documents, the Partnership paid BSAM's Advisory Fees and Profit Shares *pro rata* out of the Limited Partners' Capital Accounts. Additionally, any expenses attributed to the operation of the Partnership or the *pro rata* operational costs of the Master Fund, including fees paid to Walkers, were paid out of the Limited Partners Capital Accounts. (PPM at pp. 38, 47.)

145. On information and belief, Defendant Cioffi split the Advisory Fees and Profit Shares equally with BSAM and paid Defendants Tannin and McGarrigal, among others, from his half. Because that the Management Defendants' compensation was tied directly to asset valuations for which they themselves were responsible, the Management Defendants owed

Limited Partners a heightened fiduciary duty to value assets and assess Advisory Fees and Profit

Shares fairly, rather than inflating applicable values only to benefit themselves.

146.    The Advisory Fees and Profit Shares earned by BSAM were substantial.  For

example, for the year ended December 31, 2006, the Advisory Fee totaled $5,001,025 and

BSAM was allocated a Profit Share (or Performance Allocation) of $8,396,778.  On information

and belief, by 2006, BSAM was paying Defendant Cioffi more than $10 million per year in total

compensation.

> **5.      The Management Defendants' Duty to Obtain Approvals for
> the Related-Party Transactions Involving the High-Grade
> Master Fund**

147.    As stated, the Management Defendants caused the Master Fund to invest in SPVs

and Repackaging Vehicles that BSAM or other Bear Stearns entities arranged.  Because of the

possibility that the interests of the Master Fund and Bear Stearns would conflict, the PPM

recognized that BSAM, in its capacity as Investment Manager, owed a fiduciary duty to the

Partnership in making investment decisions:

> The Partnership may invest in the securities of issuers affiliated
> with Bear Stearns or in which Bear Stearns has an equity or
> participation interest.  The purchase, holding and sale of such
> investments by the Partnership may enhance the profitability of
> investments made by Bear Stearns or its affiliates.  *The General
> Partner has fiduciary responsibilities with respect to the
> Partnership and will make such investment decisions in a manner
> which is consistent with those responsibilities*.

(PPM at pp. 29-30.)

148.    In addition to its fiduciary and contractual obligations with regard to selecting

investments, each time BSAM or the Management Defendants caused the Master Fund to

purchase securities issued by SPV or Repackaging Vehicle developed by any Bear Stearns entity,

it was a "principal trade" under Section 206(3) of the Investment Advisers Act.  Thus, in addition

to its general fiduciary duties, the PPM acknowledged that in such cases BSAM was required to

obtain prior approvals for such transactions from the Independent Directors:

> Because the Investment Manager [BSAM] will serve as collateral
> manager of the Repackaging Vehicles, the purchase of the
> Repackaging Vehicle Junior Interests may be deemed to be a
> principal trade.  [BSAM] will, therefore, make appropriate
> disclosure to, and obtain consent from, the members of the board
> of directors of the Master Fund who are not affiliated with
> [BSAM] prior to the investment …

(PPM at p. 29.)

149.    In other words, pursuant to the PPM's own procedure designed to satisfy the

Investment Advisers Act, the Management Defendants had the fiduciary responsibility to cause

the Independent Directors to review such transactions.  In addition, the Independent Directors

owed a fiduciary duty to Limited Partners to meaningfully review the transactions.  These

various duties applied to any related transactions between the Master Fund and any Bear Stearns

entity.  As alleged herein, the Management Defendants and the Director Defendants completely

ignored these acknowledged responsibilities and dumped illiquid and ultimately valueless

securities into the Master Fund in order to serve their own financial interests.

**E.    Rights of Limited Partners**

150.    In addition to the fiduciary duties owed to each Limited Partner by the

Management Defendants and Director Defendants under Delaware law and the Partnership

Documents, each Limited Partner had a number of specific contractual rights under the

Partnership Documents.

### 1.   Each Limited Partner Had the Right to Redeem its Interests on Notice

151.   Aside from the general fiduciary duties of care, fairness, good faith and loyalty owed to them, under the Partnership Documents, each Limited Partner had specific rights that inhered to them and obligations owed to them as individual holders of Interests.

152.   Most importantly, while the Interests were not traded on any national exchange and were not transferable, each Limited Partner had the right (subject to certain procedures) to redeem them for cash.

153.   Pursuant to the PPM, upon not less than 40 days written notice to the General Partner, a Limited Partner was permitted to "withdraw all or a portion of such limited partner's Capital Account as of the last Business Day of any calendar month subject to a withdrawal fee of 2% of the amount withdrawn."  In other words, on 40 days notice a Limited Partner could redeem its Interests at any time for a 2% fee.  (PPM at p. 41.)

154.   Additionally, Interests attributable to capital contributions made more than a year prior to a redemption request could be redeemed on 60 days notice without a withdrawal fee on the anniversary of the contribution and quarterly thereafter.  (PPM at p. 41.)

155.   Redemptions of Capital Contributions made prior to September 1, 2004 were even less restrictive.  For such Capital Contributions, each Limited Partner had the right to redeem its Interests in the Limited Partnership upon no less than 40 days prior written notice to the General Partner, as of the last day of any calendar month subject to a withdrawal fee of 1% of the amount withdrawn, or, upon 60 days prior written notice, to withdraw all or a portion of its Capital Account attributable to such Capital Contribution as of the last Business Day of any calendar quarter without any withdrawal fee.  (PPM at p. 41.)

156.    Under the Partnership Documents, Limited Partners were entitled to cash from redemptions almost immediately.  If a Limited Partner made a redemption request, BSAM was required to "cause the Partnership, to the extent reasonably practicable, to distribute withdrawal proceeds . . . within 30 days of the relevant [date]."  (Partnership Agreement at p. 21.)  Upon the complete withdrawal of a Limited Partner, BSAM was required to cause the Partnership to distribute to such Limited Partner 90% of the withdrawal proceeds within 30 days of the relevant withdrawal date, and the balance within 60 days of the withdrawal date.  (Partnership Agreement at p. 21.)

157.    Clearly, to exercise their rights of redemption on an informed basis, Limited Partners required, and were entitled to, accurate, complete, and truthful information concerning the performance of the investments and assets that the Master Fund and Partnership held.

### 2.    Each Limited Partner Had the Right to Seek to Remove BSAM as General Partner

158.    In addition to redemption rights, each Limited Partner had the right to seek removal of BSAM as the General Partner upon an affirmative vote of the majority of Limited Partners.  Any Limited Partner was permitted to submit a petition to remove and replace BSAM. If the removal petition was properly made, BSAM was required to mail the petition to all nonaffiliated Limited Partners within 15 days with instructions specifying that if it is signed and returned by Limited Partners owning 10% or more of the sum of all nonaffiliated Limited Partnership Interests within 60 days, a special meeting of Limited Partners would be held to vote on the removal petition.  (Partnership Agreement at pp. 9-10.)

159.    BSAM was permitted to deem a proposed petition for removal invalid if it failed to include certain information about the Limited Partner making the proposal and if the Limited Partner had submitted (i) such proposal anytime in the preceding 5 years that had received less

than 3% of the Limited Partnership Interests' signatures, (ii) two such proposals in the preceding 5 years that had received less than 6%, (iii) or three such proposals in the preceding 5 years that had received less than 10%.

> **3.    Each Limited Partner Had the Right to Rely on the Affiliated and Independent Directors to Oversee the High-Grade Master Fund**

160.    Pursuant to the Partnership Documents, the Master Fund had five Directors who were responsible for overseeing the Master Fund:  the two Independent Director Defendants and the three Affiliated Director Defendants.  Even though the Directors delegated authority to make investment decisions to the Investment Manager and delegated responsibility for administration of the Master Fund to the Administrator, the Directors had ultimate authority over the Master Fund's operations.  (PPM at pp. 34-35.)  Limited Partners were entitled to rely on the Director Defendants to ensure that the Management Defendants were appropriately discharging their fiduciary and contractual duties to Limited Partners.

161.    Moreover, Limited Partners had the right to rely on the representation that any transactions between the Master Fund and any Bear Stearns affiliated entity would be and were reviewed and approved by Independent Directors of the Master Fund.  This approval process for related-party transactions was in lieu of notification to Limited Partners under the "principal trades" provisions of the Investment Advisers Act and was required by the Partnership Documents.

> **4.    Each Limited Partner Had the Right to Accurate and Complete Disclosures Regarding the Operation and Performance of the High-Grade Master Fund and the Partnership**

162.    Each Limited Partner was entitled to disclosures from the Management Defendants regarding material changes to the business or financial condition of the Partnership

and Master Fund and to accept or reject changes to the Partnership's or Master Fund's operations.

163.     According to the Partnership Documents, each Limited Partner had the right to periodically receive from BSAM "true and full information regarding the status of the business and financial condition of the Partnership and such other information regarding the affairs of the Partnership as is just and reasonable."  (Partnership Agreement at p. 27.)  Limited Partners were entitled to receive complete and accurate disclosures when the Management Defendants communicated, and were further entitled to receive prompt and accurate information concerning the performance of the Master Fund and the Partnership.

164.     The Partnership Documents also provided that the Limited Partners had the right to be notified and to determine whether to consent in writing before BSAM engaged in "any act that would make it impossible to carry on the ordinary business of the Partnership" or "possess Partnership Property for other than a proper Partnership purpose."  (Partnership Agreement at p. 9.)

165.     Finally, the PPM specifically provided that the Limited Partners were entitled to notification if the investment strategy materially changed:

> The Master Fund may engage in investment strategies and methods not described herein that the Investment Manager considers appropriate, provided, however, that the Limited Partners will receive advance notice of any material change in the Master Fund's overall strategy or approach.

(PPM at p. 14.)

166.     In sum, Limited Partners had the right to full disclosure of facts regarding the Partnership and the Master Fund if the Management Defendants intended to or did cause the Partnership or Master Fund to engage in any activity inconsistent with their purposes.

**V.      THE RISE AND FALL OF THE HIGH-GRADE MASTER FUND**

**A.      The High-Grade Master Fund's Early Putative Returns**

167.      From its launch in 2003 until the August 2006 PPM was issued, the Master Fund appeared to be an unqualified success.  According to the Monthly Profile distributed to Limited Partners for August 2006, the Master Fund had positive returns in each of its first 35 months and had achieved a cumulative return of more than 35%.  Further, the Monthly Profiles reflected that the Master Fund's portfolio composition was typically at or near the 90% threshold for assets rated at least AAA/AA-.  Neither the August 2006 Monthly Profile nor August 2006 PPM gave any indication or mention of liquidity problems.

168.      The November 2006 Monthly Profile reflected continuing bullish returns.  It reported that consecutive positive growth had reached 38 months and that the Master Fund had returned approximately 46% cumulatively, attributing the continued growth in part to "stability in the credit markets."  The Monthly Profile did mention declines in the value of residential mortgage backed securities ("RMBS(s)") issued in 2006, but represented that the Master Fund had very limited long-exposure to RMBSs.

169.      The portrayal of positive results continued into February 2007.  The Monthly Profile for February 2007 reflected 41 consecutive positive monthly returns and represented that cumulative growth was over 52% for the lifetime of the Master Fund.  Moreover, the Monthly Profile listed the NAV of the Master Fund at more than $1.525 billion on total invested capital (actual capital from Limited Partner Subscriptions) of only $902 million.  In other words, NAV had purportedly grown more than $600 million.

170.      The Master Fund appeared to be achieving its returns with a steady diet of just the sort of highly-rated low-risk assets the Management Defendants were purportedly experts at identifying.  The February Profile listed the "Ratings Distributions" of the Master Fund's assets

as 90% at AA or above, with 10% below A, the precise breakdown provided for in the August 2006 PPM.

171.    In sum, as of the end of February 2007, it appeared as though BSAM and the Management Defendants' investment strategy was sound and their expertise in identifying assets priced attractively for high-returns versus credit risk was well-worth the Advisory Fees and Profit Shares paid by the Limited Partners.  BSAM's Advisory Fees and Profit Shares totaled approximately $13.4 million for calendar year 2006 alone.

172.    But all was not truly well.  As Limited Partners would later learn, the positive performance information provided to the Limited Partners resulted from the Management Defendants' nearly constant practice throughout the life of the Master Fund of overvaluing assets and "smoothing" returns (the act of manipulating monthly returns to create the appearance of stability).  Moreover, by no later than the August 2006 PPM, and more likely as early as March 2006, the Management Defendants' systematic overvaluation of assets was creating a liquidity crisis so severe that it threatened to expose systematic mismanagement of the Partnership and Master Fund.  Indeed, according to the SEC Complaint, by no later than an email he sent to Defendant Tannin on September 17, 2006 regarding the Partnership liquidity problems, Defendant Cioffi was already angling to close the fund to disguise its problems: "What I was thinking was to build up 6 mos. of returns then send a letter to all the remaining investors and tell them we are closing the [Partnership]…"

173.    Supported by a pattern of misrepresentations and non-disclosures, rather than appropriately valuing assets, the Management Defendants engaged in a series of schemes through which they attempted to hide the growing liquidity crisis.

**B.    Bear Stearns' Self-Dealing**

174.    The Management Defendants failed to seek review and approval of many related-party transactions between the Master Fund and Bear Stearns entities as required by the Partnership Documents.  In so doing, the Management Defendants failed in their managerial, fiduciary, contractual and legal obligations (under the Partnership Documents and the Investment Advisers Act) to protect the Limited Partners from potential self-dealing by BSAM and affiliated Bear Stearns entities.  Moreover, the Director Defendants, including the Independent Directors, breached their fiduciary duties of oversight when they failed to enforce the PPM's requirements regarding related-party transactions.

175.    As recognized by the PPM, potential conflicts of interest existed in the operation of the Partnership and the Master Fund.  (PPM at p. 26.)  For example, the PPM indicated that the Master Fund would purchase securities from and through its prime broker BSSC, would rely on Bear Stearns' credit-risk management and pricing models and, most importantly, the Master Fund would invest in structured finance securities issued by Repackaging Vehicles organized and managed by BSAM or other Bear Stearns entities.

176.    In exchange, BSAM, BSC and other Bear Stearns entities would collect fees for brokerage services, commissions for trades, and fees for arranging and issuing these CDOs on top of the Advisory Fees and Profit Shares BSAM was already reaping.

177.    To comply with the Investment Advisers Act and to convince Limited Partners that the Partnership would be managed by prudent and responsible fiduciaries, the Management Defendants presented the following assurances and promises, among others, in the PPM regarding related-party transactions:

> [T]he Subscription Agreement of each Limited Partner provides that each Limited Partner consents and agrees that if any transaction, including any transaction effected between the Master

> Fund and the Investment Manager or its affiliates, is subject to the
> disclosure and consent requirements of Section 206(3) of the
> Advisers Act, such requirements will be satisfied with respect to
> the Master Fund and all Limited Partners *if disclosure is given to,*
> *and consent obtained from, the independent Master Fund*
> *Directors or such other advisory party.*

(PPM at p. 29.)  (Emphasis added.)

178.    With regard to the Repackaging Vehicle Junior Interests into which the

Management Defendants plunged an extraordinary amount of Master Fund and, therefore,

Partnership funds, the PPM promised:

> Because the Investment Manager will serve as collateral manager
> of the Repackaging Vehicles, the purchase of the Repackaging
> Vehicle Junior Interests may be deemed to be a principal trade.
> The *Investment Manager will, therefore, make appropriate*
> *disclosure to, and obtain consent from, the members of the board*
> *of directors of the Master Fund who are not affiliated with the*
> *Investment Manager prior to the investment by the Master Fund in*
> *Repackaging Vehicle Junior Interests.*

(PPM at p. 29.)  (Emphasis added.)

179.    As with the other related-party transactions, the Management Defendants and the

Independent Director Defendants failed to comply with either applicable law or the procedures

promised to Limited Partners to ensure that the Management Defendants would honor their

fiduciary and contractual obligations to not prefer and serve their own interests at the expense

and to the detriment of Limited Partners and the Partnership.

180.    As it turned out, the failure to obtain the required approvals for a substantial

number of related-party transactions would become a major failure of the Management

Defendants central to the self-dealing and liquidity crisis that doomed the Master Fund.  If at any

time the Independent Directors had meaningfully reviewed the numerous related-party

transactions, they could have prevented or exposed a number of areas in which the Management

Defendants mismanaged the Master Fund.

      1.    **The Management Defendants Failed to Obtain Required and Promised Approvals for a Multitude of Related-Party Transactions**

181.    Despite the requirements of Section 203(3) of the Investment Advisers Act and the provisions of the PPM, from virtually the commencement of operations of the Partnership and Master Fund, the Management Defendants failed to follow the procedures they had created and which were required for obtaining approvals for related-party transactions. Indeed, by the date of the August 2006 PPM, a pattern had developed whereby hundreds, if not thousands of related-party transactions had been completed without prior approval by the Independent Directors or, with meaningless approvals based upon incomplete and, in many cases, late information.

182.    For example, based upon documents attached to the Administrative Complaint, on July 13, 2006, Jessica Borenkind (an assistant working for Defendant Cioffi) emailed a letter to Tara Murphy, who was an unaffiliated director of the Master Fund who preceded Defendants Lennon and Wilson-Clarke, on behalf of Ms. Pusateri seeking approvals for 85 securities transactions with BS&Co. *that had already settled during the period from January 2006 through June 2006*. Ms. Murphy was an employee of PFPC International Ltd. ("PFPC"), a mutual fund advisor that provided independent directors for the Master Fund prior to Walkers. From the beginning of the Master Fund, PFPC had provided a second independent director, named Joan Kehoe, who resigned as a director in January 2006 due, on information and belief, to her concerns about BSAM's conduct that consistently violated the Investment Advisers Act and the Partnership Documents.

183.    This practice of obtaining meaningless approvals retroactively in connection with the Management Defendants' and the Independent Directors' supervision and administration of the Master Fund and the Partnership was not an anomaly. In fact, it was a pattern that had

become progressively worse during the life of the Master Fund.  Information compiled by the Massachusetts Secretary of State's Office indicates that the Management Defendants caused the Master Fund to enter into 100 principal transactions in 2003 that were deemed to require prior approvals of the Independent Directors.  Of that number, 18% were executed without prior approval.  In 2004, 29.73% of the 730 principal transactions were executed without prior approval.  The number rose to 58.66% out of 1,161 transactions and 78.95% of 342 transactions in 2005 and 2006, respectively.

184.    Moreover, on information and belief, it was not until late 2005 or early 2006 when the Management Defendants informed Ms. Borenkind and Ms. Pusateri that they were required under the law and the Partnership Documents to obtain prior approvals for transactions between the Master Fund and BSAM entities, including SPVs and Repackaging Vehicles arranged and/or managed by BSAM.

185.    In total, from the commencement of fund operations until sometime in 2006, the Management Defendants caused the Master Fund to engage in at least 2,333 principal transactions with Bear Stearns entities.  Of those, only 47% were approved prior to the settlement date of the transaction.  As a result, almost half of the related-party transactions violated governing law and the Management Defendants' fiduciary and contractual obligations to Limited Partners.  Of course, the Management Defendants earned fees on the inflated and unchecked putative value of the assets obtained in these transactions as did the BSC entities.

186.    Moreover, from the inception of the Master Fund to 2006, the Management Defendants caused the Master Fund to enter into 224 transactions, nearly 10% of the total, where no approval was ever obtained, whether timely or retroactively.

187.    More significantly, even when approvals were obtained, either timely or retroactively, the Management Defendants did not provide enough information for the Independent Directors to meaningfully analyze the proposed transaction.  Often the approval requests lacked the most basic information, including the names of the securities, notional amounts, settlement dates and independent bids or asks, if any.

188.    Even when information was provided to the Independent Directors, it was insufficient to determine whether the proposed transactions were appropriate for the Master Fund.  For example, when Ms. Borenkind sought retroactive approval for 85 transactions in July 2006, she provided the Independent Directors with a spreadsheet that contained only the trade date, the transaction type (if the Master Fund was buying or selling), a nine digit number acting as the securities "name," a word description amounting to a few abbreviations, the settlement date, the price and the total transaction amount.  None of this information could form the basis for anything more than a rubber-stamp decision.

189.    By the date of the August 2006 PPM, the Management Defendants were aware of the ongoing failure to obtain approvals.  In the summer of 2006, meetings were held between Barbara Keller, Chief Compliance Officer of BSAM, and BSAM employees working on the Master Fund regarding ongoing deficiencies in obtaining approvals for related-party transactions. On August 9, 2006, Defendant Cioffi sent an email to Ms. Pusateri acknowledging deficiencies in the system for obtaining approvals.

190.    Nevertheless, the BSAM Defendants caused the August 2006 PPM to be issued containing representations that BSAM would follow its procedures for review by the Independent Directors.  The procedures were not followed.

191.    Aside from being required by the Investment Advisers Act and the Partnership Documents, the Independent Directors' approval was admittedly required for a principal or related-party transaction to occur.  The importance of independent approval of such transactions to the integrity of the management of the Master Fund and the Partnership was pointedly summarized in a sworn declaration submitted by Simon Lowell Clayton Wicker ("Wicker") in connection with the Master Fund's Chapter 15 bankruptcy proceedings before Judge Burton Lifland on September 21, 2007.  Wicker, a partner of KPMG in the Cayman Islands, was appointed as joint provisional liquidator of the Master Fund.  In this capacity, Wicker swore that the Independent Directors of both Master Funds (the "Foreign Debtors") in the bankruptcy proceedings, among other things:

> (c) . . . regularly entered into a substantial number of securities-trading transactions (the "Principal Transactions") with entities affiliated with The Bear Stearns Companies, Inc. (collectively, "Bear Stearns").  *Each Principal Transaction required the prior written approval of one of the two Independent Directors.  Absent such approval, the Foreign Debtors were not authorized to proceed with any Principal Transaction*.

<div align="center">*   *   *</div>

> (e) I have been advised that the *Independent Directors, pursuant to their responsibility to review all Principal Transactions*, evidenced their independence in passing judgment on such transactions.

(Emphasis added.)

192.    Mr. Wicker's sworn statements to Judge Lifland demonstrate that the Management Defendants knowingly entered into numerous impermissible transactions that were not at arm's-length and that the Independent Directors knew that they were responsible for approving such transactions, but failed to do so.  The Management Defendants' and Independent Directors' wholesale disregard for the law and their contractual obligations to Limited Partners, as well as their duties to Limited Partners and the Partnership, enabled the Management

Defendants to elevate their interests above those of Limited Partners and the Partnership and to saddle the Master Fund and Partnership with illiquid securities.

193.    Because of continued deficiencies in the approval process, in September 2006, Bear Stearns finally issued a moratorium that purportedly prevented the Master Fund from entering into any more transactions with Bear Stearns.  But the ban was cosmetic and toothless. On information and belief, it neither prevented the Management Defendants from continuing to cause the Master Fund to buy additional BSAM-issued securities nor attempted to un-ring the bell with respect to the hundreds of millions of dollars worth of Bear Stearns issued securities the Master Fund already owned.

194.    Nevertheless, the ban worried Defendant McGarrigal because he saw it as isolating the Master Fund from a needed source of liquidity and a ready trading partner.  On September 19, 2006, Defendant McGarrigal emailed Defendants Cioffi and Tannin regarding the ban:

> Do we have an official mandate to terminate our relationship with Bear?  This hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOs … Bear is #1 in MBAS and in the top 5 of CDO issuers. All bad for our investors.  I think we should continue to work hard to put in place all necessary compliance procedures to allow [sic] to continue operating as we have to date.

195.    Even though McGarrigal evidently felt it was harmful to investors, the prohibition was never disclosed to Limited Partners.

196.    In any case, related-party transactions continued between the Master Fund and other Bear Stearns entities, including Repackaging Vehicles arranged by the Management Defendants, and the problems obtaining approvals continued.  For example, in March 2007, 87 letters requesting approval were sent to the Independent Directors, less than half complied with the new standards, and 21 were sent after the transaction had closed.

### 2.      The Independent Directors Were Not Truly Independent

197.     Even had the Management Defendants followed the protocol outlined in the PPM for obtaining approvals, BSAM had already violated the PPM by appointing Independent Directors who were independent in name only.

198.     Defendants Lennon and Walker-Clarke were appointed as the Independent Directors on or about the date of the 2006 PPM to replace Ms. Murphy, the lone director provided by PFPC after Ms. Kehoe resigned.  However, Walkers, which employed Lennon and Walker-Clarke, had a long history of providing services to Bear Stearns and its hedge funds. Walkers served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, and Walkers provided fund services for at least 9 of BSAM's own funds.

199.     All told, during the Class Period, the Independent Directors provided by Walkers approved at least 165 related-party transactions where the approval request was incomplete or submitted after the transaction had already occurred.  Even though they were putative experts in the hedge fund area, they did not raise any concerns about the process.  Thus, even had they been given the appropriate information, the Independent Directors would not have rejected any transactions and risked killing their employer's golden goose.  Indeed, on information and belief, from the time of their appointment until the collapse of the Master Fund, Defendants Lennon and Wilson-Clarke did not reject a single transaction between the Master Fund and any Bear Stearns entity or Repackaging Vehicle.

### C.      The Enhanced Fund is Formed to Conceal and Defray Liquidity Problems Within the High-Grade Master Fund and Partnership

200.     By March 2006, the Management Defendants had conceived of a new fund to alleviate and conceal liquidity problems they had created in the Master Fund and in the Partnership.  The new "enhanced leverage" fund would be marketed to existing Limited Partners

and to new investors as an improved fund that would out-earn the Master Fund by using the same investment strategy but employing much greater leverage.

201.    The Management Defendants intended to create additional leverage through new "master-feeder" structure and adding a large financial institution as leverage counterparty between a new master fund, the High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, (the "Enhanced Fund") and its investors.  In March 2006, the Management Defendants approached Barclays Bank Plc. ("Barclays") to act as counterparty.  Barclays agreed to provide leverage to the fund and, what was then unknown to investors and Barclays, would be a source of much-needed liquidity.

202.    On August 1, 2006, the Management Defendants launched the Enhanced Fund in the Cayman Islands and created the Bear Stearns High-Grade Credit Strategies Enhanced Fund L.P. (the "Enhanced Partnership") as a Delaware limited partnership domestic feeder-fund.

203.    The Management Defendants promoted the Enhanced Fund as superior to the High-Grade Fund because it would purportedly invest in the same highly-rated CDO classes and unrated Repackaging Vehicle Junior Interests, but would earn higher returns through increased use of leverage, up to 27.5 times NAV.

204.    From the outset of the Class Period, the Management Defendants strongly encouraged Limited Partners to "exchange" or "roll over" their Partnership Interests for interests in the new Enhanced Partnership.  In fact, the Management Defendants even offered lower Advisory Fees and Profit Shares for the Enhanced Fund as incentives for Limited Partners to move into the Enhanced Fund.

205.    The Management Defendants' plan to close the Master Fund without disclosing its failings depended upon their desperate effort to move investors into the Enhanced Fund.  In a

September 17, 2006 email discussed herein, Defendant Cioffi emphasized the importance of getting Limited Partners to convert so the Management Defendants would not have to sell Partnership assets, which he knew would expose their true value.

206.   Eventually, the Enhanced Fund received in-kind subscriptions from approximately 36% of Limited Partners and a corresponding percentage of the Master Fund's assets were transferred to comprise the assets of the Enhanced Fund.

207.   Like the Master Fund, the Enhanced Fund initially reported strong returns.  Its February 2007 Monthly Profile reported positive growth in each of its first 7 months of operation, and cumulative growth of 6.99%.

208.   Even the new Enhanced Fund Structure was apparently not enough to contain the growing but undisclosed liquidity problems with the Partnership.  A month after the Enhanced Fund launched, the Management Defendants conceived of another vehicle that could be used to disguise problems with both Funds, Everquest Financial Ltd. ("Everquest").  As discussed below, Everquest was created in an audacious attempt to offload from Bear Stearns' and the Funds' balance sheets the most illiquid CDO assets.

**D.   Everquest is Formed as an Additional Mechanism to Conceal High-Grade Master Fund and Partnership Liquidity Problems**

209.   The Management Defendants caused BSAM to create Everquest in the Cayman Islands in September 2006.  Everquest was a specialty financing company which, like the Funds, had purportedly been formed for the purpose of investing in structured finance securities. BSAM owned 67% of Everquest and served as co-manager.  Defendant Cioffi served as the Chief Executive Officer of Everquest.

210.   Unlike the Master and Enhanced Fund, Everquest was not a hedge fund populated by limited partners through feeder-funds.  Rather, Everquest was a company that would

ostensibly invest in structured finance securities and in turn issue its shares to the public through an Initial Public Offering to be underwritten by Bear Stearns.

211.    Soon after Everquest was formed, the Master Fund and Enhanced Fund sold approximately $555 million worth of their worst CDO assets to Everquest in exchange for $150 million in cash and 16 million shares of Everquest, purportedly valued at $25 per share.

212.    In connection with its planned IPO, on May 9, 2007, Everquest filed a registration statement with the SEC.

213.    However, unbeknownst to Limited Partners and undisclosed by the Management Defendants, the Everquest transaction and proposed IPO was another scheme through which the Management Defendants intended to hide the Master Fund's financial problems.  The Management Defendants believed they could dump the assets on unsuspecting investors through the IPO and the Master Fund would own shares that would have value as long as the investing public did not realize that Everquest's assets were worthless.

**E.      The High-Grade Master Fund Begins to Unravel and the Management Defendants Lie to Limited Partners**

214.    As stated, the Master Fund appeared to have experienced steady growth from its inception into the fall of 2006, by which time it had cumulative gains of approximately 35% purportedly through a diet of well-selected AAA/AA CDO securities.  Moreover, its purported success had led to the creation of the Enhanced Fund, which promised even greater returns.

215.    However, even as the positive reported returns continued into the first few months of 2007, by January 2007 Limited Partners were becoming skittish about the perceived weakening of the credit markets.  Increasingly, articles were appearing in the financial press that the market for CDOs, particularly those backed by subprime mortgages, was weakening due to increased defaults on the underlying collateral.

216.     The Management Defendants, nevertheless, reassured Limited Partners orally and in the Monthly Profiles that the Master Fund's portfolio was still primarily AAA/AA, had limited exposure to subprime debt, and was adequately hedged.  At the time, the Management Defendants had full knowledge that the Master Fund's investments were in crisis.

### 1.     The First Indications of Trouble with the High-Grade Master Fund

217.     Amidst the growing market-wide concern regarding structured finance securities backed by subprime debt, on January 18, 2007, Defendants Cioffi and Tannin held an investor conference call.  According to published reports and the SEC Complaint, during that call, Defendant Cioffi emphasized that, far from being troublesome, widening spreads in subprime debt would be favorable to the Master Fund's hedges because "we have proper hedges in place. We are short a significant amount of the subprime space."

218.     Defendant Tannin echoed Cioffi's statements that the Master Fund would benefit from a deteriorating market:  "[T]he bottom line on our exposure is this, if the market were to continue to deteriorate, and spreads were to widen, we would do very well . . . . We have a very nice short position."

219.     The false statements to Limited Partners that Defendants Cioffi and Tannin made regarding the Master Fund's hedges were reinforced by the February 2007 Monthly Profile. According to the Monthly Profile, the Master Fund's hedges had realized and unrealized returns of approximately +5.3% for February.  This was of particular significance to Limited Partners because, while the February 2007 Monthly Profile still reported positive returns for the month, the gains were for the first time attributed only to hedges rather than the value of long-assets, which had lost "approximately 4.4%" (for a net loss of about .06%).  In the February 2007

Monthly Profile, the Management Defendants blamed volatility in the subprime CDO markets

for the decrease in long-asset value:

> February was a volatile month in the structured credit markets,
> particularly in any credit associated with subprime mortgages.
> Over the course of February there were a number of failures in
> subprime originators as well as historically high levels of early
> delinquencies in subprime securitizations originated in 2006.  The
> mass media carried many stories about potential disasters in the
> subprime market.  The result of this was a rapid and severe
> widening in the subprime credit derivatives index which in turn led
> to a broad based widening of mortgage-backed assets up and down
> the capital structure.  The Fund was well positioned for this spread
> widening because of the hedges put in place over the second half
> of 2006.

220.    Limited Partners' concerns were mollified by the Management Defendants'

assurances that the Master Fund was adequately hedged.  Moreover, the Monthly Profiles stated

that the Master Fund's exposure to subprime debt was only approximately 6.0% of assets.

221.    In March 2007, the bad news continued.  The March 2007 Monthly Profile

provided that the Master Fund returned -3.71%, the first negative month in its lifetime.  The

Management Defendants blamed the results on overreaction in the subprime market, and again

falsely assured Limited Partners that the Master Fund remained well positioned due to its

effective credit monitoring and hedging:

> Performance suffered in March for two reasons:  first, continued
> weakness in CDOs with exposure to subprime collateral caused
> additional mark downs in our long asset exposure; second, our
> short positions rose in price as many investors who were short the
> subprime credit default index covered their positions.  We have
> attempted to add quality positions to the portfolio, monitor the
> credit performance of these positions over time, and have looked to
> sell positions at the first sign of credit deterioration.  The widening
> in spreads we experienced in February and March was the result of
> fear of an unprecedented increase in cumulative losses these
> portfolios will suffer over time, not an actual deterioration in credit
> on the underlying bonds in our portfolio.  This loss in structured
> credit confidence is what has generated the spread widening.  The
> price action on the short side of our portfolio was driven by

> technicals rather than credit fundamentals as many macro short
> sellers covered positions in March to lock in profits.  Thus, while
> the actual credit environment continued to deteriorate, the credit
> derivative indices rose with short covering.  Our positions are
> based on credit fundamentals. . . .  We have acted quickly to hedge
> or sell assets where we see that potential credit losses are
> unacceptable.

222.     Again, the March 2007 Monthly Profile listed the Master Fund's exposure to

subprime debt at approximately 6.0% of assets.

223.     Unfortunately for Limited Partners, the truth regarding the Master Fund's hedges

and overall financial condition was far different from the Management Defendants' falsely

optimistic portrayals.  According to published reports and the SEC Complaint, as early as

January 2007, Defendant Cioffi had recognized shortcomings in the Master Fund's hedging

strategy.  In an internal email in January 2007, Defendant Cioffi expressed concern that lack of

liquidity in certain Credit Default Swap markets could ruin the hedges.  By mid-March,

Defendant Tannin was equally concerned about the Master Fund's hedges when, in an email to

Defendant McGarrigal with the subject-line "?????????????????", Tannin asked "is Ralph doing

what he should be doing now?" with respect to hedges.

224.     Moreover, betraying his positive public statements to investors and in the

Monthly Profiles regarding the general prospects of the Master Fund, by mid-March 2007

Defendant Cioffi was panicked about the state of the subprime CDO market in general.

According to the SEC Complaint, Defendant Cioffi revealed the true extent of his concern in a

March 15, 2007 internal email to a member of the BSAM investment team:

> I'm fearful of these markets …. As we discussed it may not be a
> meltdown for the general economy but in our world it will be.
> Wall Street will be hammered with law suits.  Dealers will lose
> millions and the cdo business will not be the same for years.

71

225.    As Limited Partners would later learn, the Management Defendants had cause for concern.  In the Monthly Profiles for February 2007 and March 2007, the Management Defendants had massively understated the Master Fund's exposure to subprime debt.  According to a BSAM internal risk-exposure report (the "BSAM Report") on or about April 19, 2007, the truth was that by March 2007 the Master Fund's overall collateral including all asset classes was approximately "60% subprime," a staggering number that blatantly violated the investment parameters in the PPM.  Yet, this information was concealed from Limited Partners as the Management Defendants knew that increased requests for redemptions would quickly topple their irresponsibly leveraged house of cards that had illiquid and unsalable Bear Stearns-issued toxic equity tranche CDO securities at the core of its rotting foundation.

226.    As was their custom, the Management Defendants did not disclose to Limited Partners the true exposure to subprime debt nor was it ascertainable from the Monthly Profiles.  Instead, the Monthly Profiles listed subprime exposure as approximately 6%, which was just direct exposure.  Indirect subprime exposure through CDOs and CDOs-Squared was listed under the catch-all asset classification "ABS" (Asset Backed Securities), which was 81% and 86% of collateral in February 2007 and March 2007, respectively.  In other words, it was impossible from the Monthly Profiles to ascertain the true exposure to subprime debt or that any of the ABS collateral actually included subprime mortgages.

227.    To make matters even worse, as they had through the life of the Master Fund, the Monthly Profiles misleadingly continued to report that the Master Fund's asset composition still was in compliance with the PPM's requirements that the portfolio be comprised of approximately 90% carefully selected securities with a credit rating of AAA/AA-.

### 2.     The Management Defendants Fight Massive Redemptions

228.     Despite the Management Defendants' reassurances, due to increasing fears about the impact of subprime mortgage defaults on the CDO market, the Management Defendants began to receive increased redemption requests during the spring of 2007 and became aware that more and more Limited Partners were contemplating making redemptions.

229.     As discussed herein, most securities issued by CDOs are illiquid investments that typically cannot be sold quickly at or close to their "market price" to raise capital.  The Management Defendants knew that the Master Fund's CDO positions, concentrated as they were in the virtually valueless equity classes of Bear Stearns' structured finance vehicles, did not have the liquidity necessary to meet even marginal redemption requests.  More importantly, the Management Defendants were concerned that knowledge of large-scale redemptions would panic other Limited Partners and cause a run on the Master Fund that would hasten its already seemingly inevitable failure.

230.     Thus, in March and April of 2007, the Management Defendants engaged in a campaign to prevent Limited Partners from submitting redemption requests.  For example, according to the SEC Complaint, on March 7, 2007, Defendant Tannin told one investor that he personally was making an additional investment in the Partnership to take advantage of favorable market conditions (which he knew to be unfavorable) and, rather than redeem, encouraged the investor to do the same.  Similarly, from about March 15 to March 18, 2007, Tannin told BS&Co. salespeople to tell investors that he was increasing his stake in the Partnership. Similarly, on March 22, 2007, Defendant Cioffi encouraged a BS&Co. salesperson to confront redemption requests by an investor with a suggestion that the investor should increase its investment in the Partnership.  BS&Co. went along even though all of the Bear Stearns

Corporate Defendants knew the true state of the Master Fund's and the Partnership's lagging performance.

231.     Needless to say, Defendants Cioffi and Tannin never had any intention to increase personal exposure to the Master Fund.  Indeed, on or about March 23, 2007, Defendant Cioffi quietly redeemed $2 million of his interests in the Enhanced Fund.  By this point, Defendants Cioffi and Tannin were well aware of the catastrophic state of the Partnership and, according to the Indictment, in an email to Defendants Cioffi and McGarrigal on April 22, 2007, Defendant Tannin made clear his belief that the subprime market and by extension the Master Fund was finished:

> [T]he subprime market looks pretty damned ugly … if we believe [the BSAM report] is ANYWHERE CLOSE to accurate *I think we should close the funds now*.  The reason for this is that if the [BSAM report] is correct then the entire subprime market is toast … there is simply no way for us to make money – ever.

(Emphasis added.)

232.     Defendant McGarrigal agreed with the assessment in a reply email and suggested that the best course was to create some form of a liquidating trust for the Funds.

233.     Despite their full knowledge of the true state of the Master Fund, which led to suggestions to close down the Partnership, as Cioffi knew was likely by September 2006, the Management Defendants continued to indicate to Limited Partners that all was well.

234.     On April 25, 2007, Defendants Cioffi and Tannin held a conference call with investors during which they encouraged Limited Partners to increase their stakes in the Partnership.  During the call, and in an obviously indefensible about-face from properly panicked suggestions to close the Partnership just three days earlier, Defendants Cioffi and Tannin dismissed the negative February and March 2007 returns and assured investors that the Master

Fund was healthy and ready to take advantage of negative overreaction in the structured finance

market:

> [W]e feel that we're in a position to do exactly what we've done all along and that the opportunities now, I mean, we were again quite cautious in 2006 and even 2005 because, on a risk-adjusted basis, it was not time to really take on significant amounts of risk. *Now is the time to do it.* So the fact that we've been so cautious in the prior periods means that we have the capacity and the flexibility to take advantage of spreads that are simply irrational. So, from a portfolio construction and from a market view, *we're quite comfortable with where we sit.* (Emphasis added.)

235. During the call, Defendant Cioffi also addressed the concerns of Limited Partners

regarding swirling rumors of increased redemptions, but he did not take the obvious opportunity

to disclose to the Limited Partners the true volume of the requests. Instead, he lied:

> Obviously, the big question we've been getting from a number of investors are how do we look on a redemption subscription basis. The next big redemption date would be June 30th and, as of now, I believe we only have a couple million of redemptions for the June 30 date. So far we've gotten reasonable amounts of subscriptions … I believe we have about 45 million in subscriptions and 25 of that is from Bear Stearns.

236. In fact, by the April 25, 2007 call, Defendants Cioffi and Tannin were aware that

there were already tens of millions of pending redemption requests, including one for more than

$50 million. Moreover, additional subscriptions were far less than the $45 million quoted by

Defendant Cioffi.

### 3. The Partnership 2006 Audit Report Reveals the Extent of Self-Dealing

237. On April 24, 2007, the Audit Report and Schedules for the Partnership for year-

end 2006, was issued. The report indicated, among other things, that approximately $616 million

of the Master Fund's assets, or approximately 70% of its NAV, were values assigned by the

Management Defendants that were materially different from what they would have been if market prices had been available.

238.     The 2006 audit Report further indicated that by December 31, 2006, $751 million of the Master Funds' net assets were securities issued by Bear Stearns entities, a staggering 81.96% of total assets.

239.     In addition, the Schedule of investments provided line-items for more than *$2.2 trillion* (gross ownership due to leverage) worth of securities were not identified by name in the Schedules.  For example, the Schedule provided that the Master Fund owned $529 million in "Asset Backed Securities," and contained line items listing, among other things, the names of the Asset Backed Securities.  But it listed $187 million, or 20.87% under "Other Asset Backed Securities."  It similarly listed $221 million of "Other Collaterized Loan Obligations Securities," which was more than 60% of that asset class, and approximately $900 million of "Other Collateral Mortgage Obligation Securities," which was approximately 80% of that asset class.

240.      Not surprisingly, the Schedule provided that the largest single asset class was CDOs, which consisted of approximately $3.7 billion of the Master Fund's gross assets, more than three-times the next-largest asset class.  What was surprising, however, was that of this total, the schedule listed more than $1.19 trillion as "Other Collaterized Debt Obligations Securities."  In other words, nearly a third of the investments in the Master Fund's largest asset class were not identified.

### 4.     The Truth Becomes Known

241.      By the April 25 investor call, the game was virtually up, and the Management Defendants knew it.  Despite continued positive representations from the Management Defendants throughout April 2007 that the Master Fund was strong and its hedges working, the

Management Defendants knew full well that the April 2007 returns were going to be a disaster, and as Tannin conceded in his April 22, 2007 e-mail, the subprime market was "toast."

242.    Nevertheless, during the investor conference call Defendant Cioffi gamely offered intra-month estimates for April stating that the Master Fund would lose only .06% and the Enhanced Fund .07%.  Typically, the Management Defendants and the BSC entities computed the NAV and month-to-date return of the Master Fund daily but only provided preliminary estimates a few weeks after month-end.  Defendant Cioffi's intra-month estimates were at the time an unknown testament to his desperation and, as it would later become clear, were knowingly understated.

243.    Despite the Management Defendants' best efforts to perpetuate their false portrayals of the vitality and future prospects of the Master Fund and Partnership, the truth began to emerge in May.  In a *BusinessWeek* article published on May 11, 2007, the Everquest IPO was correctly identified as an attempt by BSAM to dump its most underperforming "assets" on the investing public:

> Never underestimate the ability of a Wall Street investment firm to
> find a new way to pawn off risky assets onto retail investors.  The
> latest example?  The initial public offering for Everquest Financial.

244.    Soon after, in an email to Limited Partners on May 16, 2007, April 2007 losses were adjusted upwards to 1.78% and 6.75% for the Master Fund and Enhanced Fund, respectively.  Unbeknownst to investors, this was only the tip of the iceberg that Defendants Cioffi and Tannin were still intent on obscuring.

245.    By late May 2007, the Management Defendants were confronted with the long-anticipated final-failure of the Master and Enhanced Funds and the Everquest scheme to dump the worst assets on the investing public through the planned IPO had been exposed.  At this point, the Management Defendants and BSC, along with BSC's co-President and co-Chief

Operating Officer Warren Spector, concocted one last scheme to rescue themselves, sell the Master and Enhanced Funds to a private buyer – leading private equity partnership Cerberus Capital Partners, L.P. ("Cerberus.")  In a May 26, 2007 email to Defendants Cioffi and McGarrigal, Defendant Tannin mentions guidance they had received from Mr. Spector regarding the presentation to Cerberus, reinforcing the fact that BSC knew of the Master Fund's problems all long.  In spite of Mr. Spector's participation, when Cerberus ultimately declined to buy the funds the scheme collapsed and it appeared as if the Master Fund's true condition would finally become public to Limited Partners.

246.   Defendant Cioffi was defiant until the end.  On May 31, 2007, as the official April 2007 returns were about to be released, a desperate Cioffi met with BSAM's pricing committee in an effort to gain permission to adjust some asset valuations upwards.  According to published reports and the SEC Complaint, when Cioffi was unable to present evidence to support his desired valuations, the committee rejected his request and, in an email to a committee member, he conceded that it was "all academic anyway" because the April 2007 results were "doomsday."

247.   Nevertheless, Defendants Cioffi and Tannin were still resistant to releasing the true results to investors.  In an email after the pricing committee meeting on May 31, 2007, Defendant Tannin asked Defendant Cioffi whether investors should be given "the larger down April," meaning the final figure.  Defendant Cioffi responded that they should discuss it on the phone rather than by email.

248.   Finally, on June 8, 2007, the true April 2007 results were released to Limited Partners.  Disastrously, the Master Fund had lost 5.09% in April 2007 alone and its year-to-date return was -6.24%.  Limited Partners were understandably shocked.  A mere two months before,

in the February Monthly Profile, the year-to-date had been reported as +2.54. More incredibly, it was reported that the Enhanced Fund had lost more that 19% in April alone.

249.    Also on June 8, 2007, the Management Defendants finally disclosed to Limited Partners that the Master Fund was inundated with redemption requests it could not meet. The Management Defendants suspended Limited Partners' rights to redeem.

250.    On June 18, 2007, the SEC served document requests upon BSC, seeking a broad production of documents relating to the Partnership and the Master Fund, among other things.

251.    Unable to sustain their investment, hedging and valuation shell game any longer, the grim truth of the Master Fund's and Partnership's abysmal performance and liquidity crisis emerged. On June 22, 2007, BSC announced it would provide $3.2 billion in secured financing in an attempt to stabilize the Master Fund. Far from magnanimous, it was Bear Stearns' last-ditch effort to save its vaunted reputation with investors. The same day, Merrill Lynch seized and sold $800 million of bonds being used as collateral for loans made to the Funds. Seizures from other lenders, including JPMorgan, followed and the bail-out plan was later withdrawn.

252.    On June 25, 2007, Everquest withdrew its Registration Statement in connection with its proposed IPO. The deal was dead and the Master Fund and Enhanced Fund were left with worthless shares of Everquest, which, as discussed below, contained the worst toxic classes of BSAM-issued CDO securities.

**5.    Defendants Are Forced to Admit That the High-Grade Master Fund is Worthless**

253.    On July 18, 2007, the Master Fund's collapse was complete. On that day, BSC sent a letter to Limited Partners informing them that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we

will seek an orderly wind-down of the Funds over time." Just like that, the Master Fund was

insolvent and approximately $925 million of Limited Partners' capital had evaporated.

254.    The letter stated, in relevant part:

> Dear Client of Bear, Stearns & Co. Inc.:
>
> Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade Structured Credit Strategies Enhanced Leveraged Funds managed by Bear Stearns Asset Management.
>
> A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.
>
> As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations.
>
> As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value.
>
> *   *   *
>
> Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June.
>
> The preliminary estimates show there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007. In light of these returns, we will seek an orderly wind-down of the Funds over time.
>
> *   *   *

255.    In a final attempt to save its reputation, the letter also conceded that investor

confidence in BSAM had been seriously impaired, and that it had restructured its deeply flawed

risk management function and instituted additional oversight, stating that:

> In the past weeks Bear Stearns has taken action to restore investor confidence in BSAM.  On June 29th, we announced that Jeff Lane was appointed chairman and chief executive officer of BSAM.  Tom Marano, head of Bear Stearns' mortgage department, has been assigned to BSAM to aid in achieving orderly sales of the Funds' assets.
>
> ***The risk management function at BSAM has been restructured so that it will now report up to Mike Alix, Bear Stearns' chief risk officer, creating an additional layer of oversight***.  Mike Winchell, former head of risk management for Bear Stearns and most recently with Bear Wagner, has been engaged to consult with BSAM with regard to its hedge fund risk management function.

(Emphasis added.)

256.    The Fund's collapse was front-page news in virtually every financial publication in the world.  The financial press, financial institutions and investors immediately speculated that it would, as Defendant Cioffi predicted in his internal March 2007 email, sound the death knell for the market for CDOs that were by then ubiquitous in the portfolios of major financial institutions up and down Wall Street.

257.    On August 5, 2007, BSC announced the resignation of Mr. Spector, stating that "[i]n light of recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure."

258.    In an August 6, 2007 article concerning Mr. Spector's departure, entitled "A Top Official at Bear Stearns Ousted," *The New York Times* observed that "the abrupt tightening of the credit markets recently has hit Bear Stearns particularly hard.  In many ways ***it was a crisis that Bear, with its long expertise in bonds, structured products and in particular mortgage-backed securities, should have seen coming***."  (Emphasis added).

259.    On the same day, August 6, 2007, Plaintiff filed its complaint in the Supreme Court for the State of New York, County of New York (it was later removed to this Court).

**VI.    MISMANAGEMENT OF THE PARTNERSHIP AND BREACHES OF FIDUCIATY AND CONTRACTUAL DUTIES OWED DIRECTLY TO LIMITED PARTNERS**

260.    After the Master Fund so rapidly collapsed in July 2007, taking with it approximately $925 million of Limited Partner's investments and nearly $10 billion in gross assets, and setting off a global credit crisis that would cause billions of dollars in write-downs by the worlds' biggest banks, the question throughout global capital markets was:  "What Went Wrong?"

261.    The financial community and the financial media immediately pointed to the near catastrophic failure of the subprime mortgage markets resulting from falling housing prices and increased defaults.  However, what became clear to investors and the financial industry in the ensuing months is that almost from the beginning of the Master Fund, and certainly by the beginning of August 2006, the Management Defendants had engaged in a systematic pattern of self-dealing and mismanagement that virtually assured that the highly-leveraged Master Fund would collapse in the face of any adverse market conditions and its owners, the feeder-fund investors, including Limited Partners, would lose their entire investments.

262.    As was later learned, beginning no later than mid-2006, the Master Fund was facing nearly constant liquidity concerns.  The Management Defendants had abandoned the investment edicts of the PPM that required 90% investment in high-grade CDO securities identified by careful credit analysis.  Moreover, in 2006, the Management Defendants began to make large bets on subprime mortgage-backed debt while, at the same time, engaging in a pattern of using manager-marks to overvalue investments in illiquid CDO securities.  These unduly risky strategies, along with the overuse of leverage and failure to maintain adequate cash reserves, caused cash shortages that ultimately destroyed the Partnership.

263.    The Management Defendants were able to engage in a long pattern of undiscovered grossly negligent mismanagement because they had long been permitted to effectuate non-arms length related-party transactions between the Master Fund and BSAM and other Bear Stearns entities and affiliates without meaningful review from the "Independent Directors," Lennon and Wilson-Clarke.  The Director Defendants and the Bear Stearns Affiliates had long given the Management Defendants almost limitless freedom in exchange for revenues for BSAM.  The collective mismanagement enabled by the lack of meaningful supervision had long weakened the Master Fund to the point that, when the market for subprime CDOs fell apart and the Management Defendants' promised hedging transactions were nowhere to be found, it all collapsed.

### A.    The Management Defendants Deliberately Abandoned the Stated Partnership Investment Strategy

264.    From the beginning, the stated investment strategy of the Master Fund was to achieve returns above LIBOR through the Management Defendants' careful construction of a portfolio of structured finance assets that were rated 90% AA- or above.  The investment strategy was reinforced in the "Ratings Distributions" section of the Monthly Profiles sent to Interest Holders that routinely reported the Master Fund's assets as 90% at AA or above.  For example, as discussed in Section IV.B., the February 2007 Monthly Profile listed the Master Fund's assets at exactly 90% AA or above.  The March 2007 Monthly profile listed the assets at 94% AA or better.

265.    As it turns out, by at least the beginning of 2006, and likely much earlier, the Management Defendants had quietly caused the Master Fund to abandon this strategy in favor of heavy bets on high-risk securities of CDOs and CDOs-Squared.  By at least August 2006, the

Master Fund was consistently and throughout the remainder of the Class Period holding the majority of its investments in securities well below the 90% AAA/AA threshold.

266.    In fact, by late 2006, the Master Fund's portfolio was comprised of approximately 35% CDOs-Squared which combined highly-rated CDO tranches with junk or unrated CDO securities to create investments with a combined default risk unworthy of a true AAA/AA rating. According to the SEC Complaint, Defendant Cioffi acknowledged in an internal email that the CDOs-Squared held by the Master Fund "were not really AAA" because of the default risk of the underlying collateral.

267.    Moreover, in addition to increasingly and misleadingly allowing the portfolio composition to drop well below 90% AAA/AA, by the beginning of the Class Period, the Management Defendants had all but abandoned the fiduciary and contractual obligations to perform thorough credit-analysis of potential investments in favor of pure volume purchases.  In fact, by mid-2006, Defendant Cioffi had become the central character in the CDO market, using leverage to buy more than $30 billion in CDOs for the Master and Enhanced Funds.

268.    Thus, if it ever really existed, the vaunted expertise of the Management Defendants in identifying attractively priced securities versus credit-risk was finally cast aside that Management Defendants to cause the Master Fund to make nearly indiscriminate leveraged purchases of massive amounts of securities issued by CDOs and CDOs-Squared, most of which were formed and/or managed by Bear Stearns entities.

269.    Needless to say, the Management Defendants did not disclose their wholesale breach of the PPM's investment guidelines, and when they did cause information to be released to Limited Partners, it was misleading.  For example, as discussed above, it was impossible to

ascertain from the "Ratings Distribution" set forth in the Monthly Profiles that the Master Fund
had made long-bets on junk, unrated and illiquid securities issued by CDOs and CDOs-Squared.

### B.     The Management Defendants Made Grossly Negligent Bets on Subprime Mortgages

270.    By early 2006, it had become clear to the Management Defendants that they could
not maintain the early "successes" achieved by the Master Fund by following the strategy
promised to Limited Partners in the PPM.  As discussed herein, throughout the Master Fund's
operation, the Management Defendants had been using manager-marks to inflate the value of
assets and to "smooth" returns.  This was especially true in connection with the Management
Defendants' purchase of Repackaging Vehicle Junior Interests from Bear-sponsored structured
investment vehicles.

271.    The inflated manager-marks, while increasing fees for BSAM and the
Management Defendants, forced the Management Defendants to take irresponsible and
misguided steps to portray positive returns.  Moreover, Defendant Cioffi's almost insatiable
appetite for lightly traded CDOs was driving down yields.  As it became increasingly difficult for
the Management Defendants to generate returns, they ignored their fiduciary and contractual
obligations to monitor credit-risk by plunging even deeper into equity classes of Bear-sponsored
CDOs backed by subprime mortgages to achieve higher returns.  Thus, the Management
Defendants generated fees for themselves on both sides of numerous transactions that left the
Master Fund holding illiquid and immovable toxic trash.

272.    As the public is now painfully aware, subprime mortgages were home loans given
to potential borrowers with poor credit ratings or limited credit histories.  The mortgages carried
a greater risk of default due to the aforementioned credit risk characteristics and delinquent or
non-existent underwriting undertaken with regard to the typical subprime borrower.

273.    With their higher yields (interest rates), subprime mortgages appeared golden to CDOs arrangers.  They could gain exposure to higher yields and still spread the risk by bundling the loans into CDOs along with hundreds or even thousands of other subprime mortgages. Driven in part by the surge of CDOs containing these risky loans, in 2004 and 2005 the U.S. was in the midst of an almost unprecedented housing boom.  CDO arrangers bet that the level of defaults would remain low because borrowers who fell behind could easily sell or refinance into loans with better terms.

274.    By 2006, subprime loans were exploding.  By this time, subprime mortgages made up about 20% of all new mortgages, up from 2.5% in 1998.  Due to Bear Stearns' extensive mortgage background, the Management Defendants were uniquely aware of larger yields offered by equity securities issued by CDOs backed by subprime debt.  By the beginning of the Class Period, the Management Defendants had increasingly chased higher returns by aggressively purchasing CDOs that issued securities backed by subprime debt.

275.    Moreover, Bear Stearns had enthusiastically expanded its own efforts into arranging and managing vehicles that issued securities backed by these high-risk mortgages.  It seemed like a natural fit.  Bear Stearns was one of the largest underwriters of mortgage bonds in the U.S., and it was a leader in the structured finance securities market.  Beginning in mid-2006 at the latest, the Master Fund was used as a willing purchaser of subprime CDO securities issued by Bear Stearns and BSAM.

276.    However, even during the housing boom, the Management Defendants were well aware that the Master Fund's investments in subprime debt violated their own investment guidelines in the PPM which required them to carefully evaluate credit-risk and focus only on

underlying collateral with stable likelihood of re-payment, which is why they concealed it throughout the Class Period.

277.    The Management Defendants' pattern of non-disclosure of the Master Fund's actual subprime exposure began from the outset of the Class Period.  In its AIMA Questionnaire distributed to Limited Partners, BSAM stated that its general practice was to have no more than one-third of the Master Fund's assets in any single asset class.  At the time of the Questionnaire, the Management Defendants knew that the Master Fund's exposure to subprime backed assets was greater than one-third.  Nevertheless, the Management Defendants caused the August 2006 PPM to be issued, and this core Partnership Document continued to represent that the focus of the Master Fund's investment strategy would be senior investment-grade securities.

278.    Moreover, the Management Defendants repeatedly caused Monthly Profiles to be provided to Limited Partners which understated the Master Fund's subprime exposure by as much as 90%.  In Monthly Profiles provided to Limited Partners between August 2006 and March 2007, the Collateral Summary section routinely listed the exposure to subprime residential mortgage backed securities at around 6%.  For example, the February 2007 Monthly Profile and the March 2007 Monthly Profile listed exposure to subprime "RMBS" at 6.1% and 6.0%, respectively.  Misleadingly, these numbers only reflected exposure to subprime debt through direct investments, the Management Defendants had indirect exposure through the more complex CDOs and CDOs-Squared in the catch-all "Asset Backed Securities" category, which covered more than 80% of total assets.

279.    The truth was far different.  In fact, the Management Defendants had bet so heavily on subprime backed CDO securities that, by December 31, 2006, BSAM was the third

largest manager of CDOs backed by subprime mortgages in the world, and the Master Fund and Leveraged Master Fund were two of BSAM's biggest customers.

280.    In fact, so large was the Master Fund's portfolio of subprime backed CDO securities, Defendant Tannin himself began to get uneasy.  According to the SEC Complaint, in a February 5, 2007 email to Defendant McGarrigal, Defendant Tannin expressed his concern about Defendant Cioffi's increased appetite for subprime CDOs by saying:  "Unbelievable, he is unable to restrain himself."

281.    Nevertheless, the Management Defendants' subprime feeding frenzy continued. According to the April 2007 BSAM Report, by March 2007 the Master Fund collateral was approximately "60% subprime."

282.    By the end of 2006, the massive leverage and high-risk asset composition of the Master Fund virtually assured it would implode if the market for CDOs decreased or the housing boom subsided and subprime defaults increased -- as the Management Defendants already knew was happening.  The Management Defendants, however, never disclosed to Limited Partners that they had abandoned the investment guidelines of the August 2006 PMM and their obligations to the Limited Partners to avoid high-risk CDOs like those backed by subprime exposure.  Even worse, the overwhelming majority of the Master Fund's exposure to these CDOs was through purchases of illiquid equity-class securities, for which there was no secondary market.  Despite these plain risks, the Management Defendants indiscriminately saddled the Master Fund and the Partnership with toxic equity securities to provide an otherwise non-existent market for Bear-sponsored CDO equity.  This tactic also increased the BSAM Defendants' fees from both the Partnership and the Repackaging Vehicles from which the "toxic waste" was issued.

C.     **The Management Defendants Benefited Themselves by Consistently Overvaluing Partnership's Assets**

283.     As stated, much of the Management Defendants' appetite for increasingly risky investments in low-rated CDOs and CDOs backed by subprime debt was driven by the need to match the Master Fund's initial "success."  However, these "returns," which were reported in the Monthly Profiles, were largely illusory gains created by a pattern of the Management Defendants overvaluing assets.

284.     As discussed above, pursuant to the PPM, the Management Defendants had fiduciary and contractual duties to value the Master Fund's assets with the "mark-to-market" method (which collected pricing information from the appropriated markets and exchanges) when possible.

285.     When market pricing was not available, as was the case with Repackaging Vehicle Junior Interests for which there was no exchange or secondary market, the PPM required the Management Defendants to value assets using the "fair-value" method, which took the present value of projected cash-flows over the life of the asset and adjusted it based on credit-risk as determined by the Management Defendants.  As with the other valuation methods, the BSAM Defendants were required to act in "good faith" and assign values that were "fair and reasonable."  (PPM at p. 46.)

286.     However, as discussed above, the PPM also provided that the Management Defendants could use "manager-marks" if, in the opinion of the Management Defendants, available market prices did not accurately reflect true value.

287.     Moreover, according to the PPM, the Management Defendants could use manager-marks to value assets to "reflect the amounts invested by the Partnership in such asset, notwithstanding that such amounts may not represent the market value of such asset."  (PPM at

p. 46.)  In essence, the Management Defendants could value an asset at the amount it had caused the Master Fund to pay.  Moreover, the Management Defendants could value assets using any "other prudent method of valuation other than that referred to [in the PPM]."

288.     In other words, the PPM allowed the Management Defendants almost limitless flexibility with respect to manager-marks.  Even so, the Management Defendants were obligated by their fiduciary and contractual duties to fairly use manager-marks.  Instead, the Management Defendants caused the Master Fund and the Partnership to purchase, from BSAM and other Bear affiliates, hundreds of millions of dollars of essentially worthless CDO scraps that the Master Fund and Partnership could never sell for value.

289.    In theory, the Management Defendants' manager-marks were subject to review by BSAM's pricing committee, a group of BSAM professionals who were charged with overseeing the ultimate calculation of the Master Fund's NAV.  By 2006, however, Defendant Cioffi's funds had become the leading generator of revenue for BSAM.  Moreover, the assets were so complex and the structures often so Byzantine that the pricing committee put their heads in the sand and accepted the Management Defendants' calculations.

290.    Thus, almost throughout the life of the Master Fund, and certainly by the beginning of the Class Period, the Management Defendants were using the manager-mark method consistently to inflate values and "smooth" returns.  The inflated values generated increased Advisory Fees and Profit Shares (which Defendant Cioffi's team was sharing with BSAM 50/50) and the smooth returns gave the appearance of stability and attracted more subscriptions -- all in the midst of a liquidity crisis at the Master Fund and Partnership that found the Management Defendants scrambling to maintain their fiction of positive performance through the Enhanced Fund and Everquest.

291.    Use of manager-marks did not improve over time.  Indeed, by December 31, 2006, more than 70% of the total assets of the Master Fund were being valued by manager-marks.

292.    While the Management Defendants' deceptiveness attracted additional Limited Partners and forestalled what otherwise would have been a wave of Limited Partner redemption requests, over-reporting values had a number of unintended consequences.  *First*, as discussed, it created continuing expectations among Limited Partners and the Partnership that the Master Fund was going to generate returns and produce revenue, thus causing more pressure on the Management Defendants to maintain the appearance of returns.  *Second*, it created liquidity problems because Limited Partners could conceivably seek to redeem Interests which would be paid from profits that did not actually exist.  *Third*, the Master Fund entered into Repo Agreements using inflated assets as collateral.  If the true value of the collateral became clear, the Master Fund would be required to make margin payments that would cause the Master Fund and Partnership to crumble, as they eventually did.

**D.     The Management Defendants' Gross Negligence Created a Constant Liquidity Crisis**

293.    Hedge funds constantly need cash to satisfy redemption requests, to meet payment obligations and margin requirements for Repo Agreements, and to pay operating expenses.  The Master Fund was no different.  But the Management Defendants' inflated manager-marks and increased investment in illiquid subprime backed CDO securities only added to the Master Fund's liquidity problems, which were a nearly constant concern.

294.    As discussed herein, while ostensibly created to compound the "success" of the Partnership and Master Fund, the Enhanced Partnership and Enhanced Fund (and the inclusion of Barclays as leverage counterparty) were actually created quietly to alleviate liquidity problems in

the Master Fund stretching back at least to March 2006 when the Management Defendants first

approached Barclays about serving as the leverage counterparty for the new "Enhanced" Funds.

295.    The Management Defendants' true motivation for creating the new Enhanced

Funds is clear from a series of emails in September 2006 regarding their "liquidity game plan" --

a way to attempt to solve the Master Fund and the Partnership's crippling liquidity problems

without telling anyone.  On September 17, 2006, Defendants Cioffi and Tannin discussed by

email how to transfer Limited Partners into the more liquid Enhanced Partnership:

> What we need to figure out is how to get the majority of our LPs
> into the enhanced fund.  That will take some time but once we do
> that we have an easy liquidity source and that's Barclays.

The same day, Defendant Tannin responded:

> I've been working on that too.
> There are three ways to roll our investors into Barclays: (although
> perhaps you can think of more).
> 1. Force them (I'm not really serious)
> 2. A sell out and sell in.  This is sticky because it forces us to raise
> liquidity in [the Master Fund] – and over time we would increase
> the more illiquid investments.
> 3. We do an in-kind exchange.  *The issue here is that we have to
> get a "real" mark on all the assets*.

Defended Cioffi replied:

> *What I was thinking was to build up 6 mos. of returns then send a
> letter to all the remaining investors and tell them we are closing
> the [Partnership] and ask everyone to convert to the [Enhanced
> Partnership]*.  We'd have to handle it like we did a thru exchange
> of assets I would not want to have to sell everything.  This is the
> riskiest way to go because you know some LPs will not convert but
> I feel comfortable that we can get almost all of them to.

296.    In addition to concerns about convincing Limited Partners to move to the

Enhanced Partnership without disclosing the true motive behind the move, the concern of

Defendants Cioffi and Tannin regarding a "real mark" for all assets demonstrate that they knew

assets had been routinely overvalued and that the carrying values were indefensible.

297. The new fund nonetheless completed in-kind subscriptions of 36.74%, and assets of the Master Fund were transferred to comprise the assets of the newly created Enhanced Master Fund.

298. Needless to say, the Management Defendants failed to disclose to the Limited Partners the liquidity problems that led to the creation of the Enhanced Funds, even though the liquidity problems stretched back to at least March 2006. Moreover, the Management Defendants caused the August 2006 PPM to be issued with no mention of the liquidity concerns facing the Master Fund.

      **E.**     **The Management Defendants Failed to Adequately Hedge the Partnership's Investments**

299. As stated above, amid growing concern about the state of the subprime market, in the financial community in late 2006 and early 2007 the Management Defendants repeatedly assured Limited Partners not only that exposure to subprime debt was minimal (which was completely untrue), but that the Master Fund's investments were adequately hedged against the softening market. Hedging had been a central component of the investment strategy in the PPM, and Limited Partners were encouraged to remain in the fund because the hedges would protect the Master Fund's positions.

300. As stated above, during a January 2007 conference call, Defendant Cioffi expressed confidence that widening spreads in subprime debt would be favorable to the Master Fund.

301. The following month, in February 2007, the Monthly Profile acknowledged negative growth in the long-positions of the Master Fund for the first time. The Management Defendants, however, still expressed positive views on the Master Fund's hedging strategy.

302.     Even the next month when the March 2007 Monthly Profile reported -3.71% returns, the first down month in the 42-week history of the Master Fund, the Management Defendants pointed to their hedging activity.  According to the SEC Complaint, during an investor conference call the same month, Defendant Cioffi stated that his "bottom line" was that the Master Fund was "effectively able to hedge" the volatility of the subprime market.

303.     In truth, the Management Defendants made massive investments in risky CDO-issued securities and had not satisfied their fiduciary and contractual obligations to adequately hedge the investments.  And, more importantly, they knew it.  Defendant Cioffi became concerned about the state of the hedges in January 2007 at the latest, and Defendants Tannin and McGarrigal emailed about hedging concerns in March 2007.

## VII.   WALKERS KNOWINGLY PARTICIPATED IN THE MANAGEMENT DEFENDANTS' BREACHES OF THEIR DUTIES TO THE PARTNERSHIP AND LIMITED PARTNERS

304.     Walkers had a long and lucrative relationship with Bear Stearns.  As discussed above, Walkers served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, and Walkers provided fund services for at least nine of BSAM's own funds.  BSAM selected Walkers to perform services for the Master Fund that would ultimately be paid for by the Partnership and the other feeder funds.  In this case, Walkers was retained to provide Independent Directors to replace the PFPC directors, ostensibly to correct the wholesale failure to comply with the related-party transaction approval process required under the Advisers Act and the Partnership Documents.

305.     By its retention in summer 2006, Walkers was aware or should have been aware of the problems with approvals of related-party transactions.  As global provider of hedge and mutual fund services, including providing independent directors, Walkers was or should have been aware of Section 206(3) of the Investment Advisers Act.

94

306.     Nevertheless, Defendants Lennon and Wilson-Clarke, the Independent Directors provided to the Master Fund, completely neglected their duties to the Master Fund, the Partnership and to other feeder-funds.  As stated above, the Independent Directors approved at least 165 related-party transactions where the approval request was incomplete or was submitted after the transaction was already completed.  Walkers entirely failed to supervise the Independent Directors or ensure that they were effectively discharging their duties.

307.     Bear Stearns long had the reputation for an independent culture, and senior managers basically ran their own fiefdoms as they saw fit.  Provided they were hitting their revenue targets, there was little oversight.  The Management Defendants were generating significant revenue for BSAM and, as a result, they were given almost limitless autonomy.  Had any of the prices, asset composition, values, volume, or credit-risk of the Master Fund's investments been independently examined, the Master Fund would not have become the primary purchaser of Bear Stearns otherwise illiquid securities.

308.     As stated above, pursuant to the PPM, the Management Defendants were permitted to value assets based on the price they had caused the Master Fund to pay for them.  In other words, when later queried by Interest holders or BSAM's pricing committee regarding valuations, the Management Defendants could point to the purchase price paid as a *de facto* mark-to-market valuation.  Independent review of many related-party transactions would have acted to control the Management Defendants' inflated manager-marks.

309.     Similarly, as evidenced by Defendant McGarrigal's September 19, 2006 email, the Master Fund frequently engaged Bear Stearns entities as lending counter-parties in the Repo Agreements used to create leverage.  As discussed above, Repo Agreements involved the Master Fund transferring collateral and making margin payments if the posted collateral decreased in

value.  In other words, Bear Stearns, as counterparty, was assigning actual monetary values for the asset-collateral and monitoring changes to its value.  Had the Independent Directors examined the Repo Agreements between Bear Stearns and the Master Fund, they could have discovered that Bear Stearns was valuing the assets differently than the BSAM Defendants' manager-marks.  The fact that the Independent Directors failed to even attempt to carry out the basic responsibilities entrusted to them was grossly negligent.  The Management Defendants' failure to require such independent review was a breach of their fiduciary and contractual duties to the Partnership and the Limited Partners.

310.    Independent review of related-party transactions also would have uncovered that the Management Defendants were causing the Master Fund to abandon its measured approach to investing in AAA/AA securities.  Over the life of Master Fund, BSSC engaged in literally hundreds of transactions with the Master Fund.  On information and belief, meaningful examination of these transactions would have uncovered that the Master Fund was increasingly investing in junk or unrated securities.

311.    Finally, and most importantly, meaningful Independent Director review would have instantly uncovered the Management Defendants' nearly compulsive investments on behalf of the Master Fund in risky CDO securities issued by Bear Stearns and backed by subprime debt.

312.    As discussed at length herein, the Master Fund, by design, was permitted to invest in structured finance securities and Repackaging Vehicle Junior Interests arranged and managed by BSAM and other Bear Stearns entities.  When, during the Class Period the Management Defendants increasingly began to direct the Master Fund to junk and unrated CDO securities, a responsible review of the transactions by the Independent Directors would have uncovered that

the Management Defendants were investing outside the parameters of the PPM and breaching

their contractual and fiduciary duties to the Limited Partners and the Partnership.

313.    In addition, the Independent Directors would have discovered that by fall 2006,

the Management Defendants had turned the Master Fund into a *de facto* purchaser of last-resort

(and, likely the only "willing" buyer) for troublesome equity securities issued by BSAM CDOs

backed by subprime debt.

314.    For example, the 2006 Audit Report and attached schedules indicated that the

Master Fund owned nearly $2.5 billion of "Collateralized Debt Obligation Securities."  Of these,

it appears that at least $655 million, or approximately one-quarter, were securities issued by

SPVs that Bear Stearns arranged and/or managed.

315.    For example, according to the Schedule, the Master Fund owned $281 million

worth of CDOs securities issued by Tahoma CDO Ltd ("Tahoma").  Although not indicated on

the Schedule, Tahoma was a Repackaging Vehicle managed by BSAM.  Similarly, the Master

Fund owned $120 million of securities issued by Tallship Funding Ltd ("Tallship").  Tallship

was also managed by BSAM, although this fact was not disclosed in the Schedule.  It was

impossible to identify for certain which CDO securities were issued by Bear Stearns entities

because the Schedule only indicated the issuer of the CDO securities it identified and left another

$1.193 billion in CDO securities unidentified.

316.    On information and belief, the majority of the $655 million in CDO securities

identified in the Schedule were equity securities issued by Bear Stearns Affiliates and backed by

subprime debt.  Moreover, as evidenced by the Master Fund's transaction with Everquest (which,

upon information and belief, was not approved by the Independent Directors), the Management

Defendants populated the Master Fund with the Bear Stearns entities' riskiest securities.  Even

after the Master Fund "sold" troubled CDO securities to Everquest (it actually still owned them through its ownership of part of the $400 million in Everquest shares owned by the Funds), the Master Fund retained at least two large CDO positions in common with Everquest.

317.    The Partnership hired Walkers to provide another level of oversight.  Among other things, Walkers wholly failed to perform its duties to the Limited Partners and the Partnership and allowed the Management Defendants' breaches of fiduciary duty to occur.

## VIII.   RULE 23.1 DERIVATIVE STANDING ALLEGATIONS

318.    Plaintiff brings Counts Six through Nine derivatively on behalf of and for the benefit of the Partnership to seek recovery for injuries suffered by the Partnership as a direct and proximate result of Defendants' legal violations alleged herein.  This is not a collusive action designed to confer jurisdiction on this Court that it would not otherwise have.

319.    Plaintiff has owned its Limited Partnership Interest continuously throughout the legal violations by Defendants alleged herein.  Plaintiff owned its Limited Partnership Interest as of the date of the filing of its original Class Action and Verified Derivative Complaint on August 6, 2007, and continues to hold its Limited Partnership Interest as of the date of the filing of this Amended Class Action and Verified Derivative Complaint.  Plaintiff will retain its Limited Partnership Interest throughout the course of this litigation.

320.    Plaintiff will fairly and adequately represent the interests of the Partnership and the Limited Partners in this litigation, and has retained competent and experienced counsel to do so.

## IX.   DEMAND FUTILITY ALLEGATIONS

321.    Plaintiff hereby incorporates by reference and realleges each and every allegation above as though fully set forth herein.

322.     Plaintiff did not make a demand upon BSAM in connection with the Complaint it first filed on August 6, 2007, or with this Amended Complaint, because such demand is excused. Additionally, and as set forth below, Plaintiff did not make a demand upon the Partnership's Joint Liquidators (the "Joint Liquidators") prior to filing this Amended Complaint because such demand is also excused.

323.     A pre-suit demand on either BSAM or the Joint Liquidators would have been unlikely to succeed given that (i) BSAM is subject to a substantial likelihood of liability and is a conflicted entity that could not have exercised its disinterested and independent business judgment in responding to such demand, and (ii) the conduct of the Joint Liquidators to date demonstrates that they are neither disinterested nor independent.

**A.     BSAM Is Neither Disinterested Nor Independent**

324.     BSAM, as the General Partner of the Partnership, was the entity with authority to bring derivative claims on behalf of the Partnership.  Plaintiff did not make a pre-suit demand on BSAM because BSAM participated in, approved, and/or acquiesced in the wrongdoing alleged herein, and therefore is not capable of exercising its disinterested or independent business judgment in responding to such demand.  A pre-suit demand on BSAM was futile for at least the additional reasons set forth herein.

**1.     BSAM Faces Substantial Likelihood Of Liability For Its
Breaches Of Fiduciary Duties**

325.     There is a substantial likelihood that BSAM faces liability for its integral role in the egregious activities upon which Plaintiff's derivative claims are based.  This substantial likelihood of liability disabled BSAM from assessing a pre-suit demand as a disinterested and independent party.

326.    A pre-suit demand on BSAM would have subjected it to an irreconcilable conflict of interest since it is one of the primary wrongdoers in the underlying derivative claims alleged herein.  BSAM acted willfully, in bad faith, and/or with gross negligence and faces a substantial likelihood of liability for its breaches under the express provisions of the Partnership Documents and Delaware law.

327.    The PPM explicitly provides that "[BSAM] has fiduciary responsibilities with respect to the Partnership and will make investment decisions in a manner consistent with those responsibilities."  The Partnership Documents do not limit or restrict the fiduciary duties BSAM owed to the Partnership under Delaware law.  Under Delaware law, BSAM owed the Partnership the highest obligations of loyalty, due care, good faith, candor, and fair dealing in conducting the Partnership's business, including refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

328.    Additionally, and as described in greater detail above, the Partnership Documents set forth explicit duties owed by BSAM to the Partnership, including, but not limited to, the obligations to:

> (a)    Ensure that the Master Fund executed the investment strategy stated in the Partnership Documents;
>
> (b)    Carefully and constantly monitor the Master Fund's credit risk with respect to its every investment;
>
> (c)    Fairly value all of the assets held in the Master Fund's portfolio;
>
> (d)    Fairly assess BSAM's fees and profit shares to be paid by the Partnership through the Capital Accounts of Limited Partners; and
>
> (e)    Obtain approvals from the Independent Directors of the Master Fund for related-party transactions involving the Master Fund.

329.    The Amended Complaint alleges that BSAM, through the actions of Defendants Cioffi, Tannin, and McGarrigal, engaged in a knowing, grossly negligent, and/or bad faith

abdication of each of these expressly delineated fiduciary duties to the Partnership, as well as the fiduciary duties imposed by Delaware law.

330.    Specifically, BSAM, as General Partner and Investment Manager of the Partnership, knowingly, systematically, and continuously breached its fiduciary duties to the Partnership and the Limited Partners by, among other actions:

(a)    Causing the Partnership and Master Fund to make investments inconsistent with the terms of the Partnership Documents;

(b)    Failing to sufficiently analyze and adequately assess the credit risk inherent in the Partnership's and Master Fund's investments as provided in the Partnership Documents;

(c)    Causing the Partnership and the Master Fund to enter into harmful and self-interested principal trades with other Bear Stearns entities without obtaining promised and legally required approvals from the Independent Directors;

(d)    Assigning inflated values to Partnership assets to increase BSAM's own fees and falsely portray positive performance;

(e)    Failing to adequately hedge the Partnership's investments as provided for in the Partnership Documents;

(f)    Failing to manage or monitor and, in fact, benefiting from acknowledged conflicts of interest in the Partnership;

331.    BSAM is not protected from liability for the foregoing breaches under the express provisions of the Partnership Documents or Delaware law.

332.    The "exculpatory" clause in the Partnership Documents does not shield BSAM from liability for its breach of these fiduciary duties.  The clause explicitly provides that BSAM is subject to liability for acts or omissions resulting from "fraud, bad faith, gross negligence, or willful misconduct."  The Amended Complaint asserts that BSAM breached its various fiduciary duties provided for in the Partnership Documents and under Delaware law with knowledge, bad faith, and/or gross negligence.  Accordingly, only non-exculpated derivative claims are pled against BSAM.

333.    At the time the Complaint was filed, the willful and/or grossly negligent nature of BSAM's breach of fiduciary duties (and therefore, the non-exculpated nature of the derivative claims) was reinforced by the SEC's investigation into securities fraud claims against Defendants Cioffi and Tannin as managing directors of BSAM.  This investigation commenced in June 2007, and BSAM knew that it was the target of broad regulatory scrutiny at that time.  The regulatory scrutiny has now ripened into formal SEC enforcement proceedings and criminal charges against Management Defendants Cioffi and Tannin.

334.    In sum, BSAM faces a substantial likelihood of liability for the derivative claims. The collapse of the Partnership and the Master Fund caused by BSAM's breach of fiduciary duties has resulted in a loss of over $900 million.  The substantial likelihood that under the Partnership Documents and Delaware law BSAM will be held liable for these losses disabled BSAM from exercising disinterested business judgment in responding to a pre-suit demand.

### 2.    BSAM Received Substantial Financial Benefit From Its Breaches Of Fiduciary Duties

335.    Demand on BSAM is excused because it had a direct pecuniary interest in the wrongdoing alleged herein which was not shared by the Partnership or the Limited Partners. BSAM is therefore not a disinterested party to a derivative claim seeking to challenge the conduct giving rise to such unwarranted financial benefits.

336.    As noted herein, BSAM received financial remuneration in the form of Advisory Fees and Profit Shares based on the NAV of the Master Fund, which in turn, was based on the valuations BSAM assigned to the assets held by the Master Fund and the Partnership.  The assets held, and investments made by the Master Fund and the Partnership were also determined by BSAM as Investment Manager of both.

337.    The BSAM Advisory Fees and Profit Shares were paid directly out of the Limited Partners' Capital Accounts.  Accordingly, BSAM received a material financial benefit from its knowing, systematic, and continuous breach of fiduciary duties to the Partnership and the Limited Partners.

338.    The material financial benefits BSAM enjoyed from its ongoing breach of fiduciary duties were not shared by the Limited Partners or the Partnership.  Indeed, since BSAM's fees were taken directly from the Limited Partners' Capital Accounts, it realized substantial profits *at the expense* of the Limited Partners.

339.    BSAM's Advisory Fees and Profit Shares were also exorbitant and out of proportion to any services it rendered to the Partnership.  As an example, for the year ended December 31, 2006, the Advisory Fee totaled $5,001,025 and BSAM was allocated a Profit Share (or Performance Allocation) of $8,396,778.  Rather than being the product of prudent investment decisions which increased the actual NAV of the Master Fund and the net new income for the Limited Partners, BSAM's significant remuneration was based on its intentional and erroneous overvaluation of the Master Fund's NAV.  BSAM therefore reaped millions in unwarranted fees through its knowing breach of fiduciary duties to the Partnership.

340.    BSAM would have no incentive to commence a suit on behalf of the Partnership that challenges such lucrative fee arrangements resulting from BSAM's knowing, continuous, and systematic breach of fiduciary duties.  Indeed, the Partnership still owed BSAM substantial fees as of the time of the Partnership's collapse.  BSAM would receive no benefit, and as explained above, would suffer a detriment from responding affirmatively to a demand to bring a lawsuit against such fees.

341.    Moreover, BSAM's inability to commence litigation on behalf of the Partnership under these circumstances was effectively admitted in the PPM.  In this regard, the PPM provided:

> The General Partner as general partner has an apparent conflict of interest between its fiduciary duty to the Partnership as general partner and its selection of itself as the Partnership's General Partner.  Prospective investors must recognize that the Partnership has been formed specifically as an investment product to be managed by the General Partner, and that the General Partner will not appoint any other investment manager for the Partnership or the Master Fund even if doing so might be in the Partnership's best interests.

342.    Clearly, facing liability for the implosion of the Partnership and the eradication of almost $1 billion in value, BSAM could not be expected to abandon its previously expressed inclination to prefer its own interests over those of the Partnership.  Accordingly, BSAM was an interested party incapable of impartially assessing a pre-suit demand.

### 3.    BSAM Engaged In Self-Dealing Transactions

343.    A pre-suit demand was also excused because BSAM engaged in self-dealing by failing to obtain approvals for related-party transactions between the Master Fund and Bear Stearns entities.  BSAM faces a substantial likelihood of liability in connection with these transactions, which violated the Investment Advisers Act.

344.    The PPM contemplated that the Master Fund would invest in securities issued by Repackaging Vehicles organized and managed by BSAM or other Bear Stearns entities.  In return, BSAM and other Bear Stearns entities would collect fees for brokerage services, commissions for trades, and fees for arranging and issuing the CDO securities purchased.

345.    To address the potential for abusive self-dealing through these transactions, the PPM set forth a process, ostensibly consistent with the requirements of the Investment Advisers

Act, whereby BSAM was required to submit such transactions to the Master Fund's Independent Directors for prior approval.

346.     BSAM failed to follow these approval procedures for the related-party transactions almost from the very inception of the Partnership and the Master Fund.  By the time the August 2006 PPM was issued, hundreds, if not thousands of related-party transactions had been completed without prior approval from the Master Fund's Independent Directors.  In 2004, 29.73% of the 730 principal transactions were executed without prior approval.  The number rose to 58.66% out of 1,161 transactions and 78.95% of 342 transactions in 2005 and 2006, respectively.  Those transactions directly violated, among other things, § 206(3) of the Advisers Act, exposing BASM and the other Management Defendants to liability.

347.     BSAM reaped enormous benefits from this concerted and continuous self-dealing through substantial fees and the appearance of a thriving business operation at the expense of the Partnership, which took on increasingly unstable assets.  Indeed, the assets acquired by the Partnership through BSAM's self-dealing ultimately led to the Partnership's collapse.

348.     BSAM's self-dealing made it an interested party unable to exercise its disinterested or independent business judgment in responding to a demand to pursue claims challenging this very same conduct on behalf of the Partnership.

### 4.     BSAM Is Not Independent

349.     BSAM is not independent, and was therefore incapable of making an objective business decision on the merits of asserting or not asserting the derivative claims alleged.

350.     BSAM is a wholly-owned subsidiary of BSC, and as such, its corporate decision making is beholden to the dictates of BSC as its parent company.  BSC had the legal authority to hold BSAM accountable for meeting BSC's financial objectives, and to otherwise conduct its

business affairs in a manner that was deemed acceptable by BSC.  In short, BSAM owed its

continued corporate existence to BSC, and BSC alone.

351.     Given this relationship, BSAM would have been incapable of exercising

independent business judgment in deciding whether to bring the aiding and abetting breach of

fiduciary duty claims against BSC.  Instead, as a wholly-owned subsidiary dominated and

controlled by BSC, BSAM's decision to commence suit against BSC would have been

compromised by extraneous considerations having nothing to do with the merits of the suit, such

as BSAM's concern for subjecting its parent company to legal liability.  BSAM could not have

exercised its independent discretion in weighing such claims against BSAM.

> **B.     The Partnership's Joint Liquidators Are Neither Disinterested Nor
>           Independent**

352.     A pre-suit demand upon the Joint Liquidators would have been futile as well.  As

detailed below, the Joint Liquidators have made no concrete effort to pursue any legal redress on

behalf of the Partnership to date.  The Joint Liquidators' inaction and practical inability to take

any action indicates that they would not have exercised disinterested and independent business

judgment in responding to a demand to commence claims against Defendants.

353.     On October 31, 2007, BSAM dissolved the Partnership pursuant to Section

12.1(a) of the LPA.  On November 1, 2007, John Milsom and Richard Heis of KPMG United

Kingdom Plc were appointed by BSAM as Joint Liquidators of the Partnership pursuant to

Section 12.2(a) of the LPA.

354.     Plaintiff received a letter from John Milsom as a Joint Liquidator of the

Partnership on November 13, 2007.  The letter was addressed to all Limited Partners and

described the putative "Role of the Liquidators" going forward.  The Joint Liquidators' primary

role as expressed in the letter is to "take control and ensure that the [Partnership] is liquidated in

an orderly manner." The letter also acknowledges that the Joint Liquidators have a duty to "independently investigate whether or not any causes of action exist in the [sic] relation to the [Partnership]." Because the Partnership was completely devoid of liquid assets at the time of its dissolution, BSAM provided the Joint Liquidators with $500,000 on a "non-recourse basis" in order to carry out their purported "independent" investigation into the Partnership's collapse.

355.     The Joint Liquidators further represented in the November 2007 letter that they "will prepare reports to . . . investors detailing the steps taken during the liquidation of the [Partnership] and the outcome of their investigations." In addition, they promised to set up a website "enabling [Partnership investors] to obtain current information regarding the overall position and the liquidation of the [Partnership]."

356.     The Joint Liquidators also notified Plaintiff and the other Partnership investors of a meeting in Wilmington, Delaware with "investors or their authorized representatives" to present their intended approach during the liquidation, investor concerns, and "potential areas of investigation." This investor meeting was confirmed in another letter from the Joint Liquidators dated December 4, 2007.

357.     On December 11, 2007, counsel for Plaintiff attended a meeting with the Joint Liquidators in Wilmington, Delaware. Counsel for Plaintiff was one of two investor representatives who attended this meeting. While the Joint Liquidators required that the details and discussions of the meeting be maintained in confidence, there was nothing of substance discussed. It was instead apparent that BSAM had financed a "whitewash" inquiry into its own wrongdoing.

358.     Subsequent to the meeting, Plaintiff's counsel sent letters to the Joint Liquidators dated December 19, 2007; and December 21, 2007 requesting more information on the scope of

information sought in an "investor questionnaire" distributed to Interest holders.  As counsel for a putative class of investors in the Partnership, the letters also requested that the Joint Liquidators provide any draft correspondence intended for distribution to Partnership investors.  Finally, Plaintiff's counsel requested a meeting with the Joint Liquidators to discuss future communications with Partnership investors.

359.    The Joint Liquidators have ignored all of Plaintiff's requests for further information regarding the scope of their purported "investigation" into the collapse of the Partnership.  They have also failed to provide Limited Partners with the promised reports detailing their efforts to investigate possible claims on behalf of the Partnership.  To date, no website has been established to apprise investors of current information regarding the status of the Partnership's liquidation.  The Joint Liquidators have obstructed all efforts by Plaintiff to gain any independent insight into their investigatory process.

360.    The Joint Liquidators have taken no tangible steps in pursuit of possible claims on behalf of the Partnership.  Although they have been engaged for over eight months, the Joint Liquidators have not served any formal or informal discovery requests on BSAM, any of the individual Management Defendants, any affiliated Bear Stearns entities, or any third-parties with connections to the Partnership.  Even after Defendants Cioffi and Tannin were indicted on federal securities and wire fraud charges in connection with their management of the Partnership, and the SEC has commenced enforcement proceedings against them arising from the same conduct, the Joint Liquidators have done nothing.

361.    In fact, the only affirmative action by the Joint Liquidators to date illustrates an intention to eliminate any potential legal claims against BSAM.  On June 25, 2008, the Joint Liquidators sent a notice to Limited Partners informing them of their decision to "waive the pre-

approval requirement for the resignation or withdrawal of Limited Partners" as set forth in the

LPA.  The purported rationale for such "'abandon[ment]'" of interests was to allow Limited

Partners to avoid potential tax liability on cancellation of debt income ("CODI") that may apply

to the Partnership.  In return, the limited partners would relinquish any further rights, including

possibly the right to bring claims against the Defendants named herein.  The letter's equivocal

information regarding potential tax liability and waiver of legal claims is far from an effort to

vigorously investigate and pursue claims on behalf of the Partnership.

362.   The Joint Liquidators have simply failed to satisfy their acknowledged duty to

investigate the collapse of the Partnership, and have done nothing to date that indicates an

intention to actually seek redress on the Partnership's behalf.  This lack of transparency in the

Joint Liquidators' investigation, combined with the absence of any steps taken to pursue

Partnership claims creates reasonable doubt that they are disinterested and independent.

## X.   CLASS ACTION ALLEGATIONS

363.   Plaintiff brings this class action pursuant to Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure on behalf of itself and the Class consisting of all Limited

Partners who held Interests in the Partnership at any time during the period from August 31,

2004 through July 18, 2007.  Excluded from the Class are the Defendants herein and any person,

firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

364.   Members of the Class are so numerous and geographically dispersed that joinder

of all members is impracticable.  While the exact number of Class Members remains within the

knowledge of Defendants and can be ascertained only through discovery, Defendants have

previously represented to this Court that there are at least 100 Class Members residing in at least

22 different states.

365.    Plaintiff's claims are typical of the other members of the Class in that Plaintiff and the other Class Members invested in the Partnership and held Partnership Interests pursuant to the same Partnership Documents, by which the Management Defendants and the Director Defendants owed fiduciary and contractual duties to each holder of such interests in its capacity as a holder of such interests.  Plaintiff and the other Class Members sustained damages due to the same breaches of fiduciary and contractual duties owed to Plaintiff and the Class Members by the Management Defendants and Director Defendants, fraudulent misrepresentations and omissions, and aiding and abetting of the breaches and fraud by the remaining Defendants.

366.    A class action is superior to other methods for the fair and efficient adjudication of the Class claims herein asserted.  Moreover, the questions of law and fact common to the Class predominate over questions, if any, relating to individual Class Members.  Common questions of law and fact include, but are not limited to, whether the Management Defendants breached fiduciary and contractual duties to Plaintiff and the Class and defrauded Plaintiff and the Class by, among other things:

> (a)    Providing financial statements and updates that did not adequately reflect the Master Fund's or the Partnership's investments or financial condition;
>
> (b)    Misrepresenting and failing to disclose facts to Limited Partners material to the performance of the Master Fund and the Partnership and Limited Partners' rights to redeem their Partnership interests;
>
> (c)    Concealing and/or misrepresenting facts related to the liquidity of the Master Fund and the Partnership;
>
> (d)    Violating the law and the promises made to Limited Partners in the Partnership Documents in connection with related-party transactions; and
>
> (e)    Failing timely to disclose to the Limited Partners that the Management Defendants were acting in a manner inconsistent with their obligations.

367.    In addition, there are common questions of law and fact regarding whether the Director Defendants, Bear Stearns Corporate Defendants, and Walkers aided and abetted the

breaches of fiduciary duties and fraud or themselves breached duties to the Partnership and Limited Partners.

## XI.    CAUSES OF ACTION

### COUNT I

### Class Claim for Breach of Fiduciary Duty Against the Management Defendants

368.    Plaintiff incorporates by reference the allegations of paragraphs 1 317, 363-67 above as if fully set forth herein.

369.    The PPM provided that "[t]he General Partner has fiduciary responsibilities with respect to the Partnership and will make investment decisions in a manner consistent with those responsibilities." BSAM, as the General Partner, and Defendants Cioffi, Tannin, and McGarrigal, as the authorized agents of BSAM, thus owed fiduciary duties to the Partnership, and specifically to the Limited Partners, as owners of the Partnership. Moreover, under Delaware law, BSAM and the other Management Defendants, as the General Partner and its designees, respectively, owed the Limited Partners duties of due care, good faith, candor, and loyalty.

370.    The PPM provided that Defendants Cioffi, Tannin, and McGarrigal were "primarily responsible for directing the Investment Manager's [BSAM] investments for the Master Fund" and for "management of the Master Fund's portfolio." Thus, BSAM, as General Partner, and its designees, Defendants Cioffi, Tannin and McGarrigal had, pursuant to the Partnership Documents, sole and exclusive authority for the management of Partnership investments through investment decisions they made for the Master Fund. It is axiomatic under Delaware Law that the Management Defendants owed fiduciary duties with respect to management of the Partnership and its investments specifically to Limited Partners as its owners.

371.    The Management Defendants had fiduciary obligations to timely distribute periodic financial statements and reports that accurately reflected the financial condition and other material facts about the Partnership and the Master Fund and to disclose to Limited Partners if the Management Defendants were engaging in conduct or possessing Partnership property inconsistent with the Partnership's purpose.  Further, when the Management Defendants elected to make statements to Limited Partners, they had a duty to speak truthfully and accurately.

372.    Throughout the Class Period, the Management Defendants breached their fiduciary duties to each Limited Partner through a systematic and continuous pattern of willful, grossly negligent, and/or bad faith nondisclosure, obfuscation and misrepresentation of material facts regarding the Partnership and the Master Fund that included, among other things:

    (a)    Misrepresenting and failing to disclose facts material to the true performance of the Partnership;

    (b)    Concealing and/or misrepresenting facts related to the liquidity of the Partnership;

    (c)    Providing financial statements and updates that did not fully, completely, or accurately reflect the Partnership's investments or financial condition;

    (d)    Misrepresenting and omitting the true volume of requests for redemptions and execution of subscriptions by Limited Partners; and

    (e)    Failing to disclose to the Limited Partners at any time during the Class Period that the Management Defendants were acting in a manner inconsistent with their obligations.

373.    The Management Defendants' misrepresentations and non-disclosures prevented each Limited Partner from considering and/or exercising its right to redeem its Interests and/or petition for removal of BSAM as General Partner (pursuant to Section 3.2 of the Partnership Agreement), on a fully informed basis.  Had the Management Defendants made accurate and

candid disclosures to Plaintiff and to other Limited Partners, each Limited Partner would have exercised its rights in order to avoid the massive losses that it suffered.

374.    Plaintiff and the other Limited Partners have suffered damages proximately caused by the Management Defendants' breaches of fiduciary duties, and the Management Defendants are liable for damages in an amount to be proven at trial.

375.    Moreover, the Management Defendants are liable for and the Plaintiff and Limited Partners are entitled to punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to the rights of the Limited Partners or the special fiduciary relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

## COUNT II

### Class Claim for Breach of Contract Against the Management Defendants

376.    Plaintiff incorporates by reference the allegations of paragraphs 1-317, 363-67 above as if fully set forth herein.

377.    Plaintiff and the other Class Members became Limited Partners of the Partnership and owners of interests in the Master Fund by executing a Subscription Agreement that incorporated the PPM and the Partnership Agreement executed by BSAM.  The Partnership Documents governed the respective contractual rights, duties, and obligations of BSAM, the other Management Defendants, and Limited Partners throughout the duration of the Partnership.

378.    Under the Partnership Documents, the Management Defendants owed certain contractual obligations to each Limited Partner with respect to the Partnership and the Master Fund, which included, among other things:

   (a)  Entering into transactions with Bear Stearns entities only if all such transactions were reviewed and approved by the Independent Directors;

      (b)     Providing accurate periodic updates to each Limited Partner regarding the condition of the Partnership and Master Fund; and

      (c)     Disclosing to Limited Partners if the Management Defendants were engaging in conduct or possessing Partnership property inconsistent with the Partnership purpose.

379.     In addition, under the Partnership Documents, each Limited Partner had a number of contractual rights, including, but not limited to:

      (a)     Redeeming its Partnership Interests as provided under the Partnership Documents; and

      (b)     Seeking to remove BSAM as the General Partner.

380.     In consideration for performance of their contractual obligations and for the Limited Partners' contractual rights under the Partnership Documents, the Management Defendants received Advisory Fees and Profit Shares paid by Limited Partners directly from their Capital Accounts.

381.     The Management Defendants breached their contractual obligations to each Limited Partner under the Partnership Documents through a pattern of willful, grossly negligent, and/or bad faith failures to, among other things:

      (a)     Obtain the necessary review and approvals for transactions entered into between Bear Stearns entities and the Master Fund;

      (b)     Provide to each Limited Partner accurate periodic updates regarding the condition of the Partnership and Master Fund;

      (c)     Inform the Limited Partners that the Management Defendants were engaging in conduct and using Partnership assets in a manner inconsistent with its purpose; and

      (d)     Provide truthful and accurate information that Limited Partners required to exercise their rights to redeem their respective Interests, and/or to petition for the removal of the General Partner.

382.     The Management Defendants' misrepresentations and non-disclosures prevented each Limited Partner from considering and/or exercising its contractual rights to redeem its Interests and/or to petition for removal of BSAM as General Partner (pursuant to Section 3.2 of

the Partnership Agreement) on a fully informed basis.  Had the Management Defendants made

accurate and candid disclosures to the Plaintiff and the other Limited Partners, would have

exercised its contractual rights in order to avoid the massive losses that it suffered.

383.   Plaintiff and the other Limited Partner have suffered damages proximately caused

by the Management Defendants' contractual breaches of the Partnership Documents and the

Management Defendants are liable for damages in an amount to be proven at trial.

## COUNT III

### Class Claim for Common-Law Fraud Against the Management Defendants

384.   Plaintiff incorporates by reference the allegations of paragraphs 1-317, 363-67

above as if fully set forth herein.

385.   BSAM, as General Partner of the Partnership, and Defendants Cioffi, Tannin, and

McGarrigal, as BSAM's designees in connection with the management of the Partnership, were

in a special relationship with the Limited Partners, as owners of Partnership Interests, under the

Partnership Documents and Delaware law with respect to the management, operations and

execution of Partnership business.

386.   In connection with their positions as managers of the Partnership, and because of

the special relationship between the Management Defendants and the Limited Partners, from the

beginning of the Class Period until the collapse of the Partnership, the Management Defendants

were able to engage in a pattern of oral and written material misrepresentations, misstatements

omissions, half-truths and outright lies in order to enrich themselves at the expense of Limited

Partners.  Specifically, as alleged and set forth in herein, the Management Defendants defrauded

the Limited Partners through a pattern deliberate misconduct, including, among other things:

(a)    Misrepresenting to Limited Partners in Monthly Profiles and Partnership
accounting and financial statements the Net Asset Value of the Partnership
in order to collect high Advisory Fees and Profit Shares;

115

(b)     Misstating actual returns to make it appear in Monthly Profiles and investor calls that the Partnership was experiencing months of consecutive positive returns;

(c)     Concealing from Limited Partners the fact that the Master Fund was experiencing liquidity problems and that the Enhanced Master Fund was being created to alleviate such problems;

(d)     Misrepresenting and failing to disclose the true volume of requests for redemptions and execution of subscriptions of Limited Partners;

(e)     Concealing that the Master Fund was entering into related-party transactions without required review by the Independent Directors;

(f)     Misrepresenting in the Monthly Profiles and in investor calls the Master Fund's true exposure to subprime debt; and

(g)     Lying to Limited Partners about the true amount that Defendants Cioffi and Tannin invested and/or intended to invest in the Partnership, including, but not limited to, the statements in 2007 that they both intended to increase their exposure to the Master Fund and Enhanced Master Fund.

387.     The Management Defendants knew, or were reckless in not knowing, that the misrepresentations, misstatements, and omissions alleged herein were false when made. Moreover, each such statement or omission alleged herein was material to the true condition of the Partnership and the Master Fund and to Limited Partners as holders of Interests in the Partnership.  The Management Defendants made or caused to be made the material misrepresentations and misstatements to the Limited Partners with the intent that they rely on such statements and/or omissions to inform decisions regarding their rights under the Partnership Documents.

388.     The Management Defendants' misrepresentations and non-disclosures prevented each Limited Partner from considering and/or exercising its right to redeem its Interests and/or petition for removal of BSAM as General Partner (pursuant to Section 3.2 of the Partnership Agreement) on a fully informed basis.  Had the Management Defendants made accurate and candid disclosures to Plaintiff and to other Limited Partners, each Limited Partner would have

116

taken steps to avoid the massive losses that it suffered, including, but not limited to, redeeming funds from its individual Capital Accounts and petitioning for removal of BSAM as General Partner (pursuant to Section 3.2 of the Partnership Agreement).

389.   By reasonably relying upon the Management Defendants' misstatements and omissions, Plaintiff and the other Limited Partners have suffered damages proximately caused by the Management Defendants' fraud and the Management Defendants are liable for damages in an amount to be proven at trial.

390.   Moreover, the Management Defendants are liable for, and the Plaintiff and Limited Partners are entitled, to punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to the rights of the Limited Partners or the special relationship between the parties under the Partnership Documents and the Delaware Limited Partnership Act.

## COUNT IV

**Class Claim for Aiding and Abetting Breach of Fiduciary
Duty Against the Director Defendants, The Bear Stearns Corporate Defendants,
and Walkers**

391.   Plaintiff incorporates by reference the allegations of paragraphs 1-317, 363-75 above as if fully set forth herein.

392.   The Management Defendants owed fiduciary duties to Plaintiff and to the other Limited Partners.

393.   The Management Defendants breached the fiduciary duties they owed to Plaintiff and to the other Limited Partners.

394.   The Director Defendants, BSC, BSSC, BS&Co., and Walkers knowingly participated in the Management Defendants' breaches of fiduciary duties.

395.    The Director Defendants, BSC, BSSC, BS&Co., and Walkers had actual knowledge of the breaches of fiduciary duties by the Management Defendants, and substantially assisted the Management Defendants in those breaches.

396.    As alleged herein, the Director Defendants failed to adequately supervise the Management Defendants' management of the Partnership and the Master Fund.  Among other things, the Director Defendants permitted the Management Defendants to engage in a systematic and continuous pattern of self-dealing.  In addition, the Director Defendants knowingly permitted the Management Defendants to cause the Master Fund to engage in harmful related-party transactions with BSAM entities without the approvals required to be given by the Independent Defendants.

397.    In addition, as alleged herein, the Partnership and the Master Fund were conceived of and sponsored collectively as an investment vehicle that carried the imprimatur of BSC and was marketed based on Bear Stearns' expertise in structured finance securities and risk-management capabilities.  Among other things, BSC, itself, and through its subsidiaries, knowingly and materially participated in and assisted the Management Defendants' breaches of fiduciary duty by, among other things:

> (a)    Performing the Master Fund's daily mark-to-market through BSC's repo desk and the portfolio management team, which were represented in the Partnership Documents as responsible for informing the Management Defendants of any price movements that could foretell problems with any of the investments; and
>
> (b)    Monitoring the Master Fund's positions and material components of the Master Fund's investments such as minimum rating requirements, overall and net leverage and portfolio concentrations, and meeting with the portfolio management team to discuss their positions, risk management and hedging techniques.

398.    BSSC knowingly participated in the Management Defendants' breaches of
fiduciary duty in its role as custodian and prime broker to the Master Fund.  BSSC, among other
things, executed related-party transactions and trades, and was counterparty to related-party
transactions and trades that BSSC knew were not being reviewed by the Independent Directors
as required by the Partnership Documents and the Investment Advisers Act.

399.    As discussed herein, Walkers was retained on behalf of the Partnership and the
Master Fund and was paid by the Partnership to provide services to the Master Fund, including
providing Independent Directors who Walkers knew were responsible for reviewing related-
party transactions between the Master Fund and Bear Stearns entities, including BSAM, BSC,
BSSC, and BS&Co.

400.    As provided in the Partnership Documents and the Investment Advisers Act,
without Independent Director approval, the Master Fund was neither permitted nor authorized to
engage in related-party transactions or principal trades.

401.    Walkers completely failed to monitor the Independent Directors it provided to the
Master Fund and failed to ensure that they were performing the oversight and review functions
which were central to the Master Fund's investment activities and trades and transactions with
Bear Stearns entities.  Walkers participated in and facilitated the Management Defendants'
breaches of fiduciary duty by failing to supervise the Independent Directors.

402.    Plaintiff and the other Limited Partners have suffered damages proximately
caused by the knowing participation of the Director Defendants, BSC, BSSC, BS&Co., and
Walkers in the foregoing breaches of fiduciary duties by the Management Defendants.

403.    Accordingly, the Director Defendants, BSC, BSSC, BS&Co., and Walkers are
liable to Plaintiff and to the other Limited Partners for aiding and abetting the Management

Defendants' breaches of their fiduciary duties to Plaintiff and to other Class members for damages in an amount to be proven at trial.

## COUNT V

### Class Claim for Aiding and Abetting Common-Law Fraud Against the Director Defendants, the Bear Stearns Corporate Defendants, and Walkers

404.    Plaintiff incorporates by reference the allegations of paragraphs 1-317, 363-67, 384-98 above as if fully set forth herein.

405.    As alleged above, the Management Defendants were in a special relationship with the Limited Partners, as owners of Partnership Interests, under the Partnership Documents, and Delaware law with respect to the management, operations and execution of Partnership business.

406.    In connection with their position as managers of the Partnership, and because of the special relationship between the Management Defendants and the Limited Partners, from the beginning of the Class Period until the collapse of the Partnership, the Management Defendants were able to defraud the Limited Partners through a pattern of oral and written material misrepresentations, misstatements, omissions, half-truths and outright lies in order to enrich themselves at the expense of the Limited Partners.

407.    The Director Defendants, BSC, BSSC, BS&Co., and Walkers knowingly participated in the Management Defendants' fraud.

408.    The Director Defendants, BSC, BSSC, BS&Co., and Walkers had actual knowledge of the fraud by the Management Defendants, and substantially assisted the Management Defendants in their fraud.

409.    As alleged herein, the Director Defendants failed to adequately supervise the Management Defendants' almost unlimited authority over the Partnership and the Master Fund. In particular, the Director Defendants permitted the Management Defendants to engage in a

systematic and continuous pattern of mismanagement of the Master Fund that would not have been possible but for the abdication of the Director Defendants' oversight responsibilities. The Director Defendants also knowingly permitted the Management Defendants to cause the Master Fund to engage in harmful related-party transactions with BSAM entities without the approvals required to be given by the Independent Directors.

410.    In addition, as alleged herein, the Partnership and the Master Fund were conceived of and sponsored collectively as an investment vehicle that carried the imprimatur of BSC and was marketed based on Bear Stearns' expertise in structured finance securities and risk-management. Moreover:

> (a)    the Master Funds daily mark-to-market was done in-house by BSC's repo desk and the portfolio management team, which were represented in the Partnership Documents as responsible for informing the Management Defendants of any price movements that could foretell problems with any of the investments; and
>
> (b)    BSC's Risk Management Department was responsible for monitoring the Fund's positions and things such as minimum rating requirements, overall and net leverage and any portfolio concentrations, and BSC's global credit department was responsible for meeting with the portfolio management team to discuss their positions, risk management and hedging techniques.

411.    BSSC knowingly participated in the Management Defendants' fraud in its role as custodian and prime broker to the Master Fund. BSSC, among other things, executed related-party transactions that BSC and its subsidiaries knew were not being reviewed by the Independent Directors.

412.    As discussed herein, Walkers was retained on behalf of the Partnership and Master Fund and paid by the Partnership to provide services to the Master Fund, including providing Independent Directors, who Walkers knew were responsible for reviewing related-party transactions between the Master Fund and Bear Stearns entities, including BSAM, BSC, BSSC, and BS&Co.

413.    As provided in the Partnership Documents and in the Investment Advisers Act, without Independent Director approval, the Master Fund was neither permitted nor authorized to engage in related-party transactions or principal trades.

414.    Walkers completely failed to monitor the Independent Directors it provided to the Master Fund to ensure that they were performing the oversight and review functions which were central to the Master Fund's investment activities and trades and transactions with Bear Stearns entities.  Walkers participated in and facilitated the Management Defendants' fraud by failing to supervise the Independent Directors.

415.    Plaintiff and the other Limited Partners have suffered damages proximately caused by the knowing participation of the Director Defendants, BSC, BSSC, BS&Co., and Walkers in the foregoing fraud by the Management Defendants.

416.    Accordingly, the Director Defendants, BSC, BSSC, BS&Co., and Walkers are liable the Plaintiff and other Limited Partners for aiding and abetting the Management Defendants' fraud in an amount to be proven at trial.

## COUNT VI

### Derivative Claim For Breach of Fiduciary Duty Against the Management Defendants

417.    Plaintiff incorporates by reference the allegations of paragraphs 1-362 above as if fully set forth herein.

418.    This claim is asserted derivatively against the Management Defendants on behalf of the Partnership.

419.    As provided in the Partnership Documents, the General Partner owed fiduciary responsibilities to the Partnership.  BSAM, as the General Partner, and Defendants Cioffi,

Tannin, and McGarrigal as the General Partners' designees, thus owed fiduciary duties to the Partnership under the Partnership Documents and Delaware law.

420.    As also as provided in the Partnership Documents, Defendants BSAM, Cioffi, Tannin and McGarrigal had fiduciary responsibilities to direct the Master Fund's investments and to manage the Master Fund's portfolio.  The Management Defendants thus owed the Partnership, as owner of the Master Fund, fiduciary duties under Partnership Documents and Delaware law.

421.    Under the Partnership Documents, the General Partner and the other Management Defendants are not relieved of liability resulting from, *inter alia*, errors in judgment or any act or omission where they were grossly negligent, engaged in willful misconduct, or acted fraudulently or in bad faith.

422.    Under Delaware law, the Management Defendants owed to the Partnership the highest obligations of due care, good faith, candor, loyalty and fair dealing.

423.    Acting with bad-faith, willful misconduct, and/or gross negligence, the Management Defendants breached their fiduciary duties to the Partnership by, among other things,:

    (a)    Causing the Master Fund to make investments inconsistent with the terms of the Partnership Documents;

    (b)    Failing to adequately analyze and assess the credit risk of Master Fund's investments as provided in the Partnership Documents;

    (c)    Causing the Master Fund to enter into principal trades with other Bear Stearns entities without getting required approvals from the Independent Directors;

    (d)    Assigning inflated values to the Master Fund's assets to increase their own fees; and

    (e)    Failing to adequately hedge the Master Fund's investments as provided for in the Partnership Documents.

424. The Partnership has suffered damages proximately caused by the Management Defendants' breaches of fiduciary duties, and the Management Defendants are liable to the Partnership for damages in an amount to be proven at trial.

425. Moreover, the Management Defendants are liable for, and the Partnership is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to the rights of the Partnership or the special fiduciary relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

426. As discussed above in Section IX, Plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT VII

### Derivative Claim for Breach of Fiduciary Duty Against the Director Defendants

427. Plaintiff incorporates by reference the allegations of paragraphs 1-362, 417-26 above as if fully set forth herein.

428. As provided in the PPM, the Director Defendants had ultimate authority over the Master Fund's operations. While the Director Defendants were entitled to and did delegate authority to make investment decisions to the Investment Manager of the Master Fund, under the Partnership Documents and the Delaware Limited Partnership Act, the Director Defendants were ultimately responsible for overseeing and supervising all aspects of the Master Fund's operations.

429. In addition, under the Partnership Documents and the Investment Advisers Act, the Independent Directors were required on behalf of the Partnership, as owner of the Master Fund, to meaningfully review and approve or reject any proposed transactions between the Master Fund and Bear Stearns entities.

430.    The Director Defendants, as the ultimate authority over the Master Fund, thus owed fiduciary duties to the Partnership, as owner of the Master Fund, as well as pursuant to the Partnership Documents and the Delaware Limited Partnership Act.

431.    As alleged herein, the Director Defendants breached their fiduciary duties by, willfully, in bad faith, and/or acting with gross negligence, among other things:

(a)    Failing to meaningfully supervise and oversee the Management Defendants' activities with respect to the Master Fund;

(b)    Abdicating their authority over the Master Fund's operations to the Management Defendants;

(c)    Enabling the Management Defendants to manage the Master Fund in a manner inconsistent with the best interests of the Partnership;

(d)    Failing to cause the Management Defendants to obtain the necessary approvals for related-party transactions; and

(e)    Failing, on the part of the Independent Directors, to review and approve all related-party transactions.

432.    The Partnership has suffered damages proximately caused by the Director Defendants' breaches of fiduciary duties, and the Director Defendants are liable for damages in an amount to the Partnership be proven at trial.

433.    Moreover, the Director Defendants are liable for, and the Partnership is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Director Defendants that was reckless, willful, wanton, and without regard to the rights of the Partnership or the special relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

434.    As discussed above in Section IX, Plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT VIII

**Derivative Claim for Gross Negligence Against the Management Defendants**

435.    Plaintiff incorporates by reference the allegations of paragraphs 1-362, 417-26 above as if fully set forth herein.

436.    As alleged herein, the Management Defendants conceived of and created the Partnership and the Master Fund as a collective investment vehicle through which they would seek on behalf of investors high current income and capital appreciation through their expertise in selecting structured finance securities.  Under the Partnership Documents, the Management Defendants had responsibility for managing and operating the Partnership and the Master Fund to achieve this stated purpose.  Thus, under the Partnership Documents and the Delaware Limited Partnership Act, the Management Defendants were required to perform their duties to the Partnership with the utmost due care commensurate with their authority.

437.    The Management Defendants were grossly negligent in performing the duties owed to the Partnership by knowingly, in bad faith, and/or recklessly, among other things:

> (a)    Causing the Master Fund to make investments inconsistent with the terms of the Partnership Documents;
>
> (b)    Failing to adequately analyze and assess the credit risk of the Master Fund's investments as provided in the Partnership Documents;
>
> (c)    Causing the Master Fund to enter into principal trades with other Bear Stearns entities without getting required approvals from the Independent Directors;
>
> (d)    Assigning inflated values to Master Fund's assets; and
>
> (e)    Failing to adequately hedge the Master Fund's investments as provided for in the Partnership Documents.

438.    The Partnership has suffered damages proximately caused by the Management Defendants' gross negligence, and the Management Defendants are liable for an amount to be proven at trial.

439.    Moreover, the Management Defendants are liable for, and the Partnership is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to the rights of the Partnership or the special fiduciary relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

440.    As discussed above in Section IX, Plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because, as set forth herein, such demand was excused as futile.

**COUNT IX**

**Derivative Claim for Aiding and Abetting Breach of Fiduciary
Duty Against the Director Defendants, the Bear Stearns Corporate Defendants,
and Walkers**

441.    Plaintiff incorporates by reference the allegations of paragraphs 1-362, 417-26 above as if fully set forth herein.

442.    The Management Defendants owed fiduciary duties to the Partnership.

443.    The Management Defendants breached the fiduciary duties they owed to the Partnership.

444.    The Director Defendants, BSC, BSSC, BS&Co., and Walkers knowingly participated in the Management Defendants' breaches of fiduciary duties.

445.    The Director Defendants, BSC, BSSC, BS&Co., and Walkers had actual knowledge of the breaches of fiduciary duties by the Management Defendants and substantially assisted the Management Defendants in those breaches.

446.    As alleged herein, the Director Defendants failed to adequately supervise the Management Defendants' management of the Master Fund.  Among other things, the Director Defendants permitted the Management Defendants to engage in a systematic and continuous pattern of self-dealing.  In addition, the Director Defendants knowingly permitted the

Management Defendants to cause the Master Fund to engage in harmful related-party transactions with BSAM entities without obtaining the approvals required to be given by the Independent Directors.

447.    In addition, as alleged herein, the Partnership and the Master Fund were conceived of and sponsored collectively as an investment vehicle that carried the imprimatur of BSC and was marketed based on Bear Stearns' expertise in structured finance securities and risk-management capabilities.  Among other things, BSC, itself and through its subsidiaries, knowingly and materially participated in and assisted the Management Defendants' breaches of fiduciary duty by, among other things:

(a)    Performing the Master Fund's daily mark-to-market through BSC's repo desk and the portfolio management team, which were represented in the Partnership Documents as responsible for informing the Management Defendants of any price movements that could foretell problems with any of the investments; and

(b)    Monitoring the Master Fund's positions and material components of the Master Fund's investments such as minimum rating requirements, overall and net leverage and portfolio concentrations, and meeting with the portfolio management team to discuss their positions, risk management and hedging techniques.

448.    BSSC knowingly participated in the Management Defendants' breaches of fiduciary duty in its role as custodian and prime broker to the Master Fund.  BSSC, among other things, executed related-party transactions and trades, and was counterparty to related-party transactions and trades, that BSSC knew were not being reviewed by Independent Directors as required by the Partnership Documents and the Investment Advisers Act.

449.    As discussed herein, Walkers was retained on behalf of the Partnership and Master Fund and was paid by the Partnership to provide services to the Master Fund, including providing Independent Directors, who Walkers knew were responsible for reviewing related-

128

party transactions between the Master Fund and Bear Stearns entities, including BSAM, BSC, BSSC, and BS&Co.

450.    As provided in the Partnership Documents and the Investment Advisers Act, without Independent Director approval, the Master Fund was neither permitted nor authorized to engage in related-party transactions or principal trades.

451.    As discussed herein, Walkers completely failed to monitor the Independent Directors it provided to the Master Fund and failed to ensure that they were performing the oversight and review functions which were central to the Master Fund's investment activities and trades and transactions with Bear Stearns entities.  Walkers participated in and facilitated the Management Defendants' breaches of fiduciary duty by failing to supervise the Independent Directors.

452.    The Partnership has suffered damages proximately caused by the knowing participation by the Director Defendants, BSC, BSSC, BS&Co., and Walkers in the foregoing breaches of fiduciary duties by the Management Defendants.

453.    Accordingly, the Director Defendants, BSC, BSSC, BS&Co., and Walkers are liable to the Partnership for aiding and abetting the Management Defendants' breaches of their fiduciary duties in an amount to be proven at trial.

454.    As discussed above in Section IX, Plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because, as set forth herein, such demand was excused as futile.

WHEREFORE, Plaintiff demands judgment as follows:

      (a)     declaring this action to be a proper derivative and class action;

      (b)     declaring Plaintiff to be the exclusive representative for the Partnership in connection with the derivative claims alleged herein;

(c)     declaring Plaintiff to be the representative of the Class;

(d)     declaring that the Management Defendants and each of them have violated their fiduciary duties to the Partnership and to Plaintiff and to the Class;

(e)     declaring that the Director Defendants, BSC, BSSC and BS&Co., and Walkers aided and abetted the Management Defendants' breaches of fiduciary duties and their fraud upon Plaintiff and the other Limited Partners;

(f)     declaring that the Management Defendants defrauded Plaintiff and the other Limited Partners;

(g)     declaring that the Management Defendants breached their contractual duties to Plaintiff and to the other Limited Partners;

(h)     ordering Defendants, jointly and severally, to account to the Plaintiff, the other members of the Class, and the Partnership for all damages suffered or to be suffered by them as a result of the Defendants' actions complained of herein;

(i)     awarding Plaintiff, the Class and the Partnership damages in an amount to be proven at trial, including pre- and post-judgment interest;

(j)     awarding Plaintiff the costs and disbursements of the action, as well as reasonable attorneys' fees and experts' fees; and

(k)     granting such other and further relief as this Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:   August 12, 2008

By: _____

Vincent R. Cappucci
Andrew J. Entwistle
Stephen D. Oestreich
Johnston de F. Whitman, Jr.
Jonathan H. Beemer
Joshua K. Porter
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

Douglas R. Hirsch
**SADIS & GOLDBERG LLP**
551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Facsimile:  (212) 947-3796

***Attorneys for Plaintiff and the Class***

131

### RULE 23.1 VERIFICATION

Navigator Capital Partners, L.P. ("Navigator"), named Plaintiff in the foregoing amended derivative and class action complaint (the "Complaint"), by its undersigned Managing Director and General Partner Steven Resnick, hereby verifies under Federal Rule of Civil Procedure 23.1 as follows:

I have read and know the contents of the foregoing Complaint, and, based on personal knowledge and the investigation conducted through counsel, I am informed and believe that the matters stated therein are true, and on that ground allege that the matters stated therein are true.

Navigator was a subscriber and direct holder of limited partnership interests in the Bear Stearns High-Grade Structured Credit Strategies, L.P. (the "Partnership") at all times relevant to the Complaint, and is still a holder and will be throughout the duration of this action.

This action is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

For the reasons stated in the foregoing Complaint, any effort by Navigator to obtain the desired action from the Partnership, its General Partner, its Directors, or the Joint Liquidators would be futile given, among other things, their pecuniary interest and lack of independence.

Executed this 12th day of August, 2008, at New York, New York.


_____
STEVEN RESNICK