**EXHIBIT Z** (III)

this is the same as the loss suffered by the company.  Such relevance as the    A
case has lies in the reasoning of Hobhouse LJ in the Court of Appeal.  At
p 474 he described *Christensen v Scott* [1996] 1 NZLR 273 as "a good
illustration of the application of the relevant principles".  After an extensive
quotation from the judgment in that case, he added, at p 475:

> "There is no reason to suppose that this case would have been           B
> differently decided in England.  The decision helpfully illustrates that,
> provided that the plaintiff can establish a personal cause of action and can
> prove a personal loss caused by the defendant's actionable wrong, then
> the fact that the loss is felt by the plaintiff in the form of the loss of the
> value of the plaintiff's shares in a company is no answer to the plaintiff's
> claim.  (In that case, as in the present case, no question of remoteness
> arose.)"                                                                  C

Thus *Christensen v Scott* does not appear to have caused problems for
English judges hitherto, and I would hope that this position might continue.
But it is necessary to add some further discussion of principle, as on the facts
the present case is not on all fours with that case or any of the others cited in
argument.

Assuming that this is a fairly typical case of a man carrying on business      D
wholly or partly through a company or companies controlled by him, the
first question at a trial will be whether Gore Wood & Co owed duties to
Mr Johnson personally as well as to Westway Homes Ltd.  Such personal
duties could arise from a contract of retainer or in tort because of the
closeness of relations ("proximity"), or from both sources concurrently.
*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145 finally established in      E
English law the legitimacy of recognising that professional advisers may owe
to the same client a duty to exercise reasonable care and skill derived from
both contract and tort law.  Conceivably the rules as to remoteness or the
measure of damages could produce different consequences; but in the
interests of justice and the clarity of the law this should obviously be avoided
unless forced upon the courts.  The duty in such a case is most simply seen as
a civil law obligation to conform to professional standards.  In the argument    F
it was not suggested that for the purposes of this appeal there is any material
difference.

Although more elaborately pleaded here, the duty owed to the personal
claimant would be to exercise reasonable care and professional skill in
handling the legal side of his affairs and those of his relevant company.  In
this case it would include the elementary responsibility of exercising
efficiently the company's option to purchase Mr Moores's land, on the basis    G
that the risk of personal loss to Mr Johnson from a questionable exercise of
the option was reasonably foreseeable by Gore Wood & Co.  The duty was
one of taking reasonable steps to safeguard his interests, not one of
indemnity.  Subject to that important qualification, there is some analogy
with a contract of insurance When a solicitor is acting for both a shareholder
personally and his company, the essence of the personal relationship is that
the individual looks to the solicitor for care to provide personal financial      H
protection.

That brings the discussion to what is perhaps the crucial point in this case.
The required degree of personal protection will extend, I think, to protection
against the operation of rules of law that might foreseeably restrict the

A  individual's right to recover damages if no duty were owed to him personally by the solicitor. In cases of the present class, two such rules may be relevant among other factors. One may be called the rule in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, using that as a shorthand to convey that a shareholder in a company has as such no right to recover from a third party damages for breach of the latter's duty to the company. The other may be called the rule in *The Lips*, using that as

B  shorthand for the proposition in *President of India v Lips Maritime Corpn* [1988] AC 395, per Lord Brandon of Oakbrook at p 425: "There is no such thing as a cause of action in damages for late payment of damages. The only remedy which the law affords for delay in paying damages is the discretionary award of interest pursuant to statute."

But for the solicitor's duty owed to the individual client, such restrictions

C  could result in inability on the part of the latter to recover damages caused to him by the solicitor's negligence. Thus in the present case, whereas the option should have been exercised in a unquestionable manner in February 1988, it was not until more than four years later that the land was belatedly conveyed to Westway Homes Ltd, and not until a further period of about eight months had elapsed that the company obtained a monetary settlement of its claim against the solicitors.

D  Mr Johnson alleges (inter alia) that in the meantime the property market had collapsed, the development project had ceased to be financially advantageous, and he had incurred very high interest charges for personal borrowings. To the extent that he can establish at a trial that the delay in the obtaining by the company of the land or monetary compensation was caused or materially contributed to by negligence on the part of the defendant

E  solicitors, there would appear to be no sound reason for denying him personal relief for any damages foreseeably caused to him personally by the delay: provided always that double recovery is not sanctioned and the interests of the company's creditors are protected.

While double recovery has to be avoided, at this pre-trial stage I would not rule out the possibility that, on the close scrutiny at trial spoken of by Lord Bingham, it will be found that the ultimate agreed payment to the

F  company was not intended to and did not in fact adequately compensate Mr Johnson for the company's want of title to the land in early 1988. It may be chiefly a matter of the timing. The rule in *The Lips* would not exclude the plaintiff's personal claim; he is not claiming damages for delay in paying damages to him. Rather he is claiming damages for the fact that his company did not have the land in 1988—a claim outside the provenance and the purview of the rule in *The Lips*.

G  Thus the true scope of the settlement in 1992 is one of the matters requiring examination. In the instant case the settlement covered a very large part of the company's claim. It may well have been a reasonable settlement, reached after having due regard to the interests of the company's creditors, who could not successfully claim that more should have been recovered. There may nevertheless be some possibility that, in addition to

H  any other right to personal damages that he may have against the solicitors, Mr Johnson could be heard to say against them that in any event he should be compensated for his company not having recovered fully. Such a possibility may be more significant in a case like *Christensen v Scott* [1996] 1 NZLR 273 where the shareholder has opposed and complains of the

inadequacy of the company's settlement; but I do not think that it can be   A
ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for
negligence on his part in making a compromise: see *In re Windsor Steam
Coal Co (1901) Ltd* [1929] 1 Ch 151; *In re Home and Colonial Insurance Co
Ltd* [1930] 1 Ch 102. Accordingly I think that in cases within that principle
the court should avoid sanctioning not only double recovery, but also any   B
real prospect of double recovery. As this aspect was not explored in
argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think
that Mr Johnson could have a good personal claim against the solicitors for
compensation on the basis already stated, that is to say on the basis that the
damages claimed by him were not suffered by the company. Accordingly
I agree with Lord Bingham that the claimed heads of damages numbered in   C
his speech 1, 2, 4 and 5 should not be struck out before trial, and that the
same applies to the part of head 3 relating to the enhancement of the value of
Mr Johnson's pension if the payments had been duly made. I am rather less
clear that the remaining parts of head 3 should be struck out. Certainly,
however, these claims relating to lost payments into a pension fund or
retention of corresponding amounts in the company's assets look very much   D
like claims for double recovery. As the other members of your Lordships'
Appellate Committee are in no doubt that they should be struck out, I am
content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must
be resolved in favour of the claimant, I think it safer to avoid fine
distinctions, especially before trial; and, with the very limited exceptions just
mentioned, to leave all the extant claims in this case of complicated facts   E
open for examination at trial. The open questions would include
remoteness. And I would add one other cautionary remark. The trial judge
would have to consider, not only issues of double recovery by Mr Johnson
and the company, but also any issue of overlapping among Mr Johnson's
claims themselves.

F

### Damages for general suffering

In *Watts v Morrow* [1991] 1 WLR 1421, Bingham LJ said, at p 1445:

"A contract-breaker is not in general liable for any distress, frustration,
anxiety, displeasure, vexation, tension or aggravation which his breach of
contract may cause to the innocent party. This rule is not, I think,
founded on the assumption that such reactions are not foreseeable, which   G
they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to
provide pleasure, relaxation, peace of mind or freedom from molestation,
damages will be awarded if the fruit of the contract is not provided or if
the contrary result is procured instead. If the law did not cater for this
exceptional category of case it would be defective. A contract to survey
the condition of a house for a prospective purchaser does not, however,   H
fall within this exceptional category.

"In cases not falling within this exceptional category, damages are in
my view recoverable for physical inconvenience and discomfort caused by
the breach and mental suffering directly related to that inconvenience and

A  discomfort. If those effects are foreseeably suffered during a period when defects are repaired I am prepared to accept that they sound in damages even though the cost of the repairs is not recoverable as such. But I also agree that awards should be restrained, and that the awards in this case far exceeded a reasonable award for the injury shown to have been suffered. I agree with the figures which Ralph Gibson LJ proposes to substitute."

B     I regard that as an authoritative statement of the present law of England regarding commercial contracts. The exceptional category is not confined, in my view, to contracts to provide pleasure and the like. For example, breaches of contracts for status such as membership of a trade union or a club may carry damages for injured feelings; but it is unnecessary to go into

C  that area further, as I accept that, if there was a contract between Mr Johnson and Gore Wood & Co, it is to be classified in English law as commercial in the sense that damages for mere distress are not available. Contract-breaking is treated as an incident of commercial life which players in the game are expected to meet with mental fortitude. For present purposes it may be assumed that the same principle applies in so far as the claim is grounded in tort: see *Hayes v James & Charles Dodd* [1990] 2 All

D  ER 815, 826, per Purchas LJ. A fuller discussion of these various matters can be found in *Mouat v Clark Boyce* [1992] 2 NZLR 559 (a stage of the litigation not under consideration by the Privy Council in *Clark Boyce v Mouat* [1994] 1 AC 428).
     But that does not quite dispose of Mr Johnson's claim for non-quantifiable damage. He alleges extreme financial embarrassment; it is said

E  that from a state of some prosperity he was reduced to subsistence on social security benefit. He also alleges deterioration in his family relationships, particularly with his wife and son. Although the pleader has treated them as mental distress, such consequences are in truth significantly more than mental distress. They are more akin to the physical inconvenience and discomfort referred to in Bingham LJ's third paragraph. In my opinion the common law would be defective and stray too far from reality, humanity

F  and justice if it remorselessly shut out even a restrained award under these heads. Hence I would leave the claim in this part of the case standing also, although only on the footing that damages could not be awarded merely for injured feelings, nor could aggravated damages be awarded merely on that account.
     English case law has fluctuated as to the recoverability of damages in

G  contract for mental distress, as is detailed in *McGregor on Damages* (1997), paras 98–106. See also Dr Harvey McGregor's preface at pp vii–viii. But it has been established since Victorian times that, by contrast with mere mental distress, damages are recoverable for substantial inconvenience and discomfort. Thus in *Hobbs v London and South Western Railway Co* (1875) LR 10 QB 111, a court including Cockburn CJ and Blackburn and

H  Mellor JJ upheld an award to a husband and wife for the inconvenience of having to walk home with young children four or five miles late on a drizzling night, although the wife's catching of a cold was found too remote. That case was applied by Barry J in *Bailey v Bullock* [1950] 2 All ER 1167 in awarding damages against solicitors for the inconvenience to the plaintiff of having to live in an overcrowded house. Such authorities are treated in

*McGregor on Damages*, paras 93 to 96, as surviving the recent restriction of    A
damages for mental distress. The third paragraph already quoted from
Bingham LJ in *Watts v Morrow* [1991] 1 WLR 1421, 1445 is largely
supported by them. The line may not always be easy to draw, and it is
particularly difficult before trial to assess the weight of the claims in the
present case. But both a changed way of life because of poverty and
damaged family relationships can be grievous forms of non-pecuniary harm.    B
I am respectfully unable to agree that they should be ruled out of the law's
purview.

Before parting with the case I would say something about *Addis v
Gramophone Co Ltd* [1909] AC 488. In severely confining damages for
wrongful dismissal, your Lordships' House of those days appears to have
seen the relationship of employer and employee as no more than an ordinary
commercial one. This is a world away from the concept now, and in    C
*Mahmud v Bank of Credit and Commerce International SA* [1998] AC 20 the
House accepted that there is an implied obligation of mutual trust and
confidence, and that an employer is under an implied obligation that he will
not, without reasonable and proper cause, conduct his business in a manner
likely to destroy or seriously damage that relationship. Damages for
financial loss, including impaired employment prospects, caused by harm to    D
reputation could be recovered. It is true that *Addis* was distinguished on the
ground that it related to injury to feelings caused by the manner of
termination of the relationship, which question did not arise in *Mahmud*: see
per Lord Nicholls of Birkenhead, at p 38, and Lord Steyn, at p 51. But the
philosophy is altogether different, as is the philosophy embodied in modern
employment legislation. Again, as Lord Bingham has pointed out, *Addis*    E
was not applied in *Ruxley Electronics and Construction Ltd v Forsyth*
[1996] AC 344. *Addis* has not uniformly been followed in the
Commonwealth: see *Brown v Waterloo Regional Board of Comrs of Police*
(1982) 136 DLR (3d) 49, a judgment of Linden J (the author of *Canadian
Tort Law*, now in its sixth edition). The decision was reversed on other
grounds, but Linden J's statements of principle were substantially accepted:    F
(1983) 150 DLR (3d) 729. According to that authority, an employee
wrongfully dismissed may recover damages for mental distress in some
circumstances. To the same effect is *Whelan v Waitaki Meats Ltd* [1991]
2 NZLR 74, which contains an instructive survey of the authorities by
Gallen J. I take leave to doubt the permanence of *Addis* in English law. But
it is not a question arising in the present case either; I make these
observations only to avoid being identified with any approbation of *Addis*.

For the reasons already given, I would allow Mr Johnson's appeal and    G
would dismiss the cross-appeal except as to the two claims identified by Lord
Bingham of Cornhill in his head 3 and as to aggravated damages. In the
result the one point on which I differ concerns the claims for damages for
financial embarrassment and injury to family relationships: those I would
permit to go to trial. I concur in the order for costs proposed by Lord
Bingham.    H

LORD HUTTON My Lords, I have had the advantage of reading in draft
the speech of my noble and learned friend, Lord Bingham of Cornhill. I am
in full agreement with his speech on the subject of abuse of process and I wish
to confine my observations to the issue whether the damages claimed by

A  Mr Johnson are recoverable as a matter of law. The case advanced by Mr Johnson is that he instructed a firm of solicitors, Gore Wood & Co ("GW"), to advise him personally as to the conduct of his businesses, including the business of property development which he carried on through a company Westway Homes Ltd ("WWH") of which he was the managing director and in which he held the entire shareholding with the exception of

B  two shares, and that acting on behalf of WWH he also instructed GW to advise that company. He contends that in advising him as to the business affairs of the company, GW owed him a duty of care in contract and tort and in breach of that duty caused him very substantial financial loss. The question whether the damages claimed are recoverable comes before the House as a preliminary issue and is to be approached on the basis that the facts pleaded by Mr Johnson are capable of establishing a breach of a duty

C  owed to him which caused him loss.

I consider it to be clear that where a shareholder is personally owed a duty of care by a defendant and a breach of that duty causes him loss, he is not debarred from recovering damages because the defendant owed a separate and similar duty of care to the company, provided that the loss suffered by the shareholder is separate and distinct from the loss suffered by the

D  company. This principle was recently stated in the judgment in the Court of Appeal delivered by Sir Christopher Slade in *Walker v Stones* [2001] QB 902, 932–933, that a claimant is entitled to recover damages where:

"(a) the plaintiff can establish that the defendant's conduct has constituted a breach of some legal duty owed to him personally (whether under the law of contract, torts, trusts or any other branch of the law) and

E  (b) on its assessment of the facts, the court is satisfied that such breach of duty has caused him personal loss, separate and distinct from any loss that may have been occasioned to any corporate body in which he may be financially interested. I further conclude that, if these two conditions are satisfied, the mere fact that the defendant's conduct may also have given rise to a cause of action at the suit of a company in which the plaintiff is financially interested (whether directly as a shareholder or indirectly as,

F  for example, a beneficiary under a trust) will not deprive the plaintiff of his cause of action; in such a case, a plea of double jeopardy will not avail the defendant."

But a more difficult question arises where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. In *Prudential Assurance Co

G  Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, the claimants sued the directors of the company alleging that they had issued a circular to the shareholders containing a fraudulent misrepresentation concerning the true value of certain assets, and the court stated, at pp 222–223:

"But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He

H  cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which

he has (say) a 3% shareholding. The plaintiff's shares are merely a right of   A
participation in the company on the terms of the articles of association.
The shares themselves, his right of participation, are not directly affected
by the wrongdoing. The plaintiff still holds all the shares as his own
absolutely unencumbered property. The deceit practised upon the
plaintiff does not affect the shares; it merely enables the defendant to rob
the company."                                                                  B

I shall call this statement "the *Prudential Assurance* principle".

In *Christensen v Scott* [1996] 1 NZLR 273, the Court of Appeal of New
Zealand decided that where a plaintiff alleges a breach of duty owed to him
personally by accountants and solicitors he is entitled to recover damages
notwithstanding that his loss flows from loss suffered by a company in which
he is a shareholder through a similar breach of duty owed to the company.    C
In that case two shareholders claimed damages for the diminution in the
value of their shareholding in a company caused by the negligence of their
accountants and solicitors. In delivering the judgment of the court, after
setting out part of the above passage in the judgment in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204
Thomas J stated, at p 280:                                                     D

"It may be accepted that the Court of Appeal was correct, however, in
concluding that a member has no right to sue directly in respect of a
breach of duty owed to the company or in respect of a tort committed
against the company. Such claims can only be bought by the company
itself or by a member in a derivative action under an exception to the rule
in *Foss v Harbottle* 2 Hare 461. But this is not necessarily to exclude a   E
claim brought by a party, who may also be a member, to whom a separate
duty is owed and who suffers a personal loss as a result of a breach of that
duty. Where such a party, irrespective that he or she is a member, has
personal rights and these rights are invaded, the rule in *Foss v Harbottle* is
irrelevant. Nor would the claim necessarily have the calamitous
consequences predicted by counsel in respect of the concept of corporate
personality and limited liability. The loss arises not from a breach of the   F
duty owed to the company but from a breach of duty owed to the
individuals. The individuals is simply suing to vindicate his own right or
redress a wrong done to him or her giving rise to a personal loss.
"We consider, therefore, that it is certainly arguable that, where there
is an independent duty owed to the plaintiff and a breach of that duty
occurs, the resulting loss may be recovered by the plaintiff. The fact that
the loss may also be suffered by the company does not mean that it is not   G
also a personal loss to the individual. Indeed, the diminution in the value
of Mr and Mrs Christensen's shares in the company is by definition a
personal loss and not a corporate loss."

The approach taken by the Court of Appeal of New Zealand has been
approved in a number of judgments of the Court of Appeal. In *Barings plc v
Coopers & Lybrand* [1997] 1 BCLC 427 the plaintiff, a company holding      H
shares in a subsidiary company, claimed damages against the defendants, a
firm of accountants, in respect of loss it suffered through loss sustained by its
subsidiary, BFS, on the ground that the defendants were in breach of duties
of care owed both to the plaintiff and to the subsidiary in carrying out an

A    audit of the subsidiary's accounts.  The defendants applied to set aside
     service of the writ in reliance on the *Prudential Assurance* principle.  The
     defendants' application was rejected by the Court of Appeal and
     Leggatt LJ stated, at p 435:

        "[*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)*
B       [1982] Ch 204] decides that a shareholder in a company has no
        independent right of action based on an allegation of diminution in the
        value of his shares occasioned by damage to the company.  Mr Kentridge
        seeks to rely on it as authority for the proposition that where a company
        may have a cause of action for damage caused to it by a tortfeasor, a
        person who enjoys an independent right of action against the tortfeasor
        cannot sue him, at least in so far as his damages are measured by a
        diminution in the value of the company's shares.  But in my judgment that
C       is a misapplication of the principle.  If C & LS are in breach of a duty of
        care owed to Barings in respect of audit information supplied to them and
        the breach causes damage, Barings cannot be disentitled from suing
        merely because the damages for which C & LS are said to be liable to
        Barings would or might include damages for which they are said to be
        liable to BFS.  For C & LS are also in breach of a different duty, whether
D       contractual or tortious, owed to BFS.  Whereas complications might arise
        if these claims were made in separate actions, any risk of double jeopardy
        or of double recovery, such as were envisaged by the New Zealand Court
        of Appeal in *Christensen v Scott* [1996] 1 NZLR 273, 280–281, can be
        avoided if both claims are made in the same action.  It may be, for
        instance, that C & LS are not liable to Barings for loss of the value of the
E       shares in either BFS or any company which has a cause of action against
        C & LS for such loss.
           "The present case differs from the *Prudential Assurance* case because
        here the person in the position of shareholder, namely Barings, has a right
        of action independent of the company, BFS.  On the other hand, unlike
        the situation in [*George Fischer (Great Britain) Ltd v Multi Construction
        Ltd* [1995] 1 BCLC 260], BFS does have a right of action itself.  As that
F       case shows, there is no legal principle that a holding company is unable to
        recover damages for loss in the value of its subsidiaries, resulting directly
        from a breach of duty owed to it, as distinct from a duty owed (or not
        owed as the case may be) to the subsidiaries."

     In *Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443
G    the plaintiff was entitled to damages for infringement of patent rights held by
     it and sought to recover damages for losses suffered by subsidiary companies
     in which it held all the shares, and which themselves had no cause of action,
     and the defendant contended that the claim was barred by the *Prudential
     Assurance* principle.  That argument was rejected by the Court of Appeal
     and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand
     in *Christensen v Scott* [1996] 1 NZLR 273 and stated, at p 475:

H       "There is no reason to suppose that this case would have been
        differently decided in England.  The decision helpfully illustrates that,
        provided that the plaintiff can establish a personal cause of action and can
        prove a personal loss caused by the defendant's actionable wrong, then
        the fact that the loss is felt by the plaintiff in the form of the loss of the

*A*

value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

The judgments in *Prudential Assurance* and *Christensen v Scott* are difficult to reconcile, and it is also difficult to reconcile the judgment in *Barings plc v Coopers & Lybrand* with the judgment in the former case because the ground on which Leggatt LJ sought to distinguish it, namely, that in *Prudential Assurance* the shareholders did not have an individual right of action, is invalid, the court in *Prudential Assurance* stating, at p 222, that the defendants owed the shareholders a duty to give sound advice. *Gerber Garment Technology* can be distinguished from *Prudential Assurance* on the ground that the companies in which the plaintiff held shares did not themselves have a cause of action against the defendant. But I consider that the ruling in *Prudential Assurance* that the shareholders could not recover damages cannot be explained on the ground of causation, which was the explanation advanced by Hobhouse LJ, at p 471; I think, in agreement with the Court of Appeal of New Zealand in *Christensen v Scott,* that the shareholders can be regarded as suffering a loss caused by breach of duty of the defendant notwithstanding that their loss is reflective of loss suffered by the company. Therefore I consider that the issue to be decided is whether this House should follow the reasoning set out in *Prudential Assurance* or the reasoning set out in *Christensen v Scott.*

*B*

*C*

*D*

My Lords, I consider, with respect, that part of the reasoning in *Prudential Assurance* is open to criticism. In my opinion the view of the Court of Appeal of New Zealand that the loss suffered by a shareholder through the diminution in the value of his shareholding is a personal loss is a more realistic assessment than the view of the Court of Appeal in *Prudential Assurance* that the shareholder's loss is merely a reflection of the loss suffered by the company and that the shareholder suffers no personal loss. This view has been criticised in an article by Mr M J Sterling on "The Theory and Policy of Shareholder Actions in Tort" (1987) 50 MLR 468, 470, 471:

*E*

"The description of the Court of Appeal is not wrong, in that the value of a share is related to the present and expected future levels of dividend of the company and the right to receive dividends is a right of participation in the company, but it is suspiciously limited because a share is commonly treated as a piece of personal property. The fact that a share is valuable because it is a right of participation in a company does not preclude one as a matter of logic from regarding it as a piece of property . . .
"The Court of Appeal gave no reason for preferring their description of a share to one which includes its nature as an item of personal property but some good reason is surely necessary to justify exclusion of this obvious characteristic. It is therefore suggested that, if necessary, a share can be regarded as a piece of personal property and a shareholder could be allowed to sue for injury to it."

*F*

*G*

*H*

In my respectful opinion there is force in this criticism. However, even if this criticism be accepted, there remains the need to ensure that there is no double recovery and that creditors and the other shareholders of the company are protected. It was this need which was emphasised by

A    Millett LJ in *Stein v Blake* [1998] 1 All ER 724, 730, as the reason why the principle in *Prudential Assurance* should be followed:

> "If this action were allowed to proceed and the plaintiff were to recover for the lost value of his shareholding from the first defendant, this would reduce his ability to meet any judgment which might thereafter be obtained by the liquidators, or by any of the old companies which were
B    not in liquidation, to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors that the first defendant is alleged to have obtained by fraud and deceit."

C    In *Christensen v Scott* [1996] 1 NZLR 273 the court considered that the problem of double recovery did not arise in that case as the defendants had settled the company's claim with the knowledge that the plaintiffs' claim was outstanding. But the court recognised that double recovery cannot be permitted and that the interests of the creditors of a company must be protected. In my opinion the resolution of the conflict between *Prudential Assurance* and *Christensen v Scott* narrows down to the issue whether, as
D    held in the former case, the shareholder is debarred from bringing to trial an action claiming loss where such loss is merely reflective of loss suffered by the company, or whether the shareholder is entitled to proceed to trial on such a claim, it being a matter for the trial judge, if the plaintiff establishes his claim, to ensure that there is no double recovery and that creditors and other shareholders of the company do not suffer loss, which was the course which Pumfrey J held should be followed.

     My Lords, whilst in a case such as *Christensen v Scott* there may be merit
E    in permitting an individual shareholder to sue, the decision in *Prudential Assurance* has stood in England for almost 20 years and, whilst the decision has sometimes been distinguished on inadequate grounds, it has been regarded as establishing a clear principle which the Court of Appeal has followed in other cases. I further consider that the principle has the advantage that, rather than leaving the protection of creditors and other shareholders of the company to be given by the trial judge in the
F    complexities of a trial to determine the validity of the claim made by the plaintiff against the defendant, where conflicts of interest may arise between directors and some shareholders, or between the liquidator and some shareholders, the principle ensures at the outset of proceedings that where the loss suffered by the plaintiff is sustained because of loss to the coffers of the company, there will be no double recovery at the expense of the
G    defendant nor loss to creditors of the company and other shareholders. Therefore whilst I think that this House should uphold the *Prudential Assurance* principle, I also consider that it is important to emphasise that the principle does not apply where the loss suffered by the shareholder is separate and distinct from the loss suffered by the company.

     The five heads of claim pleaded by Mr Johnson have been set out in the speech of my noble and learned friend, Lord Bingham of Cornhill. I consider
H    that the losses claimed in heads 1, 2, 4 and 5 are separate and distinct from loss sustained by WWH and that those heads of claim should not be struck out. In respect of head 3 I am also in agreement with the opinion of Lord Bingham that because it is not a separate and distinct loss, Mr Johnson cannot claim in respect of the moneys which WWH would have paid into a

pension fund for him if those moneys had been available to it, and that that   *A*
part of the claim should be struck out, but that Mr Johnson can claim in
respect of enhancement of the value of the pension if the payments had been
made.

For the reasons given by Lord Bingham I would strike out Mr Johnson's
claims for damages for mental distress and anxiety and for aggravated
damages. Accordingly, I would allow Mr Johnson's appeal and dismiss   *B*
GW's cross-appeal, save that I would strike out his claim in head 3 for
pension payments (or, in the alternative, for the increase in the value of his
shareholding if those pension payments had not been made), and for
damages for mental distress and anxiety and for aggravated damages.
I would concur in the order for costs proposed by Lord Bingham.

LORD MILLETT My Lords, my noble and learned friend, Lord Bingham of   *C*
Cornhill, has recounted the facts and I need not set them out again at any
length. The appellant, Mr Johnson, is an entrepreneur who carried on
business through a number of companies which he owned and controlled.
One of them was Westway Homes Ltd ("the company"). Mr Johnson was its
managing director and virtually only shareholder. The respondent firm
("the firm") is a firm of solicitors. Mr Johnson was in the habit of instructing   *D*
the firm from time to time to act for him in connection with his personal
affairs as well as for his various companies.

In 1988 the company held a valuable option to buy land for development.
Mr Johnson instructed the firm to exercise the option on the company's
behalf. The firm accepted his instructions and served the appropriate notice,
but failed to do so in a manner which was incapable of challenge by the
vendor. The vendor claimed that the option had not been validly exercised,   *E*
and the company was obliged to bring proceedings for specific performance
against him in the Chancery Division ("the Chancery proceedings"). These
were not straightforward, and although the company was ultimately
successful it was unable to obtain title to the land until April 1992, that is to
say more than four years after it had exercised the option. It was awarded
damages and costs against the vendor, but these proved to be irrecoverable.

The firm's failure to deal with the option in a manner which put its   *F*
exercise beyond dispute caused the company substantial loss. As well as
having to bear the costs of the Chancery proceedings, it sustained heavy
financial loss as a result of the delay in obtaining title to the land. This loss
was of two kinds. First, until the company established its title, it was unable
to offer the land as security for its borrowings and so obtain a reduction in
the very high interest charges it was paying. Secondly, delay in obtaining   *G*
title to the land caused a corresponding delay in the commencement and
completion of the development and thus in the time when the company
could hope to realise any profit from the venture. As it happens, the delay
frustrated the development altogether, for the collapse in the property
market which took place during the currency of the Chancery proceedings
made the venture unprofitable. But this was obviously not foreseeable in
1988, or Mr Johnson would not have caused the company to exercise the   *H*
option and the vendor would not have resisted its claim to have done so.

In January 1991 the company brought proceedings against the firm for
professional negligence. The firm admitted that it had been retained by the
company to exercise the option and that it had owed the company a duty of

A   care in doing so. But it denied both liability and quantum. The action came
on for trial in October 1992 and was estimated to last 10 to 12 days. In
December 1992, after the trial had already lasted for six weeks and evidence
was still being given on behalf of the firm, the case was settled upon payment
by the firm of £1,480,000 and £320,000 towards the company's costs. The
sum of £1,480,000 represented the greater part of the damages claimed.

B   Mr Johnson has always claimed that the firm's negligence in the manner
in which it exercised the option also caused substantial financial loss to him
personally. In April 1993 he brought his own proceedings against the firm.
This can have come as no surprise. Mr Johnson had made no secret of his
intention to bring such a claim. He had indicated as much in January 1991,
well before the company's action came to trial, and his solicitors had been in
correspondence with the firm's insurers during 1991–92. On the eve of the

C   trial his solicitors told those representing the firm that his personal claim
would be pursued whether the current proceedings resulted in judgment or
settlement. During the settlement negotiations in December 1992 the
parties' respective solicitors discussed the possibility of an overall settlement
of both Mr Johnson's personal claim and the company's claim, but the
paucity of information to enable his personal claim to be quantified made
this impossible. It was left that it was a separate claim which would be a

D   matter for separate negotiation in due course. In agreeing the terms on
which the company's claim was settled, Mr Johnson submitted to having
most of his personal claim capped at £250,000 excluding interest and costs,
and the company agreed to apply the settlement moneys in the discharge of
liabilities of the company in respect of which Mr Johnson had given personal
guarantees. This was designed to avoid the possibility of double recovery in

E   respect of these liabilities if Mr Johnson brought his own proceedings and
was successful.

   For the next 4½ years the proceedings brought by Mr Johnson followed the
normal course. The parties served and amended their pleadings and
exchanged witness statements. Mr Johnson served expert evidence. The
firm made a payment into court. A trial date was obtained. But then came a
sudden change of tack. The firm instructed fresh leading counsel. In

F   December 1997 the firm's solicitors indicated, for the first time, that it
intended to apply inter alia for an order to strike the action out as an abuse
of the process of the court. In February 1998 the court ordered the trial of
two preliminary issues: (i) whether the proceedings should be struck out as
an abuse of the process of the court; and (ii) to what extent (if at all) and
assuming the truth of the facts pleaded the heads of damages pleaded in

G   paragraphs 23 and 24 of the re-amended statement of claim were
irrecoverable by Mr Johnson as a matter of law by way of damages for the
pleaded breaches of duty owed to him.

   Mr Johnson pleaded his claim in both contract and tort, and alleged that
he had retained the firm to act for him personally as well as for the company
in connection with the exercise of the company's option. He alleged that the
firm had acted negligently in the manner in which it caused the option to be

H   exercised, and that it had from time to time negligently and with
unwarranted optimism advised him personally as to the likely duration and
outcome of the Chancery proceedings.

   On the first question, the judge (Pumfrey J) found that the proceedings
might well have been an abuse of the process of the court, but that in the

light of the circumstances in which the company's action had been settled the
firm was estopped by convention from contending that they were.  Both
parties had acted on the common assumption that Mr Johnson would bring
his own proceedings and that these would be entertained by the court.  On
the second question he ruled that none of the heads of damage pleaded was
irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell LJJ) allowed the firm's
appeal.  It held that there was no excuse for Mr Johnson's failure to launch
his own claims when the company brought its action.  "If he could have done
so", Mantell LJ said, "he should have done so".  It held that there was no
estoppel by convention; the parties shared a common assumption that
Mr Johnson would bring his own proceedings, but they made no assumption
one way or the other whether the court would entertain them; they never
thought about the matter.  On the second question the court differed from
the judge on the authorities, which it agreed were in an unsatisfactory state,
but held that, with only one exception, the pleaded heads of damage were
arguably recoverable.  Both parties now appeal to the House.  Mr Johnson
appeals on the first question; the firm cross-appeals on the second.

*Mr Johnson's appeal: abuse of process*

In describing the proceedings brought by Mr Johnson as an abuse of the
process of the court, the Court of Appeal was seeking to apply the well
known principle which Sir James Wigram V-C formulated in *Henderson v
Henderson* (1843) 3 Hare 100, 114–115:

"... I believe I state the rule of the court correctly, when I say, that
where a given matter becomes the subject of litigation in, *and of
adjudication by,* a court of competent jurisdiction, the court requires the
parties to that litigation to bring forward their whole case, and will not
(except under special circumstances) permit the same parties to open the
same subject of litigation in respect of matter which might have been
brought forward as part of the subject in contest, but which was not
brought forward, only because they have, from negligence, inadvertence,
or even accident, omitted part of their case.  *The plea of res judicata
applies,* except in special cases, not only to points upon which the court
was actually required by the parties to form an opinion and pronounce a
judgment, but to every point which properly belonged to the subject of
litigation, and which the parties, exercising reasonable diligence, might
have brought forward at the time." (My emphasis.)

As the passages which I have emphasised indicate, Sir James Wigram V-C
did not consider that he was laying down a new principle, but rather that he
was explaining the true extent of the existing plea of res judicata.  Thus he
was careful to limit what he was saying to cases which had proceeded to
judgment, and not, as in the present case, to an out-of-court settlement.
Later decisions have doubted the correctness of treating the principle as an
application of the doctrine of res judicata, while describing it as an extension
of the doctrine or analogous to it.  In *Barrow v Bankside Members Agency
Ltd* [1996] 1 WLR 257, Sir Thomas Bingham MR explained that it is not
based on the doctrine in a narrow sense, nor on the strict doctrines of issue or
cause of action estoppel.  As May LJ observed in *Manson v Vooght* [1999]
BPIR 376, 387, it is not concerned with cases where a court has decided the

A   matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to

B   protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

    In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement

C   and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

    However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the

D   opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the Convention for the Protection of Human Rights and Fundamental Freedoms (1953). While, therefore, the doctrine of res judicata in all its branches may properly be regarded as a rule of substantive law, applicable in all save exceptional

E   circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In *Brisbane City Council v Attorney General for Queensland* [1979] AC 411, 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in *Henderson v Henderson* 3 Hare 100 is abuse

F   of process and observed that it "ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation". There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could have brought them as part of or at the same time as the company's action.

G   This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson *could* have brought his action as part of or at the same time as the company's action. But it does not at all follow that he *should* have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the

H   process of the court. As May LJ observed in *Manson v Vooght* [1999] BPIR 376, 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in *Henderson v Henderson* suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should

always rest upon the defendant to establish that it is oppressive or an abuse    A
of process for him to be subjected to the second action.

The rule in *Henderson v Henderson* 3 Hare 100 cannot sensibly be
extended to the case where the defendants are different. There is then no
question of double vexation. It may be reasonable and sensible for a plaintiff
to proceed against A first, if that is a relatively simple claim, in order to use
the proceeds to finance a more complex claim against B. On the other hand,    B
it would I think normally be regarded as oppressive or an abuse of process
for a plaintiff to pursue his claims against a single defendant separately in
order to use the proceeds of the first action to finance the second, at least
where the issues largely overlap so as to form, in Sir James Wigram V-C's
words, at p 115, "the same subject of litigation".

Particular care, however, needs to be taken where the plaintiff in the    C
second action is not the same as the plaintiff in the first, but his privy. Such
situations are many and various, and it would be unwise to lay down any
general rule. The principle is, no doubt, capable in theory of applying to a
privy; but it is likely in practice to be easier for him to rebut the charge that
his proceedings are oppressive or constitute an abuse of process than it
would be for the original plaintiff to do so.

Mr Johnson conceded that he and the company are privies. He was in a    D
position to decide when to pursue the two claims and whether to pursue
them together or separately, and that is enough for present purposes. But
Mr Johnson and the company are different legal persons, each with its own
creditors, and that is a fact of critical significance. Mr Johnson's personal
claims raised difficult issues not present in the company's action: (i) did he
retain the firm to act for him personally? (ii) should the firm have foreseen
that failure to exercise the option properly would cause loss to Mr Johnson    E
personally as well as to the company? (iii) which if any of his personal losses
were recoverable (the issues in the cross-appeal)? (iv) quantum. It was not
in the company's interest for his personal claims to be joined with its own
much simpler claim, or for its case to be delayed until Mr Johnson's own
case was ready for trial. Had the company been in liquidation and its action
brought by the liquidator, he would have been well advised to insist on
separate trials and to object to any delay in the trial of the company's action.    F

In these circumstances I am satisfied that Mr Johnson, who was bound to
have regard to the interests of the company and its creditors, was entitled to
defer the bringing of his own claims until after the company's claim had been
resolved. Even if he had chosen to join the two claims in the same writ, it
would have been both possible and appropriate for separate trials to be held
of (i) liability (ii) quantum (company) (iii) Mr Johnson's title to sue and    G
(iv) quantum (Mr Johnson); and for (iii) and (iv) to be held over until after
(i) and (ii) had been determined. Even as things are, there is no real question
of double vexation. The firm was always liable to be sued by two different
plaintiffs each with its own cause of action and its own heads of loss. The
only area of overlap is in relation to the standard of care which the firm
observed. Given that Mr Johnson and the company are privies, neither of
them could reopen an adverse judgment on this, being bound by issue    H
estoppel; while the parties could make their own arrangements in the event
of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of
process for Mr Johnson to bring his action after the company's claim had

A    been resolved. Even if this were not the case, however, I agree with the trial judge that it would be unconscionable for the firm to raise the issue after the way in which it handled the negotiations for the settlement of the company's action. I would not myself put it on the ground of estoppel by convention. Like the Court of Appeal, I have some difficulty in discerning a common assumption in regard to a matter about which neither party thought at all. This is not to say that estoppel has no part to play in this field. I would

B    regard it as operating in the opposite way. Given that Mr Johnson was entitled to defer the bringing of his own proceedings until after the company's claims had been resolved, it would have been unconscionable for him to have stood by without disclosing his intentions and knowingly allowed the firm to settle the company's action in the belief that it was dealing finally with all liability arising from its alleged negligence in the

C    exercise of the option. To bring his own claim in such circumstances would, in my opinion, amount to an abuse of the process of the court. But nothing like this took place.

      This makes it unnecessary to deal with Mr Johnson's submission that it is too late for the firm to raise the issue. If necessary, however, I should have regarded the delay as fatal. Indeed, I should have regarded it as more than delay; I think it amounted to acquiescence. There is no proper analogy with

D    the case which discloses no cause of action. Although it is obviously desirable to apply to strike out a claim which is doomed to fail at the earliest opportunity, there is no point in proceeding with a trial which serves no useful purpose. Even if the point is taken at the trial itself, it is a matter for the trial judge to decide whether to hear the evidence and adjudicate on the facts before deciding whether they give rise to liability, or to assume that the plaintiff will establish his allegations and decide whether, as a matter of law,

E    they give rise to liability.

      But the premise in the present case is that Mr Johnson has a good cause of action which he should have brought earlier if at all. I do not consider that a defendant should be permitted to raise such an objection as late as this. A defendant ought to know whether the proceedings against him are oppressive. It is not a question which calls for nice judgment. If he defends

F    on the merits, this should be taken as acquiescence. It might well be otherwise if the ground on which the proceedings are alleged to be an abuse of process were different. But in a case of the present kind the court is not so much protecting its own process as the interests of the defendant.

      Accordingly, I would allow Mr Johnson's appeal on the first question.

G    *The firm's cross-appeal: recoverable heads of damage*

      A company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this is a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and

H    the company alone can sue. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, 210. Correspondingly, of course, a company's shares are the

property of the shareholder and not of the company, and if he suffers loss as     A
a result of an actionable wrong done to him, then prima facie he alone can
sue and the company cannot.  On the other hand, although a share is an
identifiable piece of property which belongs to the shareholder and has an
ascertainable value, it also represents a proportionate part of the company's
net assets, and if these are depleted the diminution in its assets will be
reflected in the diminution in the value of the shares.  The correspondence      B
may not be exact, especially in the case of a company whose shares are
publicly traded, since their value depends on market sentiment.  But in the
case of a small private company like this company, the correspondence is
exact.

   This causes no difficulty where the company has a cause of action and the
shareholder has none; or where the shareholder has a cause of action and the
company has none, as in *Lee v Sheard* [1956] 1 QB 192, *George Fischer*      C
*(Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, and
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443.
Where the company suffers loss as a result of a wrong to the shareholder but
has no cause of action in respect of its loss, the shareholder can sue and
recover damages for his own loss, whether of a capital or income nature,
measured by the diminution in the value of his shareholding.  He must, of        D
course, show that he has an independent cause of action of his own and that
he has suffered personal loss caused by the defendant's actionable wrong.
Since the company itself has no cause of action in respect of its loss, its assets
are not depleted by the recovery of damages by the shareholder.

   The position is, however, different where the company suffers loss caused
by the breach of a duty owed both to the company and to the shareholder.  In
such a case the shareholder's loss, in so far as this is measured by the          E
diminution in value of his shareholding or the loss of dividends, merely
reflects the loss suffered by the company in respect of which the company has
its own cause of action.  If the shareholder is allowed to recover in respect of
such loss, then either there will be double recovery at the expense of the
defendant or the shareholder will recover at the expense of the company and
its creditors and other shareholders.  Neither course can be permitted.  This     F
is a matter of principle; there is no discretion involved.   Justice to the
defendant requires the exclusion of one claim or the other; protection of the
interests of the company's creditors requires that it is the company which is
allowed to recover to the exclusion of the shareholder.  These principles have
been established in a number of cases, though they have not always been
faithfully observed.  The position was explained in a well known passage         G
in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982]
Ch 204, 222–223:

> "But what [the shareholder] cannot do is to recover damages merely
> because the company in which he is interested has suffered damage.  He
> cannot recover a sum equal to the diminution in the market value of his
> shares, or equal to the likely diminution in dividend, because such a 'loss'
> is merely a reflection of the loss suffered by the company.  The shareholder     H
> does not suffer any personal loss.  His only 'loss' is through the company,
> in the diminution of the value of the net assets of the company, in which
> he has (say) a 3% shareholding.  The plaintiff's shares are merely a right of
> participation in the company on the terms of the articles of association.

A   The shares themselves, his right of participation, are not directly affected
by the wrongdoing. The plaintiff still holds all the shares as his own
absolutely unencumbered property. The deceit practised upon the
defendant does not affect the shares; it merely enables the defendant to
rob the company. A simple illustration will prove the logic of this
approach. Suppose that the sole asset of a company is a cash box
B   containing £100,000. The company has an issued share capital of 100
shares, of which 99 are held by the plaintiff. The plaintiff holds the key of
the cash box. The defendant by a fraudulent misrepresentation persuades
the plaintiff to part with the key. The defendant then robs the company of
all its money. The effect of the fraud and the subsequent robbery,
assuming that the defendant successfully flees with his plunder, is (i) to
denude the company of all its assets; and (ii) to reduce the sale value of the
C   plaintiff's shares from a figure approaching £100,000 to nil. There are
two wrongs, the deceit practised on the plaintiff and the robbery of the
company. But the deceit on the plaintiff causes the plaintiff no loss which
is separate and distinct from the loss to the company. The deceit was
merely a step in the robbery. The plaintiff obviously cannot recover
personally some £100,000 damages in addition to the £100,000 damages
D   recoverable by the company."

It is indeed obvious that (on the given facts, where no consequential losses
are stated to have arisen) the defendant cannot be made liable for more than
£100,000 in total. It is equally obvious, however, that if the damages were
recoverable by the shareholder instead of by the company, this would
achieve the same extraction of the company's capital to the prejudice of the
creditors of the company as the defendant's misappropriation had done.
E       It has sometimes been suggested (see, for example, *George Fischer (Great
Britain) Ltd v Multi Construction Ltd* [1995] BCLC 260, 266G–I) that
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch
204 is authority only for the proposition that a shareholder cannot recover
for the company's loss, and is confined to the case where the defendant is not
in breach of any duty owed to the shareholder personally. That is not
F   correct. The example of the safe-deposit box makes this clear. It is the
whole point of the somewhat strained business of the key. The only reason
for this is to demonstrate that the principle applies even where the loss is
caused by a wrong actionable at the suit of the shareholder personally.
    *Prudential Assurance Co Ltd v· Newman Industries Ltd (No 2)* was
followed in *Stein v Blake* [1998] 1 All ER 724, where the facts bore some
G   resemblance to the illustration in the earlier case. The defendant was a 50%
shareholder and the sole director of a group of companies ("the old
companies"). The plaintiff, who was the other 50% shareholder, alleged
that, in breach of fiduciary duty, the defendant had misappropriated the
assets of the old companies by purchasing them at an undervalue and
transferring them to other companies in his sole ownership. The plaintiff,
who could have brought a derivative action on behalf of the old companies,
H   chose instead to bring a personal action, claiming that he had been deprived
of the opportunity to sell his shares in the old companies at their proper
value and had suffered personal loss. The Court of Appeal set aside an
earlier grant of leave to appeal from the judge's order striking out the
plaintiff's action.

The plaintiff sought to distinguish *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 by arguing that the defendant was in breach of a duty owed to him personally. But, as I pointed out, that was not the problem. The problem was that the only conduct relied upon as constituting a breach of that duty was the misappropriation of assets belonging to the old companies, so that the only loss suffered by the plaintiff consisted of the diminution in the value of his shareholding which reflected the depletion of the assets of the old companies. The old companies had their own cause of action to recover their loss, and the plaintiff's own loss would be fully remedied by the restitution to the companies of the value of the misappropriated assets. It was not alleged that the plaintiff had been induced or compelled to dispose of his shares in the companies; he still had them. If he were allowed to recover for the diminution in their value, and the companies for the depletion of their assets, there would be double recovery. Moreover, if the action were allowed to proceed and the plaintiff were to recover for the lost value of his shares, the defendant's ability to meet any judgment which the old companies or their liquidators might obtain against him would be impaired to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors as the defendant was alleged to have obtained by fraud.

*Heron International Ltd v Lord Grade* [1983] BCLC 244 was a case on the other side of the line. In the course of a contested take-over bid, the directors of the target company who owned a majority of the company's voting shares were alleged, in breach of their duties both to the company and to its shareholders, to have accepted proposals which would reduce the value of the company's assets and hence of its shares and induce the shareholders to accept the lower of two rival offers. The Court of Appeal granted the shareholders injunctive relief. It observed that the decision of the directors, if implemented, would cause loss in two directions. First, the company would suffer loss to the extent that the value of its assets would be depreciated. That loss would be borne exclusively by the company. It was not a loss in respect of which the shareholders could recover, even if the market value of their shares fell in consequence. The other loss would be to the pockets of the shareholders because they were deprived of the opportunity of accepting the higher offer. That loss would be suffered exclusively by the shareholders. It was not a loss to the coffers of the company, which would remain totally unaffected. That could readily be demonstrated. If, as a result of the decision of the board which was impugned, the take-over went through and the entire shareholding in the company became vested in one bidder at a lower price than was available from the other, the recovery of damages by the company would not compensate the former shareholders for their loss. Only a direct action by those shareholders in their own right, and not in right of the company, could provide the necessary compensation.

In *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 a company and its principal shareholder brought an action in negligence against a firm of solicitors, alleging that, as a result of the firm's failure to advise an application for a new tenancy under the Landlord and Tenant Act 1954, the company had been obliged to accept a new lease on terms less favourable than those it would have obtained under the Act. In addition, the

A    principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being

B    misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

C    In *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 a parent company, brought an action in negligence against the auditors of a wholly-owned subsidiary. Leggatt LJ correctly distinguished both *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, where the shareholder had no independent cause of action of his own, and *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260,

D    where the company had none. Here each of them had its own cause of action. But he stated, at p 435B–E, that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it could not be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting

E    directly from breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.

In *Christensen v Scott* [1996] 1 NZLR 273 the company carried on the business of potato-farming on tenanted land. The landlord defaulted on a mortgage of the land and the mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences.

F    The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed

G    duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.

In giving the judgment of the court, Thomas J distinguished *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 104 on the

H    ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct: *Heron International Ltd v Lord Grade* [1983] BCLC 244 and *R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117 are just such cases. The judge

observed that the fact that the loss was also suffered by the company did not    A
mean that it was not also a personal loss suffered by the shareholder.
"Indeed," he added, at p 280:

> "the diminution in the value of Mr and Mrs Christensen's shares in the
> company is by definition a personal loss and not a corporate loss. The
> loss suffered by the company is the loss of the lease and the profit which    B
> would have been obtained from harvesting the potato crop. That loss is
> reflected in the diminution in the value of Mr and Mrs Christensen's
> shares. They can no longer realise their shares at the value they enjoyed
> prior to the alleged default of their accountants and solicitors."

I cannot accept this reasoning as representing the position in English law. It
is of course correct that the diminution in the value of the plaintiffs' shares
was by definition a personal loss and not the company's loss, but that is not    C
the point. The point is that it merely reflected the diminution of the
company's assets. The test is not whether the company could have made a
claim in respect of the loss in question; the question is whether, treating the
company and the shareholder as one for this purpose, the shareholder's loss
is franked by that of the company. If so, such reflected loss is recoverable by
the company and not by the shareholders.

Thomas J acknowledged that double recovery could not be permitted, but    D
thought that the problem did not arise where the company had settled its
claim. He considered that it would be sufficient to make an allowance for
the amount paid to the liquidator. With respect, I cannot accept this either.
As Hobhouse LJ observed in *Gerber Garment Technology Inc v Lectra
Systems Ltd* [1997] RPC 443, 471, if the company chooses not to exercise its
remedy, the loss to the shareholder is caused by the company's decision not    E
to pursue its remedy and not by the defendant's wrongdoing. By a parity of
reasoning, the same applies if the company settles for less than it might have
done. Shareholders (and creditors) who are aggrieved by the liquidator's
proposals are not without a remedy; they can have recourse to the
Companies Court, or sue the liquidator for negligence.

But there is more to it than causation. The disallowance of the    F
shareholder's claim in respect of reflective loss is driven by policy
considerations. In my opinion, these preclude the shareholder from going
behind the settlement of the company's claim. If he were allowed to do so
then, if the company's action were brought by its directors, they would be
placed in a position where their interest conflicted with their duty; while if it
were brought by the liquidator, it would make it difficult for him to settle the
action and would effectively take the conduct of the litigation out of his    G
hands. The present case is a fortiori; Mr Johnson cannot be permitted to
challenge in one capacity the adequacy of the terms he agreed in another.

Reflective loss extends beyond the diminution of the value of the shares; it
extends to the loss of dividends (specifically mentioned in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204) and all
other payments which the shareholder might have obtained from the
company if it had not been deprived of its funds. All transactions or putative    H
transactions between the company and its shareholders must be disregarded.
Payment to the one diminishes the assets of the other. In economic terms, the
shareholder has two pockets, and cannot hold the defendant liable for his
inability to transfer money from one pocket to the other. In principle, the

A  company and the shareholder cannot together recover more than the shareholder would have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

B    The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim lies against the company, and the existence of the liability does not increase

C  the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

    On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed

D  to exercise the company's option in a manner which would be incontestable. Even if this constituted a breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise

E  money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

    There is a subsidiary complaint, that the firm represented both to the

F  company and to Mr Johnson personally that the Chancery proceedings were certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

G    Lord Bingham has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the

H  company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not

reflective loss, for the loss (or strictly the net loss) is one which the company    A
could not have sustained itself.  Had Mr Johnson carried on business in his
own name instead of through the medium of the company, then (subject only
to the question of remoteness) he would have been entitled to recover a sum
representing the lost increase in the value of his pension after giving credit
for the amount saved in respect of the contributions and interest. Such loss is
separate and distinct from the loss suffered by the company, and while    B
Mr Johnson's claim to recover it faces obvious difficulties it should not be
struck out at this stage.  But if he does establish his claim, he will have to give
credit for the contributions which would have been required, whether by the
company (reflective loss) or by himself (which he has saved), together with
interest thereon.

For the reasons given by Lord Bingham, I too would strike out
Mr Johnson's claims to damages for mental distress and anxiety and    C
aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of
the Court of Appeal in the manner proposed.

*Appeal allowed.*    D
*Cross-appeal dismissed save that*
*paragraphs 8 (except last sentence),*
*10 and 13 of schedule of loss served*
*pursuant to order of 16 October*
*1998 and paragraph 24 of re-*
*amended statement of claim of 31*
*March 1994 be struck out.*    E
*Defendants to pay plaintiff's costs in*
*House of Lords and below, to*
*include costs of appeal and cross-*
*appeal.*

*Solicitors: Shoosmiths, Fareham; Beachcroft Wansbroughs.*    F

M G

G

H