UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

NAVIGATOR CAPITAL PARTNERS, L.P., on behalf
of itself and all others similarly situated,

                    Plaintiff,

                - against -

BEAR STEARNS ASSET MANAGEMENT INC., *et
al.*,

                    Defendants,

                - and -

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES, L.P.,

                  Nominal Defendant.

———————————————————————— x

[Captions Continued on Next Page]

———————————————————————— x

No. 07 Civ. 7783 (AKH)

THE BEAR STEARNS DEFENDANTS' CONSOLIDATED
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS THE COMPLAINTS IN *NAVIGATOR*, *FIC* AND *VARGA*

```
────────────────────────────────────  x
FIC, L.P., individually, and on behalf of all others    :
similarly situated,
                                                        :

                Plaintiff,                              :

              - against -                               :

                                                        :
BEAR STEARNS ASSET MANAGEMENT INC., et
al.,                                                    :      No. 07 Civ. 11633 (AKH)

                Defendants,                             :

              - and -                                   :

                                                        :
BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES ENHANCED LEVERAGE,                    :
L.P.,
                                                        :

            Nominal Defendant.                          :
────────────────────────────────────  x
GEOFFREY VARGA and WILLIAM CLEGHORN, as                 :
Joint Voluntary Liquidators of Bear Stearns High-Grade
Structured Credit Strategies (Overseas) Ltd. and Bear   :
Stearns High-Grade Structured Credit Strategies
Enhanced Leverage (Overseas) Ltd., and as assignees of  :
shares in Bear Stearns High-Grade Structured Credit
Strategies Enhanced Leverage (Overseas) Ltd., et al.,   :

                Plaintiffs,                             :

              - against -                               :      No. 08 Civ. 3397 (AKH)

THE BEAR STEARNS COMPANIES INC., et al.,                :

                Defendants,                             :

              - and -                                   :

                                                        :
BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES, L.P., et al.,                        :

                                                        :
            Nominal Defendants.
────────────────────────────────────  x
```

Table of Contents

Page

Table of Authorities ................................................................................................... iv

Preliminary Statement ................................................................................................. 1

Factual Background ..................................................................................................... 5

The Pending Litigation ............................................................................................. 12

Summary of the Argument ....................................................................................... 19

Argument ................................................................................................................... 21

I.      PLAINTIFFS' FAILURE TO MAKE PRE-SUIT DEMAND BARS THE
        DERIVATIVE CLAIMS IN FIC, NAVIGATOR AND VARGA ................... 21

        A.      FIC Offers No Demand Futility Allegations as to the Relevant Fiduciaries ........ 24

        B.      Essex and Stillwater Fail Sufficiently to Plead Demand Futility as to
                Messrs. Heis and Milsom ......................................................................... 25

                1.      Allegations of Conduct by Ms. Beighton, Mr. Whicker and KPMG
                        Cayman Cannot Establish Demand Futility .................................. 26

                2.      Allegations Concerning the Supposed Business Relationship
                        Between KPMG and BSAM Cannot Excuse Demand ................ 27

                3.      KPMG's Alleged "Potential" Liability Cannot Establish Demand
                        Futility ........................................................................................ 28

                4.      Mr. Heis' and Mr. Milsom's Alleged Failure to Act Cannot Excuse
                        Demand ....................................................................................... 29

        C.      Navigator Fails to Allege Demand Futility ............................................. 30

II.     THE COMMON LAW FRAUD CLAIMS IN NAVIGATOR AND
        VARGA FAIL AS A MATTER OF LAW ...................................................... 32

        A.      The Common Law Fraud Claim in Varga Is Legally Insufficient ......... 32

        B.      Navigator's Class Claim for Common Law Fraud Fails ........................ 34

                1.      The Inability to Plead or Prove Class-Wide Reliance Warrants
                        Dismissal at this Juncture .......................................................... 34

                2.      Navigator is Asserting a Non-Cognizable Holder Claim ........... 35

Table of Contents (Cont'd)

Page

III.   PLAINTIFFS IN NAVIGATOR AND VARGA HAVE NOT PLEADED
       VIABLE CLAIMS FOR AIDING AND ABETTING COMMON LAW
       FRAUD .......................................................................................................... 36

       A.   Plaintiffs' Aiding and Abetting Claims Fail in the Absence of a Sufficient
            Underlying Fraud Claim ...................................................................... 36

       B.   Plaintiffs Have Not Sufficiently Alleged that Defendants Had Actual
            Knowledge of the Alleged Fraud .......................................................... 37

            1.   The Varga Plaintiffs Do Not Allege Actual Knowledge ........................ 37

            2.   Navigator Does Not Allege Actual Knowledge ........................................ 38

IV.    THE COURT SHOULD DISMISS PLAINTIFFS' BREACH OF
       FIDUCIARY DUTY CLAIMS ............................................................................ 39

       A.   The Class Claims Asserted By FIC (Count II) and Navigator (Count I)
            Should Be Dismissed Because Mismanagement and Self-Dealing Claims
            are Derivative in Nature ........................................................................ 40

       B.   The Exculpatory Clauses in the Governing Fund Documents Bar the
            Breach of Fiduciary Duty Claims Against the Director Defendants in
            Navigator and the Director Defendants and Buxton in Varga .............................. 43

            1.   Breach of Fiduciary Duty Claims Relating to the Domestic Funds
                 are Barred by Exculpation Clauses in the LPAs ...................................... 43

            2.   Breach of Fiduciary Duty Claims Relating to the Overseas Funds
                 are Barred by Exculpation Clauses in the Articles of Association .......... 46

       C.   The Varga Complaint Fails to State a Breach of Fiduciary Duty Claim
            Against BSC and Mr. Buxton Because They Were Not Fiduciaries to the
            Funds ..................................................................................................... 48

       D.   The Martin Act Bars the Claim for Breach of Fiduciary Duty by the
            Liquidators in its Entirety and by Stillwater, Essex and Navigator as
            Against the Bear Stearns Director Defendants ...................................... 49

V.     THE CLAIMS FOR AIDING AND ABETTING BREACH OF
       FIDUCIARY DUTY SHOULD BE DISMISSED ............................................ 51

       A.   The Aiding and Abetting Claims Cannot Proceed Absent Viable
            Underlying Breach of Fiduciary Duty Claims ...................................... 51

Table of Contents (Cont'd)

Page

B.    Plaintiffs Have Not Alleged "Knowing Participation"...........................................52

1.    Navigator Does Not Allege "Knowing Participation"...............................52

2.    FIC Does Not Allege "Knowing Participation"........................................53

3.    The Varga Plaintiffs Do Not Allege "Knowing Participation" ................54

VI.    THE NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS FAIL............................54

VII.    THE BREACH OF CONTRACT CLAIMS IN  VARGA AND FIC
SHOULD BE DISMISSED .................................................................................56

VIII.    THE COURT SHOULD DISMISS THE UNJUST ENRICHMENT
CLAIM IN VARGA ...........................................................................................57

IX.    THE FEDERAL SECURITIES FRAUD CLAIMS IN VARGA ARE
LEGALLY INSUFFICIENT ................................................................................58

A.    Plaintiffs' Claims Pursuant to Section 10(b) of the Exchange Act Fail ...............59

1.    Plaintiffs Lack Standing to Assert Securities Fraud Claims....................59

2.    The Amended Complaint Fails to Plead with Particularity Any
Allegedly False Statements or Omissions by BSC, BS&Co. or
Messrs. Cohen, Cummins, Guarasci, Quental or Sandelovsky.................61

3.    The Amended Complaint Fails to Allege with  Particularity that
BSC, BS&Co., or the Individual Bear Stearns Defendants Acted
with Scienter ............................................................................................63

B.    Plaintiffs' Section 20(a) Claim Against BSC, BS&Co., and the Individual
Bear Stearns Defendants Fails ..............................................................................71

Conclusion .....................................................................................................................73

Table of Authorities

Page

## CASES

*484 Assocs., L.P. v. Moy*,
   No. 06 Civ. 2290 (PAC), 2007 WL 683999 (S.D.N.Y. Mar. 5, 2007).................................36

*Adkins v. General Motors Corp.*,
   170 Fed. App'x 184 (2d Cir. 2006) ....................................................................................42

*In re AHT Corp.*,
   292 B.R. 734 (S.D.N.Y. 2003) ...........................................................................................36

*In re AIG Advisor Group Sec. Litig.*,
   No. 06 CV 1625, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007)....................................59, 61

*Agostino v. Hicks*,
   No. Civ.A. 20020-NC, 2004 WL 443987 (Del. Ch. Mar. 22, 2004).......................40, 42 n.15

*Albert v. Alex. Brown Mgmt. Servs.*,
   No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ..........42 n15

*Allison v. General Motors Corp.*,
   604 F. Supp. 1106 (Del.), *aff'd.*,
   782 F.2d 1026 (3d Cir. 1985) .............................................................................................30

*Anderson v. Airco, Inc.*,
   No. Civ. A. 02C-12-091HDR, 2004 WL 2827887 (Del. Super. Nov. 30, 2004) ..................36

*Anderson v. Wachovia Mortgage Corp.*,
   497 F. Supp. 2d 572 (D. Del. 2007)....................................................................................56

*Anglo American Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*,
   829 A.2d 143 (Del. Ch. 2003) .....................................................................................42 n.14

*Arnlund v. Deloitte & Touche LLP*,
   199 F. Supp. 2d 461 (E.D. Va. 2002) ..................................................................................36

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ...............................................................................22, 28, 29

*AstroPower Liquidating Trust v. KPMG LLP*,
   Civ. A. No. 06-469-JJF, 2007 WL 1549048 (D. Del. May 25, 2007)...........................45 n.16

Table of Authorities (Cont'd)

Page

*Bakerman v. Sidney Frank Importing Co., Inc.,*
   No. Civ.A. 1844-N, 2006 WL 3927242 (Del. Ch. Oct. 16, 2006) ........................................57

*Barr v. McGraw-Hill, Inc.,*
   710 F. Supp. 95 (S.D.N.Y. 1989) ...............................................................59

*Beam ex rel. Martha Stewart Living Omnimedia Inc. v. Stewart,*
   845 A.2d 1040 (Del. 2004) ...................................................................26, 27, 28

*Benihana of Tokyo, Inc. v. Benihana, Inc.,*
   891 A.2d 150 (Del. Ch. 2005) ................................................................42

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,*
   448 F.3d 573 (2d Cir. 2006) .................................................................57

*Bilstein v. Atwater,*
   222 A.D.2d 545, 635 N.Y.S.2d 88 (2d Dep't 1995) .............................................47

*Blasband v. Rales,*
   971 F.2d 1034 (3d Cir. 1992) ...............................................................24, 30

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,*
   754 F.2d 57 (2d Cir. 1985) ..................................................................33

*Boguslavsky v. Kaplan,*
   159 F.3d 715 (2d Cir. 1998) .................................................................72

*Brass v. American Film Techs., Inc.,*
   987 F.2d 142 (2d Cir. 1993) .................................................................5 n.2

*In re Bristol Myers  Squibb Derivative Litig.,*
   No. 02-Civ. 8571 (LAP), 2007 WL 959081 (S.D.N.Y. Mar. 30, 2007)................................29

*Browne v. Robb,*
   583 A.2d 949 (Del. 1990), *cert. denied,*
   499 U.S. 952 (1991)..........................................................................45 n.16

*Bullmore v. Ernst & Young Cayman Islands,*
   45 A.D.3d 461, 846 N.Y.S.2d 145 (1st Dep't 2007) ...........................................52

*Cantor Fitzgerald, L.P. v. Cantor,*
   724 A.2d 571 (Del. Ch. 1998) ...............................................................57

Table of Authorities (Cont'd)

Page

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ................................................................................50

*Chanoff v. United States Surgical Corp.*,
    857 F. Supp. 1011 (D. Conn. 1994), *aff'd.*,
    31 F.3d 66 (2d Cir. 1994) ....................................................................................35

*Chase Manhattan Mortgage Corp. v. Advanta Corp.*,
    No. Civ.A. 01-507 (KAJ), 2004 WL 422681 (D. Del. Mar. 4, 2004) ..................34

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
    490 F. Supp. 2d 536 (S.D.N.Y. 2007) .................................................................37

*In re Comverse Tech., Inc. Sec. Litig.*,
    No. 06-CV-1825 (NGG)(RER), 2008 WL 2795927 (E.D.N.Y. July 18, 2008)...............72, 73

*CPC Int'l Inc. v. McKesson Corp.*,
    70 N.Y.2d 268, (N.Y. 1987) ................................................................................50

*Crocker v. Federal Deposit Ins. Corp.*,
    826 F.2d 347 (5th Cir. 1987) ...............................................................................36

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) .................................................................72

*Curto v. Bender*,
    No. 05-2339-cv, 2007 WL 2348723 (2d Cir. Aug. 14, 2007) .........................5 n.2

*David B. Shaev Profit Sharing Account v. Armstrong*,
    No. Civ.A. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd.*,
    911 A.2d 802 (Del. 2006) .................................................................................23 n.9

*Debussy LLC v. Deutsche Bank AG*,
    242 Fed. App'x 735, 736 (2d Cir. 2007) ..............................................................41

*In re Deutsche Telekom AG Sec. Litig.*,
    No. 00 CIV 9475 SHS, 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..................71

*DiVittorio v. Equidyne Exractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987) ..............................................................................61

*Dietrich v. Bauer*,
    126 F. Supp. 2d 759 (S.D.N.Y. 2001) .................................................................72

Table of Authorities (Cont'd)

Page

*Dresner v. Utility.com, Inc.*,
371 F. Supp. 2d 476 (S.D.N.Y. 2005) ...............................................................63

*In re Evergreen Mut. Funds Fee Litig.*,
423 F. Supp. 2d 249 (S.D.N.Y. 2006) ...................................................27, 42 n.15

*FS Parallel Fund L.P. v. Ergen*,
No. 19853, 2004 WL 3048751 (Del. Ch. Nov. 3, 2004), *aff'd.*,
879 A.2d 602 (Del. 2005) ................................................................................33

*Felton v. Walston & Co., Inc.*,
508 F.2d 577 (2d Cir. 1974) ..........................................................................60

*Fisk Ventures, LLC v. Segal*,
Civ. No. 3017-CC, 2008 WL 1961156 (Del. Ch. May 7, 2008) ...........................45

*In re Forest Labs, Inc. Derivative Litig.*,
450 F. Supp. 2d 379 (S.D.N.Y. 2006) .............................................................29

*Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*,
CA. No. 1091-VCL, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007) .........................23

*Gaffin v. Teledyne, Inc.*,
611 A.2d 467 (Del. 1992) ...............................................................................34

*Gates v. BEA Assocs., Inc.*,
No. 88 Civ. 6522 (JSM), 1990 WL 180137 (S.D.N.Y. Nov. 13, 1990)................42

*In re General Motors (Hughes) Shareholder Litig.*,
No. Civ.A. 20269, 2005 WL 1089021 (Del. Ch. May 4, 2005), *aff'd.*,
897 A.2d 162 (Del. Mar. 20, 2006) ................................................................52

*Glatzer v. Grossman*,
47 A.D.3d 676, 849 N.Y.S.2d 300 (2d Dep't 2008)...........................................47

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
Civ. A. No. 1577-VCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) ............46, 51

*Goldman v. Metropolitan Life Ins. Co.*,
5 N.Y.3d 561 (2005).......................................................................................57

Table of Authorities (Cont'd)

Page

*In re Goldman Sachs Mutual Funds*,
No. 04 Civ. 2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006).........................42 n.15

*Grace v. Rosenstock*,
228 F.3d 40 (2d Cir. 2000), *cert. denied*,
532 U.S. 923 (2001)........................................................................................................59

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998) ..............................................................................63

*Griffin Corp. Servs., LLC v. Jacobs*,
No. Civ.A. 396-N, 2005 WL 2000775 (Del. Ch. Aug. 11, 2005) ...................................56

*Highland Legacy Ltd. v. Singer*,
No. Civ.A. 1566-N, 2006 WL 741939 (Del. Ch. Mar. 17, 2006)....................................28

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995) ....................................................................................32-33

*In re IAC/InterActiveCorp Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007) ..........................................................22 n.8, 23, 26, 27

*J. Royal Parker Assocs., Inc. v. Parco Brown & Root, Inc.*,
No. 7013, 1984 WL 8255 (Del. Ch. Nov. 30, 1984) ......................................................48

*Jacobs v. Coopers & Lybrand, L.L.P.*,
No. 97 Civ. 3374 (RPP), 1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ............................66

*Johnson v. Gore Wood & Co.*,
[2002] 2 AC 1, 2000 WL 1791527 .............................................................................46 n.17

*Kagan v. Edison Bros. Stores, Inc.*,
907 F.2d 690 (7th Cir. 1990) .........................................................................................36

*Kalin v. Xanboo, Inc.*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007) ............................................................................62

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ..............................................................................63, 67, 71

*Kassover v. Prism Venture Partners, LLC*,
Nos. 3538, 3539 60264/05, 2008 WL 2796565 (N.Y.A.D. 1st Dep't July 22, 2008) ............51

Table of Authorities (Cont'd)

Page

*Katell v. Morgan Stanley  Group, Inc.*,
   Civ.A No. 12343, 1993 WL 10871 (Del. Ch. Jan. 14, 1993) .................................24

*Kaufman v. Cohen*,
   307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) ..........................................52

*Kenney v. Koenig*,
   426 F. Supp. 2d 1175 (D. Colo. 2006)...................................................................23

*Khanna v. McMinn*,
   No. Civ.A. 20545-NC, 2006 WL 1388744 (Del. Ch. May 9, 2006) ...............................23 n.9

*Kolbeck v. LIT Am., Inc.*,
   939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd.*,
   152 F.3d 918 (2d Cir. 1998) .................................................................................38

*Kramer v. Western Pacific Indus., Inc.*,
   546 A.2d 348 (Del. 1988) ..............................................................................42 n.15

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) .................................................................................37

*Leslie v. Telephonics Office Technologies, Inc.*,
   1993 WL 547188 (Del. Ch. Dec. 30, 1993).........................................................42

*Lewis v. Fites*,
   Civ.A. No. 12566, 1993 WL 47842 (Del. Ch. Feb. 19, 1993) ..............................30

*Lipton v. Unumprovident Corp.*,
   10 A.D.3d 703, 783 N.Y.S.2d 601 (2d Dep't 2004)............................................49

*Litman v. Prudential-Bache Props., Inc.*,
   611 A.2d 12 (Del. Ch. 1992) ..............................................................41, 41 n.14

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...........................................................72, 73

*Loveman v. Lauder*,
   484 F. Supp. 2d 259 (S.D.N.Y. 2007) ...........................................................23 n.9

*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001) ...........................................................................44, 45

Table of Authorities (Cont'd)

Page

*Manzo v. Rite Aid Corp.*,
    No. Civ. A. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ........................... 34-35

*Martinez v. Vakko Holding A.S.*,
    No. 07 Civ. 3413(LAP), 2008 WL 2876529 (S.D.N.Y. July 23, 2008) ...............................56

*Matsumura v. Benihana Nat'l Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008) ..................................................................55

*Mazzaro de Abreu v. Bank of Am. Corp.*,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007) ..................................................................38

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    Nos. 02 Civ. 8472, 2008 WL 2594819 (S.D.N.Y. June 26, 2008) ........................................55

*Midland Grange No. 27 Patrons of Husbandry v. Walls*,
    C.A. No. 2155-VCN, 2008 WL 616239 (Del. Ch. Feb. 28, 2008)................................45 n.16

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) .............................................................................63

*Morin v. Trupin*,
    747 F. Supp. 1051 (S.D.N.Y. 1990) ....................................................................59

*Morse v. Weingarten*,
    777 F. Supp. 312 (S.D.N.Y. 1991) ................................................................ 33-34

*Nanopierce Technologies, Inc. v. Southridge Capital Mgmt. LLC*,
    No. 02 Civ. 0767, 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003)........................................50

*In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*,
    No. Civ.A., 17379 NC, 2002 WL 31926614 (Del. Ch. Dec. 16, 2002) ................................44

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000), *cert. denied*,
    531 U.S. 1012 (2000)....................................................................................65

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
    85 F. Supp. 2d 282 (S.D.N.Y. 2000), *aff'd*,
    2001 WL 46565 (2d Cir. Jan. 18, 2001) ................................................................60

*Oliver v. Boston Univ.*,
    No. 16570, 2000 WL 1091480 (Del. Ch. July 25, 2000) .....................................................35

Table of Authorities (Cont'd)

Page

*Ouaknine v. MacFarlane*,
    897 F.2d 75 (2d Cir. 1990) ....................................................................62

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .....................................................................31

*Postorivo v. AG Paintball Holdings, Inc.*,
    Civil Action Nos. 2991-VCP, 3111-VCP, 2008 WL 553205 (Del. Ch. Feb. 29, 2008) ........27

*Pro Bono Investments, Inc. v. Gerry*,
    No. 03 Civ. 4347 (JGK), 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005).......................50, 54

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ....................................................................24

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000) ..................................................5 n.2

*Ray v. Deloitte & Touche, L.L.P.*,
    No. 05 CVS 15862, 2006 WL 1064503 (N.C. Super. Ct. Apr. 21, 2006)...........................25

*Reddington v. Staten Island Univ. Hosp.*,
    511 F.3d 126 (2d Cir. 2007) ..............................................................5 n.2

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
    No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007) ..............................61

*In re Rexene Corp. Shareholders Litig.*,
    Civ. A. Nos. 10, 897, 11, 300, 1991 WL 77529 (Del. Ch. May 8, 1991)..............................42

*Rich v. Maidstone Fin., Inc.*,
    2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002) ....................................................33

*Richardson v. Graves*,
    C.A. No. 6617, 1983 WL 21109 (Del. Ch. June 17, 1983) ....................................30

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ..............................................................5 n.2

Table of Authorities (Cont'd)

Page

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996), *cert. denied*,
    522 U.S. 812 (1997)...................................................................................72

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ......................................................................65

*In re Santa Fe Pacific Corp. Shareholder Litig.*,
    669 A.2d 59 (Del. 1995) ...........................................................................52

*Segal v. Gordon*,
    467 F.2d 602 (2d Cir. 1972) .....................................................................60

*Seminaris v. Landa*,
    662 A.2d 1350 (Del. Ch. 1995) ...........................................................31 n.11

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .....................................................................71

*Sit-Set, A.G. v. Universal Jet Exch., Inc.*,
    747 F.2d 921 (4th Cir. 1984) ....................................................................36

*SNS Bank, N.V. v. Citibank, N.A.*,
    7 A.D.3d 352, 777 N.Y.S.2d 62 (1st Dep't 2004) ...................................48

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...........62, 66, 70, 73

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990) .........................................................................22

*Stiegele ex rel Viisage Technology, Inc. v. Bailey*,
    No. 05-10677, 2007 WL 4197496 (D. Mass. Aug. 23, 2007) ..................26

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) .....................................................................45 n.16

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ..................................................................62, 73

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) .....................................................................67

Table of Authorities (Cont'd)

Page

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007)...................................................................................... 64, 69, 70-71

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ..........................................................................................40, 41

*Trenwick America Litig. Trust v. Ernst & Young, LLP*,
  906 A.2d 168 (Del. Ch. 2006), *aff'd.*, *Trenwick America Litig. Trust v. Billet*,
  No. 495, 2006, 2007 WL 2317768 (Del. Aug. 14, 2007)........................................45

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
  901 A.2d 106 (Del. 2006) ..............................................................................................56

*White v. Panic*,
  783 A.2d 543 (Del. 2001) ..............................................................................................22

*In re WorldCom, Inc. Sec. Litig.*,
  336 F. Supp. 2d 310 (S.D.N.Y. 2004) .......................................................................36

*In re Xethanol Corp. Deriv. Litig.*,
  No. 06 Civ. 15536 (HB), 2007 WL 2331975 (S.D.N.Y. Aug. 16, 2007)........................23 n.9

## STATUTES & RULES

15 U.S.C. § 78u-4(b)(1)(B)...........................................................................59, 61, 63, 67, 71

Fed. R. Civ. P. 9(b) ................................................1, 16, 21, 37, 38, 39, 55, 58, 59, 61, 63, 67, 71

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 23

Fed. R. Civ. P. 23.1 ...........................................................................1, 19, 22, 24, 26, 39

Del. Code tit. 6, § 17-803...........................................................................................24

Del. Code tit. 6, § 17-1003......................................................................................19, 23, 24

Del. Code tit. 6, § 17-1101(f).....................................................................................44

N.Y. Gen. Bus. Law art. 23-A .................................................................................50

17 CFR 240.10b-5.......................................................................................................59

<u>Table of Authorities (Cont'd)</u>

<u>Page</u>

**ARTICLE**

Vance Cariaga, *Brokerages Face Perfect Storm of Subprime and Buyout Woes*, Inv. Bus.
Daily, Aug. 10, 2007, at A01 ................................................................................2

Defendants The Bear Stearns Companies LLC (f/k/a The Bear Stearns Companies Inc.) ("BSC"), Bear Stearns Asset Management Inc. ("BSAM"), JPMorgan Securities Inc. (f/k/a Bear, Stearns & Co. Inc.) ("BS&Co."), JPMorgan Clearing Corp. (f/k/a Bear, Stearns Securities Corp.) ("BSSC"), George Buxton, Barry Cohen, Gerald Cummins, Michael Guarasci, Greg Quental and David Sandelovsky (together, the "Bear Stearns Defendants") respectfully submit this consolidated Memorandum of Law, and the accompanying Declaration of Marjorie E. Sheldon ("Sheldon Decl."), in support of their motion to dismiss the amended complaints ("AC") in *FIC, L.P. v. Bear Stearns Asset Management Inc., et al.*, No. 07 Civ. 7783 ("*FIC*"), *Navigator Capital Partners, L.P. v. Bear Stearns Asset Management Inc., et al.*, No. 07 Civ. 11633 ("*Navigator*") and *Varga v. The Bear Stearns Companies Inc., et al.*, No. 08 Civ. 3397 ("*Varga*"), pursuant to Fed. R. Civ. P. 9(b), 12(b)(6) and 23.1 and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## Preliminary Statement

Plaintiffs in these overlapping actions seek to blame the Bear Stearns Defendants and others for losses that four hedge funds suffered as a result of the unforeseen and unforeseeable dislocation in the credit markets that began during the spring of 2007 and is still evolving to this day.  The funds in question -- Bear Stearns High-Grade Structured Credit Strategies, L.P., Bear Stearns High-Grade Structured Credit Strategies (Overseas), Ltd., Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage, L.P. and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas), Ltd. -- all described themselves in offering materials as "speculative," and warned investors of "a substantial risk of loss, including the possibility of the total loss of an investment therein."  Moreover, the funds all explicitly stated that their strategies would focus on investing in complex structured finance

products, including collateralized debt obligations ("CDOs"), collateralized mortgage obligations ("CMOs") and asset-backed securities ("ABS").

Offering materials for the four funds explicitly disclosed extensive details concerning the risks involved in their investment strategies.  Among other things, all four funds stated that:

- There might not be a liquid market for the CDOs, CMOs and ABS in which they intended to invest;

- They each anticipated investing up to 40 percent of their net asset value in securities referred to as "Repackaging Vehicle Junior Interests," which would generally not be secured and would not be investment grade;

- While they would seek to hedge against all of the risks associated with their investment strategies, any hedging efforts might fail, and the funds would always be exposed to risks that *could not be hedged at all*; and

- They would borrow significant amounts of money from third parties -- also known as using "leverage" -- which would magnify the impact of any event that adversely affected the value of their investments.

Each investor in each fund executed a subscription agreement in which it acknowledged and accepted these and many other risks.

The very risks that the funds disclosed came to pass when "the credit market began contracting in late 2006 and early 2007," and when "between December 31, 2006 and April 24, 2007" the subprime housing market "was in sharp decline."  (*FIC* AC ¶ 89; *Varga* AC ¶ 332).  Ultimately, that contraction evolved into an unprecedented market dislocation, likened in the media to a "perfect storm."  *See*, *e.g.*, Vance Cariaga, *Brokerages Face Perfect Storm of Subprime and Buyout Woes*, Investor's Bus. Daily, Aug. 10, 2007, at A01.  The "perfect storm" caused tremendous volatility in the market for structured finance securities, including the CDOs in which the funds invested heavily.  As a result, those securities became harder to value and trade, and their prices declined well below what they would have been in a more rational market.

Investor redemption requests and margin calls forced the funds to sell their securities at the worst possible moment, when they were extremely illiquid and dropping in price.  As a result, by the end of June 2007, heavy losses forced the funds to close.

The impact of the credit market contraction was not limited to the hedge funds at issue in this case.  Many sophisticated institutions -- including investment banks, lenders and competing hedge funds -- suffered, and continue to suffer, as a result of this unforeseen market phenomenon.  Multi-billion dollar write-offs became commonplace, and heavy losses forced some institutions to close or file bankruptcy petitions.  Tremendous volatility and vanishing liquidity inflicted losses on virtually anyone who had invested in structured finance products.

Against that backdrop, the opportunistic nature of the litigation now before the Court is clear.  Although the amended complaints in these cases are lengthy -- totaling more than 400 pages and 1,200 paragraphs -- their basic theory is quite simple.  Plaintiffs assert that the funds' demise, and the attendant losses, resulted from supposed mismanagement, self-dealing and fraud, rather than from an unprecedented market dislocation.  (*Varga* AC ¶ 1; *FIC* AC ¶ 99; *Navigator* AC ¶ 1).  The amended complaint in *Varga* goes even further, suggesting that the funds were designed with the knowledge and intent that they would fail.  (*Varga* AC ¶¶ 5-6).  But plaintiffs premise virtually all of their theories on hindsight assertions that, in light of the events that ultimately transpired, the Bear Stearns Defendants "must have known" that the strategies they pursued would result in losses, or that statements they made were inaccurate.

As we demonstrate below, the *Navigator*, *FIC* and *Varga* amended complaints suffer from defects that compel dismissal as to the Bear Stearns Defendants.  That is particularly so with regard to Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky, who are named as defendants in *Navigator* and *Varga*.  Plaintiffs in those actions do little more than

identify those individuals as employees of BSAM or BS&Co. and, in some instances, directors of certain of the hedge funds.  Apart from the paucity of particularized, relevant factual allegations as to the individual Bear Stearns Defendants, the claims asserted in these cases against all the Bear Stearns Defendants cannot proceed for a host of other reasons, including failure to adequately plead demand futility, lack of standing, exculpation pursuant to the funds' governing documents and (with respect to the fraud claims in *Navigator* and *Varga*) absence of sufficient *scienter* allegations.

We respectfully submit that the various pleading defects in *FIC* and *Varga* compel dismissal of those actions in their entirety as against the Bear Stearns Defendants. Similarly, the Court should dismiss all of the claims asserted in *Navigator*, with the exception of two limited claims (one for breach of contract and one for breach of fiduciary duty solely to the extent it is based on misrepresentations or omissions) against BSAM only.  Instead of twenty-three claims by five plaintiffs in three actions against ten Bear Stearns Defendants involving four different feeder funds, all that would remain are two claims by one plaintiff in a single action against just one defendant involving one fund.[1]

---

[1]   For the Court's convenience, we have attached as Annexes A, B and C to this Memorandum of Law charts describing the claims against the Bear Stearns Defendants in *Navigator*, *FIC* and *Varga*, respectively, and the grounds for dismissal of each of those claims.

Factual Background[2]

The Feeder Funds, the Master Funds and
the Bear Stearns Defendants

   Bear Stearns High-Grade Structured Credit Strategies, L.P. (the "Domestic HG Fund"), a Delaware limited partnership, and Bear Stearns High-Grade Structured Credit Strategies (Overseas), Ltd. (the "Overseas HG Fund"), a Cayman Islands company, were formed in 2003 as feeder funds in a "master-feeder" hedge fund structure.  Thus, the Domestic HG Fund and Overseas HG Fund (together, the "HG Feeder Funds") invested substantially all of their assets in Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "HG Master Fund"), another Cayman Islands company.  (*Navigator* AC ¶¶ 4, 69; *Varga* AC ¶ 61; *FIC* AC ¶ 30).

   Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage, L.P. (the "Domestic EL Fund"), a Delaware limited partnership, and Bear Stearns High-Grade

---

[2] Solely for purposes of this motion to dismiss, the Bear Stearns Defendants draw their statement of facts from the Amended Complaints, documents referenced therein (including the offering memoranda, limited partnership agreements and articles of association for the funds), and other matters of which the Court may take judicial notice.  *See*, *e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (court ruling on motion to dismiss may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit"); *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (on motion to dismiss, court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit").  While courts considering motions to dismiss generally accept as true the allegations of the complaint, they do not accord such deference to "bald assertions and conclusions of law."  *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 131 (2d Cir. 2007); *see also*, *e.g.*, *Curto v. Bender*, No. 05-2339-cv, 2007 WL 2348723, at *1 (2d Cir. Aug. 14, 2007) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (*citing Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).  Moreover, to the extent that documents properly before the Court on this motion contradict the allegations in the Amended Complaints, the documents control and the Court need not accept as true plaintiffs' conflicting allegations.  *See*, *e.g.*, *Rapoport v. Asia Elecs. Holding Co.,* 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Structured Credit Strategies Enhanced Leverage (Overseas), Ltd. ("the Overseas EL Fund"), a Cayman Islands company, were formed in 2006 as the feeder funds in a separate "master-feeder" hedge fund structure.  The master fund in that structure was Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "EL Master Fund"), a Cayman Islands company.  Unlike the HG Feeder Funds, the Domestic EL Fund and the Overseas EL Fund (together, the "EL Feeder Funds") did not invest their assets directly in the master fund with which they were associated.  Rather, the EL Feeder Funds invested substantially all of their assets in a total return swap (the "Leverage Instrument") under which they received a multiple of the returns -- gains or losses -- that the EL Master Fund generated.  (*FIC* AC ¶¶ 3, 32, 34-37).

The HG Master Fund and the EL Master Fund (together, the "Master Funds") employed similar investment strategies.  Both stated that they would buy, sell and hold, and trade "on margin or otherwise," various types of securities, specifically including "mortgage-backed and asset-backed securities, collateralized debt obligations and other structured finance securities."  (Exh. I at 7; Exh. J at 9; Exh. G at 11; Exh. H at 14).[3]  As their names suggest, the principal difference between the two Master Funds was the degree of leverage each employed.  Specifically, because the EL Master Fund structure included the Leverage Instrument, investors in the EL Feeder Funds were exposed to leverage up to 2.5 times greater than the leverage employed by the HG Master Fund and its feeders.  (*FIC* AC ¶¶ 34-35; Exh. F at 14-15, 17-17).

BSAM was the general partner of the Domestic HG Fund and the Domestic EL Fund (together, the "Domestic Funds"), pursuant to limited partnership agreements ("LPAs"). (Exhs. E, F).  BSAM also served as investment manager to the Overseas HG Fund and the Overseas EL Fund (together, the "Overseas Funds"), as well as the Master Funds, pursuant to

---

[3]   "Exh. __" refers to the exhibits appended to the Sheldon Decl.

investment management agreements ("IMAs").  (Exhs. K, L).  As compensation for its services to the funds, BSAM received (a) a two percent advisory fee, and (b) 20 percent of the funds' net income (whether realized or unrealized), subject to a "high water mark."  (*Varga* AC ¶ 164; *Navigator* AC ¶¶ 142-43; *FIC* AC ¶ 54).[4]  BSSC provided prime brokerage and custodial services to the Master Funds, and BS&Co. acted as a placement agent for the feeder funds.  (*Varga* AC ¶¶ 34-37; *Navigator* AC ¶¶ 35-38; *FIC* AC ¶¶ 22-23).

Defendants Ralph Cioffi, Matthew Tannin and Raymond McGarrigal were senior managing directors of BSAM and the portfolio managers of the Master Funds.  Barry Cohen, Gerald Cummins, Greg Quental, Michael Guarasci and David Sandelovsky (the "Director Defendants") -- named as defendants in *Navigator* and *Varga* only -- all were executives of BSAM or its subsidiaries, and served at various times as directors of the Overseas Funds and the Master Funds.  George Buxton, a defendant in *Varga* only, was a managing director and registered representative at BS&Co during the relevant time period.[5]  (*Navigator* AC ¶¶ 30-32, 45-48; *Varga* AC ¶¶ 38-47).

---

[4]   Under the "high water mark" arrangement, BSAM was entitled to share only in net income that exceeded any losses that the funds' limited partners or shareholders may have previously suffered on their investments.  (*See* Exh. E at 6; Exh. F at 7; Exh. G at 6; Exh. H at 8).

[5]   Although plaintiffs in *Varga* identify Mr. Buxton as a "senior managing director" of BS&Co., he did not receive that title until after the events at issue.  (Varga AC ¶ 41).  Moreover, the *Varga* plaintiffs falsely assert that Mr. Buxton, along with Messrs. Cioffi, Tannin and McGarrigal, was responsible for "the composition and risk management of" the Master Funds and their respective feeder funds.  (*Varga* AC ¶ 42).  This conclusory allegation concerning Mr. Buxton is false.  In fact, Mr. Buxton was not (and is not alleged to have been) employed in any capacity by BSAM, was not a director or portfolio manager for either of the Master Funds or their feeders, and had no discretion or responsibility with respect to the management or composition of any of the funds.  The amended complaint in *Varga* does not contain any particularized factual allegations suggesting otherwise, nor could it.

In June 2007, the Master Funds, and hence their respective feeders, drastically declined in value, to the point where they lacked sufficient liquidity to satisfy margin calls and redemption requests, and BSAM had no choice but to shut down the funds.  (*Varga* AC ¶¶ 237-38; *Navigator* AC ¶¶ 248-49; *FIC* AC ¶¶ 100-04).  The Master Funds went into court-directed liquidation in the Cayman Islands during August 2007.  (*Varga* AC ¶ 56; *FIC* AC ¶ 107).  In October and November 2007, liquidators were appointed for the Domestic Funds and the Overseas Funds.  (*Varga* AC ¶¶ 448, 450; Navigator AC ¶ 353).

The Relevant Provisions of the
Fund Documents

The Domestic Funds offered limited partnership interests, pursuant to private placement memoranda (the "PPMs"), to institutions and individuals who qualified as "accredited investors" under SEC guidelines.  (Exhs. E, F).  The Overseas Funds offered shares to non-U.S. investors pursuant to confidential offering memoranda (the "COMs").  (Exhs. G, H).  The PPMs and COMs advised investors that the Master Funds -- on whose returns the feeder funds depended -- would invest in various types of complex securities, specifically including:

- "equity securities and other securities issued by structured vehicles (such as collateralized debt obligations 'CDOs') that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities (such as CDOs)";

- "other structured finance assets including asset-backed securities ('ABSs'), synthetic ABSs, mortgage-backed securities ('MBSs') and global structured asset securitizations"; and

- "various derivatives, including primarily credit-default swaps, but also options, swaps, swaptions, futures and forward contracts (both listed and over-the-counter) on various financial instruments, equity securities and currencies."

(Exh. E at 1; Exh. F at 1; Exh. G at 11; Exh. H at 14).

The offering memoranda further stated that, with respect to a portion of their portfolios, the Master Funds had "targeted a portfolio rating composition of approximately 90% structured finance securities rated from AAA to AA [or AA-] by Standard & Poor's, from Aaa to Aa2 [or Aa3] by Moody's or from AAA to AA [or AA-] by Fitch." The remaining 10 percent of that portion could, the PPM stated, be invested in securities of any rating. (Exh. E at 14; Exh. F at 16; Exh. G at 14; Exh. H at 19). Finally, the documents noted that the balance of the portfolio could be invested in "equity tranches (or equivalent securities) of Repackaging Vehicles" whose securities, the PPM disclosed, would "generally not be secured or rated [investment grade]." (Exh. E at 11-12; Exh. F at 12-13; Exh. G at 12; Exh. H at 15).[6]

The PPMs and COMs explicitly and prominently warned that investments in the funds were speculative in nature, and involved a high degree of risk. Thus, the first page of the PPMs stated, in bold print:

> INTERESTS ARE SPECULATIVE AND INVOLVE A SUBSTANTIAL RISK OF LOSS, INCLUDING THE POSSIBILITY OF THE TOTAL LOSS OF AN INVESTMENT THEREIN. CONSEQUENTLY, THEY ARE AVAILABLE ONLY TO PERSONS WILLING AND ABLE TO BEAR SUCH RISK. . . . A PROSPECTIVE INVESTOR SHOULD CAREFULLY READ THIS MEMORANDUM TO EVALUATE THE RISKS INVOLVED IN LIGHT OF SUCH INVESTOR'S INVESTMENT OBJECTIVES AND FINANCIAL RESOURCES.

(Exh. E at i; Exh. F at i). Similarly, the first page of the COMs stated:

> PROSPECTIVE INVESTORS SHOULD READ THIS CONFIDENTIAL OFFERING MEMORANDUM . . . CAREFULLY BEFORE DECIDING WHETHER TO PURCHASE SHARES AND SHOULD PAY PARTICULAR ATTENTION TO THE INFORMATION SET FORTH UNDER

---

[6]   The offering memoranda defined "Repackaging Vehicles" as "structured vehicles (such as CDOs) that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities (such as CDOs)." (Exh. E at 11; Exh. F at 12; Exh. G at 11; Exh. H at 14).

THE HEADING "RISK FACTORS." INVESTMENT IN THE
SHARES IS SPECULATIVE AND INVOLVES SIGNIFICANT
RISK. INVESTORS SHOULD UNDERSTAND SUCH RISKS
AND HAVE THE FINANCIAL ABILITY AND WILLINGNESS
TO ACCEPT THEM FOR AN EXTENDED PERIOD OF TIME.

(Exh. G at i; Exh. H at i). This warning was repeated throughout the funds' disclosure

documents. (*E.g.*, Exh. E at 2, 4, 10, 15, 56; Exh. F at 2, 5, 11, 17, 63; Exh. G at 2, 4, 10, 52;

Exh. H at 2, 5, 13, 70).

The offering documents also included a lengthy section titled "Risk Factors,"

describing a number of particular risks in greater detail. (Exh. E at 15-26; Exh. F at 17-29; Exh.

G at 15-25; Exh. H at 20-34). Among other things, there were particular risk disclosures

concerning the use of leverage, the exposure to lower-quality securities, illiquidity, and the

inability to hedge in certain circumstances. (Exh. E at 15, 16, 18, 20, 21; Exh. F at 17, 19, 21,

22-24; Exh. G at 15, 16, 19, 20, 21; Exh. H at 20, 22, 24, 26, 28).

The PPMs and COMs also warned that certain "inherent and potential conflicts of

interest exist in respect of the" funds. (Exh. E at 26-31; Exh. F at 29-34; Exh. G at 25-30; Exh.

H at 34-40). For example, the offering documents noted that BSAM's compensation structure --

because it included both an advisory fee and a share of each fund's realized and unrealized

profits -- could "create an incentive for [BSAM] to make investments that are riskier or more

speculative than would be the case if [BSAM] were compensated solely based on a flat

percentage of capital." (Exh. E at 24; Exh. F at 27; Exh. G at 23; Exh. H at 32). The documents

further advised investors that BSAM would establish a "fair value" for portfolio securities as to

which market quotations were not readily available. As a result, the documents explained,

BSAM had "a conflict of interest . . . because the valuations directly affect the Net Asset Value

of the [Fund] and thus the amount of [compensation] that [BSAM] receives in respect of its

services." (Exh. E at 22, 30; Exh. F at 25, 33; Exh. G at 29; Exh. H at 29-30, 39).

Each investor in each feeder fund executed a subscription agreement, in which it represented that it had "received and read a copy of the [offering memorandum] outlining, among other things, . . . the risks, conflicts of interest, and expenses of an investment in the [Fund]." (Exh. M ¶ IV(B); Exh. N ¶ IV(C); Exh. O ¶ IV(C); Exh. P ¶ IV(B)). Each subscribing investor further represented, in the subscription agreement, that it had "carefully reviewed and understands the various risks of an investment in the [fund], including those summarized under 'Risk Factors' and described in greater detail elsewhere in the [offering] Memorandum." (Exh. M ¶ IV(C); Exh. N ¶ IV(D); Exh. O ¶ IV(D); Exh. P ¶ IV(C)). Each investor also acknowledged its understanding that "an investment in the [Fund] is speculative" and that it could "afford to bear the risks of an investment in the [Fund], including the risk of losing [its] entire investment." (*Id.*).

The LPAs accorded BSAM, as general partner of the Domestic Funds, the "full, complete, and exclusive right, power, and authority to manage and conduct the business and affairs of the Partnership[,]" including the right, power, and authority to buy, sell, hold or trade, "on margin or otherwise . . . mortgage-backed and asset-backed securities, collateralized debt obligations and other structured finance securities . . . *selected by the General Partner*." (Exh. I at 8; Exh. J at 9) (emphasis added). Under the IMAs, which governed BSAM's rights and obligations with respect to the Overseas Funds, BSAM likewise had "the discretionary authority, power, and right . . . to determine in its discretion the composition of the assets of the Fund, including determination of the purchase, retention, or sale of the securities, derivatives, cash, and other investments contained in the portfolio." (Exh. K § 2(a); Exh. L § 2(a)).

The Closure of the Funds

During March 2007, the HG Master Fund reported a loss of approximately 3.71 percent, the first such monthly loss since its founding. In a June 8, 2007 report disclosing April

- 11 -

2007 month and year-to-date results, investors were informed that the HG Master Fund was down 5.09% in April alone and 6.24% year-to-date, and the EL Master Fund was down 19% in April and approximately 23% year-to-date.  On June 8, 2007, pursuant to the funds' governing documents, BSAM suspended investors' right to redeem their interests in the HG Feeder Funds and the EL Feeder Funds.  Later in June, BSC announced that it would provide $3.2 billion in financing to try to stabilize the HG Master Fund.  The same day, Merrill Lynch began selling $850 million in collateral, and BSC withdrew its bailout plan.  (*Navigator* AC ¶¶ 244-51; *FIC* AC ¶¶ 99-104; *Varga* AC ¶¶ 237-38).

On July 17, 2007, BSC sent a letter to the limited partners of the Domestic Funds noting that during June, the two funds had "experienced significant declines in the value of their assets resulting in losses of net asset value," due in part to "unprecedented declines in the valuations of a number of highly-rated (AA and AAA) securities."  As a result, the letter stated, "there is effectively no value left for the investors in the [EL Master Fund] and very little value left for the investors in the [HG Master Fund] as of June 30, 2007."  Accordingly, the letter stated that BSAM "intend[ed] to seek an orderly wind-down of the Funds over time."  The Master Funds sought bankruptcy protection on August 1, 2007.  On October 31, 2007 and November 17, 2007, respectively, BSAM dissolved the Domestic HG Fund and the Domestic EL Fund and appointed Richard Heis and John Milsom, both restructuring directors with KPMG LLP, as the funds' liquidators, pursuant to section 12 of the LPAs.  (*Navigator* AC ¶¶ 253-54, 353; *FIC* AC ¶¶ 105, 107; *Varga* AC ¶¶ 239, 56, 448, 450; Exh. I § 12; Exh. J § 12).

<u>The Pending Litigation</u>

<u>The *Navigator* Action</u>

Navigator Capital Partners, L.P. ("Navigator"), an institutional investor in the Domestic HG Fund, filed suit in New York State Court in August 2007.  Defendants removed

the case to this Court.  In its Amended Complaint, filed on August 12, 2008, Navigator alleges

that BSAM (through Messrs. Cioffi, Tannin and McGarrigal), with the "knowing participation"

of the other defendants it has sued, engaged in "a variety of misconduct" with respect to the

Domestic HG Fund and the HG Master Fund.  Among other things, Navigator claims that BSAM

made investments that were "inconsistent with the terms of the Partnership Documents"; failed

to "sufficiently monitor and adequately assess the credit risk" of their investments; entered into

"harmful and self-interested principal trades with other Bear Stearns entities," without obtaining

the requisite approvals; assigned inflated values to partnership assets; provided inaccurate

financial statements and updates to the limited partners; failed to "adequately hedge" the

partnership's investments in accordance with the LPA; "benefit[ed] from acknowledged conflicts

of interest"; and "conceal[ed] and/or misrepresent[ed] facts related to the liquidity of the

partnership." (*Navigator* AC ¶ 25).

Based on these allegations, Navigator asserts direct claims on behalf of a putative

class of limited partners in the Domestic HG Fund, and also purports to assert claims derivatively

on behalf of that fund.  First, Navigator asserts direct claims against BSAM, and Messrs. Cioffi,

Tannin and McGarrigal (the "Management Defendants") for breach of fiduciary duty, breach of

contract and common law fraud.  (*Navigator* AC Counts I, II, III).  Navigator also asserts

derivative claims against those defendants for breach of fiduciary duty and gross negligence.

(*Navigator* AC Counts VI, VIII).  Separately, Navigator seeks to hold BSC, BS&Co., BSSC and

Messrs. Cohen, Cummins, Quental and Sandelovsky liable, on an "aiding and abetting" theory,

for the supposed fraud and fiduciary breaches by the Management Defendants.  (*Navigator* AC

Counts IV, V, IX).  Navigator also names as defendants, on its "aiding and abetting" claims,

Scott Lennon and Michelle Wilson-Clarke, who served as outside directors of the Master Funds

and their employer Walkers Fund Services Limited ("Walkers FS"), a Cayman Islands company. (*Navigator* AC ¶¶ 42-57).  Finally, Navigator purports to sue Messrs. Cohen, Cummins, Quental and Sandelovsky, derivatively on behalf of the Domestic HG Fund, for breach of fiduciary duty arising from their performance as directors of the HG Master Fund.  (*Navigator* AC Count VII).

        As we demonstrate below, the Court should dismiss all of these claims as against BSC, BS&Co., BSSC and Messrs. Cohen, Cummins, Quental and Sandelovsky.  The Court should further dismiss all claims in this case against BSAM, except for the purported class action claims for breach of fiduciary duty (to the extent that claim is based on alleged misstatements to Domestic HG Fund limited partners) and for breach of contract.

The *FIC* Action

        FIC, L.P. ("FIC"), an institutional investor in the Domestic EL Fund, filed suit on December 28, 2007, over a month after that fund's dissolution and the appointment of Messrs. Heis and Milsom as its liquidators.  In its Amended Complaint, filed on June 16, 2008, FIC alleges that the losses suffered by investors in the Domestic EL Fund resulted from "mismanagement and self dealing," rather than an unprecedented phenomenon in the debt markets.  (*FIC* AC ¶¶ 99, 147, 153).  Specifically, FIC claims that BSAM caused the EL Master Fund to purchase inappropriately risky securities on unfair terms from affiliated entities, in violation of stated investment guidelines and without obtaining the requisite review and approval by outside directors.  (*Id.* ¶¶ 8, 77-79, 83-84).  FIC also accuses BSAM of "intentionally inflating the value of the [EL] Master Fund's assets," both to increase its fees and to "hide the fact that [the EL Master Fund had] overpaid for assets in self dealing transactions with other [Bear Stearns] entities."  (*Id.* ¶ 86).

Apart from its allegations of "mismanagement and self-dealing," FIC claims that statements by the Management Defendants to investors in the Domestic EL Fund, included the following supposed material misrepresentations and omissions:

- According to FIC, the Management Defendants somehow misled investors by encouraging them to transfer money from the Domestic HG Fund to the Domestic EL Fund without telling them that the EL Master Fund had been started because, by September 2006, the HG Master Fund was experiencing significant liquidity problems. (*Id*. ¶¶ 67-68).

- FIC also points to alleged statements by Messrs. Cioffi and Tannin during February 2007 and March 2007 in which they said that, in their view, the Master Funds (and hence their feeders) would continue to perform well, notwithstanding adverse market conditions. With the benefit of hindsight, FIC suggests that those statements were false when made because "both the [HG Master Fund] and the [EL Master Fund] began reporting losses shortly after Cioffi's and Tannin's endorsements of the Funds' ability to remain profitable." (*Id*. ¶¶ 88-90).

- Finally, FIC alleges that Messrs. Cioffi and Tannin made false statements on April 25, 2007 concerning the performance and liquidity of the Master Funds, and the levels of redemption requests and new investments that the two funds had received. (*Id*. ¶¶ 91-95).

Significantly, FIC does not allege that it transferred funds from the Domestic HG Fund to the Domestic EL Fund, or that it was aware, before the funds closed, of the supposed misstatements or omissions by Messrs. Cioffi and Tannin.

Like Navigator, FIC both asserts purported class action claims and purports to sue derivatively on behalf of the feeder fund in which it allegedly invested. As against the Management Defendants, FIC asserts a direct claim, on behalf of a purported class of investors in the Domestic EL Fund, for breach of unspecified provisions in that fund's limited partnership agreement. (*FIC* AC Count I). FIC also asserts claims against the Management Defendants -- both directly on behalf of the purported class and derivatively on behalf of the Domestic EL Fund -- for breach of fiduciary duty. (*FIC* AC Counts II, IV). Finally, FIC asserts direct and derivative claims by which it seeks to hold BSC and BS&Co. liable for "aiding and abetting" the

- 15 -

alleged fiduciary breaches by the Management Defendants.  (*FIC* AC Counts III, V).  None of these claims can proceed against any of the Bear Stearns Defendants.

The *Varga* Action

The *Varga* action involves the HG Feeder Funds, the EL Feeder Funds and both Master Funds.  Geoffrey Varga and William Cleghorn (together, the "Liquidators"), appointed by a Cayman Islands court to serve as joint voluntary liquidators of the Overseas Funds, commenced *Varga* in April 2008.  Faced with a motion to dismiss for lack of subject matter jurisdiction and failure to satisfy Fed. R. Civ. P. 9(b), Varga and Cleghorn filed an amended complaint on June 30, 2008.  The amended *Varga* complaint includes claims by two additional plaintiffs, Stillwater Capital Partners, L.P. ("Stillwater") and Essex Fund Limited ("Essex"), institutional investors who purport to hold vaguely-defined "economic exposure" to the Domestic Funds.  (*Varga* AC ¶¶ 30-31).

The *Varga* plaintiffs allege that losses incurred by the Overseas Funds and the Domestic Funds were the "direct and proximate result of a sophisticated fraud perpetrated by" all of the Bear Stearns Defendants.  (*Id.* ¶ 1).  Their core accusation is improbable.  According to the amended complaint, the Bear Stearns Defendants set up these funds planning from the outset (*i.e.*, from early 2003) to fail.  The *Varga* plaintiffs further assert that "[f]rom their inception, the Funds were doomed to fail" because the Bear Stearns Defendants "had unique knowledge" that "even a slight downturn in the U.S. housing market" would result in insurmountable losses and would cause "all investor capital" to "vanish,"  for reasons that the amended complaint never explains.  (*Id.* ¶¶ 5, 6, 63).  According to plaintiffs in *Varga*, the Bear Stearns Defendants' supposed wrongdoing took several forms.

First, plaintiffs allege that the Bear Stearns Defendants erroneously marketed the HG Feeder Funds as "relatively safe, conservative investment funds" and made "misleading

representations" concerning "the low-risk nature" of the funds and their "ability to manage any potential risk." (*Id*. ¶¶ 65, 79). The Bear Stearns Defendants allegedly promised investors that the funds' assets would be "broadly diversified" and made "false and intentionally misleading representations" in the offering memorandum and elsewhere concerning the "credit quality" of the assets in which the funds would invest, their ability to manage risk, the controls that were in place to resolve conflicts arising from "related party transactions," and the methods and models they would use to value the funds' assets. (*Id*. ¶¶ 66, 68-76).

Second, plaintiffs allege that the Bear Stearns Defendants promised investors that the EL Feeder Funds "would generate higher profits" but "would carry only a small amount of additional risk." (*Id*. ¶¶ 113, 119). Plaintiffs claim that the "new 'enhanced' fund" was "marketed as a safe investment," and "as a better, smarter and safer version of the original High-Grade Funds." (*Id*. ¶¶ 130, 132). Plaintiffs also allege misrepresentations in the offering memoranda for the EL Feeder Funds, similar to those alleged with respect to the HG Feeder Funds.

Third, plaintiffs allege that Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky failed to "fulfill their fiduciary duties" as directors of the Overseas Funds and the Master Funds. (*Id*. ¶ 379). The amended complaint alleges that they "failed to ensure that BSAM was following the stated investment guidelines for the Overseas Funds;" failed to "monitor" the "manager marks" or "question the NAVs assigned by BSAM and the Management Defendants;" did not "question BSAM's assertions" about the performance of the funds; "failed to independently assess" the work of the funds' independent auditors Deloitte & Touche LLP

and Deloitte & Touche (Cayman) (together, "Deloitte"); and did not "question" the "clean bill of

health the Deloitte Defendants gave to the Overseas Funds" in April 2007.  (*Id.* ¶¶ 382-87).[7]

   The *Varga* complaint includes claims against all of the Bear Stearns Defendants,

other than BSSC.  Plaintiffs also name as defendants Deloitte, Walkers FS, Mr. Lennon and Ms.

Wilson-Clarke.  (*Id.* ¶¶ 49-53).  Of the 17 claims in *Varga*, the following nine involve the Bear

Stearns Defendants:

- Essex and Stillwater assert claims against the Bear Stearns Defendants and Deloitte for violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, arising from their supposed purchases and sales of limited partnership interests in the Domestic Funds, and the Liquidators assert a similar claim that Essex supposedly assigned to them, based on Essex's alleged purchase of shares in the Overseas EL Fund.  (*Varga* AC Count I).

- On the basis of their federal securities fraud claims in Count I, all plaintiffs assert claims for "control person" liability, under section 20(a) of the Exchange Act, against BSC, BS&Co., and Messrs. Buxton, Cioffi, Cohen, Cummins, Guarasci, McGarrigal, Quental, Sandelovsky and Tannin.  (*Varga* AC Count II).

- All plaintiffs purport to sue the Bear Stearns Defendants for common law fraud, breach of fiduciary duty and "gross negligence and negligence."  (*Varga* AC Counts III, IV, VIII).

- All plaintiffs sue BSAM for supposed breaches of unidentified provisions of unidentified agreements with the Domestic Funds and the Overseas Funds.  (*Varga* AC Count V).

- All plaintiffs seek to hold the Bear Stearns Defendants liable, on an "aiding and abetting" theory, for alleged fiduciary breaches by Walkers FS, Mr. Lennon and Ms. Wilson-Clark, and for alleged fraud by Deloitte.  (*Varga* AC Counts VI, VII).

---

[7] Plaintiffs also allege that Deloitte "knowingly or recklessly facilitated" the Bear Stearns Defendants' supposed fraudulent scheme "through their continual issuance of unqualified, 'clean' audit opinions, endorsing the Funds' financial statements," and that Walkers FS, Mr. Lennon and Ms. Wilson-Clarke "willfully disregarded their duties to provide independent review and approval of the vast majority of insider transactions executed by the Funds."  (*Id.* ¶¶ 14, 15).

- Finally, all plaintiffs purport to sue all defendants (including the Bear Stearns Defendants) for unjust enrichment.  (*Varga* AC Count XVII).

With the exception of the federal securities claims -- which plaintiffs assert directly -- Essex and Stillwater purport to assert all of their claims derivatively on behalf of the Domestic Funds, while the Liquidators proceed on behalf of the Overseas Funds.  Like the claims in *FIC*, none of these claims can survive this motion as against any of the Bear Stearns Defendants.

Summary of the Argument

As we demonstrate below, legal deficiencies compel dismissal of all claims against the Bear Stearns Defendants in *FIC* and *Varga*, and all claims in *Navigator*, with the exception of Navigator's purported direct claims against BSAM only for breach of fiduciary duty (to the extent based on supposed misrepresentations to the Domestic HG Fund's limited partners) and breach of contract.  The Court should grant this relief for the following reasons.

*First*, all of the derivative claims in the these actions -- Counts IV and V in *FIC*, Counts VI through IX in *Navigator* and Counts II through VIII and XVII in *Varga* (to the extent asserted by Essex and Stillwater) -- fail because none of the plaintiffs either made pre-suit demand or sufficiently pleaded demand futility, as Fed. R. Civ. P. 23.1 and section 17-1003 of the Delaware Revised Uniform Limited Partnership Act require.  (Point I, *infra*).

*Second*, the fraud claim in *Varga* (Count III) is legally insufficient for two reasons.  Under well-settled principles of Delaware law, a common law fraud claim belongs to *investors* in the funds, rather than to the funds themselves.  Thus, Essex, Stillwater and the Liquidators cannot assert these claims on behalf of the Domestic Funds and the Overseas Funds.  Moreover, the *Varga* plaintiffs have failed to allege, in support of this claim, that the Bear Stearns Defendants acted with scienter.  (Point II(A), *infra*).

- 19 -

*Third*, the purported class claim for common law fraud in *Navigator* is defective for different reasons.  (*Navigator* AC Count III).  At the outset, the Court should dismiss this claim because Navigator cannot establish class-wide reliance, a critical element of the cause of action for fraud.  Additionally, because Navigator does not allege that it either purchased or sold any security in reliance on the purported misrepresentations, its claim is an impermissible "holder" fraud claim.  (Point II(B), *infra*).

*Fourth*, to the extent that the purported class claims for breach of fiduciary duty are based on supposed mismanagement or self-dealing, those claims belong to the funds, rather than to investors individually.  Accordingly, FIC and Navigator cannot assert those claims directly on behalf of the purported investor classes.  The Court should therefore dismiss Count I in *Navigator* and Count II in *FIC*.  (Point IV(A), *infra*).

*Fifth*, exculpatory clauses in the governing limited partnership agreements and articles of association bar all of the breach of fiduciary claims in *Navigator* and *Varga* as against Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky.  (Point IV(B), *infra*). The breach of fiduciary duty claims in *Varga* also fail as against BSC and Mr. Buxton because neither was a fiduciary of the Overseas Funds.  (Point IV(C), *infra*).  Separately, the Liquidators' breach of fiduciary duty claims in *Varga* on behalf of the Overseas Funds as against all of the Bear Stearns Defendants, and the breach of fiduciary claims by Stillwater, Essex and Navigator as against the director defendants -- who are sued in their capacity as directors of the Overseas Funds -- are preempted by the Martin Act.  (Point III(D), *infra*).

*Sixth*, the aiding and abetting claims in these actions -- Counts VI and VII in *Varga*, Counts IV, V and IX in *Navigator*, and Counts III and V in *FIC* -- fail because (i) plaintiffs have not alleged viable underlying claims for common law fraud or breach of fiduciary

duty; and (ii) plaintiffs have failed sufficiently to allege that the supposed aiders and abettors actually knew of, or participated in, any purported tortious conduct.  (Points III, V, *infra*).

*Seventh*, the remaining common law claims in *Navigator*, *FIC* and *Varga* are without merit because:

- Exculpatory clauses in the relevant fund documents bar the negligence claims in *Varga* (Point VI, *infra*);

- The negligence and gross negligence claims in *Varga* against BSC, BS&Co. and Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky, fail to satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b) (Point VI, *infra*);

- Martin Act preemption bars the Liquidators' negligence and gross negligence claims in *Varga* as to *all* of the Bear Stearns Defendants, including BSAM (Point VI, *infra*);

- The *Varga* and *FIC* plaintiffs' claims for breach of contract fail because plaintiffs fail to specify what contracts, let alone the provisions therein, that were violated.  (Point VII, *infra*).

- The "unjust enrichment" claim in *Varga* fails (i) against BSAM because there is an express contract between BSAM and each of the funds; and (ii) as against the remaining Bear Stearns Defendants because there are no allegations that any of them was actually "enriched" at the expense of the funds.  (Point VIII, *infra*).

*Finally*, the federal securities fraud claim in *Varga* fails for lack of standing, failure to plead scienter with the particularity required by Fed. R. Civ. P. 9(b) and the PSLRA and, to the extent plaintiffs seek recovery on a "control person" theory under section 20(a) of the Exchange Act, failure to allege culpable participation in a primary violation.  (Point IX, *infra*).

<u>Argument</u>

I.   PLAINTIFFS' FAILURE TO MAKE PRE-SUIT DEMAND BARS
     <u>THE DERIVATIVE CLAIMS IN *FIC*, *NAVIGATOR* AND *VARGA*</u>

Although FIC, Navigator, Essex and Stillwater purport to assert claims derivatively on behalf of the Domestic Funds, none of those plaintiffs made pre-suit demand on the appropriate fiduciary.  Moreover, the *Navigator*, *FIC* and *Varga* complaints fall woefully

short of meeting the demanding standard under Fed. R. Civ. P. 23.1 and Delaware law for pleading demand futility.  Accordingly, the Court should dismiss Counts IV and V in *FIC*, Counts VI through IX in *Navigator*, and Counts III through VIII and XVII in *Varga* (to the extent Essex and Stillwater purport to assert those claims on behalf of the Domestic Funds).[8]

Recognizing the "basic principle" of Delaware law that "directors, rather than shareholders, manage the business and affairs of the corporation," and that "[t]he decision to bring a law suit or refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation," the Delaware Supreme Court long ago held that "shareholders seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired, or plead with particularity why demand is excused."  *E.g.*, *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (*citing Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)) (other citations omitted).  Thus, a would-be derivative plaintiff who sues without first making demand must "'overcome the powerful presumptions of the business judgment rule' by alleging sufficient particularized facts to support an inference that demand is excused because the board is '*incapable* of exercising its power and authority to pursue the derivative claims directly.'"  *White v. Panic*, 783 A.2d 543, 551 (Del. 2001) (citations omitted; emphasis in original).

Those same principles apply in the context of limited partnerships.  Thus, the Delaware Revised Uniform Limited Partnership Act ("DRULPA") requires that, where a limited

---

[8]   Because the Domestic Funds are Delaware limited partnerships, Delaware law governs the question whether demand is excused here.  *See, e.g.*, *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 598 (S.D.N.Y. 2007) (the substantive requirements for both demand and futility "are determined by the law of the state of incorporation" of the entity on whose behalf the derivative claims are asserted) (citation omitted).

partner seeks to proceed derivatively on behalf of the partnership without first making demand, "the complaint shall set forth *with particularity* the effort, if any, of the plaintiff to secure initiation of the action by a general partner or the reasons for not making the effort." Del. Code tit. 6, § 17-1003 (emphasis added).  A plaintiff may not meet that standard by mere notice pleading.  Rather, under DRULPA § 17-1003, "a plaintiff's pleading burden in the demand excused context is more onerous than that required to withstand" a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, CA. No. 1091-VCL, 2007 WL 2982247, at *5 (Del. Ch. Oct. 9, 2007) (citations and internal quotations omitted); *see also In re IAC*, 478 F. Supp. 2d at 597 ("Because Rule 23.1 requires particularized allegations, the pleading standard is higher than the standard applicable to a . . . motion to dismiss pursuant to Rule 12(b)(6).")  Given this heightened standard, courts applying Delaware law routinely dismiss derivative claims where the allegations as to demand futility "are stated conclusorily, without specification of *particular personal acts or conduct* to sustain the asserted conclusions." *Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1183 (D. Colo. 2006) (citation omitted, emphasis added).[9]

---

[9]  Delaware Courts frequently dismiss derivative claims on this ground.  *See*, *e.g.*, *David B. Shaev Profit Sharing Account v. Armstrong*, No. Civ.A. 1449-N 2006 WL 391931, at *5-6 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006)  (dismissing derivative claims because plaintiff did not allege "any particularized facts" suggesting that a demand would have been futile and relied solely on "conclusory statements"); *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at *12 (Del. Ch. May 9, 2006) (dismissing derivative claims because plaintiff did not plead specific facts concerning defendants' alleged lack of independence or disinterestedness).  Federal courts in this jurisdiction have done the same, based on Fed. R. Civ. P. 23.1.  *See*, *e.g.*, *In re Xethanol Corp. Deriv. Litig.*, No. 06 Civ. 15536 (HB), 2007 WL 2331975, at *4 (S.D.N.Y. Aug. 16, 2007) (dismissing derivative claims where plaintiffs' "[mere] conclusory allegations" failed to meet the particularity requirements of Fed. R. Civ. P. 23.1); *Loveman v. Lauder*, 484 F. Supp. 2d 259, 265 (S.D.N.Y. 2007) (dismissing derivative claims because "Delaware requires that facts demonstrating that a demand would be futile be alleged with particularity" and "[c]onclusory allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true") (internal quotations omitted).

The substantive standard for establishing demand futility is the same in the context of limited partnerships as in the context of corporations. *See Katell v. Morgan Stanley Group, Inc.*, Civ.A No. 12343, 1993 WL 10871, at *5 (Del. Ch. Jan. 14, 1993). A plaintiff seeking to proceed derivatively without first making demand must plead "*particularized factual allegations*" that "create a reasonable doubt that, as of the time the complaint is filed," the individuals charged with addressing a pre-suit demand "could have properly exercised . . . independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). FIC, Navigator, Essex and Stillwater -- the alleged investors who seek to assert derivative claims in these cases -- have not met the *Rales* standard, let alone done so with the particularity that DRULPA § 17-1003 and Fed. R. Civ. P. 23.1 demand.

A.     FIC Offers No Demand Futility
       <u>Allegations as to the Relevant Fiduciaries</u>

FIC cannot avoid the pre-suit demand requirement by alleging that demand on BSAM would have been futile because, at the time FIC commenced suit, BSAM had ceased acting as general partner of the Domestic EL Fund. (*FIC* AC ¶ 114). It is undisputed that Messrs. Heis and Milsom became the liquidators of the Domestic EL Fund on November 17, 2007, over a month before FIC filed its original complaint. (Exh. S). Consistent with DRULPA § 17-803, the LPA explicitly conferred upon Messrs. Heis and Milsom, *inter alia*, the "full, complete, and *exclusive* right, power, and authority, in the name of and for and on behalf of the Partnership to . . . prosecute and defend suits, whether civil, criminal, administrative, or investigative, and other claims, actions, or proceedings." (Exh. F § 12.2(b)(i)) (emphasis added). Thus, Messrs. Heis and Milsom -- rather than BSAM -- controlled the assertion of the Domestic EL Fund's legal rights at the time FIC commenced this action. Accordingly, FIC's "demand

futility" allegations as to BSAM are irrelevant.  Absent any allegations, conclusory or otherwise, that demand on Messrs. Heis and Milsom would have been futile, FIC cannot proceed with the derivative claims in its amended complaint.  *See*, *e.g.*, *Ray v. Deloitte & Touche, L.L.P.*, No. 05 CVS 15862, 2006 WL 1064503, at *3, *6 (N.C. Super. Ct. Apr. 21, 2006) (dismissing derivative claim on behalf of Delaware limited partnership because the general partners "were removed from office" when they filed bankruptcy petitions three months before plaintiffs sued, "lacked authority to consider the merits of this lawsuit," and "were no longer the proper representatives of the [partnership] upon whom demand should have been made").

> B.  Essex and Stillwater Fail Sufficiently to Plead
> Demand Futility as to Messrs. Heis and Milsom

In the amended *Varga* complaint, Essex and Stillwater properly concede that, because they commenced suit months after Messrs. Heis and Milsom became liquidators of the Domestic Funds, they must establish demand futility as to Messrs. Heis and Milsom, rather than BSAM.  (*Varga* AC ¶¶ 480-81).  But the Varga complaint does not contain a single fact, or even a conclusory assertion, raising any doubt -- let alone a reasonable doubt -- as to the disinterestedness and independence of either Mr. Heis or Mr. Milsom.  Rather, Essex and Stillwater attempt to avoid the pre-suit demand requirement by a series of contentions that Delaware courts have repeatedly rejected.[10]

---

[10]   Varga and Cleghorn assert claims on behalf of the Overseas Funds in their capacity as court-appointed liquidators of those funds, rather than as shareholders attempting to proceed derivatively.  Accordingly, the pre-suit demand requirement does not apply to Counts III through VIII and XVII in *Varga*, to the extent that the Liquidators assert those claims on behalf of the Overseas Funds.  However, as we demonstrate below, other defects nevertheless compel dismissal of those claims in their entirety as against the Bear Stearns Defendants.

1.    Allegations of Conduct by Ms. Beighton, Mr. Whicker
      and KPMG Cayman Cannot Establish Demand Futility

First, Essex and Stillwater attempt to establish demand futility by casting aspersions on the conduct of Simon Whicker and Kristen Beighton, employees of KPMG Cayman who originally served as liquidators of the Overseas Funds.  (*Varga* AC ¶¶ 488-92).  But even if plaintiffs' allegations concerning KPMG Cayman, Mr. Whicker and Ms. Beighton were true -- which we do not concede -- their supposed partiality, lack of independence, bias or alleged misconduct are legally irrelevant to the ability of Messrs. Heis and Milsom to exercise disinterested and independent business judgment in connection with a demand to bring suit.

Delaware law is well-settled that, for purposes of alleging demand futility, a "plaintiff must address each director individually and cannot rely on allegations made generally against the whole board or a group of directors."  *Stiegele ex rel. Viisage Technology, Inc. v. Bailey*, No. 05-10677, 2007 WL 4197496, at *7 (D. Mass. Aug. 23, 2007) (citing *Beam ex rel. Martha Stewart Living Omnimedia Inc.  v. Stewart*, 845 A.2d 1040, 1046, 1048-50 (Del. 2004)); *see also In re IAC*, 478 F. Supp. 2d at 600 (in assessing whether demand futility allegations satisfy Rule 23.1, the Court "will make a director-by-director inquiry into the specific, substantive allegations and the reasonable inferences that flow from them to determine whether a reasonable doubt of independence exists" as to each separate director).   As the Delaware Chancery Court recently explained in dismissing derivative claims for failing "to meet the pleading standard for demand futility":

> To establish demand futility . . . , a complaint must raise a reasonable doubt regarding the directors' disinterest and independence.  A plaintiff can establish that a specific director is interested by making allegations that, for example, the director will personally benefit from the challenged action or suffer as a result of the lawsuit.  A plaintiff can establish that a specific director is not independent by alleging facts that suggest the director is dominated by a close personal or familial relationship or that the

director is beholden to an interested director. *This is necessarily a detailed, fact-intensive, director-by-director analysis.*

*Postorivo v. AG Paintball Holdings, Inc.*, Civil Action Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *6, *7 (Del. Ch. Feb. 29, 2008) (emphasis added).

Because the *Varga* amended complaint fails to allege any particularized facts as to Messrs. Heis and Milsom indicating that either of them could not exercise disinterested and independent business judgment in response to a demand, Essex and Stillwater have not sufficiently pleaded demand futility.

> 2.    Allegations Concerning the Supposed Business Relationship
>          Between KPMG and BSAM Cannot Excuse Demand

Plaintiffs similarly cannot excuse pre-suit demand by asserting that KPMG "has significant business and other relationships with BSAM and the other Bear Stearns Defendants" and "was hand-picked by BSAM to serve as liquidators" of the funds. (*Varga* AC ¶ 483).

First, as a matter of law, the fact that BSAM appointed KPMG does not cast doubt on the liquidators' impartiality or independence. As one Delaware court explained, "[a]ny argument that the directors were nominated by or elected at the behest of the controlling person adds nothing. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *In re IAC*, 478 F. Supp. 2d at 602 (quoting *Aronson*, 473 A.2d at 816); s*ee also In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 262-63 (S.D.N.Y. 2006) (holding that pre-suit demand on a board was not excused because "[t]he fact that an adviser was responsible for selecting board members is an insufficient basis for establishing lack of independence or disinterestedness" as a matter of law).

Second, the mere alleged existence of a business (or other) relationship between BSAM and KPMG is "insufficient to raise a reasonable doubt about" KPMG's independence.

To excuse demand, the "relationship must be of a bias-producing nature." *Beam*, 845 A.2d at 1050 (dismissing derivative claims for failure to allege demand futility properly).  To prevail on this theory, "a plaintiff charging domination and control . . . must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson*, 473 A.2d at 816; *see also Highland Legacy Ltd. v. Singer*, No. Civ.A. 1566-N, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) ("[A]n allegation that directors are dominated and controlled, standing alone, does not meet the demand futility standard.  There must be some alleged nexus between the domination and the resulting personal benefit to the controlling party.").

Here, plaintiffs have failed to allege any *facts* suggesting that the "significant business and other relationships" would in theory, or did in actuality, cause KPMG (let alone Messrs. Heis and Milsom) to be biased to the point where it would "be more willing to risk [its] reputation" than its relationship with BSAM.  *See*, *e.g.*, *Beam*, 845 A.2d at 1052.  Nor have plaintiffs alleged whether or how KPMG or any of its employees benefited financially or otherwise from the "relationship," or what about the relationship made KPMG and its employees beholden to BSAM (or, for that matter, any of the Bear Stearns Defendants).  Indeed, they do not even allege what these "significant business and other relationships" with KPMG purportedly are.  And as noted, they do not allege, even in conclusory fashion, any business or other relationship between Messrs. Heis and Milsom and any of the Bear Stearns Defendants.  Under these circumstances, pre-suit demand is not excused.

          3.     KPMG's Alleged "Potential" Liability Cannot Establish Demand Futility

Essex and Stillwater also cannot avoid the pre-suit demand requirement by alleging that "KPMG itself faces *potential liability* based upon the collapse of the Funds."

(*Varga* AC ¶ 484) (emphasis added).  To excuse demand on this ground, a plaintiff must show that the person or entity on whom demand would be made faces a "substantial likelihood" -- not the "mere threat" -- of liability.  *Aronson*, 473 A.2d at 815; *see also*, *e.g.*, *In re Bristol Myers Squibb Derivative Litig.*, No. 02 Civ. 8571 (LAP), 2007 WL 959081, at *8 (S.D.N.Y. Mar. 30, 2007) ("mere threat" of personal liability insufficient under Delaware law to render directors interested for demand futility purposes, and plaintiffs failed to allege particularized facts to show a "substantial likelihood" of personal liability); *In re Forest Labs, Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 389 (S.D.N.Y. 2006) ("particularized allegations which, if true, give rise to a 'substantial likelihood' of personal liability are necessary to raise a reasonable doubt with respect to a director's disinterestedness").

Apart from their application of the wrong legal standard, plaintiffs in *Varga* do not offer a single allegation that KPMG or its employees or agents did, or failed to do, anything that would subject KPMG to liability to the fund entities in this case.  Notably, although plaintiffs assert claims in this case against seventeen separate defendants, they have not asserted any claims against KPMG.  More fundamentally, there are no allegations whatsoever suggesting that either Mr. Heis or Mr. Milsom face any risk of liability -- substantial, potential, or even remote -- with respect to these funds.  Under settled Delaware law, Essex's and Stillwater's amorphous allegations as to KPMG's "potential" liability cannot establish demand futility as to Messrs. Heis and Milsom.

4.      Mr. Heis' and Mr. Milsom's Alleged
        Failure to Act Cannot Excuse Demand

In the sole allegation that *is* directed at Messrs. Heis and Milsom, plaintiffs claim that "despite the fact that they have been in their positions as liquidators of the Domestic Funds for almost eight months, Heis and Milsom have commenced absolutely no proceeding against

any party or entity" relating to the collapse of the funds. (*Varga* AC ¶ 487). This allegation, even if true, similarly cannot excuse pre-suit demand. To the contrary, Delaware law is well settled that "a board's failure to take action, even if it is aware of wrongdoing, does not demonstrate [demand] futility." *Blasband v. Rales*, 971 F.2d 1034, 1052 (3d Cir. 1992); s*ee also*, *e.g.*, *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1113 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985) ("knowledge of wrongs and failure to institute suit, without more, is inadequate to excuse demand"); *Richardson v. Graves*, C.A. No. 6617, 1983 WL 21109, at *3 (Del. Ch. June 17, 1983) ("The mere fact that [the directors] have not elected to sue before the derivative action was filed should not of itself indicate 'interestedness.'"). This is true even when years have passed since the alleged wrongdoing came to light. *Lewis v. Fites*, Civ.A. No. 12566, 1993 WL 47842, at *3 (Del. Ch. Feb. 19, 1993) ("The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for *more than two years* but have taken no action . . . . Allegations of this sort offered as an excuse for failure to make demand have been rejected repeatedly.") (emphasis added).

> C.     Navigator Fails to Allege Demand Futility

Navigator initially filed suit before the Domestic HG Fund was dissolved and while BSAM continued to act as the fund's general partner. However, the Domestic HG Fund had been dissolved, and Messrs. Heis and Milsom had become its liquidators, by the time Navigator amended its complaint in August 2008 to assert new derivative claims against additional defendants. Accordingly, in order to proceed with the derivative claims in its original complaint, Navigator was required to demonstrate demand futility as to BSAM. The derivative claims that Navigator first asserted in its amended complaint require a showing that demand on Messrs. Heis and Milsom would have been futile. But the excuses Navigator offers for not

making pre-suit demand -- whether on BSAM or on Messrs. Heis and Milsom -- are barred under Delaware law.

Navigator's purported justification for not making a pre-suit demand on BSAM is that "BSAM participated in, approved, and/or acquiesced in the wrongdoing alleged herein, and therefore is not capable of exercising its disinterested or independent business judgment in responding to such a demand."   (*Navigator* AC ¶ 324).   But as Delaware's highest court has explained, a plaintiff cannot circumvent the demand requirement merely by alleging that the defendants "participated in the wrongs alleged" and "could not and would not sue themselves," *Pogostin v. Rice*, 480 A.2d 619, 623-25 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).   If the law were otherwise, a plaintiff could easily get around the pre-suit demand requirement by naming as a defendant the person or entity charged with acting on a pre-suit demand, and the requirement would become meaningless.   Navigator's demand futility allegation as to BSAM fails under that principle.[11]

Delaware law likewise forecloses Navigator's demand futility argument concerning Messrs. Heis and Milsom.   Navigator contends that demand on the liquidators "would have been futile" because they "have made no concrete effort to pursue any legal redress on behalf of the Partnership to date."   (*Navigator* AC ¶ 352).   But as we noted above, a

---

[11]   Navigator suggests that BSAM's potential liability is "reinforced by the SEC's investigation into securities fraud claims against Defendants Cioffi and Tannin."   (*Navigator* AC ¶ 333).   But that theory too has been rejected by Delaware courts.   *See, e.g.*, *Seminaris v. Landa*, 662 A.2d 1350, 1355 (Del. Ch. 1995) (dismissing derivative claims because, despite ongoing SEC investigation, plaintiff "has not alleged particularized facts that create a reasonable doubt that any of the directors are disinterested or independent").   Moreover, BSAM itself was not named as a defendant in the SEC complaint.   To the extent the SEC investigation is at all relevant to this analysis (which it is not), this fact -- far from "reinforcing" BSAM's alleged liability -- leads to the exact opposite inference.

fiduciary's failure to pursue legal action simply is not a basis for excusing demand.  (*See* Point I(B)(4), *supra*).

Absent sufficient demand futility allegations as to either BSAM or Messrs. Heis and Milsom, the Court should dismiss the derivative claims (Counts VI through IX) in *Navigator.*

## II.   THE COMMON LAW FRAUD CLAIMS IN *NAVIGATOR* AND *VARGA* FAIL AS A MATTER OF LAW

Both the common law fraud claim on behalf of the Overseas Funds and the Domestic Funds in *Varga* and Navigator's purported class claim for common law fraud are meritless.[12]  (The FIC plaintiffs did not assert a claim for common law fraud.)

### A.   The Common Law Fraud Claim in *Varga* Is Legally Insufficient

The *Varga* plaintiffs assert a common law fraud claim on behalf of all four feeder funds, against all of the "Bear Stearns Defendants."  (*Varga* AC Count III).  As Deloitte & Touche LLP ("Deloitte US") sets forth more fully in its brief, none of the plaintiffs in *Varga* has standing to assert this claim.

First, Varga and Cleghorn lack standing to assert a claim, as the Overseas Funds' liquidators, for common law fraud.  The role of the liquidator is the same as that of a bankruptcy trustee.  It is well settled that fraud claims -- specifically including "claims predicated upon the distribution of misleading PPMs to investors," as is alleged here -- "are the property of those investors, and may be asserted only by them" and not by a bankruptcy trustee.  *Hirsch v. Arthur*

---

[12]   Pursuant to the choice of law clause contained in the LPAs governing the Domestic Funds, Delaware law applies to the claims against BSAM relating to the Domestic Funds.  With respect to the Liquidators' claims on behalf of the Overseas Funds and to all claims by all plaintiffs against the Defendant Directors, who are named solely in their capacity as directors of the Overseas Funds, a grouping of contacts analysis calls for application of New York law.

*Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995); *see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 n.4 (2d Cir. 1985) (a bankruptcy trustee "has no standing to assert claims of damage to the defrauded purchasers of securities"). This settled principle bars Varga and Cleghorn from pursuing this claim. (*See* Deloitte US Br. Point IV(A)).

Second, Essex and Stillwater cannot pursue this claim derivatively on behalf of the Domestic Funds. Apart from the fact that Essex and Stillwater have failed to satisfy the pre-suit demand requirement in connection with *any* of their derivative claims, it is black letter Delaware law that "a fraud claim is inherently direct, either under the pre- or post-*Tooley* analysis." *FS Parallel Fund L.P. v. Ergen*, No. 19853, 2004 WL 3048751, at *3 (Del. Ch. Nov. 3, 2004), *aff'd*, 879 A.2d 602 (Del. 2005).[13] The Court thus should dismiss the *Varga* plaintiffs' common law fraud claim in its entirety for lack of standing. (*See* Deloitte US Br. at Point IV(A)).

Even if they did have standing to assert the common law fraud claims -- which they do not -- the *Varga* plaintiffs' common law fraud claim would still fail as against BSC, BS&Co., and Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky. The *Varga* plaintiffs base their common law fraud claim on the same allegations that underlie their federal securities fraud claim. Because, as we show in Point IX, the federal securities claim is fatally defective, the common law fraud claim also fails. *See*, *e.g.*, *Rich v. Maidstone Fin., Inc.*, 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) ("Since the Amended Complaint has failed to plead a Section 10(b) claim against either of the Bernstein Defendants, Plaintiff's common law fraud claims alleged against the Bernstein Defendants must also be dismissed."); *Morse v.*

---

[13]   Presumably aware of this well-settled law, the fraud and aiding and abetting fraud claims are the only claims that Navigator brought solely as class claims rather than as both class and derivative claims.

*Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) ("Because these elements are substantially identical to those governing § 10(b), the identical analysis applies here, and accordingly Morse has failed to allege facts which if proven would support his common law fraud claim."); *Chase Manhattan Mortgage Corp. v. Advanta Corp.*, No. Civ.A. 01-507 (KAJ), 2004 WL 422681, at *5 n.12 (D. Del. Mar. 4, 2004) (explaining that "the elements of federal securities fraud, Pennsylvania common law fraud, and Delaware common law fraud are virtually identical in this context").

        B.      <u>Navigator's Class Claim for Common Law Fraud Fails</u>

        Navigator asserts a class claim for common law fraud, on behalf of "all holders of limited partnership interests" in the Domestic HG Fund, against BSAM and Messrs. Cioffi, Tannin, McGarrigal.  (*Navigator* AC ¶1 and Count III).  This class claim should be dismissed on two separate but related grounds.

        1.      <u>The Inability to Plead or Prove Class-Wide Reliance<br>Warrants Dismissal at this Juncture</u>

        To state a claim for common law fraud under Delaware law, a plaintiff must allege actual and justifiable reliance.  *E.g.*, *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).  It is settled law in Delaware that "neither equitable nor common law fraud claims may be maintained as class actions" because individual questions of reliance "will inevitably predominate over common questions."  *Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *4 (Del. Ch. Dec. 19, 2002) (*citing Gaffin*, 611 A.2d at 472).  The Delaware Chancery Court has held that the inability to establish class-wide reliance justifies dismissing a class fraud claim, with prejudice, at the pleading stage, for failure to state a claim for relief:

> The requirement that plaintiff plead and prove actual and reasonable reliance on the false representations made by the defendants is fatal to a class action claim of either common law or equitable fraud. . . . [W]here the claim stated cannot *by its nature*

> form the basis of a class action, no class could be entitled to relief
> under any set of facts and it is appropriate to dismiss the claim as
> to the purported class under Rule 12(b)(6).

*Manzo*, 2002 WL 31926606, at *4; *see also Oliver v. Boston Univ.*, No. 16570, 2000 WL

1091480 at *11 (Del. Ch. July 25, 2000) (dismissing class claim for common law fraud).

Even if Navigator's fraud claim were to survive dismissal, it can go no further on

a class basis.  Defendants ought not to be subjected to discovery on a claim that ultimately

cannot proceed.  Accordingly, as in *Manzo* and *Oliver*, this Court should dismiss the class fraud

claim, with prejudice, because Navigator can never demonstrate class-wide reliance.

### 2.    Navigator is Asserting a Non-Cognizable Holder Claim

Navigator's fraud claim is equally defective because it seeks redress as a "holder"

of securities that declined in value, not as a buyer or seller.  Delaware law holds that, because a

plaintiff who sues as a "holder" cannot prove reliance, such a plaintiff cannot recover for

common law fraud.  *See Manzo*, 2002 WL 31926606 (dismissing holder claim because of the

impossibility of proving reliance).  Here, Navigator purchased interests in the Domestic HG

Fund in 2004 and 2005.  (*Navigator* AC ¶¶ 80-81).  Navigator does not contend that it either

purchased or sold in reliance on supposed misrepresentations.  Rather, the crux of its claim is

that defendants' alleged misrepresentations and nondisclosures prevented it from exercising its

right to redeem and/or seek to remove BSAM as general partner of the Domestic HG Fund.  (*Id.*

¶ 388).  Indeed, Navigator purports to sue on behalf of a purported class consisting of "all

*holders* of limited partnership interests."  (*Id.* ¶ 1) (emphasis added).  This is a classic holder

claim, and as such cannot survive dismissal under Delaware law.  *Accord, e.g., Chanoff v. United*

*States Surgical Corp.*, 857 F. Supp. 1011, 1018 (D. Conn. 1994) (observing that "holder" claims

under Connecticut law would violate the "established principle that a plaintiff cannot recover

profits which might have been realized if he had not been deceived, unless there is evidence by

which such profits can be estimated with reasonable certainty"), *aff'd*, 31 F.3d 66 (2d Cir. 1994);

*Kagan v. Edison Bros. Stores, Inc.*, 907 F.2d 690, 692 (7th Cir. 1990) (applying Illinois law);

*Crocker v. Federal Deposit Ins. Corp.*, 826 F.2d 347, 351 (5th Cir. 1987) (applying Mississippi

law); *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 928-29 (4th Cir. 1984) (applying

Virginia law); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 488 (E.D. Va. 2002)

(applying Virginia law); *see also In re WorldCom, Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 318-23

(S.D.N.Y. 2004) (collecting cases).

III.   PLAINTIFFS IN *NAVIGATOR* AND *VARGA* HAVE
       NOT PLEADED VIABLE CLAIMS FOR AIDING AND
       ABETTING COMMON LAW FRAUD

        There is likewise no merit to (a) Count VII in the amended *Varga* complaint,

which asserts that certain of the Bear Stearns Defendants aided and abetted an alleged fraud by

Deloitte, or (b) the purported class action claim in Count V of the amended *Navigator* complaint,

which asserts that BSC, BSSC, BS&Co. and Messrs. Cohen, Cummins, Quental and

Sandelovsky aided and abetted alleged fraud by the Management Defendants.   (FIC does not

assert a fraud claim, and does not assert a claim for aiding and abetting fraud.)

        A.    Plaintiffs' Aiding and Abetting Claims Fail in the
              Absence of a Sufficient Underlying Fraud Claim

        Claims for aiding and abetting fraud cannot survive if the underlying fraud claims

are dismissed.  *See*, *e.g.*, *484 Assocs., L.P. v. Moy*, No. 06 Civ. 2290 (PAC), 2007 WL 683999, at

*4 (S.D.N.Y. Mar. 5, 2007) (dismissing aiding and abetting fraud claim under New York law

because complaint failed to state an underlying fraud claim); *In re AHT Corp.*, 292 B.R. 734, 746

(S.D.N.Y. 2003) (same); *Anderson v. Airco, Inc.*, No. Civ. A. 02C-12-091HDR, 2004 WL

2827887, at *4 (Del. Super. Nov. 30, 2004) (underlying tortious conduct is a necessary element

of an aiding and abetting claim).  Here, the common law fraud claims in *Navigator* and *Varga*

- 36 -

against BSAM, Messrs. Cioffi, Tannin and McGarrigal and Deloitte fail as a matter of law.  (*See* Point II, *supra*; Deloitte US Br. at Points III(A) and IV(A); Deloitte & Touche (Cayman) Br. Point II(A)).  Accordingly, the claims in *Navigator* and *Varga* for aiding and abetting in those purported frauds cannot proceed.

> B.   Plaintiffs Have Not Sufficiently Alleged that
> Defendants Had Actual Knowledge of the Alleged Fraud

Even if the underlying fraud claims somehow survive dismissal (which they cannot), the Court still should dismiss the aiding and abetting claims because the amended complaints in *Varga* and *Navigator* fail to allege, as they must, that the supposed aiders and abettors had knowledge of the purported fraud.  To state an aiding and abetting claim, the plaintiff must allege that the defendant had "actual knowledge" -- not just constructive knowledge -- of the underlying fraud.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (citations omitted).  "As courts in this federal district have recognized, [t]he burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) (citations and quotations omitted).  Additionally, Fed. R. Civ. P. 9(b) requires plaintiffs to plead the actual knowledge element with particularity.  *See Lerner*, 459 F.3d at 293 (Rule 9(b) applies to an aiding and abetting fraud claim).

> 1.   The *Varga* Plaintiffs Do
> Not Allege Actual Knowledge

Here, the *Varga* plaintiffs have not met their Rule 9(b) burden of pleading which defendant knew what and when they knew it.  Rather, plaintiffs allege only that Deloitte served as independent auditors for the funds from 2003 through 2006, that "during that time the Deloitte Defendants worked closely with the Bear Stearns Defendants," and that "[t]he Bear Stearns Defendants knew that the Deloitte Defendants' unqualified audit opinions were false and

misleading." (*Varga* AC ¶¶ 245, 564).  Lumping all of the Bear Stearns Defendants together in this fashion fails to satisfy Fed. R. Civ. P. 9(b).

Beyond that fundamental pleading problem, the amended complaint alleges (at best) that the Bear Stearns Defendants should have known about or discovered the alleged accounting fraud, not that they actually knew.  Plaintiffs make no effort to allege knowledge -- actual or constructive -- by any of the Bear Stearns Defendants with respect to the Domestic Funds.  With respect to the Overseas Funds, the amended complaint merely alleges that, as a group, Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky "never inquired whether, or ensured that, the Deloitte Defendants tested and adequately evaluated the manager marks," and "never questioned the clean bill of health the Deloitte Defendants gave to the Overseas Funds" in their April 2007 audit.  (*Varga* AC ¶¶ 386-87).  But allegations of constructive knowledge do not suffice to state an aiding and abetting claim.  *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 387-388 (S.D.N.Y. 2007); *see also Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) (New York "has not adopted a constructive knowledge standard for imposing aiding and abetting liability.  Rather, New York courts and federal courts in this district, have required actual knowledge."), *aff'd*, 152 F.3d 918 (2d Cir. 1998).

### 2.   Navigator Does Not Allege Actual Knowledge

Similarly, Navigator has failed to plead, with the requisite factual particularity, that BSC, BSSC, BS&Co. or Messrs. Cohen, Cummins, Quental or Sandelovsky had any actual knowledge of any alleged fraud by the Management Defendants.  Navigator alleges that Messrs. Cohen, Cummins, Quental and Sandelovsky "failed to adequately supervise" the Management Defendants, and "permitted" them to engage in self-dealing transactions.  (*Navigator* AC ¶ 409). Devoid of any detail, these accusations, even if true, do not indicate that the HG Master Fund's

directors had actual knowledge of any alleged breaches of fiduciary duty by BSAM or the portfolio managers, let alone that they participated in any such alleged breaches.

With respect to BSC, BSAM's parent, Navigator simply alleges that the partnership and the HG Master Fund "carried the imprimatur of" BSC, and that it "knowingly participated" in BSAM's alleged breach of fiduciary duty by performing the "Master Fund's daily mark-to market" through its repo desk and "monitoring the [Master] Fund's positions." (*Navigator* AC ¶¶ 410-11).  This vague and generalized allegation does not indicate whether or when anyone at BSC had knowledge that the portfolio managers were in breach of their fiduciary obligations to the funds' investors, let alone how BSC actively participated in any such breach.

Finally, Navigator alleges that BSSC "knowingly participated" because it served as "custodian and prime broker to the Master Fund," "executed related-party transactions and trades," and "was counterparty to related-party transactions and trades that [it] knew were not being reviewed by the Independent Directors."  (*Navigator* AC ¶ 398).  But again, based solely on these cursory allegations, which do not identify individuals or dates, one cannot infer knowledge or participation.

Because these generalized allegations lack any detail -- let alone the particularity required by Rule 9(b) -- with respect to knowledge or participation, the aiding and abetting fraud claim fails.

IV.    THE COURT SHOULD DISMISS PLAINTIFFS'
       BREACH OF FIDUCIARY DUTY CLAIMS

Apart from the failure by Navigator and FIC as well as by Stillwater and Essex to comply with the pre-suit demand requirement of Fed. R. Civ. P. 23.1 and DRULPA, their claims for breach of fiduciary duty on behalf of the Domestic Funds -- as well as those asserted by the Liquidators on behalf of the Overseas Funds -- fail on other grounds.  The class claims should be

dismissed because mismanagement and self-dealing claims are derivative in nature.  (*Navigator* AC Count I; *FIC* AC Count II).  The fiduciary duty claims against the individual Bear Stearns Defendants, whether asserted directly or derivatively, are barred by the governing exculpatory clauses. (*Navigator* AC Count VII; *Varga* AC Count IV).  The fiduciary duty claim against BSC and Mr. Buxton in *Varga* fails on the additional ground that they were not fiduciaries to these funds.  And New York's Martin Act bars the Liquidators' claim against all of the Bear Stearns Defendants in *Varga* and the claim by Stillwater, Essex and Navigator against the Bear Stearns director defendants in *Varga* and *Navigator*.

> A.    The Class Claims Asserted By FIC (Count II) and
>        Navigator (Count I) Should Be Dismissed Because
>        Mismanagement and Self-Dealing Claims are Derivative in Nature

The class claims for breach of fiduciary duty in *Navigator* and *FIC* are based primarily on alleged mismanagement of the funds and self-dealing transactions between the Bear Stearns corporate defendants and the funds.  Under Delaware law, claims of this nature belong exclusively to the funds themselves rather than to the limited partners.  Thus, Navigator and FIC may assert these claims (if at all) only derivatively -- not directly.

The Delaware Supreme Court recently explained that the determination whether a claim is direct or derivative "turn[s] *solely* on the following questions: (1) who suffered the alleged harm . . . and (2) who would receive the benefit of any recovery or other remedy (the corporation or the [suing] stockholders individually)."  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).  In order to bring a direct claim -- either individually or on behalf of a purported class -- the plaintiff "must demonstrate that the duty breached was owed to the stockholder *and that he or she can prevail without showing an injury to the corporation*."  *Id.* at 1039 (emphasis added); *see also Agostino v. Hicks*, No. Civ.A. 20020-NC, 2004 WL 443987, at *7 (Del. Ch. Mar. 22, 2004) (dismissing purported class claim

for breach of fiduciary duty and holding that "the inquiry should focus on whether an injury is suffered by the shareholder *that is not dependent on a prior injury to the corporation*") (emphasis added).[14]

Both before and after *Tooley*, Delaware courts -- as well as the Second Circuit and this Court -- have held that claims of mismanagement are derivative in nature. The decision in *Litman* has particular relevance here. That case involved a limited partnership formed to invest in mortgage-backed loans. Plaintiff sued on behalf of itself and a purported class of limited partners, claiming that the general partner breached fiduciary duties by mismanaging the partnership and causing "a reduction of the Partnership's income, a reduction in the amount to be distributed to the limited partners and a reduction in the value of the [partnership] Units." *Litman*, 611 A.2d at 14. The court granted a motion to dismiss, holding that limited partners lacked standing to assert the claim at issue, and employing the following reasoning:

> By its own terms, the initial injury for which plaintiffs seek redress was to the Partnership. That is, plaintiffs complain that the Partnership received a lower amount of income because of the alleged misconduct. In other words, the defendants inflicted the alleged injury directly upon the Partnership. Therefore, defendants' misconduct damaged plaintiffs only to the extent of their proportionate interest in the Partnership. Clearly, this was not a direct injury to the limited partners or one that existed independently of the Partnership.

*Id.* at 16; *see also*, *e.g.*, *Debussy LLC v. Deutsche Bank AG*, 242 Fed. App'x 735, 736 (2d Cir. 2007) (holding that *Tooley* analysis compelled dismissal of direct claim for mismanagement, because harm alleged was to trust itself as opposed to investors generally).[15]

---

[14]   The same analysis controls the determination whether a limited partner may sue directly or must proceed derivatively on behalf of the partnership. *Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12, 15 (Del. Ch. 1992) ("the determination of whether a fiduciary duty lawsuit is derivative or direct in nature is substantially the same for corporate cases as it is for limited

The same is true with respect to self-dealing.  *See*, *e.g.*, *Adkins v. General Motors Corp.*, 170 Fed. App'x 184, 186 (2d Cir. 2006) (breach of fiduciary duty claim based on self-dealing is derivative under *Tooley*); *Gates v. BEA Assocs., Inc.*, No. 88 Civ. 6522 (JSM), 1990 WL 180137, at *7 (S.D.N.Y. Nov. 13, 1990) (claim for self-dealing "must be brought as a derivative claim on behalf of the corporation"); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 155 (Del. Ch. 2005) (same); *Leslie v. Telephonics Office Technologies, Inc.*, 1993 WL 547188, at *10 (Del. Ch. Dec. 30, 1993) (same); *In re Rexene Corp. Shareholders Litig.*, Civ. A. Nos. 10, 897, 11, 300, 1991 WL 77529, at *3 (Del. Ch. May 8, 1991) ("plaintiff's purported class claims, which allege waste [and] self-dealing . . . should be dismissed because they are, in fact, derivative claims").

Here, Navigator and FIC claim that the Bear Stearns Defendants breached their fiduciary duties by departing from the stated investment guidelines and purchasing securities that were unduly risky, unfairly priced or otherwise inappropriate.  This is a classic mismanagement claim.  They also claim that BSAM applied inflated and self-serving valuations to securities owned by the funds, engaged in related party transactions, and that Messrs. Cioffi and Tannin

---

partnership cases"); *see also*, *e.g.*, *Anglo American Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 149 (Del. Ch. 2003) (same).

[15]   *Accord*, *e.g.*, *Evergreen*, 423 F. Supp. 2d at 260-61 (same); *In re Goldman Sachs Mutual Funds*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *5, *6 (S.D.N.Y. Jan. 17, 2006) (same); *Agostino*, 2004 WL 443987, at *7 ("[T]he nature of this claim is nothing more than a claim of mismanagement that, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.  As such, the wrong alleged is entirely derivative in nature."); *Kramer v. Western Pacific Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("Delaware courts have long recognized that actions charging mismanagement which depress the value of stock allege a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action"); *Albert v. Alex. Brown Mgmt. Servs.*, No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005) (claim for breach of fiduciary duty premised on general partner's alleged mismanagement of limited partnership was "a paradigmatic derivative claim").

withdrew their own assets from the fund.  This is a classic self-dealing claim.  The sole reason

plaintiffs were harmed by this alleged misconduct is that it allegedly caused the fund to decline

in value, and plaintiffs thus cannot recover without proving that the funds themselves suffered

injury.   In light of these allegations, Delaware and Second Circuit case law compels the

conclusion that plaintiffs' breach of fiduciary duty claims belong to the funds themselves rather

than to Navigator, FIC or any other investor.  Accordingly, the Court should dismiss Count I of

the Navigator Complaint and Count II of the FIC Complaint for lack of standing.

> **B.**    **The Exculpatory Clauses in the Governing Fund Documents Bar**
> **the Breach of Fiduciary Duty Claims Against the Director Defendants**
> <u>**in Navigator and the Director Defendants and Buxton in Varga**</u>

Navigator's claim for breach of fiduciary duty against Messrs. Cohen, Cummins,

Quental and Sandelovsky (*Navigator* AC Count VII), and the breach of fiduciary claim in *Varga*

(*Varga* AC Count IV) -- to the extent it is asserted against those defendants, Mr. Buxton, BSC

and BS&Co. -- are barred by the applicable exculpatory clauses.  (FIC did not assert claims

against the directors of any of the funds.)

> **1.**    **Breach of Fiduciary Duty Claims**
> **Relating to the Domestic Funds are**
> <u>**Barred by Exculpation Clauses in the LPAs**</u>

The LPAs that govern the Domestic Funds contain exculpatory clauses that bar

claims for breach of fiduciary duty.  The clauses that govern the two funds are identical and

state, in relevant part that "to the extent . . . any General Partner Party has duties (including

fiduciary duties) and liabilities relating thereto to the Partnership or any Partner, such General

Partner Party shall not be liable for monetary or other damages . . . if such General Partner Party

acted without fraud, bad faith, gross negligence, or willful misconduct."  (Exh. I at 30; Exh. J at

36).  The LPAs define "General Partner Party" to include the General Partner (*i.e.*, BSAM), any

"Affiliate" of the General Partner, and any "director, officer, employee or agent of the General

Partner or any such Affiliate." (*Id.* at 3). Thus, the exculpatory clauses, by their terms, extend to Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky, as directors, employees and/or agents of BSAM; to BSC and BS&Co. as affiliates of BSAM; and to Mr. Buxton as an employee of BS&Co.

The DRULPA expressly authorizes exculpation clauses in partnership agreements, stating: "[a] partnership agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner." Del. Code tit. 6 § 17-1101(f) (2004). Delaware courts have held that the applicability of an exculpation clause can and should be raised on a motion to dismiss. *See In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, No. Civ.A. 17379 NC, 2002 WL 31926614, at *3 (Del. Ch. Dec. 16, 2002) ("To vindicate the statutory purpose behind the [DRULPA], it is critical that defendants be able to assert those defenses in a motion directed to the face of the complaint"); *Malpiede v. Townson*, 780 A.2d 1075, 1079 (Del. 2001) (because the existence and terms of the exculpatory clause were not in dispute, it "was properly before the Court of Chancery, which correctly held that the plaintiffs' due care claim was barred").

Under governing law, these clauses bar the breach of fiduciary claim in *Navigator* (Count VII) against Messrs. Cohen, Cummins, Quental and Sandelovsky, in their capacity as directors of the HG Master Fund. There are no non-conclusory allegations in the amended complaint suggesting that any of these individuals engaged in fraud, bad faith, gross negligence, or willful misconduct. Rather, the amended complaint merely alleges that they breached their fiduciary duties by failing to "supervise and oversee" the activities of Messrs. Cioffi, Tannin and McGarrigal in connection with the day-to-day management of the HG Master Fund. (*Navigator* AC ¶ 431). This is, at most, a negligence claim, which the exculpatory clause by definition

precludes.  Merely inserting the words "willfully," "in bad faith" and "with gross negligence," as Navigator does in paragraph 431, is no substitute for pleading facts, and there simply are no facts indicating that Messrs. Cohen, Cummins, Quental and Sandelovsky engaged in any non-exculpated conduct.  *See Malpiede*, 780 A.2d at 1094 n.65 ("plaintiffs must plead facts supporting a claim that is not barred by the exculpatory charter provision"); *Trenwick America Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 194 (Del. Ch. 2006) (to survive dismissal, "at the very least [plaintiff] would have to plead a claim not exculpated by the Trenwick charter"), *aff'd.*, *Trenwick America Litig. Trust v. Billet*, No. 495, 2006, 2007 WL 2317768 (Del. Aug. 14, 2007). [16]

The exculpatory clauses in the LPAs also bar the breach of fiduciary claim by Stillwater and Essex against BSC, BS&Co. and Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky with respect to the Domestic Funds.  As noted below, there are no non-conclusory allegations suggesting that any of these defendants acted with ill-intent. (Points IX.A.3, *supra*).  Plaintiffs' conclusory allegations do not support a fraud claim, for the reasons discussed above, and are likewise insufficient to state any other non-exculpated claims.  *See*, *e.g.*, *Fisk Ventures, LLC v. Segal*, Civ. No. 3017-CC, 2008 WL 1961156, at *11 (Del. Ch. May 7,

---

[16]   The Supreme Court of Delaware has defined "gross negligence" as a "higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990), *cert. denied*, 499 U.S. 952 (1991).  "Gross negligence" requires "more than ordinary inadvertence or inattention." *AstroPower Liquidating Trust v. KPMG LLP*, Civ. A. No. 06-469-JJF, 2007 WL 1549048, at *5 (D. Del. May 25, 2007) (quotation omitted).  It "has a stringent meaning under Delaware [corporate law] . . . [and] 'has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Midland Grange No. 27 Patrons of Husbandry v. Walls*, C.A. No. 2155-VCN, 2008 WL 616239, at *9 (Del. Ch. Feb. 28, 2008), (citation omitted, quotation marks omitted).  "Bad faith" is even harder to plead and prove because it "requires conduct that is qualitatively different from, and more culpable than" gross negligence. *Stone ex rel. AmSouth Bancorporation v. Ritter*,

2008) (dismissing complaint based, *inter alia*, on exculpatory clause, because "the hollow invocation of 'bad faith' does not magically render a deficient complaint dismissal-proof"); *Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. No. 1577-VCP, 2007 WL 4292024, at *6 n.49 (Del. Ch. Nov. 30, 2007) ("Merely stating Defendants were 'grossly negligent' without alleging any particularized fact to support that conclusion is insufficient" to state gross negligence claim.).[17]

      2.      Breach of Fiduciary Duty Claims Relating
                  to the Overseas Funds are Barred by
                  Exculpation Clauses in the Articles of Association

      The Articles of Association that govern the Overseas Funds similarly contain exculpatory clauses barring the breach of fiduciary duty claims by Varga and Cleghorn against the directors of those funds.  These clauses shield the directors from liability "for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers authorities, or discretions of [their] office or in relation thereto."  (Exh. Q at 32; Exh. R at 18).  As in the case of the Domestic Funds, the only conduct not exculpated by

---

911 A.2d 362, 369 (Del. 2006) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66-67 (Del. 2006)).

[17]  Cayman Islands law provides a separate basis for dismissing the claims for breach of fiduciary duty that Navigator, Essex and Stillwater seek to assert against Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky.  The premise for these claims is that these individuals breached fiduciary obligations they owed as directors of the Master Funds.  But under the law of the Cayman Islands, claims of this nature may only be asserted by the Master Funds themselves -- *not* by shareholders in the Master Funds.  *See*, *e.g.*, *Johnson v. Gore Wood & Co.*, [2002] 2 AC 1, 2000 WL 1791527, at *35 ("A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss.") (Annex D hereto).  Thus, even if Navigator, Essex and Stillwater had established their right to proceed on behalf of the Domestic Funds (which they have not), these claims would fail because the Domestic Funds themselves lack standing to pursue breach of fiduciary duty claims against the directors of the Master Funds.

these clauses are acts or omissions that rise to the level of bad faith, gross negligence, willful misconduct, or dishonesty.  New York courts, like Delaware courts, have held that exculpation clauses are appropriate grounds for a motion to dismiss.  *See Glatzer v. Grossman*, 47 A.D.3d 676, 677, 849 N.Y.S.2d 300, 301 (2d Dep't 2008) (affirming motion to dismiss based on exculpatory clause in certificate of incorporation); *Bilstein v. Atwater*, 222 A.D.2d 545, 546, 635 N.Y.S.2d 88, 89 (2d Dep't 1995) (same).

The exculpatory clauses in the Articles of Association require dismissal of the *Varga* plaintiffs' breach of fiduciary duty claims against Messrs. Cohen, Cummins, Sandelovsky, Quental and Guarasci, to the extent they are sued in their capacity as directors of the Overseas Funds.[18]  Plaintiffs do not allege bad faith, willful misconduct, or dishonesty by any of them. The most plaintiffs allege is that these defendants "failed to ensure that BSAM was following the stated investment guidelines for the Overseas Funds," failed to monitor the manager marks or question the NAVs, and failed to assess independently Deloitte's audits.  (*Varga* AC ¶¶ 382-86). These allegations, even if true, do not evidence the type of intentional misconduct that falls outside the reach of the exculpatory provisions.  Again, plaintiffs cannot end-run the exculpatory clauses by using conclusory language -- like "flagrantly violated" and "flagrantly breached" (*Id*. ¶¶ 382, 388) -- without particularized factual allegations demonstrating that defendants engaged

---

[18]   The Liquidators lack standing to assert claims against these defendants in their capacity as directors of the Master Funds.  (*See* note 16, *supra*).  Moreover, according to plaintiffs' own allegations, most of the individual defendants did not serve as directors of the funds throughout the relevant time period.  Mr. Cummins did not become a director until August 2006.  Mr. Quental did not become a director until March 2007.  Mr. Sandelovsky did not become a director until October 2005 and ceased being a director in March 2007.  And Mr. Guarasci ceased being a director in October 2005.  (*Varga* AC ¶¶ 44-47).  This precludes the claims against these defendants, in whole or in part, because they did not have -- and thus cannot have breached -- fiduciary duties to investors either before or after they served as directors of the funds.  Moreover, individuals who were not

in non-exculpated conduct.  *See*, *e.g.*, *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 355, 777 N.Y.S.2d 62, 65 (1st Dep't 2004) (finding a claim barred by the contract's exculpation clause and explaining that "[e]ven on a motion to dismiss, a court need not accept as true conclusory allegations that a defendant was grossly negligent or acted willfully, in bad faith or with reckless disregard of its duties").[19]

        Based on the exculpatory clauses alone, the Court should dismiss Count IV in *Varga* as against Messrs. Buxton, Cohen, Cummins, Guarasci, Quental and Sandelovsky and BSC and BS&Co, and should dismiss Count VII in *Navigator* entirely.

        C.      The Varga Complaint Fails to State a Breach of
                       Fiduciary Duty Claim Against BSC and Mr. Buxton
                       Because They Were Not Fiduciaries to the Funds

        The *Varga* plaintiffs' breach of fiduciary duty claim against BSC and Buxton should be dismissed on the additional ground that they were not fiduciaries to the funds.

        The only relevant allegation against BSC is that it had "direct and unfettered control over its wholly-owned subsidiary, BSAM." (*Varga* AC ¶ 520).  But plaintiff alleges no facts demonstrating actual control, and under New York and Delaware law, the mere existence of a parent/subsidiary relationship does not extend the subsidiary's fiduciary duties to the parent.  *J. Royal Parker Assocs., Inc. v. Parco Brown & Root, Inc.*, No. 7013, 1984 WL 8255, at *4 (Del. Ch. Nov. 30, 1984) (stating that the court was aware of no authority "holding a parent company liable for breaches of fiduciary duty by its subsidiary without piercing the corporate veil");

---

      directors of the funds at their inception can have no possible liability with respect to statements in the funds' offering documents.

[19]  For the same reasons, the exculpatory clause in the Articles of Association for the HG Master Fund provides a separate ground for dismissal of Count VII in *Navigator*, which seeks recovery for alleged breaches of fiduciary duty by Messrs. Cohen, Cummins, Quental and Sandelovsky in their capacity as directors of the HG Master Fund.

*Lipton v. Unumprovident Corp.*, 10 A.D.3d 703, 705, 783 N.Y.S.2d 601, 603 (2d Dep't 2004) (affirming dismissal of plaintiffs' claim because a "parent company will not be held liable for the torts of its subsidiary unless it can be shown that the parent exercises complete dominion and control over the subsidiary").

        As for Mr. Buxton, he held no position at BSAM, he was not a director of any of the feeder or master funds, and he is not alleged to have had (nor did he have) any responsibility with respect to the management or composition of the funds during the relevant time period (or ever). Buxton's position as "Senior Managing Director of Bear Stearns Co.," an affiliate of BSAM, does not give rise to fiduciary duties to investors in hedge funds that a separate Bear Stearns entity (BSAM) created and managed, through a designated slate of directors that did *not* include Buxton. (*Varga* AC ¶ 41).

        Accordingly, the Varga plaintiffs cannot state a breach of fiduciary duty claim against BSC or Buxton for this reason as well.

        D.    **The Martin Act Bars the Claim for Breach of Fiduciary Duty by the Liquidators in its Entirety and by Stillwater, Essex and Navigator as Against the Bear Stearns Director Defendants**

        The Liquidators' breach of fiduciary claim in *Varga* is brought on behalf of the Overseas Funds. Although Stillwater, Essex and Navigator have asserted a breach of fiduciary claim against the Bear Stearns director defendants in connection with the Domestic Funds, those defendants are actually sued solely in their capacity as directors of the Overseas Funds and/or the Master Funds (*Varga* AC ¶¶ 43-47; *Navigator* AC ¶ 428), and indeed the directors had no role with respect to the domestic feeders. Because these claims are not subject to the choice of law provision in the LPA's, they are governed by New York rather than Delaware law. As a result, they are preempted by the Martin Act, New York's "blue sky" law.

The Martin Act prohibits fraudulent and deceitful practices in connection with securities transactions, and allows the New York Attorney General to bring suit against violators of the Act.  N.Y. Gen. Bus. Law art. 23-A.  The New York Court of Appeals has held that there is no implied private right of action under the Martin Act.  *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275 (N.Y. 1987).  The Second Circuit, following New York appellate courts, has held that the Martin Act preempts common law breach of fiduciary claims in cases involving securities because allowing such claims to proceed would effectively provide investors with a private right of action to enforce the very conduct prohibited by the statute.  *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (affirming dismissal of breach of fiduciary claim because "[t]his claim is barred by the Martin Act"); *see also Pro Bono Investments, Inc. v. Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 2429787 (S.D.N.Y. Sept. 30, 2005), at *16 (breach of fiduciary duty and other state law claims are preempted by the Martin Act); *Nanopierce Technologies, Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, at *3 (S.D.N.Y. Sept. 2, 2003) (same, noting that "[t]he federal district courts that have examined the question have reached the same result with near unanimity").

Plaintiffs in *Varga* allege that the Bear Stearns Defendants breached fiduciary duties by "causing the Funds to engage in a pattern of misrepresentations and deceptive conduct."  (*Varga* AC ¶ 547).   Navigator likewise alleges disclosure violations by the Bear Stearns Defendants in connection with the funds.  Such conduct is plainly "covered by" the Martin Act, and to the extent these claims are governed by New York rather than Delaware law, a breach of fiduciary duty claim predicated on such conduct is preempted under *Castellano* and its progeny.

V.    THE CLAIMS FOR AIDING AND ABETTING BREACH
      OF FIDUCIARY DUTY SHOULD BE DISMISSED

            Plaintiffs in each of the three actions allege that certain of the Bear Stearns

Defendants aided and abetted various other defendants' alleged breaches of fiduciary duty.

Navigator alleges, in both class and derivative claims, that BSC, BS&Co., BSSC and Messrs.

Cohen, Cummins, Quental and Sandelovsky aided and abetted the alleged breaches of duty by

the Management Defendants.  (*Navigator* AC Counts IV, IX).  FIC asserts similar claims for

aiding and abetting breach of fiduciary duty against BSC and BS&Co. (*FIC* AC Counts III, V).

The *Varga* plaintiffs claim, on behalf of the Domestic Funds and the Overseas Funds, that *all* of

the Bear Stearns Defendants aided and abetted alleged breaches of fiduciary duty by Mr. Lennon,

Ms. Wilson-Clarke and Walkers FS.  (*Varga* AC Count VI).  All of these claims fail.

      A.    The Aiding and Abetting Claims Cannot Proceed Absent
            Viable Underlying Breach of Fiduciary Duty Claims

            Because aiding and abetting necessarily requires an underlying breach, these

claims cannot survive because plaintiffs have failed to allege underlying breach of fiduciary duty

claims.  *See*, *e.g.*, *Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-VCP, 2007

WL 4292024, at *15 (Del. Ch.  Nov. 30, 2007) (there can be no liability for aiding and abetting if

"the Complaint fails to state a claim for any underlying breach of fiduciary duty"); *Kassover v.

Prism Venture Partners, LLC*, Nos. 3538, 3539, 602464/05, 2008 WL 2796565, at *5 (N.Y.A.D.

1st Dep't July 22, 2008) ("[b]ecause the breach of fiduciary duty claim fails, there can be no

cause of action for aiding and abetting breach of that fiduciary duty").  Here, FIC's and

Navigator's failure to state a claim for breach of fiduciary duty against the Management

Defendants (*see* Points I and IV, *supra*), bars their related aiding and abetting claims against the

other defendants.  Similarly, because the *Varga* plaintiffs' claim of breach of fiduciary duty

against the Walkers Defendants fails (*see* Walkers Mem. Point III), so does their claim that the Bear Stearns Defendants aided and abetted that supposed breach.

       B.      <u>Plaintiffs Have Not Alleged "Knowing Participation"</u>

          Even if the underlying claims somehow could survive dismissal, the aiding and abetting claims asserted by plaintiffs in all three actions would still fail, because none of the plaintiffs has alleged "knowing participation" other than in purely conclusory terms, which does not suffice to state a claim for relief under Delaware or New York law.  *See*, *e.g.*, *In re Santa Fe Pacific Corp. Shareholder Litig.*, 669 A.2d 59, 72 (Del. 1995) (the key element of an aiding and abetting claim under Delaware law is "knowing participation in that breach" by the non-fiduciary);  *In re General Motors (Hughes) Shareholder Litig.*, No. Civ.A. 20269, 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005) ("[c]onclusory statements of knowing participation will not suffice" to state an aiding and abetting claim), *aff'd*, 897 A.2d 162 (Del. 2006); *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003) (plaintiffs must plead that the defendants "knowingly induced or participated in the [primary] breach"); *Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 464, 846 N.Y.S.2d 145, 148 (1st Dep't 2007) ("a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty").

       1.      <u>Navigator Does Not Allege "Knowing Participation"</u>

          In support of its aiding and abetting breach of fiduciary duty claim, Navigator relies on the same allegations that underlie its abetting and abetting fraud claim.  (Compare AC ¶¶ 407-11 with AC ¶¶ 394-98).  Because these generalized allegations lack sufficient detail to demonstrate knowledge or participation under the notice pleading standard (*see supra* Point III.B.2), they certainly do not meet the particularity requirement that applies to this claim.

2.      FIC Does Not Allege "Knowing Participation"

The few factual allegations in FIC that concern BSC or BS&Co. are either irrelevant or inconsistent with any theory of "knowing participation." The unremarkable allegations that BS&Co. "acted as placement agent to the [EL Fund]" and "earned fees acting as an underwriter in CDO offerings" do not establish that BS&Co., which had no contractual or fiduciary relationship with the Domestic EL Fund or its limited partners, was aware of any conduct by BSAM, let alone conduct that BSAM breached any fiduciary obligation. (*FIC* AC ¶¶ 22, 77). FIC's further assertions -- that, on unspecified occasions, BS&Co. or BSAM "caused the [EL Master Fund] to purchase" unspecified "illiquid" CDO securities that one of them had "helped issue," and for which they "could not find a purchaser" -- are equally unavailing. (*Id*. ¶ 78). Even if the Master Fund purchased illiquid securities that BS&Co. or BSAM "helped to issue," that fact would not, without more, connote a fiduciary breach by anyone, much less "knowing participation" by BS&Co. in such a breach.

As to BSC, the Amended Complaint is even thinner. The allegation of BSC's status as "the parent of BSAM and BS&Co." is legally insufficient to establish aiding and abetting liability. (*See* Point III.B, *supra*). FIC's only other non-conclusory assertion concerning BSC is that it "placed a moratorium on trades with BSAM because," according to the complaint, "BSAM did not comply with its duty to submit related party transactions to independent directors." (*Id*. ¶¶ 23, 71). But far from establishing "knowing participation" in any fiduciary breach by BSAM, this assertion demonstrates that BSC sought to *prevent* the very alleged acts of self-dealing that underlie FIC's claims.

Apart from this handful of allegations, which cannot demonstrate knowledge, FIC relies on boilerplate incantations that BSC or BS&Co. "actively and knowingly induced the Management Defendants to breach their fiduciary duties to the Class," "colluded with the

Management Defendants in their attempts to circumvent the Management Defendants' fiduciary duties to the Class," "were active and knowing participants in the Management Defendants' breaches of fiduciary duties," "participated in the breaches of the fiduciary duties by the Management Defendants for the purpose of advancing their own interests," and "had actual knowledge of the breaches of fiduciary duty and substantially assisted the Management Defendants' breach [of] their fiduciary duty." (*Id*. ¶¶ 139, 140, 141, 152). But FIC's recitation of the elements of a claim for aiding and abetting is no substitute for the factual specificity that the controlling case law, cited above, requires. Accordingly, the Court should dismiss Counts III and V of FIC's amended complaint.

### 3.   The *Varga* Plaintiffs Do Not Allege "Knowing Participation"

The allegations in *Varga* are likewise conclusory. Plaintiffs allege that the "Bear Stearns Defendants knowingly procured the breaches of these other persons' fiduciary duties to the Funds without privilege or justification, by use of their control positions and power with these other persons" and the "Bear Stearns Defendants knowingly provided substantial assistance to the breaches." (*Varga* AC ¶ 558). The Varga plaintiffs do not allege *any* facts to support *any* of these assertions with respect to *any* of "the Bear Stearns Defendants." Such empty allegations are patently insufficient to state an aiding and abetting claim against BSC, BS&Co., or the individual Bear Stearns Defendants.

## VI.   THE NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS FAIL

FIC did not allege a claim for either negligence or gross negligence. The *Varga* plaintiffs' claim for "Gross Negligence and Negligence" against all of the "Bear Stearns Defendants (*Varga* AC Count VIII) and Navigator's claim for gross negligence claim against BSAM (*Navigator* AC Count VIII) are both pled derivatively. As explained above at Point I,

because Navigator, Stillwater and Essex have failed to properly plead pre-suit demand or demand futility, their claims should be dismissed.

Additionally, the negligence claim in *Varga* is barred by the exculpation clauses in the fund documents, which contain no carve-out for ordinary as opposed to "gross" negligence. (*See* Point IV.B *supra*).[20]  The negligence claim in Count VIII should therefore be dismissed as alleged by the *Varga* plaintiffs against *all* of the named defendants.

In addition, the negligence and gross negligence claims in *Varga* should be dismissed as against BSC, BS&Co. and the individual Bear Stearns Defendants because both claims are predicated on an alleged "pattern and practice of deceptive conduct" (*Varga* AC ¶ 571) and the supporting allegations would therefore have to satisfy Rule 9(b), which they do not. There are simply no particularized factual allegations demonstrating that these defendants engaged in a pattern and practice of deceptive conduct.  (*See* Point IX.A, *infra*).  *See Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (Rule 9(b) is "applicable to any claim that 'sounds in fraud,' regardless of whether fraud is an element of the claim, . . . as well as to individual claims that, as pleaded, are predicated on allegations of fraud") (citations omitted); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484, 02 Civ. 8472, 2008 WL 2594819, at *8 (S.D.N.Y. June 26, 2008) (applying Rule 9(b) to state law claims that "indisputably are based on plaintiffs' allegations of Defendant's fraudulent conduct"). Based on those same allegations, the Liquidators' negligence and gross negligence claims against all of the Bear Stearns corporate defendants, including BSAM, are barred by the Martin Act.  *See Pro Bono Investments*, 2005 WL 2429787, at *1, *16 (dismissing state law claims, including negligence and gross negligence).

VII.   THE BREACH OF CONTRACT CLAIMS IN
       *VARGA* AND *FIC* SHOULD BE DISMISSED

        In addition to failing to satisfy the pre-suit demand requirement, the *Varga*
plaintiffs' derivative claims for breach of contract (Count V) fails because they have not
specified what contracts -- let alone what provisions of those contracts -- were allegedly
breached.  FIC's class claim for breach of contract (Count I) suffers from the same fatal defect.

        To state a contract claim under either Delaware or New York law,[21] a plaintiff
must allege, among other things, "a breach of an obligation imposed by the contract."  *Griffin
Corp. Servs., LLC v. Jacobs*, No. Civ.A. 396-N, 2005 WL 2000775, at * 8 (Del. Ch. Aug. 11,
2005) (quotation omitted).  To do that, plaintiff must identify the contract that allegedly was
breached, and "identify [the] express contractual obligation that was breached."  *Wal-Mart
Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (dismissing breach of contract
claim); *see also Martinez v. Vakko Holding A.S.*, No. 07 Civ. 3413 (LAP), 2008 WL 2876529, at
*2 (S.D.N.Y. July 23, 2008) ("A breach of contract claim will be dismissed where a plaintiff
fails to allege the essential terms of the parties' purported contract, including the specific
provisions of the contract upon which liability is predicated.") (citations and quotations omitted);
*Anderson v. Wachovia Mortgage Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007) (court
dismissed contract claim because plaintiffs "[had] not identified any express contract provision
that was breached") (quoting *Wal-Mart*, 901 A.2d at 116).

_____

[20]   Presumably recognizing that negligence claims are barred by the exculpation clause,
Navigator has asserted a claim solely for gross negligence and not ordinary negligence.

[21]   The LPAs for the Domestic Funds are governed by Delaware law; the IMAs for the Overseas
Funds are governed by New York law.

Because the plaintiffs in Varga and FIC have identified neither the contracts nor the specific provisions that BSAM allegedly breached, the Court should dismiss Count V in *Varga* and Count I in *FIC*.

VIII.   THE COURT SHOULD DISMISS THE UNJUST
        ENRICHMENT CLAIM IN *VARGA*

The *Varga* plaintiffs are the only ones who have attempted to assert a claim for unjust enrichment.  As to the Bear Stearns Defendants, their claim is misplaced.

Initially, this claim fails against BSAM because its relationship with the funds was admittedly governed by contract.  Where a valid contractual relationship exists, there can be no quasi-contract claim for unjust enrichment.  *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005) (unjust enrichment "is an obligation the law creates in the absence of any agreement" and is not a "valid claim" when "the matter is controlled by contract"); *Bakerman v. Sidney Frank Importing Co.*, Inc., No. Civ.A. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, . . . a claim for unjust enrichment will be dismissed," and "[t]his is the case even when the enforceable contract gives rise to a fiduciary relationship between the parties.").

As against the other Bear Stearns Defendants, this claim fails in the absence of allegations that any of them was actually "enriched."  To state a claim for unjust enrichment, plaintiffs must allege "(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006); *see also Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (to state a claim for unjust enrichment, plaintiffs must allege "an enrichment" by defendant, "an impoverishment" on the part of the plaintiff, and "a relation between the enrichment and impoverishment").  Because the claim here is explicitly

predicated on an alleged "fraudulent" scheme, the supporting allegations must also be pled with particularity.  *See Varga* AC ¶ 637; Point IX.A, *infra*.

        Here, Plaintiffs offer no allegations, conclusory or otherwise, that BSC or BS&Co. was "enriched" by the alleged "scheme."  While the amended complaint asserts that the "compensation and reputation" of the "BSAM Directors and the Management Defendants" were "directly tied to the performance of the Funds," and that they "received larger compensation and advisory and incentive fees . . . based on the Funds' performance" (*Varga* AC ¶ 524), it notably does not allege that any of these individuals actually received additional compensation or fees -- let alone when or how much -- as a result of any conduct alleged in the complaint (and in fact they did not).  Indeed, there are no allegations at all concerning the compensation of any of the individual defendants at any point in time.  Absent any alleged *facts* suggesting that BSC, BS&Co., or the individual Bear Stearns Defendants "benefited" or were "enriched" at plaintiffs' or the funds' expense, the Court should dismiss Count XVII of the *Varga* amended complaint as against them.

IX.    THE FEDERAL SECURITIES FRAUD CLAIMS
       IN *VARGA* ARE LEGALLY INSUFFICIENT

        Faced with a motion to dismiss its original complaint for lack of subject matter jurisdiction and failure to satisfy Rule 9(b), Varga and Cleghorn attempted to remedy that defect by including in their amended complaint claims under sections 10(b) and 20(a) of the Exchange Act.  Newly-added plaintiffs Essex and Stillwater -- institutions who allege that they hold vaguely-defined "economic interests" in the Domestic Funds -- purport to assert these claims as investors in the Domestic EL Fund and the Domestic HG Fund, respectively.  Varga and Cleghorn purport to assert these claims as "assignees" of shares purchased by Essex in one of the Overseas Funds.  The federal securities claims in *Varga* fail for a host of reasons.

A.     Plaintiffs' Claims Pursuant to Section
       10(b) of the Exchange Act Fail

Because plaintiffs have failed to plead with particularity that Essex and Stillwater purchased or sold securities during the relevant time period, the securities fraud claims -- by Essex, for its purported interest in the Domestic EL Fund, by the Liquidators, as assignee of Essex's purported interest in the Overseas EL Fund, and by Stillwater for its purported interest in the Domestic HG Fund -- should be dismissed.  Additionally, the claim must be dismissed in its entirety against BSC, BS&Co., and the individual Bear Stearns Defendants for failure sufficiently to allege material false statements and/or scienter.

1.     Plaintiffs Lack Standing to Assert
       Securities Fraud Claims

Investors lack standing to assert a securities fraud claim under Section 10(b) and Rule 10b-5 if they did not buy or sell the relevant securities during the relevant time period.  *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625, 2007 WL 1213395, at *4 (E.D.N.Y. Apr. 25, 2007); *see also Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir. 2000) ("no private action under those provisions is available to persons who were neither buyers nor sellers of the relevant securities") (citation omitted), *cert. denied*, 532 U.S. 923 (2001).  To satisfy the PSLRA and Fed. R. Civ. P. 9(b), the purchases and/or sales must be pled with particularity, meaning -- at a minimum -- that the complaint must identify the date of each purchase or sale, the securities that were bought or sold, the amount of stock purchases, and the losses suffered.  *See*, *e.g.*, *Barr v. McGraw-Hill, Inc.*, 710 F. Supp. 95, 97 (S.D.N.Y. 1989) ("To satisfy Rule 9(b), plaintiffs must plead the amount and price of the securities purchased by each plaintiff, the date and place of each purchase, and the losses suffered.  This will enable defendants to prepare a defense against the claims of individual plaintiffs, whose circumstances may differ."); *Morin v. Trupin*, 747 F. Supp. 1051, 1062 (S.D.N.Y. 1990) (dismissing Section 10(b) claim under Rule 9(b) in part

because "the complaint is silent as to the dates of [all but 2 of the 35 plaintiffs'] purchase[s] of their various investments"); *Felton v. Walston & Co., Inc.*, 508 F.2d 577, 580 (2d Cir. 1974) (noting that the motion court had considered, when dismissing plaintiffs' securities fraud claim, the fact that the complaint did not allege "specific dates and amounts of stock purchases"); *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972) (plaintiffs failed to satisfy 9(b) because, among other things, they failed to allege "the nature and amount of the securities exchanged, or the dates of the transaction"); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 295 (S.D.N.Y. 2000) ("[The] pleadings not only suffer from [the failure to cite to specific defendants in their allegations], but also fail to specify what Odyssey's losses are, if any, stemming from the transactions."), *aff'd*, 2001 WL 46565 (2d Cir. Jan. 18, 2001).

Here, the amended complaint does not allege when and where Essex purchased or sold securities in either the Domestic EL Fund or the Overseas EL Fund, the nature and amount of the securities purchased or sold, or the losses suffered.  Rather, it merely asserts in vague terms that Essex, at some point between February 2007 and the funds' closure in the summer of 2007, "made purchases and sales of limited partnership interests *and/or* shares in the High-Grade Enhanced Funds" (defined in ¶ 37 to include *both* of the EL Feeder Funds).  (*Varga* AC ¶ 496) (emphasis added).  While plaintiffs have referenced dates certain on which Stillwater allegedly made "purchases and sales" of limited partnership interests in the Domestic HG Fund, they fail to allege any specifics, including what interests they purchased, from or to whom they made purchases or sales, which transactions was a purchase and which was a sale, and the nature and amount of the securities purchased or sold or any losses suffered.  (*Id.*).  This lack of specificity is compounded by the vague assertion earlier in the amended complaint that Stillwater and Essex

had "economic exposure to limited partnership interests . . . through a leverage counterparty through which [they] initially invested."  (*Id.* ¶¶ 30-31).

Reading these allegations together, it is entirely unclear whether or when Stillwater or Essex bought or sold interests or shares in the relevant funds.  The amended complaint's lack of specificity on this most basic element of a federal securities fraud claim compels dismissal.  *See*, *e.g.*, *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *12 n.10 (S.D.N.Y. Sept. 13, 2007) ("The complaint is so vague with regard to the arrangements by which RCM held plaintiffs' securities that it is difficult to determine [standing issues]."); *In re AIG*, 2007 WL 1213395, at *4 (plaintiffs "can allege no injury from the purchase or sale of funds they never invested in" and "therefore have no standing to ask [this Court] to remedy injuries related to those funds").

> 2. The Amended Complaint Fails to Plead with Particularity Any Allegedly False Statements or Omissions by BSC, BS&Co. or Messrs. Cohen, Cummins, Guarasci, Quental or Sandelovsky

Allegations of securities fraud must "satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires fraud to be alleged with particularity," *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001), and the heightened pleading standard of the PSLRA, which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).

It is well-settled in this Circuit that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  *DiVittorio v. Equidyne Exractive Indus., Inc.*, 822 F.2d 1242,

1247 (2d Cir. 1987).  Where -- as here -- multiple defendants are accused of fraudulent conduct,

plaintiffs must "specifically state what each particular defendant did or said, by what means,

when, to whom and with what intent." *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 400

(S.D.N.Y. 2007) (internal quotations and citations omitted); *see also Suez Equity Investors, L.P.*

*v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) ("Rule 9(b) . . . imposes an obligation

on plaintiff to 'specify the statements it claims were false or misleading, give particulars as to the

respect in which plaintiff contends the statements are fraudulent, state when and where the

statements were made, *and identify those responsible for the statements*.'") (emphasis added,

internal citation omitted).

   Applying these basic pleading principles, the Court should dismiss the securities

fraud claim as against BSC, BS&Co. and Messrs. Cohen, Cummins, Guarasci, Quental and

Sandelovsky.  Plaintiffs do not allege any misrepresentations or omissions by any of these

defendants.  Instead, plaintiffs merely allege that because these defendants were affiliated with

BSAM, they "must be" liable for any purported fraudulent conduct.  (*Varga* AC ¶¶ 34, 37).  But

an entity's status as a parent or affiliate is insufficient by itself to subject it to liability.  *See*, *e.g.*,

*Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (dismissing securities fraud claims

against a corporate entity because the amended complaint -- which "identifie[d] MacFarlane

Development simply as 'a New York corporation, [which] is an affiliate of MacFarlane and

MacFarlane Perry . . . , and allege[d] no more about MacFarlane Development [in particular]'" --

failed to satisfy Rule 9(b)); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC),

2000 WL 1234601, at *5 (S.D.N.Y. Aug. 31, 2000) (dismissing Section 10(b) against claim

against Sotheby's, Inc., a subsidiary of defendant Sotheby's Holdings, Inc., because "[t]he

Complaint does not specifically allege that Sotheby's, Inc. made any false or misleading statements").

Similarly, the *Varga* amended complaint does not attribute any supposed false statement to Messrs. Cohen, Cummins, Guarasci, Quental or Sandelovsky individually.  Under settled law, references to the "Bear Stearns Defendants" as a group do not suffice to state a section 10(b) claim against BSC, BS&Co. or these individuals.  *See*, *e.g.*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'") (citation omitted); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 493 (S.D.N.Y. 2005) ("A number of courts have recognized that such indiscriminate defendant 'clumping' does not adhere to the particularity standards of Fed. R. Civ. P. 9(b) and the PSLRA."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998) ("[A] claim may not rely upon blanket references to acts or omissions by all the defendants, for each defendant named is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he is individually charged.").

> 3. The Amended Complaint Fails to Allege with
> Particularity that BSC, BS&Co., or the Individual
> Bear Stearns Defendants Acted with Scienter

The Court also should dismiss the securities fraud claim as against BSC, BS&Co., and the Individual Bear Stearns Defendants because plaintiffs have failed to allege adequately that any of them acted with *scienter*.  The PSLRA and Fed. R. Civ. P. 9(b) require that plaintiff plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  In determining whether there is a "strong

inference" of scienter, the United States Supreme Court has recently instructed that courts "must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). Thus, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent *and at least as compelling as any opposing inference one could draw from the facts alleged.*" *Id.* at 2510 (emphasis added).

a.   Plaintiffs Have Not Alleged Scienter as to
BSC and BS&Co.

In the entire 639-paragraph *Varga* complaint, there are only two conclusory paragraphs -- not even found in the section pertaining to the section 10(b) claim but rather in the section 20(a) claim -- that even purport to bear on the state of mind of BSC and BS&Co. Plaintiffs allege that BSC and BS&Co. "at all relevant times, participated in and/or were aware of, among others, BSAM's fraudulent activities vis-à-vis the Funds," "had an intimate knowledge of the Funds' actual true values through internal corporate documents and communications," and "had access to documents evidencing the securities fraud violations, including, but not limited to, copies of financial reports, press releases and public documents that contained the false and misleading information previously described herein." (*Varga* AC ¶ 521). Plaintiffs further allege that "[a]lthough they had the ability to stop and/or expose the fraud, the Bear Stearns Companies and Bear Stearns Co. did not do so." (*Id.* ¶ 522). Because there are no facts anywhere in the amended complaint that support these assertions, they cannot give rise to a "strong inference" of fraudulent intent on the part of BSC or BS&Co.

Plaintiffs contend that BSC and BS&Co. "had an intimate knowledge of the Funds' actual true values through internal corporate documents and communications" and "had access to documents evidencing the securities fraud violations." (*Varga* AC ¶ 521). But the complaint never identifies *what* internal corporate documents or *what* communications they were

- 64 -

allegedly privy to, *who* at BSC or BS&Co. was privy to them, let alone *when* and *where* they allegedly saw or had access to this information. Without those details, plaintiffs' allegations lack sufficient particularity to satisfy Rule 9(b) or the PSLRA. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."), *cert. denied*, 531 U.S. 1012 (2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss.").

Nor can plaintiffs establish scienter by alleging that the "stellar performance" of the funds should have alerted BSC and BS&Co. to possible wrongdoing. (*E.g.*, *Varga* AC ¶¶ 80-81). As the Second Circuit explained in *Novak*, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary -- specifically, the 'unprecedented and dramatically increasing profitability' of a particular form of trading -- as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws." *Novak*, 216 F.3d at 309 (citation omitted).

      b.    Plaintiffs Have Not Alleged Scienter as to
              Messrs. Cohen, Cummins, Guarasci, Quental
              and Sandelovsky

In the four pages of the amended complaint devoted to Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky -- which pertain solely to their purported involvement in the Overseas Funds -- plaintiffs do not allege, even in conclusory fashion, *any* material misrepresentations or omissions. (*Varga* AC ¶¶ 379-88). If one stretches, the only allegations that even remotely bear on the Directors' state of mind are that:

> [T]he BSAM Directors turned a blind eye to, if not collaborated
> with, the Bear Stearns Defendants and the Deloitte Defendants
> in their wrongdoing. (*Id.* ¶ 379).

> As members of senior management of the Bear Stearns entities, and in their capacities as officers and managers of the Funds, the BSAM Directors and the Management Defendants, at all relevant times, were intimately involved in, and knowledgeable of, the day-to-day activities of the Funds, including the securities law violations. The BSAM Directors and the Management Defendants, therefore, knew of these violations and/or recklessly disregarded their occurrence, and failed to stop or expose the commission of the securities fraud. (*Id*. ¶ 523).

> Because their compensation and reputation both were directly tied to the performance of the Funds, the BSAM Directors and the Management Defendants allowed the occurrence of the fraud. In particular, BSAM Directors and the Management Defendants received larger compensation and advisory and incentive fees, and increased the value of their holding in Bear Stearns entities based on the Funds' performance. Thus, the higher they inflated the Funds' NAVs, the higher their bonuses, incentive and advisory fees and stock options would be. (*Id*. ¶ 524).

These entirely conclusory allegations cannot and do not give rise to a "strong inference" of fraudulent intent.

First, the mere allegation that an individual defendant was a director or officer of an entity that made purportedly fraudulent statements is insufficient to establish scienter. *See, e.g.*, *In re Sotheby's Holdings,* 2000 WL 1234601, at *7 ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (citing cases); *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *16 (S.D.N.Y. Mar. 1, 1999) (dismissing securities fraud claim against corporate director where complaint "[did] not state with particularity what [defendant] was aware of and when he was so aware or otherwise specify the nature of his conscious disregard of a known risk," and noting that scienter cannot be inferred "just because a defendant is a director and member of the company's audit committee").

Second, the only conceivable "motive and opportunity" allegation -- *i.e.*, that Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky wanted to "inflate[ ] the Funds' NAVs" in order to get bigger "bonuses, incentive and advisory fees and stock options" (*Varga* AC ¶ 524) -- plainly falls within the categories of "[i]nsufficient motives . . . [that] include (1) the desire for the corporation to appear profitable and (2) *the desire to keep stock prices high to increase officer compensation*."   *Kalnit*, 264 F.3d at 139 (emphasis added); *see also*, *e.g.*, *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008) ("[Plaintiffs'] proffered motive is the same desire to maintain the appearance of profitability that we have consistently rejected as insufficient in securities fraud pleading.") (citation omitted).

Third, plaintiffs' contention that Messrs. Cohen, Cummins, Guarasci, Quental and Sandelovsky "at all relevant times, were intimately involved in, and knowledgeable of, the day-to-day activities of the Funds, including the securities law violations" is insufficient to plead scienter.  (*Varga* AC ¶ 523).  Where, as here, the amended complaint never identifies *what* they knew and *how* they were knowledgeable about the day-to-day activities of the funds and any purported violations, the allegations fail to satisfy the particularity requirements of Rule 9(b) and the PSLRA.  *See*, *e.g.*, *Dynex*, 531 F.3d at 196 (plaintiff could not plead scienter simply by alleging that "senior executives . . . had access to [abstract] 'collection data'" because such a "broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated . . . the inaccuracy of [the corporation's] public statements").

c.      Plaintiffs Have Not Alleged that
Mr. Buxton Acted with Scienter

Although there are a handful of allegations that attribute certain statements to Mr.

Buxton, not a single one suggests that at the time he made them -- as opposed to after-the-fact --

he knew they were false:

> [I]n an e-mail dated March 14, 2006, Defendants Tannin and
> Buxton represented to Essex that:
>
>> It is our belief that the combination of cash flow and market
>> value leverage and the combination of asset based and portfolio
>> based leverage on assets that have no interest rate volatility
>> (they are all floating rate), very little credit volatility (AAA to A
>> assets) and a short spread duration (currently 3 years) is a very
>> efficient risk reward strategy. We have been very conservative
>> until now -- and we believe we have developed the tools and the
>> systems and the risk infrastructure to run the portfolio [at these
>> levels] (*Varga* AC ¶ 137).
>
> . . .
>
> on or about March 14, 2006, Defendants Tannin and Buxton
> informed Essex that "because they have graciously agreed to hold
> off on their redemption pending the set-up of the leveraged classes,"
> the Bear Stearns Defendants would "waive the notice period for any
> [future] redemption [Essex and other investors] may wish to make
> on the $48mm in redemption notices received for the March 31,
> 2006 redemption [from the High-Grade Fund]." (*Id*. ¶ 142).
>
> . . .
>
> Upon learning of  Essex's intention to redeem, the Bear Stearns
> Defendants, and Buxton in particular, fraudulently represented to
> Essex that, as of February 13, 2007, 93% of the assets in the High-
> Grade Enhanced Funds and 90% of the assets in the High-Grade
> Funds were in AA or better-rated credits, and that they had increased
> their hedges, generating positive results, and the High-Grade and
> High-Grade Enhanced Funds' portfolios were continuing to
> perform consistently. (*Id*. ¶ 159).
>
> . . .
>
> On February 28, 2007, still in the face of Essex's expressed
> intentions to redeem, Buxton represented to investors in the High-
> Grade and High-Grade Enhanced Funds that the Funds were "doing

> quite well in this environment. Hedges are working and the team is taking advantage of structuring opportunities that have arisen because of market activity." (*Id*. ¶ 160).
>
> . . .
>
> In or about mid-March 2007, Buxton met with senior Essex representatives. During this meeting, Buxton falsely represented that the High-Grade Enhanced Funds were doing well, and stated that not only was this not the time to redeem, but this was the time to invest more money in the High-Grade Enhanced Funds. Buxton even represented that some of the Management Defendants were currently investing their own money. (*Id*. ¶ 162).
>
> . . .
>
> on or about May 22, 2007, Buxton reached out to investors and specifically stated that the High-Grade Enhanced Fund was up two percent and attempted to set up a meeting to share this "new improved future outlook." (*Id*. ¶ 227).

Even if Mr. Buxton made these statements, the mere fact that he made them sheds no light on his state of mind, and the amended complaint, when considered "in its entirety," taking into account "*all* of the facts alleged," does not support a "strong inference" that he acted with scienter. *See Tellabs*, 127 S. Ct. at 2509.

In conclusory fashion, and without ever explaining what he *did* do as an employee of BS&Co., plaintiffs group Mr. Buxton among the funds' portfolio managers. (*See Varga* AC ¶¶ 41, 42). Their assertion is not supported by any facts, and is patently false. Mr. Buxton is not alleged to have held any positions at BSAM, and in fact he did not. He is not alleged to have been a director of any of the funds, and in fact he was not. He was a broker, not a portfolio manager, and like brokers generally, he had no responsibility for or involvement with the management or composition of the funds that he sold. While plaintiffs allege that Mr. Buxton communicated with Essex concerning the funds, they notably do not allege (nor could they) that he was privy to any of the "internal communications" among Messrs. Cioffi, Tannin and

McGarrigal indicating that they allegedly knew the information being communicated to investors was false.  (*See Id*. ¶¶ 219, 225, 228-33).  Mr. Buxton, a broker who did not manage the funds, told investors what was told to him by others.  The amended complaint confirms this.  For example, plaintiffs allege that in mid-March 2007 Mr. Buxton "represented that some of the Management Defendants were currently investing their own money."  The same paragraph of the amended complaint cites to a March 16, 2007 e-mail in which Mr. Tannin states that:  "My opinion is that this is a good time to invest.  I am investing myself."  Plaintiffs' own pleading makes clear that Mr. Buxton was simply relaying information.  (*Id. ¶* 163).  He neither knew, nor should have known, that the information he relayed purportedly was untrue and there are no factual allegations in the amended complaint suggesting otherwise.[22]

Under *Tellabs*, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and a section 10(b) claim can survive dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510.  Given Mr. Buxton's lack of alleged (or actual) ties to BSAM or to the funds during the relevant time period, the "plausible nonculpable explanations" for his statements -- namely, that he had no access to any information suggesting that they were untrue -- far outweigh any inferences to the contrary.  Plaintiffs' allegations, when closely scrutinized, bear that out.  To suggest, based solely on these allegations, that Mr. Buxton acted with scienter

---

[22]  Moreover, there are no allegations, conclusory or otherwise, connecting Mr. Buxton to the management of any of the funds *during the relevant time period*.  The sole allegation on point is both conclusory, and chronologically flawed.  It states that "[u]ntil the events giving rise to this action," Mr. Buxton shared responsibility with Cioffi, Tannin and McGarrigal for "the composition and risk management of" the HG Funds and the Master Funds.  (*Id*. ¶ 42).  Even if that were true -- which it is not -- the amended complaint notably does not allege that

requires a leap of logic that the United States Supreme Court's decision in *Tellabs* does not allow.

   With these limited exceptions, all other relevant allegations merely lump Mr. Buxton together with "the Bear Stearns Defendants" and/or "the Management Defendants" and do not identify anything that Mr. Buxton himself did or failed to do.  (*E.g.*, *Varga* AC ¶¶ 234, 499, 523).  As discussed above at page 61 and 62, lumping defendants together in this fashion does not satisfy the heightened pleading requirements of Rule 9(b) or the PSLRA.

   Finally, as discussed above, plaintiffs' attempt to invoke an incentive-based compensation arrangement to suggest that Mr. Buxton had the motive and opportunity to commit fraud -- "[b]ecause their compensation and reputation both were directly tied to the performance of the Funds, . . . the Management Defendants allowed the occurrence of the fraud" (*Varga* AC ¶ 524) -- is legally insufficient to give rise to a "strong inference" of fraudulent intent.  *See, e.g.*, *Kalnit*, 264 F.3d at 139; *In re Sotheby's Holdings*, 2000 WL 1234601, at *7.  This would be so even if, in addition to Mr. Buxton's compensation and position, Plaintiffs could establish that the information Mr. Buxton relayed later turned out to be untrue.  *See*, *e.g.*, *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("To allege a motive sufficient to support the inference that optimistic but erroneous statements were fraudulently made, a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.").

  B. Plaintiffs' Section 20(a) Claim Against BSC, BS&Co.,
    and the Individual Bear Stearns Defendants Fails

   The *Varga* plaintiffs assert a "control person" liability claim against all of the Bear Stearns Defendants other than BSAM.  This claim fails on two grounds.  First, because the

---

  Mr. Buxton had any responsibility with respect to these funds in 2006 or 2007, when he allegedly made the statements quoted above, and in fact he did not.

underlying securities fraud claim fails, the section 20(a) claim cannot survive on its own.   *E.g.,* *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted) (to state a claim under Section 20(a), a plaintiff must allege "a primary violation by a controlled person").

   Second, even if the Section 10(b) claim was viable (which it is not), plaintiffs have failed to allege that BSC, BS&Co., or any of the individual Bear Stearns Defendants "culpably participated" in any purported misconduct by BSAM.  To survive dismissal, a plaintiff must allege that "the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) (citations and alterations omitted).  As with the underlying claim, "the PSLRA requires a strong inference of culpable participation." *In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002).  "[C]ulpable participation" requires some degree of fraudulent intent.  *See*, *e.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG)(RER), 2008 WL 2795927, at *7 (E.D.N.Y. July 18, 2008) ("pleading a Section 20(a) claim requires a showing of scienter"); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 417 (S.D.N.Y. 2001) ("recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a)").  Accordingly, a claim under Section 20(a) may proceed only "where facts are pled with sufficient particularity that a strong inference is raised that the . . . control person knew or should have known that the controlled person was engaging in fraudulent conduct."  *In re Deutsche Telekom*, 2002 WL 244597, at *7 (citing *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001); *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765-66 (S.D.N.Y. 2001)).

   Here, the mere status of certain of the individual defendants as directors and officers of BSAM -- the alleged primary violator -- does not, standing alone, indicate that they

were "culpable participants" in any alleged fraud.  *See*, *e.g.*, *Suez Equity*, 250 F.3d at 102 ("These vague allegations are conclusory at best, indicating only that certain employees worked for multiple defendants, and are insufficient under § 20 as a matter of law."); *In re Sotheby's Holdings*, 2000 WL 1234601, at *7 ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.") (citing cases).  And as discussed above at pages 63-71, plaintiffs have not alleged that any of these defendants acted intentionally or even recklessly.  The absence of such allegations is likewise fatal to plaintiffs' control person liability claim.  *See*, *e.g.*, *In re Comverse*, 2008 WL 2795927, at *7 (Section 20(a) claim fails because plaintiff "has not met the requirements of the PSLRA for alleging scienter"); *In re Livent*, 151 F. Supp. 2d at 437 (dismissing Section 20(a) claim because plaintiffs "have failed to allege more than negligence on the part of the outside directors").

<u>Conclusion</u>

For all of the foregoing reasons, the Bear Stearns Defendants respectfully request that this Court (a) dismiss the *FIC* and *Varga* actions in their entirety as to all of the Bear Stearns Defendants; (b) dismiss the *Navigator* action in its entirety as to all of the Bear Stearns Defendants other than BSAM; and (c) dismiss all claims against BSAM in the *Navigator* action, except the claims for breach of fiduciary duty (to the extent based on supposed misrepresentations to the Domestic HG Fund's limited partners) and breach of contract. Specifically, the Court should:

(a)     In the *FIC* action

       (i)     Dismiss Count I for failure to state a claim;

       (ii)    Dismiss Counts II and III for lack of standing and failure to state a claim;

       (iii)   Dismiss Count IV for failure to make pre-suit demand;

        (iv)       Dismiss Count V for failure to make pre-suit demand and failure to state a claim;

(b)      In the *Varga* action

        (i)       Dismiss Count I as against all defendants for lack of standing, and additionally as against BSCI, BS&Co., the BSAM Directors, and Buxton for failure to state a claim;

        (ii)      Dismiss Count II for failure to state a claim;

        (iii)     Dismiss Count III as asserted by Stillwater and Essex as against all defendants for lack of standing and failure to make pre-suit demand, and additionally as against BSCI, BS&Co., the BSAM Directors, and Buxton for failure to state a claim;

        (iv)      Dismiss Count III as asserted by the Liquidators as against all defendants for lack of standing, and additionally as against BSCI, BS&Co., the BSAM Directors, and Buxton for failure to state a claim;

        (v)       Dismiss Count IV as asserted by Stillwater and Essex as against all defendants for failure to make pre-suit demand, and additionally as against BSCI, BS&Co., the BSAM Directors, and Buxton for failure to state a claim;

        (vi)      Dismiss Count IV as asserted by the Liquidators as against all defendants and by Stillwater and Essex as against the Director Defendants as barred by the Martin Act, and additionally as against BSCI, BS&Co., the BSAM Directors, and Buxton for failure to state a claim;

        (vii)    Dismiss Counts V, VI, VII and XVII as asserted by Stillwater, Essex and the Liquidators for failure to state a claim and additionally, as asserted by Stillwater and Essex, for failure to make pre-suit demand;

        (viii)   Dismiss Count VIII as asserted by Stillwater, Essex and the Liquidators for failure to state a claim and additionally, as asserted by Stillwater and Essex, for failure to make pre-suit demand, and additionally, as asserted by the Liquidators, as barred by the Martin Act;

(c)      In the *Navigator* action

        (i)       Dismiss Count I for lack of standing and failure to state a claim

        (ii)      Dismiss Counts III, IV and V for failure to state a claim;

        (iii)     Dismiss Counts VI and VIII for failure to make pre-suit demand; and

(iv)   Dismiss Counts VII and IX for failure to make pre-suit demand and failure to state a claim, and additionally dismiss Count VII as barred by the Martin Act.

Dated:   New York, New York
         October 30, 2008

Kramer Levin Naftalis & Frankel LLP


By:_____/s/ Barry H. Berke_____
         Barry H. Berke
         Stephen M. Sinaiko
         Kerri Ann Law
         Marjorie E. Sheldon

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for the Bear Stearns Defendants

# **Appendix A**

**Navigator Claims and Grounds for Dismissal**

| Claims | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|
| Class Claim for Breach of Fiduciary Duty (Count I) | Against BSAM | To the extent it alleges mismanagement and self-dealing, it must be brought derivatively. |
| Class Claim for Breach of Contract (Count II) | Against BSAM | Not moving to dismiss. |
| Class Claim for Common Law Fraud (Count III) | Against BSAM | Inability to allege reliance and impermissibly seeks redress as "holder" of securities. |
| Class Claim for Aiding and Abetting Breach of Fiduciary Duty (Count IV) | Against Cohen, Cummins, Sandelovsky, Quental, BSCI, BS&Co., and BSSC | No underlying breach of fiduciary duty by BSAM and failure to allege actual knowledge with requisite particularity. |
| Class Claim for Aiding and Abetting Fraud (Count V) | Against Cohen, Cummins, Sandelovsky, Quental, BSCI, BS&Co., and BSSC | No underlying fraud by BSAM and failure to allege actual knowledge with requisite particularity. |
| Derivative Claim for Breach of Fiduciary Duty (Count VI) | Against BSAM | Failure to plead pre-suit demand or demand futility. |

| Claims | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|
| Derivative Claim for Breach of Fiduciary Duty against the Director Defendants (Count VII) | Against Cohen, Cummins, Sandelovsky, and Quental | Failure to plead pre-suit demand or demand futility, barred by the exculpation clause in the governing fund documents, and preempted by the Martin Act. |
| Derivative Claim for Gross Negligence (Count VIII) | Against BSAM | Failure to plead pre-suit demand or demand futility. |
| Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty (Count IX) | Against Cohen, Cummins, Sandelovsky, Quental, BSCI, BS&Co., and BSSC | Failure to plead pre-suit demand or demand futility; no underlying breach of fiduciary duty by BSAM; and failure to allege knowing participation with requisite particularity. |

# **Appendix B**

**FIC Claims and Grounds for Dismissal**

| Claims | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|
| Class Claim for Breach of Contract (Count I) | Against BSAM | Failure to identify contracts or specific provisions therein that have been breached. |
| Class Claim for Breach of Fiduciary Duty (Count II) | Against BSAM | Alleges mismanagement and self-dealing that must be brought derivatively. |
| Class Claim for Aiding and Abetting Breach of Fiduciary Duty (Count III) | Against BSCI and BS&Co. | Underlying claim for breach of fiduciary duty against Management Defendants fails and amended complaint fails to allege knowing participation with particularity. |
| Derivative Claim for Breach of Fiduciary Duty (Count IV) | Against BSAM | Failure to plead pre-suit demand or demand futility. |
| Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty (Count V) | Against BSCI and BS&Co. | Failure to plead pre-suit demand or demand futility; underlying claim for breach of fiduciary duty against Management Defendants fails; failure to allege knowing participation with particularity. |

# **<u>Appendix C</u>**

**The Varga Plaintiffs' Claims and Grounds for Dismissal**

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder<br><br>The Liquidators of the Overseas Feeders as assignees of Essex's shares in the Overseas EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | As against all defendants, plaintiffs lack standing because they have failed to plead with particularity that Essex and Stillwater purchased or sold securities during the relevant time period.<br><br>Additionally, the amended complaint fails to allege with particularity (1) any materially false statements or omissions by BSCI, BS&Co., or the BSAM Directors or (2) that BSCI, BS&Co., the BSAM Directors or Buxton acted with scienter. |
| Section 20(a) of the Exchange Act (Count II) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder<br><br>The Liquidators of the Overseas Feeders as assignees of Essex's shares in the Overseas EL Feeder | Against BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Fails because the underlying securities fraud claim fails.<br><br>Additionally, plaintiffs have not alleged "culpable participation" by BSCI, BS&Co., the BSAM Directors or Buxton in any purported misconduct by BSAM. |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Derivative Claim for Common Law Fraud (Count III) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci | Cannot assert a fraud claim derivatively (it is inherently direct) and even if you could, plaintiffs failed to plead pre-suit demand or demand futility.<br><br>As against BSCI, BS&Co., the BSAM Directors and Buxton, claim also fails because it is based on the same defective allegations that underlie the federal securities fraud claim. |
| | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci | The liquidators lack standing to assert a common law fraud claim on behalf of the funds b/c such claims belong to investors.<br><br>As against BSCI, BS&Co., the BSAM Directors and Buxton, claim also fails because it is based on the same defective allegations that underlie the federal securities fraud claim. |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Derivative Claim for Breach of Fiduciary Duty (Count IV) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Fails as against all defendants because plaintiffs failed to plead pre-suit demand or demand futility.<br><br>Additionally fails as against Buxton, Cohen, Cummins, Sandelovosky, Quental, Guarasci, BS&Co., and BSCI because it is barred by the exculpatory clauses in the governing fund documents.<br><br>Preempted as against Cohen, Cummins, Sandelovosky, Quental and Guarasci by the Martin Act.<br><br>Also fails against BSCI and Buxton because they were not fiduciaries to the Domestic Funds. |
| | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Preempted as against all defendants by the Martin Act.<br><br>As against Buxton, Cohen, Cummins, Sandelovosky, Quental, Guarasci, BS&Co., and BSCI, the claim also is barred by the exculpatory clauses in the governing fund documents.<br><br>Also fails against BSCI and Buxton because they were not fiduciaries to the Overseas |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| | | | Funds. |
| Derivative Claim for Breach of Contract (Count V) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM | Failure to plead pre-suit demand or demand futility and failure to identify contracts or specific provisions therein that have been breached. |
| | The Liquidators of the Overseas Feeders | Against BSAM | Failure to identify contracts or specific provisions therein that have been breached. |
| Derivative Claim for Aiding and Abetting Breach of Fiduciary Duty (Count VI) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Failure to plead pre-suit demand or demand futility; underlying claim for breach of fiduciary duty against Walkers Defendants fails; failure to allege knowing participation with particularity. |
| | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Underlying claim for breach of fiduciary duty against Walkers Defendants fails and amended complaint fails to allege knowing participation with particularity. |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Derivative Claim for Aiding and Abetting Fraud (Count VII) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Failure to plead pre-suit demand or demand futility; underlying claim for fraud against Deloitte Defendants fails; failure to allege knowing participation with particularity. |
| | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Underlying claim for fraud against Deloitte Defendants fails; failure to allege knowing participation with particularity. |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Derivative Claim for Negligence and Gross Negligence (Count VIII) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Negligence and gross negligence claims fail against all defendants because plaintiffs failed to plead pre-suit demand or demand futility.<br><br>Additionally, negligence claim against all defendants is barred by the exculpation clause in the governing fund documents.<br><br>Gross negligence claim against BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci also fails because plaintiffs have not alleged a "pattern and practice of deceptive conduct" with requisite particularity. |
| | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci | Negligence claim against all defendants is barred by the exculpation clause in the governing fund documents.<br><br>Gross negligence is preempted as against all defendants by the Martin Act.<br><br>Gross negligence claim against BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovosky, Quental and Guarasci because plaintiffs failed to alleged a "pattern and practice of deceptive conduct" with requisite particularity. |

| Claims | Asserted by Whom | Against Which Defendants We Represent | Brief Summary of Grounds for Dismissal |
|---|---|---|---|
| Derivative Claim for Unjust Enrichment (Count XVII) | Stillwater in connection with the Domestic HG Feeder; Essex in connection with the Domestic EL Feeder | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci | Failure to plead pre-suit demand or demand futility.<br><br>Also fails against BSAM claim because its relationship was governed by contract and against BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci because plaintiffs do not allege that any of these defendants was actually "enriched." |
|  | The Liquidators of the Overseas Feeders | Against BSAM, BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci | Fails against BSAM claim because its relationship was governed by contract.<br><br>Fails against BS&Co., BSCI, Buxton, Cohen, Cummins, Sandelovsky, Quental and Guarasci because plaintiffs do not allege that any of these defendants was actually "enriched." |

# **Appendix D**

Westlaw.

[2002] 2 A.C. 1                                                                                                Page 1
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

*1 Johnson v. Gore Wood & Co (A Firm)
[2001] 2 W.L.R. 72

House of Lords

HL

Lord Bingham of Cornhill   , Lord Goff of
Chieveley   , Lord Cooke of
Thorndon   , Lord Hutton   and Lord Millett

2000 July 17, 19, 20; Dec 14

Company--Shareholder--Rights--Action by com-
pany for damages for breach of duty--Subsequent
action by majority shareholder in respect of person-
al losses sustained--Whether losses recoverable
where not merely reflective of company's losses

Damages--Contract--Breach--Measure of damages-
-Whether damages for mental distress and anxiety
recoverable

Estoppel--Convention, by--Underlying assumption-
-Validity of test

Practice--Pleadings--Striking out--Abuse of pro-
cess--Company bringing action against solicitors
for damages for professional negligence--Action
compromised--Majority shareholder subsequently
bringing action in respect of personal losses sus-
tained--Whether question of abuse of process to be
judged broadly on merits

The plaintiff, a businessman, conducted his affairs
through a number of companies, including W Ltd,
in which he held all but two of the issued shares.
On behalf of W Ltd he instructed the defendants, a
firm of solicitors, who from time to time also acted
on behalf of himself personally and of others of his
companies, to act for W Ltd in connection with a
proposed purchase of land, which it planned to de-
velop. It had an option to purchase the land, and the
defendants were instructed to serve a notice exer-

cising the option. Service of the notice was fol-
lowed by a dispute as to its validity and consequent
proceedings in the Chancery Division, where an or-
der for specific performance was made against the
vendor. By the time the conveyance was completed
W Ltd had suffered substantial loss because of the
cost of the Chancery proceedings, in which the
vendor had been legally aided, its inability to re-
cover damages and costs from the vendor, the col-
lapse of the property market and interest charges
that it had incurred. In January 1991 it started pro-
ceedings against the defendants for professional
negligence in connection with the exercise of the
option. Before the action came to trial, solicitors
representing W Ltd notified solicitors acting for the
defendants that the plaintiff also had a personal
claim against the defendants, arising out of the
same matters, which he would pursue in due course.
Subsequently, a solicitor acting for the plaintiff and
a solicitor representing the defendants discussed the
plaintiff's personal claim on the telephone and the
plaintiff's solicitor explained that it had been
thought better to wait until the company's claim had
been concluded before dealing with the personal
claim. An overall settlement of W Ltd's claim and
the plaintiff's claim was discussed, as was a settle-
ment of the plaintiff's claim. W Ltd's proceedings
were eventually compromised during the trial on
payment to W Ltd of a substantial proportion of the
sum claimed by it. In April 1993 the plaintiff issued
a writ against the defendants. In December 1997 the
defendants applied for the action to be struck out as
an abuse of the process of the court. They also
sought determination of preliminary issues as to
whether they had owed the plaintiff a duty of care
and whether the damages claimed by him were in
principle recoverable on the facts pleaded. The
judge declined to strike out the plaintiff's claim,
holding that the defendants were estopped by con-
vention from contending that the plaintiff's action
was an abuse of process. He further held that the
heads of damage pleaded were not irrecoverable as
a matter of law in respect of the breaches alleged by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                                        Page 2
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

the plaintiff. The Court of Appeal, on appeal by the defendants, ordered that the judge's order be set aside in so far as he had dismissed *2 the defendants' application to strike out the proceedings as an abuse of the process of the court but not otherwise.

On appeal by the plaintiff and cross-appeal by the defendants--

**Held:**

(1) allowing the appeal, that there was a public interest in the finality of litigation and in a defendant not being vexed twice in the same matter; but that whether an action was an abuse of process as offending against that public interest should be judged broadly on the merits taking account of all the public and private interests involved and all the facts of the case, the crucial question being whether the plaintiff was in all the circumstances misusing or abusing the process of the court; and that, in all the circumstances, the plaintiff's action was not abusive (post, pp 30H-31F, 32C-33A, 34C-G, 38F-G, 42D-F, 50H, 58G-60C).

Henderson v Henderson (1843) 3 Hare 100 considered

Observations as to estoppel by convention (post, pp 33C-G, 38H-41C, 60H-61A).

(2) Dismissing the cross-appeal but varying the order of the Court of Appeal, that the plaintiff was in principle entitled to recover in respect of any loss that he had himself suffered that was not merely a reflection of the loss suffered by W Ltd; that, save for his claims in respect of the diminution in value of his pension and of his majority shareholding in W Ltd in so far as they were merely a reflection of W Ltd's loss, the plaintiff's heads of claim in respect of quantifiable damage should not be struck out; that damages for breach of contract could not generally include damages for mental distress and anxiety; that (Lord Cooke of Thorndon dissenting) the plaintiff's claim for damages under that head should be struck out; and that his claim for aggravated damages should also be struck out (post, pp 35E-37A, 38C-D, 41E-42C, 48B-D, 50G, 55D-56B,

67C).

Addis v Gramophone Co Ltd [1909] AC 488, HL(E) applied.

Decision of the Court of Appeal [1999] Lloyd's Rep PN 91; [1999] PNLR 426 reversed in part.

The following cases are referred to in their Lordships' opinions:

Addis v Gramophone Co Ltd [1909] AC 488, HL(E)

Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84; [1981] 3 WLR 565; [1981] 3 All ER 577, CA

Arnold v National Westminster Bank plc [1991] 2 AC 93; [1991] 2 WLR 1177; [1991] 3 All ER 41, HL(E )

Ashmore v British Coal Corpn [1990] 2 QB 338; [1990] 2 WLR 1437; [1990] 2 All ER 981, CA

Bailey v Bullock [1950] 2 All ER 1167

Barings plc v Coopers & Lybrand [1997] 1 BCLC 427, CA

Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257; [1996] 1 All ER 981, CA

Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482; [1999] 4 All ER 217, CA

Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 Lloyd's Rep 132, CA

Brisbane City Council v Attorney General for Queensland [1979] AC 411; [1978] 3 WLR 299; [1978] 3 All ER 30, PC

Brown v Waterloo Regional Board of Comrs of Police (1982) 136 DLR (3d) 49; (1983) 150 DLR (3d) 729

C (A Minor) v Hackney London Borough Coun-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                Page 3
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

cil [1996] 1 WLR 789; [1996] 1 All ER 973, CA

Christensen v Scott [1996] 1 NZLR 273

Clark Boyce v Mouat [1994] 1 AC 428; [1993] 3
WLR 1021; [1993] 4 All ER 268, PC

Fischer (George) (Great Britain) Ltd v Multi
Construction Ltd [1995] 1 BCLC 260, CA

Foss v Harbottle (1843) 2 Hare 461

Gerber Garment Technology Inc v Lectra Sys-
tems Ltd [1997] RPC 443, CA

*3          Gleeson v J Wippell & Co Ltd [1977] 1
WLR 510; [1977] 3 All ER 54

Greenhalgh v Mallard [1947] 2 All ER 255, CA

Halliday v Shoesmith [1993] 1 WLR 1, CA

Hayes v James & Charles Dodd [1990] 2 All ER
815, CA

Henderson v Henderson (1843) 3 Hare 100

Henderson v Merrett Syndicates Ltd [1995] 2
AC 145; [1994] 3 WLR 761; [1994] 3 All ER 506,
HL(E)

Heron International Ltd v Lord Grade [1983]
BCLC 244, CA

Hobbs v London and South Western Railway Co
(1875) LR 10 QB 111

Home and Colonial Insurance Co Ltd, In re
[1930] 1 Ch 102

House of Spring Gardens Ltd v Waite [1991] 1
QB 241; [1990] 3 WLR 347; [1990] 2 All ER 990,
CA

Howard (R P) Ltd v Woodman Matthews & Co
[1983] BCLC 117

Hunter v Chief Constable of the West Midlands
Police [1982] AC 529; [1981] 3 WLR 906; [1981] 3

All ER 727, HL(E)

Lee v Sheard [1956] 1 QB 192; [1955] 3 WLR
951; [1955] 3 All ER 777, CA

Mahmud v Bank of Credit and Commerce Inter-
national SA [1998] AC 20; [1997] 3 WLR 95;
[1997] 3 All ER 1, HL(E)

Manson v Vooght [1999] BPIR 376, CA

Mouat v Clark Boyce [1992] 2 NZLR 559

President of India v Lips Maritime Corpn [1988]
AC 395; [1987] 3 WLR 572; [1987] 3 All ER 110,
HL(E)

Prudential Assurance Co Ltd v Newman Indus-
tries Ltd (No 2) [1982] 2 Ch 204; [1982] 2 WLR 31;
[1982] 1 All ER 354, CA

Ruxley Electronics and Construction Ltd v For-
syth [1996] AC 344; [1995] 3 WLR 118; [1995] 3
All ER 268, CA

Stein v Blake [1998] 1 All ER 724, CA

Talbot v Berkshire County Council [1994] QB
290; [1993] 3 WLR 708; [1993] 4 All ER 9, CA

Taylors Fashions Ltd v Liverpool Victoria
Trustees Co Ltd (Note) [1982] QB 133; [1981] 2
WLR 576; [1981] 1 All ER 897

Vervaeke (formerly Messina) v Smith [1983] 1
AC 145; [1982] 2 WLR 855; [1982] 2 All ER 144,
HL(E)

Walker v Stones [2001] QB 902; [2001] 2 WLR
623; [2000] 4 All ER 412, CA

Watson v Dutton Forshaw Motor Group Ltd
(unreported) 22 July 1998; Court of Appeal (Civil
Division) Transcript No 1284 of 1998, CA

Watts v Morrow [1991] 1 WLR 1421; [1991] 4
All ER 937, CA

Whelan v Waitaki Meats Ltd [1991] 2 NZLR 74

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                             Page 4
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

Windsor Steam Coal Co (1901) Ltd, In re [1929] 1 Ch 151, CA

Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581; [1975] 2 WLR 690, PC

The following additional cases were cited in argument:

Allison (Kenneth) Ltd v A E Limehouse & Co [1992] 2 AC 105; [1991] 3 WLR 671; [1991] 4 All ER 500, HL(E)

Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2) [1967] 1 AC 853; [1966] 3 WLR 125; [1966] 2 All ER 536, HL(E)

Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain Gregos) (No 2) [1990] 2 Lloyd's Rep 395, CA

Farley v Skinner (unreported) 6 April 2000; Court of Appeal (Civil Division) Transcript No 577 of 2000, CA

Fox v Star Newspaper Co Ltd [1898] 1 QB 636, CA        ; [1900] AC 19, HL(E)

Goodwill v British Pregnancy Advisory Service [1996] 1 WLR 1397; [1996] 2 All ER 161, CA

Hall v Governor and Co of the Bank of England (unreported) 19 April 2000; Court of Appeal (Civil Division) Transcript No 725 of 2000, CA

*4        Hiscox v Outhwaite [1992] 1 AC 562        ; [1991] 2 WLR 1321; [1991] 3 All ER 124, CA        ; [1992] 1 AC 562; [1991] 3 WLR 297; [1991] 3 All ER 641, HL(E)

Ketteman v Hansel Properties Ltd [1987] AC 189; [1987] 2 WLR 312; [1987] 1 All ER 38, HL(E)

L R v Witherspoon [1999] Lloyd's Rep PN 401, CA

MCC Proceeds Inc v Lehman Bros International

(Europe) [1998] 2 BCLC 659, CA

Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord) [1988] 2 Lloyd's Rep 343, CA

Verderame v Commercial Union Assurance Co plc [1992] BCLC 793, CA

Wapshott v Davis Donovan & Co [1996] PNLR 361, CA

APPEAL and CROSS-APPEAL from the Court of Appeal

This was an appeal by the plaintiff, William Henry John Johnson, by leave of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord Millett) given on 25 May 1999 and a cross-appeal by the defendants, Gore Wood & Co (a firm), by leave of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord Millett) given on 3 November 1999 from a judgment of the Court of Appeal (Nourse, Ward and Mantell LJJ) given on 12 November 1998.

By its judgment, the Court of Appeal had allowed an appeal by the defendants from an order of Pumfrey J dated 21 May 1998. The judge, on application by the defendants, had declined to strike out the plaintiff's claim against them. On preliminary issues ordered by Sir Richard Scott V-C sitting as an additional judge of the Queen's Bench Division, the judge had determined that (a) the facts and matters relied on by the plaintiff as constituting breaches of duty by the defendants were capable of constituting the breach of a contractual, tortious or fiduciary duty owed as a matter of law by the defendants to the plaintiff and (b) the heads of damage alleged in paragraphs 23 and 24 of the re-amended statement of claim were not irrecoverable as a matter of law as damages for the pleaded breaches alleged by the plaintiff. The Court of Appeal ordered that his judgment be set aside in so far as he had dismissed the defendants' application to strike out the proceedings as an abuse of the process of the court but not further or otherwise. It

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                        Page 5
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

held that one head of damage, namely diminution in the value of the plaintiff's shareholding in Westway Homes Ltd, should be struck out of the re-amended statement of claim.

The facts are stated in the opinion of Lord Bingham of Cornhill.

*Roger ter Haar QC* and *Simon Howarth* for the plaintiff. The Court of Appeal correctly identified the underlying principle in all cases of abuse of process as that articulated by Lord Diplock in Hunter v Chief Constable of the West Midlands Police [1982] AC 529, 536c-d . The Court of Appeal's decision is inconsistent with Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482 . No "additional element" of the type suggested in that case is present here, nor was any such additional element identified by the Court of Appeal. The Court of Appeal appears to have re-garded it as being for the plaintiff to establish that special circumstances existed; the approach in Bradford and Bingley is to be preferred as be-ing more consonant with justice and consistent with Lord Diplock's dicta in Hunter and dicta in Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 , 590 and Brisbane City Coun-cil v Attorney General for Queensland [1979] AC 411 , 425. May LJ in Manson v Vooght [1999] BPIR 376 , 387- *5 388, in a dictum cor-rectly stating the effect of the authorities, said that "it may in particular cases be sensible to advance cases separately". This was such a case. The Court of Appeal appears to have regarded the mere fact of "re"-litigation as sufficient to amount to abuse of process: compare Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482, 1492g . In effect, this equated the case to one of issue es-toppel, which it is not. With abuse of process, one is looking at much broader issues of justice; many cases involve a collateral attack on a previous de-cision. If necessary, Talbot v Berkshire County Council [1994] QB 290 should be overruled [Reference was also made to Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2) [1967] 1 AC 853

.]

Further, the Court of Appeal gave no or inadequate consideration to the reasons put forward in the plaintiff's affidavit explaining the reasons for the course adopted. Its reference to full legal aid having been available "long before the trial" was incorrect. The plaintiff was obliged to have regard, and did have regard, to the interests of the other sharehold-ers and creditors of the company in reaching his de-cision. The Court of Appeal was wrong to hold that the plaintiff was "in control throughout". His op-tions were severely limited.

It appears, although it is not entirely clear, that the Court of Appeal accepted that "most practitioners [in 1992] would not have thought the rule [in Henderson v Henderson (1843) 3 Hare 100] ap-plied at all". If that is so, then the pursuit of the personal claim separately from the company claim was not an abuse of process: see per Lord Kilbrandon in Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 , 590. Whilst the diligence or lack of diligence of a legal adviser may not be relevant in a true case of issue estoppel, it is relevant where the court is considering ques-tions of abuse of process (as here) or exercise of its discretion. On the other hand, if the Court of Ap-peal took the view that most practitioners in 1992 would have thought that the rule in Henderson v Henderson applied, then the defendants could and should have taken the point then and it was un-conscionable for them to take it for the first time in December 1997. Moreover, the consequence will be that court time will not be saved by striking out this action as suggested by the Court of Appeal [1999] Lloyd's Rep PN 91 , 114; on the contrary, it will now be occupied by further and more complic-ated litigation against the solicitors and counsel ad-vising the plaintiff in respect of his personal claim in 1992. Further, in deciding whether the com-mencement of the present proceedings was an ab-use of process the applicable principles are those applying in 1992, not those current in 1998; accord-ingly, the Court of Appeal was wrong to take into

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                Page 6
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

account, "the current reform of civil justice ". In deciding whether the present proceedings constitute an abuse of process it is relevant to consider not only the plaintiff's conduct but also that of the defendants. The Court of Appeal's approach is contrary to recent comments made in L R v Witherspoon [1999] Lloyd's Rep PN 401     , where the guidance in Halliday v Shoesmith [1993] 1 WLR 1     was approved and followed     . The Court of Appeal in the present case appears to have considered that there were conflicting decisions of the court as to the proper approach to be adopted in the circumstances, comparing, at pp 113-114, Halliday v Shoesmith     with Goodwill v British Pregnancy Advisory Service [1996] 1 WLR 1397     . The true rule, which both Halliday     and Goodwill     support, is that where a case is *6     hopeless the court should accede to an application to strike out however late it is made because it is bound to save time and costs. If, however, the claim is arguable in law then a belated application to strike it out without a trial on the merits should only be entertained on receiving a valid explanation for the delay in making it. The Court of Appeal accepted, that the reason for the point not being taken earlier was that it had not been considered until Mr Steinfeld was instructed. The plaintiff also accepts that that is the explanation for the delay. It is a bad reason for failure to take such a point: see L R v Witherspoon [1999] Lloyd's Rep PN 401     and Ketteman v Hansel Properties Ltd [1987] AC 189     , 219-220. There was accordingly no proper reason for the delay.

In the circumstances, the present proceedings do not constitute an abuse of process. Applying the dictum of Lord Diplock in Hunter v Chief Constable of the West Midlands Police [1982] AC 529     , 536c, bringing them is not "manifestly unfair" to the defendants, because they settled the original company proceedings on the basis that the plaintiff's personal claim would be litigated or settled later. To allow this claim to be pursued would not "bring the administration of justice into disrepute among right-thinking people" given that the defendants settled the company proceedings on the basis that they knew that the personal claim would be brought, that they obtained valuable concessions on the basis that it would be litigated or settled later and that both they and the plaintiff acted for a considerable time on a common assumption that it would be made and would be entertained by the court. If it is necessary for the plaintiff to show "special circumstances", these matters constitute them. The plaintiff is not the same party as the company, nor are his claims the same.

To apply the rule in Henderson v Henderson 3 Hare 100     to a party in the plaintiff's position is a substantial and unnecessary extension of the law in so far as it applies to issue estoppel. So far as that doctrine is concerned, it is desirable that it should be clearly and unambiguously applied so that parties know where they stand and should not depend on questions as to whether an action "should" have been joined with another. In so far as wider considerations apply in respect of abuse of process, the mere fact that the plaintiff could more conveniently have joined in the earlier action against the defendant does not render the later claim an abuse of process: see C (A Minor) v Hackney London Borough Council [1996] 1 WLR 789     and Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482     . In these circumstances the court is concerned with wider questions of justice and fairness than the strict ratio of Henderson v Henderson     . In so far as the Court of Appeal extended the rule in Henderson v Henderson     by treating this case as an instance of issue estoppel they were wrong to do so. In so far as they considered it to be a case of abuse of process going beyond Henderson v Henderson     they failed to consider the matter in the round. Had they done so, they should have concluded that the significant differences between the company and the personal claims and the reason for proceeding first with the company claim justified (or excused) the course taken.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                          Page 7
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

One of the main reasons for the rule in Henderson v Henderson     is the prevention of the risk that different courts seized of different actions dealing with the same subject matter and raising the same issues will come to different conclusions. This would be unfair to the parties, particularly to an initially successful party who fails in a subsequent proceeding, and likely to *7     bring the administration of justice into disrepute. It is self-evident that where there is a settlement of the first action these dangers fall away. It is open to a party fearful of a second action following settlement of the first to negotiate terms of settlement that preclude his adversary from issuing further proceedings. To hold that the rule applies where there has been a compromise of the first action gives rise to practical problems. Is the rule to apply (and if so how) in a situation where two actions are started and one is settled by a prompt payment into court? There is no reason why the second action should be regarded as an abuse of process. The defendant is aware of both actions, has chosen to settle one and has thereby removed the risk of inconsistent results. No one could have contemplated in the instant case that as soon as the company action was settled the plaintiff's personal action should immediately have been struck out.

As to estoppel by convention, the judgment of the Court of Appeal confuses it with estoppel by representation, is contrary to previous binding authority and is illogical and contrary to principle. The defendants knew that another action was likely to be commenced and also knew that it would involve repetition of allegations made in the company action. An objection to a second action per se (i e, to its very existence rather than to the time when it was launched or the detail of the case made in it) would necessarily always be open to the defendant. Accordingly, such an objection could and should have been perceived at the time of the settlement agreement and the defendants could and should expressly have reserved their right to take it if they had wished to preserve such a right. There was unchallenged evidence that the plaintiff would not have agreed to the undertakings he gave in the settlement agreement if there had been any intimation that this point would be taken. Silence on the matter amounted to an undertaking not to take it. That the defendants not only kept silent but also obtained concessions in relation to the second action shows that the parties were proceeding on the assumption that a second action could be brought if commenced in time and properly constituted. Otherwise, the concessions extracted from the plaintiff make no sense.

The Court of Appeal appear to have misunderstood or misconstrued the meaning of "common assumption" in this context. They identified , at p 113, as the assumption on which the estoppel was based as being that if the rule in Henderson v Henderson     did apply it would not be raised. That formulation was not suggested by the plaintiff and he disputes its accuracy. "Assume" means "take as being true, for purpose of argument or action": see Concise Oxford English Dictionary, 7th ed (1982). In the present case, for the purpose of entering into the settlement agreement the parties took it as being true that the plaintiff could bring a second action against the defendants provided that it was brought within time and disclosed a reasonable cause of action. There could not have been any relevant assumption in relation to Henderson v Henderson     because no one had spotted the point. The assumption must, therefore, be formulated in more general terms. The court should not inquire into the reasons why the assumption was made once it is satisfied that it existed and was relied on. If the Court of Appeal were correct, a distinction would be drawn between a case where the parties form their assumption because a point is overlooked and one where they notice the point but mistakenly believe that it is a bad one. In consequence of this distinction, an estoppel would arise in the latter case but not in the former. *8     Such a distinction is not logical or justifiable in principle. Further, it is not clear how any rule involving such a distinction would apply where party A misses the point entirely and party B spots the point but, thinking it a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                    Page 8
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

bad one, does not mention it to party A. The parties then proceed on the assumption that the point is not available but party B then changes his mind as to its merits. There ought to be an estoppel, because the important factor that suggests (as a matter of broad justice) the application of an estoppel would be present. The parties would both have acted in good faith on the basis that the point was not available. [Reference was made to Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84, 122          ; Ashmore v British Coal Corpn [1990] 2 QB 338          ; Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257          ; Hiscox v Outhwaite [1992] 1 AC 562          and Kenneth Allison Ltd v A E Limehouse & Co [1992] 2 AC 105          .]

*Alan Steinfeld QC*   and *Elizabeth Overy* for the defendants. The Court of Appeal was correct to hold that the rule in Henderson v Henderson 3 Hare 100          prima facie applies to these proceedings. In so far as the principle covers matters that might have been, but were not, brought forward, it is now well established that it depends not on a strict application of the doctrine of res judicata but on the public policy that requires that there should be an end to litigation and so treats actions falling within it as an abuse of process: see Talbot v Berkshire County Council [1994] QB 290          , 296d. This case is concerned with that wider, public policy, aspect of the Henderson v Henderson principle. The policy itself has assumed greater importance with the much greater stress now laid on case management under the Civil Procedure Rules          . It is not possible for the court properly to direct the parties how to manage the case unless both it and the parties know the full range of the issues that lie between the parties.

There are three vices in litigating or relitigating issues that have already been litigated or should have been, any one of which is sufficient to constitute an abuse of process. (i) It is a substantial waste of court time and is unfair to other litigants; to that extent the rule in Henderson v Henderson          is

founded in public policy. The courts should be wary of finding that the parties agreed that the rule should not apply. (ii) It subjects, or potentially subjects, the defendant to more than one set of proceedings, which is prima facie unfair. It substantially increases costs, as in the present case. (iii) In many cases, relitigation may constitute a collateral attack on the outcome of the previous proceedings. There are two objections to this: it offends against the principle that there should be an end of litigation, and it could result in conflicting decisions. Here, where the plaintiff takes the view that the amount recovered by the company in its proceedings was not enough to put it back on its feet, all three vices are present.

The fact that the roots of the principle lie in public policy offers guidance both on the question whether it should be applied in circumstances where it is contended that a party could and should have brought his case forward at an earlier stage but the factual situation differs from the precise situation outlined in Henderson v Henderson 3 Hare 100          and on the question of the exercise of discretion. The question of prima facie application is ultimately whether to permit the claim to proceed would amount to a misuse of procedure in the way indicated by Lord Diplock in Hunter v Chief Constable of the West Midlands Police [1982] AC 529          *9          , 536c. The existence of the wider Henderson v Henderson          principle and its foundation in public policy were clearly recognised in Vervaeke (formerly Messina) v Smith [1983] 1 AC 145          , 157F, 163b-e. [Reference was also made to Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581          and Brisbane City Council v Attorney General for Queensland [1979] AC 411          .]

Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482          suggests that in the application of Henderson v Henderson 3 Hare 100          a distinction is to be drawn between cases in which the narrower principle is relevant, where the principle applies unless there are special cir-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                   Page 9
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

cumstances, and those in which the wider principle is invoked, where it is for the person alleging abuse of process to establish that when all the circumstances are weighed there will be found to be an abuse. No sufficient warrant for such a distinction is to be found in any of the former authorities or was made in the present case. Public policy points clearly against relitigation and thus a prima facie abuse exists equally in any relitigation case. The need for a careful examination of all the circumstances was recognised in both Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581        and Brisbane City Council v Attorney General for Queensland [1979] AC 411        , but with no indication that something over and above the abuse normally resulting from relitigation had to be shown. Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257        involved consideration of the wider Henderson v Henderson principle and is not properly to be relied on in the way in which it was relied on in Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482. Auld LJ seems to suggest that the House of Lords in Arnold v National Westminster Bank plc [1991] 2 AC 93 was dealing with issue estoppel in its strict form and not deciding anything in relation to the wider principle based on abuse of process. It is clear, however (see at pp 106b and 108g-h), that their Lordships were not drawing any distinction between cases in which the issue had actually been decided and those in which the relevant point might have been brought forward but was not. As Talbot v Berkshire County Council [1994] QB 290 shows, that is the very distinction between the narrower and the wider aspects of the principle. Bradford and Bingley Building Society v Seddon [1999] 1 WLR 1482        should, therefore, be overruled in so far as it requires a different approach to the two types of case. Any balancing process comes only at the stage of the exercise of discretion.

The Court of Appeal was correct to hold that the rule in Henderson v Henderson 3 Hare 100        applies to a privy of the claimant in the first action as it would to the claimant himself and that the plaintiff was a privy of Westway Homes Ltd ("WWH") for the purposes of the rule. As to privity generally, an abuse of process objection based on relitigation may be taken against a person who is a privy of the original claimant in the sense of having a common interest in the determination of the original action: see Ashmore v British Coal Corpn [1990] 2 QB 338        ; House of Spring Gardens Ltd v Waite [1991] 1 QB 241        and MCC Proceeds Inc v Lehman Bros International (Europe) [1998] BCLC 793        . There is no logical justification for distinguishing between the position of a privy in a case of estoppel under the narrower Henderson v Henderson        principle and his position in a case of abuse of process under the wider principle. It follows that the general rule should be that in the latter case as in the former there is no need to show any special or exceptional circumstances before a privy may be bound. The real *10        question is who is a privy of the original party for these purposes. [Reference was made to Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2) [1967] 1 AC 853        .]

The plaintiff contended in the Court of Appeal that the application of the wider Henderson v Henderson 3 Hare 100        principle to privies was an extension that could have dramatic and unfair consequences and so should not be made. If it is an extension at all, rather than a case not previously considered but plainly within the original rule, then it is an extension that ensures a consistent approach to all aspects of Henderson v Henderson        . The difficulties identified by the plaintiff in the Court of Appeal all stem from a choice by two closely related parties bringing claims covering substantially the same issues to proceed independently. In such circumstances, the answer lies in proper case management. Both claims have in fact been put forward and it is for the parties and the court to manage the litigation in such a way that the court's process is not abused by exposing the defendants to relitigation. The argument does not show a basis for the House of Lords to determine that the Henderson v Henderson        principle does not apply to a privy.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                    Page 10
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

The misuse of procedure test is satisfied.

As to privity specifically in this case, the test in Gleeson v J Whippell & Co Ltd [1977] 1 WLR 510        , 515f is correct. The essence of the plaintiff's case is that WWH was his alter ego. There is the closest possible identification between him and WWH, the original party. In substance they are one and the same for present purposes, and it is just that the plaintiff should be bound under the principle binding privies. Further, he relies on allegations that the defendants owed him duties in exactly the same terms as they did to WWH and were in breach of those duties in exactly the same way. The Court of Appeal [1999] PLR 426        , 462f rightly said that those allegations encompass "practically the whole of the ground traversed for six weeks" in the company proceedings. The plaintiff is fairly and squarely covered by the approach of Stuart-Smith LJ in House of Spring Gardens Ltd v Waite [1991] 1 QB 241        , 254a-b. If the company action had gone on to judgment and been dismissed on a finding that the defendants had not been negligent, it is inconceivable that he would not have been estopped by that judgment in the same way as the plaintiff in the Spring Gardens      case was so as to preclude his bringing his personal claim. He is therefore to be regarded as a privy of WWH not only as a matter of practical identity but also through his conduct in relation to the company proceedings.

The Court of Appeal was correct to hold that the rule in Henderson v Henderson 3 Hare 100 was capable of applying in the situation where the first action was compromised rather than continued through to judgment and that the rule applied in the present case having regard (if necessary) to the stage the company proceedings had reached when they were compromised. The significance of the reference in Henderson v Henderson        to adjudication is that adjudication is a final form of resolution after consideration of the merits. There is no reason in principle why a compromise should not have the same effect, given that it is equally a final form of resolution of the parties' disputes relating to the particular subject matter after consideration of the merits. There is no basis in public policy for distinguishing the two classes of case.

It is immaterial at what stage of the proceedings the compromise is reached. There is no basis on which the plaintiff can say that the trial of the company proceedings had not got far *11 enough. In any event, the principle in Henderson v Henderson 3 Hare 100        should apply where the action has gone beyond the stage at which the court would permit the claimant to discontinue and start again. That will be so where the claimant has opened his case (and a fortiori once, as here, he has closed his case on liability): see Fox v Star Newspaper Co Ltd [1898] 1 QB 636        ; [1900] AC 19      . The situation is then comparable with the primary Henderson v Henderson        case, in which the court and the parties will have full awareness of the material issues on which the court is adjudicating. On any view, the company proceedings had gone far enough for Henderson v Henderson      to apply.

The Court of Appeal was correct to determine that there were no special circumstances that required that the present action should not be struck out despite the prima facie application of the rule in Henderson v Henderson 3 Hare 100        . As to the first special circumstance relied on by the plaintiff, namely, his reasons for not bringing his personal claim at the same time as the company claim, all his arguments stem ultimately from his and the company's lack of financial resources. Difficulties in funding litigation do not in themselves amount to special circumstances for the purposes of the Henderson v Henderson        principle: see Manson v Vooght [1999] BPIR 376      . Any other approach would involve the risk that a claimant would pursue one head of claim after another as funding for each became available, whether from borrowing, legal aid, a contingency fee arrangement or even the fruits of success on previous heads. Such a process would clearly be oppressive to the defend-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                Page 11

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

ant.

As to the second special circumstance relied on, namely, the defendants' conduct relating to the plaintiff's personal claim, essentially the matters of conduct amount to no more than that the defendants did not ask the plaintiff to join his claim with that of WWH in the company proceedings, contemplated but did not achieve settlement of the personal claim and did not raise the abuse point until late in the day. Complaint is also made that the defendants are not prepared to make concessions (i e, to admit liability) that would reduce the length of the trial. Save in so far as his conduct may found an estoppel argument, a potential defendant is under no obligation to advise a claimant how to make his claim so that a successful application to strike out on the ground of abuse of process may be avoided. Similarly, a defendant is not obliged to concede points not determined against him so that the claimant cannot be said to be relitigating those issues. The Court of Appeal rightly found that the delay was not a special circumstance.

As to the third special circumstance relied on, namely, the fact that the plaintiff was not warned by his legal advisers of the potential challenge to the personal claim, this should not be visited on the defendants as a special circumstance taking this case out of the Henderson v Henderson 3 Hare 100    principle. The mischief of relitigation between the same parties or their privies is the same in either case.

The Court of Appeal was correct to determine that the defendants were not estopped by convention from alleging that the present action was an abuse of the process of the court. The difference on this point between the Court of Appeal and Pumfrey J arose not from any difference as to the applicable law but because on the facts the Court of Appeal held that the common assumption on the basis of which the parties had acted was more limited than Pumfrey J had found. The classic statement of the principle *12    underlying estoppel by convention on the basis of which both Pumfrey J and the

Court of Appeal proceeded is that of Lord Denning MR in Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84, 122    . [Reference was also made to Kenneth Allison Ltd v A E Limehouse & Co [1992] 2 AC 105, 127d-g    .] It is an essential feature of the application of the principle that each party should be aware of the assumption made by the other and that they should conduct their dealings on the basis of those assumptions: see Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord) [1988] 2 Lloyd's Rep 343, 351    and Compania Portorafti Commerciale SA v Ultramar Panama Inc (The Captain Gregos) (No 2) [1990] 2 Lloyd's Rep 395, 405    . It is not sufficient that the assumption is common to both if they are not also both aware that it is common to both; in that sense, the assumption must be not only common but agreed. It is also an essential feature that the estoppel should arise on the basis of an assumption as to facts or law. It does not arise on the basis of a representation by one party to the other either as to fact or as to that party's future conduct: see The Vistafjord    , p 351 and Spencer Bower and Turner, Estoppel by Representation, 3rd ed (1977)    , p 157, para 157. The inquiry concerns not what a party will do but what a state of affairs is. In Hiscox v Outhwaite [1992] 1 AC 562    , which led Pumfrey J to his conclusion, there was no departure from those principles. The argument addressed to the Court of Appeal related solely to the facts of the case: see p 565h. The case is no more than an illustration of the application of the principles to particular factual circumstances. To succeed in the present case on the footing of estoppel by convention on the basis of the circumstances of and surrounding the settlement of the company proceedings and the terms of that settlement, the plaintiff needs to show an agreed assumption that as and when he made his personal claim it would not be open to attack as an abuse of process on the basis of Henderson v Henderson 3 Hare 100    . An agreed assumption that the defendants would not adopt a particular line of attack would not be sufficient. The agreed assumption

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                 Page 12
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

found by Pumfrey J that "the personal claim would be made, and would be entertained by the court" appears to be an assumption as to the future conduct of the plaintiff and, if it is intended to extend to an assumption that the claim would be considered on its merits, as to the future conduct either of the court or of the defendants. It could not support the estoppel by convention that the judge found.

The Court of Appeal was correct to hold that the facts did not evidence a common assumption of the necessary nature. The fact that the defendants did nothing to indicate that they accepted that the threatened claim was or might be a good one or one capable of being maintained (i e, in this context, a claim that would not be vulnerable to a striking-out application on the ground of abuse of process) and that they would limit the nature of any defences or objections that they might have is fatal to the plaintiff's case. It is in fact inconceivable that there should have been an agreed assumption about possible lines of attack on the plaintiff's present claim at a time when there was no pleading in existence and in view of the fact that the claim as now formulated is very different from the claim then notified. If the plaintiff's personal claim had been statute-barred, there was nothing in the compromise or in the defendants' conduct to give rise to an estoppel that would have prevented them from taking a limitation point in the personal action when it was brought. There is no logical distinction between that and *13 any other defence or objection. The position is not affected by bringing into the equation the defendants' delay in making the striking-out application. It is true that when the claim was actually brought and pleaded they became able to assess to some degree whether or not it was an abuse of process. (The position became clearer after completion of service of the plaintiff's factual and expert evidence.) It cannot be said, however, that conduct consisting of nothing more than, on the one part, failure to make an application and, on the other, continuing with the action involves a communication between the parties of the fact that each is

proceeding on the assumption that the action is not an abuse of process. Delay is to be considered, as it was by the Court of Appeal and Pumfrey J, in relation to the issues of special circumstances and the exercise of the striking-out power.

As to the possibility of an estoppel by representation, if the point is sought to be raised, there is nothing in the evidence to show any representation by the defendants to the plaintiff that they would conduct their defence of the action in any particular way or without taking any particular point.

There are no grounds for attacking the Court of Appeal's exercise of its discretion to strike out the plaintiff's claim as an abuse of process. Once the abuse of process has been shown, the court has a duty to put an end to it by striking the action out unless in the exercise of its discretion it concludes that its duty to do so is outweighed by other considerations. It "defies common sense" (see Goodwill v British Pregnancy Advisory Service [1996] 1 WLR 1397        , 1402), and would defeat the general public policy underlying Henderson v. Henderson 3 Hare 100        , to refuse to prevent an abuse of the court's process simply to punish the defendants for their delay. Goodwill        should be preferred to Halliday v Shoesmith [1993] 1 WLR 1        . It shows that the decision in Halliday        should be confined to similarly exceptional cases.

"Special circumstances" cannot be resurrected at the discretion stage as contended, for by the plaintiff. The points raised are explicit or implicit in the issues already considered and do not support an independent attack on the exercise of discretion. The present action is manifestly unfair to the defendants, who only some years after the settlement of the company proceedings became aware of the extent to which the plaintiff proposed to go over again issues extensively canvassed in the previous action. That could not have been foreseen from the sketchy details available at the end of November 1992. It would bring the administration of justice into disrepute to allow the plaintiff to do this simply because through his alter ego (and by his own

[2002] 2 A.C. 1                                                                                                Page 13
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

choice) he did not recover as much in the company proceedings as he would have liked to. Alternatively, on any view the Court of Appeal was entitled to exercise its discretion as it did, having regard to the overall principle of Hunter v Chief Constable of the West Midlands Police [1982] AC 529      and cannot be said to have been plainly wrong.

As to delay, the prospect of a trial of at least eight weeks (the parties' current estimate), which ex hypothesi constitutes an abuse of process, has to be balanced against the time, effort and expense incurred in the progress of the litigation to date and the stress of the litigation on the plaintiff. His advisers are sufficiently compensated for their time and effort through their entitlement to costs. While the plaintiff has himself spent time on the action and has experienced stress, that is the consequence of his having persisted in an action that will be found to have been an abuse. When the balancing *14      exercise has been performed, it is a decision not to strike out the action that would be plainly wrong.

On the cross-appeal, the first five principles put forward by the Court of Appeal [1999] PNLR 456b-f      are correct. The fundamental principle is that, as a general rule, the company is the proper claimant in an action to recover loss that it has itself suffered: see Foss v Harbottle (1843) 2 Hare 461      . A shareholder cannot in substance avoid that rule by bringing a personal claim to recover damages for loss in the value of his shares merely because the company in which he is interested has suffered damage, even if the conduct of which he complains gave him personally, and not the company alone, a cause of action: see Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204      , 222h-223a. He is suing for loss that simply reflects loss to the company. The Prudential      principle is, as the Court of Appeal [1999] PNLR 457f      said, salutary. It ensures that loss to the company is recovered only by the company and that the proceeds of recovery are not diverted to the shareholders to the potential preju-

dice of creditors. It similarly ensures that the process of recovery is conducted only by the company and that the company's right to recover is not adversely affected by outside compromises with the shareholders to the potential prejudice of creditors. It applies to loss of benefits as a director as well as to loss of dividends. There is no exception to it by which a shareholder can recover in respect of reflective loss that the company itself has for any reason failed to recover: see Prudential      , at p 223e, and Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443      , 471.

The loss claimed by the plaintiff as shareholder is entirely a reflection of WWH's loss, being referable to lack of available funds in WWH at a particular time and/or the compromise of the company proceedings for (it is alleged) a sum substantially less than the full amount of WWH's loss. The duties breach of which is alleged to have caused the plaintiff's loss are the same in content as those relied on in the company proceedings and are alleged to have been broken in the same way.

In any event, in accordance with general principles as to recoverability of damage a shareholder cannot recover for loss stemming from delayed payment of damages to him, a fortiori from delayed payment of damages to the company: see Verderame v Commercial Union Assurance Co plc [1992] BCLC 793      . The essence of the claim to additional loss in such circumstances is that the claimant, having been deprived of financial resources to be expected from the company, has suffered a further loss resulting from his reflective loss. A claim by the company to consequential loss arising from deprivation of financial resources would be met by the general policy objection to recovery of damages for loss resulting from delayed payment and impecuniosity. A fortiori that policy constitutes a ground of objection to recovery of such damages by a shareholder whose right of recovery is only through the company, in accordance with Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204      . It is essentially a policy limit-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                      Page 14

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

ation based on the ground that one party is not to be taken to contemplate that a breach of duty will cause the other to suffer additional loss of which the immediate cause is his impecuniosity. [Reference was made to Lee v Sheard [1956] 1 QB 192 ; R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117 ; Heron International Ltd v Lord Grade [1983] BCLC 244 ; George Fischer (Great Britain) Ltd v Multi Construction Ltd[1995] 1 BCLC 260 *15 ; Barings plc v Coopers & Lybrand [1997] 1 BCLC 427 and Hall v Governor and Co of the Bank of England (unreported) 19 April 2000 .]

Christensen v Scott [1996] 1 NZLR 273 is inconsistent with the above principles, and the Court of Appeal [1999] PNLR 457g was correct to hold that it should not be followed in this country. Although Hobhouse LJ in Gerber Garment Technology Inc v Lectra Syatems Ltd [1997] RPC 443 expressed approval of Christensen , he reached his conclusion for reasons that in no way depended on the correctness of anything in Christensen . The Court of Appeal, at p 457c-f, also rightly approved the approach of Millett LJ in Stein v Blake [1998] 1 All ER 724 . [Reference was also made to Hayes v James & Charles Dodd [1990] 2 All ER 815 ; Wapshott v Davis Donovan & Co [1996] PNLR 361 , 377-378; Watson v Dutton Forshaw Motor Group Ltd (unreported) 22 July 1998 and Farley v Skinner (unreported) 6 April 2000. ]

Damages for mental distress and anxiety in respect of a breach of duty causing purely economic loss in circumstances in which no physical injury was reasonably foreseeable as a consequence of the breach are not recoverable, and the plaintiff's claim to such damages accordingly fails. His mental distress and anxiety were the consequence of the financial position of WWH and are irrecoverable under the Prudential principle: see Hayes v James & Charles Dodd [1990] 2 All ER 815 and Verderame v Commercial Union Assurance Co plc [1992] BCLC 793 . [Reference was also made

to Wapshott v Davis Donovan & Co [1996] PNLR 361 , 377f-378d.].

As to aggravated damages, the facts pleaded in the re-amended statement of claim make it clear that the plaintiff's complaint is not as to the manner in which the wrong was committed but as to the manner in which the claims have been defended. That does not constitute aggravation of the damage in circumstances such as the present. When aggravated damages are claimed on the basis of the manner of defence in defamation actions, it is because the defendant has pleaded justification and so by his defence has continued to repeat the wrong of which the claimant complains. No such case can be made out here.

*ter Haar QC* in reply. It is important to look at the actual mischief that is said to have been caused by the alleged abuse of process.

On the cross-appeal, the primary relationship was that between the defendants and the plaintiff rather than between them and the company. In so far as they acted on behalf of the company they did so in support of the plaintiff's business plans. As to the cost of the plaintiff's personal borrowings (loan capital and interest), bank interest and charges and mortgage charges and interest, these losses can be grouped together. In one sense they can be said to relate to the impecuniosity of the company, but that is an incomplete analysis. All the losses are the plaintiff's personal losses. To characterise them as losses arising out of a shortage of funds in the company gives inadequate weight to the facts that the plaintiff's personal wealth was substantially concentrated in the company; that if the company were to lose its only substantial asset he would be liable on the guarantees given by him to support it and that support of it in its litigation could only come from him personally in circumstances where his principal asset had been rendered worthless unless the litigation succeeded; and that, accordingly, his ability to *16 borrow to finance his personal expenditure and other investments was increasingly constrained: the longer the litigation continued, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                          Page 15
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

more the need for it to succeed increased while his creditworthiness decreased.

As to diminution in value of the plaintiff's pension/majority shareholding in Westway Homes Ltd, this claim is primarily related to loss of pension rights. The plaintiff has suffered a loss that is separate from the company's and that would not have been recompensed even if the company had achieved a 100% recovery in its action.

As to loss of the 12.5% shareholding in Westway Homes Ltd, this loss is the plaintiff's and from its nature could not be the company's. Additional tax liability is again in its very nature a loss suffered by the plaintiff.

The true ratio of Stein v Blake [1998] 1 All ER 724 and Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 is in each case that no separate duty was owed to the shareholder. The decision in Heron International Ltd v Lord Grade [1983] BCLC 244 is explicable on the basis that no actionable duty was owed to the shareholders in respect of the loss in question: see p 263. Christensen v Scott [1996] 1 NZLR 273 is a good statement of the law. There is no difference between English law and the law in New Zealand. No English authority supports the defendants' propositions. [Reference was made to R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117 ; Walker v Stones [2001] QB 902 and Wapshott v Davis Donovan & Co [1996] PNLR 361 .]

In so far as the plaintiff has received indemnification for his losses as a result of the settlement of the company claim, credit will have to be given. The proper way to deal with this, as the judge observed, is to recognise the risks of double recovery and to ensure that appropriate directions are given so as to ensure that the true measure of loss is established.

As to damages for mental distress and anxiety and aggravated damages, the judge and the Court of Appeal were right to allow these heads of damage

to proceed.

As to remoteness, this is essentially fact-driven and the facts should be found first.

*Steinfeld QC*          replied on the cross-appeal.

Their Lordships took time for consideration. 14 December.

LORD BINGHAM OF CORNHILL

My Lords, there are two parties before the House. The first is Mr Johnson, the plaintiff in the action, who appeals against a decision of the Court of Appeal dismissing the action as an abuse of the process of the court. The other is Gore Wood & Co, a firm of solicitors, who cross-appeal against a decision of the Court of Appeal, on a preliminary issue of law, that certain heads of damage pleaded by Mr Johnson should not be struck out as irrecoverable. Both appeal and cross-appeal raise questions of legal principle which your Lordships' House has not, in recent years, had occasion to consider.

*The facts*

Mr Johnson is a businessman who conducted his business affairs through a number of companies. One of his businesses was property development, which he carried on through a company, Westway Homes Ltd ("WWH"), of *17 which he was managing director and holder of all but two of the issued shares. For all practical purposes WWH was the corporate embodiment of Mr Johnson.

Acting on behalf of WWH, Mr Johnson instructed Gore Wood & Co ("GW"), through a partner in the firm named Robert Wood, to act as solicitors for WWH in connection with a proposed purchase of land at Burlesdon in Hampshire from a Mr Moores. WWH planned to develop the land, but the project was one of some complexity, since the title of Mr Moores was to some extent doubtful and access to the land was dependent on acquisition of a strip of land owned by a third party. WWH had an option to purchase Mr Moores's land, and WWH instructed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                          Page 16
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

GW to serve a notice exercising this option.

Mr Johnson contends that from early April 1987, even before GW was formally instructed to act as solicitor for WWH, Mr Johnson engaged the firm, usually acting through Mr Wood, to advise him personally and act on behalf of certain of his companies in addition to WWH, as a result of which GW and in particular Mr Wood gained a detailed knowledge of his financial affairs and those of the companies concerned. He further contends that GW through Mr Wood knew and intended that advice given to him in connection with any business matter would or might be acted upon by him in relation to the conduct of his business affairs generally, including his personal financial affairs. Since the present proceedings have not progressed beyond determination of the preliminary issues giving rise to this appeal and cross-appeal there has been no detailed investigation of the facts, some of which are in dispute between the parties. But GW accepts that from time to time the firm acted on behalf of Mr Johnson personally and some of his companies other than WWH.

In February 1988 GW served notice exercising WWH's option on Mr Moores's solicitors. Mr Moores and the solicitors acting for him asserted that the notice had not been validly served since it had not been served upon Mr Moores personally. Having obtained the advice of counsel WWH instructed GW to issue proceedings against Mr Moores for specific performance of the contract created by the exercise of the option. This was done in March 1988. An alternative claim was made against Mr Moores's solicitors alleging breach of warranty of authority. GW continued to act for WWH in those proceedings until the end of November 1989. The proceedings came on for trial in the Chancery Division in January 1990, when an order for specific performance was made against Mr Moores and an inquiry into damages ordered. The alternative claim against Mr Moores's solicitors was dismissed. Mr Moores had been legally aided from an early stage of the litigation and now, be-

cause of his mental condition, was acting through a guardian ad litem. He appealed against the judge's decision, but his appeal was dismissed by the Court of Appeal on 20 February 1991, although on different grounds.

For reasons outside the control of Mr Johnson or WWH there was further delay before the land was conveyed to WWH. It was April 1992, more than four years after the exercise of the option, before the conveyance was completed. By this time WWH had suffered substantial loss because of the cost of the Chancery proceedings, the inability of WWH to recover damages and costs from Mr Moores, who had no assets save for the balance of the purchase price of the Burlesdon land, the collapse of the property market *18 and the high interest charges borne by WWH. On 8 January 1991 WWH started proceedings for professional negligence against GW. In those proceedings GW admitted that it had owed WWH a duty to exercise reasonable care in connection with the exercise of the option, but denied that that duty had been broken or that the damages claimed were recoverable. WWH applied for summary judgment. This application succeeded at first instance but failed on appeal. WWH was now in serious financial difficulty.

WWH's action against GW came to trial before a deputy judge on 26 October 1992. The hearing was estimated to last 10 to 12 days. This estimate was greatly exceeded. In the sixth week of trial, the company's evidence on liability had been completed and Mr Wood was in the course of giving evidence for GW when the action was compromised upon payment by GW to WWH of £1,480,000, which represented a very substantial proportion of the sum claimed by WWH, and costs in the agreed sum of £320,000.

Mr Johnson claims that because he had retained GW to advise and act for him personally as well as for WWH, the firm owed him as well as WWH a duty of care in contract and tort in relation to the exercise of the option, the advice which Mr Johnson contends was given to him personally as well as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                              Page 17
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

to WWH concerning the prospects of success in and the likely duration of the Chancery proceedings and the conduct of the Chancery proceedings. He claims that GW breached that duty and so caused him substantial loss. Whether GW owed Mr Johnson personally such a duty and whether (if so) it breached that duty will be live issues in this action if it proceeds. But for purposes of the issues now before the House, GW accepts that the facts pleaded by Mr Johnson are capable of supporting his case on these issues if established at trial.

Mr Johnson did not initiate proceedings to enforce any personal claims against GW at the time when WWH began its action against the firm. In an affidavit sworn on 6 March 1998 he deposed to his reasons for not doing so at that stage. His reasons were: (1) that he was in no position to bring a personal claim against GW until he was granted full legal aid in October 1992, his previous certificate having been limited; (2) that advancing his personal claims would have substantially delayed the progress and ultimate resolution of WWH's action against GW, which would have led to WWH going into liquidation before the trial of its action; (3) that the financial resources of both Mr Johnson and WWH had been exhausted by this litigation, said to have been caused by GW's negligence; (4) that joining the personal claim to WWH's claims would have led to an adjournment of the October 1992 trial date fixed for WWH's action; (5) that the more complicated nature of Mr Johnson's personal claims would have had an adverse effect on the costly and time-consuming work required to prepare WWH's case for trial; and (6) that the time which Mr Johnson could devote to the conduct of litigation was restricted by his need, from June 1991, to find new employment. GW does not deny that these were the reasons which led Mr Johnson not to proceed personally at that time, but does not accept that they provided valid or reasonable grounds for not doing so.

On 17 January 1991, well before WWH's action came to trial, solicitors representing that company notified the solicitors for GW that Mr Johnson had a personal claim against the firm which he would pursue in due course. No details of the claim were given. On 6 December 1991 solicitors *19 representing Mr Johnson informed GW that he had received a legal aid certificate to take proceedings against the firm for damages for negligence. The letter, couched in general terms, contended that GW had owed a duty to Mr Johnson personally as well as to WWH. While making no admission, GW's insurers in January 1992 invited Mr Johnson's solicitors to give full details of the quantum of his personal claim. Mr Johnson's solicitors replied in February 1992, outlining certain heads of claim and giving estimates in round figures of claims approaching £2m. In October 1992, on the eve of trial of WWH's action against GW, Mr Johnson's solicitors wrote to GW's solicitors, referring to his legal aid certificate and giving notice that his personal claim would be pursued whether the company's claim culminated in judgment or settlement. Since a substantial payment into court had been made on behalf of GW, Mr Johnson and WWH expected a favourable outcome of the company's action. On 19 November 1992, when trial of the company's action against GW was well advanced, Mr Pugh (a solicitor representing Mr Johnson) spoke to Mrs MacLennan (the solicitor representing GW) on the telephone and discussed Mr Johnson's personal claim: Mr Pugh said that it had been thought better to wait until the company's claim had been concluded before dealing with the personal claim; Mrs MacLennan asked whether Mr Pugh would object to an overall settlement of the company's claim and Mr Johnson's personal claim; he said that he would have to take instructions but could not himself see any objections "provided the figures were all right". He gave her a rough idea of the heads of claim and the figures. Mr Johnson instructed Mr Pugh that he would not be adverse to an overall settlement provided it was reasonably satisfactory. Mrs MacLennan indicated that GW (or its insurers) also were not adverse to an overall settlement if the figures could be agreed. On 1 December 1992 Mr Pugh met Mrs MacLennan at court to try to negotiate a settlement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                Page 18
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

of his personal claim. His attendance note of this meeting read:

"She mentioned an overall cap and said that she could not settle for more. I said that John Johnson's claim was a separate one and she said that so far as it was not related to the actual company's claim it might well be different. After some discussion it was agreed that so far as his claim as shareholder and only relating to a loss of dividends income and capital distribution there would be a cap at a figure to be agreed. This would not affect all the other claims on the list as previously discussed. Mrs Mc-Clenan [sic] reiterated her previous view but said it would be a separate claim and it would really be a matter for separate negotiation in due course. A cap was agreed at £250,000 excluding interest and costs."

The settlement agreement made between WWH and GW on 2 December 1992 was signed by solicitors for both sides; the solicitors representing WWH also, for this purpose, represented Mr Johnson.

By the settlement agreement GW agreed to pay the sums already mentioned with no admission of liability, in full and final satisfaction of all claims of WWH against GW and vice versa. The sum of £1m which GW had paid into court was to be paid out to WWH's solicitors. WWH undertook that any of its liabilities personally guaranteed by Mr Johnson would be discharged out of the sums received under the settlement agreement, the object plainly being to limit the quantum of any claim which Mr Johnson *20 might thereafter make personally. Clause 3 of the settlement agreement provided:

"Mr Johnson undertakes that the amount of any claim made by him personally in any action against [GW] in respect of any losses suffered by him by reason of loss of income, dividends or capital distribution in respect of his position as a shareholder of [WWH] will not exceed £250,000 not including interest accruing in respect of any period after the date of this agreement nor costs. This undertaking does not limit any other of Mr Johnson's rights against [GW]."

A confidentiality clause in the agreement contained an exception "In connection with any action which Mr Johnson may bring against [GW]."

Mr Johnson issued his writ in the present proceedings against GW on 7 April 1993. Over the next 41/2 years the parties pleaded and repleaded their respective cases. A payment into court was made by GW. Witness statements were exchanged. Mr Johnson served his accountancy evidence. On 20 November 1997 the action was fixed for trial in January 1999. On 3 December 1997 GW's solicitors intimated, for the first time, that it intended to apply to strike out the action as an abuse of the process of the court. Notice was also given that GW would seek the determination of preliminary issues whether it had owed Mr Johnson a duty of care and whether the damages which he claimed were in principle recoverable on the facts pleaded. On 25 February 1998 it was ordered that preliminary issues be tried, the second of which was:

"to what extent (if at all) on the basis of and assuming the truth of the facts pleaded as set out above are any of the heads of damage pleaded in paragraphs 23 and 24 of the re-amended statement of claim irrecoverable as a matter of law by [Mr Johnson] by way of damages for the pleaded breaches of the duties owed to him."

In paragraph 6 of his re-amended statement of claim Mr Johnson pleaded an implied term of his personal retainer of GW that it would exercise all due skill and care in execution of that retainer, and a like duty of care in tort. In paragraph 9 it was pleaded:

"Without prejudice to the generality of paragraph 6 above it was the duty of [GW], in carrying out its retainer on behalf of [Mr Johnson] in accordance with the implied term pleaded in the said paragraph, or alternatively in discharging its duty of care in tort owed to [Mr Johnson], to (a) exercise all due skill and care in connection with the exercise of the said option to purchase land and/or any further steps which were necessary to obtain possession of the land; (b) advise [Mr Johnson] fully and accur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                Page 19
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) J45 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

ately of all developments in connection with the exercise of the said option which might affect the financial requirements and prospects of [WWH]; (c) advise [Mr Johnson] of the implications of such developments for his personal financial situation and other business projects, including his existing liabilities and new financial commitments contemplated; (d) advise and/or warn [Mr Johnson] fully and accurately of any delay or difficulty in exercising the said option to purchase land, which might adversely affect [Mr Johnson's] personal financial situation and other business projects, including his existing liabilities *21 and new financial commitments contemplated; (e) advise and/or warn [Mr Johnson] fully and accurately of the implications of any advice given or steps taken by [GW] on behalf of [WWH] which might adversely affect [Mr Johnson's] personal financial situation and other business projects."

In paragraph 12 it was pleaded that GW had acted in breach of the terms pleaded in paragraphs 6 and 9 in connection with the exercise of WWH's option to purchase the Burlesdon land, and in paragraph 16 it was pleaded that between February 1988 and November 1989 GW had acted negligently or in breach of the implied terms of its retainer pleaded in paragraphs 6 and 9 in advising Mr Johnson from time to time as to the likely duration and outcome of the earlier proceedings against Mr Moores. The claims for damages made by Mr Johnson in paragraphs 23 and 24 of his re-amended statement of claim are the subject of detailed consideration below.

The preliminary issues came for hearing at first instance before Pumfrey J who, in a careful judgment delivered on 21 May 1998, resolved them in favour of Mr Johnson. On the abuse issue he found that GW was estopped by convention from contending that the action was an abuse. Applying Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84 he concluded:

"that in reaching the settlement, [GW] and Mr

Johnson did act on the common assumption that the personal claim would be made, and would be entertained by the court. I think that it is now unconscionable for [GW] to allege that the personal claim is an abuse of process in the light of Henderson v Henderson (1843) 3 Hare 100       ."

He resolved the duty issue in favour of Mr Johnson. He concluded that the heads of damage claimed by Mr Johnson were not irrecoverable as a matter of law as damages for the breaches alleged by Mr Johnson.

GW appealed. In a judgment of the court (Nourse, Ward and Mantell LJJ) given on 12 November 1998, the Court of Appeal agreed with the judge that on the facts pleaded a duty of care had arguably been owed by GW to Mr Johnson. The Court of Appeal shared the judge's view on the difficulty of the damage issue but agreed with his conclusion that the pleaded heads of damage were arguably recoverable, save as to one head of damage which it would have struck out.

The Court of Appeal held, differing from the judge, that there had been no estoppel by convention. But it also held that there had been an abuse under the rule in Henderson v Henderson (1843) 3 Hare 100       . It said:

"Mr ter Haar submits that the rule has no application because different issues arise in the two sets of proceedings. In this action there are entirely new questions about the extent of the duty owed to the plaintiff personally and the losses he has suffered. On the other hand, there was in our view a substantial similarity, particularly as to whether or not [GW's] conduct as solicitors fell below the required standard in connection with the exercise of the option and the conduct of the Chancery litigation [against Mr Moores] as well as the overlapping loss suffered by the company. This encompasses practically the whole of the ground traversed for six weeks in the company action. In our judgment, narrowly to circumscribe the application of the rule would defeat its purpose. Mr Johnson was the alter ego of the company: he controlled the

[2002] 2 A.C. 1                                                                                          Page 20
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

company's decisions and through him the company's claim was brought. Within days after that writ was issued, he was intimating his personal claim. He could have brought it then. Although his legal aid was then limited in some way which is not clear to us, no explanation has been given for the delay in removing whatever limitations had been imposed and he had full cover by October, long before the trial. For reasons which appeared good to him, he preferred not to delay the company action but to pursue it vigorously before the company was forced into liquidation. That does not, in our judgment, excuse him from failing to launch his own claims. If he could have done so, he should have done so."

*Abuse of process*

The rule of law depends upon the existence and availability of courts and tribunals to which citizens may resort for the determination of differences between them which they cannot otherwise resolve. Litigants are not without scrupulous examination of all the circumstances to be denied the right to bring a genuine subject of litigation before the court: Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581          , 590 per Lord Kilbrandon, giving the advice of the Judicial Committee; Brisbane City Council v Attorney General for Queensland [1979] AC 411          , 425 per Lord Wilberforce, giving the advice of the Judicial Committee). This does not however mean that the court must hear in full and rule on the merits of any claim or defence which a party to litigation may choose to put forward. For there is, as Lord Diplock said at the outset of his speech in Hunter v Chief Constable of the West Midlands Police [1982] AC 529          , 536, an

"inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people.

The circumstances in which abuse of process can arise are very varied; those which give rise to the instant appeal must surely be unique. It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power."

One manifestation of this power was to be found in RSC          Ord 18, r 19          which empowered the court, at any stage of the proceedings, to strike out any pleading which disclosed no reasonable cause of action or defence, or which was scandalous, frivolous or vexatious, or which was otherwise an abuse of the process of the court. A similar power is now to be found in CPR r 3.4

GW contends that Mr Johnson has abused the process of the court by bringing an action against it in his own name and for his own benefit when such an action could and should have been brought, if at all, as part of or at the same time as the action brought against the firm by WWH. The allegations of negligence and breach of duty made against the firm by WWH in that action were, it is argued, essentially those upon which Mr Johnson now relies. The oral and documentary evidence relating to each **\*23** action is substantially the same. To litigate these matters in separate actions on different occasions is, GW contends, to duplicate the cost and use of court time involved, to prolong the time before the matter is finally resolved, to subject GW to avoidable harassment and to mount a collateral attack on the outcome of the earlier action, settled by GW on the basis that liability was not admitted.

This form of abuse of process has in recent years been taken to be that described by Sir James Wigram V-C in Henderson v Henderson 3 Hare 100          , 114-115:

"In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdic-

[2002] 2 A.C. 1                                                                                    Page 21
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

tion, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time."

Thus the abuse in question need not involve the reopening of a matter already decided in proceedings between the same parties, as where a party is estopped in law from seeking to relitigate a cause of action or an issue already decided in earlier proceedings, but, as Somervell LJ put it in Greenhalgh v Mallard [1947] 2 All ER 255          , 257, may cover

"issues or facts which are so clearly part of the subject-matter of the litigation and so clearly could have been raised that it would be an abuse of the process of the court to allow a new proceeding to be started in respect of them."

A series of cases, mostly in recent years, has explored this form of abuse. Reference need not be made to all of them. In the Yat Tung          case abuse was found where a claimant who had unsuccessfully sued a bank on one ground brought a further action against the same bank and another party on a different ground shortly thereafter. Giving the advice of the Judicial Committee of the Privy Council, Lord Kilbrandon said, at pp 589-590:

"The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in

no 969, any formal repudiation of the pleas raised by the appellant in no 534. Nor was Choi Kee, a party to no 534, a party to no 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."

*24 In Brisbane City Council v Attorney General for Queensland [1979] AC 411          the Privy Council expressly endorsed Somervell LJ's reference to abuse of process and observed, at p 425:

"This is the true basis of the doctrine and it ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation."

In Hunter v Chief Constable of the West Midlands Police [1982] AC 529          , in which Henderson v Henderson          was not cited, the plaintiff sought to challenge in civil proceedings a decision in a criminal case against which he had not appealed on the ground which he sought to raise in the civil proceedings. The proceedings were struck out.

In Vervaeke (formerly Messina) v Smith [1983] 1 AC 145          the appellant, who had failed in English proceedings to annul her marriage, had succeeded in doing so in Belgium on different grounds and sought recognition in England of the Belgian decree. Lord Hailsham of St Marylebone LC, at p 157, described the rule in Henderson v Henderson          as "both a rule of public policy and an application of the law of res judicata" and said of it:

"whatever the limits of Henderson v Henderson 3 Hare 100          (which I regard as a sound rule in ordinary civil litigation) may ultimately turn out to be, I believe that it must apply to a case like the present, where the petitioner in the first proceedings not merely does not rely on the grounds then already in theory available to her, but deliberately conceals the real facts (on which she now relies) from the court in order to put forward a bogus

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                          Page 22

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

case which is radically inconsistent with them."

Ashmore v British Coal Corpn [1990] 2 QB 338 involved an attempt to reopen issues which had been decided adversely to the appellant's contentions in rulings which, although not formally binding on her, had been given in sample cases selected from a group of claims of which hers had been one. The Court of Appeal held that it was not in the interests of justice to allow her to pursue her claim. Reliance was placed on Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 Lloyds Rep 132 in which Kerr LJ said, at p 137:

"To take the authorities first, it is clear that an attempt to relitigate in another action issues which have been fully investigated and decided in a former action *may* constitute an abuse of process, quite apart from any question of *res judicata* or issue estoppel on the ground that the parties or their privies are the same. It would be wrong to attempt to categorise the situations in which such a conclusion would be appropriate."

In House of Spring Gardens Ltd v Waite [1991] 1 QB 241 the plaintiffs sued three defendants in England to enforce a judgment which they had obtained against those defendants in Ireland. The defendants pleaded in defence that the Irish judgment had been obtained by fraud. That was a contention which two of the defendants, but not the third (a Mr McLeod), had raised in Irish proceedings to set aside the judgment, but the allegation had been dismissed by Egan J. Summary judgment was given against the three defendants in England but Mr McLeod appealed against that judgment. The Court of Appeal held that Mr McLeod, like the other *25 defendants, was estopped from mounting what was in effect a collateral challenge to the decision of Egan J. It also held that Mr McLeod's defence was an abuse of process. Stuart-Smith LJ said, at p 255:

"The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J in Ireland. In my judgment it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to relitigate matters which have twice been extensively investigated and decided in their favour in the natural forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's judgment, and they were quite right not to do so. The plaintiffs will no doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is in Mr McLeod's case reached? Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause."

Arnold v National Westminster Bank plc [1991] 2 AC 93 was a case of issue estoppel. Tenants invited the court to construe the terms of a rent review provision in the sub-underlease under which they held premises. The provision had been construed in a sense adverse to them in earlier proceedings before Walton J, but they had been unable to challenge his decision on appeal. Later cases threw doubt on his construction. The question was whether the rules governing issue estoppel were subject to exceptions which would permit the matter to be reopened. The House held that they were. Lord Keith of Kinkel said, at p 109:

"In my opinion your Lordships should affirm it to be the law that there may an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in spe-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                    Page 23

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

cial circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above from his speech in Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2) [1967] 1 AC 853                , 947."

In the passage referred to Lord Upjohn had said:

"All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind."

Talbot v Berkshire County Council [1994] QB 290                arose out of a motor accident in which both the driver and his passenger were severely injured. The passenger sued the driver. The driver's insurers, without notice to the driver, made a third party claim against the Berkshire County Council, *26                claiming contribution as between joint tortfeasors but including no claim for the driver's own injuries. Not until after the expiry of the limitation period for bringing a personal claim did the driver learn of the third party claim against the county council. At trial, the passenger succeeded in full, damages being apportioned between the driver and the county council. The driver then sued the county council to recover damages for his own injuries. On the trial of preliminary issues, the judge held that the driver was prima facie estopped from bringing the action but that there were special circumstances which enabled the court to permit the action to be pursued. The county council successfully challenged that conclusion on appeal. Stuart-Smith LJ said, at p 298:

"There can be no doubt that the [driver's] personal injury claim could have been brought at the time of [the passenger's] action. It could have been included in the original third party notice issued against the council ( RSC Ord 16, r 1(b)(c)                ); it could have been started by a separate writ and consolidated with or ordered to be tried with [the passenger's] action: Ord 4, r 9                . The third party proceedings could have been amended at any time before trial and per-

haps even during the trial to include such a claim, notwithstanding that it was statute-barred, since it arose out of the same or substantially the same facts as the cause of action in respect of which relief was already claimed, namely, contribution or indemnity in respect of [the passenger's] claim: Ord 20, r 5                 . In my opinion, if it was to be pursued, it should have been so brought."

Stuart-Smith LJ considered that the insurers' solicitors appeared to have been negligent but that the claim against the county council should be struck out unless there were special circumstances, and concluded that there were not. With his conclusions Mann and Nourse LJJ agreed. Since the driver's claim against the county council was held by the judge to be statute-barred, a claim against the solicitors may have offered the driver his only hope of recovery.

The plaintiff in C (A Minor) v Hackney London Borough Council [1996] 1 WLR 789                lived in the house of which her mother was tenant. She suffered from Down's syndrome and claimed in this action to have suffered personal injury caused by the negligence and breach of statutory duty of the borough council as housing authority. Her mother had previously made a similar claim which had been the subject of a consent order in the county court. The borough council applied to set aside a judgment entered in the plaintiff's favour in default of defence and to strike out the claim on the ground that the plaintiff's action was an abuse of the process of the court. Reliance was placed in particular on Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581                and Talbot v Berkshire County Council [1994] QB 290                . This argument was accepted by the judge, who held that the plaintiff's action should have been advanced at the same time as her mother's, the more so as the plaintiff was dependent on her mother. The plaintiff's appeal against this decision succeeded. Simon Brown LJ said, at pp 794-795:

"I therefore reject entirely the submission that Yat Tung Investment Co Ltd v Dao Heng Bank Ltd                justifies extending the Talbot v

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                          Page 24
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

Berkshire County Council     principle--that an unlitigated monetary claim is barred if it could have been advanced and established in earlier proceedings (itself *27     to my mind an extended application of the res judicata doctrine)--to those not themselves party to the earlier proceedings.

"It follows from all this that in my judgment the doctrine of res judicata even in its widest sense has simply no application to the circumstances of the present case and that the judge erred in ruling to the contrary. One does not, therefore, reach the point of asking here whether special circumstances exist to exclude it; C's erstwhile solicitors' suggested negligence is, frankly, an irrelevance. Nor, in my judgment, does this case come within measurable distance of any other form of abuse of process based on public policy considerations analogous to those underlying the res judicata doctrine: see, for instance, the Court of Appeal's decision in Ashmore v British Coal Corpn [1990] 2 QB 338     .

"All that said, this judgment should not be taken as any encouragement to lawyers or their clients to follow the course in fact adopted here. As the judge rightly recognised, in circumstances such as these, it is plainly in the public interest to have a single action in which the claims of all the affected members of the household are included rather than a multiplicity of actions ..."

Barrow v Bankside Agency Ltd [1996] 1 WLR 257     was one of the flood of cases which arose out of losses in the Lloyd's insurance market. Mr Barrow was a member of an action group which had successfully sued a number of members' agents for negligent underwriting. Having substantially succeeded, but recovered only a proportion of the damages he had claimed, Mr Barrow issued fresh proceedings against his members' agent on a different ground. It was clear that this claim, even if made earlier, would not have been tried at the same time as the earlier action, since the scheduling of cases was the subject of detailed management by the Commercial Court. The members' agent contended that to bring this further claim, not raised at the

time of the earlier proceedings, was an abuse. In the Court of Appeal it was said, at p 260:

"The rule in Henderson v Henderson 3 Hare 100     is very well known. It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed."

The rule was described, at p 263, as a salutary one, and the court suggested that its application should not be circumscribed by unnecessarily restrictive rules. On the facts it was held that the procedure adopted by Mr Barrow was not an abuse. The court also held that if, contrary to its opinion, the case did fall within the mischief at which Henderson v Henderson     *28     was directed, there were special circumstances which justified non-application of the rule.

In Manson v Vooght [1999] BPIR 376     , the plaintiff had sued administrative receivers of a company of which he had been managing director and principal shareholder in a 1990 action which culminated in a judgment adverse to him in 1993. There were other proceedings leading to other judgments, also given in 1993, relating to certain of the same issues: proceedings to disqualify the plaintiff as a director, in which findings adverse to him were made; and summonses issued in the liquidation of the company, when the court refused to allow is-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                    Page 25

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001] P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98 L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

sues which had been decided in the disqualification proceedings to be re-litigated. In 1994 the plaintiff issued a further writ making claims against the administrative receivers and others. His proceedings against the administrative receivers were struck out on the ground that these claims should have been raised, if at all, in the 1990 action. This decision was upheld by the Court of Appeal. Giving the leading judgment May LJ said, at pp 387-388:

"In my view, the use in this context of the phrase 'res judicata' is perhaps unhelpful, and this not only because it is Latin. We are not concerned with cases where a court has decided the matter; but rather cases where the court has not decided the matter, but where in a (usually late) succeeding action someone wants to bring a claim which should have been brought, if at all, in earlier concluded proceedings. If in all the circumstances the bringing of the claim in the succeeding action is an abuse, the court will strike it out unless there are special circumstances. To find that there are special circumstances may, for practical purposes, be the same thing as deciding that there is no abuse, as Sir Thomas Bingham MR came close to holding on the facts in Barrow v Bankside Agency Ltd [1996] 1 WLR 257        . The bringing of a claim which could have been brought in earlier proceedings may not be an abuse. It may in particular cases be sensible to advance cases separately. It depends on all the circumstances of each case. Once the court's consideration is directed clearly towards the question of abuse, it will be seen that the passage from Sir James Wigram V-C's judgment in Henderson v Henderson 3 Hare 100        is a full modern statement of the law so long as it is not picked over semantically as if it were a tax statute.

"The extent of any coincidence of causes of action, facts or even the capacities in which parties are sued, though relevant, will not necessarily determine the outcome."

May LJ continued, at pp 388-389:

"[Counsel for Mr Manson] submits that the kind of abuse of process relied on by the first defendant in this appeal is to be narrowly confined and precisely defined so that legitimate claims are not

stifled and so that potential litigants know where they stand. Otherwise they may be driven to include in one proceedings related but distinct claims which might sensibly be left for later consideration. The law should not thus encourage premature litigation which may prove unnecessary. He further submits that delay is the subject of the law of limitation and should not feature additionally as an element of abuse.

*29 "It is of course axiomatic that the court will only strike out a claim as an abuse after most careful consideration. But the court has to balance a plaintiff's right to bring before the court genuine and legitimate claims with a defendant's right to be protected from being harassed by multiple proceedings where one should have sufficed. Abuse of process is a concept which defies precise definition in the abstract. In particular cases, the court has to decide whether there is abuse sufficiently serious to justify preventing the offending litigant from proceeding. In cases such as the present, the abuse is sufficiently defined in Henderson        which itself is encapsulated in the proposition that the litigant could and should have raised the matter in question in earlier concluded proceedings. Special circumstances may negative or excuse what would otherwise be an abuse. But there may in particular cases be elements of abuse additional to the mere fact that the matter could and should have been raised in the earlier proceedings."

May LJ added, at p 389:

"Mr Manson relies on special circumstances to negative or excuse the abuse. He says that the scope of the 1990 action was limited because he had legal expenses insurance for that action which only covered some of his claims and that the insurers were not prepared to support the claims which he now wants to bring. Although this may be an explanation, in my view it does not excuse the abuse nor does it amount to special circumstances. It is commonplace for litigants to have difficulties in affording the cost of litigation. But lack of means cannot stand as an excuse for abuse of process."

Last in this series of cases comes Bradford and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                    Page 26
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

Bingley Building Society v Seddon [1999] 1 WLR 1482                          , a decision later in time than the Court of Appeal's judgment in the present case but given by two of the same Lords Justices. Mr Seddon had made an investment on the advice of an accountant, Mr Hancock, which he had financed by taking a mortgage loan from the Bradford and Bingley Building Society. The investment failed. Mr Seddon claimed damages or an indemnity against Mr Hancock, who admitted liability to indemnify Mr Seddon to the extent of about 75% of Mr Seddon's claim. Judgment was entered in Mr Seddon's favour for this admitted sum and Mr Hancock was given leave to defend as to the balance. Mr Seddon was unable to enforce his judgment as Mr Hancock had no money, and the residual claim was not pursued. The building society then proceeded against Mr Seddon to enforce the debt owed to it under the mortgage loan. Mr Seddon sought to join as third parties Mr Hancock, in order to pursue the residual claim, and two of his partners, Mr Seddon's contention being that the advice tended to him had been given by the firm to which Mr Hancock and his partners belonged. An application to strike out the third party claim was upheld by the judge and Mr Seddon appealed. In the course of a judgment with which Nourse and Ward LJJ agreed, Auld LJ said, at pp 1490-1491:

"In my judgment, it is important to distinguish clearly between res judicata and abuse of process not qualifying as res judicata, a distinction delayed by the blurring of the two in the courts' subsequent application of the above dictum [of Sir James Wigram V-C in Henderson v Henderson3 Hare 100]        *30        . The former, in its cause of action estoppel form, is an absolute bar to relitigation, and in its issue estoppel form also, save in 'special cases' or 'special circumstances': see Thoday v Thoday [1964] P 181                          , 197-198, per Diplock LJ, and Arnold v National Westminster Bank plc [1991] 2 AC 93                   . The latter, which may arise where there is no cause of action or issue estoppel, is not subject to the same test, the task of the court being to draw the balance between the competing claims of one party

to put his case before the court and of the other not to be unjustly hounded given the earlier history of the matter ...

"Thus, abuse of process may arise where there has been no earlier decision capable of amounting to res judicata (either or both because the parties or the issues are different) for example, where liability between new parties and/or determination of new issues should have been resolved in the earlier proceedings. It may also arise where there is such an inconsistency between the two that it would be unjust to permit the later one to continue."

Auld LJ continued, at pp 1492-1493:

"In my judgment mere 're'-litigation, in circumstances not giving rise to cause of action or issue estoppel, does not necessarily give rise to abuse of process. Equally, the maintenance of a second claim which could have been part of an earlier one, or which conflicts with an earlier one, should not, per se, be regarded as an abuse of process. Rules of such rigidity would be to deny its very concept and purpose. As Kerr LJ and Sir David Cairns emphasised in Bragg v Oceanus Mutual Underwriting Association (Bermuda) Ltd [1982] 2 Lloyd's Rep 132                          , 137, 138-139 respectively, the courts should not attempt to define 'or categorise fully what may amount to an abuse of process; see also per Stuart-Smith LJ in Ashmore v British Coal Corpn [1992] 2 QB 338                          , 352. Sir Thomas Bingham MR underlined this in Barrow v Bankside Agency Ltd [1996] 1 WLR 257                          , stating, at p 263b, that the doctrine should not be 'circumscribed by unnecessarily restrictive rules' since its purpose was the prevention of abuse and it should not endanger the maintenance of genuine claims; see also per Saville LJ, at p 266d-e.

"Some additional element is required, such as a collateral attack on a previous decision (see e g Hunter v Chief Constable of the West Midlands Police [1982] AC 529                          ; Bragg's case [1982] 2 Lloyd's Rep 132                          , per Kerr LJ and Sir David Cairns, at pp 137 and 139 respectively, and Ashmore's case [1990] 2 QB 338                          ), some dishonesty (see e g per

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                           Page 27
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

Stephenson LJ in Bragg's             case, at p 139, and Potter LJ in Morris v Wentworth-Stanley [1999] 2 WLR 470        , 480 and 481; or successive actions amounting to unjust harassment (see e g Manson v Vooght [1999] BPIR 376        ...))."

The Court of Appeal held that Mr Seddon's third party proceedings were not an abuse of process, and the appeal succeeded.

It may very well be, as has been convincingly argued (Watt, "The Danger and Deceit of the Rule in Henderson v Henderson       : A new approach to successive civil actions arising from the same factual matter" (2000) 19 CLJ 287        ), that what is now taken to be the rule in Henderson v Henderson        has diverged from the ruling which Wigram V-C made, which was addressed to *31 res judicata. But Henderson v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in

later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice.

Mr ter Haar, for Mr Johnson, submitted (as the judge had held) that GW was estopped by convention from contending that the bringing of an action to enforce his personal claims was an abuse of process. In resisting GW's complaint of abuse, Mr ter Haar relied, as he did in the courts below, on three features of this case in particular. The first was the acute financial predicament in which Mr Johnson personally and WWH found themselves as a result, as Mr Johnson alleges, of GW's negligence. The burden of financing the continuing operation of WWH, and of its very expensive litigation against GW, fell on him. His means was stretched to the utmost. The only hope of financial salvation lay in an early and favourable outcome to the company's claim against GW. Mr Johnson did not have a full

[2002] 2 A.C. 1                                                                                                                                         Page 28
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

legal aid certificate to pursue a personal claim. In any event, the addition of a personal claim would have complicated and delayed the trial of the company's claim, which might well have jeopardised the company's *32 survival. Secondly, Mr ter Haar relied on the conduct of the parties after the settlement agreement was made (if, contrary to his earlier submission, there was no estoppel by convention). He pointed out that 4 1/2 years elapsed from the issue of Mr Johnson's writ in this action before GW first intimated their intention to apply to strike out the proceedings as an abuse of the court's process, during which period pleadings and evidence were exchanged, considerable costs were incurred, a substantial payment into court was made and a trial date fixed. This procedural history, he submitted, was evidence of the expectation of the parties at the time when the company's action was settled, and was in itself ground for rejecting GW's application: Halliday v Shoesmith [1993] 1 WLR 1     , 5. Thirdly, Mr ter Haar submitted that to, the extent that issues litigated in the company's action were to be relitigated in this action, it was because GW had insisted on this and rejected the invitation of Mr Johnson to treat the evidence given in the earlier action as if given in this action.

Two subsidiary arguments were advanced by Mr ter Haar in the courts below and rejected by each. The first was that the rule in Henderson v Henderson 3 Hare 100     did not apply to Mr Johnson since he had not been the plaintiff in the first action against GW. In my judgment this argument was rightly rejected. A formulaic approach to application of the rule would be mistaken. WWH was the corporate embodiment of Mr Johnson. He made decisions and gave instructions on its behalf. If he had wished to include his personal claim in the company's action, or to issue proceedings in tandem with those of the company, he had power to do so. The correct approach is that formulated by Sir Robert Megarry V-C in Gleeson v J Wippell & Co Ltd [1977] 1 WLR 510 where he said, at p 515:

"Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest.' "

On the present facts that test was clearly satisfied.

The second subsidiary argument was that the rule in Henderson v Henderson 3 Hare 100     did not apply to Mr Johnson since the first action against GW had culminated in a compromise and not a judgment. This argument also was rightly rejected. An important purpose of the rule is to protect a defendant against the harassment necessarily involved in repeated actions concerning the same subject matter. A second action is not the less harassing because the defendant has been driven or thought it prudent to *33 settle the first; often, indeed, that outcome would make a second action the more harassing.

On the estoppel by convention issue, Mr Steinfeld for GW submitted that the Court of Appeal had been right and the judge wrong. There had been no common understanding between the parties on the issue of abuse, a topic which had never been raised. There was nothing to suggest that GW had tacitly agreed to forgo any defence properly open to it. Mr Steinfeld further submitted that the present proceedings did amount to an abuse, as the Court of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                       Page 29
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

Appeal had rightly held. Mr Johnson could have advanced his personal claim at the same time as the company's claim and therefore should have done so. The consequence of his not doing so was to expose GW to the harassment of further proceedings canvassing many of the same issues as had been canvassed in the earlier action, with consequential waste of time and money and detriment to other court users. The facts relied on to excuse his earlier inaction were not accepted. He should have sought a full legal aid certificate earlier. He could not rely on lack of means. Any loss caused to Mr Johnson by GW's delay in applying to strike out could be compensated in costs.

Neither party challenged the correctness in principle of Lord Denning MR's statement in Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84          , 122 which, despite its familiarity, I quote:

"The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption--either of fact or of law--whether due to misrepresentation or mistake makes no difference--on which they have conducted the dealings between them--neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."

The question is whether the parties to the settlement of WWH's action (relevantly, Mr Johnson and GW) proceeded on the basis of an underlying assumption that a further proceeding by Mr Johnson would not be an abuse of process and whether, if they did, it would be unfair or unjust to allow GW to go back on that assumption. In my judgment both these conditions were met on the present facts. Mr Johnson was willing in principle to try to negotiate an overall settlement of his and the company's claims but this was not possible in the time available and it was GW's solicitor who said that the personal claim "would be a separate claim and it would really be a matter for separate negotiation in due course". It is noteworthy that Mr Johnson personally was party to the settlement agreement, and that the agreement *34 contained terms designed to preclude (in one instance) and limit (in another) personal claims by him. Those provisions only made sense on the assumption that Mr Johnson was likely to make a personal claim. GW did not, of course, agree to forgo any defence the firm might have to Mr Johnson's claim if brought, and the documents show that GW's solicitor was alert to issues of remoteness and duplication. Had Mr Johnson delayed unduly before proceeding, a limitation defence would have become available. But an application to strike out for abuse of process is not a defence; it is an objection to an action being brought at all. The terms of the settlement agreement and the exchanges which preceded it in my view point strongly towards acceptance by both parties that it was open to Mr Johnson to issue proceedings to enforce a personal claim, which could then be tried or settled on its merits, and I consider that it would be unjust to permit GW to resile from that assumption.

If, contrary to my view, GW is not estopped by convention from seeking to strike out Mr Johnson's action, its failure to take action to strike out over a long period of time is potent evidence not only that the action was not seen as abusive at the time but also that, on the facts, it was not abusive. The indicia of true abuse are not so obscure that an experienced professional party, advised by leading coun-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                        Page 30
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

sel (not, at that stage, Mr Steinfeld), will fail to recognise them. It is accepted that Mr Johnson had reasons which he regarded as compelling to defer prosecution of his personal claim. If, as he contended, the urgency of obtaining an early and favourable decision in the company's action was itself a result of GW's breach of duty to the company and to him, it would seem to me wrong to stigmatise as abusive what was, in practical terms, unavoidable. I agree with GW that it would certainly have been preferable if the judge who tried the company's action, and thereby became familiar with much of the relevant detail and evidence, had been able at the same time or shortly thereafter to rule on the personal claim. That would have been efficient and economical. But there were reasons accepted at least implicitly by both parties at the time for not proceeding in that way, and GW could, if it wishes, limit the extent to which issues extensively canvassed in the earlier action are to be reopened. It is far-fetched to suggest that this action involves a collateral attack on GW's non-admission of liability in the first action when that action was settled by insurers on terms quite inconsistent with any realistic expectation that GW would not be found liable.

In my opinion, based on the facts of this case, the bringing of this action was not an abuse of process. The Court of Appeal adopted too mechanical an approach, giving little or no weight to the considerations which led Mr Johnson to act as he did and failing to weigh the overall balance of justice. I would allow Mr Johnson's appeal.

*The recoverability of the damages claimed by Mr Johnson*

By its notice of cross-appeal GW challenged the Court of Appeal's ruling that all the heads of damage pleaded on behalf of Mr Johnson (with one exception) were or might be recoverable in principle if the pleaded facts were fully proved.

GW's first argument before the House, applicable to all save two of the pleaded heads of damage, was in

principle very simple. It was that this damage, if suffered at all, had been suffered by WWH and Mr Johnson, *35          being for this purpose no more than a shareholder in the company, could not sue to recover its loss. As the Court of Appeal pointed out in Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204          , 210:

"A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested."

Here, it was argued, Mr Johnson was seeking to recover damage which had been suffered by WWH.

Mr Johnson's response was equally simple. It was accepted, for purposes of the application to strike out the damages claim, that GW owed a duty to him personally and was in breach of that duty. Therefore, subject to showing that the damage complained of was caused by GW's breach of duty and was not too remote, which depended on the facts established at trial and could not be determined on the pleadings, he was entitled in principle to recover any damage which he had himself suffered as a personal loss separate and distinct from any loss suffered by the company.

On this issue we were referred to a number of authorities which included Lee v Sheard [1956] 1 QB 192          ; Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204          ; Heron International Ltd v Lord Grade [1983] BCLC 244          ; R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117          ; George Fischer (Great Britain) Ltd v Multi Construction Ltd [1995] 1 BCLC 260          ; Christensen v Scott [1996] 1 NZLR 273          ; Barings plc v Coopers & Lybrand [1997] 1 BCLC 427          ; Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443          ; Stein v Blake [1998] 1 All ER 724          and Watson v Dutton Forshaw Motor Group Ltd (unreported) 22 July 1998; Court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                    Page 31
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

of Appeal (Civil Division) Transcript No 1284 of 1998.

These authorities support the following propositions. (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204        , particularly at pp 222-223, *Heron International*        , particularly at pp 261-262, *George Fischer*        , particularly at pp 266 and 270-271, *Gerber* and *Stein v Blake*        , particularly at pp 726-729. (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by *Lee v Sheard* [1956] 1 QB 192        , 195-196, *George Fischer* and *Gerber*        . (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may *36        recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of *Lee v Sheard*        , at pp 195-196, *Heron International*        , particularly at p 262, *R P Howard*        , particularly at p 123, *Gerber* and *Stein v Blake*        , particularly at p 726. I do not think the observations of Leggatt LJ in *Barings*        at p 435b and of the Court of

Appeal of New Zealand in *Christensen v Scott*        at p 280, lines 25-35, can be reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204        , 223) the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant.

I turn to consider the heads of claim now pleaded by Mr Johnson. (1) Collector Piece Video Ltd and Adfocus Ltd. The claim is for sums which Mr Johnson, acting on GW's advice, invested in these companies and lost. This claim is unobjectionable in principle, as Mr Steinfeld came close to accepting. (2) Cost of personal borrowings: loan capital and

[2002] 2 A.C. 1                                                         Page 32
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

interest. The claim is for sums which Mr Johnson claims he was obliged to borrow at punitive rates of interest to fund his personal outgoings and those of his businesses. Both the ingredients and the quantum of this claim will call for close examination, among other things to be sure that it is not a disguised claim for loss of dividend, but it cannot at this stage be struck out as bad on its face. The same is true of Mr Johnson's claims for bank interest and charges and mortgage charges and interest (which will raise obvious questions of remoteness). (3) Diminution in value of Mr Johnson's pension and majority shareholding in WWH. In part this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out. In part the claim relates to enhancement of the value of Mr Johnson's pension if the payments had been duly made. I do not regard this part of the claim as objectionable in principle. An alternative claim, based on the supposition that the company would not have made the pension payments, that its assets would thereby have been increased and that the value of Mr Johnson's shareholding would thereby have been enhanced, *37       is also a reflection of the company's loss and I would strike it out. (4) Loss of 12.5% of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle. (5) Additional tax liability. If proved, this is a personal loss and I would not strike it out.

The second limb of GW's argument on the cross-appeal was directed to Mr Johnson's claim for damages for mental distress and anxiety. This is a claim for general damages for

"the mental distress and anxiety which he has suffered as a result of the protracted litigation process to which he has been subjected, the extreme financial embarrassment in which he and his family have found themselves, and the deterioration in his

family relationships, particularly with his wife and son, as a result of the matters complained of in the re-amended statement of claim."

Closely allied to this was a claim, pleaded at length, for aggravated damages "by reason of the fact that the manner of the commission of [GW's] tort was such as to injure his pride and dignity". GW contended that damages for mental distress and anxiety did not lie for breach of a commercial contract such as the present and that this was not a class of case in which aggravated damages were in principle recoverable. Mr ter Haar took issue with both these points.

The general rule laid down in Addis v Gramophone Co Ltd [1909] AC 488       was that damages for breach of contract could not include damages for mental distress. Cases decided over the last century established some inroads into that general rule: see, generally, McGregor on Damages       , 16th ed (1997), paras 98-104. But the inroads have been limited and McGregor       describes as a useful summary a passage in Watts v Morrow [1991] 1 WLR 1421       , 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead."

Your Lordships' House had occasion to touch on this question in Ruxley Electronics and Construction Ltd v Forsyth [1996] AC 344       , an unusual case in which the issue concerned the measure of compensation recoverable by a building owner against a contractor who had built a swimming pool which was 18 inches shallower at the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                    Page 33
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

deep end than the contract specified. Lord Lloyd of Berwick said, at p 374:

" Addis v Gramophone Co Ltd estab- lished the general rule that in claims for breach of contract, the plaintiff cannot recover damages for his injured feelings. But the rule, like most rules, is subject to exceptions. One of the well established exceptions is when the object of the contract is *38 to afford pleasure, as, for example, where the plaintiff has booked a holiday with a tour operator. If the tour operator is in breach of con- tract by failing to provide what the contract called for, the plaintiff may recover damages for his dis- appointment: see Jarvis v Swans Tours Ltd [1973] QB 233 and Jackson v Horizon Holi- days Ltd [1975] 1 WLR 1468 .

"This was, as I understand it, the principle which Judge Diamond applied in the present case. He took the view that the contract was one 'for the provision of a pleasurable amenity'. In the event, Mr Forsyth's pleasure was not so great as it would have been if the swimming pool had been 7 feet 6 inches deep. This was a view which the judge was entitled to take. If it involves a further inroad on the rule in Addis v Gramophone Co Ltd [1909] AC 488 , then so be it. But I prefer to regard it as a logical application or adaptation of the exist- ing exception to a new situation."

I do not regard this observation as throwing doubt on the applicability of Addis v Gramophone Co Ltd in a case such as the present. It is un- doubtedly true that many breaches of contract cause intense frustration and anxiety to the innocent party. I am not, however, persuaded on the argu- ment presented on this appeal that the general ap- plicability of Addis v Gramophone Co Ltd should be further restricted.

I would strike out Mr Johnson's claim for damages for mental distress and anxiety. I would also strike out his claim for aggravated damages: I see nothing in the pleaded facts which would justify any award beyond the basic compensatory measure of dam- ages.

*Conclusion*

For these reasons I would allow Mr Johnson's ap- peal and dismiss GW's cross-appeal, save that I would strike out his claims (identified in (3) above) for pension payments and the enhanced value of his shareholding, and for damages for mental distress and anxiety and aggravated damages. I would order GW to pay Mr Johnson's costs before the Court of Appeal and the judge, and the costs of the appeal and the cross-appeal to this House.

LORD GOFF OF CHIEVELEY My Lords,

*(1) The appeal*

*(a) Abuse of process*

On the question whether there was an abuse of pro- cess on the part of the plaintiff, my noble and learned friend, Lord Bingham of Cornhill, has re- viewed the facts and the relevant authorities in lu- cid detail. I find myself to be in complete agree- ment with his analysis of the authorities, and with his conclusion that on the facts there was no abuse of process on the part of the plaintiff; and I do not propose to burden this opinion with a repetition of his reasoning. I only wish to add a few words on the separate question of estoppel, with regard to the nature of the estoppel on which the plaintiff could, if necessary, have relied.

*(b) Estoppel*

The conclusion of the judge, and the contention of Mr ter Haar for the plaintiff, was that the relevant estoppel was estoppel by convention. *39 Reliance was placed in particular on a well known passage in the judgment of Lord Den- ning MR in Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84 , 122:

"The doctrine of estoppel is one of the most flex- ible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                           Page 34
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption--either of fact or of law--whether due to misrepresentation or mistake makes no difference--on which they have conducted the dealings between them--neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."

This broad statement of law is most appealing. I yield to nobody in my admiration for Lord Denning; but it has to be said that his attempt in this passage to identify a common criterion for the existence of various forms of estoppel--he refers in particular to proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel--is characteristically bold; and that the criterion which he chooses, viz that the parties to a transaction should have proceeded on the basis of an underlying assumption, was previously thought to be relevant only in certain cases (for example, it was adopted by Oliver J in his important judgment in Taylors Fashions Ltd v Liverpool Victoria Trustees Co Ltd (Note) [1982] QB 133        ) and, in particular, in the case of estoppel by convention, a species of estoppel which Lord Denning does not mention. Furthermore, if he intended that his broad statement of principle should apply in the case of estoppel by convention, a further problem arises in that, in relation to that doctrine, it has been authoritatively stated in Spencer Bower & Turner, The Law Relating to Estoppel by Representation, in the scholarly and much admired third edition (1977) by Sir Alexander Turner,

at pp 167-168, that:

"Just as the representation which supports an estoppel in pais must be a representation of *fact*            , the assumed state of affairs which is the necessary foundation of an estoppel by convention must be an assumed state of facts presently in existence ... No case has gone so far as to support an estoppel by convention precluding a party from resiling from a promise or assurance, not effective as a matter of contract, as to future conduct or as to a state of affairs not yet in existence. And there is no reason to suppose that the doctrine will ever develop so far. To allow such an estoppel would amount to the abandonment of the doctrine of consideration, and to accord contractual effect to assurances as to the future for which no consideration has been given."

*40 I myself suspect that this statement may be too categorical; but we cannot ignore the fact that it embodies a fundamental principle of our law of contract. The doctrine of consideration may not be very popular nowadays; but although its progeny, the doctrine of privity, has recently been abolished by statute, the doctrine of consideration still exists as part of our law.

I myself was the judge of first instance in Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank Ltd [1982] QB 84          . I remember the doctrine of estoppel by convention being urged upon me; but the case was concerned with the scope of a guarantee, which was a matter of law, and, in the light of the passage in *Spencer Bower & Turner*      which I have just quoted, I hesitated to adopt the doctrine. Cautiously, and I still think wisely, I founded my conclusion on a broader basis of unconscionability. In the Court of Appeal, however, both Eveleigh and Brandon LJJ expressly founded the relevant parts of their judgments on the doctrine of estoppel by convention. They did so relying on the statement of principle from *Spencer Bower & Turner* which I have already cited, which limits the doctrine to cases where there has been an agreed as-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                      Page 35
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

sumption as to *facts*, but nevertheless applied that statement to a case where the agreed assumption (as to the scope of the guarantee) was one of law. If Lord Denning's statement of principle is to be read as applying to the case of estoppel by convention, he implicitly rejected the statement of the law in *Spencer Bower & Turner*, holding that there could be an estoppel whether the common underlying assumption was one of fact or of law.

I accept that in certain circumstances an estoppel may have the effect of enabling a party to enforce a cause of action which, without the estoppel, would not exist. Examples are given in my judgment in Amalgamated Investment and Property Co Ltd v Texas Commerce International Bank [1982] QB 84, 105-107. But in my opinion it is not enough for that purpose that the estoppel may be characterised as an estoppel by convention, or that it can be said to be founded upon a common assumption by the parties.

Against this background I am, despite my great admiration for Lord Denning, reluctant to proceed on the basis of estoppel by convention in the present case. The function of the estoppel is here said to be to preclude the defendant firm from contending that Mr Johnson, by personally advancing a separate claim to damages against the defendant firm instead of doing so at the same time as pursuing his company's claim, was abusing the process of the court. That, as I see it, must relate to a matter of law. It could, however, be appropriate subject matter for an estoppel by representation, whether in the form of promissory estoppel or of acquiescence, on account of which the firm is, by reason of its prior conduct, precluded from enforcing its strict legal rights against Mr Johnson (to claim that his personal proceedings against the firm constituted an abuse of the process of the court). Such an estoppel is not, as I understand it, based on a common underlying assumption so much as on a representation by the representor that he does not intend to rely upon his strict legal rights against the representee which is

so acted on by the representee that it is inequitable for the representor thereafter to enforce those rights against him. This approach, as I see it, is consistent with the conclusion of my noble and learned friend, Lord Millett, who considers that the firm would be so precluded by virtue of its acquiescence in the manner in which Mr Johnson had conducted the *41 litigation hitherto. In the context of the present case, moreover, I can see no material difference between invoking promissory estoppel or acquiescence as the ground on which the defendant firm should be precluded from asserting that the plaintiff had abused the process of the court. The truth of the matter is that the defendant firm, by its conduct and in particular by participating in negotiations for settlement of the company's claim against it on the basis that Mr Johnson would thereafter be free to pursue his own personal claim against it, lulled Mr Johnson into a sense of security that he was free to pursue such a claim against the firm, without objection, in separate proceedings, with the effect that it became unconscionable for the firm to contend that his personal proceedings constituted an abuse of the process of the court. In the end, I am inclined to think that the many circumstances capable of giving rise to an estoppel cannot be accommodated within a single formula, and that it is unconscionability which provides the link between them.

For these reasons I would, like the remainder of your Lordships, allow the appeal; and I now turn to the cross-appeal of the defendant firm.

*(2) The cross-appeal*

Here the question is whether certain heads of claim advanced by the plaintiff, Mr Johnson, against the defendant firm, should be struck out. The relevant heads of claim are usefully recorded in the opinion of my noble and learned friend, Lord Bingham of Cornhill. I do not propose to repeat them in this opinion. The Court of Appeal held that each of the heads of damage pleaded in paragraphs 23 and 24 of the re-amended statement of claim is recoverable as a matter of law by the plaintiff by way of dam-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                                                        Page 36
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

ages for the breaches of duty pleaded by him, and so should not be struck out. It is against that decision that the defendant firm now cross-appeals to your Lordships' House.

The principal ground on which it is said by the respondent firm that some of these heads of claim should be struck out is derived from the well-known case of Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204     . I agree with the analysis of that case, and of the other cases following upon it, set out in the opinion of my noble and learned friend, Lord Millett (which I have had the opportunity of reading in draft). I accordingly agree with his conclusion, post, p 126c-d that:

"On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote."

On that basis I, like Lord Millett, agree with my noble and learned friend, Lord Bingham of Cornhill, that the heads of damage specified by him as items 1, 2, 4 and 5 are unobjectionable and should not be struck out. Item 3 relates to the diminution in value of the plaintiff's pension policy set up by the company and accruing to the benefit of the plaintiff as part of his remuneration in his capacity as director of the company. In so far as the claim relates to payments which the company would have made into a pension fund for the plaintiff, I agree that the claim is merely a reflection of the company's loss and should therefore be struck out. But in so far as it *42     relates to enhancement of the value of his pension if the payments had been made, it is unobjectionable and should be allowed to stand.

The second ground relates to the plaintiff's claims for general damages for mental distress, and for aggravated damages based on the fact that the manner of commission of the respondent firm's wrong was "such as to injure his pride and dignity". I agree

with my noble and learned friend, Lord Bingham of Cornhill, that, as a matter of principle, damages on these grounds are not generally recoverable: see Addis v Gramophone Co Ltd [1909] AC 488     ; Watts v Morrow [1991] 1 WLR 1421     , 1445, per Bingham LJ; McGregor on Damages     , paras 98-104. It is true that there has in recent years been a softening of this principle in certain respects (see McGregor on Damages     and Mahmud v Bank of Credit and Commerce International SA [1998] AC 20     ), but none of these developments has, so far as I can see, gone so far as to allow recovery on the broad grounds here pleaded. I also would therefore strike out these two heads of claim.

For these reasons, I agree with the order proposed by my noble and learned friend, Lord Bingham of Cornhill, as to the disposal of both the appeal and the cross-appeal. I also agree with the order proposed by him as to costs.

LORD COOKE OF THORNDON

My Lords, having had the advantage of reading in draft the speech of my noble and learned friend, Lord Bingham of Cornhill, I agree with all that he says on the subject of abuse of process. The course adopted by the parties of settling Westway Homes Ltd's claim against Gore Wood & Co, but leaving open any personal claim by Mr Johnson against the same solicitors, subject to a cap on certain heads of damages and an undertaking concerning personal guarantees, strikes me as a sensible one: the personal claim against the solicitors plainly involves different and more difficult issues. The belated raising by the defendants of the contention, more ingenious than realistic, that the settlement had the effect of preventing the personal claim seems to me closer to abuse of process than the plaintiff's conduct in pursuing the claim. The defendants are saved from that stigma by the acceptance of their contention by the Court of Appeal, but I agree that on this part of the case the appeal of the plaintiff must be allowed.

On the recoverability of personal damages, I have

[2002] 2 A.C. 1                                                                                                    Page 37
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

much more difficulty, for the following reasons. It will be convenient to deal first with the claim for quantifiable financial loss, secondly with the claim based on other forms of suffering.

*Damages for quantifiable financial loss*

As the present is an action by one claiming to be a personal client against solicitors, not an action by a shareholder against a company and directors, Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204       , including the well known passage at pp 222-223, has only a limited bearing. The cash box illustration given by the Court of Appeal (Cumming-Bruce, Templeman and Brightman LJJ) is not helpful in this case because it does not envisage any loss except of the company's £100,000. It is by no means self-evident that, if the controlling shareholder had lost a valuable business opportunity for want of prompt access to the company's money, he would have been unable to recover damages for that loss caused by the **\*43**       defendant's deceit and theft of the cash box. The court did give as a possible instance of a recoverable personal loss the cost caused to the shareholder in consequence of a fraudulent circular, such as the cost of attending a meeting; but this single specific example is not fully illuminating. Nothing that I am about to say involves any criticism of the decision in the Prudential       case or anything said in it. My point is simply that it was not concerned with the kind of issue arising in the present case and contains no observations about this kind of issue. The same applies to Stein v Blake [1998] 1 All ER 724       .

I respectfully agree that the three numbered propositions set out in the speech of Lord Bingham are supported by the English authorities cited by him. But these authorities and the propositions are not comprehensive. Nor, as my noble and learned friend also indicates, do they resolve the crucial question arising on a strike-out application in a case such as the present. This is a case about solicitors' negligence. The English authorities cited include only one relating to the not uncommon situation of a solicitor acting both for a client personally and for a company controlled by the latter. This is R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117       . In that case the solicitor was negligent in failing initiate a timely application for statutory protection of the company's lease. The company negotiated with the landlord a new lease on terms less favourable than could have been obtained with the bargaining power of an extant application (loss A). The new lease also stipulated that the shareholder could not sell his shares without the landlord's consent (loss B). Against the solicitor Staughton J awarded the company loss A and the shareholder loss B. Although it flowed from the company's loss of bargaining power, loss B was not suffered by the company. So, too, in the present case Mr Johnson claims that at least the greater part of the losses for which he sues were not suffered by the company.

As the report of Christensen v Scott [1996] 1 NZLR 273       may not be readily available in England, it is as well to reproduce here the whole of the relevant passage in the judgment of the Court of Appeal delivered by Thomas J. I must not conceal that I was a member of the court of five on behalf of whom the judge spoke, although I confess to little independent recollection of the case. It was a case in which the defendants, firms of chartered accountants and solicitors, acted for the plaintiffs personally and in the course of doing so advised on channelling their assets into a company taking a lease of farm land. Naturally the defendants came to act for the company as well. By reason of alleged negligence on the part of the defendants the consent of the landlord's mortgagees was not obtained, nor was a caveat registered against the title. Consequently the land was lost and the company failed. The company's claim against the defendants was settled by the liquidator for a sum alleged by the plaintiffs to be totally inadequate. The Court of Appeal held that the personal claims should not be struck out before trial. Thomas J said, at pp 280-281:

"We do not need to enter upon a close examina-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                    Page 38

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

tion of the Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 decision. It has attracted not insignificant and, at times, critical comment. See e g L C B Gower, Gower's Principles of Modern Company Law, 5th ed (1992) , pp 647-653 ; L S Sealy, ' Problems of Standing, Pleading and Proof in Corporate Litigation' (ed B G Pettet), p 1, esp pp 6-10; and *44 M J Sterling, 'The Theory and Policy of Shareholder Actions in Tort' (1987) 50 MLR 468 , esp pp 470-474. It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in Foss v Harbottle (1843) 2 Hare 461

But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in Foss v Harbottle is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of duty owed to the company but from a breach of duty owed to the individuals. The individual is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is

the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged default of their accountants and solicitors. (For a discussion of the policy issues which arise in considering these questions, see Sterling, at pp 474-491.)

"In circumstances of this kind the possibility that the company and the member may seek to hold the same party liable for the same loss may pose a difficulty. Double recovery, of course, cannot be permitted. The problem does not arise in this case, however, as the company has chosen to settle its claim. Peat Marwick and McCaw Lewis accepted a compromise in the knowledge that Mr and Mrs Christensen's claim was outstanding. It may well be, as was acknowledged by Mr Pidgeon in the course of argument, that an allowance will need to be made for the amount already paid to the liquidator in settlement of the company's claim.

"It is to be acknowledged, however, that the problem of double recovery may well arise in other cases. No doubt, such a possibility is most likely with smaller private companies where the interrelationship between the company, the directors and the shareholders may give rise to independent duties on the part of the professional advisers involved. But the situation where one defendant owes a duty to two persons who suffer a common loss is not unknown in the law, and it will need to be examined in this context. It may be found that there is no necessary reason why the company's loss should take precedence over the loss of the individuals who are owed a separate duty of care. To meet the problem of double *45 recovery in such circumstances it will be necessary to evolve principles to determine which party or parties will be able to seek or obtain recovery. A stay of one proceeding may be required. Judgment, with a stay of execution against one or other of the parties, may be in order. An obligation to account in whole or in part may be appropriate. The interest of creditors who may benefit if one party recovers and not the other

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                Page 39
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

may require consideration. As the problem of double recovery does not arise in this case, however, it is preferable to leave an examination of these issues to a case where that problem is squarely in point.

"Essentially, Mr and Mrs Christensen are alleging that as a result of Peat Marwick and McCaw Lewis's breach of duty owed to them personally they suffered a personal loss, that is, a reduction in the value of their assets. Their assets in this case had been channelled into their company. Thus, it is arguable that the diminution in the value of their shareholding is the measure of that loss. It may well be that when the evidence is heard it will be apparent that Mr and Mrs Christensen's claim is inflated, but that is a matter for the trial.

"We are not prepared to hold at this stage that they do not have an arguable case to recover damages for the breach of an acknowledged duty."

When that passage is read as a whole, two features will be noted. It will be seen not only that the whole passage is throughout guarded and provisional, but also that the court recognised both that double recovery cannot be permitted and that the interests of creditors may require consideration. In this field, if a client is suing his own solicitor, it would appear that only the problems of double recovery or prejudice to the company's creditors would justify denying or limiting the right to recover personal damages which, on ordinary principles of foreseeability, would otherwise arise. One other observation should be made about the passage in Thomas J's judgment. Although he did mention that Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204        had not gone without criticism, he did not find it necessary to examine that case closely. I would repeat that in no way am I criticising it. On the contrary I accept it to the full.

The next closest of the English reported cases cited is Barings plc v Coopers & Lybrand [1997] 1 BCLC 427        , 435. In that case (arising from the activities of Mr Leeson) a United Kingdom company was suing the auditors of its Singapore

subsidiary; the auditors were also responsible for supplying audit information for the group accounts. On a pre-trial appeal, Leggatt LJ stated the law in terms which, albeit briefer, are much the same as those of Thomas J in Christensen v Scott [1996] 1 NZLR 273        which case was cited by Leggatt LJ.

Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443        is more distant from the present case on the facts. It was a suit for infringement of patents in which some of the lost profits for which the plaintiff company claimed damages were suffered by subsidiary companies in which it held all the shares. The decision was that, when a shareholder has a cause of action but his company has none, he can recover damages measured by the reduction in value of his shareholding; but that the plaintiff must prove the amount of his own loss and that it cannot be assumed that *46        this is the same as the loss suffered by the company. Such relevance as the case has lies in the reasoning of Hobhouse LJ in the Court of Appeal. At p 474 he described Christensen v Scott [1996] 1 NZLR 273        as "a good illustration of the application of the relevant principles". After an extensive quotation from the judgment in that case, he added, at p 475:

"There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

Thus Christensen v Scott        does not appear to have caused problems for English judges hitherto, and I would hope that this position might continue. But it is necessary to add some further discussion of principle, as on the facts the present case is not on all fours with that case or any of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                     Page 40
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

others cited in argument.

Assuming that this is a fairly typical case of a man carrying on business wholly or partly through a company or companies controlled by him, the first question at a trial will be whether Gore Wood & Co owed duties to Mr Johnson personally as well as to Westway Homes Ltd. Such personal duties could arise from a contract of retainer or in tort because of the closeness of relations ("proximity"), or from both sources concurrently. Henderson v Merrett Syndicates Ltd [1995] 2 AC 145        finally established in English law the legitimacy of recognising that professional advisers may owe to the same client a duty to exercise reasonable care and skill derived from both contract and tort law. Conceivably the rules as to remoteness or the measure of damages could produce different consequences; but in the interests of justice and the clarity of the law this should obviously be avoided unless forced upon the courts. The duty in such a case is most simply seen as a civil law obligation to conform to professional standards. In the argument it was not suggested that for the purposes of this appeal there is any material difference.

Although more elaborately pleaded here, the duty owed to the personal claimant would be to exercise reasonable care and professional skill in handling the legal side of his affairs and those of his relevant company. In this case it would include the elementary responsibility of exercising efficiently the company's option to purchase Mr Moores's land, on the basis that the risk of personal loss to Mr Johnson from a questionable exercise of the option was reasonably foreseeable by Gore Wood & Co. The duty was one of taking reasonable steps to safeguard his interests, not one of indemnity. Subject to that important qualification, there is some analogy with a contract of insurance When a solicitor is acting for both a shareholder personally and his company, the essence of the personal relationship is that the individual looks to the solicitor for care to provide personal financial protection.

That brings the discussion to what is perhaps the crucial point in this case. The required degree of personal protection will extend, I think, to protection against the operation of rules of law that might foreseeably restrict the *47                individual's right to recover damages if no duty were owed to him personally by the solicitor. In cases of the present class, two such rules may be relevant among other factors. One may be called the rule in Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204        , using that as a shorthand to convey that a shareholder in a company has as such no right to recover from a third party damages for breach of the latter's duty to the company. The other may be called the rule in The Lips        , using that as shorthand for the proposition in President of India v Lips Maritime Corpn [1988] AC 395        , per Lord Brandon of Oakbrook at p 425: "There is no such thing as a cause of action in damages for late payment of damages. The only remedy which the law affords for delay in paying damages is the discretionary award of interest pursuant to statute."

But for the solicitor's duty owed to the individual client, such restrictions could result in inability on the part of the latter to recover damages caused to him by the solicitor's negligence. Thus in the present case, whereas the option should have been exercised in a unquestionable manner in February 1988, it was not until more than four years later that the land was belatedly conveyed to Westway Homes Ltd, and not until a further period of about eight months had elapsed that the company obtained a monetary settlement of its claim against the solicitors.

Mr Johnson alleges (inter alia) that in the meantime the property market had collapsed, the development project had ceased to be financially advantageous, and he had incurred very high interest charges for personal borrowings. To the extent that he can establish at a trial that the delay in the obtaining by the company of the land or monetary compensation was caused or materially contributed to by negligence on the part of the defendant solicitors, there

[2002] 2 A.C. 1                                                                        Page 41
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

would appear to be no sound reason for denying him personal relief for any damages foreseeably caused to him personally by the delay: provided always that double recovery is not sanctioned and the interests of the company's creditors are protected.

While double recovery has to be avoided, at this pre-trial stage I would not rule out the possibility that, on the close scrutiny at trial spoken of by Lord Bingham, it will be found that the ultimate agreed payment to the company was not intended to and did not in fact adequately compensate Mr Johnson for the company's want of title to the land in early 1988. It may be chiefly a matter of the timing. The rule in The Lips         would not exclude the plaintiff's personal claim; he is not claiming damages for delay in paying damages to him. Rather he is claiming damages for the fact that his company did not have the land in 1988--a claim outside the provenance and the purview of the rule in The Lips        .

Thus the true scope of the settlement in 1992 is one of the matters requiring examination. In the instant case the settlement covered a very large part of the company's claim. It may well have been a reasonable settlement, reached after having due regard to the interests of the company's creditors, who could not successfully claim that more should have been recovered. There may nevertheless be some possibility that, in addition to any other right to personal damages that he may have against the solicitors, Mr Johnson could be heard to say against them that in any event he should be compensated for his company not having recovered fully. Such a possibility may be more significant in a case like Christensen v Scott [1996] 1 NZLR 273 where the shareholder has opposed and complains of the *48        inadequacy of the company's settlement; but I do not think that it can be ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for negligence on his part in making a compromise: see In re Windsor Steam Coal Co (1901) Ltd [1929] 1 Ch 151        ; In re

Home and Colonial Insurance Co Ltd [1930] 1 Ch 102        . Accordingly I think that in cases within that principle the court should avoid sanctioning not only double recovery, but also any real prospect of double recovery. As this aspect was not explored in argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think that Mr Johnson could have a good personal claim against the solicitors for compensation on the basis already stated, that is to say on the basis that the damages claimed by him were not suffered by the company. Accordingly I agree with Lord Bingham that the claimed heads of damages numbered in his speech 1, 2, 4 and 5 should not be struck out before trial, and that the same applies to the part of head 3 relating to the enhancement of the value of Mr Johnson's pension if the payments had been duly made. I am rather less clear that the remaining parts of head 3 should be struck out. Certainly, however, these claims relating to lost payments into a pension fund or retention of corresponding amounts in the company's assets look very much like claims for double recovery. As the other members of your Lordships' Appellate Committee are in no doubt that they should be struck out, I am content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must be resolved in favour of the claimant, I think it safer to avoid fine distinctions, especially before trial; and, with the very limited exceptions just mentioned, to leave all the extant claims in this case of complicated facts open for examination at trial. The open questions would include remoteness. And I would add one other cautionary remark. The trial judge would have to consider, not only issues of double recovery by Mr Johnson and the company, but also any issue of overlapping among Mr Johnson's claims themselves.

*Damages for general suffering*

In Watts v Morrow [1991] 1 WLR 1421

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                      Page 42
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

Bingham LJ said, at p 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead. If the law did not cater for this exceptional category of case it would be defective. A contract to survey the condition of a house for a prospective purchaser does not, however, fall within this exceptional category.

"In cases not falling within this exceptional category, damages are in my view recoverable for physical inconvenience and discomfort caused by the breach and mental suffering directly related to that inconvenience and *49        discomfort. If those effects are foreseeably suffered during a period when defects are repaired I am prepared to accept that they sound in damages even though the cost of the repairs is not recoverable as such. But I also agree that awards should be restrained, and that the awards in this case far exceeded a reasonable award for the injury shown to have been suffered. I agree with the figures which Ralph Gibson LJ proposes to substitute."

I regard that as an authoritative statement of the present law of England regarding commercial contracts. The exceptional category is not confined, in my view, to contracts to provide pleasure and the like. For example, breaches of contracts for status such as membership of a trade union or a club may carry damages for injured feelings; but it is unnecessary to go into that area further, as I accept that, if there was a contract between Mr Johnson and Gore Wood & Co, it is to be classified in English law as commercial in the sense that damages for mere distress are not available. Contract-breaking is treated as an incident of commercial life which players in the game are expected to meet with mental fortitude. For present purposes it may be assumed that the same principle applies in so far as the claim is grounded in tort: see Hayes v James & Charles Dodd [1990] 2 All ER 815        , 826, per Purchas LJ. A fuller discussion of these various matters can be found in Mouat v Clark Boyce [1992] 2 NZLR 559        (a stage of the litigation not under consideration by the Privy Council in Clark Boyce v Mouat [1994] 1 AC 428        ).

But that does not quite dispose of Mr Johnson's claim for non-quantifiable damage. He alleges extreme financial embarrassment; it is said that from a state of some prosperity he was reduced to subsistence on social security benefit. He also alleges deterioration in his family relationships, particularly with his wife and son. Although the pleader has treated them as mental distress, such consequences are in truth significantly more than mental distress. They are more akin to the physical inconvenience and discomfort referred to in Bingham LJ's third paragraph. In my opinion the common law would be defective and stray too far from reality, humanity and justice if it remorselessly shut out even a restrained award under these heads. Hence I would leave the claim in this part of the case standing also, although only on the footing that damages could not be awarded merely for injured feelings, nor could aggravated damages be awarded merely on that account.

English case law has fluctuated as to the recoverability of damages in contract for mental distress, as is detailed in McGregor on Damages (1997), paras 98-106. See also Dr Harvey McGregor's preface at pp vii-viii. But it has been established since Victorian times that, by contrast with mere mental distress, damages are recoverable for substantial inconvenience and discomfort. Thus in Hobbs v London and South Western Railway Co (1875) LR 10 QB 111        , a court including Cockburn CJ and Blackburn and Mellor JJ upheld an award to a husband and wife for the inconvenience of having

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                Page 43
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

to walk home with young children four or five miles late on a drizzling night, although the wife's catching of a cold was found too remote. That case was applied by Barry J in Bailey v Bullock [1950] 2 All ER 1167      in awarding damages against solicitors for the inconvenience to the plaintiff of having to live in an overcrowded house. Such authorities are treated in *50      *McGregor on Damages*      , paras 93 to 96, as surviving the recent restriction of damages for mental distress. The third paragraph already quoted from Bingham LJ in Watts v Morrow [1991] 1 WLR 1421      , 1445 is largely supported by them. The line may not always be easy to draw, and it is particularly difficult before trial to assess the weight of the claims in the present case. But both a changed way of life because of poverty and damaged family relationships can be grievous forms of non-pecuniary harm. I am respectfully unable to agree that they should be ruled out of the law's purview.

Before parting with the case I would say something about Addis v Gramophone Co Ltd [1909] AC 488      . In severely confining damages for wrongful dismissal, your Lordships' House of those days appears to have seen the relationship of employer and employee as no more than an ordinary commercial one. This is a world away from the concept now, and in Mahmud v Bank of Credit and Commerce International SA [1998] AC 20      the House accepted that there is an implied obligation of mutual trust and confidence, and that an employer is under an implied obligation that he will not, without reasonable and proper cause, conduct his business in a manner likely to destroy or seriously damage that relationship. Damages for financial loss, including impaired employment prospects, caused by harm to reputation could be recovered. It is true that Addis      was distinguished on the ground that it related to injury to feelings caused by the manner of termination of the relationship, which question did not arise in Mahmud      : see per Lord Nicholls of Birkenhead, at p 38, and Lord Steyn, at p 51. But the philosophy is altogether different, as is the philosophy embod-

ied in modern employment legislation. Again, as Lord Bingham has pointed out, Addis      was not applied in Ruxley Electronics and Construction Ltd v Forsyth [1996] AC 344      . Addis      has not uniformly been followed in the Commonwealth: see Brown v Waterloo Regional Board of Comrs of Police (1982) 136 DLR (3d) 49      , a judgment of Linden J (the author of *Canadian Tort Law*      , now in its sixth edition). The decision was reversed on other grounds, but Linden J's statements of principle were substantially accepted: (1983) 150 DLR (3d) 729      . According to that authority, an employee wrongfully dismissed may recover damages for mental distress in some circumstances. To the same effect is Whelan v Waitaki Meats Ltd [1991] 2 NZLR 74      , which contains an instructive survey of the authorities by Gallen J. I take leave to doubt the permanence of Addis      in English law. But it is not a question arising in the present case either; I make these observations only to avoid being identified with any approbation of Addis      .

For the reasons already given, I would allow Mr Johnson's appeal and would dismiss the cross-appeal except as to the two claims identified by Lord Bingham of Cornhill in his head 3 and as to aggravated damages. In the result the one point on which I differ concerns the claims for damages for financial embarrassment and injury to family relationships: those I would permit to go to trial. I concur in the order for costs proposed by Lord Bingham.

LORD HUTTON

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Bingham of Cornhill. I am in full agreement with his speech on the subject of abuse of process and I wish to confine my observations to the issue whether the damages claimed by *51      Mr Johnson are recoverable as a matter of law. The case advanced by Mr Johnson is that he instructed a firm of solicitors, Gore Wood & Co ("GW"), to advise him personally as to the conduct of his businesses, including the business of property develop-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                    Page 44
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

ment which he carried on through a company West-way Homes Ltd ("WWH") of which he was the managing director and in which he held the entire shareholding with the exception of two shares, and that acting on behalf of WWH he also instructed GW to advise that company. He contends that in advising him as to the business affairs of the company, GW owed him a duty of care in contract and tort and in breach of that duty caused him very substantial financial loss. The question whether the damages claimed are recoverable comes before the House as a preliminary issue and is to be approached on the basis that the facts pleaded by Mr Johnson are capable of establishing a breach of a duty owed to him which caused him loss.

I consider it to be clear that where a shareholder is personally owed a duty of care by a defendant and a breach of that duty causes him loss, he is not debarred from recovering damages because the defendant owed a separate and similar duty of care to the company, provided that the loss suffered by the shareholder is separate and distinct from the loss suffered by the company. This principle was recently stated in the judgment in the Court of Appeal delivered by Sir Christopher Slade in Walker v Stones [2001] QB 902          , 932-933, that a claimant is entitled to recover damages where:

"(a) the plaintiff can establish that the defendant's conduct has constituted a breach of some legal duty owed to him personally (whether under the law of contract, torts, trusts or any other branch of the law) and (b) on its assessment of the facts, the court is satisfied that such breach of duty has caused him personal loss, separate and distinct from any loss that may have been occasioned to any corporate body in which he may be financially interested. I further conclude that, if these two conditions are satisfied, the mere fact that the defendant's conduct may also have given rise to a cause of action at the suit of a company in which the plaintiff is financially interested (whether directly as a shareholder or indirectly as, for example, a beneficiary under a trust) will not deprive the plaintiff of his cause of action; in such a case, a plea of double

jeopardy will not avail the defendant."

But a more difficult question arises where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. In Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204          , the claimants sued the directors of the company alleging that they had issued a circular to the shareholders containing a fraudulent misrepresentation concerning the true value of certain assets, and the court stated, at pp 222-223:

"But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which *52        he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."

I shall call this statement "the Prudential Assurance principle".

In Christensen v Scott [1996] 1 NZLR 273          , the Court of Appeal of New Zealand decided that where a plaintiff alleges a breach of duty owed to him personally by accountants and solicitors he is entitled to recover damages notwithstanding that his loss flows from loss suffered by a company in which he is a shareholder through a similar breach of duty owed to the company. In that case two shareholders claimed damages for the diminution in the value of their shareholding in a company caused

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                    Page 45
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

by the negligence of their accountants and solicitors. In delivering the judgment of the court, after setting out part of the above passage in the judgment in Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204                Thomas J stated, at p 280:

"It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in Foss v Harbottle 2 Hare 461            . But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in Foss v Harbottle            is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals. The individuals is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss."

The approach taken by the Court of Appeal of New Zealand has been approved in a number of judgments of the Court of Appeal. In Barings plc v Coopers & Lybrand [1997] 1 BCLC 427            the plaintiff, a company holding shares in a subsidiary

company, claimed damages against the defendants, a firm of accountants, in respect of loss it suffered through loss sustained by its subsidiary, BFS, on the ground that the defendants were in breach of duties of care owed both to the plaintiff and to the subsidiary in carrying out an *53      audit of the subsidiary's accounts. The defendants applied to set aside service of the writ in reliance on the Prudential Assurance      principle. The defendants' application was rejected by the Court of Appeal and Leggatt LJ stated , at p 435:

"[ Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204]            decides that a shareholder in a company has no independent right of action based on an allegation of diminution in the value of his shares occasioned by damage to the company. Mr Kentridge seeks to rely on it as authority for the proposition that where a company may have a cause of action for damage caused to it by a tortfeasor, a person who enjoys an independent right of action against the tortfeasor cannot sue him, at least in so far as his damages are measured by a diminution in the value of the company's shares. But in my judgment that is a misapplication of the principle. If C & LS are in breach of a duty of care owed to Barings in respect of audit information supplied to them and the breach causes damage, Barings cannot be disentitled from suing merely because the damages for which C & LS are said to be liable to Barings would or might include damages for which they are said to be liable to BFS. For C & LS are also in breach of a different duty, whether contractual or tortious, owed to BFS. Whereas complications might arise if these claims were made in separate actions, any risk of double jeopardy or of double recovery, such as were envisaged by the New Zealand Court of Appeal in Christensen v Scott [1996] 1 NZLR 273            , 280-281, can be avoided if both claims are made in the same action. It may be, for instance, that C & LS are not liable to Barings for loss of the value of the shares in either BFS or any company which has a cause of action against C & LS for such loss.

"The present case differs from the Prudential Assurance            case because here the person in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                    Page 46
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

the position of shareholder, namely Barings, has a right of action independent of the company, BFS. On the other hand, unlike the situation in [ George Fischer (Great Britain) Ltd v Multi Construction Ltd [1995] 1 BCLC 260]          , BFS does have a right of action itself. As that case shows, there is no legal principle that a holding company is unable to recover damages for loss in the value of its subsidiaries, resulting directly from a breach of duty owed to it, as distinct from a duty owed (or not owed as the case may be) to the subsidiaries."

In Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443          the plaintiff was entitled to damages for infringement of patent rights held by it and sought to recover damages for losses suffered by subsidiary companies in which it held all the shares, and which themselves had no cause of action, and the defendant contended that the claim was barred by the Prudential Assurance          principle. That argument was rejected by the Court of Appeal and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand in Christensen v Scott [1996] 1 NZLR 273          and stated , at p 475:

"There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the *54          value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

The judgments in Prudential Assurance          and Christensen v Scott          are difficult to reconcile, and it is also difficult to reconcile the judgment in Barings plc v Coopers & Lybrand          with the judgment in the former case because the ground on which Leggatt LJ sought to distinguish it, namely, that in Prudential Assurance          the shareholders did not have an individual right of action, is invalid, the court in Prudential Assurance          stating, at p

222, that the defendants owed the shareholders a duty to give sound advice. Gerber Garment Technology can be distinguished from Prudential Assurance          on the ground that the companies in which the plaintiff held shares did not themselves have a cause of action against the defendant. But I consider that the ruling in Prudential Assurance          that the shareholders could not recover damages cannot be explained on the ground of causation, which was the explanation advanced by Hobhouse LJ, at p 471; I think, in agreement with the Court of Appeal of New Zealand in Christensen v Scott,          that the shareholders can be regarded as suffering a loss caused by breach of duty of the defendant notwithstanding that their loss is reflective of loss suffered by the company. Therefore I consider that the issue to be decided is whether this House should follow the reasoning set out in Prudential Assurance          or the reasoning set out in Christensen v Scott          .

My Lords, I consider, with respect, that part of the reasoning in Prudential Assurance          is open to criticism. In my opinion the view of the Court of Appeal of New Zealand that the loss suffered by a shareholder through the diminution in the value of his shareholding is a personal loss is a more realistic assessment than the view of the Court of Appeal in Prudential Assurance          that the shareholder's loss is merely a reflection of the loss suffered by the company and that the shareholder suffers no personal loss. This view has been criticised in an article by Mr M J Sterling on "The Theory and Policy of Shareholder Actions in Tort" (1987) 50 MLR 468          , 470, 471:

"The description of the Court of Appeal is not wrong, in that the value of a share is related to the present and expected future levels of dividend of the company and the right to receive dividends is a right of participation in the company, but it is suspiciously limited because a share is commonly treated as a piece of personal property. The fact that a share is valuable because it is a right of participation in a company does not preclude one as a matter of logic from regarding it as a piece of property ...

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                              Page 47
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

"The Court of Appeal gave no reason for preferring their description of a share to one which includes its nature as an item of personal property but some good reason is surely necessary to justify exclusion of this obvious characteristic. It is therefore suggested that, if necessary, a share can be regarded as a piece of personal property and a shareholder could be allowed to sue for injury to it."

In my respectful opinion there is force in this criticism. However, even if this criticism be accepted, there remains the need to ensure that there is no double recovery and that creditors and the other shareholders of the company are protected. It was this need which was emphasised by *55 Millett LJ in Stein v Blake [1998] 1 All ER 724          , 730, as the reason why the principle in Prudential Assurance       should be followed:

"If this action were allowed to proceed and the plaintiff were to recover for the lost value of his shareholding from the first defendant, this would reduce his ability to meet any judgment which might thereafter be obtained by the liquidators, or by any of the old companies which were not in liquidation, to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors that the first defendant is alleged to have obtained by fraud and deceit."

In Christensen v Scott [1996] 1 NZLR 273 the court considered that the problem of double recovery did not arise in that case as the defendants had settled the company's claim with the knowledge that the plaintiffs' claim was outstanding. But the court recognised that double recovery cannot be permitted and that the interests of the creditors of a company must be protected. In my opinion the resolution of the conflict between Prudential Assurance and Christensen v Scott          narrows down to the issue whether, as held in the former case, the shareholder is debarred from bringing to trial an action claiming loss where such loss is merely reflective of loss suffered by the company, or whether the

shareholder is entitled to proceed to trial on such a claim, it being a matter for the trial judge, if the plaintiff establishes his claim, to ensure that there is no double recovery and that creditors and other shareholders of the company do not suffer loss, which was the course which Pumfrey J held should be followed.

My Lords, whilst in a case such as Christensen v Scott          there may be merit in permitting an individual shareholder to sue, the decision in Prudential Assurance          has stood in England for almost 20 years and, whilst the decision has sometimes been distinguished on inadequate grounds, it has been regarded as establishing a clear principle which the Court of Appeal has followed in other cases. I further consider that the principle has the advantage that, rather than leaving the protection of creditors and other shareholders of the company to be given by the trial judge in the complexities of a trial to determine the validity of the claim made by the plaintiff against the defendant, where conflicts of interest may arise between directors and some shareholders, or between the liquidator and some shareholders, the principle ensures at the outset of proceedings that where the loss suffered by the plaintiff is sustained because of loss to the coffers of the company, there will be no double recovery at the expense of the defendant nor loss to creditors of the company and other shareholders. Therefore whilst I think that this House should uphold the Prudential Assurance          principle, I also consider that it is important to emphasise that the principle does not apply where the loss suffered by the shareholder is separate and distinct from the loss suffered by the company.

The five heads of claim pleaded by Mr Johnson have been set out in the speech of my noble and learned friend, Lord Bingham of Cornhill. I consider that the losses claimed in heads 1, 2, 4 and 5 are separate and distinct from loss sustained by WWH and that those heads of claim should not be struck out. In respect of head 3 I am also in agreement with the opinion of Lord Bingham that be-

[2002] 2 A.C. 1

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001] P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98 L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527

(Cite as: [2002] 2 A.C. 1)

cause it is not a separate and distinct loss, Mr Johnson cannot claim in respect of the moneys which WWH would have paid into a *56 pension fund for him if those moneys had been available to it, and that that part of the claim should be struck out, but that Mr Johnson can claim in respect of enhancement of the value of the pension if the payments had been made.

For the reasons given by Lord Bingham I would strike out Mr Johnson's claims for damages for mental distress and anxiety and for aggravated damages. Accordingly, I would allow Mr Johnson's appeal and dismiss GW's cross-appeal, save that I would strike out his claim in head 3 for pension payments (or, in the alternative, for the increase in the value of his shareholding if those pension payments had not been made), and for damages for mental distress and anxiety and for aggravated damages. I would concur in the order for costs proposed by Lord Bingham.

LORD MILLETT

My Lords, my noble and learned friend, Lord Bingham of Cornhill, has recounted the facts and I need not set them out again at any length. The appellant, Mr Johnson, is an entrepreneur who carried on business through a number of companies which he owned and controlled. One of them was Westway Homes Ltd ("the company"). Mr Johnson was its managing director and virtually only shareholder. The respondent firm ("the firm") is a firm of solicitors. Mr Johnson was in the habit of instructing the firm from time to time to act for him in connection with his personal affairs as well as for his various companies.

In 1988 the company held a valuable option to buy land for development. Mr Johnson instructed the firm to exercise the option on the company's behalf. The firm accepted his instructions and served the appropriate notice, but failed to do so in a manner which was incapable of challenge by the vendor. The vendor claimed that the option had not been validly exercised, and the company was obliged to

bring proceedings for specific performance against him in the Chancery Division ("the Chancery proceedings"). These were not straightforward, and although the company was ultimately successful it was unable to obtain title to the land until April 1992, that is to say more than four years after it had exercised the option. It was awarded damages and costs against the vendor, but these proved to be irrecoverable.

The firm's failure to deal with the option in a manner which put its exercise beyond dispute caused the company substantial loss. As well as having to bear the costs of the Chancery proceedings, it sustained heavy financial loss as a result of the delay in obtaining title to the land. This loss was of two kinds. First, until the company established its title, it was unable to offer the land as security for its borrowings and so obtain a reduction in the very high interest charges it was paying. Secondly, delay in obtaining title to the land caused a corresponding delay in the commencement and completion of the development and thus in the time when the company could hope to realise any profit from the venture. As it happens, the delay frustrated the development altogether, for the collapse in the property market which took place during the currency of the Chancery proceedings made the venture unprofitable. But this was obviously not foreseeable in 1988, or Mr Johnson would not have caused the company to exercise the option and the vendor would not have resisted its claim to have done so.

In January 1991 the company brought proceedings against the firm for professional negligence. The firm admitted that it had been retained by the company to exercise the option and that it had owed the company a duty of *57 care in doing so. But it denied both liability and quantum. The action came on for trial in October 1992 and was estimated to last 10 to 12 days. In December 1992, after the trial had already lasted for six weeks and evidence was still being given on behalf of the firm, the case was settled upon payment by the firm of £1,480,000 and £320,000 towards the company's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                                    Page 49
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

costs. The sum of £1,480,000 represented the greater part of the damages claimed.

Mr Johnson has always claimed that the firm's negligence in the manner in which it exercised the option also caused substantial financial loss to him personally. In April 1993 he brought his own proceedings against the firm. This can have come as no surprise. Mr Johnson had made no secret of his intention to bring such a claim. He had indicated as much in January 1991, well before the company's action came to trial, and his solicitors had been in correspondence with the firm's insurers during 1991-92. On the eve of the trial his solicitors told those representing the firm that his personal claim would be pursued whether the current proceedings resulted in judgment or settlement. During the settlement negotiations in December 1992 the parties' respective solicitors discussed the possibility of an overall settlement of both Mr Johnson's personal claim and the company's claim, but the paucity of information to enable his personal claim to be quantified made this impossible. It was left that it was a separate claim which would be a matter for separate negotiation in due course. In agreeing the terms on which the company's claim was settled, Mr Johnson submitted to having most of his personal claim capped at £250,000 excluding interest and costs, and the company agreed to apply the settlement moneys in the discharge of liabilities of the company in respect of which Mr Johnson had given personal guarantees. This was designed to avoid the possibility of double recovery in respect of these liabilities if Mr Johnson brought his own proceedings and was successful.

For the next 4 1/2 years the proceedings brought by Mr Johnson followed the normal course. The parties served and amended their pleadings and exchanged witness statements. Mr Johnson served expert evidence. The firm made a payment into court. A trial date was obtained. But then came a sudden change of tack. The firm instructed fresh leading counsel. In December 1997 the firm's solicitors indicated, for the first time, that it intended to apply

inter alia for an order to strike the action out as an abuse of the process of the court. In February 1998 the court ordered the trial of two preliminary issues: (i) whether the proceedings should be struck out as an abuse of the process of the court; and (ii) to what extent (if at all) and assuming the truth of the facts pleaded the heads of damages pleaded in paragraphs 23 and 24 of the re-amended statement of claim were irrecoverable by Mr Johnson as a matter of law by way of damages for the pleaded breaches of duty owed to him.

Mr Johnson pleaded his claim in both contract and tort, and alleged that he had retained the firm to act for him personally as well as for the company in connection with the exercise of the company's option. He alleged that the firm had acted negligently in the manner in which it caused the option to be exercised, and that it had from time to time negligently and with unwarranted optimism advised him personally as to the likely duration and outcome of the Chancery proceedings.

On the first question, the judge (Pumfrey J) found that the proceedings might well have been an abuse of the process of the court, but that in the *58 light of the circumstances in which the company's action had been settled the firm was estopped by convention from contending that they were. Both parties had acted on the common assumption that Mr Johnson would bring his own proceedings and that these would be entertained by the court. On the second question he ruled that none of the heads of damage pleaded was irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell LJJ) allowed the firm's appeal. It held that there was no excuse for Mr Johnson's failure to launch his own claims when the company brought its action. "If he could have done so", Mantell LJ said, "he should have done so". It held that there was no estoppel by convention; the parties shared a common assumption that Mr Johnson would bring his own proceedings, but they made no assumption one way or the other whether the court would entertain

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                        Page 50
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

them; they never thought about the matter. On the second question the court differed from the judge on the authorities, which it agreed were in an unsatisfactory state, but held that, with only one exception, the pleaded heads of damage were arguably recoverable. Both parties now appeal to the House. Mr Johnson appeals on the first question; the firm cross-appeals on the second.

*Mr Johnson's appeal: abuse of process*

In describing the proceedings brought by Mr Johnson as an abuse of the process of the court, the Court of Appeal was seeking to apply the well known principle which Sir James Wigram V-C formulated in Henderson v Henderson (1843) 3 Hare 100       , 114-115:

"... I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, *and of adjudication by,*       a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. *The plea of res judicata applies,*       except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." (My emphasis.)

As the passages which I have emphasised indicate, Sir James Wigram V-C did not consider that he was laying down a new principle, but rather that he was explaining the true extent of the existing plea of res judicata. Thus he was careful to limit what he was saying to cases which had proceeded to judgment, and not, as in the present case, to an out-of-court settlement. Later decisions have doubted

the correctness of treating the principle as an application of the doctrine of res judicata, while describing it as an extension of the doctrine or analogous to it. In Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257         , Sir Thomas Bingham MR explained that it is not based on the doctrine in a narrow sense, nor on the strict doctrines of issue or cause of action estoppel. As May LJ observed in Manson v Vooght [1999] BPIR 376       , 387, it is not concerned with cases where a court has decided the *59  :   matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                    Page 51

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

and guaranteed by article 6      of the Conven-
tion for the Protection of Human Rights and Funda-
mental Freedoms (1953)      . While, therefore,
the doctrine of res judicata in all its branches may
properly be regarded as a rule of substantive law,
applicable in all save exceptional circumstances,
the doctrine now under consideration can be no
more than a procedural rule based on the need to
protect the process of the court from abuse and the
defendant from oppression. In Brisbane City Coun-
cil v Attorney General for Queensland [1979] AC
411      , 425 Lord Wilberforce, giving the ad-
vice of the Judicial Committee of the Privy Coun-
cil, explained that the true basis of the rule in
Henderson v Henderson 3 Hare 100      is abuse
of process and observed that it "ought only to be
applied when the facts are such as to amount to an
abuse: otherwise there is a danger of a party being
shut out from bringing forward a genuine subject of
litigation". There is, therefore, only one question to
be considered in the present case: whether it was
oppressive or otherwise an abuse of the process of
the court for Mr Johnson to bring his own proceed-
ings against the firm when he could have brought
them as part of or at the same time as the com-
pany's action. This question must be determined as
at the time when Mr Johnson brought the present
proceedings and in the light of everything that had
then happened. There is, of course, no doubt that
Mr Johnson *could*      have brought his action
as part of or at the same time as the company's ac-
tion. But it does not at all follow that he
*should*      have done so or that his failure to do
so renders the present action oppressive to the firm
or an abuse of the process of the court. As May LJ
observed in Manson v Vooght [1999] BPIR
376      , 387, it may in a particular case be
sensible to advance claims separately. In so far as
the so-called rule in Henderson v Hender-
son      suggests that there is a presumption
against the bringing of successive actions, I con-
sider that it is a distortion of the true position. The
burden should *60      always rest upon the de-
fendant to establish that it is oppressive or an abuse
of process for him to be subjected to the second ac-

tion.

The rule in Henderson v Henderson 3 Hare
100      cannot sensibly be extended to the case
where the defendants are different. There is then no
question of double vexation. It may be reasonable
and sensible for a plaintiff to proceed against A
first, if that is a relatively simple claim, in order to
use the proceeds to finance a more complex claim
against B. On the other hand, it would I think nor-
mally be regarded as oppressive or an abuse of pro-
cess for a plaintiff to pursue his claims against a
single defendant separately in order to use the pro-
ceeds of the first action to finance the second, at
least where the issues largely overlap so as to form,
in Sir James Wigram V-C's words, at p 115, "the
same subject of litigation".

Particular care, however, needs to be taken where
the plaintiff in the second action is not the same as
the plaintiff in the first, but his privy. Such situ-
ations are many and various, and it would be un-
wise to lay down any general rule. The principle is,
no doubt, capable in theory of applying to a privy;
but it is likely in practice to be easier for him to re-
but the charge that his proceedings are oppressive
or constitute an abuse of process than it would be
for the original plaintiff to do so.

Mr Johnson conceded that he and the company are
privies. He was in a position to decide when to pur-
sue the two claims and whether to pursue them to-
gether or separately, and that is enough for present
purposes. But Mr Johnson and the company are dif-
ferent legal persons, each with its own creditors,
and that is a fact of critical significance. Mr John-
son's personal claims raised difficult issues not
present in the company's action: (i) did he retain the
firm to act for him personally? (ii) should the firm
have foreseen that failure to exercise the option
properly would cause loss to Mr Johnson personally
as well as to the company? (iii) which if any of his
personal losses were recoverable (the issues in the
cross-appeal)? (iv) quantum. It was not in the com-
pany's interest for his personal claims to be joined
with its own much simpler claim, or for its case to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                          Page 52
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

be delayed until Mr Johnson's own case was ready for trial. Had the company been in liquidation and its action brought by the liquidator, he would have been well advised to insist on separate trials and to object to any delay in the trial of the company's action.

In these circumstances I am satisfied that Mr Johnson, who was bound to have regard to the interests of the company and its creditors, was entitled to defer the bringing of his own claims until after the company's claim had been resolved. Even if he had chosen to join the two claims in the same writ, it would have been both possible and appropriate for separate trials to be held of (i) liability (ii) quantum (company) (iii) Mr Johnson's title to sue and (iv) quantum (Mr Johnson); and for (iii) and (iv) to be held over until after (i) and (ii) had been determined. Even as things are, there is no real question of double vexation. The firm was always liable to be sued by two different plaintiffs each with its own cause of action and its own heads of loss. The only area of overlap is in relation to the standard of care which the firm observed. Given that Mr Johnson and the company are privies, neither of them could reopen an adverse judgment on this, being bound by issue estoppel; while the parties could make their own arrangements in the event of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of process for Mr Johnson to bring his action after the company's claim had **\*61** been resolved. Even if this were not the case, however, I agree with the trial judge that it would be unconscionable for the firm to raise the issue after the way in which it handled the negotiations for the settlement of the company's action. I would not myself put it on the ground of estoppel by convention. Like the Court of Appeal, I have some difficulty in discerning a common assumption in regard to a matter about which neither party thought at all. This is not to say that estoppel has no part to play in this field. I would regard it as operating in the opposite way. Given that Mr Johnson was entitled to defer the bringing of his own proceed-

ings until after the company's claims had been resolved, it would have been unconscionable for him to have stood by without disclosing his intentions and knowingly allowed the firm to settle the company's action in the belief that it was dealing finally with all liability arising from its alleged negligence in the exercise of the option. To bring his own claim in such circumstances would, in my opinion, amount to an abuse of the process of the court. But nothing like this took place.

This makes it unnecessary to deal with Mr Johnson's submission that it is too late for the firm to raise the issue. If necessary, however, I should have regarded the delay as fatal. Indeed, I should have regarded it as more than delay; I think it amounted to acquiescence. There is no proper analogy with the case which discloses no cause of action. Although it is obviously desirable to apply to strike out a claim which is doomed to fail at the earliest opportunity, there is no point in proceeding with a trial which serves no useful purpose. Even if the point is taken at the trial itself, it is a matter for the trial judge to decide whether to hear the evidence and adjudicate on the facts before deciding whether they give rise to liability, or to assume that the plaintiff will establish his allegations and decide whether, as a matter of law, they give rise to liability.

But the premise in the present case is that Mr Johnson has a good cause of action which he should have brought earlier if at all. I do not consider that a defendant should be permitted to raise such an objection as late as this. A defendant ought to know whether the proceedings against him are oppressive. It is not a question which calls for nice judgment. If he defends on the merits, this should be taken as acquiescence. It might well be otherwise if the ground on which the proceedings are alleged to be an abuse of process were different. But in a case of the present kind the court is not so much protecting its own process as the interests of the defendant.

Accordingly, I would allow Mr Johnson's appeal on the first question.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                      Page 53

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

*The firm's cross-appeal: recoverable heads of damage*

A company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this is a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204     , 210. Correspondingly, of course, a company's shares are the *62 property of the shareholder and not of the company, and if he suffers loss as a result of an actionable wrong done to him, then prima facie he alone can sue and the company cannot. On the other hand, although a share is an identifiable piece of property which belongs to the shareholder and has an ascertainable value, it also represents a proportionate part of the company's net assets, and if these are depleted the diminution in its assets will be reflected in the diminution in the value of the shares. The correspondence may not be exact, especially in the case of a company whose shares are publicly traded, since their value depends on market sentiment. But in the case of a small private company like this company, the correspondence is exact.

This causes no difficulty where the company has a cause of action and the shareholder has none; or where the shareholder has a cause of action and the company has none, as in Lee v Sheard [1956] 1 QB 192     , George Fischer (Great Britain) Ltd v Multi Construction Ltd [1995] 1 BCLC 260 , and Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443     . Where the company suffers loss as a result of a wrong to the shareholder but has no cause of action in respect of its

loss, the shareholder can sue and recover damages for his own loss, whether of a capital or income nature, measured by the diminution in the value of his shareholding. He must, of course, show that he has an independent cause of action of his own and that he has suffered personal loss caused by the defendant's actionable wrong. Since the company itself has no cause of action in respect of its loss, its assets are not depleted by the recovery of damages by the shareholder.

The position is, however, different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder. These principles have been established in a number of cases, though they have not always been faithfully observed. The position was explained in a well known passage in Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204     , 222-223:

"But what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

diminution of the value of the net assets of the company, in which he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. *63          The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the defendant does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £ 100,000 damages in addition to the £100,000 damages recoverable by the company."

It is indeed obvious that (on the given facts, where no consequential losses are stated to have arisen) the defendant cannot be made liable for more than £100,000 in total. It is equally obvious, however, that if the damages were recoverable by the shareholder instead of by the company, this would achieve the same extraction of the company's capital to the prejudice of the creditors of the company as the defendant's misappropriation had done.

It has sometimes been suggested (see, for example, George Fischer (Great Britain) Ltd v Multi Construction Ltd [1995] BCLC 260          , 266g-i)

that Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204          is authority only for the proposition that a shareholder cannot recover for the company's loss, and is confined to the case where the defendant is not in breach of any duty owed to the shareholder personally. That is not correct. The example of the safe-deposit box makes this clear. It is the whole point of the somewhat strained business of the key. The only reason for this is to demonstrate that the principle applies even where the loss is caused by a wrong actionable at the suit of the shareholder personally.

Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)          was followed in Stein v Blake [1998] 1 All ER 724          , where the facts bore some resemblance to the illustration in the earlier case. The defendant was a 50% shareholder and the sole director of a group of companies ("the old companies"). The plaintiff, who was the other 50% shareholder, alleged that, in breach of fiduciary duty, the defendant had misappropriated the assets of the old companies by purchasing them at an undervalue and transferring them to other companies in his sole ownership. The plaintiff, who could have brought a derivative action on behalf of the old companies, chose instead to bring a personal action, claiming that he had been deprived of the opportunity to sell his shares in the old companies at their proper value and had suffered personal loss. The Court of Appeal set aside an earlier grant of leave to appeal from the judge's order striking out the plaintiff's action.

*64 The plaintiff sought to distinguish Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204          by arguing that the defendant was in breach of a duty owed to him personally. But, as I pointed out, that was not the problem. The problem was that the only conduct relied upon as constituting a breach of that duty was the misappropriation of assets belonging to the old companies, so that the only loss suffered by the plaintiff consisted of the diminution in the value of his shareholding which reflected the depletion of the assets

[2002] 2 A.C. 1                                                                                                     Page 55
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

of the old companies. The old companies had their own cause of action to recover their loss, and the plaintiff's own loss would be fully remedied by the restitution to the companies of the value of the misappropriated assets. It was not alleged that the plaintiff had been induced or compelled to dispose of his shares in the companies; he still had them. If he were allowed to recover for the diminution in their value, and the companies for the depletion of their assets, there would be double recovery. Moreover, if the action were allowed to proceed and the plaintiff were to recover for the lost value of his shares, the defendant's ability to meet any judgment which the old companies or their liquidators might obtain against him would be impaired to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors as the defendant was alleged to have obtained by fraud.

Heron International Ltd v Lord Grade [1983] BCLC 244                   was a case on the other side of the line. In the course of a contested take-over bid, the directors of the target company who owned a majority of the company's voting shares were alleged, in breach of their duties both to the company and to its shareholders, to have accepted proposals which would reduce the value of the company's assets and hence of its shares and induce the shareholders to accept the lower of two rival offers. The Court of Appeal granted the shareholders injunctive relief. It observed that the decision of the directors, if implemented, would cause loss in two directions. First, the company would suffer loss to the extent that the value of its assets would be depreciated. That loss would be borne exclusively by the company. It was not a loss in respect of which the shareholders could recover, even if the market value of their shares fell in consequence. The other loss would be to the pockets of the shareholders because they were deprived of the opportunity of accepting the higher offer. That loss was suffered exclusively by the shareholders. It was not a loss to the coffers of the company, which would

remain totally unaffected. That could readily be demonstrated. If, as a result of the decision of the board which was impugned, the take-over went through and the entire shareholding in the company became vested in one bidder at a lower price than was available from the other, the recovery of damages by the company would not compensate the former shareholders for their loss. Only a direct action by those shareholders in their own right, and not in right of the company, could provide the necessary compensation.

In R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117         a company and its principal shareholder brought an action in negligence against a firm of solicitors, alleging that, as a result of the firm's failure to advise an application for a new tenancy under the Landlord and Tenant Act 1954        , the company had been obliged to accept a new lease on terms less favourable than those it would have obtained under the Act. In addition, the *65        principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204        on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

In Barings plc v Coopers & Lybrand [1997] 1 BCLC 427        a parent company, brought an action in negligence against the auditors of a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                    Page 56
2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

wholly-owned subsidiary. Leggatt LJ correctly distinguished both Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 , where the shareholder had no independent cause of action of his own, and George Fischer (Great Britain) Ltd v Multi Construction Ltd [1995] 1 BCLC 260 , where the company had none. Here each of them had its own cause of action. But he stated, at p 435b-e, that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it could not be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting directly from the breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.

In Christensen v Scott [1996] 1 NZLR 273 the company carried on the business of potato-farming on tenanted land. The landlord defaulted on a mortgage of the land and the mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences. The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.

In giving the judgment of the court, Thomas J distinguished Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 104 on the ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct: Heron International Ltd v Lord Grade [1983] BCLC 244 and R P Howard Ltd v Woodman Matthews & Co [1983] BCLC 117 are just such cases. The judge *66 observed that the fact that the loss was also suffered by the company did not mean that it was not also a personal loss suffered by the shareholder. "Indeed," he added, at p 280:

"the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged default of their accountants and solicitors."

I cannot accept this reasoning as representing the position in English law. It is of course correct that the diminution in the value of the plaintiffs' shares was by definition a personal loss and not the company's loss, but that is not the point. The point is that it merely reflected the diminution of the company's assets. The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, treating the company and the shareholder as one for this purpose, the shareholder's loss is franked by that of the company. If so, such reflected loss is recoverable by the company and not by the shareholders.

Thomas J acknowledged that double recovery could not be permitted, but thought that the problem did not arise where the company had settled its claim. He considered that it would be sufficient to make an allowance for the amount paid to the liquidator. With respect, I cannot accept this either.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                                                    Page 57

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
(Cite as: [2002] 2 A.C. 1)

As Hobhouse LJ observed in Gerber Garment Technology Inc v Lectra Systems Ltd [1997] RPC 443 , 471, if the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing. By a parity of reasoning, the same applies if the company settles for less than it might have done. Shareholders (and creditors) who are aggrieved by the liquidator's proposals are not without a remedy; they can have recourse to the Companies Court, or sue the liquidator for negligence.

But there is more to it than causation. The disallowance of the shareholder's claim in respect of reflective loss is driven by policy considerations. In my opinion, these preclude the shareholder from going behind the settlement of the company's claim. If he were allowed to do so then, if the company's action were brought by its directors, they would be placed in a position where their interest conflicted with their duty; while if it were brought by the liquidator, it would make it difficult for him to settle the action and would effectively take the conduct of the litigation out of his hands. The present case is a fortiori; Mr Johnson cannot be permitted to challenge in one capacity the adequacy of the terms he agreed in another.

Reflective loss extends beyond the diminution of the value of the shares; it extends to the loss of dividends (specifically mentioned in Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] Ch 204 ) and all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds. All transactions or putative transactions between the company and its shareholders must be disregarded. Payment to the one diminishes the assets of the other. In economic terms, the shareholder has two pockets, and cannot hold the defendant liable for his inability to transfer money from one pocket to the other. In principle, the *67 company and the shareholder cannot together recover more than the shareholder would

have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim lies against the company, and the existence of the liability does not increase the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed to exercise the company's option in a manner which would be incontestable. Even if this constituted a breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2002] 2 A.C. 1                                                                                       Page 58

2000 WL 1791527 (HL), [2002] 2 A.C. 1, [2001] 1 All E.R. 481, [2001] B.C.C. 820, [2001] 1 B.C.L.C. 313, [2001]
P.N.L.R. 18, (2001) 145 S.J.L.B. 29, [2001] 2 W.L.R. 72, [2001] C.P.L.R. 49, (2001) 98 L.S.G. 24, (2001) 98
L.S.G. 46, (2000) 150 N.L.J. 1889, 12-22-2000 Times 1791,527, 2-07-2001 Independent 1791,527
**(Cite as: [2002] 2 A.C. 1)**

There is a subsidiary complaint, that the firm represented both to the company and to Mr Johnson personally that the Chancery proceedings were certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

Lord Bingham has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not *68     reflective loss, for the loss (or strictly the net loss) is one which the company could not have sustained itself. Had Mr Johnson carried on business in his own name instead of through the medium of the company, then (subject only to the question of remoteness) he would have been entitled to recover a sum representing the lost increase in the value of his pension after giving credit for the amount saved in respect of the contributions and interest. Such loss is separate and distinct from the loss suffered by the company, and while Mr Johnson's claim to recover it faces obvious difficulties it should not be struck out at this stage. But if he does establish his claim, he will have to give

credit for the contributions which would have been required, whether by the company (reflective loss) or by himself (which he has saved), together with interest thereon.

For the reasons given by Lord Bingham, I too would strike out Mr Johnson's claims to damages for mental distress and anxiety and aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of the Court of Appeal in the manner proposed.

### Representation

Solicitors:Shoosmiths, Fareham   ;Beachcroft Wansbroughs   .

Appeal allowed. Cross-appeal dismissed save that paragraphs 8 (except last sentence), 10 and 13 of schedule of loss served pursuant to order of 16 October 1998 and paragraph 24 of re-amended statement of claim of 31 March 1994 be struck out. Defendants to pay plaintiff's costs in House of Lords and below, to include costs of appeal and cross-appeal. (M G )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.