UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

NAVIGATOR CAPITAL PARTNERS, L.P., on behalf
of itself and all others similarly situated,

                  Plaintiff,

        - against -

                 No. 07 Civ. 07783 (AKH)

BEAR STEARNS ASSET MANAGEMENT INC.,
BEAR, STEARNS SECURITIES CORP., THE BEAR      ECF Case
STEARNS COMPANIES INC., BEAR, STEARNS &
CO. INC., RALPH CIOFFI, RAYMOND
MCGARRIGAL, MATTHEW TANNIN, BARRY
COHEN, GERALD CUMMINS,  DAVID             Jury Trial Demanded
SANDELOVSKY, GREGORY QUENTAL, SCOTT
LENNON, MICHELLE WILSON-CLARKE, AND
WALKERS FUND SERVICES LIMITED,

              Defendants,

        - and -

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES, L.P.,

            Nominal Defendant.

—————————————————————————— x

**PLAINTIFF NAVIGATOR CAPITAL PARTNERS, L.P.'S MEMORANDUM OF LAW
IN OPPOSITION TO THE BEAR STEARNS DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT............................. 1

STATEMENT OF FACTS ........................................................................................... 5

    A.    The Partnership's Structure.................................................................. 5

    B.    The Partnership's Investment Strategy ................................................. 7

    C.    Principal Trades and the Management Defendants' Fees....................... 8

    D.    Defendants' Duties and Responsibilities and Limited Partners' Rights................ 9

    E.    Defendants' Mismanagement, Self-Dealing, Misrepresentations, and Omissions in Connection with the Partnership...................................... 10

    F.    The High-Grade Master Fund and the Partnership's Collapse ............................. 14

ARGUMENT ............................................................................................................. 15

I.    THE COMPLAINT STATES DIRECT CLAIMS FOR BREACH OF FIDUCIARY DUTY AND BREACH OF CONTRACT (COUNTS I & II) .................. 15

II.    THE COMPLAINT STATES DIRECT CLAIMS RELATING TO THE MANAGEMENT DEFENDANTS' MISMANAGEMENT AND SELF-DEALING (COUNTS I & IV) .............................................................. 16

III.    THE COMPLAINT ADEQUATELY PLEADS DEMAND FUTILITY WITH RESPECT TO THE DERIVATIVE CLAIMS (COUNTS VI-IX)................................... 17

    A.    Demand Is Excused As To BSAM ...................................................... 18

        1.    BSAM Faces A Substantial Likelihood Of Liability............................... 19

        2.    BSAM Received Substantial Financial Benefit From Its Breaches of Fiduciary Duties ........................................ 21

        3.    BSAM Engaged In Self-Dealing Transactions ......................................... 22

        4.    BSAM Is Not Independent........................................................................ 24

    B.    Demand Is Excused As To The Joint Liquidators ................................. 24

IV.    THE COMPLAINT STATES A DERIVATIVE CLAIM FOR GROSS NEGLIGENCE AGAINST THE MANAGEMENT DEFENDANTS (COUNT VIII) ........................................................................................................ 27

V.    THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE AFFILIATED DIRECTOR DEFENDANTS (COUNT VII)......................................................................................................... 27

    A.    The Martin Act Is Inapplicable .......................................................... 27

    B.    The Exculpatory Provisions Of The Partnership Documents Do Not Bar The Claims Against The Affiliated Director Defendants ..................................... 29

VI.    THE COMPLAINT STATES CLAIMS AGAINST THE BEAR STEARNS CORPORATE DEFENDANTS AND THE AFFILIATED DIRECTOR

DEFENDANTS FOR AIDING AND ABETTING THE MANAGEMENT
DEFENDANTS' BREACHES OF FIDUCIARY DUTY (COUNTS IV & IX) .............. 32

    A.    The Complaint's Allegations Raise A Reasonable Inference That The Bear
            Stearns Corporate Defendants Knowingly Participated In The Breaches ........... 33

    B.    The Complaint's Allegations Raise A Reasonable Inference That The
            Affiliated Director Defendants Knowingly Participated In The Breaches .......... 37

VII.    THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW FRAUD
        AGAINST THE MANAGEMENT DEFENDANTS (COUNT III) ................................ 38

    A.    "Holders" May Bring Fraud Claims Under Delaware Law .................................. 39

    B.    Defendants' Class Certification Observations Do Not Warrant Dismissal
            of Count III ........................................................................................................ 40

VIII.    THE COMPLAINT STATES A CLAIM AGAINST THE BEAR STEARNS
        CORPORATE DEFENDANTS AND THE AFFILIATED DIRECTOR
        DEFENDANTS FOR AIDING AND ABETTING COMMON LAW FRAUD
        (COUNT V) ........................................................................................................ 41

CONCLUSION ............................................................................................................ 45

## TABLE OF AUTHORITIES

**Cases**

*Albert v. Alex. Brown Mgmt. Servs.*,
   Civ. A. No. 762-N, Civ. A. 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ....... 21, 30, 42

*American Fuel Corp. v. Utah Energy Dev. Co.*,
   122 F.3d 130 (2d Cir. 1997) ................................................................................ 27

*Anderson v. Airco, Inc.*,
   No. Civ. A. 02C-12-091HDR, 2004 WL 2827887 (Del. Super. Nov. 30, 2004) ................... 41

*Anglo American Sec. Fund, L.P. v. S.R. Global International Fund, L.P.*,
   829 A.2d 143 (Del. Ch. 2003) ........................................................................... 31

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) ................................................................................ 24

*Bell Atlantic Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ..................................................................................... 30

*Beneville v. York*,
   769 A.2d 80 (Del. Ch. 2000) ............................................................................. 23

*Bischoff v. Boar's Head Provisions Co.*,
   436 F. Supp. 2d 626 (S.D.N.Y. 2006) .................................................................. 29

*Buckley v. O'Hanlon*,
   No. 04-955GMS, 2007 WL 956947 (D. Del. March 28, 2007) ........................................ 16, 31

*Cantor Fitzgerald, L.P. v. Cantor*,
   No. 18101, 2001 WL 1456494 (Del. Ch. Nov. 5, 2001) .............................................. 19

*Cargill, Inc. v. JWH Special Circumstance LLC*,
   Civil Action No. 3234-VCP, 2008 WL 4950069 (Del. Ch. Nov. 7, 2008) ...................... 33, 35

*In Cencom Cable Income Partners, L.P. Litig.*,
   No. C.A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000) ...................................... 19

*Cromer Fin. Ltd. v. Berger*,
   00 Civ. 2284 (DLC), 00 Civ. 2498 (DLC), 2001 U.S. Dist. LEXIS 14744 (S.D.N.Y.
   2001) ............................................................................................................. 29

*Czarnik v. Illumina, Inc.*,
   437 F. Supp. 2d 252 (D. Del. 2006) .................................................................... 40

*Deutsch v. Cogan*,
   Civ. A. No. 8808, 1989 WL 34983 (Del. Ch. Apr. 11, 1989) .................................... 38

*Forsythe v. ESC Fund Mgmt. Co.*,
   No. 1091-VCL, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007) ................................ 17, 18, 19, 21

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
   376 F. Supp. 385 (S.D.N.Y. 2007) ..................................................................... 39

*Gaffin v. Teledyne, Inc.*,
  611 A.2d 467 (Del. 1992) ................................................................... 41

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
  No. 15754, 1998 WL 832631 (Del Ch. Nov. 10, 1998) ................................... 17, 18

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) .............................................................. 21, 24

*Gutman v. Howard Savings Bank*,
  748 F. Supp. 254 (D. N.J. 1990) ............................................................ 39

*Henneberry v. Sumitomo Corp. of America*,
  532 F. Supp. 2d 523 (S.D.N.Y. 2007) ...................................................... 30

*Herman v. Feinsmith*,
  39 A.D.3d 327 (N.Y. App. Div. 2007) ...................................................... 29

*In re IAC/InterActiveCorp Sec. Litig.*,
  478 F. Supp. 2d 574 (S.D.N.Y. 2007) .................................................. 17, 27

*In re infoUSA, Inc. S'holders Litig.*,
  953 A.2d 963 (Del. Ch. 2007) ............................................................. 21

*Ishimaru v. Fung*,
  No. 929, 2005 WL 2899680 (Del. Ch. Oct. 26, 2005) ........................................ 18

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005) .................................................. 41, 42

*Kamen v. Kemper Fin. Servs. Inc.*,
  500 U.S. 90 (1991) .................................................................... 17, 26

*Kapan v. Wyatt*,
  484 A.2d 501 (Del. Ch. 1984) ............................................................. 26

*Katell v. Morgan Stanley Group Inc.*,
  No. 12343, 1993 WL 10871 (Del. Ch. Jan. 14, 1993) ........................................ 19

*Kolbeck v. LIT America, Inc.*,
  939 F. Supp. 240 (S.D.N.Y. 1996) ........................................................ 42

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
  179 F. Supp. 2d 159 (S.D.N.Y. 2001) .................................................. 28, 29

*In re LNR Property Corp. S'holders Litig.*,
  896 A.2d 169 (Del. Ch. 2005) ............................................................. 31

*Malkinzon v. Kordonsky*,
  2008 WL 5006431 (N.Y. App. Div. 2d Dept. Nov. 28, 2008) .................................. 29

*Malpiede v. Townson*,
  780 A.2d 1075 (Del. 2001) ................................................................ 30

*Manzo v. Rite Aid Corp.*,
  No. Civ. A. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ...................... 40, 41

*McPadden v. Sidhu,*
  Civil Action No. 3310-CC, 2008 WL 4017052 (Del. Ch. Aug. 29, 2008) .............................. 31

*Mizrahi v. Chanel, Inc.,*
  746 N.Y.S.2d 878 (Sup. Ct. N.Y. County 2001) ............................................................... 28

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,*
  02 Civ. 1230 (LMM), 2002 U.S. Dist. LEXIS 16995 (S.D.N.Y. Sept. 9, 2002) ..................... 28

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,*
  No. 02 Civ. 0767 (LBS), 2003 WL 22052894 (S.D.N.Y. 2003) ........................................... 28

*In re Nantucket Island Assocs. Ltd. P'Ship Unitholders Litig.,*
  810 A.2d 351 (Del. Ch. 2002) ...................................................................................... 37

*Nathel v. Siegal,*
  No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297 (S.D.N.Y. Oct. 20, 2008) ............. 42

*Nussbacher v. Continental Illinois Nat'l Bank & Trust Co.,*
  518 F.2d 873 (7th Cir. 1975) ...................................................................................... 26

*Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins,*
  No. Civ. A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) ................................... 32

*Oliver v. Boston Univ.,*
  No. 16570, 2000 WL 1091480 (Del. Ch. July 18, 2000) ................................................... 41

*Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,*
  446 F. Supp. 2d 163 (S.D.N.Y. 2006) ........................................................................... 39

*In re Primedia Inc., Derivative Litig.,*
  910 A.2d 248 (Del. Ch. 2006) ...................................................................................... 23

*Rales v. Blasband,*
  634 A.2d 929 (Del. 1993) ...................................................................................... 18, 19

*Reisman v. KPMG Peat Marwick LLP,*
  787 N.E.2d 1060 (Mass. App. Ct. 2003) ....................................................................... 39

*Ryan v. Lyondell Chemical Co.,*
  C.A. No. 3176-VCN, 2008 WL 2923427 (Del. Ch. 2008) ................................................... 26

*Scalp & Blade, Inc. v. Advest, Inc.,*
  281 A.D. 2d 882 (N.Y. App. Div. 2001) ......................................................................... 29

*Schupak v. Florescue,*
  No. 92 Civ. 1189 (JFK), No. 92 Civ. 1189 (JFK), 1993 WL 256572 (S.D.N.Y. July 8,
  1993) ...................................................................................................................... 30

*Schuss v. Penfield Partners, L.P.,*
  C.A. No. 3132-VCP, 2008 WL 2433842 (Del. Ch. June 13, 2008) ...................................... 30

*Shamrock Holdings of California, Inc. v. Iger,*
  No. 1330-N, 2005 WL 5756479 (Del. Ch. June 6, 2005) ................................................... 39

*Small v. Fritz Cos.,*
  65 P.3d 1255 (Cal. 2003) ........................................................................................... 39

*Solutia Inc. v. FMC Corp.*,
   385 F. Supp. 2d 324 (S.D.N.Y. 2005) ............................................................ 29

*Stephenson v. Capano Dev., Inc.*,
   462 A.2d 1069 (Del. 1983) ........................................................................... 39

*Tooley v. AXA Financial, Inc., et al.*,
   No. 18414, 2005 Del. Ch. LEXIS 67 (Del. Ch. May 13, 2005) ............................. 23

*Trenwick America Litig. Trust v. Ernst & Young, LLP*,
   906 A.2d 168 (Del. Ch. 2006) ....................................................................... 30

*Trump v. Cheng*,
   862 N.Y.S.2d 812, 2005 WL 2738344 (Sup. Ct. N.Y. County 2005) ..................... 28

*Twin Bridges Ltd. P'ship v. Draper*,
   No. Civ. A. 2351-VCP, 2007 WL 2744609 (Del. Ch. Sept. 14, 2007) ................... 38

*Tzolis v. Wolff*,
   10 N.Y.3d 100 (N.Y. 2008) ........................................................................... 29

*In re Veeco Instruments, Inc. Sec. Litig.*,
   434 F. Supp. 2d 267 (S.D.N.Y. 2006) ............................................................ 18

*In re Walt Disney Co. Deriv. Litig.*,
   906 A.2d 27 (Del. 2006) ............................................................................... 31

*Walton v. Morgan Stanley & Co.*,
   623 F.2d 796 (2d Cir. 1980) .......................................................................... 27

*In re Worldcom, Inc. Sec. Litig.*,
   382 F. Supp. 2d 549 (S.D.N.Y. 2005) ............................................................ 39

*Wolf v. Rand*,
   258 A.D.2d 401 (N.Y. App. Div. 1999) ........................................................... 29


**Statutes**

28 U.S.C. § 1332(d)(2)(A) ................................................................................ 27

6 Del. C. § 17-1001 ........................................................................................ 17

DRULPA § 1003 (2008) .................................................................................. 17

Investment Advisers Act § 206(3) ................................................................... 8, 23

N.Y. Bus. Corp. Law § 626 ............................................................................. 29

N.Y. Gen. Bus. Law. §352 .............................................................................. 28

N.Y. Partnership Law § 115–a ......................................................................... 29

New York Partnership Law § 121-901 ............................................................... 28

**Rules & Regulations**

Fed. R. Civ. P. 23.1 ................................................................................................................ 18

Fed. R. Civ. P. 8(a)(2) .......................................................................................................... 30

Plaintiff, Navigator Capital Partners, L.P. ("Plaintiff" or "Navigator"), respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss Navigator's First Amended Class Action and Verified Derivative Complaint (the "Complaint") filed jointly by the Bear Stearns Defendants, namely:  (i) Bear Stearns Asset Management, Inc. ("BSAM"), The Bear Stearns Companies Inc, ("BSC"), Bear, Stearns Securities Corporation ("BSSC"), and Bear, Stearns & Co. Inc. ("BS&Co.") (collectively, BSC, BSSC, and BSC&Co. are referred to herein and in the Complaint as the "Bear Stearns Corporate Defendants"); and (ii) Barry Cohen, Gerald Cummins, David Sandelovsky, and Gregory Quental (collectively referred to herein and in the Complaint as the "Affiliated Director Defendants").[1]  This Memorandum of Law also opposes arguments set forth in the separate memoranda of law submitted in support of the respective motions to dismiss certain claims in the Complaint filed by defendants Ralph Cioffi ("Cioffi"), Matthew Tannin ("Tannin"), and Raymond McGarrigal ("McGarrigal") (collectively, BSAM, Cioffi, Tannin, and McGarrigal are referred to herein and in the Complaint as the "Management Defendants").

## PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT

As a direct result of the Management Defendants' breaches of their fiduciary and contractual duties, Bear Stearns High-Grade Structured Credit Strategies, L.P. (the "Partnership")[2] lost approximately $1 billion -- its *entire* value.  Further, the Management Defendants' misrepresentations and omissions concerning, among other things, the performance and prospects of the Partnership and the level of investor redemption requests, foreclosed Plaintiff and all other holders of Partnership Interests (the "Class") between August 31, 2004 and

---

[1]  Together, the Bear Stearns Corporate Defendants and the Affiliated Director Defendants have submitted a Consolidated Memorandum of Law In Support of their Motion to Dismiss the Complaint.  This Consolidated Memorandum is referred to herein as "BSD Br."

[2]  If not defined in this Preliminary Statement, capitalized terms shall have the meanings attributed to such terms below in the Statement of Facts.

July 18, 2007 (the "Class Period") from exercising rights under the Partnership Documents that would have enabled them to avoid the massive losses they have suffered. Indeed, by trusting and relying upon the Defendants to act honestly, competently, in good faith, in compliance with the Partnership Documents and the law, and in the best interests of the Partnership and its Limited Partners, the Class has ultimately been left with nothing. The Complaint asserts well-pled direct claims on behalf of the Class and derivative claims on behalf of the Partnership seeking recovery for these wrongdoings by Defendants.

Attempting to sidestep the numerous breaches of fiduciary and contractual duties and material misrepresentations and omissions that the Complaint pleads in detail, the Bear Stearns Defendants contend that it was really an "unprecedented market dislocation" that destroyed the entire value of the Partnership and prevented Limited Partners from redeeming their interests. (BSD Br. at 3.) Defendants seek further absolution in the obligatory "Risk Factors" listed in the Partnership Documents. (*Id.* at 2, 9-10.) Their misplaced reliance on references to "market conditions" and standard disclaimers in the Partnership Documents neither excuse nor justify the Management Defendants' wholesale breaches of their fiduciary and contractual duties and related misconduct, which included, among other things:

    (i)    Causing the Partnership and the Master Fund to make investments inconsistent with the terms of the Partnership Documents (¶¶ 264-82);

    (ii)    Entering into harmful and self-interested principal trades with other Bear Stearns entities without obtaining the promised and legally required approvals from the Independent Directors (¶¶ 8-9, 119-23, 174-96, 237-40);

    (iii)    Assigning inflated values to Partnership assets to increase their own fees and to falsely portray positive performance (¶¶ 2, 118, 145-46, 185, 283-92);

    (iv)    Failing to manage or monitor conflicts of interest and, in fact, benefiting from such acknowledged conflicts (¶¶ 2, 11, 174-96, 283-92);

   (v)      Failing to sufficiently monitor and adequately assess the credit risk inherent in the Partnership's investments, as provided in the Partnership Documents (¶¶ 88-98, 270-82);

   (vi)     Failing to adequately hedge the Partnership's investments, as provided for in the Partnership Documents (¶¶ 106-12, 299-303);

   (vii)    Providing financial statements and updates to Limited Partners that did not accurately reflect the Partnership's investments or financial condition (¶¶ 11-17, 167-73, 216-27, 277-81);

   (viii)   Misrepresenting and failing to disclose facts to Limited Partners material to the performance of the Partnership and to the Limited Partners' rights to redeem their Partnership Interests and/or to petition for removal of the Partnership's General Partner (¶¶ 11-19, 217-27, 229-36); and

   (ix)     Concealing and/or misrepresenting facts related to the liquidity of the Partnership (¶¶ 11-15, 75, 172-73, 200-13, 262, 293-98).

Based on these allegations and others, the Complaint states claims against the Management Defendants, as well as the Bear Stearns Corporate Defendants and the Affiliated Director Defendants, who aided and abetted the Management Defendants' misconduct.

BSAM concedes that Count I of the Complaint states a direct claim for breach of fiduciary duties based upon misrepresentations and omissions that the Management Defendants made to Limited Partners. (BSD Br. at 4, 14, 73-74.)  Although Defendant Tannin offers a separate argument suggesting that the underlying allegations "sound in fraud" warranting dismissal of Count I, he offers no support for his conclusion.  Defendants also concede that Count II of the Complaint adequately alleges a class breach of contract claim against BSAM. (Point I, *infra*).

Defendants erroneously contend that the Complaint's detailed allegations of self-dealing and mismanagement allege injury to the Partnership and cannot support the class claim for breach of fiduciary duty alleged in Count I of the Complaint.  (BSD Br. at 40-43.)  As correctly stated in Plaintiff FIC, L.P.'s ("FIC") Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("FIC Mem.") submitted in the related case, *FIC, L.P. v. Bear Stearns Asset*

*Management, et al.*, No. 07 Civ. 11633 (AKH), the decimation of a limited partner's capital account in the context of the partnership's dissolution gives rise to direct claims against the general partner.  Navigator respectfully joins in and adopts the arguments set forth in Section I of the FIC Mem.  (Point II, *infra*).

Defendants seek dismissal of each of the Complaint's derivative claims (Counts VI-IX) for failure to adequately allege the futility of a pre-suit demand.  (BSD Br. at 30-32.)  In fact, this is Defendants' *sole* challenge to the separate derivative claims for breach of fiduciary duty and for gross negligence against the Management Defendants (Counts VI and VIII).  Nevertheless, the Complaint alleges demand futility against both BSAM and the Partnership's Joint Liquidators with the requisite particularity as to all of the Complaint's derivative claims.  (Points III and IV, *infra*).

The Affiliated Director Defendants' arguments that the Complaint's derivative claim for breach of fiduciary duty against them (Count VII) is barred by exculpatory provisions in the Partnership Documents and by New York's Martin Act also fails.  (BSD Br. 43-46, 49-50.) Even assuming that New York law applies to Count VII -- which it does not -- the Martin Act does not preempt this derivative claim.  Moreover, the Complaint clearly pleads that the Affiliated Director Defendants acted with gross negligence, and the exculpatory provisions of the Partnership documents do not prohibit liability for such conduct.  (Point V, *infra*).

In connection with Counts IV and IX, the Complaint alleges facts that, at a minimum, give rise to a reasonable inference that the Bear Stearns Corporate Defendants and the Affiliated Director Defendants knowingly participated in the Management Defendants' breaches of fiduciary duties.  Moreover, as noted above, Count I and Count VI of the Complaint adequately allege underlying breach of fiduciary duty claims.  As a result, the Complaint's class (Count IV)

and derivative (Count IX) claims against the Bear Stearns Corporate Defendants and the Affiliated Director Defendants for aiding and abetting the Management Defendants' breaches of their fiduciary duties should be sustained.  (Point VI, *infra*).

The Management Defendants contend that the Complaint's common law fraud claim (Count III) must be dismissed because:  (i) claims for fraudulent inducement to retain securities are not recognized under Delaware law; and (ii) individual issues of reliance for class-wide common law fraud claims will eventually predominate over common questions, preventing class certification.  (BSD Br. at 34-36.)  Neither of the Management Defendants' arguments supports dismissal of Count III.  (Point VII, *infra*).  Moreover, the Complaint adequately alleges that the Affiliated Director Defendants and the Bear Stearns Corporate Defendants aided and abetted the Management Defendants' fraud, and Count V of the Complaint should be sustained.  (Point VIII, *infra*).

## STATEMENT OF FACTS

### A.  The Partnership's Structure

The Partnership was organized under the laws of the State of Delaware on August 26, 2003, subject to the provisions of the Delaware Limited Partnership Act.  (¶¶ 58, 68.)[3]  The Partnership was a "feeder-fund" in a "master-feeder" arrangement pursuant to which investors ("Limited Partners") purchased interests in the Partnership.  (¶¶ 4, 67-69.)  In turn, the Partnership invested substantially all of its assets through the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "Master Fund").  (*Id*.)  The value of the Partnership reflected its *pro rata* co-ownership of the Master Fund (two other feeder-funds were also co-owners), and each Limited Partner's ownership interest in the Partnership was reflected

---

[3]  References to (¶ ___) are references to paragraphs in the Complaint.  In citing certain specific paragraphs in the Complaint, Plaintiff does not represent that the selected paragraphs are exclusive support for the referenced statement.

in the Limited Partner's Capital Account, which was established and maintained by the

Management Defendants.  (¶¶ 78-79.)  Each Limited Partner's Capital Account reflected its

individual *pro rata* ownership of the Partnership's portion of the Master Fund.  (¶¶ 69, 142.)  As

a result, the overall value of the Partnership and each Limited Partner's ownership interests were

tied entirely to the performance and overall value of the Master Fund.  (¶¶ 69-70.)  As of

December 31, 2006, the Partnership owned approximately 28% of the Master Fund.  (¶ 70.)

Limited Partners purchased interests in the Partnership pursuant to (i) a Subscription

Agreement For Limited Partnership Interests (the "Subscription Agreement"), (ii) the August 31,

2006 Amended and Restated Limited Partnership Agreement, which amended a Limited

Partnership Agreement dated August 31, 2004 (the "Partnership Agreement" or "LPA"), and (iii)

a Private Placement Memorandum for Limited Partnership Interests dated August 2006 (the

"PPM"), which replaced a Private Placement Memorandum dated August 31, 2004 (collectively,

the Subscription Agreement, Partnership Agreement, and the PPM are referred to in the

Complaint and herein as the "Partnership Documents").  (¶¶ 71-72, 76.)  The Partnership

Documents set forth the putative purposes and investment strategies of the Partnership, as well as

the respective rights, duties, and obligations of BSAM, the other Management Defendants, and

Limited Partners.  (¶¶ 6-9, 76-79, 124-66, 326-28.)  Plaintiff purchased Limited Partnership

Interests on August 31, 2004 (¶ 80), owned such Interests continually during the period of

wrongdoing alleged in the Complaint (¶ 319), and will retain such Interests throughout this

litigation.  (*Id.*)

BSAM was the General Partner and Investment Manager of the Partnership and the

Master Fund, and carried out its responsibilities through Defendants Cioffi, Tannin and

McGarrigal, each of whom was a BSAM Managing Director and portfolio manager for the

Partnership and the Master Fund.  (¶¶ 4, 30-32, 66, 140, 145, 329, 333, 369-71, 385, 419-20.)
Defendant Bear, Stearns Securities Corporation ("BSSC") served as prime broker and custodian
of the Master Fund.  (¶¶ 4, 37, 113, 175, 310, 398, 411, 448.)  Defendant Bear, Stearns & Co.
Inc. ("BS&Co.") served as, among other things, placement agent to the Partnership and the
Master Fund, (¶¶ 4, 38), and Defendant The Bear Stearns Companies Inc. ("BSC") provided a
variety of services to the Partnership and the Master Fund, including, but not limited to valuing
their holdings.  (¶¶ 4, 10, 20, 35-36, 128, 242, 397, 410, 447.)

> **B.**     **The Partnership's Investment Strategy**

The stated objective of the Partnership was to seek high current income and capital
appreciation, primarily through leveraged investments in investment-grade structured finance
securities, chiefly collateralized debt obligations ("CDOs"), with an emphasis on triple-A and
double-A rated classes.  (¶¶ 5, 84-91, 436.)  In this regard, the Partnership Documents provided
that the Master Fund's investment portfolio would consist of approximately 90% low-risk
investment-grade senior CDO classes rated AAA to AA-.  (¶¶ 5, 90, 227, 262, 264.)  The
Partnership Documents also represented that the Management Defendants would use leverage in
making investments (¶¶ 99-105), and that the Management Defendants would employ hedging
strategies to maintain liquidity and minimize the risk of leverage.  (¶¶ 106-110.)

The Partnership Documents further provided that the Management Defendants would
cause the Master Fund to purchase non-investment grade assets known as "Repackaging Vehicle
Junior Interests" from structured finance vehicles ("Repackaging Vehicles"), which were
investment vehicles created, sponsored and managed by BSAM and the Bear Stearns Corporate
Defendants.  These "Repackaging Vehicles" packaged together various types of existing CDO
securities and reissued new CDO securities based on the newly "repackaged" assets.  (¶¶ 7, 15,
91, 94-96, 114-23.)  BSAM served as collateral manager for each of the Repackaging Vehicles

from which the Master Fund purchased unrated and illiquid Repackaging Vehicle Junior

Interests.  (¶¶ 94-96, 114-18.)  As such, each transaction involving the Master Fund and a

Repackaging Vehicle was a related-party transaction/principal trade as defined in the Partnership

Documents and under Section 206(3) of the Investment Advisers Act.  (¶¶ 147-49, 177-78.)

### C.      Principal Trades and the Management Defendants' Fees

The PPM explicitly provided that BSAM would make investments in securities issued by

Repackaging Vehicles and in the securities of other issuers affiliated with Bear Stearns

consistent with its fiduciary duties to the Partnership and to Limited Partners.  (¶¶ 8, 147, 177-

78.)  Because such transactions were "principal trades" under Section 206(3) of the Investment

Advisers Act, the Management Defendants were required to obtain the *prior* approval of such

transactions from Defendants Michelle Wilson Clarke and Scott Lennon (the "Independent

Directors").  (¶¶ 148, 177-78.)  The Partnership Documents assured Limited Partners that

conflicts of interest would be managed consistent with the Management Defendants' fiduciary

duties and the applicable law.  (*Id.*) (¶¶ 149, 160-61.)

The Management Defendants earned Advisory Fees and a Profit Share based largely

upon the Net Asset Value ("NAV") of the Partnership, which the Management Defendants were

responsible for calculating with due care and in good faith.  (¶¶ 9, 131-32, 136, 142-43.)  The

Advisory Fee was equal to 2.0% per year of the balance of each Limited Partner's Capital

Account, regardless of the performance of the Partnership.  (¶ 142.)  Because the Limited

Partner's Capital Accounts reflected the value of their *pro rata* ownership of the Master Fund,

the Advisory Fee was directly proportional to the NAV calculated by the Management

Defendants.  (*Id.*) (¶ 144.)  The PPM also provided that BSAM was allocated a Profit Share at

the end of each relevant Accounting Period in an amount equal to 20% of net new income

reflected in each Limited Partner's Capital Account, subject to a high water mark.  (¶ 143.)  Like

the Advisory Fee, the Management Defendants' Profit Share was based on the NAV that they

calculated.  (*Id.*)

       **D.**     **Defendants' Duties and Responsibilities and Limited Partners' Rights**

     In addition to adhering to measures to mitigate conflicts of interest and complying with

the principal trade provisions of the Investment Adviser's Act (¶¶ 51, 147-49, 160-61, 177-78),

the Partnership Documents provided that the Management Defendants had the following duties,

among others:

      (i)      making investments consistent with the stated investment strategy (¶¶ 84-91);

      (ii)     assigning fair values to the Master Fund's investments and assets (¶¶ 130-34);

      (iii)    accurately disclosing the performance of the Master Fund and the Partnership (¶¶ 135-41, 162-66);

      (iv)    adequately monitoring, analyzing and assessing the credit risk of Master Fund's investments (¶¶ 125-29, 88-96); and

      (v)     hedging the Master Fund's investments as provided in the Partnership Documents (¶¶ 106-11).

     Each of the Bear Stearns Corporate Defendants also had specific responsibilities which

were integral to the operation of the Partnership and the Master Fund.  For example, BSC:

      (i)      engaged in the daily valuation and monitoring of the CDO securities purchased by the Master Fund  (¶¶ 10, 175);

      (ii)     monitored the material components of the Master Fund's investments, as well as leverage and investment portfolio concentrations  (¶¶ 5, 90, 99-100);

      (iii)    structured and/or managed Repackaging Vehicles that issued the Repackaging Vehicle Junior Interests which the Master Fund purchased  (¶¶ 7, 93); and

      (iv)    served as the leverage counterparty for the Master Fund's repurchase agreements ("Repo Agreements") under which the Master Fund could use the proceeds to make additional investments or meet short-term operational liquidity needs. (¶¶ 101-02).

Defendants BS&Co. also served as a counterparty for the Master Fund's Repo Agreements, and structured and/or managed the Repackaging Vehicles which issued securities purchased by the Master Fund.  (¶¶ 7, 93, 102).  In addition, BS&Co. served as placement agent to the Partnership and the Master Fund with responsibility for locating investors.  (¶ 4.)  Defendant BSSC served as prime broker and custodian of the Master Fund, responsible for executing transactions with the Master Fund and safeguarding the Master Fund's assets.  (¶¶ 4, 113, 175.)

Further, Defendants Barry Cohen, Gerald Cummins, David Sandelovsky, and Gregory Quental (collectively, the "Affiliated Directors"), had ultimate authority over the Master Fund's operations.  (¶¶ 50, 428, 430.)  Accordingly, the Affiliated Directors had a duty to oversee all of the Master Fund's dealings and supervise its designees to ensure that the Master Fund and its managers complied with the Partnership Documents, applicable laws, and duties owed to its investors such as Limited Partners.  (*Id.*)

In addition to the general fiduciary duties of care, fairness, good faith and loyalty owed to them, each Limited Partner had specific rights under the Partnership Documents, including:  (i) withdrawing or redeeming its Interests upon notice to BSAM (¶¶ 152-57); (ii) removing BSAM as the General Partner of the Partnership (¶¶ 158-59); (iii) receiving timely, accurate, and complete disclosures concerning the operation and performance of the Partnership and the Master Fund (¶¶ 162-66); and (iv) relying upon the Affiliated Directors and the Independent Directors to oversee the Management Defendants (¶¶ 160-61).

### E.    Defendants' Mismanagement, Self-Dealing, Misrepresentations, and Omissions in Connection with the Partnership

Despite their obligations to act in the best interests of the Limited Partners and the Partnership under Delaware law and pursuant to the terms of the Partnership Documents, the

Management Defendants engaged in a consistent pattern of gross negligence, bad faith, self-dealing, and misrepresentations that prevented Limited Partners from exercising their rights to redeem their Interests and decimated the value of the Partnership.  (¶¶ 1-2, 172-227, 228-36, 260-98.)  While the nature and extent of the Management Defendants' breaches of their fiduciary and contractual duties are too voluminous to repeat herein, the Complaint contains detailed allegations demonstrating that the Management Defendants, among other things:

    (i)    Caused the Partnership and the Master Fund to make investments inconsistent with the terms of the Partnership Documents (¶¶ 264-82);

    (ii)    Entered into harmful and self-interested principal trades with other Bear Stearns entities without obtaining the promised and legally required approvals from the Independent Directors (¶¶ 8-9, 119-23, 174-96, 237-40);

    (iii)    Assigned inflated values to Partnership assets to increase their own fees and to falsely portray positive performance (¶¶ 2, 118, 145-46, 185, 283-92);

    (iv)    Failed to manage or monitor conflicts of interest and, in fact, benefitted from such acknowledged conflicts (¶¶ 2, 11, 174-96, 283-92);

    (v)    Failed to sufficiently monitor and adequately assess the credit risk inherent in the Partnership's investments, as provided in the Partnership Documents (¶¶ 88-98, 270-82);

    (vi)    Failed to adequately hedge the Partnership's investments, as provided for in the Partnership Documents (¶¶ 106-12, 299-303);

    (vii)    Provided financial statements and updates to Limited Partners that did not accurately reflect the Partnership's investments or financial condition (¶¶ 11-17, 167-73, 216-27, 277-81);

    (viii)    Misrepresented and failed to disclose facts to Limited Partners material to the performance of the Partnership and to the Limited Partners' rights to redeem their Partnership interests and/or to petition for removal of the Partnership's General Partner (¶¶ 11-19, 217-27, 229-36); and

    (ix)    Concealed and/or misrepresented facts related to the liquidity of the Partnership (¶¶ 11-15, 75, 172-73, 200-13, 262, 293-98).

Among the most egregious breaches of fiduciary and contractual duties alleged in the Complaint is the Management Defendants' and the Independent Directors' knowing and persistent failure to comply with the approval requirements of the Investment Advisers Act and

the Partnership Documents concerning related-party transactions/principal trades.  (¶¶ 8-10, 174-96, 237-40.)  Bypassing these requirements, the Management Defendants saddled the Master Fund and the Partnership with risky and illiquid Repackaging Vehicle Junior Interests, to which they assigned inflated values.  (¶¶ 8-10, 290.)  The inflated prices that the Master Fund paid for these securities enabled the Bear Stearns Corporate Defendants to earn fees for ridding their own balance sheets of these otherwise immovable interests.  (¶¶ 41, 118, 176, 185.)  Moreover, the inflated values that the Management Defendants assigned to these holdings enabled the Management Defendants to earn heightened fees.  (¶¶ 172, 271, 282, 285-91.)  The Management Defendants and the Bear Stearns Corporate Defendants used the Partnership and the Master Fund as a "money machine" to serve their own interests to the detriment of the Limited Partners and the Partnership.  (¶ 10.)

While inflating the Partnership's NAV by assigning phony prices and values to illiquid assets, the Management Defendants represented that the Partnership was experiencing months of consecutive positive returns as of August 2006.  (¶ 167.)  Undisclosed to Limited Partners, the self-dealing and basically useless investments that the Management Defendants had plunged into the Master Fund (and carried at grossly inflated values) caused the Partnership to suffer severe liquidity problems.  (¶¶ 172-73.)  The Management Defendants, therefore, engaged in a series of schemes through which they attempted to hide the growing liquidity crisis.  (¶ 173.)

These desperate measures included cobbling together an alternative fund, the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, (the "Enhanced Master Fund"), which was launched together with a domestic and an overseas feeder fund on or about August 1, 2006 (collectively, the "Enhanced Fund").  (¶¶ 13, 200-08.)  The Management Defendants secretly intended to "roll" all Limited Partners into the Enhanced Fund

12

structure and then close the Master Fund and the Partnership.  (*Id.*)  Soon after the Enhanced

Fund launched, the Management Defendants also formed Everquest Financial Ltd. ("Everquest")

into which the High-Grade Master Fund and the Enhanced Fund sold approximately $555

million of their worst CDO assets that BSAM and BSC intended to offload to other unsuspecting

investors through an initial public offering.  (¶¶ 14-15, 209-13, 243, 252.)

     During this time, the Management Defendants provided Limited Partners with Monthly

Profiles pertaining to the Master Fund that grossly understated the Master Fund's and the

Partnership's exposure to subprime mortgages.  (¶¶ 17, 219-27, 278, 285.)  Further, in an effort

to stave off mounting redemption requests from Limited Partners, the Management Defendants

made misrepresentations and omissions concerning the Partnership's prospects, the number of

pending redemption requests, and the level of new investments in the Partnership -- including

lies about new investments in the Partnership that the Management Defendants themselves

would be making.  (¶¶ 228-36.)

     An April 19, 2007 BSAM internal risk-exposure report (the "BSAM Report") revealed

that as of March 2007, the Master Fund's overall collateral, including all asset classes, was

approximately "60% subprime."  (¶¶ 19, 225, 281.)  Based upon his recognition that the

subprime market was likely "toast," Defendant Tannin fired off panicked e-mails to Defendants

Cioffi and McGarrigal on April 22, 2007, urging that the Master Fund and the Partnership should

be closed immediately.  (¶¶ 19, 231, 241.)  The Management Defendants held a conference call

with Limited Partners and other investors just three days later on April 25, 2007.  (¶¶ 19, 234.)

During this call, the Management Defendants made numerous misrepresentations and omitted

numerous facts, as alleged in the Complaint, including contending that:

          [W]e feel that we're in a position to do exactly what we've done
          all along and that the opportunities now, I mean, we were again

> quite cautious in 2006 and even 2005 because, on a risk-adjusted
> basis, it was not time to really take on significant amounts of risk.
> *Now is the time to do it.*  So the fact that we've been so cautious in
> the prior periods means that we have the capacity and the
> flexibility to take advantage of spreads that are simply irrational.
> So, from a portfolio construction and from a market view, *we're
> quite comfortable with where we sit.*

(¶¶ 19, 234.)

The Management Defendants also misrepresented the volume of outstanding redemption requests, the level of new subscriptions, and numerous other facts material to the operation and prospects of the Master Fund and the Partnership.  (¶¶ 235-36.)

## F.    The High-Grade Master Fund and the Partnership's Collapse

During the latter portion of the spring of 2007, the Management Defendants continued to conceal their wholesale mismanagement of the Partnership and to misrepresent and conceal information from Limited Partners, which would have caused them to redeem their Interests (¶¶ 228-36, 241-52), but they could not outrun the truth.  With the prospects of the Everquest IPO in grave doubt (¶¶ 243-44, 252), BSC's top executives stepped in and attempted to sell the Master Fund and Enhanced Fund portfolios to outside investors, including Cerberus Capital Management.  (¶¶ 20, 245).  When these last-ditch efforts failed, BSC announced on June 22, 2007 that it would provide up to $3.2 billion in financing to the Master Fund.  (¶¶ 20, 251).  Ultimately, BSC provided only a small portion of this amount.  It was too late, and the game was over when repo counterparties terminated financing agreements and moved in to sell assets and seize collateral.  (*Id.*)

In a disclosure to Limited Partners on July 18, 2007, BSC finally admitted that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the Funds over time."  (¶¶ 21, 253-54.)  At the time of its collapse, the Partnership had approximately $1 billion in capital that

vanished into thin air.  (¶¶ 21, 253.)  The Enforcement Section of the Massachusetts Securities

Division of the Office of the Secretary of the Commonwealth, the United States Securities and

Exchange Commission (the "SEC"), and the United States Attorney's Office for the Eastern

District of New York (the "Government") are conducting concurrent litigation and proceedings

concerning the collapse of the Master Fund and the Partnership.  (¶¶ 22-24, 333.)  On June 19,

2008, Defendants Cioffi and Tannin were indicted on three counts of securities fraud, five counts

of wire fraud, and one count of conspiracy to commit securities and wire fraud.  (¶ 23.)

## ARGUMENT

## I.     THE COMPLAINT STATES DIRECT CLAIMS FOR BREACH OF FIDUCIARY DUTY AND BREACH OF CONTRACT (COUNTS I & II)

The Bear Stearns Defendants acknowledge that Navigator states valid class claims

against BSAM for breach of fiduciary duty with respect to misrepresentations and omissions that

the Management Defendants made to Limited Partners (Count I) and for breach of contract

(Count II).  (*See* BSD Br. at 4, 14, 73-74.)[4]

Defendant Tannin separately argues that the Complaint's direct breach of fiduciary duties

claim against the Management Defendants (Count I) must be dismissed for an eventual inability

to prove class-wide reliance.  (Tannin Br. at 7-9.)  According to Tannin, the allegations

underlying Count I "sound in fraud," which means that plaintiff must "prove" proximate cause.

(*Id*. at 7-8.)  Tannin, however, cites no authority for his argument that certain factual allegations

underlying a breach of fiduciary duty claim somehow require a plaintiff to plead and prove the

elements of a fraud claim.

---

[4] Although the Bear Stearns Defendants did not move to dismiss the Complaint's breach of contract claim (Count II) against BSAM, Navigator respectfully withdraws that claim as against Defendants Cioffi, Tannin, and McGarrigal.

While Tannin observes that certain courts have applied Federal Rule of Civil Procedure 9(b) to a "portion" of the factual allegations underlying breach of fiduciary duty claims, none of the cases that Tannin cites support his argument that the presence of any such allegations converts a claim for breach of the fiduciary duty of disclosure into a claim for fraud.  (Tannin Br. 8 n.4.)[5]  The allegations underlying Count I do not "sound in fraud."  Rather, the allegations detail the Management Defendants "pattern of willful, grossly negligent, and/or bad faith nondisclosure, obfuscation and misrepresentation of material facts."  (¶ 373.)  Defendant Tannin's sweeping characterization of the Complaint's allegations is unavailing.  *See Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *5 (D. Del. March 28, 2007) (allegations of intentional and knowing misconduct "do not transform claims for breach of fiduciary duty into claims based in fraud.").  Further, Tannin's suggestion that the misrepresentations must "sound in fraud" to "avoid being barred by the LPA's exculpatory clause" (Tannin Br. at 7) is incorrect. The exculpatory provisions of the Partnership Documents do not bar claims based upon gross negligence such as the breach of fiduciary duty claims pled here.  (¶ 77; *see also* Sheldon Ex. I at 30.)

## II.   THE COMPLAINT STATES DIRECT CLAIMS RELATING TO THE MANAGEMENT DEFENDANTS' MISMANAGEMENT AND SELF-DEALING (COUNTS I & IV)

Plaintiff adopts and incorporates by reference herein the arguments set forth in Section I of FIC's Memorandum of Law in Opposition to Defendants' Motions to Dismiss FIC's Amended Complaint.  For the reasons set forth therein, the allegations of mismanagement and self-dealing set forth in Navigator's Complaint also allege direct breach of fiduciary duty claims against the Management Defendants.

---

[5]  Neither Tannin nor any of the other Management Defendants argues that the Complaint fails to plead their misrepresentations and omissions with particularity.

**III.   THE COMPLAINT ADEQUATELY PLEADS DEMAND FUTILITY WITH RESPECT TO THE DERIVATIVE CLAIMS (COUNTS VI-IX)**

Defendants argue that the Complaint fails to plead adequate demand futility allegations for the derivative claims asserted on behalf of the Partnership in Counts VI through IX.  (*See* BSD Br. at 30-32.)  In the case of a limited partnership, demand futility is a function of whether demand upon the *general partner* is excused.  *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, No. Civ. A. 15754-NC, 1998 WL 832631, at *5 (Del. Ch. Nov. 10, 1998) (demand is to be made upon the general partner and not the general partner's board of directors); 6 Del. C. § 17-1001 (demand is measured against the general partner).  Defendants contend that Navigator's situation is somewhat atypical in that demand futility should be measured against the Partnership's General Partner (*i.e.*, BSAM) for the claims asserted in the original complaint but against the Liquidators (*i.e.*, Messrs. Heis and Milsom) for the claims first asserted in the Amended Complaint filed in August 2008.  (BSD Br. at 30-31.)  However measured, the Complaint adequately explains why demand is excused as to both BSAM and the Liquidators. (¶¶ 321-62.)

The demand requirements for a derivative suit are determined by the law of the state of incorporation, which in the case of the Partnership is Delaware.[6]  *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 598 (S.D.N.Y. 2007) (citing *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991)).  Under Delaware law, to determine whether demand is excused, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint *create a reasonable doubt* that, as of the time the complaint is filed, the board of

---

[6]  The substantive standard for establishing demand futility is the same in the limited partnership context as it is in the corporate context.  *See* DRULPA § 1003 (2008); *Forsythe v. ESC Fund Mgmt. Co.*, No. 1091-VCL, 2007 WL 2982247, at *5 (Del. Ch. Oct. 9, 2007) ("Delaware courts look to pleading standards developed in the corporate context to determine whether a limited partner has alleged particularized facts satisfying [why demand is excused].").

directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *See Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993) (emphasis added).

Although demand futility allegations must be particularized, *see* Fed. R. Civ. P. 23.1, courts are required to examine the allegations in a complaint in their totality when making demand futility determinations.  *See, e.g.*, *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (under Delaware law, "[w]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the board must be determined from the accumulation *of all the facts taken together*") (emphasis added).[7]  As explained below, when the Complaint's allegations are viewed collectively, it is beyond question that demand upon both BSAM and the Liquidators would have been futile.

## A.    Demand Is Excused As To BSAM

The conduct of BSAM and the other Management Defendants has led to two criminal indictments (of Cioffi and Tannin), an SEC civil fraud complaint (against Cioffi and Tannin), and an administrative complaint (against BSAM) filed by the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth.  (¶¶ 22-25.)  As explained more fully below, the conduct that led to the indictments and civil proceedings excuses demand against BSAM for the following reasons:  (i) BSAM faces a

---

[7]  Defendants cite to numerous cases for the proposition that courts will dismiss derivative claims that contain conclusory demand futility allegations.  (*See* BSD. Br. at 23 n.9.)  These cases are inapposite given thet detailed demand fultility allegations contained in the Complaint.  Indeed, in contrast to these cases, the Complaint alleges the kind of particularized facts as to why demand is excused that Delaware courts routinely sustain. *See, e.g.*, *Forsythe*, 2007 WL 2982247, at *9 (sustaining particularized allegations that supported inference of general partner's failure to exercise its oversight duties); *Ishimaru v. Fung*, No. Civ. A. 929, 2005 WL 2899680, at *12 (Del. Ch. Oct. 26, 2005) (holding that, under *Rales*, plaintiff has "easily satisfie[d] the statutory requirement to plead demand excusal with particularity" by allegations of self-dealing); *Gotham Partners,*1998 WL 832631, at *4  (finding that plaintiff's complaint was a "paradigm of particularized allegations supported with purported [company] internal memos, citations to the Partnership Agreement, and a legally sustainable theory of relief").

substantial likelihood of liability; (ii) BSAM received substantial financial benefit from its fiduciary duty breaches; (iii) BSAM engaged in self-dealing transactions; and (iv) BSAM was not independent.

### 1.      BSAM Faces A Substantial Likelihood Of Liability

Allegations of specific facts establishing that "the potential for liability is not a mere threat but instead may rise to a substantial likelihood" create a reasonable doubt as to the general partner's disinterestedness.[8]  *Rales*, 634 A.2d at 936 (internal quotations omitted); *see also In re Cencom Cable Income Partners, L.P. Litig.*, No. C.A. 14634, 2000 WL 130629, at *4 (Del. Ch. Jan. 27, 2000) (same test applied to limited partnership); *Katell v. Morgan Stanley Group*, No. C.A. 12343, 1993 WL 10871, at *5 (Del. Ch. Jan. 14, 1993) (same).

The Complaint makes clear that BSAM faces a substantial likelihood of liability for its central role and participation in the activities that caused the Partnership to lose approximately $1 billion and upon which the derivative claims are based.  The PPM and other Partnership Documents, including the LPA and Subscription Agreement, govern the scope of BSAM's fiduciary obligations owed to the Partnership and Limited Partners and thus, the standard by which BSAM's liability for breach of such duties will be measured.  *See Forsythe*, 2007 WL 2982247, at *6 ("the Partnership Agreement, not the common law, provides the proper standard of liability."); *Cantor Fitzgerald, L.P. v. Cantor*, No. C.A. 18101, 2001 WL 1456494, at *5 (Del. Ch. Nov. 5, 2001) ("[W]here the parties have a more or less elaborated statement of their respective rights and duties, absent fraud, those rights and duties, where they apply by their

---

[8]  Defendants' concession that the Complaint has pleaded a viable cause of action for breach of contract against BSAM (Count II) reinforces the sufficiency of the Complaint's demand futility allegations against BSAM.  BSAM's contractual obligations and fiduciary duties both arose out of the same governing Partnership Documents.  Because the Defendants do not challenge the fact that BSAM breached its contractual obligations -- obligations that are intertwined and related to BSAM's fiduciary duties under the Partnership Documents -- BSAM's "potential for liability" is more than "a mere threat."  *See Rales*, 634 A.2d at 936.

terms, and not the vague language of a default fiduciary duty, will form the metric for determining breach of duty.").

The PPM explicitly provides that "BSAM has fiduciary responsibilities with respect to the Partnership and will make investment decisions in a manner consistent with those responsibilities." (¶ 327.) Those responsibilities included: (i) ensuring that the Master Fund executed the investment strategy stated in the Partnership Documents (¶¶ 124, 328); (ii) carefully and constantly monitoring the Master Fund's credit risk with respect to *every* investment (¶¶ 125-29, 328); (iii) fairly valuing all of the assets held in the Master Fund's portfolio (¶¶ 130-34, 328); (iv) accurately disclosing the Master Fund's performance (¶¶ 135-41); (v) fairly assessing BSAM's fees and profit shares to be paid by the Partnership through the Capital Accounts of Limited Partners (¶¶ 142-46, 328); and (vi) obtaining approvals from the Independent Directors of the Master Fund for related-party transactions involving the Master Fund (¶¶ 147-49, 328).

BSAM breached these contractual obligations and, consequently, its fiduciary duties. The Complaint details with great specificity how Defendants Cioffi, Tannin, and McGarrigal engaged in a knowing, grossly negligent, and/or bad faith abdication of these duties. Specifically, BSAM in its dual role as General Partner of the Partnership and Investment Manager of the Master Fund: (i) caused the Partnership and Master Fund to make investments inconsistent with the terms of the Partnership Documents (¶¶ 264-69, 330); (ii) failed to sufficiently analyze and adequately assess the credit risk inherent in the Partnership's and Master Fund's investments as provided in the Partnership Documents, including making grossly negligent bets on subprime mortgages (¶¶ 270-82, 330); (iii) assigned inflated values to Partnership assets to increase BSAM's own fees and falsely portray positive performance

(¶¶ 283-92, 330); (iv) created a constant liquidity problem for the Partnership (¶¶ 293-98); (v) failed to adequately hedge the Partnership's investments as provided for in the Partnership Documents (¶¶ 299-303, 330); and (vi) caused the Partnership and the Master Fund to enter into harmful and self-interested principal trades with other Bear Stearns entities without obtaining the required approvals from the Independent Directors (¶ 330).

These detailed allegations are more than sufficient at the pleading stage to establish a substantial likelihood that BSAM faces liability for its numerous breaches of fiduciary duties.[9] *See, e.g.*, *Forsythe*, 2007 WL 2982247, at *9 (demand excused where general partner failed to exercise its oversight duties); *Albert v. Alex. Brown Mgmt. Servs.*, Civ. A. No. 762-N, Civ. A. 763-N, 2005 WL 2130607, at *5-6 (Del. Ch. Aug. 26, 2005) (sustaining claims against the general partners for failing to discharge their supervisory and oversight duties). Accordingly, demand is excused as to BSAM for the derivative claims asserted in Navigator's original complaint.

### 2.    BSAM Received Substantial Financial Benefit From Its Breaches of Fiduciary Duties

Demand is also excused as to BSAM because it had a direct pecuniary interest in the wrongdoing alleged in the Complaint. It is well established under Delaware law that demand is excused when a director (or in this case, the General Partner) has a personal material financial interest in the challenged action. *See, e.g.*, *Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (recognizing that demand is excused when one director has a financial interest not shared by others); *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007) (same); BSD Br.

---

[9]  Defendants argue that the criminal indictments of Defendants Cioffi and Tannin, and the civil proceedings filed by the SEC and the Massachusetts Securities Division, the latter of which specifically charges *BSAM* with illegal activity, are all irrelevant. (*See* BSD Br. at 31 n.11.) Criminal and civil complaints filed against both BSAM and its senior managing directors are obviously relevant to an analysis of the likelihood of BSAM's liability when the allegations in those actions overlap with the allegations in the derivative claims asserted in the Complaint.

at 26 ("A plaintiff can establish that a specific director is interested by making allegations that, for example the director will personally benefit from the challenged action.") (citation omitted).

BSAM's significant financial interest in the conduct at issue raises a reasonable doubt that BSAM could impartially assess a pre-suit demand. BSAM received substantial Advisory Fees and Profit Shares based upon the NAV of the Master Fund, which in turn was based on valuations BSAM assigned to the assets held by the Master Fund and the Partnership. (¶¶ 142-46.) The assets held and investments made by the Master Fund and the Partnership were also determined by BSAM as Investment Manager for both. (¶¶ 9, 142-46, 336.) Because BSAM would receive higher fees if the NAV of the Master Fund increased in value, BSAM intentionally and erroneously overvalued the Master Fund's NAV to reap these higher fees. (¶¶ 145-46, 283-92, 339-42.) The Advisory Fees and Profit Shares were paid to BSAM directly out of the Limited Partners' Capital Accounts. (¶¶ 144 (citing PPM at 38, 47), 337-38.) Thus, BSAM received a material financial benefit[10] from its knowing, systematic, and continuous breach of fiduciary duties to the Partnership and the Limited Partners. (¶ 337.) Indeed, BSAM was still owed substantial fees as of the time of the Partnership's collapse. (¶ 340.)

In light of BSAM's receipt of substantial financial benefit at the expense of the Limited Partners and in breach of BSAM's fiduciary duties, BSAM is an interested party and pre-suit demand is excused.

### 3.    BSAM Engaged In Self-Dealing Transactions

Demand is also excused because BSAM engaged in extensive self-dealing through its repeated failures to obtain the required approvals for related-party transactions between the Master Fund and the Bear Stearns entities. Delaware courts routinely hold that pre-suit demand

---

[10] For example, for the year ended December 31, 2006, the Advisory Fee totaled $5,001,025, and BSAM was allocated a Profit share of $8,396,778. (¶¶ 146, 339.)

is excused when a controlling party engages in self-dealing by which that party causes the controlled corporation (or partnership) to enter into a transaction that harms the controlled corporation but, at the same time, confers a unique benefit on the controlling party. *See, e.g.*, *In re Primedia Inc., Derivative Litig.*, 910 A.2d 248, 259-60 (Del. Ch. 2006) (excusing pre-suit demand and denying motion to dismiss because controlling director engaged in a course of self-dealing that breached its duty of loyalty to the corporate enterprise); *Tooley v. AXA Financial, Inc., et al.*, No. 18414, 2005 Del. Ch. LEXIS 67, at *22 (Del. Ch. May 13, 2005) (excusing pre-suit demand and denying motion to dismiss because the majority shareholder, through self-dealing, received an exclusive benefit at the detriment of the minority shareholders); *Beneville v. York*, 769 A.2d 80, 84 (Del. Ch. 2000) (excusing pre-suit demand and denying motion to dismiss because of defendants' self-dealing transactions).  Here, there is simply no question that BSAM engaged in self-dealing to the detriment of the Limited Partners and the Partnership.

Recognizing the potential for self-dealing abuses, the PPM sets forth a process, consistent with the Investment Advisers Act, that required BSAM to obtain approvals from the Master Fund's Independent Directors for related-party transactions.  (¶¶ 147-49, 345.)  BSAM utterly failed to obtain these required approvals from the Independent Directors.  (¶¶ 181-99.)  In fact, by the time the August 2006 PPM was issued, hundreds, if not thousands, of related-party transactions had been completed without prior approval.  (¶ 346.)  In 2004, 29.73% of the 730 principal transactions were executed without approval.  (*Id.*)  This number rose to 58.66% out of 1,161 transactions in 2005, and 78.95% of 342 transactions in 2006.  (¶¶ 183, 346.)  Those self-dealing transactions violated, among other things, § 206(3) of the Investment Advisers Act, exposing BSAM and the other Management Defendants to liability.  (¶ 346.)

BSAM (along with the other Management Defendants) reaped enormous benefits from this self-dealing through substantial fees and the appearance of a thriving business operation at the expense of the Partnership, which was forced to take on riskier and unstable assets that ultimately imploded.  BSAM breached its duty of loyalty through its continuous and concerted self-dealing, making BSAM an interested party and unable to exercise its disinterested or independent business judgment in responding to a pre-suit demand.

### 4.      BSAM Is Not Independent

BSAM is a wholly-owned subsidiary of BSC, which controls BSAM's entire corporate decision making.  (¶ 350.)  BSC had the legal authority to hold BSAM accountable for meeting BSC's financial objectives and to ensure that BSAM conducted its business affairs in a manner that BSC deemed acceptable.  (*Id.*)  Given this relationship, BSAM would have been incapable of exercising independent business judgment in deciding whether to bring derivative aiding and abetting breach of fiduciary duty claims against BSC.  (Count IX.)  BSAM was not an independent or disinterested general partner, and was, as a consequence, incapable of making an impartial business judgment as to the merits of the claims asserted in the Complaint.  *See Beam v. Stewart*, 845 A.2d 1040, 1049 n.20 (Del. 2004) (recognizing that under Delaware law demand is excused if a party is "incapable of acting independently for some other reason such as domination or control") (citing *Grimes*, 673 A.2d at 1216 (*rev'd on other grounds*).

### B.      Demand Is Excused As To The Joint Liquidators

Defendants argue that the only demand futility allegations against the Liquidators is that Messrs. Heis and Milsom failed to bring the claims asserted in Counts VI through IX, which Defendants argue is insufficient to excuse demand.  (BSD Br. at 31.)  The Complaint, however, alleges much more than a mere delay or failure to act.  (¶¶ 352-62.)  In addition to letting a year go by without filing any litigation seeking redress for the Partnership's collapse, the Liquidators

have failed to even conduct the investigation into possible claims relating to the Partnership which they represented they would do. (¶ 354.)  Moreover, the Joint Liquidators have not distributed a promised report, set up a website for Partnership investors, or responded to Navigator's repeated inquiries for information regarding the scope of their purported "investigation" into Partnership claims.  (¶¶ 352-59.)  Nor have the Joint Liquidators served any formal or informal discovery requests on BSAM, Messrs. Cioffi, Tannin or McGarrigal, or on any third-parties with connections to the Partnership to obtain more information on the Partnership's collapse.  (¶ 360.)  In sum, the Joint Liquidators have simply failed to make a good-faith effort to conduct the investigation they promised to the Limited Partners.

In fact the *only* affirmative action that the Joint Liquidators have taken to date has been to attempt to *eliminate* any potential claims against BSAM.  On June 25, 2008, the Joint Liquidators sent a notice to the Limited Partners informing them of the Liquidators' decision to "waive the pre-approval requirement for the resignation or withdrawal of Limited Partners" as set forth in the LPA.  (¶ 361.)  The purported rationale to abandon such interests was to allow the Limited Partners to avoid potential tax liability.  *Id.*  However, in return, the Limited Partners were required to relinquish any further rights, including the right to bring claims against BSAM and other involved parties.  *Id.*  Far from pursuing and upholding the responsibilities and obligations that the Joint Liquidators explicitly acknowledged to the Limited Partners, the Joint Liquidators sought to extinguish the Limited Partners' legitimate claims.

Thus, despite the fact that (i) the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed an administrative complaint against BSAM, (ii) Defendants Cioffi and Tannin were criminally indicted on federal securities and wire fraud charges in connection with their management of the Partnership, and (iii) the SEC

has commenced enforcement proceedings against Cioffi and Tannin arising from the same conduct, the Joint Liquidators have done nothing to investigate or pursue claims on behalf of the Partnership.  Instead, Messrs. Heis and Milsom have inexplicably attempted to obtain releases on behalf of the Defendants.

More pointedly, the Liquidators primary responsibility is to maximize recovery for the Partnership.  This is not akin to a traditional sitation involving an ongoing company where directors must balance "commercial, promotional, public relations, employee relations, and fiscal factors" before bringing a lawsuit.  *Kapan v. Wyatt*, 484 A.2d 501, 509 (Del. Ch. 1984). Liquidation is more like a situation where the directors decide to put a company up for sale and must have a "singular focus on seeking and attaining the highest value reasonably available[.]" *Ryan v. Lyondell Chemical Co.*, C.A. No. 3176-VCN, 2008 WL 2923427, at *2 (Del. Ch. July 29, 2008) .  Given the availability of counsel willing to pursue these derivative actions on a contingency fee basis, the Liquidators have no discretion under the business judgment rule to refuse to pursue meritorious litigation that could only increase the recovery to the Partnership assets.

Under the totality of the circumstances, the Joint Liquidators' actions clearly raise a reasonable doubt that Messrs. Heis and Milsom could have properly exercised independent and disinterested business judgment in responding to a pre-suit demand.  *See Nussbacher v. Continental Illinois Nat'l Bank & Trust Co.*, 518 F.2d 873, 879 (7th Cir. 1975) (demand futile where it is "loud and clear that under no circumstances would the board of directors have approved the corporation bringing the action"), *overruled on other grounds by, Kamen*, 908 F.2d at 1359; *see also* BSD Br. at 27 ("It is the care, attention and sense of individual responsibility to the performance of one's duties . . . that generally touches on independence.") (citing *In re*

*IAC/InterActiveCorp. Sec. Litig.*, 478 F. Supp.2d at 602).  Accordingly, demand against the Joint

Liquidators is excused.

## IV.     THE COMPLAINT STATES A DERIVATIVE CLAIM FOR GROSS NEGLIGENCE AGAINST THE MANAGEMENT DEFENDANTS (COUNT VIII)

The Management Defendants do not offer any substantive arguments for dismissal of the

derivative gross negligence claim in Count VIII of the Complaint.  Instead, the Management

Defendants' sole argument for dismissal of this claim is that the Complaint "fail[s] to properly

plead pre-suit demand or demand futility."  (BSD Br. at 55; Cioffi Br. at 7; Tannin Br. at 2; and

McGarrigal Br. at 6.)  As explained above in Section III, the Complaint adequately alleges

demand futility with respect to both BSAM and the Joint Liquidators.  Accordingly, Count VIII

should be sustained.

## V.      THE COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE AFFILIATED DIRECTOR DEFENDANTS (COUNT VII)

### A.      The Martin Act Is Inapplicable

Defendants' contention that New York's Martin Act bars Count VII against the Affiliated

Director Defendants is meritless.  Defendants offer no authority supporting application of New

York law to these claims.  (*See* BSD Br. at 49-50.)  Even if New York law did apply, the law of

the state of incorporation would govern claims for breach of fiduciary duties in this context.  *See,*

*e.g., Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980).[11]  Because the

Partnership is a Delaware limited partnership, New York law mandates that *Delaware* law

_____

[11]   The Court has subject matter jurisdiction over this case based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(d)(2)(A).  In diversity actions, a federal court applies the substantive law as determined by the choice of law rules of the state in which it sits.  *See American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

governs breach of fiduciary duty claims.[12]  *See Trump v. Cheng*, No. 602877/05, 2005 WL

2738344, at *4 (N.Y. Sup. Ct. Sept. 14, 2005) ("With respect to the claims involving breaches of

fiduciary duties, the laws of the jurisdiction under which a foreign limited partnership is

organized govern its organization and internal affairs and the liability of its . . . partners.") (citing

New York Partnership Law § 121-901); *see also Mizrahi v. Chanel, Inc.*, 746 N.Y.S.2d 878, 881

(N.Y. Sup. Ct. 2001) (same).

Even if New York law applied, the Martin Act would not preempt Count VII.  The

Martin Act only allows the Attorney General to institute proceedings when the allegations are *in*

*connection with the purchase and sale of* securities.  *See Lehman Bros. Commercial Corp. v.*

*Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001)

("New York's Martin Act grants the Attorney General the power to regulate fraud and deception

*in the sale of securities*.") (citing N.Y. Gen. Bus. Law. §352[1]) (emphasis added); *Nairobi*

*Holdings Ltd. v. Brown Bros. Harriman & Co.*, 02 Civ. 1230 (LMM), 2002 U.S. Dist. LEXIS

16995, at *28-29 (S.D.N.Y. Sept. 9, 2002) ("Courts have deemed claims for negligent

misrepresentation and breach of fiduciary duty *in the context of sales of securities* to come within

the purview of the Martin Act.") (emphasis added).  Thus, courts have held claims to be

preempted only when they involve allegations that fall within the scope of the Martin Act.  *See*

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL

22052894, at *5 (S.D.N.Y. 2003) ("In cases where the Attorney General has, by operation of

statute, no enforcement power, it is difficult to see how permitting a common law claim to go

---

[12]  The Affiliated Director Defendants tacitly acknowledge as much through their contradictory and mistaken
assertion that, under Delaware law, the exculpation clause in the LPA operates to bar the breach of fiduciary duty
claim against them (Count VII).  (BSD Br. at 43.)  Presumably recognizing this inconsistency and their inability to
resolve it to their advantage, the Defendants ultimately limit their Martin Act argument as potentially applying only
"to the extent these claims are governed by New York rather than Delaware law."  (BSD Br. at 50.)  Although, in a
footnote, the Defendants express an opinion concerning how Cayman Islands law may address Count VII, they do
not contend that Cayman Islands law actually applies.  (BSD Br. at 46 n.17.)

forward would interfere with the state legislature's enforcement mechanism."); *see also Lehman Bros.*, 179 F. Supp. at 165 (declining to dismiss breach of fiduciary duty claims because the transaction was not covered by the Martin Act). As the Defendants concede, Navigator asserts a holder claim and "does not contend that it either purchased or sold" securities. (*See* BSD Br. at 35.) Consequently, the Martin Act would not preempt Count VIII against the Affiliated Directors even if New York law applied.[13]

Lastly, courts have held that the Martin Act does not preempt fiduciary duty claims even when asserted in connection with the purchase or sale of securities. *See Cromer Fin. Ltd. v. Berger,* 00 Civ. 2284 (DLC), 00 Civ. 2498 (DLC), 2001 U.S. Dist. LEXIS 14744, at *13-14 (S.D.N.Y. 2001) (citing *Scalp & Blade, Inc. v. Advest, Inc.*, 281 A.D. 2d 882, 883 (N.Y. App. Div. 2001) (stating that "nothing in the Martin Act, or in the Court of Appeals cases construing it, precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney-General a basis for proceeding civilly or criminally against a defendant under the Martin Act.")).

### B.     The Exculpatory Provisions Of The Partnership Documents Do Not Bar The Claims Against The Affiliated Director Defendants

The LPA's exculpation clause does not bar claims based upon "fraud, bad faith, gross negligence, or willful misconduct." (*See* LPA at 30.) Because Count VII alleges that the

---

[13] Indeed, were Defendants correct, derivative actions on behalf of New York business organizations would effectively be outlawed, a proposition for which Defendants have offered no authority. Under N.Y. Bus. Corp. Law § 626 and N.Y. Partnership Law § 115–a, New York courts routinely allow corporate shareholders and limited partners to bring derivative suits for breaches of fiduciary duty with no mention of Martin Act preemption. *See, e.g., Tzolis v. Wolff*, 10 N.Y.3d 100 (N.Y. 2008) (recognizing the validity of these sections while holding members of an LLC may bring derivative suits on the LLC's behalf); *Bischoff v. Boar's Head Provisions Co.*, 436 F. Supp. 2d 626, 630 (S.D.N.Y. 2006) (concluding that N.Y. Partnership Law § 115–a provides "explicit authorization of derivative actions" for breach of fiduciary duty claims); *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 331 (S.D.N.Y. 2005) ("Under New York law, a shareholder always has standing to sue for harm to the corporation, as long as the suit is brought derivatively. . ."). *See also Malkinzon v. Kordonsky*, 2008 WL 5006431 (N.Y. App. Div. Nov. 28, 2008) (upholding derivative suit for breach of fiduciary duty with no mention of Martin Act preemption); *Herman v. Feinsmith*, 39 A.D.3d 327, 328 (N.Y. App. Div. 2007) (same); *Wolf v. Rand*, 258 A.D.2d 401, 403 (N.Y. App. Div. 1999) (same).

Affiliated Director Defendants acted with bad faith, gross negligence, and willful misconduct (¶ 431), the breach of fiduciary duty claims are not barred by the express terms of the exculpation clause. *See, e.g., Albert*, 2005 WL 2130607, at * 8 (gross negligence claim sustained where it did not fall within the scope of the exculpation clause).[14]

Defendants argue that the Complaint's allegations are not particularized enough to establish a cause of action based on director fraud, bad faith, gross negligence, or willful misconduct. (*See* BSD Br. at 44 ("There are no non-conclusory allegations. . .").)  Defendants' argument omits two key points:  (i) claims for breach of fiduciary duty are governed by the general notice pleading requirements of Fed. R. Civ. P. 8(a)(2); and (ii) the Complaint's allegations are sufficiently particularized to assert plausible claims (especially for the Director Defendants' gross negligence).

Fed. R. Civ. P. 8(a)(2) governs the pleading requirements for breach of fiduciary duty claims. *See Schupak v. Florescue*, No. 92 Civ. 1189 (JFK), No. 92 Civ. 1189 (JFK), 1993 WL 256572, at *3 (S.D.N.Y. July 8, 1993); *see also Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523 (S.D.N.Y. 2007) ("Rule 9(b)'s heightened requirements do not apply to a breach of fiduciary obligations to act in the best interest of the Company and its shareholders, in which case the more liberal pleading requirements of Rule 8 apply.") (internal quotations and citation omitted).  Thus, as long as the claims found in Count VII are *plausible* they should be sustained. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *see also Schuss v. Penfield Partners, L.P.*, C.A. No. 3132-VCP, 2008 WL 2433842, at * 10 (Del. Ch. June 13, 2008) (refusing to dismiss breach of fiduciary duty claim based on exculpation clause when plaintiffs

---

[14] Defendants' citations merely highlight this point. *See Trenwick America Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 194 (Del. Ch. 2006) (recognizing the need "to plead a claim not exculpated by the [corporation's] charter"); *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) (plaintiff must plead a claim "that is not barred by the exculpatory charter").

"conceivably could prove Defendants adopted their interpretation in bad faith or as a result of gross negligence or willful misconduct"); *In re LNR Property Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del. Ch. 2005) (premature to dismiss breach of fiduciary duty claims on motion to dismiss despite "insubstantial nature of allegations"); *Anglo American Sec. Fund, L.P. v. S.R. Global International Fund, L.P.*, 829 A.2d 143, 157 (Del. Ch. 2003) ("It is impossible to determine at this stage of the litigation whether the breach of fiduciary duty and negligence claims are subject to exculpation under this provision.").

Despite Defendants' blanket statement otherwise, the Complaint alleges facts demonstrating that the Director Defendants engaged in non-exculpated conduct.[15]  Specifically, the Affiliated Director Defendants acted in bad faith and/or were grossly negligent by, among other things:  (i) failing to oversee the operations of the Master Fund (¶ 53); (ii) completely ignoring the investment objectives set forth in the Partnership Documents and allowing BSAM to dump illiquid and valueless securities into the Master Fund in order to serve Defendants' financial interests (¶¶ 88-97, 123, 149); and (iii) permitting rampant self-dealing by failing to enforce the PPM's requirements regarding related-party transactions (¶¶ 160, 174, 179, 263).

Allegations such as these are clearly sufficient *at the pleading stage* to establish gross negligence if not outright bad faith.  *See Anglo American Sec. Fund*, 829 A.2d at 157 ("Until a factual record is developed, a determination of the applicability of the exculpatory provision to the claims would be premature."); *see also Buckley*, 2007 WL 956947, at *6 (holding director defendants acted with "knowing and deliberate indifference" when they stopped examining delinquent accounts); *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc.*

---

[15]  Delaware law currently defines bad faith as an "intentional dereliction of duty or the conscious disregard for one's responsibilities," whereas gross negligence is defined as "conduct that constitutes reckless indifference or actions that are without the bounds of reason."  *McPadden v. Sidhu*, Civil Action No. 3310-CC, 2008 WL 4017052, at * 32-33 (Del. Ch. Aug. 29, 2008) (discussing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64–67 (Del. 2006)).

*v. Elkins*, No. Civ. A. 20228-NC, 2004 WL 1949290, at *15 (Del. Ch. Aug. 24, 2004) (denying

the protection of exculpation clause where director defendants acted with knowing and deliberate

indifference by approving a loan program without consideration, deliberation, or advice from an

expert).

**VI.    THE COMPLAINT STATES CLAIMS AGAINST THE BEAR STEARNS
CORPORATE DEFENDANTS AND THE AFFILIATED DIRECTOR
DEFENDANTS FOR AIDING AND ABETTING THE MANAGEMENT
DEFENDANTS' BREACHES OF FIDUCIARY DUTY (COUNTS IV & IX)**

The Defendants argue that the aiding and abetting claims in Counts IV and IX fail

because the Complaint does not allege:  (i) an underlying breach of fiduciary duty claim against

the Management Defendants under Counts I and VI;[16] and (ii) each defendant's "knowing

participation" in the breaches.  (BSD Br. at 51-52.)  As set forth above in Section(s) II and III,

Counts I and VI state valid breach of fiduciary duty claims against the Management

Defendants.[17]  The Complaint also adequately alleges that each of the Bear Stearns Corporate

Defendants and the Affiliated Director Defendants knowingly participated in the Management

Defendants' breaches.

Knowing participation in a fiduciary's breach requires the third party to act with

knowledge that the conduct advocated or assisted constitutes such a breach.  *See Malpiede*, 780

A.2d at 1097.  Knowledge need not be pled with particularity as to the aiding and abetting

defendants.  Rather, courts must analyze whether the complaint alleges facts that support a

*reasonable inference* that the third party "knowingly participated" in the fiduciary's breach.  *Id.*;

*see also Cargill, Inc. v. JWH Special Circumstance LLC*, C.A. No. 3234-VCP, 2008 WL

---

[16]  Counts I and IV are direct claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty,
whereas Counts VI and IX are derivative claims for breach of fiduciary duty and aiding and abetting breach of
fiduciary duty on behalf of the Partnership.

[17]  Indeed, the Bear Stearns Defendants explicitly concede that Navigator's class claim for breach of fiduciary duty
against the Management Defendants (Count I) states a claim against BSAM based upon, at least, BSAM's
misrepresentations and omissions to the Limited Partners.  (*See* BSD Br. at 4, 14, 73-74.)

4950069, at *21 (Del. Ch. Nov. 7, 2008) (facts supporting a reasonable inference that defendant

knowingly participated in fiduciary's breach are adequate to support aiding and abetting claim).[18]

(emphasis added).  The Complaint's allegations amply satisfy this standard.

**A.    The Complaint's Allegations Raise A Reasonable Inference That The
Bear Stearns Corporate Defendants Knowingly Participated In The
Breaches**

Defendants make only a single sweeping characterization of the Complaint's allegations

supporting the aiding and abetting breach of fiduciary duty claims (Counts IV and IX).  (BSD Br.

at 52 (referring only to, but not addressing ¶¶ 394–98 of Count IV).)  The Complaint, however,

alleges numerous facts, among others, giving rise to a reasonable inference that the Bear Stearns

Corporate Defendants knowingly participated in the Management Defendants' breaches of their

fiduciary duties to the Limited Partners and to the Partnership.  For example, the Bear Stearns

Corporate Defendants knowingly:

- Organized and/or managed structured finance vehicles
("Repackaging Vehicles") that issued the illiquid and high-risk
Repackaging Vehicle Junior Interests, which the Management
Defendants caused the Master Fund to purchase in increasing
amounts in derogation of the investment guidelines stated in the
Partnership Documents and without disclosure to investors (¶¶ 7,
93, 96-98, 123, 175);

- Earned substantial fees for arranging and managing the
Repackaging Vehicles, and depended on the Master Fund and the
Partnership to serve as the marketplace for otherwise illiquid and
unmarketable securities of the Bear Stearns Corporate Defendants
and other Bear Stearns entities (¶¶ 7, 10, 98, 118, 123, 176);

- Served as counter-parties for the Master Fund's Repo Agreements,
which ultimately allowed the Management Defendants to purchase
more and more of the illiquid and high-risk Repackaging Vehicle
Junior Interests issued by Bear Stearns entities (which also

---

[18]  Defendants provide no support for the unidentified "particularity requirements" that they contend apply to the aiding and abetting breach of fiduciary duty claims (Counts IV and IX) in the Complaint.  (BSD Br. at 52.)

generated fees at the expense of the Limited Partnership) (¶¶ 40, 102–105, 113, 118–19, 282);

- Facilitated the Management Defendants' departure from the investment objectives set forth in the Partnership Documents (¶¶ 97, 276–82.); and

- Participated in the Management Defendants' misrepresentations to Limited Partners in Master Fund financial statements and Monthly Performance Profiles which did not accurately reflect the Partnership's investments or financial condition.  (¶¶ 16-17, 278.)

The Complaint also points to particular activities by each Bear Stearns Corporate Defendant which evidence their knowing participation in the Management Defendants' breaches. For example, the Complaint alleges that BSC engaged in the daily valuation and monitoring of the CDO securities purchased by the Master Fund, which ultimately led to the collapse of the Master Fund and Partnership.  (¶¶ 10, 175.)  Specifically, BSC performed the "daily mark-to-market" valuation of these securities through its repo desk and portfolio management team. (¶¶ 128, 397, 447.)  The Complaint also asserts that BSC's Risk Management Department monitored the material components of the Master Fund's investments, including the minimal rating requirements dictated by the Partnership Documents, as well as overall and net leverage and investment portfolio concentrations.  (¶¶ 5, 90, 100.)  BSC's active valuation and monitoring of the securities that were integral to the Master Fund's investment portfolio gave it intimate knowledge of the credit risks associated with these investments.  Furthermore, BSC's activities in this regard helped facilitate the Management Defendants' breach of their fiduciary duty to monitor diligently the Master Fund's credit risk.  (¶¶ 97, 125-29, 276-82.)

BSC was also aware that the related-party transactions it and other Bear Stearns affiliates executed with the Master Fund were consummated without prior approval of the Master Fund's Independent Directors as required by the Investment Advisors Act and the terms of the

Partnership Documents.  As an initial matter, BSC's knowledge can be reasonably inferred from

its active participation as a counter-party to some of the thousands of Master Fund transactions

entered into without prior approval by the Independent Directors.  (¶¶ 183, 185.)  BSC's

knowledge is further evidenced by the September 2006 moratorium it placed on the Management

Defendants' ability to engage in such transactions.  (¶¶ 12, 193.)  The moratorium itself reveals

that BSC was aware of the ever increasing number of related-party transactions being executed

without the required Independent Director approval.  Moreover, despite this knowledge, BSC did

nothing to inform Limited Partners of the moratorium or the Management Defendants' repeated

failure to obtain prior approvals in violation of both the law and the explicit provisions of the

Partnership Documents.  (¶ 196.)  Taken together, these facts create a reasonable inference that

BSC knowingly participated in the Management Defendants' failure to obtain the required

Independent Director approvals in breach of their fiduciary duties.  *See, e.g., Cargill,* 2008 WL

4831483, at *21 (plaintiff's allegations supported a reasonable inference that defendant

knowingly participated in the breach of fiduciary duty by facilitating a transaction for the benefit

of defendant without regard to plaintiff's interests).

        Finally, BSC's knowing participation in the Management Defendants' breaches is evident

from its attempts to orchestrate a last-ditch sale of the Master Fund to the private equity

partnership Cerberus Capital Partners, L.P. ("Cerberus") in May 2007.  (¶ 245.)  As the

Complaint alleges, BSC co-President and co-Chief Operating Officer Warren Spector, provided

the Management Defendants with guidance on the sale presentation to Cerberus.  (¶¶ 20, 245.)

BSC's integral participation in the Management Defendants' final effort to prevent disclosure of

the Master Fund's true financial condition raises a more than reasonable inference that BSC had

full knowledge of the Master Fund's precarious status throughout.  Despite such knowledge,

BSC sat idly by without informing Limited Partners of the Master Fund's impending collapse as the Cerberus transaction fell through and the Management Defendants continued to conceal the Master Fund's dire financial situation.  (¶¶ 245-47.)  BSC's June 2007 announcement that it would provide $3.2 billion in secured financing to the Master Fund served only to facilitate this further concealment by the Management Defendants.  (¶ 251.)  These facts support a reasonable inference that BSC was a knowing participant in the Management Defendants' breaches of fiduciary duties to the Limited Partners and the Partnership.

The Complaint also contains specific allegations supporting reasonable inferences that both BS&Co. and BSSC knowingly participated in the Management Defendants breaches of fiduciary duties.  Specifically, it is alleged that BS&Co. entered into 85 securities transactions with the Master Fund which settled between January and June 2006 without prior approval from the unaffiliated directors of the Master Fund.  (¶ 182.)  Moreover, in March 2007, at the request of Defendants Cioffi and Tannin, BS&Co. salespeople agreed to tell investors that Tannin was increasing his Partnership investment, and to confront investor redemption requests with suggestions to increase investment in the Partnership.  (¶ 230.)  BS&Co. undertook both actions while aware of the Master Fund's disastrous performance, thereby aiding the Management Defendants' blatant breach of their fiduciary duties to the Limited Partners.  (*Id*.)  The Complaint also asserts that Defendant BSSC engaged in related-party transactions with the Master Fund with knowledge that the transactions were not being reviewed by the Independent Directors as required under the Investment Advisors Act and the Partnership Documents.  (¶¶ 398, 448.)  Additionally, BSSC knowingly provided prime brokerage and bank custodian services for Master Fund transactions involving other related counterparties which had no prior Independent Director approvals.  (¶¶ 4, 113, 175, 398, 448.)

As the foregoing demonstrates, the Complaint contains far more detailed allegations of knowing participation than the handful of allegations selectively cited by the Defendants.  (BSD Br. at 38-39, 52.)  Collectively, these factual allegations raise a reasonable inference that the Bear Stearns Corporate Defendants knowingly participated in the Management Defendants' breaches of fiduciary duties. *See, e.g., In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 375-76 (Del. Ch. 2002) (allegations established reasonable inference of knowing participation by the general partner's affiliate for purposes of limited partners' aiding and abetting breach of fiduciary duty claim against affiliate).

**B.    The Complaint's Allegations Raise A Reasonable Inference That The Affiliated Director Defendants Knowingly Participated In The Breaches**

The Complaint details the Affiliated Director Defendants' knowing failure to supervise the Management Defendants' operation of the Partnership and the Master Fund.  (¶¶ 54, 396, 446).  Specifically, the Affiliated Director Defendants' knowingly:

- Failed to oversee the operations of the Master Fund, including its investment and credit-risk hedging activities, for which the Affiliated Director Defendants had ultimate authority under the PPM (¶¶ 54, 160);

- Permitted the Management Defendants to exercise unfettered discretion to assign grossly inflated manager-mark valuations to Master Fund investments, including illiquid CDO securities, and other assets and collateral held by the Master Fund (¶¶ 54, 134, 262, 270-71, 290-92);

- Failed to enforce the PPM's requirements regarding Independent Director approval of related-party transactions between the Master Fund and Bear Stearns affiliated entities (¶¶ 161, 174-80);

- Ignored the investment objectives set forth in the Partnership Documents and allowed BSAM to dump illiquid securities into the Master Fund to serve the financial interests of those other than the Limited Partners (¶¶ 88-97, 123, 149); and

37

- • Allowed limitless self-dealing, non-arm's length, related-party transactions to take place between the Master Fund and Bear Stearns affiliated entities without meaningful review.  (¶¶ 263, 396, 446.)

Separately and together, these factual allegations support a reasonable inference that the Affiliated Director Defendants knowingly participated in the Management Defendants' breaches of fiduciary duties.

Because the Complaint sets forth facts raising, at least, a reasonable inference that the Bear Stearns Corporate Directors and the Affiliated Directors knowingly participated in the Management Defendants' breaches of their fiduciary duties as alleged in Counts I and IV of the Complaint, Counts IV and IX should be sustained.  *See Twin Bridges Ltd. P'ship v. Draper*, No. Civ. A. 2351-VCP, 2007 WL 2744609, at *24 (Del. Ch. Sept. 14, 2007) (counterclaimant pled sufficient facts such as plaintiff's assistance with fiduciary's self-interested dealings to support a reasonable inference of knowing participation in fiduciary breach); *Deutsch v. Cogan*, Civ. A. No. 8808, 1989 WL 34983, at *3 (Del. Ch. Apr. 11, 1989) (assistance with financial and operational affairs enough to permit a reasonable inference that defendants knowingly participated in the breach of fiduciary duty); *Allied Capital Corp. v. GC Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (holding an affiliate of a limited partner's general partner liable for aiding and abetting the general partner's breach of fiduciary duty by participating in a transaction that enriched the affiliate at the expense of the partnership).  Nothing more is required at this stage of the proceedings.

## VII.   THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW FRAUD AGAINST THE MANAGEMENT DEFENDANTS (COUNT III)

The Management Defendants challenge the Complaint's common law fraud claim (Count III) on two grounds:  (i) that claims based on the fraudulent inducement to retain securities (*i.e.,* "holder claims") are not recognized under Delaware law; and (ii) that class-action common law

fraud claims should be dismissed at the pleading stage because individual issues of reliance will eventually predominate over common questions, preventing class certification.  (BSD Br. at 34-36.)[19]  The Management Defendants' arguments do not support dismissal of Count III.

### A.      "Holders" May Bring Fraud Claims Under Delaware Law

Contrary to Defendants' arguments, Delaware law does not foreclose "holder" claims. Under Delaware law, to prevail on a claim of common law fraud, a party is required to show:  (i) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (ii) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (iii) the defendant intended to induce the plaintiff to act *or refrain from acting*; (iv) the plaintiff's action or *inaction* was taken in justifiable reliance upon the representation; and (v) damage to the plaintiff as a result of such reliance.  *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

Within this framework, Delaware recognizes fraudulently induced forbearance as a viable form of fraud.[20]  *See Shamrock Holdings of California, Inc. v. Iger*, No. 1330-N, 2005 WL 5756479, at *7 (Del. Ch. June 6, 2005) (shareholder plaintiffs adequately alleged that defendants' fraudulent statements induced them *not* to pursue the proxy battle they initially

---

[19]  Each of the other Management Defendants joins in the Bear Stearns Defendants' arguments as to this Count. (*See* Cioffi Br. at 3; Tannin Br. at 2; and McGarrigal Br. at 6.)

[20]  For that matter, courts in this Circuit and elsewhere have long recognized common law fraud claims where the plaintiff was fraudulently induced to retain an investment.  *See, e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, 376 F. Supp. 385, 407 (S.D.N.Y. 2007) ("Unlike the federal securities claim … the common law fraud claim reaches alleged injuries based upon plaintiffs' decisions to *retain* their investments in reliance upon the alleged fraud.") (emphasis added); *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 204 (S.D.N.Y. 2006) (holding "New York recognizes a claim of fraud where investors induced to retain securities in reliance on a defendant's misrepresentations."); *In re Worldcom, Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559 (S.D.N.Y. 2005) (same); *Gutman v. Howard Savings Bank*, 748 F. Supp. 254, 263 (D. N.J. 1990) ("The Court concludes that, under New York law, a plaintiff may state a common law fraud claim against a defendant whose misrepresentations caused plaintiff to *hold* securities which plaintiff otherwise would have sold.") (emphasis added); *Small v. Fritz Cos.*, 65 P.3d 1255, 1258 (Cal. 2003) (recognizing a cause of action for a stockholder induced by fraud to refrain from selling stock); *Reisman v. KPMG Peat Marwick LLP*, 787 N.E.2d 1060, 1068–70 (Mass. App. Ct. 2003) (recognizing holder claims under Massachusetts law).

threatened) (emphasis added); *Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 260 (D. Del. 2006) (plaintiff justifiably relied on defendant's fraudulent concealment in refraining from taking action to ensure that his name was on patents). Although the Management Defendants mischaracterize Delaware law as prohibiting "holder" claims, the only Delaware case they cite for the proposition, *Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002), did no such thing. In *Manzo*, the common law fraud claims were dismissed because the plaintiff failed to adequately allege reliance and damages. The court did not disallow, or even directly address, holder claims.

The Management Defendants' misrepresentations and omissions fraudulently induced the Limited Partners to refrain from exercising their redemption rights and/or petitioning for the removal of BSAM as General Partner. (¶¶ 16, 19, 25, 75, 82, 230-36, 241-52, 386-88.) Had the Management Defendants made truthful disclosures, each Limited Partner would have taken steps to avoid losses, including redeeming funds from their individual Capital Accounts and petitioning for the removal of BSAM as General Partner -- both of which they were specifically entitled to do under the Partnership Documents. (¶¶ 151-59, 388.) Each Limited Partner's inaction was taken in justifiable reliance on the Management Defendants' misrepresentations, stating a claim for common law fraud. (*See* ¶¶ 230-36, 386-87).

### B.   Defendants' Class Certification Observations Do Not Warrant Dismissal of Count III

The Management Defendants erroneously argue that, as a matter of law, common law fraud claims may not be maintained on a class-wide basis because individual questions of reliance will inevitably predominate over common questions. (BSD Br. at 34.) While Delaware law precludes *purely* common law fraud cases from being brought as a class action, Delaware

law does not preclude such claims when additional claims are adequately established, such as the

breach of contract claim in Count II that BSAM admits states a valid cause of action.

For example, in *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992), the Delaware

Supreme Court merely refused to *certify* a class action in a "*purely*" common law fraud case.  In

*Zirn*, 621 A.2d at 783, on the other hand, the Delaware Supreme Court rejected the defendant's

argument that a class-wide fraud claim should not have been certified where breach of fiduciary

duty claims were also asserted:  "so long as the fiduciary [duty] claims survive, class certification

continues to be appropriate."  As BSAM concedes, Navigator has adequately alleged a breach of

fiduciary duty claim in Count I; and a breach of contract claim in Count II.  As a result, the Court

should sustain Navigator's common law fraud claim.[21]

## VIII.  THE COMPLAINT STATES A CLAIM AGAINST THE BEAR STEARNS CORPORATE DEFENDANTS AND THE AFFILIATED DIRECTOR DEFENDANTS FOR AIDING AND ABETTING COMMON LAW FRAUD (COUNT V)

To state a claim for aiding and abetting fraud, a plaintiff must allege:  "(1) the existence

of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided

substantial assistance to advance the fraud's commission."  *JP Morgan Chase Bank v. Winnick*,

406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (interpreting New York law) (citations omitted); *see

also Anderson v. Airco, Inc.*, No. Civ. A. 02C-12-091HDR, 2004 WL 2827887, at *4 (Del.

Super. Nov. 30, 2004) (under Delaware law, "[l]iability for aiding and abetting requires . . .

underlying tortuous conduct, knowledge, and substantial assistance").  Each of these elements

has been satisfied here.

---

[21]  *Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *4 (Del. Ch. Dec. 19, 2002) is inapposite because the court dismissed the fiduciary duty claim on other grounds, leaving nothing but a class claim for common law fraud.  The chancery court's decision in *Oliver v. Boston Univ.*, No. 16570, 2000 WL 1091480, at * 11 (Del. Ch. July 18, 2000) is also distinguishable because the plaintiff failed to establish even an individual claim for fraud by failing "to allege specific facts that if true would show that [defendants] knew of the alleged misrepresentations."

Under New York law, the "knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud."  *See Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996).  However, in pleading actual knowledge, the allegations set forth in the complaint do "not have to be based on defendant's explicit acknowledgement of the fraud," but can be drawn from facts which evidence such knowledge. *See*, *e.g.*, *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297, at *33 (S.D.N.Y. Oct. 20, 2008) (finding actual knowledge of fraud where defendant managing partners knew that allegedly fraudulent partnership documents misrepresented their role in partnership operations); *Winnick*, 406 F. Supp. 2d at 249 (actual knowledge pled where alleged aider and abettor was copied on three e-mails which vaguely stated that telecommunications company was fraudulently "taking capacity" to meet revenue targets).

Delaware law does not require an explicit showing of actual knowledge, but rather "well-pleaded facts from which it can reasonably be inferred that [the fraud] was knowable and that the defendant was in a position to know it."  *Albert*, 2005 WL 2130607, at *11.  The detailed allegations in the Complaint support a finding that the Bear Stearns Corporate Defendants and the Affiliated Director Defendants had knowledge of the Management Defendants' fraud under both the New York and Delaware standard.

The Bear Stearns Defendants erroneously assert that the Complaint fails to allege either: (i) an underlying fraud claim against the Management Defendants under Count III; or (ii) knowledge of the Management Defendants' fraud by the Bear Stearns Corporate Defendants and Affiliated Director Defendants.  (BSD Br. at 36-38.)[22]  As discussed above in Section VII, the Complaint alleges a valid fraud claim against the Management Defendants.  Moreover, the

[22] Notably, the Defendants do not address the "substantial assistance" element of the aiding and abetting fraud claims, and thereby, concede that the Complaint alleges sufficient facts describing the Bear Stearns Corporate Defendants' and the Affiliated Director Defendants' substantial assistance to the Management Defendants' fraud.

Complaint alleges facts with requisite particularity demonstrating that the Bear Stearns Corporate Defendants and the Affiliated Director Defendants had knowledge of the Management Defendants' fraud.  Indeed, their actual knowledge is demonstrated by the same conduct alleged in the Complaint which establishes their knowing participation in the Management Defendants' breaches of fiduciary duties.

In sum, and as described in greater detail above in Section VI, the Complaint establishes that the Bear Stearns Corporate Defendants knowingly:  (i) failed to monitor the activities of the Management Defendants with respect to their management and investments; (ii) entered into numerous related-party transactions that further facilitated the Management Defendants' wrongdoing -- including giving the Management Defendants limitless freedom in exchange for revenues for BSAM; (iii) facilitated the Management Defendants' departure from the investment objectives set forth in the Partnership Documents; (iv) assisted the Management Defendants in their misrepresentation of the true volume of Partnership redemption requests and execution of subscriptions; and (v) participated in the Management Defendants' misrepresentations to Limited Partners in Master Fund financial statements and Monthly Performance Profiles which did not accurately reflect the Partnership's investments or financial condition.  (¶¶ 16-17, 25, 35-41, 97, 230, 263, 276-82, 398, 404-16.)

Similarly, and as described in greater detail above in Section V.I.B.,  the Complaint details how the Affiliated Director Defendants knowingly:  (i) failed to uphold their oversight and independent directorial duties while having actual knowledge of the numerous related-party transactions that only served the Management Defendants' fraudulent interests at the expense and to the detriment of the Limited Partners and the Partnership (¶¶ 50-57, 149, 160-61, 174, 179, 263, 404-16); (ii) permitted the Management Defendants to assign overvalued manager-

mark valuations to Master Fund investments (¶¶ 54, 134, 262, 270-71, 290-92); and (iii) allowed BSAM to dump illiquid securities into the Master Fund contrary to stated investment objectives (¶¶ 88-97, 123, 149).

Because the Complaint's allegations are particularized with respect to each Defendant's actual knowledge of the fraud committed by the Management Defendants, Count V should be sustained.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny the

Motions to Dismiss filed by the Management Defendants, the Bear Stearns Corporate

Defendants, and the Affiliated Director Defendants.

Dated:  December 3, 2008

Respectfully Submitted,


By:_____/s/_____
    Andrew J. Entwistle
    Vincent R. Cappucci
    Stephen D. Oestreich
    Johnston de F. Whitman, Jr.
    Jonathan H. Beemer
    Joshua K. Porter
    **ENTWISTLE & CAPPUCCI LLP**
    280 Park Avenue, 26th Floor West
    New York, New York 10017
    (212) 894-7200

    Douglas R. Hirsch
    **SADIS & GOLDBERG LLP**
    551 Fifth Avenue, 21st Floor
    New York, New York 10176
    (212) 947-3793

    *Attorneys for Plaintiff and the Class*

45