UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

NAVIGATOR CAPITAL PARTNERS, L.P., :
on behalf of itself and all others similarly situated, :
:
Plaintiff, :
:
- against - :
:
BEAR STEARNS ASSET MANAGEMENT :
INC., *et al.*, :
Defendants. :
:

---------------------------------------- x

GEOFFREY VARGA and WILLIAM : 07-CV-07783 (AKH)
CLEGHORN, *et al.*, : 08-CV-03397 (AKH)
:
Plaintiffs, : REPLY DECLARATION OF
: <u>MARJORIE E. SHELDON</u>
- against - :
:
THE BEAR STEARNS COMPANIES, INC., :
*et al.*, :
:
Defendants. :

---------------------------------------- x

      MARJORIE E. SHELDON, an attorney duly admitted to practice before the Bar of this Court, hereby declares under penalty of perjury:

    1.    I am Special Counsel with the law firm of Kramer Levin Naftalis & Frankel LLP, attorneys for defendants The Bear Stearns Companies, Inc. (now known as The Bear Stearns Companies LLC), Bear Stearns Asset Management Inc., Bear Stearns & Co. Inc. (now known as JPMorgan Securities Inc.), Bear Stearns Securities Corp. (now known as JPMorgan Clearing Corp.), Barry Cohen, Gerald Cummins, David Sandelovsky, Greg Quental, Michael Guarasci and George Buxton (together, the "Bear Stearns Defendants") in the above-captioned actions. I

respectfully submit this reply declaration to provide the Court with the documents that are cited in the reply memoranda of law in support of the Bear Stearns Defendants' motions to dismiss.

2. Attached as Exhibit A is a true and correct copy of a letter from John Milsom to all Limited Partners in the EL Domestic Fund, dated June 25, 2008.

3. Attached as Exhibit B is a true and correct copy of a transcript from the liquidation proceedings before the Cayman Islands Court relating to the Overseas Funds, dated February 22, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on December 19, 2008.

/Marjorie E. Sheldon

# **Exhibit A**



KPMG United Kingdom Plc
8 Salisbury Square
London EC4Y 8BB
United Kingdom

Tel +44 (0) 207 694 3243
Fax +44 (0) 207 694 3533
DX 38050 Blackfriars

**TO ALL LIMITED PARTNERS**

Our ref   jm/to

25 June 2008

Dear Sir or Madam

**Bear Stearns High-Grade Structured Credit Strategies Enhance Leverage Fund, L.P. – in liquidation (the 'Feeder Fund')**

Please find enclosed a copy of a notice sent to limited partners of the Feeder Fund (the 'Limited Partners') in respect of the decision by John Milsom and Richard Heis (the 'Joint Liquidators') to waive the pre-approval requirement for the resignation or withdrawal of Limited Partners from the Feeder Fund giving you the opportunity to resign, or withdraw from, or "abandon" your interest should you chose to do so.

If you have any questions please do not hesitate to contact Tony Oakley or Mark Cook via email at tony.oakley@kpmg.co.uk or mark.cook@kpmg.co.uk, respectively, by fax at +44(0) 207 311 3533, by telephone on +44(0) 207 311 3243 or at the postal address at the top of this letter.

Yours faithfully

John Milsom
*Joint Liquidator*

John David Thomas Milsom and Richard Heis are authorised to act as insolvency practitioners by the Institute of Chartered Accountants in England & Wales



KPMG United Kingdom Plc
8 Salisbury Square
London EC4Y 8BB
United Kingdom

Tel +44 (0) 207 694 3243
Fax +44 (0) 207 694 3533
DX 38050 Blackfriars

**TO ALL LIMITED PARTNERS**

Our ref   jm/to

25 June 2008

Dear Sir or Madam

**Bear Stearns High-Grade Structured Credit Strategies, L.P. – in liquidation (the 'Feeder Fund')**

Please find enclosed a copy of a notice sent to limited partners of the Feeder Fund (the 'Limited Partners') in respect of the decision by John Milsom and Richard Heis (the 'Joint Liquidators') to waive the pre-approval requirement for the resignation or withdrawal of Limited Partners from the Feeder Fund giving you the opportunity to resign, or withdraw from, or "abandon" your interest should you chose to do so.

If you have any questions please do not hesitate to contact Tony Oakley or Mark Cook via email at tony.oakley@kpmg.co.uk or mark.cook@kpmg.co.uk, respectively, by fax at +44(0) 207 311 3533, by telephone on +44(0) 207 311 3243 or at the postal address at the top of this letter.

Yours faithfully

John Milsom
*Joint Liquidator*

John David Thomas Milsom and Richard Heis are authorised to act as insolvency practitioners by the Institute of Chartered Accountants in England & Wales

**NOTICE TO THE LIMITED PARTNERS OF:**

**A) BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES, L.P.**

**B) BEAR STEARNS HIGH-GRADE STRUCTURED CREDIT STRATEGIES ENHANCED LEVERAGE FUND, L.P.**

**PURPOSE**

The purpose of this Notice is to advise the limited partners (the "Limited Partners") of Bear Stearns High-Grade Structured Credit Strategies, L.P. (the "Original Delaware Feeder Fund") and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. (the "Enhanced Delaware Feeder Fund" and together with the Original Delaware Feeder Fund, collectively, the "Delaware Feeder Funds") that the liquidators of the Delaware Feeder Funds, John Milsom and Richard Heis, Restructuring Directors of KPMG United Kingdom Plc (collectively, the "Liquidators"), have decided to waive the pre-approval requirement for the resignation or withdrawal of Limited Partners set forth in the limited partnership agreements for the respective Delaware Feeder Funds with immediate effect. See: Amended and Restated Limited Partnership Agreement of the Bear Stearns High-Grade Structured Credit Strategies, L.P., dated as of August 31, 2006, Article 6.3; and Amended and Restated Limited Partnership Agreement of the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P., dated as of July 31, 2006, Article 6.3. If a Limited Partner wishes to resign or withdraw from, or "abandon," his or her interest in either Delaware Feeder Fund, he or she should notify the Liquidators in writing by sending an email to Tony Oakley at tony.oakley@kpmg.co.uk, or by fax on +44 (0) 207 311 3533, or in writing to Tony Oakley, KPMG United Kingdom Plc, 8 Salisbury Square, London, EC4Y 8BB, United Kingom, stating his or her name and Social Security Number, identifying which Delaware Feeder Fund(s) he or she wishes to resign or withdraw from, and stating his or her approximate ownership percentage(s). The Liquidators have been advised by legal counsel that, in the event a Limited Partner resigns or withdraws from the Delaware Feeder Funds, he or she will have no further rights as a Limited Partner.

**BACKGROUND**

The Liquidators have received U.S. federal income tax advice to the effect that the Delaware Feeder Funds may earn cancellation of debt income ("CODI") as a result of certain actions that creditors of the respective Delaware Feeder Funds may take in the future, or a distributive share of CODI as a result of certain actions that creditors of the respective master funds may take in the future. The two master funds, which are both in liquidation in the Cayman Islands, are: (a) Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "Original Master Fund"), and (b) Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Master Fund" and together with the Original Master Fund, collectively, the "Master Funds").

Debt and other obligations exist at the level of the Master Funds and the Delaware Feeder Funds. For example, the Liquidators understand that the "leveraged total return swap" entered into by the Enhanced Delaware Feeder Fund with Barclays Bank PLC was intended to constitute debt for U.S. federal income tax purposes equal to the "initial notional amount" invested as cash by Barclays Bank PLC in the Enhanced Master Fund.

The Liquidators also have been advised that certain Limited Partners who are U.S. citizens or resident aliens may be subject to tax on their distributive shares of any CODI. CODI may be treated as ordinary income that is subject to U.S. federal income tax at 35 percent, while the offsetting loss that Limited Partners are likely to incur as a result of their investment, as adjusted for any CODI inclusion, in the Delaware Feeder Funds may be capital. If an individual Limited Partner's loss arising out of an investment in one of the Delaware Feeder Funds results in a capital loss, such capital loss will not be deductible against more than $3,000 of ordinary income (after offsetting capital gains). On the other hand, any Limited Partner who is the subject of a U.S. bankruptcy proceeding or is insolvent may be able to exclude his or her distributive share of CODI, but will be required to reduce certain U.S. federal income tax attributes (if available), e.g. net operating losses. The Liquidators also have been advised that the Delaware Feeder Funds may be able to avoid earning some or all of the CODI that they would otherwise be allocated as a distributive share from the Master Funds if they resign from, or "abandon", their interests in the Master Funds <u>before</u> the event occurs which causes the Master Funds to recognize such CODI.

The Liquidators also are aware that certain Limited Partners may have joined in class actions and/or arbitration claims relating to the Master Funds. The Liquidators have sought legal advice as to whether any Limited Partner's rights in connection therewith could be adversely affected if the Delaware Feeder Funds resign, withdraw or "abandon" their interests in the Master Funds. The Liquidators have <u>not</u> been able to obtain unequivocal legal advice confirming that the Delaware Feeder Funds' resignation, withdrawal or abandonment of their interests in the Master Funds would in no case prejudice a Limited Partner's rights. Accordingly, in order not to affect such rights, the Liquidators have decided <u>not</u> to cause the Feeder Funds to abandon their interests in the Master Funds at this time.

Nevertheless, the Liquidators wish to facilitate Limited Partners abandoning their interests in the Delaware Feeder Funds if they choose to do so. Accordingly, the Liquidators hereby waive the pre-approval requirement for the resignation or withdrawal of Limited Partners set forth in the respective limited partnership agreements of the Delaware Feeder Funds. This waiver has immediate effect. If you wish to abandon your interest in any Delaware Feeder Fund, please do so in writing in the manner set forth under the "<u>PURPOSE</u>" heading, above.

**<u>Please note that nothing contained herein constitutes legal or tax advice to the Limited Partners, and they are strongly urged to consult their own legal and tax advisors on the potential legal and tax consequences of abandoning their interests in the Delaware Feeder Funds or withdrawing or resigning as Limited Partners, or of not doing so.</u>** For example, abandonment may cause Limited Partners to lose some or all of their shares of any cash recovery by the Delaware

2

Feeder Funds, and/or some or all of their rights to proceed by class action, arbitration claim, or otherwise against the Master Funds, Bear Stearns, or Bear Stearns employees. In addition, a Limited Partner may accelerate recognition of taxable gain by abandoning his or her interest at this time. Conversely, a Limited Partner who does not abandon his or her interest in a Delaware Feeder Fund may increase his or her share of any CODI earned by that fund directly or as a distributive share of the relevant Master Fund's CODI because other Limited Partners have abandoned their rights to such CODI and the amount of CODI to be allocated among the Limited Partners remains constant.

**NO GUARANTEE CAN BE MADE THAT A LIMITED PARTNER WILL SUCCEED IN AVOIDING SOME OR ALL OF SUCH LIMITED PARTNER'S DISTRIBUTIVE SHARE OF CODI IF SUCH LIMITED PARTNER ABANDONS HIS OR HER INTEREST IN THE DELAWARE FEEDER FUNDS. MOREOVER, AT THIS TIME NO ASSURANCE CAN BE GIVEN AS TO THE EVENTUAL TAX TREATMENT OF ANY LIMITED PARTNER'S DISTRIBUTIVE SHARE OF ANY CODI THAT MAY RESULT FROM ACTIONS TAKEN BY THE MASTER FUNDS OR IN CONNECTION WITH THE LIQUIDATION OF THE MASTER FUNDS OR DELAWARE FEEDER FUNDS.** The Liquidators are not in possession of the information needed to develop a view on the possibility that the Delaware Feeder Funds or Master Funds have earned or will earn CODI, or on the U.S. federal income tax effect of a Limited Partner's abandonment of his or her interest in a Delaware Feeder Fund. As for the events that occurred at the Master Fund level in 2007, the Liquidators do not anticipate being informed of their U.S. federal income tax characterization until the U.S. federal income tax preparer for the Master Funds (who is in the process of being appointed) delivers the 2007 Forms 1065 for the Master Funds and the 2007 Schedules K-1 for the Delaware Feeder Funds.

In light of the nature of the debt and other obligations of the Delaware Feeder Funds and Master Funds, it is possible that they have not recognized, and will not in the future recognize, any CODI. Alternatively, it is possible that the Delaware Feeder Funds and Master Funds have the potential of earning CODI, but that all the events that cause the recognition of all such income have already occurred, in which case abandonment now by the Limited Partners of their interests in the Delaware Feeder Funds would have a zero or reduced contribution to the goal of avoiding such income. The Liquidators note, however, that the stay against the creditors' foreclosure on the assets of the Master Funds entered by the U.S. Bankruptcy Court pending the appeal of that Court's denial of the Master Funds' Chapter 15 Recognition Motion is due to terminate on June 30, 2008. While actions taken by creditors of the Master Funds to date may limit the significance of this event, it is possible that additional actions may occur immediately after such termination which would cause the Master Funds and/or the Delaware Feeder Funds to earn CODI.

While this Notice is not intended to constitute legal or tax advice, to ensure compliance with requirements imposed by the Internal Revenue Service in Circular 230 on tax practitioners, we inform you that, unless we expressly state otherwise in this communication (including any attachments), if any information in this communication is deemed to be federal tax advice, it is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal

3

Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or other matter addressed herein.

This Notice is addressed to all Limited Partners, whether they are individuals or entities.

Please direct any questions about this Notice to Tony Oakley by email at tony.oakley@kpmg.co.uk, fax on +44 (0) 207 311 3533, or write to Tony Oakley, KPMG United Kingdom Plc, 8 Salisbury Square, London, EC4Y 8BB, United Kingdom.

John Milsom
Joint Liquidator
KPMG United Kingdom Plc
London, United Kingdom, June 25, 2008

# **Exhibit B**

### Page 491

1 **FRIDAY, FEBRUARY 22, 2008**
2
3 — COMMENCED AT 4:18.
4
5     THE COURT: Good afternoon.
6     In the time available, having thought
7 about the matter and reviewed the arguments, I
8 have been allowed only time to frame a very
9 brief summary of my decision. If necessary,
10 I'm prepared at a later time to give fuller
11 written reasons.
12     I'll now read the summary of the decision.
13
14     ———————
15
16     **RULING**
17 SMELLIE, C.J.
18     I have before me Ordinary Applications
19 brought in the Causes 551 and 552 of 2007 by
20 the investors in Bear Stearns High-Grade
21 Structured Credit Strategies Enhanced Leverage
22 (Overseas) Ltd. ("HGEL") and Bear Stearns
23 High-Grade Structured Credit Strategies
24 (Overseas) Ltd. ("High Grade").
25     HGEL and High Grade are both exempted

### Page 492

1 limited liability companies organised and
2 incorporated under the Companies Law of the
3 Cayman Islands. Both have been placed into
4 voluntary liquidation by resolution of the
5 members holding their ordinary voting shares.
6 Both were promoted and managed by Bear Stearns
7 Asset Management as their investment manager.
8     These Ordinary Applications are in effect
9 brought as cross-applications to petitions now
10 before the court for the voluntary liquidations
11 to continue under the supervision of the court.
12     The relief sought by the Investors are of
13 varying and alternative kinds.
14     In HGEL and High Grade applications, the
15 first relief sought are orders setting aside
16 the resolutions purportedly passed by the
17 shareholder of the companies respectively in
18 General Meetings on the 1st of November 2007 to
19 appoint Messrs Simon Whicker and Chris Beighton
20 of KPMG as Joint Voluntary Liquidators of the
21 companies - the resolutions aforementioned by
22 which the companies were placed into voluntary
23 winding up.
24     The first head of relief required a trial
25 of factual allegations of a very serious and

### Page 493

1 troubling nature going to the central issue
2 whether or not the powers to pass resolutions
3 by which the companies were placed into
4 voluntary liquidation were exercised for an
5 improper purpose and if so, whether those
6 powers were exercised in breach of the
7 fiduciary duties and obligations owed to those
8 having the real financial interests in the
9 companies, that is the applicant Investors,
10 among others.
11     The specific improper purpose alleged is
12 to the effect that the voting shareholders
13 (that is Walkers SPV as trustees of the STAR
14 Trust that holds the voting shares) resolved to
15 place the companies into liquidation in order
16 to stymie or thwart a removal petition which
17 had been notified by the participating
18 shareholders to be voted on for the removal of
19 the directors of HGEL, i.e. officers of Bear
20 Stearns Asset Management and Walkers Fund
21 Services, and to replace them with directors of
22 their own choosing. These would be new
23 directors whom the participating shareholders
24 intended to investigate into the massive losses
25 which had been suffered by the Funds of the

### Page 494

1 Companies.
2     In short, the allegation is that the
3 resolutions for voluntary winding up was a step
4 taken by the directors and by the trustee at
5 BSAM's behest and for BSAM's benefit and not in
6 the interest of the only persons who at that
7 stage mattered, that is, the Investors.
8     The relevant background to these
9 allegations had been canvassed in some detail
10 over the past three days and there have been
11 extensive cross-examination of an officer
12 respectively of Walkers Fund Services
13 (Mr. Scott Lennon) and of Walkers SPV
14 (Mr. David Egglishaw).
15     For reasons which I need not elaborate now
16 (but would be prepared to if asked), I am led
17 to an irresistible impression that the manner
18 of the conduct of the directors, trustee and
19 the lawyers advising them over the resolutions
20 for winding up was clandestine and suspicious
21 and was certainly in breach of the strict
22 prohibition in the STAR Trust, that is the
23 prohibition against such a resolution being
24 taken during the pendancy of the Investors'
25 petition for the removal of the directors.

495
(NOT REVIEWED BY THE CHIEF JUSTICE)

1  The only issue that separates this
2  impression that I have formed from an outright
3  conclusion that the resolutions were not taken
4  "bona fide in the interests of the companies"
5  is the further requirement of a positive
6  finding of actual knowledge and of collusion in
7  the improper purpose on the part of Walkers SPV
8  as trustee, in this instance, in the person of
9  Mr. David Egglishaw. This is although even in
10 his case, there are also highly suspicious
11 circumstances from which the necessary scienter
12 might well be inferred; if one were obliged to
13 put that issue to the test.
14     I do not do so now for two reasons:
15     First, among the various alternative kinds
16 of relief sought by the Investors, it seems to
17 me a finding of invalidity of the winding up
18 resolutions to which a finding of improper
19 purpose would lead, would be the outcome
20 perhaps least advantageous to the Investors.
21     This is because, whatever may have been
22 the true financial position of the Companies on
23 1st November 2007 when the resolutions to wind
24 up were taken, the Companies have now lost
25 their substrata and on the just and equitable

496
(NOT REVIEWED BY THE CHIEF JUSTICE)

1  basis are liable to be wound up in any event.
2     To my mind, the real question now is not
3  whether the Companies must be wound up, but
4  rather how best in the context of their winding
5  up to secure the interests of those having the
6  real financial stake in the outcome.
7     My second reason is that however
8  improbable it may seem from all the
9  circumstances that Mr. Egglishaw did not have
10 actual knowledge of the removal petition, a
11 conclusion that he, in fact, had that knowledge
12 is one which I could now arrive at only as I
13 matter of inference. While I would be entitled
14 to consider drawing that inference if compelled
15 to do so to decide the question of the
16 invalidity of the winding up resolution, I am
17 not so bound to do if, as a matter of
18 discretion, I consider, as I do, that another
19 form of relief would be in the best interest of
20 the Investors.
21     The attribution of the directors'
22 knowledge to the trustee is perhaps another
23 route by which the conclusion of invalidity
24 could have been reached, but as a legal
25 concept, the principles are not free from

497
(NOT REVIEWED BY THE CHIEF JUSTICE)

1  difficulty if, as here, the attribution would
2  have to be made by disregarding the corporate
3  identities of the separate legal entities
4  within which the individual directors and the
5  trustee operated.
6     The conclusion at which I have arrived is
7  that the Joint Voluntary Liquidators should be
8  required to step aside in deference to other
9  liquidators of the Investors' choosing and who
10 will enjoy the confidence of the Investors.
11     By this I wish to emphasise that no
12 suggestion whatsoever of impropriety or
13 incompetence on the part of the Joint Voluntary
14 Liquidators is intended. On the contrary, all
15 parties have been keen to acknowledge the high
16 reputation of KPMG and of its nominated
17 officers here.
18     The problem, as I see it, is primarily the
19 potential conflict of interest facing the JVLs
20 in their dual capacity as liquidators of the
21 insolvent Master Funds as well.
22     In that latter capacity, their primary
23 obligation would be to the creditors of the
24 Master Fund.
25     Already some $600 million in creditor

498
(NOT REVIEWED BY THE CHIEF JUSTICE)

1  claims have been anticipated against assets in
2  hand within the Master Fund of only some $40 -
3  50 million.
4     To the extent that the Investors in these
5  Companies (which are the Feeder Funds) will
6  have claims against the Master Fund and its
7  promoters and investment managers, it is clear
8  that the Joint Voluntary Liquidators' primary
9  obligation would not be to them, but would be
10 to the creditors.
11     The implication of this is that the costs
12 of the investigation and prosecution of claims
13 arising from the losses suffered by the Feeder
14 Funds will have to be borne by the Investors.
15     Better then, from the Investors' point of
16 view, that if they wish to fund the liquidation
17 with a view to the recovery of any of their
18 huge losses of equity (in the order I am told
19 of some $600 million) they should be able to do
20 so through liquidators in whom they have full
21 confidence as being committed to securing first
22 their own interests.
23     While BSAM has provided initial funding of
24 $1.25 million to the Joint Voluntary
25 Liquidators as a precondition to the acceptance

## 499

1. of their appointment, I am told that less than
2. half that amount remains in the Estate of the
3. Feeder Funds. It is not to be expected that
4. the Master Fund's cash-at-hand will be
5. available to fund the winding up in the Feeder
6. Funds as that cash, as already mentioned, is
7. first pledged to the creditors of the Master
8. Fund which is itself hugely insolvent. There
9. is, moreover, no basis for expecting that BSAM,
10. which sought the appointment of the Joint
11. Voluntary Liquidators, would be prepared to
12. fund their efforts to any further extent,
13. especially because BSAM will itself likely be a
14. target of the investigations to be undertaken.
15. The allegations to be investigated on
16. behalf of the Investors include that BSAM
17. generated and relied upon erroneous Net Asset
18. Value of calculations and that BSAM
19. "warehoused" or "dumped" unrealisable ungraded
20. investments (so-called sub-prime debt) in the
21. Feeder Funds in contravention of the offering
22. memorandum.
23. If such allegations are to be
24. investigated, it is understandable that those
25. having the real economic interest would wish to

## 500

1. be assured that they will be undertaken in an
2. entirely independent, impartial and unfettered
3. manner. And in this regard, the perceptions
4. are as important as the realities.
5. I consider that in all the circumstances
6. of this case, there are proper grounds (within
7. the meaning of the case law) for the removal
8. and replacement of the Joint Voluntary
9. Liquidators.
10. That is the aspect of the relief sought by
11. the Investors in their Ordinary Applications,
12. which I now grant.
13.
14. ----------
15.
16. MR. LOWE: My lord, can I say I'm
17. extremely grateful that your lordship dealt
18. with this at such short notice and under such
19. pressure?
20. We have an application for costs, and the
21. application is an application we make against
22. BSAM and not against other parties. I know
23. your lordship didn't make a finding on
24. paragraph one, but your lordship -- what your
25. lordship said indicates, what we would submit,

## 501

1. that we are here because of BSAM's attempts to
2. keep this and that kind of liquidation that
3. they initiated, and certainly the other relief
4. was opposed by BSAM and it's appropriate,
5. therefore, that they should pay the costs.
6. MR. TURNER: My lord, this question of
7. costs goes on the *Parmalat* matter, and we have
8. a similar type of situation where Dr. Bondi
9. opposed the continuance and office of --
10. THE COURT: PWC, was it?
11. MR. TURNER: -- the provisional
12. liquidators.
13. THE COURT: Yes.
14. MR. TURNER: It was provisional
15. liquidators in that case, my lord. And the
16. provisional liquidators had been appointed *ex*
17. *parte*. The applicants -- the petitioners were
18. actually companies which had been controlled by
19. the same persons, by Mr. Cleaver and
20. Mr. MacRae, who brought the petitions on for
21. hearing, my lord. My firm represented
22. approximately 85 percent of the creditor
23. interests who had become a representative and
24. not for Bondi.
25. THE COURT: This is the Bank of America

## 502

1. and their --
2. MR. TURNER: Bank of America and -- were
3. involved, my lord.
4. THE COURT: Yes.
5. MR. TURNER: They didn't participate on
6. the -- but they certainly attended court. The
7. way it worked out in that, my lord, that there
8. are, in fact, authorities which suggests -- in
9. fact, I think they say, but I don't have them
10. with me today. We might have to come back on
11. this point. And there are authorities which
12. say -- in fact, Mr. Henderson held -- that
13. there should be no impediment for persons
14. coming before the court on a winding up
15. petition. There's a public interest in making
16. sure that every person who has an interest in
17. the outcome of an application that's before the
18. court for winding up, and in this case continue
19. under the supervision of the court, should not
20. feel threatened by a possible punishment by
21. having to get a cost order against the
22. petitioner.
23. The only order for costs which I think can
24. be made in this case, my lord -- there is an
25. outstanding petition which has been brought by

503

1  the voluntary liquidators. The voluntary
2  liquidators sought to have an offer made on
3  that petition. My learned friend intervened.
4  And the way this would -- would normally have
5  worked out, my lord -- and, in fact, I know
6  your lordship has dealt with it very
7  efficiently. It's really to treat his
8  arguments as essentially opposition to the
9  granting of the relief which is to continue the
10 voluntary liquidation as a court supervised
11 liquidation.
12     Now, you've actually -- he's failed on his
13 -- his main -- the main thrust of his argument,
14 which is that there should be no order made on
15 the petition. It seems that your lordship is
16 prepared to make an order on the petition, but
17 your order is to continue the liquidation under
18 court supervision subject to the investors
19 having their choice of liquidator.
20     Now, in that situation, my lord, the
21 parties have attended, Bear Stearns Asset
22 Management, Walkers SPV, the provisional
23 liquidators -- or voluntary liquidators. There
24 shouldn't be an order to pay costs, my lord.
25 All my learned friend can obtain is an order

504

1  against the petitioning companies, the
2  companies in voluntary liquidation which
3  brought the petition. And BSAM is merely a
4  party who came along to express its views to
5  the court as an interested party, and it would
6  be a shareholder or a creditor who may come
7  before the court with any petition. And it
8  would be a very unfortunate precedent, my lord,
9  if this court was to start making orders
10 against parties who put forward submissions
11 which the court didn't agree with on a
12 petition.
13     And that's certainly not the way it was
14 dealt with in the *Parmalat* matter. And there
15 are authorities on this point, my lord, but I
16 don't have them with me and I'm not in a
17 position to refer you to the authority.
18     But from the general principles I've
19 outlined, I think your lordship can understand
20 the nature of the jurisdiction.
21     MR. LOWE: Normally that is the case.
22 This particular creditor called Mr. Lennon as a
23 witness, participated in the production of his
24 witness statement, which was designed to resist
25 paragraph one of the relief, and did a great

505

1  deal more than the average creditor does when
2  they come and express their views to the court.
3  There was, indeed, a great question about
4  whether they were a creditor at all. And their
5  good faith in these proceedings was seriously
6  called into question and that's why they were
7  here.
8      And in those circumstances -- all cost
9  questions are fact sensitive. They always
10 depend on the role that the party plays in the
11 proceedings, and your lordship is best -- best
12 equipped in this case to form a view on the
13 facts rather than by reference to anecdotal
14 cases which don't really bear on any
15 principles. That's really what I propose to
16 say, my lord.
17     MR. MEESON: My lord, can I rise in
18 relation to costs as well because, as a matter
19 of fact, the only reason, in fact, that these
20 proceedings took the court's time at all really
21 was because of the opposition of BSAM.
22 Because, as I indicated to your lordship in our
23 skeleton, we were prepared, given that we'd
24 understood the relief to be unopposed, to
25 accede to a stay of the liquidation. Now, your

506

1  lordship has chosen a different -- slightly
2  different course, but, nevertheless, on behalf
3  of -- perhaps of the estate, before we hand it
4  over, considerable costs have been incurred in
5  relation to this application by the liquidators
6  which your lordship may consider appropriate to
7  be reimbursed by BSAM given that it's really
8  their actions that have caused this time to be
9  taken up, if not in relation to all of the
10 costs relating to the proceedings but perhaps
11 in relation to the actual hearing this week.
12     THE COURT: Thank you.
13     MR. BARRIE: My lord, in relation to my
14 client, I seek an order for costs against the
15 applicants. The position is that the
16 application -- the Ordinary Applications that
17 were filed by the applicants accepted cause
18 even though they were in the petition, and my
19 clients were required to come to court and
20 answer the allegations of bad faith, and, in my
21 submission, the costs should follow the event.
22     MR. TURNER: Your lordship should also
23 bear in mind that there are several hundred
24 thousand dollars still within these companies.
25 So if your lordship were to order costs against

507

```
1    the companies, my learned friend's clients
2    would have ample --
3        THE COURT REPORTER: Sorry. Would have
4    ample?
5        MR. TURNER: -- cash available. Well,
6    that cash is my client's cash in a sense, my
7    lord. But I think the only proper order that
8    can be made, if your lordship is of the view
9    that my learned friend has succeeded in
10   resisting the petition, is to make an award of
11   costs against the petitioner, and they've got
12   cash available to meet that cost order.
13       THE COURT: Well, one thing has been
14   perfectly clear to me in this matter is that
15   the investors have been wronged. My
16   conclusions stop short of a finding that this
17   was deliberately so on the part of Walkers SPV.
18   But it is perfectly clear to me that the
19   directors, specifically at the instigation of
20   BSAM, proceeded with this, with the resolutions
21   to procure the resolutions through the trustee
22   in knowledge of the pending removal petition.
23   That is how this whole thing started, that is
24   why we are here.
25       The fact that I have not acceded to the
```

508

```
1    first limb of the application doesn't mean, in
2    any sense, that the investors have not
3    succeeded in their application. And given the
4    background, the facts to which this -- these
5    proceedings, as Mr. Lowe has said, are
6    sensitive and of which the proceedings and my
7    conclusions must be cognizant, I do not think I
8    can take any other view but that costs must
9    follow the event. And in the circumstances,
10   the protagonists have been the applicants in a
11   real sense and BSAM and Walkers SPV on the
12   other hand.
13       My conclusion is that the costs of the
14   applicants must be paid equally by BSAM,
15   Mr. Turner's clients, and by Mr. Barrie's
16   clients. I make no order of costs in respect
17   of Mr. Meeson's clients.
18       MR. TURNER: Will my learned friend draft
19   an order?
20       MR. LOWE: I'll draft an order for your
21   lordship. Thank you very much again, my lord.
22       THE COURT: Thank you.
23
24   -- Whereupon the case adjourns 4:40 p.m. on Friday,
25   February 22, 2008.
```

509

```
9    Certified correct to the best of our skill and
10   ability, dated the 26th day of February 2008.



            [signature]
            Karen Woon Sam


            [signature]
            Carol Rouse
```